# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **IN RE CATTLE ANTITRUST LITIGATION** | Civil No. 19-cv-1222 (JRT/HB) |
| *This document relates to:*<br><br>ALL CASES | CONSOLIDATED AMENDED<br>CLASS ACTION COMPLAINT |

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................... 1

II.     PARTIES ........................................................................................... 10

    A.    Plaintiffs ................................................................................. 10
    B.    The Tyson Defendants.............................................................. 12
    C.    The JBS Defendants ................................................................. 13
    D.    The Cargill Defendants ............................................................ 14
    E.    The National Beef Defendants .................................................. 15
    F.    Packing Defendants ................................................................. 15
    G.    John Doe Defendants................................................................ 16
    H.    Agents and Affiliates................................................................ 17

III.    JURISDICTION, VENUE AND COMMERCE .................................. 17

IV.     OVERVIEW OF THE FED CATTLE MARKET................................. 20

V.      PACKING DEFENDANTS CONSPIRED TO DEPRESS FED CATTLE
       PRICES ............................................................................................. 27

    A.    Packing Defendants Agreed to Coordinated Slaughter Reductions........... 29
    B.    Packing Defendants Agreed to Slash Cash Cattle Purchases During
         Slaughter Reductions................................................................ 31
    C.    Packing Defendants Coordinated their Procurement Practices for Cash
         Cattle ...................................................................................... 33
    D.    Packing Defendants Uneconomically Imported Foreign Live Cattle to
         Depress Demand for U.S. Fed Cattle ....................................... 42
    E.    Packing Defendants Agreed to Refrain from Expanding Their Slaughtering
         Capacity.................................................................................. 46

VI.     PACKING DEFENDANTS' CONSPIRACY CAUSED THE 2015 PRICE
       COLLAPSE AND SUPPRESSED PRICES THEREAFTER ......................... 48

    A.    Packing Defendants' Conduct Precipitated the Collapse in Fed Cattle Prices
         in 2015 ................................................................................... 48
    B.    Packing Defendants' Ongoing Conduct Continues to Depress Fed Cattle
         Prices ..................................................................................... 55
    C.    Packing Defendants Publicly Affirmed Their Commitment to Supply
         Restraint.................................................................................. 58
    D.    Economic Analysis Supports the Existence of the Alleged Conspiracy..... 60
         1.    Supply and Demand Drivers Do Not Explain the 2015 Price
             Collapse or Subsequent Low Prices................................. 60
         2.    Econometric Analysis Corroborates the Alleged Conspiracy.......... 68
         3.    Other Explanations Proffered for the Drop in Fed Cattle Prices
             Do Not Withstand Scrutiny ............................................. 73

VII.    THE FED CATTLE MARKET IS CONDUCIVE TO COLLUSION............. 74

A. The Fed Cattle Packing Industry Has Experienced High Consolidation and Is Highly Concentrated ................................................................................ 74

B. The Supply of Fed Cattle and Demand for Beef Are Relatively Insensitive to Short-Term Changes in Price ................................................................ 75

C. Fed Cattle Producers Face Significant Market Access Risk ...................... 76

D. There Are Numerous Trade Organizations and Opportunities for Packing Defendants to Meet and Collude ............................................................... 78

E. Packing Defendants Benefit from High Barriers to Entry ......................... 79

F. Packing Defendants Have Similar Cost Structures and Have Significant Oversight of Each Other's Price and Production Decisions ....................... 81

VIII. PACKING DEFENDANTS ARE RECIDIVISTS WITH A HISTORY OF COLLUSION ....................................................................................................... 82

IX. MANIPULATION OF LIVE CATTLE FUTURES AND OPTIONS ............. 84

A. Futures and Options Generally ................................................................... 85

B. Live Cattle Contracts ................................................................................. 86

1. Live Cattle Futures .......................................................................... 87

2. Live Cattle Options ......................................................................... 89

C. Relationship Between Live Cattle Futures and Cattle Spot (Cash) Prices .. 91

D. Packing Defendants Traded CME Live Cattle Futures and Options .......... 96

E. Packing Defendants Directly Caused CME Live Cattle Futures and Options Prices to Be Artificial ................................................................... 99

X. CLASS ACTION ALLEGATIONS ................................................................... 100

XI. STATUTE OF LIMITATIONS AND TOLLING ............................................ 104

XII. CLAIMS FOR RELIEF ..................................................................................... 106

XIII. PRAYER FOR RELIEF .................................................................................... 115

XIV. JURY DEMAND ................................................................................................. 116

Plaintiffs Ranchers Cattlemen Action Legal Fund United Stockgrowers of America, Weinreis Brothers Partnership, Minatare Feedlot, Inc., Charles Weinreis, Eric Nelson, James Jensen d/b/a Lucky 7 Angus, Richard Chambers as trustee of the Richard C. Chambers Living Trust, Steven Graham, and Nathan Graham ("Plaintiffs"), on behalf of themselves and all other similarly situated persons and entities, bring claims against the following for their violations of law from at least January 1, 2015 through the present (the "Class Period"): Tyson Foods, Inc., Tyson Fresh Meats, Inc., JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., Cargill, Incorporated, Cargill Meat Solutions Corporation, Marfrig Global Foods S.A., and National Beef Packing Company, LLC (the "Packing Defendants"), and John Does 1-10 (who traded in cattle futures and options on the Chicago Mercantile Exchange ("CME"), which is owned by the CME Group Inc.) (the "John Doe Defendants") (collectively, the "Defendants").[1]  Based upon personal knowledge, information and belief, and investigation of counsel, Plaintiffs allege as follows:

## I.    INTRODUCTION

1.    This action challenges Packing Defendants' conspiracy to suppress the price of fed cattle that they purchased in the United States, from at least January 1, 2015 through the present.  Packing Defendants' coordinated conduct, including slashing their respective slaughter volumes and curtailing their purchases of fed cattle in the cash cattle market, precipitated an unprecedented collapse in fed cattle prices in 2015.  Packing Defendants

---

[1]    Plaintiffs reserve the right to amend their Complaint once the identities of any further alleged conspirators are established.

then continued to suppress the price of fed cattle through coordinated procurement practices and periodic slaughter restraint.   Packing Defendants' conspiracy – which is confirmed by witness accounts, trade records, and economic evidence – impacted both the physical fed cattle market and the market for live cattle futures and options traded on the CME.

2.      Fed cattle are steers and heifers raised and fed for the production and sale of high quality beef products.  Packing Defendants are beef packers who purchase fed cattle from Plaintiffs and the Producer Class (defined below) for slaughter.  Packing Defendants then process the resulting carcasses into beef for sale to other processers, wholesalers, and retail outlets.  Live cattle futures contracts are standardized contracts traded on the CME in which the contract buyer agrees to take delivery, from the seller, of a specific quantity of fed cattle, at a predetermined price on a future delivery date.

3.      Packing Defendants control the U.S. market for the purchase of slaughter-weight fed cattle.  Following a series of mergers and acquisitions, beginning in the 1980s and culminating in 2013, Packing Defendants have purchased and slaughtered between 81 and 89% of all fed cattle sold within the United States on an annual basis.  Figure 1 demonstrates Packing Defendants' overwhelming share of the market for the purchase of fed cattle:

**Figure 1.  Packing Defendants' Share of Annual U.S. Fed Cattle Slaughter Volumes**[2]



4.      Packing Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef. As the supply of fed cattle is insensitive to short-term changes of price – owing to the long life cycle of fed cattle, their perishable nature, and their lack of any alternative use – and as beef demand is relatively insensitive to changes in price, the meat margin is very sensitive to changes in aggregate industry slaughter levels.   Consequently, Packing Defendants can increase the meat margin, and thus their profitability, by working

---

[2]      Cattle Buyers Weekly, "Steer And Heifer Slaughter Market Share", http://www.cattlebuyersweekly.com/users/rankings/packerssteerheifer.php   ("CBW Market Share").  Unless otherwise indicated, all websites cited in this Complaint were last accessed on April 15, 2019.

cooperatively to reduce their respective slaughter volumes, thereby depressing the price of fed cattle.

5.    Packing Defendants procure about 70% of their fed cattle though alternative marketing agreements ("AMAs"), such as "formula" and "forward" contracts.  Under these contracts, the producer agrees to deliver its cattle to a Packing Defendant once they have reached slaughter-weight at a price to be determined at or around the time of delivery.  The price formulas used by formula contracts typically incorporate reported prices of fed cattle sold in the weekly cash cattle trade, the industry's spot market.  The price formulas used by forward contracts incorporate live cattle futures prices, which, in turn, are directly impacted by reported cash cattle prices.  As a result, the prices paid for fed cattle in the cash cattle trade – which constitutes a mere 20-25% of all fed cattle sold in the United States – determines the price of almost all fed cattle bought by Packing Defendants.

6.    Against this backdrop, fed cattle prices increased steadily between 2009 and 2014 in response to strong beef demand and a shortage of fed cattle following the droughts of 2011 through 2013.  After prices peaked in November 2014, the industry expected the price of fed cattle to stabilize in 2015 and continue at or around that level for a number of years.

7.    This widely predicted price stability did not occur.  Instead, Packing Defendants used their market power, price sensitivities, and the thin cash cattle trade to their advantage and embarked upon a conspiracy to depress fed cattle prices.  Their conspiracy to reduce fed cattle prices, and thereby increase the meat margin, was carried out through the following coordinated conduct: (1) Packing Defendants periodically

4

reduced their slaughter volumes so as to reduce demand for fed cattle; (2) Packing Defendants curtailed their purchase and slaughter of cash cattle during those same periods; (3) Packing Defendants coordinated their procurement practices for cash cattle; (4) Packing Defendants imported foreign cattle at a loss so as to reduce domestic demand; and (5) Packing Defendants, simultaneously, closed and idled plants.

8.      Packing Defendants' conspiracy succeeded in precipitating an unprecedented collapse in fed cattle prices in the second half of 2015, and continued to suppress fed cattle prices thereafter:

**Figure 2.  Fed Cattle Prices vs. Retail Beef Prices**



9.      As can be seen from the foregoing graphic, despite the drastic collapse in fed cattle prices caused by Packing Defendants' conspiracy, Packing Defendants and their

wholesale customers continued to benefit from record beef prices.  This disconnect allowed

Packing Defendants to reap record per-head meat margins during the Class Period at the

expense of fed cattle producers, as illustrated in the chart below:

**Figure 3.  Weekly Packer Per-Head Meat Margin (1,400 lb. Avg. Live Steer 65-80% Choice; 875 lb. Avg. Dressed Carcass)**[3]



10.     Witness accounts, trade records, and economic evidence confirm that

Packing Defendants agreed to depress the price of fed cattle bought during the Class Period.

---

[3]     Table prepared using USDA Market News Service Reports: 5-Area Weekly Live Steer Price per CWT (LM_CT150), National Weekly Boxed Beef Cutout and Boxed Beef Cuts - Negotiated Sales (LM_XB459) and By-Product Drop Value data available here: https://marketnews.usda.gov/mnp/ls-report-config.

11.     To begin with, a confidential witness previously employed by a Packing Defendant ("Witness 1"), confirmed that Packing Defendants expressly agreed to periodically reduce or restrain their respective slaughter volumes so as to reduce demand for fed cattle.   Transaction data and slaughter volume records reported by Packing Defendants and published by the United States Department of Agriculture ("USDA") – as well as Packing Defendants' public calls for slaughter and capacity reductions – further corroborate Witness 1's account.

12.     The same data demonstrate that Packing Defendants drastically reduced their purchases of cash cattle during these periods of slaughter restraint.   Packing Defendants did so in an attempt to "back-up" (that is, create a glut in) the number of slaughter-ready cash cattle and encourage producers to accept lower prices for their highly perishable product.   Doing so not only dropped cash cattle prices, but also the prices paid under Packing Defendants' formula and forward contracts.   Once Packing Defendants had broken the cash cattle trade and created a relative supply glut, Packing Defendants collectively ramped up their cash cattle purchases and reaped supra-competitive profits at the expense of the producers.

13.     In addition, Packing Defendants also engaged in various collusive bidding practices that further suppressed prices.   In particular, Packing Defendants enforced, through threat of boycott, an antiquated "queuing protocol" which significantly limited cash cattle sellers' ability to generate price competition among Packing Defendants. Packing Defendants also typically conducted all, or substantially all, of their weekly cash cattle purchasing during a short 30- to 60-minute window late on Friday, and would adhere

7

to the price established by the Packing Defendant that had opened the weekly cash cattle trade.  The bidding practices of Packing Defendants differed from the practices of regional packers (a small percentage of the fed cattle purchasers), which bid on and purchased cash cattle throughout the week during the Class Period.

14.     Packing Defendants employed other procurement methods to depress the cash cattle price reports incorporated directly into their formula contracts and indirectly into their forward contracts.  In particular, import data show that Packing Defendants continued importing large numbers of live cattle for slaughter from Canada and Mexico, even after it became uneconomical for them to do so.  Such conduct would not have been economically rational but for Packing Defendants' agreement to curtail their domestic cash cattle purchases.

15.     Finally, Packing Defendants' closure and idling of certain plants immediately prior to and during the Class Period is strongly suggestive of an agreement amongst Packing Defendants to reduce or restrain their respective slaughter capacities so as to limit competition for the available supply of fed cattle.

16.     All of this conduct occurred in a market that is highly conducive to collusion for numerous reasons including: the small number of big market beef packers, the high barriers to entry, and frequent, easily accessible means of communications among Packing Defendants.  In relation to the latter, Packing Defendants' field buyers had ample opportunity to meet and exchange commercially sensitive information with each other each

week as they inspected feedlots within their respective territories.[4]  Field buyers routinely communicated "market color" obtained from the field – including reports of their competitors' activities obtained from producers – back to their head office and their firms' other field buyers through daily conference calls.  Packing Defendants were also members of various trade and industry organizations, which provided additional opportunities to conspire.

17.    The economic facts further support the existence of the alleged conspiracy. Plaintiffs' economic analysis shows that:

a.    Supply and demand drivers of fed cattle prices, and other commonly proffered explanations, do not explain the 2015 collapse in fed cattle prices or the low prices that have prevailed since then; and

b.    Fed cattle prices have been artificially depressed by an average of 7.9% in the three years since January 2015.

18.    As a result of Packing Defendants' misconduct, Plaintiffs and other producers who sold fed cattle to Packing Defendants (the "Producer Class") received significantly lower prices for their cattle than they would have in a competitive market, and purchasers of live cattle futures and options (the "Exchange Class"), including certain Plaintiffs, suffered significant harm as a result of the same.

---

[4]    A feedlot is a plot of land on which cattle are fed intensively so as to reach slaughter weight.

## II.   PARTIES

### A.   <u>Plaintiffs</u>

19.    Plaintiff Ranchers Cattlemen Action Legal Fund United Stockgrowers of America ("R-CALF USA") is a non-profit public benefit corporation existing under the laws of the State of Montana, and has its principal place of business in Billings, Montana. It is the largest cattle producer-only based membership trade organization, and works to "address the market interest of U.S. cattle producers with the primary purpose of addressing the threats posed to the domestic live cattle industry by unfair and illegal trade practices and imports."[5]  Its members include fed cattle producers who sold fed cattle to Packing Defendants and individuals who transacted cattle futures and options on the CME during the Class Period.

20.    R-CALF USA has standing to bring this action pursuant to established Supreme Court precedent for: (a) declaratory and injunctive relief in a representative capacity on behalf of its members, who are adversely affected by Packing Defendants' misconduct described herein and whose participation is not required for the declaratory and injunctive relief sought; and (b) damages in its personal capacity for that same misconduct, which has frustrated its mission to protect the interest of its members, and diverted R-CALF USA's resources to help its members mitigate damages and prevent further breaches of the law by Packing Defendants. *United Food & Commer. Workers*

---

[5]    R-CALF USA Amended Articles of Incorporation dated April 21, 2009, Art. VI.

*Union Local 751 v. Brown Group*, 517 U.S. 544, 553 (1996) and *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

21.     Plaintiff Weinreis Brothers Partnership ("Weinreis Brothers") is a general partnership organized under the laws of the State of North Dakota, and has its principal place of business in Scottsbluff, Nebraska.

22.     Plaintiff Minatare Feedlot Inc. ("Minatare") is a Nebraska corporation with its principal place of business located at Scottsbluff, Nebraska.

23.     Plaintiff Charles "Chuck" Weinreis ("Weinreis") is an individual, a partner of Weinreis Brothers, president of Minatare, and a sole proprietor with a principal place of business in Scottsbluff, Nebraska.

24.     Plaintiff Eric Nelson ("Nelson") is an individual and sole proprietor with a principal place of business in Moville, Iowa.

25.     Plaintiff James "Jim" Jensen d/b/a Lucky 7 Angus ("Lucky 7 Angus") is an individual and sole proprietor with a principal place of business in Riverton, Wyoming.

26.     Plaintiff Richard "Rick" Chambers ("Chambers") is the trustee of the Richard C. Chambers Living Trust ("Chambers Trust"), a trust organized under the laws of the State of Kansas, with a principal place of business in Hays, Kansas.  Chambers is also a beneficiary of the Chambers Trust.

27.     Plaintiffs Steven Graham and Nathan Graham own a cattle feeding business with a principal place of business in Cherokee, Iowa.  Steven Graham operated the business as a sole proprietor until in or around 2018.  Beginning in or around 2018 Steven Graham operated the business in partnership with Nathan Graham.  The Graham's feedlot at times

conducted business under the name "Graham Feedlot."  Steven Graham, Nathan Graham, and the Graham Feedlot are collectively referred to herein as "the Grahams."

28.     During the Class Period, the Weinreis Brothers, Minatare, Weinreis, Nelson, Lucky 7 Angus, Chambers as trustee of the Chambers Trust, and the Grahams (the "Producer Plaintiffs") each sold fed cattle directly to one or more of the Packing Defendants, and Weinreis Brothers, Weinreis, Nelson, Lucky 7 Angus, Chambers as trustee of the Chambers Trust, and Steve Graham (the "Exchange Plaintiffs) each transacted live cattle futures and/or options on the CME.

29.     As a consequence of the conduct described in this Complaint:

a.      Producer Plaintiffs suffered damages in that they received less for their sales of fed cattle to Packing Defendants than they would have in the absence of the breaches of the law alleged herein; and

b.      Exchange Plaintiffs suffered damages from a manipulated live cattle futures and options market.  Exchange Plaintiffs suffered monetary losses by transacting in live cattle futures and options at artificial prices directly resulting from Packing Defendants' conduct, including their suppression of fed cattle prices.

**B.     The Tyson Defendants**

30.     Defendant Tyson Foods, Inc. ("Tyson Foods") is a Delaware corporation with its principal place of business located at 2200 Don Tyson Parkway, Springdale, Arkansas 72762.

31.     Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh Meats") is a wholly owned subsidiary of Tyson Foods.  Tyson Fresh Meats is a Delaware corporation with its principal place of business located at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049.

32.     Defendants Tyson Foods and Tyson Fresh Meats are referred to collectively herein as "Tyson" or the "Tyson Defendants".

33.     During the Class Period, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of both Classes in the United States and in this District.

C.     **The JBS Defendants**

34.     Defendant JBS S.A. ("JBS") is a Brazilian corporation with its principal place of business located at Av. Marginal Direta do Tiete, 500 Bloco 3-3o. andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil.

35.     Defendant JBS USA Food Company ("JBS USA") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634.

36.     Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634.

37.     Defendant JBS Packerland, Inc. ("JBS Packerland") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634.

38.     Defendants JBS USA, Swift, and JBS Packerland were, throughout the Class Period, wholly-owned, direct or indirect subsidiaries of JBS.  Defendants JBS, JBS USA, Swift, and JBS Packerland are referred to collectively herein as "JBS" or the "JBS Defendants."

39.     During the Class Period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of both Classes in the United States and in this District.

**D.     The Cargill Defendants**

40.     Defendant Cargill, Incorporated ("Cargill") is a Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391.

41.     Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) ("Cargill Meat"), a subsidiary of Cargill, is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202.

42.     Defendants Cargill and Cargill Meat are referred to collectively herein as "Cargill" or the "Cargill Defendants."

43.     During the Class Period, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of both Classes in the United States and in this District.

E.     **The National Beef Defendants**

44.     Defendant Marfrig Global Foods S.A. ("Marfrig") is a Brazilian corporation with its principal place of business at Av. Queiroz Filho, 1560 Sabia Tower, 3rd Floor, Vila Hamburguesa, Sao Paulo, SP 05319.   Marfrig is a meatpacking conglomerate with operations around the world and, since June 2018, owns a controlling interest in National Beef Packing Company, LLC.[6]

45.     Defendant National Beef Packing Company, LLC ("National Beef Packing") is a Delaware limited liability company with its principal place of business located at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163.

46.     Marfrig and National Beef Packing are referred to collectively herein as "National Beef" or the "National Beef Defendants."

47.     During the Class Period, the National Beef Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of both Classes in the United States and in this District.

F.     **Packing Defendants**

48.      During the Class Period, each Packing Defendant purchased fed cattle in the United States.  In 2017, Tyson, JBS, Cargill, and National Beef accounted for 26%, 21%,

---

[6]     "Marfrig Concludes Acquisition of National Beef," Marfrig (Jun. 6, 2018), http://www.marfrig.com.br/en/documentos?id=780; Jefferies Financial Group Inc., Annual Report, (Form 10-K) (Jan. 10, 2019) ("Jefferies 2018 Annual Report"), at 6.  After the acquisition, National Beef Packing's previous majority shareholder, Jefferies Financial Group Inc., retained a 31% interest in National Beef.

22%, 12.5% of the total U.S. fed cattle slaughter, respectively.[7]  In their 2017 fiscal years,

Tyson, JBS, Cargill, National Beef had approximately $14.5 billion, $13.4 billion, $13.1

billion, $7.34 billion, in sales in their respective beef segments.[8]

49.     During the Class Period, each Packing Defendant exploited the relationship

between physical cash cattle and the CME live cattle market and transacted in cattle futures

and/or options at prices that they had suppressed.

50.     Each Packing Defendant was a co-conspirator with the other Packing

Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the

United States and in this District.

### G.     John Doe Defendants

51.      John Doe Defendants are those packing firms, financial institutions, and/or

trading firms that participated in the manipulation of the live cattle futures and options

market, as described herein.  The identity of individuals and firms that trade CME futures

and options is anonymous and not available to the public.  Plaintiffs will be able to identify

the John Doe Defendants through discovery of trading records in possession of the CME

Group Inc. that it is required to maintain under the Commodity Exchange Act ("CEA")

---

[7]     CBW Market Share.

[8]     Jefferies 2018 Annual Report at 38; National Cattlemen's Beef Association,
"Directions statistics" (2008), at 2,
http://www.beefusa.org/CMDocs/BeefUSA/Publications/CattleFaxSection.pdf; Cattle
Buyers Weekly, "Top 30 Beef Packers 2018,"
http://www.cattlebuyersweekly.com/users/rankings/beefpackers2018.php (last accessed
Apr. 15, 2019).

including, but not limited to, Order Entry Operator identifications, Tag 50 IDs, User Assigned IDs, and Clearing Information.

### H.    Agents and Affiliates

52.    "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, and directors.

53.    Whenever reference is made to any act, deed, or transaction of any corporate group, corporation, or partnership, the allegation means that the corporate group, corporation, or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parents, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

## III.    JURISDICTION, VENUE AND COMMERCE

54.    This action arises under Section 1 of the Sherman Act (15 U.S.C. §1), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), Sections 202 and 308 of the Packers & Stockyards Act (7 U.S.C. §§192, 209), and Sections 2(a), 6(c) and 22 of the Commodity Exchange Act (7 U.S.C. §1 *et. seq*).   The action is for injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorneys' fees.

55.    This Court has federal question subject matter jurisdiction under 28 U.S.C. §§1331, 1332(d), and 1337, Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), and Section 22 of the Commodity Exchange Act (7 U.S.C. §25).   The Court has

supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiffs' claims brought under State law.

56.     Venue is proper in this District under 15 U.S.C. §§15 and 22 and 28 U.S.C. §1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District, including:

   a.     Cargill is domiciled in this District;

   b.     Packing Defendants purchased fed cattle owned or located in this District,[9] including from members of the Class;

   c.     Packing Defendants processed the resultant beef at plants located in this District and/or sold resultant beef products to customers located in this District.[10]

57.     The conduct detailed in ¶56 furthered Defendants' conspiracy to profit from the violations of law alleged herein.

---

[9]     The 2017 USDA Census of Agriculture records that approximately 1.4 million beef cattle were sold from Minnesota farms in 2017.  See USDA, "Census of Agriculture", Volume 1, Chapter 1: State Level Data: Minnesota, Table 16, https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_State_Level/Minnesota/st27_1_0015_0016.pdf. *See* also American Angus Association, "Feedlots", https://www.angus.org/Commercial/Links/CommFeedlotRpt.aspx#MN.
[10]    Specifically, Cargill operated a protein processing plant in Albert Lea, Minnesota, which processed beef during the Class Period.

58.     Defendants' conspiracy and conduct were within the flow of, were intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States. During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal scheme.

59.     This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, is located, or its co-conspirators committed overt acts in furtherance of the illegal conspiracy and manipulation of the cattle futures and options market, in the United States, including in this District. Defendants should, therefore, have foreseen the possibility of being brought before this Court to answer for any illegal acts related to their business conducted here.

60.     The Court has personal jurisdiction over all non-resident Defendants under Minnesota's long-arm statute, Minn. Stat. §543.19, because each such Defendant: (a) owns, possesses, or uses real or personal property in Minnesota; (b) transacts business within Minnesota; (c) commits acts in Minnesota causing injury or property damage; and/or (d) commits acts outside Minnesota causing injury or property damage within Minnesota. Moreover, Minnesota has a substantial interest in providing a forum and the burden placed on Defendants by being brought under the state's jurisdiction does not violate fairness and substantial justice.

61.     During the Class Period, all Defendants, both foreign and domestic, engaged in conduct within the United States related to Plaintiffs' allegations.   Defendants' misconduct was purposefully directed at the United States and was specifically intended to affect the prices of fed cattle bought within the United States and live cattle futures and

options transacted by the Defendants with U.S. counterparties. Defendants' acts were acts in furtherance of the conspiracy that, because they occurred in the United States by Defendants' domestic entities, provide specific personal jurisdiction over all conspirators.

62. The conspiracy and the overt acts taken in furtherance of it, were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

63. As members of the conspiracy, foreign-based Defendants are liable for acts taken in furtherance of the conspiracy by domestic Defendants, as well as their own actions taken in the United States, and personal jurisdiction attaches, regardless of whether some portion of the conduct in furtherance of the conspiracy might have occurred overseas.

## IV.   OVERVIEW OF THE FED CATTLE MARKET

64. In 2017, 25.8 million fed cattle were slaughtered and processed into beef products, accounting for 80% of the 32.2 million commercial cattle slaughtered across the United States.[11]

65. The cattle production cycle, running from birth to slaughter, typically ranges between 15 to 24 months, and is the longest of all animals typically raised for meat. Fed cattle availability varies seasonally, with supplies being more plentiful over the summer months owing to the fact that the majority of calves are born in the spring.

---

[11] The remaining volume comprised slaughter cows (female cattle that have birthed a calf) and bulls, whose meat is typically used for lesser quality beef products such as hamburger patties. "2017 Meat & Poultry Facts, 46th Ed.," NORTH AMERICAN MEAT INSTITUTE, 2018, at 11 ("2017 Meat & Poultry Facts").

66.    Fed cattle progress through three interrelated sectors prior to slaughter: cow/calf; stocking and background; and feedlots, as detailed in Figure 4 below.

**Figure 4.  Cattle and Beef Industry from Breeding to Consumption**[12]



67.    Once cattle reach between around 950 and 1,500 pounds they are marketed, transported to, and slaughtered at a packing plant operated by a beef packer such as Packing Defendants.  Packing Defendants process the carcasses into various primal cuts that are then vacuum-packed and boxed for sale to customers of "boxed beef" who process it into

---

[12]    U.S. Gov't Accountability Off., GAO-18-296, U.S. Department of Agriculture: Additional Data Analysis Could Enhance Monitoring of U.S.  Cattle Market (Apr. 2018) ("2018 GAO Report"), at 6, https://www.gao.gov/assets/700/691178.pdf.

cuts that are ultimately sold to consumers at retail, restaurants, and other foodservice operations.  Customers of boxed beef include foodservice companies such as Sysco and US Foods and large retailers such as Costco and Sam's Club.  Boxed beef is a commodity product, and competition to sell boxed beef is primarily on price as between boxes of equivalent USDA quality and yield grades.[13]  Packing Defendants also process boxed beef in-house, and sell case-ready beef and other value added products (*e.g.*, sausages) directly to retailers, restaurants, hospitals, and others at a premium over boxed beef prices.  Certain customers will purchase both boxed beef and processed products from Packing Defendants.

68.     As a perishable product, the majority of beef sold domestically is sold on short-term contracts.  Certain large purchasers, such as Walmart or national restaurant chains like Outback Steakhouse, purchase some of their beef on "forward" contracts (pursuant to which beef is sold 22 days or more prior to delivery) and other long-term supply agreements.

69.     Each Packing Defendant operates a live cattle procurement team, run by a head buyer, who is supported by a number of "field buyers" who are responsible for stated territories.  Field buyers acquire cattle from feedlots situated inside their territory.  They conduct negotiations directly with the fed cattle producers and their agents within the parameters set by their head buyer.[14]

---

[13]     Amended Complaint, ¶ 24, *U.S. v. JBS SA* (N.D. Ill., Eastern Division) (08-cv-05992), filed on November 7, 2008 ("*U.S. v. JBS* Amended Complaint").

[14]     Producers commonly delegate authority for marketing their cattle to the commercial feedlot which has fed their cattle or to third-party marketing cooperatives.  A small portion of the fed cattle sales to Packing Defendants also occur at public auctions.

70.     Each Packing Defendant seeks to procure sufficient fed cattle to operate its slaughter plants at its chosen utilization rates without interruption.  Weekly plant capacity is determined not only by plant size, but by the number and length of shifts run in a given week.  Packing Defendants' average cost of production increases if they underutilize their plant capacity.  Thus, it is in the individual interest of each Packing Defendant to make sure that it has timely access to sufficient fed cattle to run its plants efficiently.

71.     Prior to the consolidation of the beef packing industry, almost all fed cattle was sold through the "cash" or "negotiated" cattle trade:[15] meat packers' buyers went to feedlots and auctions and paid a cattle price set each day at the dollar mark where supply and demand met.

72.     However, by 2015, the cash cattle trade had been drastically thinned, and now accounts for only 20-25% of national fed cattle sales.[16]  Despite this, the cash cattle trade remains the industry's price discovery mechanism and continues to determine the price of the nearly 71% of fed cattle bought pursuant to "formula" or "forward" contracts.  Under these agreements, commonly referred to as "captive supply" agreements, producers commit to deliver their cattle to a packer once they have obtained slaughter-weight at a price to be determined at or around the point of delivery pursuant to an agreed-upon formula.

---

[15]     For the avoidance of doubt, Plaintiffs do not allege that there are separate or sub-markets in the U.S. product market for the purchase of fed cattle, whether demarcated by contracting type or otherwise.

[16]     A by-region breakdown of these figures appears in Appendix 1.

**Figure 5.  USDA Records of Fed Cattle Procurement Methods – U.S. – 2005 to 2018**[17]



73.     The price of cattle delivered under formula contracts is determined by reference to a stipulated measure of cash cattle prices at, or just prior to, the date of delivery. These contracts commonly incorporate a specified average cash price reported by the USDA Agricultural Marketing Service's ("AMS") Livestock Mandatory Reporting's ("LMR") cattle transaction price summaries.[18]   Moreover, the price of cattle delivered under forward contracts is typically established by reference to the price of the live cattle

---

[17]     Under negotiated grid contracts the seller and buyer negotiate a base price, which is then raised or lowered through the application of premiums or discounts after slaughter based on carcass performance.  Negotiated grid contracts' base prices tend to move in parallel with cash cattle prices.

[18]     These price series collate the information Packing Defendants and others are required to submit to the USDA on a daily and weekly basis regarding their live cattle purchases and deliveries pursuant to the Livestock Mandatory Reporting Act of 1999.  The Act imposes similar reporting obligations upon packers in relation to their boxed beef sales.

futures contract settling in the month of or adjacent to the expected delivery date.  As explained in Section IX, the price of live cattle futures contracts is directly impacted by current and expected cash cattle prices.  Thus, the price of cash cattle sets or drives the price of the bulk of Packing Defendants' fed cattle purchases, despite constituting only a small percentage of total fed cattle purchases.[19]

74.   Each Packing Defendant uses captive supply agreements for the bulk of its procurement needs.  This has both incentivized and facilitated Packing Defendants' suppression of cash cattle prices.  The greater a Packing Defendant's supply of captive cattle, the less reliant it becomes on participating in the cash cattle trade to procure sufficient cattle to operate its slaughter plants at its chosen utilization rates.  This, in turn, allows a Packing Defendant to abstain from purchasing cash cattle when it regards market prices to be too high.  All things being equal, a reduction in demand for cash cattle results in a drop in cash cattle prices, as producers are forced to lower their asking price in order to attract a buyer willing to purchase and slaughter the producer's perishable product (See section VII(C) below).  And because cash cattle prices are used to set the prices paid under formula contracts and directly impact the live cattle futures prices incorporated into forward agreements, a reduction in cash cattle prices reduces the price paid by Packing Defendants for cattle bought on such contracts.

---

[19]   The base prices used in negotiated grid contracts are also impacted by changes in cash cattle prices.

75.      As the cost of fed cattle constitutes the majority of their costs of production,

Packing Defendants' profitability is driven by the "meat margin," which is the spread

between the price packers pay for fed cattle and the price they charge for beef.[20]  The meat

margin is very sensitive to changes in industry aggregate slaughter levels, and Packing

Defendants can, through cooperation, increase it.   As noted by the U.S. Department of

Justice ("DOJ"), "all else being equal, when the meat packing industry reduces production

levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are

demanded and customers pay more for [beef] because less is available for purchase.

Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-

term changes in price, even small changes in industry production levels can significantly

affect packer profits."[21]   As a result of these sensitivities, Packing Defendants can improve

their profitability by coordinating their respective slaughter levels at or below the

prevailing supply of slaughter-weight fed cattle.

76.      The fed cattle market itself is highly concentrated.   In fact, during the Class

Period, Packing Defendants have collectively purchased and slaughtered between 81 to

---

[20]      Jeffries 2018 Annual Report, at 38 ("National Beef's profitability is dependent, in
large part, on the spread between its costs for live cattle, the primary raw material for its
business, and the value received from selling boxed beef and other products, coupled with
its overall volume.").

[21]      *U.S. v. JBS* Amended Complaint, ¶ 26-27.  *See also* Section VII(B) below regarding
the elasticities of fed cattle and beef.

85% of the 23 to 27 million fed cattle slaughtered in the United States annually.[22]  *See* Figure 1 above.

77.     During this same period, Packing Defendants' respective shares of annual fed cattle slaughter volumes have remained stable despite any yearly variation in slaughter numbers.  *See* Figure 1 above.  The remainder of the U.S.'s fed cattle slaughter capacity is predominately provided by regional independent packing businesses such as Greater Omaha and Nebraska Beef, which typically only operate one plant ("Regional Packers").[23]

## V.    PACKING DEFENDANTS CONSPIRED TO DEPRESS FED CATTLE PRICES

78.     Fed cattle prices increased consistently from 2009 through 2014, peaking in November 2014 at approximately $170 per hundredweight ("CWT").[24]  Market analysts, such as the USDA Economic Research Service, predicted that the price levels established in 2014 would continue for a number of years before experiencing a gradual decline.[25]

---

[22]    2017 Meat & Poultry Facts at 11; CBW Market Share.

[23]    Lee Schulz, *et al.*, "Economic Importance of Iowa's Beef Industry," IOWA STATE UNIVERSITY (Dec. 2017), https://store.extension.iastate.edu/product/Economic-Importance-of-Iowas-Beef-Industry; and CBW Market Share.

[24]    Cattle are typically priced on a live-weight basis (the price per CWT applied to the live-weight of the animal prior to slaughter, typically immediately prior to delivery) or a carcass-weight or "dressed" basis (the price per CWT applied to the animal once "dressed," *i.e.*, slaughtered with its head, hide, and internal organs removed).  References to fed cattle prices in this Complaint are on a live-weight basis unless otherwise stated.  Live-weight and carcass-weight prices typically move together, as both are based on the expected value of the cattle once slaughtered.

[25]    U.S. Dep't of Agric., OCE-2015-1, Off. of the Chief Economist: USDA Agricultural Projections to 2024, Interagency Agricultural Projections Committee (February 2015) at 81,

Some forecasters even foresaw no drastic change from 2014 prices "barring any outside market shocks like drought or a U.S. economic recession."[26]

79.    While Packing Defendants initially benefited from the rise in fed cattle prices because wholesale beef prices rose in parallel, the meat margin fell to a low of approximately $50 in the months leading up to 2015, sending the packers' margins into the red.

80.    In response, Packing Defendants commenced and/or accelerated their conspiracy to depress and stabilize the price of fed cattle purchased in the United States. The core of their collusion was an agreement to reduce and then manage their respective slaughter volumes: a classic abuse of monopsony, or unfair buying power.  Packing Defendants implemented their conspiracy, by, among other conduct, agreeing to: (1) periodically restrain or reduce slaughter numbers so as to reduce demand for fed cattle; (2) curtail their purchases of cash cattle during these periods; (3) coordinate their procurement practices with respect to the cash cattle they did in fact purchase; (4) import foreign cattle to depress demand for cheaper domestic cattle; and (5) close or idle slaughter plants and refrain from expanding their remaining slaughtering capacity.

---

https://www.usda.gov/oce/commodity/projections/USDA_Agricultural_Projections_to_2024.pdf.

[26]    "Livestock Monitor, A Newsletter for Extension Staff," LIVESTOCK MARKETING INFORMATION CENTER, STATE EXTENSION SERVICES IN COOPERATION WITH USDA (Jan. 12, 2015), at 2; and "CattleFax Predicts Strong Prices to Remain in 2015," AGWEB (Feb. 6, 2015), https://www.agweb.com/article/cattlefax-predicts-strong-prices-to-remain-in-2015-naa-news-release/ ("Analyst[s] . . . expect fed cattle prices averaging in the mid-$150s [per CWT in 2015], slightly higher than last year.  Prices will trade in a range from the near $140 [per CWT] in the lows to near $170 [per CWT] in the highs in the year ahead.").

A.     **Packing Defendants Agreed to Coordinated Slaughter Reductions**

81.     As confirmed by a former employee, Packing Defendants agreed to implement periodic kill reductions in response to actual or anticipated rises in fed cattle prices during the Class Period.  Witness 1 was employed as a quality assurance officer at one of Packing Defendant's slaughter plants ("Slaughter Plant 1") for over 10 years until his employment ceased in 2018.

82.     Witness 1 explained that a senior operations manager from Slaughter Plant 1 told him on multiple occasions that Packing Defendants had agreed to collectively reduce their slaughter volumes in response to rising fed cattle prices, and that, as a consequence, Slaughter Plant 1 would reduce its slaughter volumes and procurement of cattle.  Witness 1 stated that this agreement was in effect in 2015.

83.     Witness 1 understands that the senior operations manager, who was a former employee of another Packing Defendant, had first-hand knowledge of Packing Defendants' anticompetitive agreement.   In addition to discussing Packing Defendants' collusive slaughter reduction, the senior operations manager provided Witness 1 with detailed information as to the current and future operations of packing plants operated by other Packing Defendants.

84.     Witness 1 stated that the purpose of the agreed slaughter reductions was to force cattle producers (in particular, cash cattle producers) to feed their cattle for longer periods, and in doing so, create a condition of oversupply that would encourage producers to either accept lower cash prices for their cattle or commit their cattle in advance on captive supply agreements.  Put another way, by creating and encouraging an apprehension

29

amongst producers that they might not be able to "get their cattle dead," Packing Defendants sought to increase their collective leverage over producers.  As Witness 1 noted, once cattle are fed beyond their ideal slaughter-weight, producers face increasing "pressure to drop their prices in order to get rid of their [perishable] cattle."

85.    Witness 1 explained that the extent of the slaughter reduction varied from plant to plant, depending upon, among other things, their slaughter capacity and the supply of fed cattle in the surrounding region.  Witness 1 stated that Slaughter Plant 1 had a 6,000 head per day slaughtering capacity and might drop its kill level back to around 5,000 heads per day when implementing Packing Defendants' agreement.  Other slaughter plants appear to have implemented Packing Defendants' agreement through planned and unplanned maintenance shutdowns.

86.    Witness 1 also stated that Packing Defendants' agreement extended to proportionate slaughter reductions designed to suppress seasonal rises in fed cattle prices, such as those traditionally experienced in the late winter/early spring, and in the fall.[27]

---

[27]    The Packing Defendants' reduction in slaughter volumes during these periods has not gone unnoticed across the industry.  *See, e.g.*, Cassie Fish, "And the Beat Goes On," THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/.  ("Packers also know that February is typically the lightest slaughter month and even though they are killing more cattle than a year ago – some plant 'dark days' began yesterday as plans to keep the balance between supply and demand are paramount.  Some plants will undertake maintenance or upgrade projects and some will honor holidays such as Monday's President's Day.  Others will pull back hours to 36-hour work week.").

## B.   Packing Defendants Agreed to Slash Cash Cattle Purchases During Slaughter Reductions

87.     To place further pressure on cattle prices, Packing Defendants also agreed to drastically reduce their purchase of cash cattle during periods of agreed slaughter reduction or restraint.   When doing so, Packing Defendants could still obtain the cattle needed to satisfy their curtailed kill numbers by leaning upon their own cattle and cattle deliverable under previously-agreed formula and forward contracts.[28]   And, because Packing Defendants had successfully thinned the cash cattle trade in the decade preceding 2015, even small reductions in their cash cattle purchases had an outsized impact on cash cattle demand.   For example, and as detailed in section VI(A) below, the 7% year-on-year decline in slaughter volumes witnessed across the second and third quarters of 2015 was driven by a 22% year-on-year decline in the slaughter of cash cattle.

88.     By reducing their purchases of cash cattle, Packing Defendants sought to reduce the price of all cattle by utilizing the link between cash cattle prices and the prices paid under formula and forward contracts.   As noted above, by reducing their cash cattle purchases for a period of weeks or months, Packing Defendants could "back-up" the

---

[28]     Until recently, Defendants JBS and Cargill owned two of the nation's largest feedlot businesses and fed a large number of their own cattle for slaughter at their respective plants. Both continue to purchase all of the cattle fed by their former feedlots. *See also* Cassie Fish, "Futures Treading Water; Packers Keep Pressure On" The Beef (Jun. 17, 2015), https://www.thebeefread.com/2015/06/17/futures-treading-water-packers-keep-pressure-on/ ("The news is well known this week and the packer has the upper hand.  Boxes are higher and margins are black but packers are keeping kills small.  The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.").

volume of slaughter-ready cash cattle, thereby encouraging producers to overfeed their cattle and/or accept lower prices or enter captive supply agreements to timely market their perishable product.[29]

89.     One former feedlot manager, who managed a 35,000 head commercial feedlot until early 2016 ("Witness 2"), explained the limited incentives for a producer to try to bid up Packing Defendants in such circumstances.  Witness 2 elaborated:

> There was a good chance that you wouldn't get your cattle sold if you rejected the [top-of-the market] basis bid.[30]  Even if you did succeed in getting a higher [cash] bid on Friday, you had taken a huge risk for which others, who just accepted the [top-of the market] basis bid, got to benefit from [*i.e.*, through the higher reported cash prices used to set prices under their contracts].  But by accepting the bid, you added to the packers' captive supply and helped them push the prices down, which of course hurt you as well [through the lower reported cash prices].

90.     The lower reported cash prices were then incorporated into Packing Defendants' formula and forward contacts – the latter via a depression of live cattle future prices – thereby lowering the costs of all the cattle delivered to Packing Defendants'

---

[29]     Cassie Fish, "Whatever Happened to a Fair Fight," THE BEEF (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/  ("The conversation is no longer, what's cash going to be, but rather, who needs any. . .. The smaller feeder is left to fight it out.  Hoping he can get a buyer to come by and look at his cattle.  Pressured to sell cattle with time.  Anything to get cattle gone.  Those that attempt to fight the market run the risk of making cattle too big even by today's standards or worse, alienate their local buyer.  Powerlessness is widely felt by smaller producers on a regular basis.").

[30]     The "basis bid" is a form of most favored nation contract under which the packer agrees to pay the producer some variant of that week's top reported cash price, with or without a premium.  Packing Defendants used such bids during the Class Period to further reduce the number of cattle they needed to purchase during the weekly cash cattle trade, thereby putting further pressure on cash cattle prices.

plants.[31]   And once a condition of actual or perceived oversupply had been created, Packing Defendants could gradually increase their cash cattle purchases (and slaughter volumes) without putting any significant upward pressure on prices.

91.   As detailed in Section VI below, Packing Defendants' implementation of this scheme precipitated the dramatic collapse in fed cattle prices in 2015.

### C.   Packing Defendants Coordinated their Procurement Practices for Cash Cattle

92.   A third prong of Defendants' conspiracy involved coordinating the means by which each Packing Defendant purchased cash cattle.

93.   First, Packing Defendants supported their conspiracy by collectively enforcing an antiquated queuing convention via threats of boycott.  That convention works as follows:  once a bid is received from Packer A, the producer may either accept the bid or pass on it, but may not "shop" that bid to other packers.  If the producer passes on the bid to seek further bids from other packers, the producer must inform them that it was bid "X" by Packer A and that it can, therefore, only accept bids of X+$1.[32]  If Packer B is only willing to bid X or if the producer wants to alter its reservation price, the producer is obligated to first return to Packer A, who is "on the cattle" at price X and offer it a right-

---

[31]   Cassie Fish, "Cash Trade Volume Tiny; Futures Shake it Off," THE BEEF (Jun. 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156, though the official USDA tally isn't out yet.  But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive.").

[32]   In certain instances, it may be acceptable to offer/accept bids in $0.50 per CWT increments.

of-first-refusal. Only if Packer A declines can the producer offer to sell to Packer B at X or his new reservation price. At this point, however, Packer B is under no obligation to purchase from the producer.

94. Witness 2 confirmed that Packing Defendants enforced strict adherence to this convention with threats of retaliation. He explained how Packing Defendants' field buyers spoke to him about the importance of his feedlot complying with the convention and that they would not "come-by" anymore should he break with it. Witness 2 also heard from field buyers and other industry participants about other producers being "blackballed" for breaking with the queuing convention. In those circumstances, Witness 2 understood that the Packing Defendant who was "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer whom the producer contacted out of turn.

95. Second, a Packing Defendant would, for periods of time, sometimes extending across many months, offer the only bid (or the only credible bid) for a particular feedlot's fed cattle (or substantially all its fed cattle) week to week, ensuring that the feedlots affected could not regularly procure credible bids from the other Packing Defendants. Buyers for these other Packing Defendants would even routinely fail to take or return calls from the producer until after the Friday trading window had closed. These arrangements – akin to a "home-market" market allocation scheme – point to an agreement among Packing Defendants to respect each other's relationships with their preferred suppliers.

96. Third, Packing Defendants would, at times, stop buying cash cattle from feedlots located in a particular region for a number of weeks. In doing so they intended to

back-up cash cattle in those regions and break the resolve of affected producers to hold-out for higher prices.  Having boycotted a region for a number of weeks, Packing Defendants would then begin purchasing cattle from that region again during the same week.  When executing this scheme, Packing Defendants would often seek to initiate their weekly cash cattle trade in the region recently boycotted.  This allowed them to use the lower prices agreed to in that region to set the "market" for the remainder of the trade.  In doing so, Packing Defendants were able to influence the prices of fed cattle sales across the United States.[33]

97.     Fourth, Packing Defendants suspiciously all chose to reserve most of their weekly cash trade procurement activity for Friday, typically after the CME had closed.[34] While the exact time on Friday varied from week to week, Packing Defendants would consistently conduct all, or substantially all, of their weekly cash cattle trade during the same 30- to 60-minute window on a Friday.  During that window, Packing Defendants would typically adhere to the price level established by the Packing Defendant that opened the weekly cash cattle trade, which would quickly be circulated across the market via word-of-mouth and industry reporting.  If a Packing Defendant felt it necessary to offer prices above this price level to secure the cattle it required, it would often hold such bids back until after the core trading window had closed.  This reduced the chance that reports of

---

[33]     For similar reasons, Packing Defendants would also, at times, seek to set the market price lower by opening the weekly trade by purchasing a pen of poor quality cattle at a discount.

[34]     This deprives producers of a price discovery mechanism and limits the ability of producers who hedge their cattle on the CME to manage their positions in response to the bids offered by the packers.

such bids might impact negotiations conducted during the core trading window.   In contrast, Regional Packers continued to purchase cash cattle across nearly every day of the week, thereby securing pens of high quality cattle with limited competition.   When operated alongside Packing Defendants' slaughter restraint and other bidding practices (outlined above), this practice effectively reduced competition amongst Packing Defendants for cash cattle to a race to place the first bid on each pen during the Friday cash trade.

98.   Plaintiffs' analysis of the reported cash cattle trade across AMS LMR's five price reporting regions confirms both that Packing Defendants reduced their participation in the cash cattle trade and that they conducted the bulk of the trading on Fridays.   In particular, that analysis finds that, starting in or around 2014 and 2015, Packing Defendants dramatically *increased* the number of days per month on which they *did not conduct any* cash cattle transactions within the five AMS LMR reporting regions.[35]   Figures 6 to 10 below plot these days:

---

[35]   This trend is evident in each LMS reporting region bar except Iowa-Minnesota, which retains a comparably robust cash cattle trade. *See* Appendix 1.

**Figure 6.  Days per Month without Reported Cash Transactions in TX-OK-NM**



**Figure 7.  Days per Month without Reported Cash Transactions in Nebraska**



**Figure 8.  Days per Month without Reported Cash Transactions in Kansas**



**Figure 9.  Days per Month without Reported Cash Transactions in Colorado**



**Figure 10.  Days per Month without Reported Cash Transactions in IA-MN**



99.      The data reported above are consistent with the existence of an agreement among Packing Defendants to both: (1) limit their purchases of cash cattle; and (2) conduct all, or substantially all, of their cash cattle trade in a short window on Friday.[36]  If any single Packing Defendant took these actions in the absence of such an agreement, that Packing Defendant would risk failing to secure a sufficient quantity or quality of cattle to

---

[36]      But for Packing Defendants' agreement to conduct the majority of their cash cattle procurement on Fridays, there would be fewer days per month with no reported transactions as Packing Defendants could reasonably be expected to conduct their purchases across the week.  As the daily transaction reports published by AMS capture purchases agreed between 2pm Central the prior day until 2pm Central the current day, it is not possible to identify specifically the number of transactions conducted, as opposed to reported, per day.  However, analysis does confirm that the vast majority of weekly cash cattle transactions over the Class Period were reported on Fridays and Mondays.  This is further evidence that the majority of Packing Defendants' cash cattle purchasers are agreed on Fridays in circumstances that: a) Friday's reports include purchases made between 2pm Thursday and 2pm Friday; b) Monday's reports include purchases made between 2pm Friday and 2pm Monday; and c) very few trades occur on Mondays.

operate its plants at the most efficient capacity and/or meet customer demand, without any guarantee that its actions would have the desired impact on fed cattle or beef prices.  The graphs are even more striking when one considers that Regional Packers continued to purchase cash cattle throughout the week and thus can be regarded as being responsible for the bulk of the transactions reported mid-week.

100.   Packing Defendants' increased reliance upon formula and forward contracts and the corresponding decrease in the number of cash cattle transactions does not explain the pattern observed above.   While the number of cash cattle bought annually fell continuously from 2005 to 2015, it was not until 2014/2015 that the data show a dramatic increase in the number of days without any reported cash transaction.   This rise is then sustained despite a slight increase in cash cattle buying year-on-year in 2016 and 2017.  *See* Figures 11-13 below[37]:

---

[37]    A similar trend is evident in Colorado and Iowa-Minnesota during the period the LMS provided reporting in those regions (2011 onwards).

**Figure 11.  Yearly Total Headcount in Cash Cattle Transactions in TX-OK-NM**



**Figure 12.  Yearly Total Headcount in Cash Cattle Transactions in Nebraska**



**Figure 13.  Yearly Total Headcount in Cash Cattle Transactions in Kansas**



101.    In short, even though cash cattle slaughter numbers increased slightly after 2015, the number of days per month in which there were no cash cattle transactions also increased.   Consequently, Packing Defendants' coordinated reduction in the number of days on which they purchase cash cattle is not explained merely by the decline in the number of cash cattle purchased annually.

**D.   Packing Defendants Uneconomically Imported Foreign Live Cattle to Depress Demand for U.S. Fed Cattle**

102.    Packing Defendants also engaged in coordinated import and shipping practices that reduced demand for domestic fed cattle and suppressed the cash price transaction reports used to set the price of cattle procured under captive supply agreements. In particular, Packing Defendants would ship cattle over uneconomically long distances to their slaughter plants, from locations both inside the United States and from Canada and

Mexico, to avoid bidding up the reported price of cattle in closer AMS LMR reporting regions.

103.   Given the additional freight costs incurred in procuring fed cattle from Canada or Mexico, it is only economic for a Packing Defendant to do so where the prevailing price differences as against domestic prices exceeded these additional costs.  But Plaintiffs' analysis suggests that Packing Defendants' import of live cattle from Canada and Mexico began to increase slightly in 2014, and continued, even after it became uneconomical for them to do so in or around mid-2015:[38]

**Figure 14.  Live Slaughter Cattle Imports into the U.S.**[39]



---

[38]   On information and belief, Plaintiffs understand that Packing Defendants are responsible for the bulk of all live cattle imports for slaughter.

[39]   Fed cattle slaughter volumes sourced from AMS LMR report "LM_CT106-National Daily Direct slaughter, committed and delivered."

104.    As can be seen from this graph, live cattle imports had gradually declined until 2014 when they stabilized and began a slight upward trend.  While such imports were originally economical, considering the prevailing price differences (adjusted for shipping costs and exchange rates), from mid-2015 onwards, they were often uneconomical, and became increasingly so as the Class Period continued.   This is particularly the case in relation to Canadian cattle, which comprise the substantial majority of all live cattle imports for slaughter:

**Figure 15.   Difference between Nebraska Fed Cattle Prices and Alberta Fed Cattle Prices Adjusted for Shipping Costs**[40]



---

[40]    To construct comparable price series for Canadian and Mexican imports, Plaintiffs adjusted Alberta and Chihuahua fed cattle prices for shipping costs and the exchange rate between the U.S. dollar, the Canadian dollar, and the Mexican peso, respectively.  To do so, Plaintiffs accounted for the following factors which impact shipping cost per CWT:  the cost per pound, per loaded truck to haul cattle, the capacity of the trailers used to haul

**Figure 16.   Difference between TX, OK, NM Fed Cattle Prices and Chihuahua Fed Cattle Prices Adjusted for Shipping Costs**[41]



105.   As can be seen from Figures 15 and 16 above, procuring Canadian and Mexican fed cattle from mid-2015 onwards was regularly more expensive than procuring

cattle, the distance between Alberta and Nebraska, the distance from Chihuahua to Texas, and fuel costs.  AMS LMR price series for Nebraska and Texas, Oklahoma and New Mexico are selected as the appropriate proxies as they are the nearest U.S. price reporting regions to Alberta and Chihuahua, respectively.  Alberta and Chihuahua are the key cattle exporting regions of Canada and Mexico, respectively.  Alberta Government "Livestock Prices", accessed December 26, 2018, https://economicdashboard.alberta.ca/LivestockPrices.  Canadian dollars per cwt of live cattle in Alberta converted to USD per cwt.

[41]     "Cuadro Comparativo Annual Nacional Pecuario," SISTEMA NACIONAL DE INFORMACIÓN E INTEGRACIÓN DE MERCADOS, http://www.economia-sniim.gob.mx/2010prueba/CuadroAnualConsPec.asp?per=A&xedo=S&x=49&y=15. USDA daily negotiated cash, live – fob, all grades prices, for fed steers paid to Feedlots in

fed cattle from the adjacent U.S. feeding regions.  These periods of uneconomical imports are identified by the portions of both figures where the live cattle price difference line graph dips below zero.

106.    These actions are consistent with an intent to depress U.S. fed cattle cash prices.  A Packing Defendant would not incur the additional cost associated with the import and purchase of foreign or extra-regional cattle in the hope of lowering its captive supply procurement costs unless it was certain that its major competitors would do the same thing, and therefore, also abstaining from bidding up local cash cattle prices.

### E.    Packing Defendants Agreed to Refrain from Expanding Their Slaughtering Capacity

107.    In furtherance of their conspiracy to manipulate the fed cattle market, Packing Defendants also agreed to refrain from expanding their respective slaughtering capacity, or from increasing their utilization of existing capacity.  Indeed, during the run-up of fed cattle prices until their precipitous fall in mid-2015, Packing Defendants first sought to reduce demand through a series of plant closures:  Cargill closed its Plainview, Texas and Milwaukee, Wisconsin plants (4,000 and 1,300-1,400 head per day capacities, respectively) in February 2013 and August 2014, respectively;  National Beef shut its Brawley, California plant (2,000 head per day) in June 2014;  Tyson closed its Denison, Iowa plant (2,000 head per day) in August 2015; and, JBS left its newly acquired Nampa, Idaho plant closed.  Packing Defendants' plant closures, even excluding the continued

---

Texas-Oklahoma-New Mexico in USD per cwt.  Pesos per kilogram of live steer in MX converted to USD per cwt.

idling of the Nampa plant, stripped out approximately two million head from the industry's annual slaughter capacity, thereby limiting demand for fed cattle. In relation to each closure, the relevant Packing Defendant offered pre-textual explanations such as a lack of available cattle in the adjacent regions and plant inefficiencies.[42]

108. As a result, and as shown in Figure 17 below, the United States has experienced both a decline in fed cattle slaughter capacity and an underutilization of that capacity. This decline in marketing outlets for fed cattle producers has been compounded in certain regions, where fed cattle producers now only have one, or possibly two, slaughter plants to which they are able to sell their cattle.

**Figure 17.  Annual U.S. Fed Cattle Slaughter Capacity and Utilization Over Time**



Annual Fed Cattle Slaughter
Annual Fed Cattle Slaughter
Capacity (thousands of head)

**Utilization Rates**

| | |
|---|---|
| 2000-2012 | 91.3% |
| 2013 | 84.3% |
| 2014 | 81.9% |
| 2015 | 80.5% |
| 2016 | 85.4% |
| 2017 | 87.9% |
| 2018 | 89.3% |

---

[42]    National Beef even rejected a significant package of incentives offered by local government, utilities and nearby feedlots when it decided to close its Brawley plant. "National Beef plant closing Brawley Facility," PROGRESSIVE CATTLEMAN (March 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plant-closing-brawley-facility.

## VI.    PACKING DEFENDANTS' CONSPIRACY CAUSED THE 2015 PRICE COLLAPSE AND SUPPRESSED PRICES THEREAFTER

### A.    Packing Defendants' Conduct Precipitated the Collapse in Fed Cattle Prices in 2015

109.    Packing Defendants' coordinated conduct was successful.  Responding to the compression of their margins in late 2014, Packing Defendants reduced their slaughter volumes.  This reduction in slaughter levels had the desired effect.  For the first half of 2015, prices fluctuated at or around $160 CWT, $10 CWT (or about $130 per head) lower than the high established in November 2014.

110.    Not satisfied with this, Packing Defendants embarked upon an unprecedented slaughter reduction during the second and third quarters of 2015.  To place further pressure on cattle prices, Packing Defendants also drastically reduced their purchase of cash cattle, leaning heavily on their own cattle and other captive supplies to satisfy their curtailed kill numbers.[43]  Packing Defendants' strategy was immediately

---

[43]    Packing Defendants' slaughter levels of their own cattle across the second half of 2015 were steady on a year-on-year basis, as reported by AMS LMR Report "LM_CT153 – National Weekly Direct Slaughter Cattle – Prior Week Slaughter and Contract Purchases," https://marketnews.usda.gov/mnp/ls-report-config.  *See also* Cassie Fish, "Cash Trade Volume Tiny; Futures Shake it Off" THE BEEF (Jun. 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156, though the official USDA tally isn't out yet.  But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive.  Only problem is, packers weren't able to secure enough cattle cheaper, even when relying on captives, to easily fill an even curtailed kill expected this week at 540,000 head.  June forward contracts are rumored being called in as a way to offset the absence of negotiated purchases."); and Fish, "Futures Treading Water; Packers Keep Pressure On" *supra* note 28 ("The news is well known this week and the packer has the upper hand.  Boxes are higher and margins are black but packers are

successful, with cash cattle – and thus formula cattle – prices falling continuously across June to about $150 CWT.[44]  Meanwhile, with lower slaughter volumes and lower boxed beef output, the meat margin expanded rapidly, bloating Packing Defendants' margins.  *See* Figure 3 above and Figure 21 below.

111.  Tight fed cattle supplies do not explain Packing Defendants' reduced slaughter volume.  The available supply of fed cattle had actually increased on a year-on-year basis, reflecting the continuing rebuild of the cattle herd.  As seen in the below chart, fed cattle inventory was higher in almost every month of 2015, compared to 2014:

---

keeping kills small.  The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.").

[44]  Cassie Fish, "Smack Down," THE BEEF (Jun. 15, 2015), https://www.thebeefread.com/2015/06/15/smack-down/ ("Cash cattle prices broke hard Friday as packers successfully executed a strategy of slashed kills and limited negotiated purchases. ").

**Figure 18.  Inventory Levels in 1000+ Head Feedlots – 2014 vs 2015**[45]



112.  Packing Defendants' determination to "break" cash cattle prices through their collective slaughter reductions and reduced cash cattle purchases was remarked upon by industry analysts at the time.  On June 12, 2015, analyst Cassandra Fish of "The Beef" and formerly a risk manager at Tyson, speculated as to when one of Packing Defendants might break ranks:

---

[45]    USDA National Agricultural Statistics Service ("NASS") "Cattle on Feed," Economics, Statistics and Market Information System, available at: usda.library.cornell.edu/concern/publications/m326m174z?locale-en ("Cattle on Feed"). Cattle on feed reports provide an estimate of the number of fed cattle presently being fed in feedlots with a 1,000 head or greater capacity.  Such feedlots typically hold between 80 and 85% of all fed cattle on feed in the United States.

> Rarely has this industry segment [the beef packers,] been an all-for-one and one-for-all group. All packers need to buy cattle inventory. Most have cut hours. So will someone break ranks, pay up for cattle and add hours to capture the better realization that the next boxed beef rally will bring? Will one short a customer only to find that order filled by a competitor?[46]

113. Ms. Fish answered her own question a few weeks later, remarking on June 25, 2015 that the "packers refuse to reach for cattle and are currently in command. After 3 weeks of sharply curtailed kills, packers are exhibiting incredible discipline and letting the kill increase gradually," limiting the ability "of feeders to get all cattle marketed [*i.e.*, sold] in a timely fashion."[47]

114. Packing Defendants tightened the screws during the remainder of 2015. They continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that slaughter-ready cattle had been "backed up" and were reaching historically heavy weights.[48]

115. This was particularly evident in September 2015, when Packing Defendants utilized the leverage they had established over producers in the prior months to great effect, pushing prices down to $120 CWT by months' end, despite increasing their purchases of cash cattle. Packing Defendants also demanded extended delivery periods of two to four weeks as a condition of trade throughout the month, providing them with further leverage

---

[46]   Cassie Fish, "Futures Holding Gains; Waiting on Cash," THE BEEF (Jun. 11, 2015), https://www.thebeefread.com/2015/06/11/futures-holding-gains-waiting-on-cash/.
[47]   Cassie Fish, "Another Round of the Blues," THE BEEF (Jun. 25, 2015), https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/.
[48]   Cassie Fish, "Kills Too Small For Too Long," THE BEEF (Sep. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/.

over producers who still had cattle to sell.[49]   As a result, large numbers of the cash cattle sold in September were not slaughtered until October.

116.   Packing Defendants' concerted actions to depress cattle prices are summarized by the below two charts.  Figures 19 and 20 both compare the price of fed cattle across 2015 against the number of fed cattle slaughtered across 2014 and 2015 at packing plants subject to AMS LMR reporting obligations.[50]   These figures are a good proxy for Packing Defendants' cumulative slaughter volume as Packing Defendants operate the substantial majority of such plants.  Figure 19 details the price and slaughter volumes of all fed cattle, however procured by Packing Defendants, whereas Figure 20 details the price and slaughter volumes of cash cattle.  The average monthly slaughter volumes between 2010 and 2014 are also detailed.  As shown by these figures, the decline in cash cattle slaughter across the second and third quarters of 2015 depressed the price of all fed cattle.  This enabled Packing Defendants to increase their slaughter volumes in the final quarter of 2015 by purchasing cheaply the oversupply of cash cattle they had created across the preceding two quarters.

---

[49]     *See, e.g.*, Cassie Fish, "No bottom in sight," THE BEEF (Sep. 16, 2015), https://www.thebeefread.com/2015/09/16/no-bottom-in-sight/.

[50]     Figures 19 and 20 were prepared using USDA Market News Service Reports: "LM_CT106-National direct slaughter, committed and delivered", "LM_CT151-National Weekly-Formula, Forward, Negotiated Net (Domestic)", and "LM_CT154-Weekly National direct slaughter, negotiated."   Report series are available here: https://marketnews.usda.gov/mnp/ls-report-config. Fed cattle prices shown in Figure 19 is the weighted average price of all four purchase categories (formula, forward, negotiated (*i.e.*, cash), negotiated grid).

**Figure 19.  Total Fed Cattle Slaughter Volumes and Fed Cattle Prices – all purchase types**



**Figure 20.  Cash Cattle Slaughter Volumes and Cash Cattle Prices**



117.    As Ms. Fish lamented on November 10, 2015, the "[p]ackers no longer compete against each other to buy fed cattle each week," and were consequently reaping "gangbuster profits."[51]   The financial impact of Packing Defendants' conspiracy can be seen in the chart below, which estimates producers' and packers' respective per head margins:

**Figure 21.  Producer vs Packer per-head margins across 2015**[52]



118.    As shown above, during the second half of 2015, after Packing Defendants embarked on their collusive reduction in slaughter volume, producer margins were materially reduced, while Packing Defendants' margins remained positive.

---

[51]    Fish, *supra* note 29.

[52]    Per-head margin estimates sourced from the Sterling Profit Tracker produced by Sterling Marketing Inc. and published weekly on www.drovers.com.

## B.    Packing Defendants' Ongoing Conduct Continues to Depress Fed Cattle Prices

119.    Following their successful 2015, Packing Defendants continued to restrain their collective slaughter numbers and cash cattle purchases in 2016.  While monthly slaughter volumes for the first three quarters of 2016 were up on 2015's record lows, they remained flat or below 2014 levels despite the available supply of fed cattle having risen again.

120.    As a result, the price of fed cattle continued to fall across 2016 to a low of approximately $98 CWT in mid-October.  As in 2015, Packing Defendants responded by dramatically increasing kill volumes in the fourth quarter.  Kill levels in November 2016 alone were up 24% and 19% on a year-on-year basis as compared to 2014 and 2015, respectively.[53]

121.    Packing Defendants' success in "backing-up" cash cattle across the summer of 2016 is confirmed by the fact that Packing Defendants were able to raise cash cattle slaughter levels 38% and 24% in the fourth quarter of 2016 as against 2014 and 2015 levels without causing a dramatic rise in prices.[54]  In fact, during the fourth quarter of 2016, prices

---

[53]    Year-on-year comparisons calculated using USDA Market News Service Report "LM_CT106-National direct slaughter, committed and delivered", available here: https://marketnews.usda.gov/mnp/ls-report-config.

[54]    *Id*.  *See also* Cassie Fish, "And it All Falls Down," THE BEEF (Sep. 27, 2016), https://www.thebeefread.com/2016/09/27/and-it-all-falls-down/  ("The big carryover of unsold negotiated cattle from last week has gained negative status as the hours have rolled by, with packers willing and able to sit back and lower bids to $104, $6 lower than 2 weeks ago and $3 lower than the few that traded Friday and Saturday"); and Cassie Fish, "Despondency," THE BEEF (Oct. 11, 2018), https://www.thebeefread.com/2016/10/11/despondency/ ("As if on cue, kills this week are

remained steady at or around $100-$105 CWT until late November.  Prices then hovered

between $110-$117 through December.[55]  This gradual price increase was consistent with

the seasonal rise in fed cattle prices typically experienced in the fourth quarter of each year

as the availability of slaughter-weight cattle declines.  But for the glut in slaughter-ready

cattle created by Packing Defendants' coordinated actions, prices would have risen

significantly higher in response to the Defendants' dramatic increase in year-on-year

slaughter numbers.

122.    As the cattle herd continued to rebuild, and more fed cattle became available

for slaughter in 2017 and into 2018, Packing Defendants responded accordingly.  Having

already reduced their slaughter volumes below historic levels and curtailed their cash cattle

purchases, Packing Defendants began to tell the market that they had insufficient capacity

to slaughter the supposed "wall of cattle" due to reach slaughter-weight in the summer of

2018.[56]  Packing Defendants thus encouraged producers to commit their cattle early on

---

now rumored to be cutback to 585k-595k, with a cooler cleaning and Saturday kills out.  .
.  .  A pull back in the kill with record packer margins cements the reality that easily and
efficiently killing our way through the numbers, which used to be a reality, isn't any longer.
This makes it difficult for the market to return to fully current marketing status if there is
any slowdown in kill.").

[55]    At these prices, Packing Defendants were purchasing cash cattle at a significant
discount even compared to 2015's depressed prices.

[56]    Cassie    Fish,    "Still    Green!?!"    THE    BEEF    (Mar.    27,    2018),
https://www.thebeefread.com/2018/03/27/still-green/    ("The    [packers']    mechanical
[slaughter] capacity exceeds needs [across Q2 2018].  The limitation perception is linked
to labor.  The perception of there being a limitation has created fear and inspired some
cattle feeders to "get in line" by selling [cattle] out-front [*i.e.*, on captive supply
agreements].").

captive supply agreements to ensure they could "get their cattle dead" before Packing Defendants ran out of "hook" or "shackle space."[57]  At the same time, Packing Defendants managed their respective slaughter volumes to ensure that their collective demand did not exceed the available supply.[58]

123.   Packing Defendants' tactics succeeded.  Prices fell during late Winter/Spring 2018, despite record strong beef demand and tight supplies of slaughter-ready cattle across March and April.  Indeed, prices fell from approximately $129 per CWT at the beginning of March 2018 to $110 per CWT by the beginning of May 2018.  Prices stayed at or around that mark until mid-November 2018, a significant extension of the one to two-month summer low typically experienced by the market.  And of course, Packing Defendants never did reach slaughter capacity.[59]

---

[57]   *See also,* Cassie Fish, "Holding Gain," THE BEEF (Apr. 18, 2018), https://www.thebeefread.com/2018/04/18/holding-gains/ ("Cattle feeders, still fearful of growing supplies in May, June and beyond continue to sell cattle for May at substantially lower prices than current values.").

[58]   Cassie Fish, "Futures Trade Both Sides; Cash Poised To Trade Lower," THE BEEF (Apr. 2, 2018), available at: https://www.thebeefread.com/2018/04/02/futures-trade-both-sides-cash-poised-to-trade-lower/ ("Looking back at March's fed slaughter rate, it underperformed expectations. . ..  Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable.").

[59]   Cassie Fish, "Quiet Conclusion," THE BEEF (Jun. 1, 2018), https://www.thebeefread.com/2018/06/01/quiet-conclusion/ ("As each week goes by in June, the calendar will take the industry into the heart of one of the most well-advertised "walls" of market-ready cattle in memory.  Now that it is a known fact that the industry can kill 540k head of fed cattle and that demand can absorb the largest beef production in 10-years, the panic experienced in March seems overdone.").

C. **Packing Defendants Publicly Affirmed Their Commitment to Supply Restraint**

124.   Packing Defendants' joint efforts to periodically curtail slaughter levels so as to "balance" their demand to supply are further evidenced by public statements by their senior executives about their firms' commitment to production restraint and operating a "margin" rather than a "market share" business.  Explicit and implicit in the executives' statements was the importance of restricting slaughter levels and capacity across the industry as a whole.

125.   For example, commenting on National Beef's decision to close its Brawley, California plant on January 31, 2014, Tyson's COO stated "it is consistent, I guess, with what we've been saying all along, as the calf crop declines and the noncompetitive feedlot areas or noncompetitive plants or the combination thereof, we'll probably have to curtail production . . .  to some extent, we've always felt that - and anticipated something like that would happen."[60]

126.   As prices continued to rise in 2014, JBS director Wesley Mendonça Batista responded to an analyst's question as to whether U.S. fed cattle slaughtering capacity needed to be rationalized by suggesting that JBS's recent acquisition of XL Foods' Omaha, Nebraska plant was probably a mistake, and that slaughtering capacity needed to come out of California and at least one other U.S. region ("If you want to be balanced you need to have capacity to be shut there.").[61]

---

[60]     Tyson Foods Q1 2014 Results Earnings Call Transcript (Jan. 31, 2014), at 4.
[61]     JBS Q3 2014 Earnings Calls Transcript (Nov. 13, 2014), at 12.

127.    Even after fed cattle prices had already collapsed, Tyson's then-CEO Donald Smith still publicly stressed the need for further slaughter reductions in August 2015: "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs.  In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term."[62]

128.    JBS's André Nogueira de Souza went further and publicly praised Packing Defendants' efforts to reduce industry-wide slaughter capacity through plant closures, noting that it had left the industry in "a very good position, [to achieve] balance in the industry in 2016, 2017, and 2018."[63]

129.    Packing Defendants' executives evidently knew that they needed to tread a narrow line in their public exhortations for slaughter restraint, as shown by Tyson's then CEO Donnie Smith's slip during his discussion of output restraint during Tyson's Q4 2015 Earnings Call:[64]

> You've got relatively low cattle supply, you've got too much -- well, not to say too much, probably not the right way to say it, but you've got excess industry capacity.  And that limits our ability to drive margins above the 1.5% to 3%, we think.

---

[62]    Tyson Foods Q3 2015 Results Earnings Call Transcript (Aug. 3, 2015), at 4.

[63]    JBS Q3 2015 Results Earnings Call Transcript (Nov. 12, 2015), at 9.

[64]    Tyson Foods Q4 2015 Earnings Call Transcript (Nov. 24, 2015).

D.      **Economic Analysis Supports the Existence of the Alleged Conspiracy**

130.    Economic analysis corroborates the direct and circumstantial evidence of the alleged conspiracy, including the accounts of Witness 1 and Witness 2.   In particular, it confirms that: (a) the collapse in fed cattle prices in 2015 cannot be explained by common supply or demand drivers; (b) from at least January 1, 2015, fed cattle prices were artificially depressed by an average of 7.9%; and (c) other explanations potentially offered for the 2015 price collapse do not withstand scrutiny.

1.      **Supply and Demand Drivers Do Not Explain the 2015 Price Collapse or Subsequent Low Prices**

131.    The prices for fed cattle bought across the United States followed a discernable pattern: increasing consistently from 2009 through 2014 (accounting for seasonal fluctuations in prices), collapsing dramatically in 2015, and then stabilizing below the prior trend line:[65]

---

[65]    The below graphs are not adjusted for seasonal changes in fed cattle prices, which do not explain the dramatic depression of fed cattle prices during the Class Period. Historically fed cattle prices tend to gradually rise during the first quarter until the early part of the second quarter, peaking in March or April. Prices then tend to trend downwards to a summer low typically established in June or July, before commencing an upward trend that typically peaks in November.   "Annual and Seasonal Price Patterns for Cattle," CORNHUSKER ECONOMICS, University of Nebraska-Lincoln (Aug. 19, 2015), https://agecon.unl.edu/cornhusker-economics/2015/annual-and-seasonal-price-patterns-for-cattle.

**Figure 22.  AMS LMR Reported Prices for Fed Cattle by Reporting Region**[66]



132.    Fed cattle producers' main cost – purchasing feeder cattle – also increased and decreased during this period.  But the decline in feeder cattle costs did not occur until after fed cattle prices collapsed in 2015:

**Figure 23.  Fed Cattle Input Costs - Feeder Cattle Costs**[67]



133.    That a decline in the fed cattle producers' costs did not cause the 2015 decline is evident when one compares fed cattle prices to fed cattle producers' total costs:

---

[66]     The series presented are for negotiated cash prices for mixed lots of steers, heifers, and cows, 80% or more choice, delivered live and priced free-on-board (FOB) feedlot.  The same pricing pattern is generally evident in all AMS LMR categories, *i.e.*, for different qualities, for live or dressed, priced FOB feedlot or delivered, whether steers, heifers, or mixed.

[67]     Figures 23, 24 and 25 were prepared utilizing Iowa State University's estimate of the break-even price (*i.e.*, the cost) associated with feeding a 750-pound yearling to a market weight of 1,250 pounds.  Ag Econ Department, Cooperative Extension Service, Iowa    State    University,    "Estimated    Livestock    Returns"    available    here: http://www2.econ.iastate.edu/estimated-returns/.

**Figure 24.  Fed Cattle Price vs. Producers' Total Input Costs**[68]



134.    In fact, during 2015, when fed cattle prices underwent a drastic decline, the costs borne by fed cattle producers actually increased.  Specifically, from January 2015 to January 2016, fed cattle prices in Iowa and Minnesota, for example, decreased by approximately 20.7%, whereas input costs increased by approximately 2.6%.

135.    As a result of this dramatic disconnect between fed cattle prices and input costs, fed cattle producers suffered their largest losses in 30 years during 2015 and 2016, as shown below:

---

[68]       *Id.*

**Figure 25.  Fed Cattle Producers' Margins Per Head Overtime: IA and MN**[69]



136.   While fed cattle producers did enjoy a profitable 2017, this was largely due to a significant drop in the input costs associated with fed cattle marketed during that year, and in particular, the price of feeder cattle.  Packing Defendants were able to constrain the typical seasonal rise in fed cattle prices across the first half of 2017 and continued to profit from historic margins:

---

[69]   *Id.*  Margins calculated are for Iowa and Minnesota but similar patterns can be observed in other cattle feeding regions.

**Figure 26.  Packers' Estimated Per Head Margins**



137.   Nor do changes in beef demand or consumer preferences explain the depression of fed cattle prices.  As shown in Figure 27 below, while there was a 5.67% decline in retail beef prices from January 2015 to January 2016, prices rebounded in the months that followed, before undulating down, then up again thereafter.  Importantly, the spread between retail beef prices and fed cattle prices continued its gradual increase, consistent with its upward trend during the past 20 years, suggesting beef demand remained robust.  That beef demand remained strong during this period is also evident from Figure 28 below:

**Figure 27.  Retail Beef Prices vs Fed Cattle Prices**[70]



---

[70]     USDA, Economic Research Service ("ERS"), "Meat Price Spreads," accessed April 16, 2019 at https://www.ers.usda.gov/data-products/meat-price-spreads/.

**Figure 28.  Monthly Beef Demand Indices, Jan. 1988 – Oct. 2017**[71]



138.    Importantly, what did change in 2015 was the meat margin.  As shown in Figure 3 (reproduced below), the meat margins realized by Packing Defendants in the aftermath of the 2015 price collapse – which at times exceeded $600 per head – were historically unprecedented:

---

[71] "Assessing Beef Demand Determinants" (Jan. 18, 2018), pp. 13-14, available at: https://www.beefboard.org/news/files/FY2018/Assessing%20Beef%20Demand%20Determinants_FullReport.pdf.  Chart prepared using USDA ERS record of All-Fresh Retail price and using 1988 as the base year.

**Figure 3.  Weekly Packer Per-Head Meat Margin (1,400 lb. Avg. Live Steer 65-80% Choice; 875 lb. Avg. Dressed Carcass)**



### 2.    Econometric Analysis Corroborates the Alleged Conspiracy

139.    Consistent with the existence of a conspiracy amongst Packing Defendants to decrease fed cattle prices, Plaintiffs' econometric analysis confirms that fed cattle prices were artificially depressed by an average of 7.9% in the three years following January 1, 2015.

140.    Plaintiffs used a professionally accepted multivariate regression-based methodology to demonstrate the degree to which fed cattle prices were depressed. Plaintiffs' model of fed cattle prices over time (the "Model") tested whether AMS LMR

daily reported negotiated prices[72] for fed cattle were significantly depressed starting in January 2015 compared to the earlier period beginning November 2002.

141.   The Model controls for changes in the supply and demand factors that explain fed cattle prices, so that any residual, unexplained price decrease can reasonably be ascribed to artificial price suppression.  In particular, aside from the AMS LMR price data, the Model incorporates the following variables that impact fed cattle prices and which are commonly selected by academics in their empirical models of fed cattle prices:

a.   General determinants of demand, such as population and GDP;

b.   Inflation;[73]

c.   Costs faced by fed cattle producers, which were lagged by one month consistent with the academic literature;

d.   Prices of substitutes, namely pork, chicken, and turkey;

e.   Net imports of beef and live cattle;

---

[72]   The AMS publishes 359 daily fed cattle negotiated price series, for a combination of transaction, region and cattle characteristics.  The effect of the transaction, region, and cattle characteristics on fed cattle prices are controlled for by including "fixed-effect variables" for each possible combination, while cattle weight and dress percentage are controlled for by including both as continuous variables in the model.  Specifically, each of the 359 fixed-effect variables for these combinations takes the value 1 when data points meet the characteristics for that specific combination (*e.g.*, negotiated cash prices, for mixed lots of steers, heifers, and cows, with 80% or more choice, delivered live, FOB, in Kansas) and 0 when data points do not.  In this way, the model controls for the fact that prices for each combination are historically and consistently different than each other.

[73]   Inflation was controlled for by adjusting all dollar denominated variables to October 2018 values using the consumer price index.

f.      Indicators of relative market power between buyers and sellers, such as the number of packer plants nationwide, the number of feedlots nationwide, and the average feedlot capacity;

g.      Episodes of Mad Cow disease;[74]

h.      The implementation and then repeal of Mandatory Country of Origin Labeling ("COOL");[75] and

i.      Time of year, to control for seasonality.[76]

142.    As shown in Table 1 below, fed cattle prices have been depressed by an average of 7.9% since January 1, 2015.  This result is highly statistically significant.  The Model has an R-squared of 95%, meaning it explains 95% of the variation in fed cattle prices:

---

[74]    Plaintiffs' modelling is performed in accordance with the conclusions reached in the literature that the effects of Mad Cow disease are driven primarily by the reactions of foreign governments in terms of trade, rather than by the fears of U.S. consumers.  Thus, the indicator variable used reflects the period over which the trade for beef was meaningfully impacted by the disease, *i.e.*, May 2003 through December 2005.

[75]    A COOL indicator variable is used to demark the implementation period specific to the market for beef, namely September 30, 2008 to February 2016.

[76]    Plaintiffs use a set of indicator variables corresponding to different months of the year to account for seasonality in fed cattle prices.

**Table 1.  Results of Plaintiffs' Regression Analysis[77]**

| Independent variable: | Coefficient[78] |
|---|---|
|     Underpayment indicator: Estimate January 2015 through December 2017 | -0.08*** (7.9%) |
| Product and transaction characteristics | |
|     Log cattle weight | -0.05*** |
|     Dress percentage, expressed as a proportion | 0.04 |
|     Fixed effects (cattle type, fob/delivered, 5 area region, percentage choice, live/dressed, cash/grid) | ✓ |
| Demand | |
|     Log (real) GDP | 0.77*** |
|     Log population size | 0.19*** |
| Supply (costs) | |
|     Log (real) breakeven cost (1-month lag) | 0.40*** |
| Possible Substitutes | |
|     Log (real) pork price | 0.94*** |
|     Log (real) chicken price | -0.35*** |
|     Log (real) turkey price | -0.18*** |
| Imports/Exports | |
|     Net imports of beef, expressed as a proportion of U.S. production | -0.44*** |
|     Net imports of cattle, expressed as a proportion of U.S. production | 1.20*** |
| Other | |
| Log Packer plants count | 1.12*** |
| Log Feedlots count | -0.25*** |
| Log average Feedlot capacity | -0.64*** |
| Mad cow disease indicator | 0.08*** |
| COOL in effect indicator | 0.07*** |
| Seasonality | |
|     Indicators for each month of year | ✓ |
| Constant term | -9.63*** |
| Number of observations | 124,497 |
| R-squared | 95% |

143.   Further, the Model's estimates for its control variables are consistent with economic theory.  For example, the negative coefficient on cattle weight in the Model

---

[77]      *, **, and *** represent 90%, 95%, and 99% levels of confidence.

reflects that fatter cattle tend to be of lower quality.  Higher demand for beef (either as a result of having more consumers or existing consumers having higher disposable income) and higher costs faced by producers are both expected to drive prices for fed cattle up.  The positive coefficients on GDP, population, and breakeven cost reflect this.

144.    The coefficient on the price of pork is positive, as is expected for a substitute for beef.  The coefficients on chicken and turkey prices are negative, but they are correlated with pork prices, so this is likely due to an issue known as multicollinearity and is not a concern for present purposes.[79]

145.    Importantly, the Model finds that the number of packing plants has a positive impact on fed cattle prices.  This is consistent with Plaintiffs' theory that greater slaughter capacity results in more competitive bidding for fed cattle and accordingly higher prices, and *vice versa*.

146.    In sum, the Model's results are consistent with Packing Defendants having acted in a concerted fashion beginning in or around January 2015 in an attempt to depress fed cattle prices.

---

[78]    The regression is estimated in log-log form, by transforming all non-indicator and non-proportion variables into natural logarithms.  This transformation permits the interpretation of the coefficients as elasticities: *i.e.*, a coefficient of 1 represents a 1% change in the independent variable being associated with a 1% change in the price variable.

[79]    "Multicollinearity" can make it difficult to separately estimate coefficients on highly correlated variables.  This is only a concern if one is specifically interested in those coefficients and is not a concern if one merely wants to control for their collective effect, which is Plaintiffs' goal here.

### 3. Other Explanations Proffered for the Drop in Fed Cattle Prices Do Not Withstand Scrutiny

147.   The United States Government Accountability Office's ("GAO") 2018 Report suggests potential explanations for the price collapse proffered by Packing Defendants and others.  These explanations, however, are not borne out by the facts or Plaintiffs' preliminary regression analysis.

148.   For example, the GAO Report mentions that the droughts of 2011-2013 might have reduced the availability of forage to raise calves and feeder cattle, leading ranchers to reduce cattle inventory.[80]   Under this explanation, ranchers expanded their inventory once the drought eased, thereby oversupplying the market and causing prices to crash.  However, any oversupply of feeder cattle should have caused a collapse in the price of feeder cattle, which did not happen until well after fed cattle prices had collapsed (see Figures 23 and 24 above).

149.   It has also been suggested that the increase supply of corn seen in the aftermath of the 2011 to 2013 droughts encouraged fed cattle producers to feed their cattle for longer than they typically would.  The resulting fatter cattle then received lower prices per CWT, as is customary.  Aside from the fact that Plaintiffs' regression analysis controlled for both cattle weight and the price of corn, the premise of the explanation is inconsistent with the facts.  The majority of producers did not choose to overfeed their cattle, but were forced into doing so by Packing Defendants' coordinated slaughter restrictions.

---

[80]    2018 GAO Report at 12.

150.    Finally, the strengthening of the U.S. dollar in 2014 and potentially related changes in the volume of U.S. imports and exports of live cattle and beef also cannot explain the price collapse.[81]  These events were not even in lock-step with the collapse in fed cattle prices in the second half of 2015.  In fact, during the second half of 2014, when net imports of beef and the U.S. dollar were increasing, fed cattle prices still increased to their November 2014 peak.  In the first half of 2015, net imports were transiently around 8% of total U.S. production, but by November 2015 – when fed cattle prices had bottomed out – net imports of beef had turned slightly negative.

## VII.    THE FED CATTLE MARKET IS CONDUCIVE TO COLLUSION

151.    The structure and characteristics of the market for the purchase of fed cattle make the market highly susceptible to collusion.  These facts, when considered against the backdrop of the actions of Packing Defendants that are consistent with collusion and inconsistent with the proper functioning of a competitive market, support an inference of the anticompetitive agreement alleged herein.

### A.    The Fed Cattle Packing Industry Has Experienced High Consolidation and Is Highly Concentrated

152.    The Fed Cattle Packing industry is highly concentrated.[82]  Since JBS's acquisition of Smithfield Beef Group, Inc. in 2008, Packing Defendants' cumulative share

---

[81]    *Id.* at 14.

[82]    The U.S. national four-firm concentration ratio (CR4) for beef packing rose from 25% in 1977 to 71% in 1992, the first year in which the national Herfindahl-Hirschmann Index ("HHI") exceeded 1800.  Since that time, the HHI index for the industry has only increased, particularly in certain regions.  *U.S. v. JBS* Amended Complaint, ¶ 36-37; Cai, Stiegert, and Koontz, *Regime Switching and Oligopsony power: the case of US beef*

of annual purchases of U.S. fed cattle has approximated 81-89% each year, with each Packing Defendant's individual share of annual purchases remaining largely static. No Regional Packer possesses a double-digit market share, with Greater Omaha, Packing Defendants' nearest rival, maintaining a 2.5-3.5% market share through its Omaha, Nebraska plant. The GAO's 2018 Report found that lower "packer competition in any given area was associated with lower fed cattle prices in that area."[83]

### B.  The Supply of Fed Cattle and Demand for Beef Are Relatively Insensitive to Short-Term Changes in Price

153.   Recent studies have shown that the quantity of beef U.S. consumers purchase has become less sensitive to changes in beef prices, and the impact of such price changes on beef demand is economically small relative to other factors.[84]  Beef's own price elasticity for the period 2008-2017 was estimated at -0.479, indicating that a "10% price increase would reduce [beef] demand by 4.79%."[85]  As a result, Packing Defendants are incentivized to reduce fed cattle slaughter and beef production, as neither they, nor their immediate customers, are harmed by the resulting wholesale and retail price rises.

---

*processing*, 41 AGRICULTURAL ECONOMICS 99-109, 99 (2011); Cai, Stiegert and Koontz, *Oligopsony Fed Cattle Pricing: Did Mandatory Price Reporting Increase Meatpacker Market*, APPLIED ECONOMIC PERSPECTIVES AND POLICY 33(4), 606–622 (2011).

[83]    2018 GAO Report at 15-16.

[84]    Glynn Tonsor, Jason Lusk, Ted Schroeder, "Assessing Beef Demand Determinants" (Jan. 18, 2018), at 7-9, www.beefboard.org/news/files/FY2018/Assessing%20Beef%20Demand%20Determinants_ FullReport.pdf.

[85]    *Id.*

154.    Further, as noted at ¶75 above, reduced slaughter volumes and/or lower fed cattle prices are unlikely to significantly alter the immediately available supply of fed cattle.  Owing to cattle's comparably long life cycle, cattle producers typically require about 39 months to alter supply levels once a decision has been made to increase production.[86]  As a result, fed cattle supplies are relatively insensitive to short-term price changes, particularly given the absence of a substitute market into which fed cattle producers can sell their cattle.

## C.    Fed Cattle Producers Face Significant Market Access Risk

155.    As perishable commodities, producers face significant pressure to sell their cattle within a matter of weeks once they reach slaughter-weight.[87]  As noted by Grain Inspection, Packers and Stockyards Administration (now a part of the AMS) and shown by Plaintiffs' regression above, "[c]attle held beyond the optimal marketing period begin to decrease in value because of excessive fat gain and the rising cost of gain."[88]  Further,

---

[86]    Tyson Foods Inc. "Investor Fact Book – Fiscal Year 2017" (2018), at 10, https://s22.q4cdn.com/104708849/files/doc_factbook/Tyson-Foods-FY17-Fact-Book-(rev-042518).pdf ("Tyson 2017 Fact Book").; 2018 GAO Report at 5.

[87]    RTI International, "GIPSA Livestock and Meat Marketing Study, Vol. 3: Fed Cattle and Beef Industries," *prepared for* U.S.D.A. Grain Inspection, Packers and Stockyard Administration (2007), at 5-4, https://www.gipsa.usda.gov/psp/publication/livemarketstudy/LMMS_Vol_3.pdf.

[88]    *Id.*

continuing to hold slaughter-weight cattle increases the risk of death loss, which elevates after cattle spend more than 5-6 months in the feedlot.[89]

156.   These facts, coupled with the absence of a substitute market to sell fed cattle into, exposes fed cattle producers to market access risk, namely "the availability of a timely and appropriate market outlet."[90]

157.   That risk and the leverage it provides to Packing Defendants is exacerbated by the significant information asymmetry faced by producers *vis-à-vis* Packing Defendants with regard to the available supply of fed cattle and Packing Defendants' procurement needs.  In relation to the former, producers have only a limited ability to obtain information regarding the supply of fed cattle beyond the information conveyed by the USDA's Cattle on Feed Reports.   By contrast, Packing Defendants are able to construct detailed inventories of upcoming fed cattle supplies through their regular contacts with all the fed cattle producers situated within their respective procurement territories.

158.   The impact of market access risk upon the parties' relative bargaining power is significant.  As demonstrated by Packing Defendants' threats regarding 2018's supposed "wall of cattle," the mere use of coordinated threats of increased market access risk can be sufficient to coerce producers to commit cattle on captive supply agreements or accept lower cash prices.

---

[89]   David Cooper, "Feedyard data reveals higher death losses," PROGRESSIVE CATTLEMAN (Dec. 24, 2015), https://www.progressivecattle.com/topics/herd-health/feedyard-data-reveals-higher-death-losses.

[90]   RTI International, *supra* note 87.

**D.**     **There Are Numerous Trade Organizations and Opportunities for Packing Defendants to Meet and Collude**

159.    Packing Defendants' management and employees have regular opportunities to meet and collude through their membership in various trade and industry associations, including: the National Cattlemen's Beef Association ("NCBA"); the U.S. Meat Export Federation ("USMEF"); the Global and U.S. Roundtables for Sustainable Beef ("USRSB")[91]; and the North American Meat Institute ("NAMI") (which resulted from the merger of The North American Meat Association and the American Meat Institute).

160.    For example, the NCBA holds an annual convention (known as "CattleCon"), a summer conference, a legislative conference, and regional meetings.[92]  The NCBA Product Council, which includes Packing Defendants, other packers, and certain retailers and restaurants, meets quarterly for the Beef Executive Forum, an invitation-only event.[93]  Representatives of each Packing Defendant typically attend these events.  Packing Defendants also participate in meetings of the Beef Checkoff program run by the

---

[91]     In 2015, Packing Defendants were among the founding members of the USRSB. Packing Defendants participate in its annual meetings (held in spring), with JBS and Cargill additionally having leadership positions in certain working groups.

[92]     *NCBA Allied Industry Membership*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), www.beefusa.org/CMDocs/BeefUSA/AboutUs/2019NCBA%20Allied%20Industry%20 Brochure.pdf.

[93]     *Id.*

Federation of State Beef Councils that are held in conjunction with the NCBA summer and winter meetings.[94]

161.    Similarly, the USMEF – a trade association that develops export opportunities for U.S. protein producers and whose leadership includes current and former employees and officers of Packing Defendants – holds both spring and fall conferences and monthly international trade shows.[95]

162.    The NAMI – which is a national trade association that represents companies that process 95% of red meat – conducts a series of annual conference and educational workshops all across the country.[96]

### E.    <u>Packing Defendants Benefit from High Barriers to Entry</u>

163.    Packing Defendants benefit from substantial barriers to entry into the market. As a result of these barriers, the entry of new fed cattle slaughter businesses, or the repurposing of existing cow and bull slaughter facilities, is not likely to occur despite any decrease in the price of fed cattle or increase in the wholesale price of beef.[97]

---

[94]    *See also The Association*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/theassociation.aspx and *Federation*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/federation.aspx.

[95]    *Events: Meetings*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/bod-meetings/; *Events: Trade Show Calendar*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/trade-shows/.

[96]    *See About NAMI*, NAT'L AM. MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204; *Events*, NAT'L AMERICAN MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422.

[97]    *U.S. v. JBS* Amended Complaint, ¶41.

164.    The construction of a large packing plant requires an investment of at least $250-$350 million, and two or more years to obtain necessary permits, plan, design, and build.[98]  The construction of smaller plants, with capacity to slaughter approximately 1,000 - 1,500 head per day, would take a similar period of time and cost at least $150 million.[99] Re-purposing an existing plant, or reopening a similar sized, but previously shuttered, plant costs at least $40 million.[100]

165.    Aside from the costs and time associated with opening a plant, new entrants face difficulties complying with a significant volume of regulations, finding and training a workforce of between 1,500 to 3,000 staff, and finding marketing outlets for the resultant beef.[101]

166.    As a result, an industry rule of thumb is that a newly opened packing plant will lose at least 60% of its initial investment before it begins to profitably sell any of its beef product.  Not surprisingly, recent years have seen the failure of new or re-launched

---

[98]    *Id.* Plaintiffs understand that the last major plant constructed by Packing Defendants – Tyson's plant in Lexington, Nebraska – cost over $250 million to construction 1991 and would likely cost significantly more in today's money.

[99]    Amanda Ranke, "What's the Future For Northern Beef Packers?" BEEF (Jul. 22, 2013), www.beefmagazine.com/blog/whats-future-northern-beef-packers; Press Release, "JR Simplot Company and Caviness Beef Packers to Build New Idaho Beef Processing Plant" J.R. Simplot (Jan. 7 2015), www.simplot.com/news/jr_simplot_company_and_caviness_beef_packers_to_build_new _idaho_beef.

[100]    This is the amount Iowa Premium Beef spent refurbishing the previously shuttered Tama, Iowa plant.

[101]    For example, one recent successful entrance, namely Iowa Premium Beef's reopening of the Tama, Iowa plant, was made possible by Sysco's agreement to invest $36 million in the plant and take delivery of a significant volume of the resultant beef produced.

independent fed cattle packing businesses, including Northern Beef Packers and Kane Beef.[102]

### F.    Packing Defendants Have Similar Cost Structures and Have Significant Oversight of Each Other's Price and Production Decisions

167.    As a result of their similar cost structures,[103]  Packing Defendants have a limited ability to steal market share from each other by operating with compressed meat margins (*i.e.*, bidding high for cattle and asking low for beef).  But consequently, they do have a shared interest in manipulating the meat margin to extract increased profits from their existing market shares.

168.    Packing Defendants' field buyers' weekly trips to inspect the feedlots in their territory provide an opportunity to meet and exchange commercially sensitive information amongst each other.  Field buyers routinely communicate "market color" obtained from the field, including reports of their competitors' activities obtained from producers, back to their respective head offices and their firm's other field buyers through daily conference calls.

---

[102]    Amanda Radke, "What's the Future for Northern Beef Packers?" BEEF (July 22, 2013), www.beefmagazine.com/blog/whats-future-northern-beef-packers; Dirk Lammers, "Aberdeen beef plant open again and slaughtering" CAPITAL JOURNAL (November 19, 2015), www.capjournal.com/news/aberdeen-beef-plant-open-again-and-slaughtering-cattle/article_b0a76552-8f0b-11e5-aab0-4747ca2759bc.html; Greg Henderson, "Kane Beef Now under Court Receivership," DROVERS (Oct. 16, 2018), www.drovers.com/article/kane-beef-now-under-court-receivership.

[103]    On information and belief, Packing Defendants' typical cut and kill costs per head – *i.e.*, the costs of slaughter and beef preparation – is between $160-$170 when their plant, or each shift at a plant, run at or near 40 hours per week.  That cost increases by approximately $20 per head if a plant runs at only 32 hours per week.

169.    These realities, combined with widespread formal and informal reporting of fed cattle and beef bids, transactions and volumes, and each slaughter plant's current and planned output, enable Packing Defendants to monitor each other's adherence to any anticompetitive agreement.  The purchasing dynamics of the fed cattle market, with its weekly cash trade, also provide Packing Defendants with the ability to punish any suspected non-compliance with such an agreement.[104]

## VIII.  PACKING DEFENDANTS ARE RECIDIVISTS WITH A HISTORY OF COLLUSION

170.    The conduct of Packing Defendants alleged herein is consistent with their previous use of production restraint to increase the price of other commodities such as broiler chicken and pork.  JBS and Tyson maintain significant market shares in both the broiler chicken and pork processing markets.  Cargill was the fourth largest U.S. pork processer until it sold its pork business to JBS in October 2015.

171.    Broiler chicken and pork processers, including JBS and Tyson, are alleged to have engaged in a series of synchronized production cuts or restrictions designed to raise wholesale prices.  The broiler chicken processors are also said to have manipulated the

---

[104]    Research shows that markets, such as the fed cattle market, in which a large number of sellers make repetitive sales to a small group of purchasers, facilitate the formation and maintenance of price-fixing agreements as they provide opportunities for the purchasers to agree, sustain and enforce market sharing arrangements.  Posner, R., ANTITRUST LAW 68 (Chicago, IL: University of Chicago Press, 2nd ed. 2001), at 68; and "Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For," U.S. DEPARTMENT OF JUSTICE, ANTITRUST DIVISION, www.justice.gov/atr/public/guidelines/211578.htm.

"Georgia Dock" price benchmark – a self-reported benchmark commonly used by market participants to set wholesale chicken prices.

172.    In both cases, like here, the participants publicly called upon each other to maintain supply "discipline".[105]  Smithfield's CEO, Larry Pope, went as far as to confirm publicly in September 2009 that he had discussed pork production cuts with other "*sizable large producers*":

> The answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation. . .I think this industry has got to solve it collectively.  I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back. . .But the answer is, yes, there are others cutting back. We're not the only one.[106]

---

[105]    For example, on May 3, 2013 JBS/Pilgrim's Pride CFO, Bill Lovettee said: "So I think the [broiler] industry is doing an admirable job in being disciplined on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying. . .I believe the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken."

[106]    Event Brief of Q1 2010, Smithfield Earnings Conference Call (September 8, 2009).

173.    Government investigations[107] and civil litigation[108] regarding the processers' alleged conspiracies are ongoing.  At least one defendant, Fieldale Farms, opted to settle with plaintiffs in the broiler class claims.[109]

174.    In addition, Packing Defendants have a long history of other misconduct, spanning breaches of the Packers & Stockyards Act as well as antitrust, anti-corruption, environmental, health and safety regulation, both domestic and foreign.  Further details of these violations are provided in Appendix 2.

## IX.    MANIPULATION OF LIVE CATTLE FUTURES AND OPTIONS

175.    Live cattle futures have traded on the CME since 1964. Live cattle options have traded on the CME since 1984.[110]  Both contracts, which are important tools used by producers such as Plaintiffs to manage the risks associated with their businesses, were impacted by Packing Defendants' conspiracy.

---

[107]    The Antitrust Section of the Florida Attorney General's office opened an investigation into the broiler chicken processors' alleged anticompetitive practices, and the Georgia Department of Agriculture has suspended the Georgia Dock price index.

[108]    *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.) and *In re Pork Antitrust Litigation*, 18-cv-1776 (D. Minn).  The U.S. District Court for Northern District of Illinois held that the broiler chicken processors' customers had alleged sufficient facts to plausibly suggest that defendants' conduct was the product of a conspiracy.  *See In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d 772 (2017) ("Defendants' business strategies during the relevant time period are indicative of a conspiracy.").

[109]    Order Granting Final Approval of Settlement with Defendant Fieldale Farms Corporation, *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.), Nov. 16, 2018, Docket # 1414.

[110]    *Historical First Trade Dates*, CME, https://www.cmegroup.com/media-room/historical-first-trade-dates.html.

A.     **Futures and Options Generally**

176.   A commodity futures contract is a standardized bilateral agreement for the purchase and sale of a particular commodity – like fed cattle – at a specified time.  In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

177.   A futures contract typically involves two parties, with an exchange (in this case, the CME) acting as a central clearinghouse that guarantees both sides of the transaction, thereby eliminating counterparty risk.  The buyer of a futures contract is typically considered a "long," whose position will increase in value as the underlying physical or cash market price increases.   The seller of a futures contract is typically considered a "short" whose position will increase in value as the underlying physical or cash market price decreases.

178.   Rather than take delivery, futures market participants almost always "offset" their futures contracts prior to actual delivery.  For example, a purchaser of one live cattle futures contract may liquidate, cancel, or offset a future obligation to take delivery of the cattle by selling one live cattle futures contract.  The difference between the initial purchase price and the subsequent sale price represents the realized profit or loss for the trader.

179.   An options contract comes in two forms: a "call option" and a "put option." The buyer of a call option has the right (but not the obligation) to purchase the underlying asset at a set price (the "strike price").  The seller of the call option (sometimes called the "writer") has the obligation to deliver the underlying asset at the strike price if the buyer exercises its right.   The buyer of a put option has the right (but not the obligation) to sell

the underlying asset at a set price (the "strike" or "exercise" price). The seller of a put option has the obligation to buy the underlying asset at the strike price if the buyer exercises its right.

## B.    Live Cattle Contracts

180.    When fed cattle have reached slaughter-weight, they are referred to as "live," "finished," or "fat" cattle. They can be distinguished from "feeder cattle", which refers to fed cattle which weigh between 700-900 pounds and have yet to enter the feedlot. Live cattle, for purposes of CME live cattle futures contracts, weigh no less than 1,050 pounds and no more than 1,550 pounds (or 1,350 pounds for heifers).

181.    Trading in CME live cattle futures and options is subject to the rules and regulations of the CME, including Chapter 101[111] (live cattle futures), Chapter 101A[112] (options on live cattle futures), and Chapter 101B[113] (options on live cattle futures calendar spreads) of the CME Rulebook.

182.    CME live cattle futures and options are traded electronically on CME's Globex electronic trading platform. While both live cattle futures and options were also traded in CME's "open outcry" trading pits at the beginning of the Class Period, only live cattle options continued to be so traded after the CME's decision to close down most of its futures trading pits in July 2015.

---

[111]    CME Rulebook, CME, https://www.cmegroup.com/rulebook/CME/ ("CME Rulebook"), Chapter 101.

[112]    CME Rulebook, Chapter 101A.

[113]    CME Rulebook, Chapter 101B.

### 1.    Live Cattle Futures

183.    Chapter 101 of the CME Rulebook sets forth the rules for trading in CME live cattle futures–including contract size, trade dates, and tick sizes–as well as deliveries on CME live cattle futures contracts, including, for example, weight deviations, location differentials, and delivery points.

184.    One live cattle futures contract calls for the delivery of 40,000 pounds of live cattle producing 65% Choice, 35% Select USDA grade of live steers or live heifers.[114]

185.    Live cattle futures prices are quoted in cents per pound.  The minimum tick size is $0.00025 per pound (or $10 per contract).[115]  A one penny ($0.01) change in the per pound price results in a $400 change in the contract price.

186.    Live cattle futures trade for the following contract months: February, April, June, August, October, and December.  Nine contract months are eligible for trading at any given time.  They include the six upcoming contract months and the next three contract months in the calendar cycle.[116] For example, in March 2019, the following contract months were eligible for trading: April 2019, June 2019, August 2019, October 2019,

---

[114]    CME Rulebook, Chapter 101, Rules 10101, 10102.B.

[115]    *Live Cattle Futures Contract Specs*, CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_contract_specifications.html.

[116]    *Live Cattle Futures Quotes,* CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_quotes_globex.html.

December 2019, February 2020, April 2020, June 2020, August 2020.  Trading continues until the last business day of the given contract month at 12:00 p.m.[117]

187.   Live cattle futures are "physically" settled.  This means the buyer of a live cattle future has a right to receive (and the seller of a live cattle future has the obligation to deliver) 40,000 pounds of cattle per contract.[118]

188.   Buyers may choose either live graded deliveries or carcass graded deliveries.[119] Deliveries of live cattle are to be made at approved delivery points at approved livestock yards in the following territories: Colorado; Iowa / Minnesota / South Dakota; Kansas; Nebraska; Texas / Oklahoma / New Mexico.[120]  Buyers electing carcass graded delivery must specify an approved slaughter plant enumerated by the CME. Eligible slaughter plants include those enumerated for the livestock yards to which the cattle were tendered, and any other approved slaughter plant that is within 225 road miles of the originating feedlot.

---

[117]    *Supra,* note 115.

[118]    *Self-Study Guide to Hedging with Livestock Futures and Options*, CME, (Version 17), at 7, https://www.cmegroup.com/trading/agricultural/files/AC-215_SelfStuy_GuideNYMEX.pdf.

[119]    CME Rulebook, Chapter 101, Rules 10103.B, 10103.C.

[120]    *Id.*, Rule 10103.B.

189.   A live delivery unit must consist entirely of steers or entirely of heifers.[121] All cattle are required to be healthy,[122] and all cattle must be born and raised exclusively in the United States.[123]

## 2.   Live Cattle Options

190.   Chapter 101A of the CME Rulebook outlines the specifications for live cattle options.  The asset underlying a live cattle option is a live cattle futures contract.  A live cattle option permits the holder to buy, in the case of the call, or to sell, in the case of the put, one live cattle futures contract.  Live cattle options trade in cents per pound.  The minimum price fluctuation is $0.00025 per pound.[124]

191.   Live cattle options trade in the following contract months: February, April, June, August, October and December.[125] At any given time, ten contract months trade, the six months in the February bi-monthly cycle, plus the three next in that cycle in the following year, as well as one nearby "serial" month of January, March, May, July, September, or November.[126]  Trading in live cattle options ends on the first Friday of the contract month at 1:00 p.m.[127]

---

[121]   *Id.*

[122]   *Id.*

[123]   *Id.*, Rule 10101.

[124]   *Live Cattle Options Contract Specs*, CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_contractSpecs_options.html.

[125]   *Id.*

[126]   *Id.*

[127]   *Id.*

192.    For monthly options that expire in the February bi-monthly cycle (*i.e.*, February, April, June, August, October, and December), the underlying futures contract is the futures contract for the month in which the option expires.  For example, the underlying futures contract for an option that expires in February is the February futures contract.[128]

193.    For monthly options that expire in months other than those in the February bi-monthly cycle (*i.e.*, January, March, May, July, September, and November), the underlying futures contract is the next futures contract in the February bi-monthly cycle that is nearest to the expiration of the option.  For example, the underlying futures contract for an option that expires in January is the February futures contract.

194.    Live cattle options are "American style," meaning that the option holders can exercise their options at any point prior to expiration of trading.[129]

195.    In addition, CME lists "live cattle calendar spread options," which trade pursuant to CME Rule 101B.  In the case of calendar spreads, the option is to buy (in the case of the call), or to sell (in the case of the put), one live cattle futures calendar spread.[130] A live cattle futures calendar spread option consists of a combination of a purchase in one futures contract month and a sale in another futures contract month.[131] Unlike American style options, these options can only be exercised on the day of expiration.[132]

---

[128]    CME Rulebook, Chapter 101A, Rule 101A01.D.

[129]    *Id.*, Rule 101A02.A.

[130]    CME Rulebook, Chapter 101B, Rule 101B01.

[131]    *Id.*

[132]    *Id.*, Rule 101B02.

C.      **Relationship Between Live Cattle Futures and Cattle Spot (Cash) Prices**

196.    There is a strong interplay between live cattle futures and the underlying fed cattle cash market.  As CME observes, "livestock cash prices and futures prices tend to move up and down together, which is what makes the concept of effective hedging possible."[133] "[F]utures prices [are] reflective of the main cash markets."[134]

197.    As the CME has recognized, livestock (including live cattle and feeder cattle) contract specifications are designed to ensure "a two-way relationship between the benchmark livestock futures market and the numerous livestock cash markets.  The price that is discovered in a futures market comes from the interaction between the supply (sellers' offers) and demand (buyers' bids)."[135] Many futures market "bids and offers come from cash market participants."[136]

198.    "In turn, the futures contract price is then used by cash market participants to transact in the spot (current) market or for cash forward type contracts."[137]  The relationship between the cash market and the futures market is particularly strong with respect to live

---

[133]    *INTRODUCTION TO LIVESTOCK: Learn about Basis: Livestock,* CME, *available at* https://www.cmegroup.com/education/courses/introduction-to-livestock/learn-about-basis-livestock.html.

[134]    *Self-Study Guide to Hedging with Livestock Futures and Options,* CME (2009 Version), at 9, *available at* http://www.kisfutures.com/CMELivestockSelfStudy.pdf.

[135]    *Self-Study Guide to Hedging with Livestock Futures and Options*, CME (Version 17), at 6, *available at* https://www.cmegroup.com/trading/agricultural/files/AC-215_SelfStuy_GuideNYMEX.pdf.

[136]    *Id.*

[137]    *Id.*

cattle futures because, as the CME has observed, "many cash market contracts are 'based on' or 'referenced to' the futures market price."[138]

199.    Live cattle futures contracts are designed so that their prices converge with physical cash cattle prices when they expire.[139]  For physically settled contracts such as live cattle, "[t]he possibility of delivery on the futures contract generally causes the futures price during the delivery month to align with the cash price at the futures delivery locations."[140]

200.    Regression analyses demonstrate a strong, statistically-significant relationship between: (1) changes in the physical cash cattle prices reported in the afternoon of day 1 with live cattle futures market price changes on day 2; (2) changes in physical cash cattle prices reported on day 2 and live cattle futures market price changes on day 2; and (3) changes in live cattle futures market prices on day 2 and physical cash market prices changes reported on the morning of day 3.

201.    The figures below depict the close relationship between price changes in the fed cattle cash market ("Cash am" and "Cash pm") and price changes in the live cattle futures market, across all contract months:

---

[138]    *Id.*

[139]    *Supra* note 134.

[140]    *Id.* at 11.

**Figure 29.  Relationship Between 2015 Live Cattle Futures Contracts and AMS LMR National Morning and Afternoon Cash Cattle Purchase Reports**



**Figure 30.  Relationship Between 2016 Live Cattle Futures Contracts and AMS LMR National Morning and Afternoon Cash Cattle Purchase Reports**



**Figure 31.  Relationship Between 2017 Live Cattle Futures Contracts and AMS LMR National Morning and Afternoon Cash Cattle Purchase Reports**



**Figure 32.  Relationship Between 2018 Live Cattle Futures Contracts and AMS LMR National Morning and Afternoon Cash Cattle Purchase Reports**



### D.    Packing Defendants Traded CME Live Cattle Futures and Options

202.    Packing Defendants interact regularly with the CME live cattle markets.

203.    During the period February 1, 2018 through January 31, 2019, for example, Packing Defendants had the only CME-approved slaughter plants for live cattle.[141] As a result, they are central participants in the CME live cattle market.

---

[141]    CME Group, *Chicago Mercantile Exchange Inc. 2018 Approved Slaughter Plants for Live Cattle*, https://www.cmegroup.com/content/dam/cmegroup/notices/market-regulation/2018/01/2018-approved-slaughter-plants-for-live-cattle.pdf.

204.   In addition, Packing Defendants regularly trade live cattle futures and options.  Cargill touts its ability to effectively "manage risk" in live and feeder cattle futures and options contracts.  "Our risk management team has more than 20 years of experience helping customers manage price risks across 70-plus commodities markets" including "Live cattle" and "Feeder cattle."[142]  News reports indicate that it trades actively in the cattle futures markets.  For example, on January 25, 2016, Cargill stated through a spokesperson, "We've seen not only a very volatile cattle futures market, but prices were coming down a lot."[143]

205.   Tyson uses "derivative financial instruments, primarily futures and options, to reduce our exposure to various market risks related to commodity purchases,"[144] as well as "to reduce the effect of changing prices and as a mechanism to procure the underlying commodity . . . ."[145]  "We hold certain positions, primarily in . . . livestock futures, that are not hedges for financial reporting purposes."[146]  "As part of our commodity risk

---

[142]   Cargill, *Agriculture Risk Management*, https://www.cargill.com/price-risk/crm/agriculture.

[143]   Gregory Meyer, *Cattlemen lock horns with futures exchange over market volatility*, FINANCIAL TIMES (Jan. 25, 2016), https://www.ft.com/content/6eed1268-c130-11e5-846f-79b0e3d20eaf.

[144]   Tyson Foods, Inc., Quarterly Report (Form 10-Q) at 37 (February 4, 2011), https://www.sec.gov/Archives/edgar/data/100493/000119312511024082/d10q.htm.

[145]   Tyson Foods, Inc., Annual Report (Form 10-K) at 8 (Sept. 29, 2018), https://s22.q4cdn.com/104708849/files/doc_financials/quartely/2018/q4/TSN-FY18-10-K.pdf.

[146]   *Id.* at 14.

management activities, we use derivative financial instruments, primarily futures and options, to reduce our exposure to various market risks related to these purchases . . . ."[147]

206.   JBS references the CME live cattle futures contract in its procurement contracts.[148]  Its financial reports also indicate a high level of commodities, derivatives and futures trading.[149]  Marfrig likewise acknowledges that it trades "futures market derivative financial instruments" to "reduce commodity-related price risk."[150]  National Beef Packing similarly stated that it used "futures contracts in order to reduce exposure associated with entering into firm commitments to purchase live cattle at prices determined prior to the delivery of the cattle . . . ."[151]

207.   The specifics of Packing Defendants' CME cattle futures and options trading activity are not public information.   Trading on the CME is anonymous.   Packing Defendants do not publicly disclose their specific trading activity.   This information can

---

[147]   *Id.* at 52.

[148]   *Driftless Region Beef Conference 2013*, Sample Contract, https://lib.dr.iastate.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir =1&article=1034&context=driftlessconference.

[149]   JBS S.A., Condensed Financial Statements and Independent auditors' report, at 46 (Sept. 30, 2018), https://jbss.infoinvest.com.br/enu/4812/DF%20JBS%20300918%20Ingls%20-%20Condensada%2013.11%2018h20_Parecer.pdf.

[150]   Marfrig Global Foods, 2017 Sustainability Report at 77, http://www.marfrig.com.br/Uploads/Arquivos/Marfrig_RA17_eng.pdf.

[151]   National Beef Packing Company, LLC, Annual Report (Form 10-K) at F-15, (November 16, 2011), https://www.sec.gov/Archives/edgar/data/1273784/000144530511003450/nbp201182710 k.htm.

only be obtained through discovery from Packing Defendants and third parties such as CME.

### E.   Packing Defendants Directly Caused CME Live Cattle Futures and Options Prices to Be Artificial

208.   As explained above, Packing Defendants suppressed the price of fed cattle. Because slaughter-weight fed cattle is the commodity underlying CME live cattle futures and options, Defendants necessarily and directly caused prices of live cattle futures and options to be artificial.

209.   Packing Defendants had the motive to cause artificial depression of futures prices, separate and apart from their futures transactions.  In particular, futures prices are used to set the price of cattle delivered under forward contracts, as explained above.  As such, by depressing live cattle futures contracts Packing Defendants lower the cost of cattle procured under forward contracts.

210.   Packing Defendants' conduct in the cash cattle market had a direct and proximate impact on prices in the CME live cattle futures and options markets.  For example, on August 14, 2015, Tyson announced that it was closing its Denison, Iowa beef plant, which resulted in price declines in the cash and futures markets.  In particular, the spot or front-month August contract fell $0.004 per pound ($160 per live cattle future) and the October 2015 contract fell $0.01 per pound ($400 per live cattle future).  According to

one market participant, "[s]ome feedlots may have surrendered after seeing futures fall earlier in the session, partly on word that Tyson closed a beef plant."[152]

## X.    CLASS ACTION ALLEGATIONS

211.    Plaintiffs bring this action on behalf of themselves, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of all members of the following two classes:

**Producer Class**
All persons or entities within the United States that directly sold to a Defendant one or more fed cattle for slaughter during the Class Period other than on a cost-plus basis.

**Exchange Class**
All persons who transacted in live cattle futures and/or options traded on the CME or another U.S. exchange during the Class Period.[153]

212.    Excluded from both Classes are Defendants and their officers, directors, management, employees, subsidiaries, and affiliates.  Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

---

[152]    Theopolis Waters, *Livestock-CME live cattle futures sag with initial cash prices*, REUTERS, Aug. 14, 2015, https://www.reuters.com/article/markets-livestock-cattle/livestock-cme-live-cattle-futures-sag-with-initial-cash-prices-idUSL1N10P2MG20150814.

[153]    The Exchange Class includes persons who established positions prior to the commencement of the Class period but who closed out or stood for delivery on these positions after the Class Period commenced.  As noted below, Plaintiffs reserve the right to amend the Class definitions as the litigation progresses to include, by way of example and not limitation, all persons who transacted in CME feeder cattle futures and options during the Class Period.

213.    "Fed cattle" means steers and heifers, whether beef breeds or Holsteins, which are raised and fed specifically for beef production.  "Class Period" means the period from January 1, 2015 through the present.  "Cost-plus basis" means an agreement to sell fed cattle at a price determined by the producers' costs of production without regard to prevailing cash cattle prices.

214.    Members of the Classes are so numerous and geographically dispersed that joinder is impracticable.  Further, members of the Producer Class are readily identifiable from information and records in the possession of Packing Defendants or third parties (including commercial feedlots and marketing cooperatives engaged by certain Class members).  Members of the Exchange Class are readily identifiable from information and records in the possession of the CME, or capable of identification via third parties.

215.    Plaintiffs' claims are typical of the claims of the members of both Classes.  Plaintiffs and members of both Classes were damaged by the same wrongful conduct of Defendants.

216.    Plaintiffs will fairly and adequately protect and represent the interests of members of both Classes.  The interests of Plaintiffs are coincidental with, and not antagonistic to, those of members of the Classes.  Producer Plaintiffs and all members of the Producer Class are similarly affected by Packing Defendants' wrongful conduct in that they received artificially low prices for fed cattle sold to Packing Defendants.  Exchange Plaintiffs and all members of the Exchange Class are similarly affected by Defendants' course of conduct in violation of the Commodity Exchange Act.

217.     Plaintiffs are represented by counsel with experience in the prosecution and leadership of class action antitrust, commodities manipulation and other complex litigation, including class actions in the financial services industry.

218.     Questions of law and fact common to the members of both Classes predominate over questions that may affect only individual Class members, thereby making relief with respect to members of both Classes as a whole appropriate.  Questions of law and fact common to members of the Classes include, but are not limited to:

a.     whether Packing Defendants engaged in a combination and conspiracy among themselves to fix, depress, suppress, and/or stabilize the prices of fed cattle purchased in the United States;

b.     whether Packing Defendants engaged in a combination and conspiracy among themselves to allocate the market for the purchase of fed cattle offered for sale in the United States;

c.     the identity of the participants of the alleged conspiracy;

d.     the duration of the alleged conspiracy and the acts carried out by Packing Defendants in furtherance of the conspiracy;

e.     whether Packing Defendants' alleged conspiracy violated federal antitrust laws

f.     whether Packing Defendants' alleged conspiracy and/or course of business violated the Packers and Stockyards Act;

g.     whether Defendants' conduct violated Sections 6(c)(3), 9(a) and 22 of the Commodity Exchange Act;

h.     whether Defendants' conduct violated Sections 6(c)(1) and 22 of the Commodity Exchange Act;

i.     whether Defendants acted to aid and abet violations of the Commodity Exchange Act;

j.     whether John Doe Defendants' unlawful conduct caused cognizable legal injury under the Commodity Exchange Act;

k.     whether Plaintiffs and members of the Classes suffered injury;

l.     the amount of damages suffered by Plaintiffs and members of the Classes; and

m.     the appropriate type and scope of injunctive and related equitable relief.

219.   A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

220.   Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

221.   Plaintiffs have defined members of the Classes based on currently available information and hereby reserve the right to amend the definition of members of the Classes, including, without limitation, the length of the Class Period.

## XI.   STATUTE OF LIMITATIONS AND TOLLING

222.   The statutes of limitations governing Plaintiffs' claims against Packing Defendants were tolled under the doctrine of fraudulent concealment.  The doctrine applies here because Packing Defendants fraudulently concealed their misconduct through their own affirmative acts, and because Defendants' conduct was inherently self-concealing.

223.   Packing Defendants actively concealed their violations of law from Plaintiffs and both Classes by, amongst other matters, (i) relying on non-public forms of communication; (ii) offering pre-textual justifications for their plant closures, slaughter reductions and withdrawal from the cash cattle trade; (iii) explicitly and implicitly representing that the fed cattle bids and contract terms Packing Defendants offered Plaintiffs and the Producer Class were the product of honest competition and not a conspiracy; and (iv) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws.  Below is a list of non-exhaustive examples of such statements that each Packing Defendant published during the Class Period:

a.   Tyson's Code of Conduct extolled Tyson's compliance with antitrust laws throughout the Class Period.  The Code's most recent iteration, from October 2018, reports that Tyson "compete[s] in the market with

integrity and compl[ies] with competition laws . . . .  We comply with the letter and spirit of competition laws . . . wherever we do business."

b.    JBS's 2014 Annual Report detailed the policies it had in place to "ensure ethical conduct and integrity in the management of its business", including its Manual of Ethical Conduct, which "addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices and other sensitive topics."   JBS also launched an "Always Do The Right Thing" compliance program in July 2017.

c.    Cargill stressed in its 2015 Corporate Responsibility report that "[w]e obey the law.  Obeying the law is the foundation on which our reputation and Guiding Principles are built . . . .  We conduct our business with integrity . . . .  We compete vigorously, but do so fairly and ethically.  We . . . comply with the laws and regulations that support fair competition and integrity in the marketplace."  Cargill reiterated this message in its subsequent Corporate Responsibility reports.

d.    National Beef Packing's former majority shareholder, Jeffries Financial Group, Inc. (formerly Leucadia National Corporation) noted in its 2014 Annual Report that National Beef was "subject to extensive government regulation" including by the USDA.

224.   Packing Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation.   Had the public learned that Packing Defendants conspired to fix prices in the fed cattle market, their conspiracy could not have continued for as long as it did.   Accordingly, Plaintiffs could not have learned of Packing Defendants' anticompetitive conduct until recently.

225.   Because of Packing Defendants' fraudulent concealment, Plaintiffs and both Classes were not aware of Packing Defendants' misconduct and could not have discovered it through the exercise of due diligence until recently.   Plaintiffs and members of both Classes have acted diligently in seeking to bring their claims promptly.

226.   Accordingly, Plaintiffs assert that the applicable statutes of limitations on Plaintiffs' claims were tolled.   Defendants are also equitably estopped from asserting any statute of limitations defense.

## XII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### MARKET ALLOCATION AND PRICE-FIXING IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §1
### (Alleged against all Packing Defendants)

227.   Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

228.   During the Class Period, Packing Defendants controlled the slaughter of fed cattle in the United States and thus the available marketing outlets for fed cattle producers. Packing Defendants were horizontal competitors in the market for the purchase of fed cattle.

229.   From at least January 1, 2015 and continuing to the present, the exact dates being unknown to Plaintiffs, Packing Defendants engaged in a continuing agreement, understanding and conspiracy in an unreasonable and unlawful restraint of trade to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.  Packing Defendants' conspiracy is a *per se* violation of federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

230.   Packing Defendants' conspiracy and the resulting impact on fed cattle prices received by producers occurred in and affected U.S. interstate commerce.

231.   As a proximate result of Packing Defendants' unlawful conduct, Producer Plaintiffs and members of the Producer Class have suffered injury to their business or property.  These injuries included, but were not limited to, receiving artificial and non-competitive prices for fed cattle sold to Packing Defendants.  Plaintiffs and the Producer Class were also deprived of the benefits of free and open competition in the market for the purchase of fed cattle.  Producer Plaintiffs and members of the Producer Class are each entitled to treble damages for Packing Defendants' violations of the Sherman Act alleged herein.

232.   As a proximate result of Packing Defendants' unlawful conduct, R-CALF USA has suffered injury to its business and property.  These injuries included, but were not limited to, the frustration of its mission to protect the interest of its members, and diversion of R-CALF USA's resources to: (a) help its members mitigate the injuries incurred as a

proximate result of Packing Defendants' unlawful conduct; and (b) to prevent further breaches of the law by the same.

233.    Producer Plaintiffs, R-CALF USA and the members of the Producer Class are threatened with future injury to their businesses and property unless the injunctive relief requested is granted.

## SECOND CLAIM FOR RELIEF
## VIOLATIONS OF PACKERS AND STOCKYARDS ACT, 7 U.S.C. §§192 and 209
### (Alleged Against All Packing Defendants)

234.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

235.    Title 7 U.S.C. §192 provides, in pertinent part, "[i]t shall be unlawful for any packer with respect to livestock . . . to . . . (a) [e]ngage in or use any unfair, unjustly discriminatory, or deceptive trade practice or device; or . . .  (e) [e]ngage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or (f) [c]onspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or (g) [c]onspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e)."

236.    Title 7 U.S.C. §209 further provides that, "[i]f any person subject to this chapter violates any of the provisions of this chapter . . . relating to the purchase, sale, or handling of livestock, . . . he shall be liable to the person or persons injured thereby for the

full amount of damages sustained in consequence of such violation." Such liability may be enforced "by suit in any district court of the United States of competent jurisdiction[.]"

237. Deceptive trade practices under the Packers and Stockyards Act are addressed in the Code of Federal Regulations in Part 201 of Title 9. Section 201.70 states "[e]ach packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged."

238. From at least January 1, 2015 and continuing to the present, the exact dates being unknown to Plaintiffs, Packing Defendants violated 7 U.S.C. §192(a), (e), (f), and (g) by engaging in a course of business and doing acts for the purpose or with the effect of reaching and implementing a conspiracy, combination, agreement, or arrangement to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle.

239. The effect of these acts and this conspiracy, combination, agreement, or arrangement, was to fix, depress, suppress, stabilize, or otherwise artificially manipulate the price of fed cattle bought by Packing Defendants. Packing Defendants had no legitimate business justification for these acts and this conspiracy, combination, agreement, or arrangement.

240. As a proximate result of Packing Defendants' breaches of the Packers and Stockyards Act, Producer Plaintiffs, R-CALF USA, and the members of the Producer Class have been injured and damaged in their respective businesses and property, including those injuries detailed at ¶¶231 and 232.

## THIRD CLAIM FOR RELIEF
## UNJUST ENRICHMENT IN VIOLATION OF COMMON LAW
### (Alleged Against All Packing Defendants)

241.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

242.    Plaintiffs and Producer Class members sold fed cattle during the Class Period directly to Packing Defendants.  These transactions were supposed to be priced based on competitive market forces and reflect honest competition by Packing Defendants.

243.    However, rather than competing honestly and aggressively with each other, Packing Defendants colluded to fix, depress, suppress, or stabilize the prices paid to Plaintiffs and the Producer Class for the purchase of their fed cattle.

244.    Packing Defendants' collusion enabled them to enjoy supra-competitive profits at the expense of Plaintiffs and the Producer Class and caused Plaintiffs and the Producer Class to receive less for sales of fed cattle to Packing Defendants than they otherwise would have received had Defendants acted honestly and fairly.

245.    It is unjust and inequitable for Packing Defendants to have enriched themselves in this manner at the expense of Producer Plaintiffs and the Producer Class, and equity and good conscience require Packing Defendants to make restitution.

246.    Producer Plaintiffs and the Producer Class therefore seek restoration of the monies of which they were unfairly and unlawfully deprived as described in this Complaint.

## FOURTH CLAIM FOR RELIEF
## MANIPULATION
## IN VIOLATION OF THE COMMODITY EXCHANGE ACT
## 7 U.S.C. §§1, *ET SEQ.* AND CFTC REGULATION 180.2, CFTC REGULATION
## 180.2, 17 C.F.R. §180.2
### (Alleged against all Packing Defendants and John Does 1-10)

247.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

248.    During the Class Period, Packing Defendants, through their own conduct and through the conduct of John Does 1-10, specifically intended to manipulate the prices of fed cattle, the physical commodity underlying the CME live cattle futures and options contracts, and specifically intended to manipulate the prices of CME live cattle futures and options.

249.    Packing Defendants, through their own conduct and the conduct of John Does 1-10, had the ability to cause artificial prices in fed cattle and live cattle futures and options.  They did so through, among other things, their dominant position in the market for the purchase of fed cattle, their superior access to information and reporting mechanisms, their financial wherewithal, and their extensive involvement in the CME live cattle futures and options trading and delivery processes.

250.    Packing Defendants, through their own conduct and the conduct of John Does 1-10, in fact caused artificial prices in the physical fed cattle market as well as in live cattle futures and options markets.  Their conduct resulted in, among other things, artificially low prices in the commodity underlying CME live cattle futures and options prices and in the live cattle futures and options prices themselves.

251.    Packing Defendants and John Does 1-10 therefore engaged in unlawful manipulation of CME live cattle and futures and options and their underlying physical commodity in violation of Sections 6(c)(3), 7 U.S.C §9(3), 9(a) of the CEA, 7 U.S.C. §13(a), Section 22 of the CEA, 7 U.S.C. §25(a), and CFTC Rule 180.2, 17 C.F.R. §180.2.

252.    The manipulation by Packing Defendants and their conspirators and agents, including John Does 1-10, deprived Exchange Plaintiffs and the Exchange Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

253.    Exchange Plaintiffs and Exchange Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

**FIFTH CLAIM FOR RELIEF**
**MANIPULATIVE AND DECEPTIVE DEVICE**
**IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1, *ET***
***SEQ.* AND CFTC REGULATION 180.1(A), 17 C.F.R. §180.1(A)**
**(Alleged Against All Packing Defendants and John Does 1-10)**

254.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

255.    Packing Defendants intended to affect or acted recklessly with regards to affecting prices of CME live cattle futures and options contracts and engaged in overt acts in furtherance of that intent.

256.    Packing Defendants intentionally or recklessly used or employed a manipulative device or artifice to defraud, and engaged in acts, practices, and/or courses of business which operated as a fraud or deceit upon any person, in violation of Section 6(c)(1)

of the CEA, 7 U.S.C. §9, and Section 22 of the CEA (7 U.S.C. §25), and Regulation 180.1(a), 17 C.F.R. §180.1(a).

257.   Packing Defendants' conduct proximately caused injury to Exchange Plaintiffs and other members of the Exchange Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

258.   The manipulative and deceptive devices employed by Packing Defendants and their conspirators and agents, including John Does 1-10, deprived Exchange Plaintiffs and the Exchange Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

259.   Exchange Plaintiffs and Exchange Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

**SIXTH CLAIM FOR RELIEF**
**PRINCIPAL-AGENT LIABILITY**
**IN VIOLATION OF THE COMMODITY EXCHANGE ACT,7 U.S.C. §§1, *ET SEQ.* AND CFTC REGULATION 1.2, 17 C.F.R. §1.2**
**(Alleged Against All Packing Defendants and John Does 1-10)**

260.   Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

261.   Packing Defendants' traders, employees and/or officers, and conspirators, including John Does 1-10, acted as agents for their principals, Packing Defendants, when engaging in the manipulation and manipulative and deceptive devices and schemes described herein.

262.    Packing Defendants are liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B) and Regulation 1.2, 17 C.F.R. §1.2, for the manipulative acts of its agents, representatives, and/or other persons acting for them in the scope of their employment.

263.    The principal-agent violations by Packing Defendants and their conspirators and agents, including John Does 1-10, deprived Plaintiffs and the Exchange Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

264.    Exchange Plaintiffs and Exchange Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

## SEVENTH CLAIM FOR RELIEF
## AIDING AND ABETTING
## IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1, *ET SEQ.*
**(Alleged Against All Packing Defendants and John Does 1-10)**

265.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

266.    Packing Defendants and John Does 1-10 knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein, including violations by the other Packing Defendants and John Does 1-10.

267.    Packing Defendants and John Does 1-10 did so knowing of their violations of the CEA and willfully intended to assist these manipulations, which resulted in CME live cattle futures and options prices, and their underlying physical commodity becoming artificial, during the Class Period.

268. Through their aiding and abetting violations, Packing Defendants and John Does 1-10 violated Section 22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

269. Exchange Plaintiffs and Exchange Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

## XIII. PRAYER FOR RELIEF

270. Plaintiffs, on behalf of themselves and members of the Classes, request relief as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a) & (b) of the Federal Rules of Civil Procedure, that the Plaintiffs be named as Class Representatives of both Classes, that the undersigned be named as Lead Class Counsel of both Classes, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B. That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal laws set forth above;

C. That the Court award Plaintiffs and members of the Classes damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

D. That the Court issue appropriate injunctive and other equitable relief against Defendants;

E. That the Court award Plaintiffs pre- and post-judgment interest;

F. That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts; and

G.      That the Court award any and all such other relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

271.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all matters so triable.

Dated:  July 15, 2019

SCOTT+SCOTT
ATTORNEYS AT LAW LLP

/s Christopher M. Burke
Christopher M. Burke (*pro hac vice*)
600 W. Broadway
Suite 3300
San Diego, CA  92101
Tel.:   619-233-4565
Fax:   619-233-0508
cburke@scott-scott.com

David R. Scott (*pro hac vice*)
Amanda F. Lawrence (*pro hac vice*)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Tel.:   860-537-5537
Fax:   860-537-4432
david.scott@scott-scott.com
alawrence2scott-scott.com

Peter A. Barile III (*pro hac vice*)
Anjali Bhat (*pro hac vice*)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue
17th Floor
New York, NY  10169

Tel.:   212-223-6444
Fax:    212-223-6334
pbarile@scott-scott.com
abhat@scott-scott.com

Anthony F. Fata (*pro hac vice*)
Christopher P.T. Tourek (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
150 S. Wacker
Suite 3000
Chicago, IL 60606
Tel.:   312-782-4882
Fax:    312-782-4485
afata@caffertyclobes.com
ctourek@caffertyclobes.com
boconnell@caffertyclobes.com

Ellen Meriwether (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
 205 N. Monroe St.
Media, PA 19063
Tel.:   215-864-2800
Fax:    215-864-2810
emeriwether@caffertyclobes.com

*Interim Co-Lead Counsel for the Cattle
Plaintiffs*


K. Craig Wildfang (Bar No. 0117043)
Thomas J. Undlin (Bar No. 0183751)
Stacey P. Slaughter (Bar No. 0296971)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue
Suite 2800
Minneapolis, MN  55402
Tel:    612-349-8500
Fax:    612-339-4181
kcwildfang@robinskaplan.com
tundlin@robinskaplan.com

117

sslaughter@robinskaplan.com

Hollis Salzman
Kellie Lerner
**ROBINS KAPLAN LLP**
 399 Park Avenue
Suite 3600
New York, NY  10022
Tel:    212-980-7400
Fax:    212-980-7499
hsalzman@robinskaplan.com
klerner@robinskaplan.com

*Liaison Counsel for the Cattle Plaintiffs*

Eric H. Gibbs (*pro hac vice*)
Michael L. Schrag (*pro hac vice*)
Joshua Bloomfield (*pro hac vice*)
George Sampson (*pro hac vice*)
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Tel:    (510) 350-9700
ehg@classlawgroup.com
mls@classlawgroup.com
jjb@classlawgroup.com
gws@classlawgroup.com

David E. Kovel (*pro hac vice*)
Thomas W. Elrod *(pro hac vice)*
Karen Lerner (*pro hac vice*)
Anthony E. Maneiro (*pro hac vice*)
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Tel:    (212) 371-6600
dkovel@kmllp.com
telrod@kmllp.com
klerner@kmllp.com
amaneiro@kmllp.com

Richard M. Paul III  (*pro hac vice*)
Sean Cooper  (*pro hac vice forthcoming*)
**PAUL LLP**

601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Tel:     (816) 984-8100
Rick@PaulLLP.com
Sean@PaulLLP.com

Melissa S. Weiner (Bar No. 0387900)
Joseph C. Bourne (Bar No. 0389922)
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Tel:     (612) 389-0600
mweiner@pswlaw.com
jbourne@pswlaw.com

Bruce L. Simon (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Tel:     (415) 433-9000
bsimon@pswlaw.com

Daniel L. Warshaw (*pro hac vice*)
Bobby Pouya (*pro hac vice*)
Matthew A. Pearson (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Tel:     (818) 788-8300
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mapearson@pswlaw.com

*Plaintiffs' Executive Committee*