## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **IN RE CATTLE ANTITRUST LITIGATION**<br><br>This document relates to:<br><br>ALL CASES | Case No. 19-cv-1222-JRT-HB |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' JOINT MOTION TO DISMISS
## THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Table of authorities .................................................................................................. iii

Introduction ............................................................................................................... 1

Legal standard ........................................................................................................... 7

Argument .................................................................................................................... 9

I.      Plaintiffs fail to plead a violation of the Sherman Act (Count I) ............................... 9

    A.    Plaintiffs fail to allege parallel conduct ........................................................ 11

        1.   The Complaint relies primarily on industry-wide trend data rather than defendant-specific allegations .......................................................... 11

        2.   The few defendant-specific allegations do not establish parallel conduct ...................................................................................................... 13

            a.   Plant closures .................................................................................. 13

            b.   Public statements ........................................................................... 15

        3.   The confidential witness allegations do not establish parallel conduct or provide direct evidence of a conspiracy ................................. 16

            a.   Plaintiffs do not sufficiently identify the confidential witnesses ......................................................................................... 17

            b.   The confidential witnesses' conclusory assertions do not support a conspiracy ...................................................................... 22

    B.    Plaintiffs fail to plead other facts supporting the inference of a conspiracy .................................................................................................... 26

        1.   Each action Defendants supposedly took to carry out the alleged conspiracy is consistent with lawful competitive behavior ..................... 26

        2.   Even if Plaintiffs have alleged parallel conduct, they have not alleged sufficient plus factors ....................................................................... 32

        3.   Plaintiffs' statistical analysis is not evidence of a conspiracy ................. 37

        4.   Plaintiffs' economic data undercuts their alleged conspiracy ................. 39

            a.   The Complaint shows that slaughter volumes and capacity *increased* during the conspiracy period ........................................ 39

            b.   The Complaint shows an increase in cash cattle transactions during the conspiracy period ............................................................ 41

            c.   The data in the Complaint explains why fed cattle prices actually fell ...................................................................................... 41

    C.    R-CALF lacks standing to seek money damages ............................................. 43

# TABLE OF CONTENTS
## (continued)

II.  Plaintiffs fail to plead a violation of the Packers and Stockyards Act (Count II) ............................................................................................................. 44

    A.  The conspiracy allegations are insufficient ..................................................... 44

    B.  No alleged act violates the PSA ....................................................................... 45

III.  Plaintiffs fail to plead unjust enrichment (Count III) ................................................. 46

    A.  Plaintiffs' unjust-enrichment claim is wholly derivative of their alleged conspiracy ................................................................................................. 48

    B.  Plaintiffs have not pleaded the elements of unjust enrichment ...................... 48

IV.  Plaintiffs fail to plead a violation of the Commodity Exchange Act (Counts IV-VII) ............................................................................................................. 50

    A.  Plaintiffs' CEA claims are derivative of their Sherman Act claims ............... 52

    B.  Plaintiffs fail to meet the heightened pleading standard applicable to CEA claims .................................................................................................... 52

    C.  Plaintiffs fail to allege a net loss .................................................................... 53

V.  Plaintiffs fail to plead fraudulent concealment ......................................................... 54

    A.  Plaintiffs do not plead concealment ............................................................... 55

    B.  Plaintiffs do not allege that they failed to discover the conspiracy ................ 57

    C.  Plaintiffs do not plead due diligence .............................................................. 58

VI.  Plaintiffs' claims should be dismissed with prejudice ............................................... 59

Conclusion ............................................................................................................................. 60

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*In re Amaranth Nat. Gas Commodities Litig.,*
   587 F. Supp. 2d 513 (S.D.N.Y. 2008) ......................................................... 53

*In re Amaranth Nat. Gas Commodities Litig.,*
   269 F.R.D. 366 (S.D.N.Y. 2010) ................................................................ 51

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................... 7, 8, 27, 38

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
   Carpenters,*
   459 U.S. 519 (1983) ................................................................................. 43

*Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.,*
   94 F. Supp. 3d 1035 (D. Minn. 2015) ......................................................... 37

*In re Beef Indus. Antitrust Litig. MDL Docket No. 248,*
   710 F.2d 216 (5th Cir. 1983) ................................................................. 7, 36

*In re Beef Indus. Antitrust Litig. MDL Docket No. 248,*
   907 F.2d 510 (5th Cir. 1990) ........................................................... 7, 13, 36

*Been v. O.K. Indus., Inc.,*
   495 F.3d 1217 (10th Cir. 2007) ................................................................ 44

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................ *passim*

*Blodorn Lumber Co. of North Platte v. Nielson,*
   915 N.W.2d 786 (Neb. 2018) .................................................................... 49

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.,*
   203 F.3d 1028 (8th Cir. 2000) .................................................... 7, 14, 16, 35

*Brown v. Medtronic, Inc.,*
   628 F.3d 451 (8th Cir. 2010) ...................................................................... 8

*Buetow v. A.L.S. Enters. Inc.,*
   564 F. Supp. 2d 1038 (D. Minn. 2008) ......................................................... 9

*Cathcart v. Meyer,*
   88 P.3d 1050 (Wyo. 2004) ........................................................................ 49

iii

# TABLE OF AUTHORITIES
## (continued)

**Cases – continued**                                                          **Page(s)**

*CFTC v. Kraft Foods Group, Inc.*,
   153 F. Supp. 3d 996 (N.D. Ill. 2015) ........................................................... 53

*CFTC v. Kratville*,
   796 F.3d 873 (8th Cir. 2015) ..................................................................... 50

*Chamberlain v. Reddy Ice Holdings, Inc.*,
   757 F. Supp. 2d 683 (E.D. Mich. 2010)........................................... 19, 20, 21

*In re Chocolate Confectionary Antitrust Litig.*,
   801 F.3d 383 (3rd Cir. 2015) ...................................................................... 35

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) ....................................................................... 18

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
   851 F.2d 478 (1st Cir. 1988) ....................................................................... 10

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
   No. 11-MD-2213(RPP), 2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013) ..................... 11

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984)..................................................................................... 9

*In re Crude Oil Commodity Litig.*,
   No. 06 Civ. 6677(NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007).................... 53

*Dahl v. R.J. Reynolds Tobacco Co.*,
   742 N.W.2d 186 (Minn. Ct. App. 2007)...................................................... 47

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*,
   No. 16-02709-MD-W-GAF, 2019 WL 1418292 (W.D. Mo. Mar. 21,
   2019) .................................................................................................... 46

*ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*,
   355 F. Supp. 3d 785 (D. Minn. 2019)......................................................... 60

*In re Elevator Antitrust Litig.*,
   No. 04-cv-1178(TPG), 2006 WL 1470994 (S.D.N.Y. May 30, 2006)....................... 11

## TABLE OF AUTHORITIES
### (continued)

**Cases – continued**                                                    **Page(s)**

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) ........................................................... 35

*Erie Cty. v. Morton Salt, Inc.*,
    702 F.3d 860 (6th Cir. 2012) ....................................................... 33

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
    788 F. Supp. 1042 (D. Minn. 1992) ...................................... 26, 34

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) .................................... 14

*In re GSE Bonds Antitrust Litig.*,
    No. 19-cv-1704, 2019 WL 4071070 (S.D.N.Y. Aug. 29, 2019) .................... 23, 24, 37

*Harry v. Total Gas & Power N. Am., Inc.*,
    244 F. Supp. 3d 402 (S.D.N.Y. 2017) ...................................... 54

*Hendrick v. Moresco*,
    No. 116,927, 2017 WL 3113221 (Kan. Ct. App. 2017) ............................. 49

*Hershey v. Energy Transfer Partners, L.P.*,
    610 F.3d 239 (5th Cir. 2010) ....................................................... 51

*Holdsworth v. Nissly*,
    520 N.W.2d 332 (Iowa Ct. App. 1994) ...................................... 48

*Holiday Wholesale Grocery Co. v. Philip Morris Inc.*,
    231 F. Supp. 2d 1253 (N.D. Ga. 2002) .......................... 33, 36, 37

*IBP, Inc. v. Glickman*,
    187 F.3d 974 (8th Cir. 1999) ...........................................*passim*

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ...................................................... 23, 33

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*,
    661 F. Supp. 2d 1039 (D. Minn. 2009) ....................................... 9

## TABLE OF AUTHORITIES
### (continued)

**Cases – continued**                                                          **Page(s)**

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   Civ. No. 13-2664 ADM/SER, 2014 WL 943224 (D. Minn. Mar. 11,
   2014) ................................................................................................. 47, 58

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   797 F.3d 538 (8th Cir. 2015) ..................................................... 8, 9, 10, 45

*Jackson v. Swift Eckrich, Inc.*,
   53 F.3d 1452 (8th Cir. 1995) ............................................................. 44, 55

*Kanne v. Visa U.S.A. Inc.*,
   723 N.W.2d 293 (Neb. 2006) .................................................................. 47

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
   910 F.3d 927 (7th Cir. 2018) .................................................................. 25

*In re Late Fee & Over-Limit Fee Litig.*,
   528 F. Supp. 2d 953 (N.D. Cal. 2007) .................................................... 34

*Legg v. West Bank*,
   873 N.W.2d 763 (Iowa 2016) ................................................................. 49

*Lerma v. Univision Commc'ns, Inc.*,
   52 F. Supp. 2d 1011 (E.D. Wis. 1999) ................................................... 27

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   935 F. Supp. 2d 666 (S.D.N.Y. 2013) ......................................... 52, 53, 54

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   213 F. Supp. 3d 530 (S.D.N.Y. 2016) .................................................... 51

*In re LTL Shipping Servs. Antitrust Litig.*,
   No. 1:08-MD-01895-WSD, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009) ................. 34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................... 10

*McDonough v. Anoka Cty.*,
   799 F.3d 931 (8th Cir. 2015) ................................................................ 6, 8

## TABLE OF AUTHORITIES
### (continued)

**Cases – continued**                                                                 **Page(s)**

*In re Metawave Commc'ns Corp. Secs. Litig.*,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003) ........................................................... 21, 26

*Midwest Commc'ns, Inc. v. Minn. Twins, Inc.*,
    779 F.2d 444 (8th Cir. 1985) ..................................................................... 43

*In re Milk Prods. Antitrust Litig.*,
    84 F. Supp. 2d 1016 (D. Minn. 1997) ....................................................... 11, 55, 56, 58

*In re Monosodium Glutamate Antitrust Litig.*,
    No. CIV. 00MDL1328PAM, 2003 WL 297287 (D. Minn. Feb. 6, 2003) ................... 55

*Montierth v. Deutsche Bank Nat'l Tr. Co.*,
    415 P.3d 654 (Wyo. 2018) ......................................................................... 47

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ................................................................... 32

*In re Mylan N.V. Secs. Litig.*,
    379 F. Supp. 3d 198 (S.D.N.Y. 2019) ...................................................... 23

*N. Cheyenne Tribe v. Roman Catholic Church*,
    296 P.3d 450 (Mont. 2013) ...................................................................... 47, 50

*Nelson v. Nelson*,
    205 P.3d 715 (Kan. 2009) ......................................................................... 47, 48

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    350 F. Supp. 2d 160 (D. Me. 2004) ........................................................... 48

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp. 2d 987 (E.D. Mich. 2010) .................................................... 18, 19, 20

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018) ..................................................................... 14, 32

*Pickett v. Tyson Fresh Meats, Inc.*,
    315 F. Supp. 2d 1172 (M.D. Ala. 2004) ................................................... 5, 45

*Pickett v. Tyson Fresh Meats, Inc.*,
    420 F.3d 1272 (11th Cir. 2005) ................................................................. 36

## TABLE OF AUTHORITIES
### (continued)

**Cases – continued**                                                          **Page(s)**

*In re Pilgrim's Pride Corp.*,
  728 F.3d 457 (5th Cir. 2013) ................................................................... 45

*Pilot Inv. Group v. Hofarth*,
  550 N.W.2d 27 (Neb. 1996) ..................................................................... 49

*In re Platinum & Palladium Commodities Litig.*,
  828 F. Supp. 2d 588 (S.D.N.Y. 2011) ....................................................... 52

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
  828 F.2d 211 (4th Cir. 1987) .................................................................... 57

*Podpeskar v. Makita USA Inc.*,
  247 F. Supp. 3d 1001 (D. Minn. 2017) ...................................................... 55

*In re Pork Antitrust Litig.*,
  No. 18-cv-1776 (JRT/HB), 2019 WL 3752497 (D. Minn. Aug. 8, 2019)............ *passim*

*In re Possis Med., Inc. Secs. Litig.*,
  No. 05-CV-1084, 2007 WL 335051 (D. Minn. Feb. 1, 2007).......................... 3, 17, 19

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  893 F.3d 1047 (8th Cir. 2018) ............................................................. *passim*

*Ripplinger v. Amoco Oil Co.*,
  916 F.2d 441 (8th Cir. 1990) .................................................................... 55

*Schumacher v. Cargill Meat Sols. Corp.*,
  515 F.3d 867 (8th Cir. 2008) .......................................................... 7, 36, 44

*Shoemaker v. Cardiovascular Sys., Inc.*,
  No. 16-CV-568(DWF/KMM), 2017 WL 1180444 (D. Minn. Mar. 29,
  2017) ................................................................................................ 17, 21

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017)......................................................... 54

*Sports & Travel Mktg., Inc. v. Chi. Cutlery Co.*,
  811 F. Supp. 1372 (D. Minn. 1993).......................................................... 49

## TABLE OF AUTHORITIES
### (continued)

**Cases – continued**                                                        **Page(s)**

*Stahl v. U.S. Dep't of Agric.*,
   327 F.3d 697 (8th Cir. 2003) ................................................. 8

*State v. Hultgren*,
   541 P.2d 1211 (Mont. 1975) ................................................ 49

*State v. Unisys Corp.*,
   637 N.W.2d 142 (Iowa 2001) .............................................. 47

*Summerhill v. Terminix, Inc.*,
   637 F.3d 877 (8th Cir. 2011) ......................................... 55, 56

*Tatone v. SunTrust Mortg., Inc.*,
   857 F. Supp. 2d 821 (D. Minn. 2012) ................................. 11

*Terry v. Tyson Farms, Inc.*,
   604 F.3d 272 (6th Cir. 2010) .............................................. 44

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) .............................................. 60

*Three Way, Inc. v. Burton Enters., Inc.*,
   177 P.3d 219 (Wyo. 2008) .................................................. 49

*In re Tyson Foods, Inc. Secs. Litig.*,
   275 F. Supp. 3d 970 (W.D. Ark. 2017) .............................. 33

*United States v. Bame*,
   721 F.3d 1025 (8th Cir. 2013) ........................................... 49

*Vaccaro v. City of Omaha*,
   579 N.W.2d 535 (Neb. 1998) ............................................. 49

*Washington Cty. Health Care Auth. Inc. v. Baxter Int'l Inc.*,
   328 F. Supp. 3d 824 (N.D. Ill. 2018) ................................ 14

*Welu v. Twin Hearts Smiling Horses, Inc.*,
   386 P.3d 937 (Mont. 2016) ................................................ 49

*Wheeler v. Pilgrim's Pride Corp.*,
   591 F.3d 355 (5th Cir. 2009) .............................................. 45

## TABLE OF AUTHORITIES
### (continued)

**Statutes**                                                        **Page(s)**

Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ........................................ 1

    7 U.S.C. § 13(a)(2) ........................................................... 50

    7 U.S.C. § 25(a)(1) ........................................................... 53

    7 U.S.C. § 25(c) .............................................................. 55

Packers & Stockyards Act, 7 U.S.C. § 181 *et seq.* ................................... 1

    7 U.S.C. § 192 ............................................................... 44

Sherman Act, 15 U.S.C. § 1 *et seq.* ................................................. 1

    15 U.S.C. § 1 ................................................................. 9

    15 U.S.C. § 15b ............................................................. 55

Consolidated Appropriations Act of 2016,
    Pub. L. No. 114-113, 129 Stat. 2242 (2015) ................................... 30

Kan. Stat. Ann. § 60-512(1) .......................................................... 55

Neb. Rev. Stat. § 25-206 ............................................................. 55

**Rules & Regulations**

17 C.F.R. § 180.1 .................................................................... 51

17 C.F.R. § 180.2 .................................................................... 50

17 C.F.R. § 229.303(a)(3)(ii) ........................................................ 37

Fed. R. Civ. P. 9(b) ............................................................ 52, 55

Fed. R. Civ. P. 12(b)(6) ............................................................. 7

Fed. R. Evid. 404(b)(1) ............................................................. 36

## TABLE OF AUTHORITIES
### (continued)

**Other Authorities**                                                                          **Page(s)**

*About*, Nat'l Cattlemen's Beef Ass'n, https://www.ncba.org/about.aspx ........................ 35

*Cuadro Comparativo Anual Nacional Pecuario*, Sistema Nacional de
   Información e Integración de Mercados, http://www.economia-
   sniim.gob.mx/2010prueba/CuadroAnualConsPec.asp?per=A&xedo=S&
   x=49&y=15 ............................................................................................................ 31

H.R. Rep. No. 85-1048 (1957) ...................................................................................... 44

*Livestock*, CME Group,
   https://www.cmegroup.com/trading/agricultural/#livestock ...................................... 54

Ltr. from Bill Bullard, CEO, R-CALF, to Sen. Charles E. Grassley,
   Chairman of the Sen. Comm. on the Jud. (Jan. 5, 2016),
   https://perma.cc/Z5U4-948P ................................................................................ 57, 59

Ltr. from Sen. Charles E. Grassley, Chairman of the Sen. Comm. on the
   Jud., to Gene L. Dodaro, Comptroller General (Apr. 20, 2016),
   https://perma.cc/Z5U4-948P .................................................................................... 58

Lynch, David J., *"America First" May Be Last Hope for These Cattle
   Ranchers*, Wash. Post (May 3, 2019) ......................................................................... 31

Press Release, JBS, *JBS USA Acquires U.S. Operations of XL Foods* (Apr.
   4, 2013), https://jbssa.com/about/news/2013/04-04/#.XW3Q8yhKjx5...................... 14

U.S. Dep't of Agric. Econ. Research Serv., *Historical Monthly Price
   Spread Data for Beef, Pork, Broilers* (Feb. 28, 2019),
   https://www.ers.usda.gov/webdocs/DataFiles/52160/history.xls ............................... 42

U.S. Dep't of Agric. Econ. Research Serv., *Livestock & Meat Domestic
   Data* (July 26, 2019), https://www.ers.usda.gov/data-products/livestock-
   meat-domestic-data/livestock-meat-domestic-data/#Livestock and
   poultry slaughter ....................................................................................................... 40

U.S. Dep't of Agric. Econ. Research Serv., *Livestock Prices* (Aug. 27, 2019),
   https://www.ers.usda.gov/webdocs/DataFiles/51875/LivestockPrices.xlsx................ 42

# TABLE OF AUTHORITIES
## (continued)

**Other Authorities – continued**                                                                 **Page(s)**

U.S. Dep't of Agric., *FSIS Meat, Poultry and Egg Product Inspection
   Directory* (Aug. 5, 2019),
   https://www.fsis.usda.gov/wps/wcm/connect/bf8d9766-9767-4e0c-a9f1-
   efea0b2a42bc/MPI_Directory_Establishment_Name.pdf?MOD=AJPERES ............ 30

U.S. Gov't Accountability Off., GAO-18-296, *U.S. Department of
   Agriculture:  Additional Data Analysis Could Enhance Monitoring of
   U.S. Cattle Market* (Apr. 2018),
   https://www.gao.gov/assets/700/691178.pdf ....................................................... *passim*

## INTRODUCTION

Common sense – and economic theory – dictate that commodity prices follow the law of supply and demand.  So when fed cattle prices hit a historic peak in late 2014, driven in large part by reduced supply (caused by a significant drought), the market responded as expected.  Producers increased the supply of fed cattle, and fed cattle prices fell accordingly.

Plaintiffs, producers who raise fed cattle and an organization that represents them, refuse to accept that ordinary market forces responded to correct an extraordinary market situation.  Instead, Plaintiffs dream up an elaborate scheme in which Defendants purportedly agreed to suppress cattle prices in response to the historically high prices.  Plaintiffs allege that Defendants colluded in five ways:  reducing slaughter volumes; curtailing fed cattle purchases in the cash market; coordinating procurement practices; uneconomically importing fed cattle; and reducing slaughter capacity.

That conspiracy, Plaintiffs allege, violated the Sherman Act, 15 U.S.C. § 1 *et seq.*; the Packers and Stockyard Act, 7 U.S.C. § 181 *et seq.* (PSA); the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* (CEA); and state unjust-enrichment laws.  Plaintiffs make these allegations even though they acknowledge that the federal government investigated the fall in fed cattle prices and found no evidence that "packers engaged in anticompetitive or improper behavior."  U.S. Gov't Accountability Off., GAO-18-296, *U.S. Department of Agriculture:  Additional Data Analysis Could Enhance Monitoring of U.S. Cattle Market* 16 (Apr. 2018) (GAO Report), https://www.gao.gov/assets/700/691178.pdf.

To plead an antitrust conspiracy, a plaintiff must provide direct evidence of an unlawful agreement, or point to facts showing that the defendants acted in parallel, plus facts that tend to exclude the possibility that the defendants acted independently. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). After all, that companies in an industry might take similar actions in response to market conditions – *i.e.*, engage in parallel conduct – does not mean that they have conspired to do so. Courts carefully scrutinize antitrust conspiracy claims because discovery in antitrust cases is "inevitably costly and protracted." *Id*. at 558 (internal quotation marks omitted).

Plaintiffs do not come close to alleging the facts necessary to support their claim of a massive conspiracy in the beef industry. They do not provide any plausible direct evidence of a conspiracy; they do not sufficiently allege parallel conduct; and they do not plead additional facts suggesting that any Defendant's conduct was due to a conspiracy. And because all of Plaintiffs' claims depend on the claimed conspiracy, they all fail as a matter of law.

**Plaintiffs fail to plead parallel conduct to support a conspiracy.** Plaintiffs identify almost no conduct attributable to particular Defendants during the alleged conspiracy, let alone explain how that conduct was done in parallel with other Defendants' conduct. As this Court recently held, it is not enough to plead "industry-wide data" and then ask a court to assume that each defendant took actions consistent with industry trends, rather than alleging particular actions taken by particular defendants. *In re Pork Antitrust Litig.*, No. 18-cv-1776 (JRT/HB), 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019). Yet that is precisely what Plaintiffs have done here. Without "specific information" tying each

2

Defendant to the alleged conspiracy, Plaintiffs do not even allege parallel conduct, and so their claims fail right out of the gate. *Id.*

In the hundreds of paragraphs in the Complaint, there are only two defendant-specific allegations, and neither establishes parallel conduct. First, the Complaint alleges that three Defendants closed four slaughter plants. But three of the four plant closings occurred before the supposed conspiracy began. And the Complaint acknowledges that the closures were not done in parallel (they occurred over two years), and that they can be explained as lawful market behavior (packers' margins depend on optimally utilizing their plants).

Second, the Complaint points to two Defendants' public statements about the industry. But the Complaint does not link those statements – which are general statements about the industry, and do not mention other Defendants – to any specific actions taken by any Defendant. As this Court has recognized, those types of statements simply do not show the parallel conduct or collusion necessary for a conspiracy. *In re Pork*, 2019 WL 3752497, at *9.

**The alleged confidential witnesses do not show a conspiracy.** Plaintiffs attempt to bolster their claim of conspiracy with allegations from two confidential witnesses. Plaintiffs were required to describe each witness "with sufficient particularity" so the Court can determine whether it is plausible that "a person in the position occupied by the source would possess the information alleged." *In re Possis Med., Inc. Secs. Litig.*, No. 05-CV-1084 (JMR/FLN), 2007 WL 335051, at *4 (D. Minn. Feb. 1, 2007) (internal quotation marks omitted).

Here, Plaintiffs provide almost no particulars about the confidential witnesses. Plaintiffs do not name the witnesses, identify which Defendants they worked for or with, explain the basis for their alleged knowledge, or provide any other facts that could be used to judge their reliability.  In fact, the Complaint admits that the witnesses lacked personal knowledge; it says that they relied on reports from other, unnamed individuals (and it does not establish those individuals' personal knowledge, either).  Defendants asked Plaintiffs for basic identifying information about the witnesses, and Plaintiffs refused to provide it.

Even if credited, the confidential witness allegations do not support a conspiracy. Neither witness provides any defendant-specific information, including who did what in the supposed conspiracy.  Witness 1 claims that Defendants "agreed" to cut production, but he does not identify which Defendants agreed to such cuts, let alone when, how, and to what extent.  Compl. ¶ 81.  Witness 2 claims that Defendants enforced a queuing convention, but he does not say which Defendants participated, when they did so, and to whom.  It would be unprecedented to allow an antitrust suit to proceed to discovery on such barebones allegations.

**Plaintiffs fail to plead other evidence suggesting a conspiracy.**  Even if the Court were to look past Plaintiffs' failure to allege parallel conduct, Plaintiffs' claims would fail because none of the evidence of industry-wide conduct or asserted plus factors supports an inference that Defendants colluded with one another.

All of the actions Plaintiffs assert were part of the conspiracy either are directly contradicted by other allegations in the Complaint or are consistent with lawful competition.  For example, Plaintiffs claim that Defendants agreed not to expand slaughter

capacity – yet Plaintiffs' own data shows that slaughter volumes *increased* during the period of the alleged conspiracy.  Further, four of Plaintiffs' asserted plus factors relate to market characteristics (industry concentration, inelastic supply and demand, relative bargaining power, and barriers to entry) that simply show a concentrated market, not a conspiracy.  And Plaintiffs' other four asserted plus factors (similar cost structures, opportunities to collude, prior conduct, and public statements) all are consistent with lawful competition.  For example, Plaintiffs allege that because Defendants belong to trade organizations, they had opportunities to collude.  But trade organizations serve many lawful purposes, and mere membership in one does not make a company a co-conspirator. Plaintiffs never identify any meetings or conversations in which Defendants agreed to the supposed conspiracy.

**Plaintiffs' other claims fail because they are derivative of the antitrust claim.** Plaintiffs' claims under the PSA, state unjust-enrichment law, and the CEA rest on the same conspiracy as Plaintiffs' Sherman Act claims, and they should be dismissed for the same reasons.

Each claim also fails for independent reasons.  In the PSA claim, Plaintiffs complain about the use of marketing agreements in the cattle industry.  But those agreements are completely lawful, not anticompetitive.  *See IBP, Inc. v. Glickman*, 187 F.3d 974 (8th Cir. 1999); *Pickett v. Tyson Fresh Meats, Inc.*, 315 F. Supp. 2d 1172 (M.D. Ala. 2004), *aff'd*, 420 F.3d 1272 (11th Cir. 2005).  The unjust-enrichment claims fail because (among other reasons) Plaintiffs have an adequate legal remedy that precludes resort to unjust enrichment.  And the CEA claims fail because Plaintiffs do not allege a key element of

5

those claims – that they suffered a net loss on specific commodities transactions due to the supposed conspiracy.

**Plaintiffs' claims are untimely.**   Nearly all of Plaintiffs' claims are time-barred. Plaintiffs filed their first complaint in this case more than four years after the start of the alleged conspiracy.  Yet the statutes of limitations for their Sherman Act, PSA, CEA, and two of their state-law unjust-enrichment claims are four years or less.  Plaintiffs assert fraudulent concealment, but the Complaint does not allege the necessary predicates for it. Nothing here was concealed – the Complaint relies almost exclusively on publicly-available data, and Plaintiffs have been publicly accusing Defendants of this conspiracy for years.

**Plaintiffs cannot fix the flaws in the Complaint by repleading their claims.**  The Complaint is full of factual allegations that either directly contradict Plaintiffs' claims or implicitly undercut the claim of a conspiracy by providing "obvious alternative explanations" for the fall in prices.  *McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (internal quotation marks omitted).  These "obvious alternative explanations" are why Plaintiffs' allegations of packer collusion already have been rejected many times.

At the urging of one of the Plaintiffs, the General Accounting Office studied what caused the drop in fed cattle prices in 2015.  The GAO investigated for two years, then issued a 56-page report concluding that the fall in prices was caused by market forces such as "drought, costs for feed, and the price of substitute proteins" – not because "packers engaged in anticompetitive or improper behavior."  GAO Report 12-14, 16.  And over the years, Plaintiffs have filed other lawsuits alleging similar claims, and courts have

repeatedly rejected their allegations of wrongdoing against packers in the U.S. beef market. *See, e.g.*, *Schumacher v. Cargill Meat Sols. Corp.*, 515 F.3d 867 (8th Cir. 2008); *IBP, Inc.*, 187 F.3d 974; *In re Beef Indus. Antitrust Litig. MDL Docket No. 248*, 907 F.2d 510 (5th Cir. 1990); *In re Beef Indus. Antitrust Litig. MDL Docket No. 248*, 710 F.2d 216 (5th Cir. 1983).

Put simply, Plaintiffs want a return to the historically high prices for fed cattle. But the antitrust laws do not require that outcome. Defendants were allowed to offer cattle producers less money when the supplies of cattle increased. The fact that Defendants took common-sense actions in reaction to market forces does not permit an inference that they conspired together to do so. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1037 (8th Cir. 2000) (en banc) ("[W]here there is an independent business justification for the defendant[s'] behavior, no inference of conspiracy can be drawn.").

Plaintiffs have had years to try to build a case. If Plaintiffs had additional facts to support their claims of conspiracy, they would have included them in the Complaint. They did not. Plaintiffs' claims are not going to become more plausible with repleading. The Court therefore should dismiss the Complaint with prejudice.

## LEGAL STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "sufficient factual matter" that if "accepted as true" " 'state[s] a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Instead, the complaint must plead facts that tend to

7

support the claim of unlawful behavior.  A complaint that "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

To meet that standard, plaintiffs pleading an antitrust conspiracy must plead "factual content" – such as the "relevant individuals, acts, and conversations" – that "raise a right to relief above the speculative level."  *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1056-57 (8th Cir. 2018) (citations and internal quotation marks omitted).  The allegations must be specific to the defendants in the case; plaintiffs cannot plead industry-wide trends and ask the court to speculate that the defendants contributed to those trends. *In re Pork*, 2019 WL 3752497, at *8.  And the court must consider "whether there are lawful, 'obvious alternative explanation[s]' for the alleged conduct."  *McDonough*, 799 F.3d at 946 (quoting *Iqbal*, 556 U.S. at 682).

In determining whether plaintiffs have pleaded facts sufficient to support an inference of unlawful conduct, the court may look to the complaint itself and to documents attached to or incorporated by reference in the complaint.  *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459-60 (8th Cir. 2010); *see Twombly*, 550 U.S. at 568 n.13.  The court also may consider items in the public record.  *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003).

Courts are particularly vigilant about "weeding out meritless antitrust claims at the pleading stage."  *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (internal quotation marks omitted).  That is because of the "unusually high cost of discovery in antitrust cases" coupled with the "limited success of judicial supervision in

checking discovery abuse." *Id.* (internal quotation marks omitted). Thus, while it "is one thing to be cautious before dismissing an antitrust complaint in advance of discovery," it is "quite another to forget that proceeding to antitrust discovery can be expensive." *Twombly*, 550 U.S. at 558.

## ARGUMENT

## I. PLAINTIFFS FAIL TO PLEAD A VIOLATION OF THE SHERMAN ACT (COUNT I)

The Sherman Act prohibits conspiracies to unreasonably restrain trade, in order to promote and protect competition, and ultimately to benefit consumers. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984). To make out a claim under Section 1 of the Sherman Act, "a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a *per se* rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009) (internal quotation marks omitted); *see* 15 U.S.C. § 1. Because the "hallmark of a conspiracy is agreement," *Buetow v. A.L.S. Enters. Inc.*, 564 F. Supp. 2d 1038, 1041 (D. Minn. 2008) (citation and internal brackets omitted), the plaintiff "must demonstrate that the defendants shared a unity of purpose or a common design and understanding, or a meeting of the minds," *Insulate SB, Inc.*, 797 F.3d at 543 (citation and internal quotation marks omitted).

A plaintiff alleging an antitrust conspiracy can either plead direct evidence of an agreement, or plead that the defendants acted in parallel and that there is "substantial

additional evidence – often referred to as 'plus factors'" – that tends to exclude the possibility that the defendants were acting lawfully. *In re Pork*, 2019 WL 3752497, at *6 (internal quotation marks omitted); *see Twombly*, 550 U.S. at 557. For a plaintiff proceeding without direct evidence, pleading parallel conduct is necessary but not sufficient; defendants taking similar actions at the same time does not establish that they *agreed* to take those actions to restrain trade. *Insulate SB, Inc.*, 797 F.3d at 544; *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988). "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

Plaintiffs have failed to plead the necessary facts to sufficiently allege an antitrust conspiracy. First, the Complaint includes almost no allegations specific to any individual Defendant; instead, it primarily relies on industry-wide trend data. Second, the two claimed confidential witnesses do not support the inference of a conspiracy, because the Complaint provides almost no detail about them and what they allegedly heard, and the facts they allege do not suggest a conspiracy in any event. Third, the conduct alleged is consistent with lawful conduct; in fact, many of the Complaint's allegations contradict and undercut the asserted conspiracy. Fourth, Plaintiffs' asserted plus factors do not suggest that the alleged conduct was part of a conspiracy, rather than independent, lawful conduct.

A.      **Plaintiffs fail to allege parallel conduct**

1.      **The Complaint relies primarily on industry-wide trend data rather than defendant-specific allegations**

Allegations of antitrust conspiracy must be individualized to each defendant. "Without specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted" in furtherance of the alleged conspiracy. *In re Pork*, 2019 WL 3752497, at *8. "A complaint which lumps all defendants together . . . does not sufficiently allege who did what to whom" and should be dismissed. *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012); *see, e.g.*, *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1020 (D. Minn. 1997) (dismissing claims where the complaint "attempt[s] to lump [defendant] in with the other defendants"), *aff'd*, 195 F.3d 430 (8th Cir. 1999).

Plaintiffs cannot solve this problem by attributing industry-wide trends to each Defendant. That is because industry-wide data "does nothing to indicate how any of the individual Defendants acted." *In re Pork*, 2019 WL 3752497, at *8; *see, e.g.*, *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, No. 11-MD-2213(RPP), 2013 WL 1100770, at *4 (S.D.N.Y. Mar. 18, 2013) (dismissing claims based on "generalized fluctuations" in the market because plaintiffs "d[id] not . . . connect or link these fluctuations to actions undertaken by [a defendant]"), *aff'd*, 560 Fed. App'x 84 (2d Cir. 2014) (unpublished); *In re Elevator Antitrust Litig.*, No. 04-cv-1178(TPG), 2006 WL 1470994, at *2-*3 (S.D.N.Y. May 30, 2006) (dismissing antitrust claims alleged "in

entirely general terms without any specification of any particular activities by any particular defendant"), *aff'd*, 502 F.3d 47 (2d Cir. 2007) (per curiam).

The Complaint does not contain factual allegations specific to any Defendant for most of the five alleged actions of the conspiracy. Plaintiffs do not allege any defendant-specific slaughter volumes; any defendant-specific purchase data; any defendant-specific procurement practices; or any defendant-specific cattle import figures or costs. Nor do they allege any defendant-specific actions to coordinate and collude. Without those defendant-specific allegations, this Court would have to "infer" that each individual Defendant took the actions alleged "seemingly simply because they make up the majority of the industry." *In re Pork*, 2019 WL 3752497, at *8. This Court has refused to "engage in such speculation" before, and it should refuse to do so here. *Id.*

Plaintiffs thus fail to plead the necessary "factual content" of the alleged conspiracy. The allegations in this case are even more meager than in the pork antitrust case. In that case, direct and indirect purchasers of pork alleged that eight pork producers conspired to raise the wholesale and retail prices of pork. *In re Pork*, 2019 WL 3752497, at *2. The plaintiffs alleged that the pork producers colluded to limit pork production and exchanged information about their operations through Agri Stats, an industry bench-marking company. *Id.* at *2-*3. This Court dismissed the complaint because the plaintiffs failed to plead facts showing that the particular defendants decreased pork production during the conspiracy, let alone as part of an agreement. *Id.* at *8-*9. A key problem was the lack of allegations to link each defendant to the supposed conspiracy. *Id.*

12

But the plaintiffs in the pork case at least were able to adequately allege that one defendant engaged in production cuts, and to point to a statement by that defendant's CEO indicating that he had spoken to other producers about cuts. *In re Pork*, 2019 WL 3752497, at *8-*9 & *8 n.9. There are no such allegations here. Plaintiffs do not tie even a single Defendant to the alleged conspiracy. Plaintiffs therefore cannot allege parallel conduct, and their claims fail at the outset. *See, e.g.*, *In re Beef Indus.*, 907 F.2d at 514.

### 2.    The few defendant-specific allegations do not establish parallel conduct

The few defendant-specific allegations in the complaint relate to asserted plant closures and to public statements about the industry. Neither supports an inference of parallel conduct.

### a.    Plant closures

First, the Complaint alleges that "Defendants, simultaneously, closed and idled plants." Compl. ¶ 7. It cites four instances of plant closures:

| Closure date | Defendant | Plant location | Capacity |
|:---:|:---:|:---:|:---:|
| February 2013 | Cargill | Plainview, TX | 4,000 head/day |
| June 2014 | National Beef | Brawley, CA | 2,000 head/day |
| August 2014 | Cargill | Milwaukee, WI | 1,300-1,400 head/day |
| August 2015 | Tyson | Denison, IA | 2,000 head/day |

*Id.* ¶ 107. Plaintiffs also allege that JBS decided to leave "its newly acquired Nampa, Idaho plant closed," but do not specify when JBS acquired the plant or decided to leave it closed. *Id.*

These allegations do not show parallel conduct because they have two obvious temporal problems: most of them occurred before the supposed conspiracy began, and the

13

closures are not simultaneous with each other.  First, the conspiracy supposedly began in January 2015, Compl. ¶ 1, but the first three alleged plant closures occurred before that date, and so they cannot be evidence of that conspiracy, *see Blomkest Fertilizer, Inc.*, 203 F.3d at 1037 n.7 (act occurring "before the class contends the conspiracy ever began . . . is . . . of little relevance").  The fifth allegation – that JBS left its Nampa, Idaho, plant closed – also cannot support the alleged conspiracy, because the Complaint does not allege when JBS acquired the plant, when JBS decided to keep it closed, or why JBS decided to keep it closed.[1]

Second, these alleged closures occurred too far apart to be parallel conduct.  The first two alleged plant closures occurred more than a year apart, and then another year separated the third and fourth closures.  That is not parallel conduct.  *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018) (holding that conduct "executed under dissimilar circumstances and separated by six months" did not permit an inference of parallel conduct); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) (holding that a three-month separation did not show parallel conduct).  The alleged closures also did not "occur in a predictable pattern or scale," which "tends to undermine, rather than support, the notion that the defendants engaged in parallel conduct." *Washington Cty. Health Care Auth. Inc. v. Baxter Int'l Inc.*,

---

[1]  In fact, JBS acquired the plant in April 2013, nearly two years before the start of the supposed conspiracy, and the plant already was closed when JBS acquired it.  *See* Press Release, JBS, *JBS USA Acquires U.S. Operations of XL Foods* (Apr. 4, 2013), https://jbssa.com/about/news/2013/04-04/#.XW3Q8yhKjx5.

328 F. Supp. 3d 824, 836-37 (N.D. Ill. 2018).  Nor were they tied to any evidence of collusion – for instance, Plaintiffs do not claim that Defendants had a particular meeting or conversation in which they agreed to close plants, and then Defendants closed the plants in accordance with that agreement.

And the alleged closures had an obvious lawful explanation:  There was a shortage of fed cattle in 2013 and 2014 caused by a significant drought, and so there were fewer cattle available to slaughter.  Compl. ¶ 6; *see* GAO Report 12 ("[F]rom 2010 through early 2013 a prolonged drought . . . caused the supply of young cattle to decrease"; the domestic cattle inventory "decreased from about 96.5 million in 2007 to about 88.5 million in 2014.").  In this industry, packers' margins depend directly on how well they utilize their plants.  The Complaint acknowledges this.  Compl. ¶ 70 (explaining that "average cost of production increases if [packers] underutilize their plant capacity").  So when fed cattle volumes fell, packers had a strong economic incentive to close underutilized and inefficient plants.

### b.   Public statements

The only other defendant-specific allegations in the Complaint are five alleged "public statements by [two Defendants'] senior executives about their firms' commitment to production restraint."  Compl. ¶ 124.  These statements are not evidence of parallel conduct, but (if anything) are evidence of "plus factor[s]."  *In re Pork*, 2019 WL 3752497, at *8.  However categorized, the statements do not support a conspiracy.

The alleged statements were made by executives of the two publicly-held Defendants (Tyson and JBS) during earning calls.[2]   All of the cited statements were ordinary and legitimate communications to investors in the wake of the fall in fed cattle supply caused by the drought.  Compl. ¶¶ 125-29.  Two of the five statements are from before the start of the alleged conspiracy, *id.* ¶¶ 125-26, so they do not provide evidence of the alleged conspiracy, *see Blomkest Fertilizer, Inc.*, 203 F.3d at 1034 n.6.  None of the statements refers to any other Defendant – or indeed, any other competitor – and none suggests that there were any communications between the Defendants indicative of collusion.  One of the statements actually suggests that Defendants were *not* acting in parallel:  In November 2015, Tyson's then-CEO expressed his view that there was "excess industry capacity," Compl. ¶ 129 – which would not be the case if, as alleged, Defendants' conspiracy was in full swing, *see id.* ¶¶ 109-10.  The statements therefore do not support an inference of parallel conduct or a conspiracy.

### 3. The confidential witness allegations do not establish parallel conduct or provide direct evidence of a conspiracy

Plaintiffs attempt to salvage their claim of a conspiracy with statements from two unnamed confidential witnesses.  Witness 1, who allegedly worked as a quality assurance manager at a slaughter plant for one unnamed Defendant, claims that he heard from an unnamed operations manager that Defendants agreed to collectively reduce slaughter volumes to drive down fed cattle prices.  Compl. ¶ 84.  Witness 2, who allegedly worked

---

[2]   The Complaint does not allege that executives from Cargill or National Beef made any such statements.

as the manager of a feedlot, claims that Defendants coordinated cattle purchases through a queueing convention, in which Defendants required producers to give the first high bidder on a pen of cattle the right to match another packer's higher bid, and that he heard from unidentified "industry participants" that Defendants blackballed producers who did not comply. *Id.* ¶¶ 89, 94.

These allegations do not save the Complaint for two reasons. First, Plaintiffs provide very little information about either witness, so the Court cannot assess whether the statements have any foundation, or whether the witnesses even exist. Second, the allegations are conclusory and do not provide the factual content necessary to support a reasonable inference of conspiracy.

### a.   Plaintiffs do not sufficiently identify the confidential witnesses

Because "[c]ourts are understandably wary of 'testimony' by unidentified 'witnesses,'" *In re Possis Med., Inc.*, 2007 WL 335051, at *4 (internal quotation marks omitted), a plaintiff who relies on confidential witnesses must provide sufficient identifying information so the court can determine whether each witness has a basis for his or her claimed knowledge and whether it is plausible that the witness even exists, *see Shoemaker v. Cardiovascular Sys., Inc.*, No. 16-CV-568(DWF/KMM), 2017 WL 1180444, at *8 (D. Minn. Mar. 29, 2017) ("Recognizing that confidential witnesses could have a variety of reasons for speaking to plaintiff's counsel, courts routinely evaluate and disregard the statements on a motion to dismiss." (citation omitted)). A confidential witness "may be ill-informed, may be acting from spite rather than knowledge, may be

misrepresented, [or] may even be nonexistent." *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013). Confidential witnesses therefore must be "sufficiently identified" before their allegations can be accepted as true. *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1013 (E.D. Mich. 2010).[3]

The confidential witness allegations here do not provide any detail that allows the Court to identify or evaluate the witnesses. The Complaint does not specify for which Defendant Witness 1 worked, and it does not establish a basis for his assertions. According to the Complaint, Witness 1 does not have personal knowledge to support his allegations; he relies on an unnamed operations manager from "Slaughter Plant 1" who allegedly told him that Defendants agreed to reduce slaughter volumes. Compl. ¶ 82. The Complaint does not provide facts to assess whether the operations manager had personal knowledge of the claimed conspiracy, either. Witness 1 asserts that he "understands" that the operations manager "had first-hand knowledge," *id*. ¶ 83, but does not provide any foundation for either that "understand[ing]" or that "first-hand knowledge." It is implausible that the operations manager would have that knowledge, because an operations manager in a slaughter plant would not be in a position within the company to enter into a conspiracy on behalf of that company. (A quality assurance manager would be even further removed.) It also is implausible that an operations manager would have the necessary

---

[3] Nearly all of the decisions involving confidential witness statements at the motion-to-dismiss stage are securities fraud cases subject to heightened pleading requirements. Those decisions nonetheless are instructive, because a plaintiff always must provide enough identifying information so that the court can evaluate the plausibility of the witness's allegations.

knowledge of other Defendants' actions even if the companies' principals had agreed to a conspiracy. After all, the Complaint admits that the alleged conspiracy involved multiple Defendants and that the asserted production cuts "varied from plant to plant" among Defendants. *Id.* ¶ 85. The allegations that the quality assurance manager and operations manager could testify to a massive conspiracy in the beef industry simply are implausible. *See In re Possis Med., Inc.*, 2007 WL 335051, at *5 (rejecting confidential witnesses' testimony where "plaintiffs fail to address how or why [the witness] would have had access to the information he or she alleges").

The Complaint provides even less information about Witness 2. The Complaint does not identify the feedlot where Witness 2 worked; indicate that Witness 2 ever had any interaction with any Defendant; or even say that any Defendant ever purchased cattle from Witness 2's feedlot. And Witness 2 (like Witness 1) relies on other, unidentified sources, rather than his own personal knowledge. Witness 2 alleges that he "heard from field buyers and other industry participants about other producers being 'blackballed' for breaking with the queuing convention." Compl. ¶ 94. The Complaint does not allege that those field buyers and industry participants were speaking from personal knowledge (and as explained below, the allegations about the queueing convention are perfectly consistent with lawful behavior).

*Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683 (E.D. Mich. 2010), and *In re Packaged Ice*, 723 F. Supp. 2d 987, highlight the problems with Plaintiffs' confidential witness allegations, because the court in those cases rejected allegations similar to those made here. Those are two related cases, decided by the same district court

19

judge.  The first complaint raised securities fraud claims and the second complaint raised

antitrust claims.  Both complaints relied in significant part on confidential witnesses.  The

*Chamberlain* complaint included statements from four confidential witnesses that were

intended to corroborate statements made by a named whistleblower.  757 F. Supp. 2d at

690-91.  The court credited some of the testimony of the first three confidential witnesses,

because the complaint had included their employers, dates of employment, job titles, details

of how the witnesses learned of the conspiracy, and specific details about the conspiracy,

and those witnesses' allegations were consistent with the named whistleblower's

statements and with details in multiple unsealed guilty pleas.  *Id.* at 690-93, 704-06.

But the court disregarded the allegations of the fourth witness.  That witness's

hearsay allegations are similar to Witness 1's allegations in this case:

> [The fourth witness] is a former Reddy Ice plant manager for one of Reddy
> Ice's large manufacturing facilities in Arizona from mid-2007 through late-
> 2008.  According to [the fourth witness], he was told by other Reddy Ice
> employees that Reddy Ice and Arctic Glacier had "management meetings"
> during which a deal was struck whereby Arctic Glacier agreed to leave
> California while Reddy Ice agreed to stay out of Arizona.

*Chamberlain*, 757 F. Supp. 2d at 692.  Because the fourth witness's knowledge was

"alleged to have been gained from 'other Reddy Ice employees' and 'co-workers,'" the

court determined that the complaint offered an "insufficient basis . . . to provide the

foundation for [his] testimony."  *Id.* at 705-06.  The court took the same tack with the

antitrust complaint, crediting the allegations of two of the first three confidential witnesses,

but not the fourth witness.  *See In re Packaged Ice*, 723 F. Supp. 2d at 1013-14.  And that

ruling is consistent with other decisions assessing confidential witness allegations.  *See,*

*e.g.*, *Shoemaker*, 2017 WL 1180444, at *9 (disregarding confidential witness allegations that were "vague or based on second-hand knowledge"); *In re Metawave Commc'ns Corp. Secs. Litig.*, 298 F. Supp. 2d 1056, 1069 (W.D. Wash. 2003) (disregarding confidential witness allegations that were "based on hearsay [and] [could] not be imputed to the Individual Defendants").

The Complaint here provides even less detail about the confidential witnesses than there was about the fourth witness in *Chamberlain*.  In that case, the complaint at least identified the witness's employer, the facility in which he worked, and his dates of employment.  *Chamberlain*, 757 F. Supp. 2d at 692.  Here, the Complaint identifies the job titles of Witnesses 1 and 2 but does not give any facts establishing personal knowledge of the supposed conspiracy.  Nor does the Complaint explain how the witnesses could know about any agreement to collude or about the conduct of the Defendants that did not employ them.  And these allegations stand alone; they are not supported by any guilty pleas, statements from other witnesses, or other data.[4]  Since the Court cannot determine whether the two confidential witnesses (and the unnamed operations manager) are "speaking from personal knowledge or merely regurgitating gossip and innuendo," *In re Metawave Commc'ns Corp.*, 298 F. Supp. 2d at 1068 (internal quotation marks omitted), the Court cannot evaluate the plausibility of the allegations.  Indeed, based on the positions these

---

[4]  The Complaint alleges (¶ 11) that "[t]ransaction data and slaughter volume records reported by Packing Defendants and published by the United States Department of Agriculture . . . further corroborate Witness 1's account," but the Complaint does not actually provide that data.

witnesses occupied, it is much more likely that they relied on gossip rather than any actual knowledge of a conspiracy.

Defendants sent Plaintiffs a letter requesting that Plaintiffs provide the names of, or other identifying information about, those witnesses. *See* Ltr. from Mark W. Ryan, Mayer Brown, to Patrick McGahan, Scott & Scott 1 (Aug. 8, 2019) (attached as Exhibit A). Plaintiffs' counsel refused, stating that Defendants had not identified any authority requiring Plaintiffs to provide that information "at this stage of the litigation, or indeed, at any stage of the litigation." Ltr. from Patrick McGahan, Scott & Scott, to Mark W. Ryan, Mayer Brown 1 (Aug. 12, 2019) (attached as Exhibit B).[5] So that identifying information is not forthcoming. The Court therefore should disregard these anonymous allegations as lacking the necessary foundation.

> **b.     The confidential witnesses' conclusory assertions do not support a conspiracy**

Not only do the allegations about the two confidential witnesses fail to provide the necessary identifying information, but they also fail to provide the necessary "factual content" to support the "reasonable inference" of a conspiracy. *In re Pre-Filled Propane Tank*, 893 F.3d at 1057 (citations and internal quotation marks omitted).

Witness 1 alleges that Defendants "agreed to collectively reduce . . . slaughter volumes" (the first means of executing the alleged conspiracy). Compl. ¶ 82. He does not describe what slaughter reductions were agreed upon and when; how and when Defendants

---

[5]  Plaintiffs have not provided any reason why they must keep the witnesses confidential. Neither confidential witness is a current employee of any Defendant, Compl. ¶¶ 81, 89, and the Complaint has not alleged that either could be the subject of retaliation.

implemented reductions; or how long those reductions lasted.  Further, he appears to be unsure whether any reductions even were due to a conspiracy:  He claims that the plant he worked at "might" have dropped its slaughter levels as part of the alleged agreement, and that other plants "appear to have implemented" the agreement "through planned and unplanned maintenance shutdowns." *Id.* ¶ 85.

Witness 1's vague and conclusory allegations constitute neither direct evidence of a conspiracy nor evidence of parallel conduct.  "Allegations of direct evidence of an agreement" must be "sufficiently detailed." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323-24 (3d Cir. 2010).  That means identifying, among other things, "the contours of the alleged agreement" – *i.e.*, the "specific time, place, [and] person involved in the alleged conspirac[y]." *In re Mylan N.V. Secs. Litig.*, 379 F. Supp. 3d 198, 209 (S.D.N.Y. 2019) (internal quotation marks omitted).  Witness 1 provides no detail about the alleged conspiracy.  And because he does not provide any defendant-specific allegations, Witness 1's statement does not constitute evidence of parallel conduct, either.  *See In re Pork,* 2019 WL 3752497, at *8.

*In re GSE Bonds Antitrust Litigation*, No. 19-cv-1704, 2019 WL 4071070 (S.D.N.Y. Aug. 29, 2019), is instructive because the court there disregarded generic confidential witness allegations like the ones here.  In that case, plaintiffs alleged that banks were colluding to fix the price of government bonds.  To support that allegation, they pointed to chat room logs received from a whistleblower in which employees of some of the banks discussed price-fixing. *Id.* at *2-*3.  The whistleblower alleged that other banks also were involved in the conspiracy but did not provide "any specifics" of their involvement. *Id.* at

*7.  The district court concluded that the chat room logs were direct evidence of a conspiracy with respect to the banks that appeared in those logs, but that the whistleblower's "unadorned" assertion that other banks were involved did not support tying them to the alleged conspiracy.  *Id.*  The same principle applies here, with extra force: Witness 1 does not even name the defendants supposedly involved in the alleged conspiracy, let alone provide any specifics as to their involvement, so his statement does not constitute evidence against any Defendant.  At best, Witness 1's statement consists of "generalizations as to . . . defendants as a group" and accordingly "cannot salvage the pleading."  *Id.* (internal quotation marks omitted).

Even if Witness 1's allegations were imputed to each Defendant, they would not show a conspiracy, because periodic reductions in plant hours and production are consistent with ordinary market behavior.  A plant's capacity is not a fixed number: "Weekly plant capacity is determined not only by plant size, but by the number and length of shifts run in a given week."  Compl. ¶ 70.  In determining how many shifts to run (and how long to run each one), it is perfectly normal for plant managers to consider "the supply of fed cattle in the surrounding region," *id.* ¶ 85, as well as other factors such as maintenance needs and available labor.  Further, "[f]ed cattle availability varies seasonally," *id.* ¶ 65; periodic reductions in slaughter volumes should be expected because sometimes fewer cattle are available.  In other words, a bare allegation that Defendants "periodically" reduced cattle slaughter is perfectly consistent with market realities and not at all indicative of a conspiracy.

24

These periodic slaughter reductions also would be easily reversible, further undermining any inference of a conspiracy. Reducing production by underusing machinery – essentially what Witness 1 is alleging here – "is the kind of flexible behavior that is consistent with rational attempts to raise prices through watchful attention to one's competitors." *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938 (7th Cir. 2018). Had the "[defendant's] efforts not paid off, it could have increased its output quickly." *Id*. For that reason, the fact that a company took an easily-reversible step to cut production does not support an inference that it participated in a conspiracy. *Id*. That is all that Witness 1 alleges.

Witness 2's allegations do not adequately plead a conspiracy. Witness 2 alleges that Defendants enforced a queueing convention for buying cattle (the third means of executing the alleged conspiracy). Compl. ¶¶ 93-94. Witness 2 does not describe which Defendants agreed to the queueing convention; which field buyers discussed the queueing convention; which Defendants' field buyers or other industry participants discussed "blackball[ing]"; or which producers were "blackballed." Like Witness 1's statement, Witness 2's statement gives the Court "no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted" in the manner the witnesses describe. *In re Pork*, 2019 WL 3752497, at *8.

Further, the conduct alleged is pro-competitive, not anticompetitive. The claimed convention pushes meatpackers to compete against each other to bid the highest price for a pen of cattle. So if packers required feedlots to adhere to the alleged queueing convention, it was not because packers wanted to pay *less* for fed cattle.

25

Complaints must be dismissed if their "allegations are too vague to provide adequate notice of the factual grounds on which plaintiffs' [antitrust] claim rests." *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1048 (D. Minn. 1992). Attributing vague assertions to a confidential witness does not make them any less conclusory. *See In re Metawave Commc'ns Corp.,* 298 F. Supp. 2d at 1069 (dismissing a confidential witness's allegations as "merely opinion, or vague").

## B.   Plaintiffs fail to plead other facts supporting the inference of a conspiracy

Not only does the Complaint fail to plead parallel conduct, but it fails to plead any other facts that tend to support a conspiracy, as opposed to independent, lawful conduct.

### 1.   Each action Defendants supposedly took to carry out the alleged conspiracy is consistent with lawful competitive behavior

The lack of defendant-specific allegations alone is enough to doom the Complaint. But even if the Court attributed Plaintiffs' generalized, industry-wide allegations to each individual Defendant, those allegations still would not provide circumstantial evidence of a conspiracy.

Plaintiffs must plead something more than parallel conduct; they must provide facts suggesting that the Defendants' "behavior . . . would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" or some other evidence of an agreement. *In re Pork*, 2019 WL 3752497, at *6 n.6 (quoting *Twombly*, 550 U.S. at 557 n.4). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short

of the line between possibility and plausibility" and thus should be dismissed. *Id.* at *5 (quoting *Iqbal*, 556 U.S. at 678).

Here, Plaintiffs' allegations about each of the five ways Defendants implemented the supposed conspiracy are equally consistent with normal, independent competitive behavior, and in some instances actually undermine the claim of collusion. Plaintiffs' conspiracy theory does not make "economic and factual sense," and it should be dismissed. *See Lerma v. Univision Commc'ns, Inc.*, 52 F. Supp. 2d 1011, 1025 (E.D. Wis. 1999).

**Periodic slaughter reductions.** Plaintiffs allege that Defendants "periodically" reduced slaughter numbers pursuant to an agreement. Compl. ¶ 80. The only support Plaintiffs have for these allegations is Witness 1's statement. *See id.* ¶¶ 81-86. Witness 1 provides no details of any slaughter reductions, even on an aggregate, industry-wide basis. All he alleges is that the "extent of the slaughter reduction varied from plant to plant, depending upon, among other things, their slaughter capacity and the supply of fed cattle in the surrounding region." *Id.* ¶ 85. As Witness 1 admits, those reductions are indistinguishable from ordinary market behavior. *Id.* (reductions "appear to have [been] implemented . . . through planned and unplanned maintenance shutdowns").

**Curtailing purchases of cash cattle.** Plaintiffs allege that Defendants agreed to "drastically" reduce their purchases of fed cattle in the cash market while they were slaughtering fewer cattle. Compl. ¶ 87. But buying fewer cash cattle during the time packers were slaughtering fewer cattle is just as consistent with lawful competition as it is with an unlawful conspiracy. If packers are slaughtering fewer cattle, then they need fewer cattle, and they are likely to reduce their purchases in the cash market, rather than through

27

marketing agreements.  Over 70% of fed cattle are sold under marketing agreements, in which cattle producers commit to deliver their cattle once they achieve slaughter weight. *Id.* ¶ 72.  If a beef packer needs fewer cattle in a given week, the most obvious place to reduce its purchases is in the cash market, because it has already committed to making the purchases required by its marketing agreements.

**Coordinating procurement practices.**  Plaintiffs allege that Defendants engaged in a number of coordinated procurement practices.  Each of these practices is consistent with lawful competition.  And Plaintiffs offer no facts showing collusion.

First, Plaintiffs allege that Defendants imposed a "queuing convention" for buying cattle and "blackballed" feedlots who did not comply with this convention.  Compl. ¶¶ 93-94.  But a "queuing convention" alone is not unlawful, because under it, packers still can compete against each other to buy fed cattle at higher prices.  If a packer bids "X," another packer can bid "X + $1" and buy the cattle at that higher price if the first packer is unwilling to match the new high bid.  *Id.* ¶ 93.  It therefore does not make sense to infer that Defendants used this process to suppress the price of fed cattle.  As the Eighth Circuit has explained, such right-of-first-refusal arrangements do not "ha[ve] the actual effect of suppressing or reducing competition" for fed cattle.  *IBP, Inc.*, 187 F.3d at 977.

Second, Plaintiffs allege that only a single packer would solicit certain feedlots as part of a supposed "home-market" allocation scheme.  Compl. ¶ 95.  This is not nefarious conduct.  It makes sense for packers to bid for cattle at feedlots near their processing plants because in this industry, transportation costs matter.  *Id.* ¶¶ 102-03.  (In fact, the Complaint acknowledges that in some regions, "producers now only have one, or possibly two,

28

slaughter plants to which they are able to sell their cattle" because of their distance from other plants. *Id.* ¶ 108.) Plaintiffs offer no facts to suggest that any Defendant decided to bid at feedlots near its plants because of collusion, rather than an independent business decision. In light of the sheer number of feedlots, it would not be surprising if each packer visits only a limited number of feedlots each week. *See* GAO Report 39 (indicating that there are over 2,400 feedlots with 1,000 head of cattle or more).

Third, Plaintiffs allege Defendants acted to "back-up" cattle, meaning that they would refrain from buying cattle in certain regions for several weeks, so the prices of cattle in those regions would fall, and then they could buy cattle in those regions at the lower prices. Compl. ¶ 96. But buying cattle in regions with lower prices (as opposed to regions with higher prices) is exactly what rational economic actors would do. It does not indicate a collusive agreement.

Fourth, Plaintiffs allege Defendants made most of their weekly cash trades during a limited trading window on Friday, usually after the Chicago Mercantile Exchange closed. Compl. ¶ 97. The Complaint alleges that this arrangement reduced competition for cash cattle bids because it prevented bid prices from being reported until the next trading day. *Id.* ¶ 97 n.34. But the Complaint then immediately contradicts that claim by alleging that packers' bids during the trading window are "quickly . . . circulated across the market via word-of-mouth and industry reporting." *Id.* ¶ 97. And the Complaint concedes that packers

could (and did) bid higher prices for cash cattle outside of that window. *See id*. So the Complaint entirely fails to allege how this arrangement was anticompetitive.[6]

**Uneconomically importing cattle.** Plaintiffs allege that Defendants agreed to import cattle from Canada and Mexico that were more expensive than domestic cattle, in order to suppress prices for domestic fed cattle. Compl. ¶¶ 102-06. Plaintiffs do not allege who imported what, from where, for which plants, when, and at what cost – or that any imports were done pursuant to an agreement. All the Complaint says is that cattle imports increased slightly since 2015. *Id.* ¶ 103 & fig. 14. That is consistent with lawful activity. A packer with a plant near the Canadian border (such as Tyson's plant in Washington state[7]) may reasonably decide to import Canadian cattle rather than buy and transport cattle from farther away in the United States.

Further, any increase in imports has an obvious lawful explanation. In 2016, Congress repealed the Mandatory Country of Origin Labeling rule for beef. *See* Compl. ¶ 141(h) & n.75; Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, § 759, 129 Stat. 2242, 2284-85 (2015) (amending 7 U.S.C. § 1638). When the rule was in place,

---

[6] The Complaint conclusorily asserts that a Defendant would not wait until after the market closes to place bids without an agreement to do so, because that Defendant risks failing to secure a sufficient quantity of cattle. Compl. ¶ 99. But the Complaint elsewhere alleges that packers get over 70% of their cattle through marketing agreements, which meets the great majority of their needs, *id.* ¶ 72, and that the supply of fed cattle increased through 2015 and beyond, *id.* ¶ 122. In light of those facts, a Defendant rationally could decide to wait until after the market closed on Friday to place its bids.

[7] U.S. Dep't of Agric., *FSIS Meat, Poultry and Egg Product Inspection Directory* 643 (Aug. 5, 2019), https://www.fsis.usda.gov/wps/wcm/connect/bf8d9766-9767-4e0c-a9f1-efea0b2a42bc/MPI_Directory_Establishment_Name.pdf?MOD=AJPERES.

domestic feedlots could charge higher prices than foreign feedlots because of the premium paid for domestic beef. *See* Compl ¶ 142 tbl. 1; David J. Lynch, *"America First" May Be Last Hope for These Cattle Ranchers*, Wash. Post (May 3, 2019), https://perma.cc/7LQT-MQU8?type=image (R-CALF CEO's recognition of positive effect of labeling requirement on domestic fed cattle prices). After the rule was repealed, foreign beef no longer had to be labelled as such, which spurred additional imports and caused domestic cattle prices to fall.

Plaintiffs attempt to show uneconomical imports by constructing "trend lines" estimating the periods in which it would have been uneconomical to import Canadian cattle from Alberta to Nebraska and Mexican cattle from Chihuahua to Texas. *See* Compl. ¶¶ 104 & fig. 15, 105 & fig. 16. This chart is all hypothetical – it is based on hypothetical shipping costs and hypothetical cattle prices,[8] and it does not link those hypothetical costs and prices to any Defendant in this case. It is all conjecture.

**Reducing slaughter capacity.** Plaintiffs allege that Defendants closed plants and underutilized their plant capacity pursuant to an agreement. Compl. ¶¶ 107-08. All but one of the specific examples they cite pre-date the alleged conspiracy. *See* pp. 13-14, *supra*. Plaintiffs note that Defendants explained the plant closures as resulting from "a lack of cattle in the adjacent regions and plant inefficiencies," but assert that these

---

[8] The source cited in the Complaint (¶ 104 n. 41) does not actually provide prices for cattle in Chihuahua for the relevant years. *See Cuadro Comparativo Anual Nacional Pecuario*, Sistema Nacional de Información e Integración de Mercados, http://www.economia-sniim.gob.mx/2010prueba/CuadroAnualConsPec.asp?per=A&xedo=S&x=49&y=15 (last visited Sept. 12, 2019).

explanations were "pre-textual." Compl. ¶ 107. Plaintiffs do not provide a factual basis for that assertion. And the Complaint itself recognizes the reason for the closures – "a shortage of fed cattle." *Id.* ¶ 6.

If there are fewer cattle available, there is less need for slaughter capacity. And as Plaintiffs acknowledge, the "average cost of production increases if [packers] underutilize their plant capacity." Compl. ¶ 70. So it is entirely rational for a packer to close capacity during the period before 2015, when there was fewer cattle to slaughter. But as to 2015 onward (the period of the alleged conspiracy), the Complaint recognizes that both slaughter capacity and the utilization of that capacity actually *increased*, not decreased. *Id.* ¶ 108 & fig. 17.

### 2. Even if Plaintiffs have alleged parallel conduct, they have not alleged sufficient plus factors

Because Plaintiffs do not plausibly plead parallel conduct, "no discussion of any 'plus factors' is necessary." *Park Irmat Drug Corp.*, 911 F.3d at 517. Regardless, Plaintiffs' allegations concerning "plus factors" do not provide the necessary factual content to infer a conspiracy.

"[P]lus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). Examples of plus factors include "a common motive to conspire"; evidence the "parallel acts were against the apparent individual economic self-interests of the alleged conspirators"; and

"evidence of a high level of interfirm communications." *In re Tyson Foods, Inc. Secs. Litig.*, 275 F. Supp. 3d 970, 991 (W.D. Ark. 2017) (internal quotation marks omitted).

In the Complaint, Plaintiffs allege eight plus factors. Compl. ¶¶ 124-29, 151-74. Four of them address market characteristics and thus have no bearing on whether Defendants' conduct was conspiratorial. The remaining four are completely consistent with ordinary competition and likewise have been rejected by courts.

**Factors 1-4:  Market characteristics.**  Plaintiffs allege four characteristics of the fed cattle industry:  (1) the industry is concentrated, Compl. ¶ 152; (2) fed cattle supply and beef demand are somewhat inelastic, *id*. ¶¶ 153-54; (3) "the parties' relative bargaining power" creates market access risk, *id*. ¶¶ 155-58; and (4) there are substantial barriers to entry, *id*. ¶¶ 163-66.

These allegations merely describe a concentrated market, not evidence of a conspiracy. *See In re Ins. Brokerage*, 618 F.3d at 322 (the fact that "defendants operate in an oligopolistic market . . . [is] legally insufficient" evidence of a conspiracy); *Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1305 (N.D. Ga. 2002) ("[T]he 'nature of the market' is not a 'plus factor.'"), *aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003).  "[D]escriptions of the market . . . do not give rise to an inference of an unlawful agreement." *Erie Cty. v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012).

**Factor 5:  Similar cost structures.**  Plaintiffs allege that as a "result of their similar cost structures, Packing Defendants have a limited ability to steal market share from each other."  Compl. ¶ 167.  But an allegation of similar cost structures actually undercuts the

inference of a conspiracy.  If competitors have similar costs, then the prices they charge (and their other conduct) "would naturally be similar without the need for any agreement." *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007).  That is because each competitor "would be equally impacted by market variables, such as . . . labor costs, taxes, and unanticipated costs" and "would have the same incentive" to react to those market variables in the same way.  *In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 WL 323219, at *15 (N.D. Ga. Jan. 28, 2009).

**Factor 6:    Opportunities to collude.**    Plaintiffs allege that "Defendants' management and employees have regular opportunities to meet and collude through their membership in various trade and industry associations."  Compl. ¶¶ 159-62.  But the Complaint does not describe even a single meeting or communication that occurred during any trade association meeting.  Nor does it list individuals who attended these meetings or explain how they had an opportunity to collude.  And the Complaint does not attempt to link the timing of any meeting with any actions in the alleged conspiracy.  Time and again, courts have held that "belong[ing] to the same trade guild" does not establish a plausible inference of a conspiracy.  *Twombly*, 550 U.S. at 567 n.12; *see, e.g.*, *Five Smiths, Inc.*, 788 F. Supp. at 1049 n.5 ("A trade association is not a 'walking conspiracy' of its members.").  That is all Plaintiffs allege here.

Plaintiffs' allegations about cattle industry trade organizations are particularly unpersuasive here because producers like Plaintiffs are members of at least one of the organizations listed in the Complaint and obviously see value in these organizations.  Specifically, the National Cattlemen's Beef Association (Compl. ¶ 159) "represents more

than 175,000 cattle producers and feeders." *About*, Nat'l Cattlemen's Beef Ass'n, https://www.ncba.org/about.aspx (last visited Sept. 12, 2019). It is not plausible to assert, without additional factual allegations, that Defendants used Plaintiffs' own trade organization to hatch a conspiracy aimed at harming Plaintiffs.

The Complaint also alleges that "Defendants' field buyers' weekly trips to inspect the feedlots in their territory provide an opportunity to meet and exchange commercially sensitive information amongst each other." Compl. ¶ 168. Again, there are no specifics – Plaintiffs identify no communication or meeting where any discussion took place. The "mere opportunity to conspire" is "not necessarily probative evidence of price-fixing conspiracy." *Blomkest Fertilizer, Inc.*, 203 F.3d at 1036 (citation omitted). And field buyers would not be in a position within their companies to agree to a conspiracy. If the unidentified field buyers actually had exchanged commercially-sensitive information while inspecting feedlots, presumably Plaintiffs (many of whom own feedlots) would have alleged specific examples of when those exchanges took place and between whom. They did not.

**Factor 7:  Prior conduct.**  Plaintiffs allege that Defendants are "recidivists with a history of collusion." Compl. ¶¶ 170-74. This accusation is both legally irrelevant and factually false. Courts uniformly reject the "if it happened there, it could have happened here" argument. *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (per curiam) (internal quotation marks omitted). "A conspiracy elsewhere, without more, generally does not tend to prove a domestic conspiracy." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 403 (3rd Cir. 2015). Accordingly, courts do not use "'history

of collusion' . . . as a plus factor." *Holiday Wholesale Grocery Co.*, 231 F. Supp. 2d at 1305. Indeed, that type of evidence generally would not be admissible at trial, *see* Fed. R. Evid. 404(b)(1), and perhaps even would be defamatory.

In any event, Plaintiffs' assertion of a "history of collusion" is wrong. The *Broiler Chicken* cases are ongoing (and do not involve all of the Defendants in this case), Compl. ¶ 173, and this Court dismissed the pork antitrust case (which also does not involve all of the Defendants here), *In re Pork*, 2019 WL 3752497, at *1. The so-called "history of other misconduct," Compl. ¶ 174, does not relate to collusion in the U.S. beef market but instead relates primarily to environmental and labor issues. Further, Plaintiffs have consistently failed to prove allegations of wrongdoing in the U.S. beef market.[9] And the GAO has thoroughly considered and rejected Plaintiffs' claims. GAO Report 16.

**Factor 8: Public statements.** Plaintiffs allege that "Defendants publicly affirmed their commitment to supply restraint" through "public statements by their senior executives about their firms." Compl. ¶¶ 124-29. Plaintiffs offer statements from only two Defendants' employees. And there is nothing "ominous or collusive" about "statements

---

[9] *See Schumacher*, 515 F.3d at 872 (producers failed to show that meat packers purposefully manipulated or controlled prices); *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1287-88 (11th Cir. 2005) (producers failed to show Tyson lacked a valid business reason for using marketing agreements); *IBP, Inc.*, 187 F.3d at 977-78 (right-of-first-refusal marketing agreements did not violate the PSA); *In re Beef Indus.*, 907 F.2d at 514 (producers failed to show that meat packers used Yellow Sheet, a daily cattle price publication, to stabilize and depress the price of fed cattle); *In re Beef Indus.*, 710 F.2d at 220 (producers failed to allege that retail grocery stores conspired to purchase beef from meat packers at artificially low prices).

made every day by corporate executives to industry analysts." *Holiday Wholesale Grocery Co.*, 231 F. Supp. 2d at 1280.

In fact, these types of disclosures often are required for publicly traded companies. *See* 17 C.F.R. § 229.303(a)(3)(ii) (Reg. S-K) (requiring that public companies disclose "trends or uncertainties that have had or that [they] reasonably expect[] will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"); *Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1047 (D. Minn. 2015) (explaining Reg. S-K's disclosure requirements). So this alleged plus factor, like the others, fails to support Plaintiffs' alleged conspiracy.

### 3.   Plaintiffs' statistical analysis is not evidence of a conspiracy

Plaintiffs also provide statistical analysis in the form of a purported regression model, which they claim shows that fed cattle prices were "artificially depressed" beyond the normal forces of supply and demand between January 2015 and December 2017. Compl. ¶ 139. The model does not provide support for Plaintiffs' claims.

As an initial matter, the model is not specific to any Defendant. All of the data used in the model – data such as population, GDP, inflation, feed costs, prices of substitutes, net imports, number of packer plants and feedlots, and feedlot capacity, *see* Compl. ¶ 141 – is on an aggregated, industry-wide basis. So, like their other industry allegations, Plaintiffs' model "do[es] not plausibly suggest that the particular defendants named in this suit were part of [a] conspiracy." *In re GSE Bonds*, 2019 WL 4071070, at *8; *see id.* (industry-wide statistical analyses do not provide a "reason to believe that the . . . defendants named in this suit were involved [in a conspiracy] apart from plaintiffs' say-so").

37

Further, Plaintiffs do not identify the source of any data they use in the model. Allegations of collusion based on unidentified data and unexplained methodologies are nothing but conclusions, unsupported by facts, and are not entitled to a presumption of truth. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

Even assuming the model says something specific about Defendants – and its analysis is accurate – the model does not show what Plaintiffs claim. Plaintiffs claim that the model indicates that "fed cattle prices were *artificially* depressed by an average of 7.9%" during the time period of the alleged conspiracy. Compl. ¶ 139 (emphasis added). But the model is not capable of determining the reason for any alleged price depression. All the model shows is that the 17 variables Plaintiffs chose to include account for the vast majority of the movement in fed cattle prices; the model attributes the rest of the movement to what Plaintiffs call "underpayment." *Id.* ¶ 142 tbl.1; *see id.* ¶ 141 (explaining that the model "ascribe[s] to artificial price suppression" any "residual, unexplained price decrease" after taking into account the variables Plaintiffs provided the model). There is no reason to believe that those 17 variables are the only possible variables affecting the price of fed cattle, and that anything not explained by those variables must be an antitrust conspiracy. Notably, Plaintiffs did not include the supply of fed cattle as a variable, even though the Complaint acknowledges that supply increased starting in 2015, *id*. ¶ 111 & fig.18, and supply would be an obvious driver of fed cattle prices.

Plaintiffs' model thus does not make the existence of an antitrust conspiracy any more plausible (much less tie that conspiracy to all Defendants), and it does not negate the inference that ordinary market forces account for the drop in fed cattle prices.

### 4. Plaintiffs' economic data undercuts their alleged conspiracy

Not only does the model fail to support Plaintiffs' claims, but the other economic data in the Complaint contradicts Plaintiffs' allegations or presents obvious alternative explanations for the fall in fed cattle prices.

### a. The Complaint shows that slaughter volumes and capacity *increased* during the conspiracy period

One of Plaintiffs' key allegations is Defendants drove down fed cattle prices by reducing cattle slaughter. *See, e.g.*, Compl. ¶¶ 111, 122. The data in the Complaint shows the opposite: industry slaughter volumes actually increased during the time period of the alleged conspiracy. The Complaint's Figure 17, reproduced below, shows that "annual fed cattle slaughter capacity" (orange bars) and "annual fed slaughter [utilization]" (blue line) both increased from 2015 onward:

39

*Figure 1:  Plaintiffs' Figure 17*



If both slaughter capacity and slaughter utilization increased during the conspiracy, then

overall slaughter volumes increased as well.  The USDA's data confirms that.  It shows

that 2015 was a low point and slaughter volumes have increased since then:

*Figure 2:  Total Cattle Slaughtered (By Month)*[10]



So Plaintiffs' own data shows that the packing industry increased cattle slaughter during

the alleged conspiracy.

---

[10] U.S. Dep't of Agric. Econ. Research Serv., *Livestock & Meat Domestic Data* (July 26, 2019),   https://www.ers.usda.gov/data-products/livestock-meat-domestic-data/livestock-

> b.   **The Complaint shows an increase in cash cattle transactions during the conspiracy period**

Plaintiffs also allege that "Defendants reduced their participation in the cash cattle trade" as a way to increase leverage over fed cattle prices. Compl. ¶ 98. But Plaintiffs' Figures 11-13 show the opposite. *See id.* ¶ 100 figs.11-13. They indicate that after years of declines, the number of fed cattle purchased in the cash market actually increased in every region from 2015 to 2017. So these charts directly contradict Plaintiffs' allegations about the second action in the conspiracy.

> c.   **The data in the Complaint explains why fed cattle prices actually fell**

Plaintiffs' overarching theory is that Defendants' conspiracy caused fed cattle prices to fall starting in 2015. But the Complaint itself presents obvious alternative explanations for that result.

First, the Complaint includes a chart showing the drop in fed cattle prices, but the picture the chart presents is incomplete. *See* Compl. ¶ 8 & fig.2. Plaintiffs start this chart in 2009. When the exact same data is viewed over a longer time frame, it is clear that the key change in prices was not the 2015 decline, but rather the dramatic rise in prices that started in 2009:

---

meat-domestic-data/#Livestock and poultry slaughter. Plaintiffs cite this data source in the Complaint. Compl. ¶ 11.

*Figure 3:  Plaintiffs' Figure 2, expanded to 2000*[11]



This chart makes clear that Plaintiffs' real grievance is that prices did not stay at their historic highs.  And the Complaint acknowledges the reasons why prices increased to the historic high (drought and "strong beef demand"), *id.* ¶ 6, and why prices then fell (the drought ended, the fed cattle supply increased, and demand for domestic fed cattle decreased).[12]  That is consistent with the GAO's conclusion:  "[S]upply and demand

---

[11] This figure uses the same USDA data as Plaintiffs' Figure 2, except it goes back to January 2000.  U.S. Dep't of Agric. Econ. Research Serv., *Livestock Prices* (Aug. 27, 2019),  https://www.ers.usda.gov/webdocs/DataFiles/51875/LivestockPrices.xlsx;  U.S. Dep't of Agric. Econ. Research Serv., *Historical Monthly Price Spread Data for Beef, Pork, Broilers* (Feb. 28, 2019),  https://www.ers.usda.gov/webdocs/DataFiles/52160/history.xls.

[12] *See* Compl. ¶ 111 ("The available supply of fed cattle [in 2015] had actually increased on a year-on-year basis, reflecting the continuing rebuild of the cattle herd."); *id.* ¶ 111 & fig. 18 ("[F]ed cattle inventory was higher in almost every month of 2015, compared to 2014"); *id.* ¶ 119 ("[In 2016,] the available supply of fed cattle . . . r[ose] again."); *id.* ¶ 122 ("As the cattle herd continued to rebuild . . . more fed cattle became available for slaughter in 2017 and into 2018.").  The Complaint also acknowledges the drop in prices of feeder cattle, which likely contributed to the increase in the fed cattle supply.  *Id.* ¶ 132.  And the Complaint acknowledges that the demand for domestic fed cattle also decreased, due in

factors" – not collusion by packers – accounted for the changes in fed cattle prices.  GAO Report 12, 16.

### C.  R-CALF lacks standing to seek money damages

To the extent that Plaintiff R-CALF seeks antitrust damages, it lacks standing to do so.  R-CALF seeks "damages in its personal capacity [for the alleged conspiracy], which has frustrated its mission to protect the interest of its members, and diverted [its] resources to help its members mitigate damages and prevent further breaches of the law by Packing Defendants."  Compl. ¶ 20; *see id.* ¶ 232.  But only those who are "the target of the anticompetitive activity" can seek antitrust damages; those "who [have] merely suffered indirect, secondary, or remote injury" cannot.  *Midwest Commc'ns, Inc. v. Minn. Twins, Inc.*, 779 F.2d 444, 451 (8th Cir. 1985) (internal quotation marks omitted).  Trade organizations in particular usually cannot seek antitrust damages because they do not participate directly in the targeted market.  *See, e.g.*, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 539 (1983).

Here, R-CALF does not participate in the targeted market.  It does not sell fed cattle, Compl. ¶ 19, and it therefore lacks standing to seek antitrust damages either for itself or on behalf of its members.

---

part to the repeal of the Mandatory Country of Origin Labeling rule.  *See* pp. 30-31, *supra*; *see also* Compl. ¶ 141(h).

## II.   PLAINTIFFS FAIL TO PLEAD A VIOLATION OF THE PACKERS AND STOCKYARDS ACT (COUNT II)

The Packers and Stockyards Act prohibits certain anticompetitive conduct in the poultry and meatpacking industries.  7 U.S.C. § 192.  Congress enacted it to "assure fair competition and fair trade practices" in those industries.  *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1228 (10th Cir. 2007) (quoting H.R. Rep. No. 85-1048, at 1 (1957)).  It is "essentially an antitrust statute" that primarily regulates packers.  *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 277 (6th Cir. 2010); *see Schumacher*, 515 F.3d at 871.  The Eighth Circuit therefore construes the PSA in harmony with the Sherman Act.  *See Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1460 (8th Cir. 1995) (applying the Sherman Act's four-year statute of limitations to PSA claims because the "PSA has its origins in antecedent antitrust legislation and primarily prevents conduct which injures competition").

Plaintiffs allege that Defendants violated the PSA by conspiring to "allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle." Compl. ¶ 238.  There are two problems with these allegations.  First, Plaintiffs' claim is based on their allegations of an antitrust conspiracy, and it fails for the same reasons. Second, the acts about which Plaintiffs complain are lawful under the PSA.

### A.   The conspiracy allegations are insufficient

Plaintiffs fail to allege the facts necessary to establish a conspiracy, or even to allege parallel conduct by the Defendants.  Because Plaintiffs' claims are rooted in an alleged antitrust conspiracy, and because courts construe the PSA in harmony with the Sherman Act, *Jackson*, 53 F.3d at 1460, Plaintiffs' failure to state an antitrust conspiracy under the

44

Sherman Act necessarily dooms their claim. *Cf. Insulate SB, Inc.*, 797 F.3d at 547-48 (dismissing state antitrust claims where plaintiffs failed to plead a violation of the Sherman Act); *In re Pork*, 2019 WL 3752497, at *10 (same).

### B.      No alleged act violates the PSA

A practice that "does not potentially suppress or reduce competition" does not violate the PSA. *IBP, Inc.*, 187 F.3d at 977; *see Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 357 (5th Cir. 2009) ("[O]nly those practices that will likely affect competition adversely violate the [PSA]."). None of the acts alleged in the Complaint are anticompetitive.

For example, Plaintiffs' allegation that the Defendants reduced slaughter volumes, Compl. ¶¶ 81-86, 109-10, does not violate the PSA. "If a firm inadvertently over-produces a good and drives down prices, it does not break the law by cutting production so that prices may recover." *In re Pilgrim's Pride Corp.*, 728 F.3d 457, 463 (5th Cir. 2013) (defendant "did not violate PSA § 192(e) by reducing its commodity chicken output"). Similarly, the alleged right-of-first-refusal protocol, Compl. ¶ 93, is actually pro-competitive and does not violate the PSA, either. *See IBP, Inc.*, 187 F.3d at 977 (concluding that an analogous right of first refusal protocol did not potentially or actually suppress competition). Plaintiffs also rely (Compl. ¶¶ 87-90) on Defendants' use of marketing agreements, but marketing agreements are perfectly lawful. *Pickett*, 315 F. Supp. 2d at 1177 (concluding that the use of "marketing agreements, joint ventures and forward contracts" does not violate the PSA).

R-CALF and its members are free to sell their cattle however they like, but they are not allowed to restrict how other producers sell cattle and how packers buy cattle. Their attempts to dress their claim up as an antitrust conspiracy or a PSA violation does not change that logic. Plaintiffs' PSA claim therefore should be dismissed.

## III.    PLAINTIFFS FAIL TO PLEAD UNJUST ENRICHMENT (COUNT III)

Plaintiffs contend that Defendants were unjustly enriched as a result of the alleged conspiracy and should be required to return the money they received as a result. The Complaint provides only the most meager allegation of unjust enrichment. All it says is that Defendants "colluded to fix, depress, suppress, or stabilize the prices paid to Plaintiffs" and that this alleged collusion "enabled [Defendants] to enjoy supra-competitive profits at the expense of Plaintiffs" by causing Plaintiffs "to receive less for sales of fed cattle . . . than they otherwise would have received." Compl. ¶¶ 243-44.

The Complaint does not state which jurisdictions' law this alleged conduct violates. Because "there is no clearly established federal common law of restitution for a federal antitrust violation," *In re Pre-Filled Propane Tank*, 893 F.3d at 1059 (internal quotation marks omitted), Defendants assume that each named Plaintiff brings an unjust-enrichment claim under the law of the State in which that Plaintiff does business. *See In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*, No. 16-02709-MD-W-GAF, 2019 WL 1418292, at *7 (W.D. Mo. Mar. 21, 2019) (under Minnesota choice-of-law principles "the unjust enrichment laws of states where the transactions occurred will govern Plaintiffs' unjust enrichment claims"). Plaintiffs do business in Iowa (Nelson and the

Grahams), Kansas (Chambers), Montana (R-CALF), Nebraska (Weinreis Brothers and Minatare), and Wyoming (Lucky 7 Angus). Compl. ¶¶ 19-28.[13]

The basic elements of unjust enrichment are the same in all five States at issue: (1) the defendant must have received a benefit at the plaintiff's expense, and (2) it must be unjust for the defendant to retain that benefit. *See State v. Unisys Corp.*, 637 N.W.2d 142, 154-55 (Iowa 2001); *Nelson v. Nelson*, 205 P.3d 715, 724 (Kan. 2009); *N. Cheyenne Tribe v. Roman Catholic Church*, 296 P.3d 450, 457 (Mont. 2013); *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 302 (Neb. 2006); *Montierth v. Deutsche Bank Nat'l Tr. Co.*, 415 P.3d 654, 665 n.3 (Wyo. 2018); *see also Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195 (Minn. Ct. App. 2007). Kansas and Montana (and Minnesota) additionally require that the defendant appreciate or otherwise know of the benefit. *Nelson*, 205 P.3d at 724; *N. Cheyenne Tribe*, 296 P.3d at 457; *Dahl*, 742 N.W.2d at 195. Wyoming similarly requires that the defendant have "accepted, used, and enjoyed" the benefit. *Montierth*, 415 P.3d at 665 n.3.

There are two problems with Plaintiffs' unjust-enrichment claims: They are derivative of Plaintiffs' statutory claims, and they do not satisfy the necessary elements for unjust enrichment.

---

[13] Plaintiffs also seek to represent a nationwide class of direct sellers. Compl. ¶ 211. But because there are no named plaintiffs for any other State, Plaintiffs do not have standing to bring unjust enrichment claims under any other State's law. *See Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, Civ. No. 13-2664 ADM/SER, 2014 WL 943224, at *11 (D. Minn. Mar. 11, 2014), *aff'd*, 797 F.3d 538.

47

### A.   Plaintiffs' unjust-enrichment claim is wholly derivative of their alleged conspiracy

Plaintiffs' theory of unjust enrichment is that Defendants' conspiracy allowed Defendants to buy fed cattle from Plaintiffs at prices lower than they otherwise would have been.  Compl. ¶¶ 242-44.  Plaintiffs' unjust-enrichment claims therefore are entirely derivative of their antitrust theories.  If there was no conspiracy to suppress fed cattle prices, then no Defendant received any benefit, much less an unjust one.

Plaintiffs do not bring any independent unjust-enrichment claim.  That is, they do not allege conduct other than the supposed conspiracy, and they do not contend that Defendants' conduct would be unjust even if that conduct did not violate the antitrust laws.  And even if they did, Plaintiffs would not be allowed to expand statutory antitrust regimes through unjust enrichment.  *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 209 (D. Me. 2004) (permitting an independent unjust-enrichment claim would "undermine" the antitrust laws, because those laws are meant to "permit unfettered economic activity in matters that are not within their proscription"); *see, e.g.*, *In re Pre-Filled Propane Tank*, 893 F.3d at 1059 (holding that an indirect purchaser cannot bring a restitution claim to expand liability under the federal antitrust laws).

### B.   Plaintiffs have not pleaded the elements of unjust enrichment

Plaintiffs' unjust-enrichment claims fail for a number of independent reasons.

**Plaintiffs have an adequate legal remedy.**  In all States at issue, a plaintiff cannot bring an unjust-enrichment claim when he or she has an adequate remedy at law.  *See Holdsworth v. Nissly*, 520 N.W.2d 332, 335 (Iowa Ct. App. 1994); *Nelson*, 205 P.3d at

734; *State v. Hultgren*, 541 P.2d 1211, 1214 (Mont. 1975); *Pilot Inv. Group v. Hofarth*, 550 N.W.2d 27, 33 (Neb. 1996); *Cathcart v. Meyer*, 88 P.3d 1050, 1060-61 (Wyo. 2004); *see also United States v. Bame*, 721 F.3d 1025, 1030 (8th Cir. 2013) (applying Minnesota law). "An adequate remedy at law means a remedy which is plain and complete and as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." *Vaccaro v. City of Omaha*, 579 N.W.2d 535, 539 (Neb. 1998).

Here, Plaintiffs' unjust-enrichment claims cover the same ground as their antitrust claims, and Plaintiffs seek the same relief (recovery for the damages allegedly incurred by each Plaintiff for having sold cattle at allegedly suppressed prices). *Compare* Compl. ¶ 231 (Sherman Act claim), *with id.* ¶¶ 244-46 (unjust enrichment claim). If Plaintiffs were correct about the supposed conspiracy, they would have an adequate legal remedy under the antitrust laws. Accordingly, they cannot bring a claim for unjust enrichment. *See Bame*, 721 F.3d at 1031 ("District courts routinely dismiss unjust enrichment claims where the plaintiff pleaded and pursued both equitable and legal claims.").

**The conduct at issue is governed by contract.** In the five States at issue, a plaintiff cannot proceed with an unjust-enrichment claim if the complained-of conduct is governed by a contract. *See Legg v. West Bank*, 873 N.W.2d 763, 772 (Iowa 2016); *Hendrick v. Moresco*, No. 116,927, 2017 WL 3113221, at *4 (Kan. Ct. App. 2017); *Welu v. Twin Hearts Smiling Horses, Inc.*, 386 P.3d 937, 945 (Mont. 2016); *Blodorn Lumber Co. of North Platte v. Nielson*, 915 N.W.2d 786, 792 (Neb. 2018); *Three Way, Inc. v. Burton Enters., Inc.*, 177 P.3d 219, 226 (Wyo. 2008); *see also Sports & Travel Mktg., Inc. v. Chi. Cutlery Co.*, 811 F. Supp. 1372, 1381 (D. Minn. 1993) (applying Minnesota law).

49

Here, contracts cover the subject-matter of Plaintiffs' claims. As the Complaint itself recognizes, each sale of fed cattle is done pursuant to a contract. Compl. ¶ 5. Those contracts include pricing terms. *Id.* ¶ 73. Plaintiffs now complain about those prices, but they do not contend that those contracts are void or otherwise unenforceable. The subject-matter of Plaintiffs' claims therefore is covered by contract, so they cannot pursue unjust-enrichment claims as well.

**R-CALF did not sell cattle.** A basic element of unjust enrichment is that the defendant must have enriched itself at the plaintiff's expense. *N. Cheyenne Tribe*, 296 P.3d at 457. But R-CALF does not allege that it sold cattle to any Defendant. R-CALF contends that it incurred damages in helping its members mitigate the alleged conspiracy, Compl. ¶ 20, but that is not providing a benefit to any Defendant. Because R-CALF does not allege that any Defendant received a benefit at its expense, it cannot bring an unjust-enrichment claim.

For all of these reasons, Plaintiffs' unjust-enrichment claims should be dismissed.

## IV.   PLAINTIFFS FAIL TO PLEAD A VIOLATION OF THE COMMODITY EXCHANGE ACT (COUNTS IV-VII)

The Commodity Exchange Act regulates commodities trading on organized exchanges. The CEA protects "the innocent individual investor," *CFTC v. Kratville*, 796 F.3d 873, 891 (8th Cir. 2015) (internal quotation marks omitted), by making it illegal for "[a]ny person to manipulate or attempt to manipulate" the price of any commodity, 7 U.S.C. § 13(a)(2). Plaintiffs bring a CEA market-manipulation claim under CFTC Regulation 180.2, 17 C.F.R. § 180.2 (Count IV); a CEA manipulative-device claim under

CFTC Regulation 180.1, 17 C.F.R. § 180.1 (Count V); a derivative claim for principal-agent liability (Count VI); and a CEA aiding-and-abetting claim (Count VII).

In order to bring a CEA market-manipulation claim, a plaintiff must allege that the defendant intentionally manipulated the price of a commodity, so its price was artificially increased or decreased. *In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 378 (S.D.N.Y. 2010); *see Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247-48 (5th Cir. 2010). To bring a manipulative-device claim, the plaintiff must allege that the defendant intentionally engaged in a manipulative trading practice. *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 569 (S.D.N.Y. 2016). And the principal-agent and aiding-and-abetting claims both require a predicate CEA violation. *Id.* at 570-71. For each of these claims, a plaintiff must plead "actual damages" by alleging a net loss – that is, a loss on the combined purchase and sale of a commodity. *In re Amaranth Nat. Gas Commodities*, 269 F.R.D at 378-79.

Plaintiffs allege that they traded cattle commodities, such as cattle futures and options, on the Chicago Mercantile Exchange during the time period of the alleged conspiracy. Compl. ¶ 28.[14] Plaintiffs claim that the prices of those financial instruments depended in part on prices for fed cattle in the cash market. *Id.* ¶ 196. Plaintiffs allege that by conspiring to depress the prices for fed cattle in the cash market, Defendants' antitrust

---

[14] A future is a contract to buy or sell a commodity at a specified time and price, Compl. ¶ 176; an option is a contract that gives the holder the right to buy or sell a commodity at a specified price, *id.* ¶ 179.

conspiracy affected the price of the futures and options in which Plaintiffs traded. *Id.* ¶¶ 208-10.

Plaintiffs' CEA claims fail because they are entirely derivative of the antitrust conspiracy claim; because they do not satisfy the heightened pleading standard applicable to CEA claims; and because they do not allege net loss, a key element of a CEA claim.

### A.      Plaintiffs' CEA claims are derivative of their Sherman Act claims

All of Plaintiffs' CEA claims depend on the same antitrust conspiracy as their Sherman Act claims.  Specifically, Plaintiffs claim that Defendants artificially reduced the price of fed cattle, which artificially reduced prices of fed cattle futures and options as well. Compl. ¶¶ 247-69.  The Complaint does not allege that any individual Defendant otherwise manipulated the prices of cattle futures or options or engaged in some other type of manipulative practice.   Rather, Plaintiffs' CEA claims rely on the alleged antitrust conspiracy to suppress fed cattle prices.  Plaintiffs have not sufficiently pleaded that conspiracy, so their CEA claims fail as well. *See In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 598 (S.D.N.Y. 2011) (dismissing antitrust and CEA claims based on same alleged price fixing).

### B.      Plaintiffs fail to meet the heightened pleading standard applicable to CEA claims

A CEA claim based on manipulating prices by misleading the market about supply and demand must comply with Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 713-14 (S.D.N.Y. 2013), *rev'd on other grounds sub. nom. Gelboim v. Bank of Am. Corp.*,

823 F.3d 759 (2d Cir. 2016). The same is true for a CEA claim based on the use of a manipulative device. *CFTC v. Kraft Foods Group, Inc.*, 153 F. Supp. 3d 996, 1008-10 (N.D. Ill. 2015). To meet the heightened pleading standard, the plaintiff must plead "with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 528 (S.D.N.Y. 2008) (internal quotation marks omitted).

The Complaint does not come close to meeting those requirements. Far from alleging the "who, what, where, and when" of their alleged conspiracy, all Plaintiffs offer are undifferentiated group allegations and a few irrelevant defendant-specific allegations. Those allegations plainly do not satisfy the heightened pleading standard. *See, e.g.*, *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677(NRB), 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007) ("[T]he complaint must specifically allege the fraud perpetrated by each defendant, and 'lumping' all defendants together fails to satisfy the particularity requirement.").

## C.  Plaintiffs fail to allege a net loss

The CEA's private right of action requires a plaintiff to establish "actual damages resulting from" the claimed violation. 7 U.S.C. § 25(a)(1). To satisfy this requirement, a plaintiff must show that he has suffered a net loss. *See, e.g.*, *In re LIBOR-Based Fin. Instruments*, 935 F. Supp. 2d at 716-17. That is, the plaintiff must allege that he lost money on the combined purchase and sale of a commodity; it is not enough that he bought a commodity at an artificially high price, because he also could have sold that commodity at the same high price, with no damages. Without an allegation of net loss, a CEA claim fails

53

at the outset and should be dismissed. *See, e.g.*, *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 570 (S.D.N.Y. 2017); *Harry v. Total Gas & Power N. Am.*, *Inc.*, 244 F. Supp. 3d 402, 416 (S.D.N.Y. 2017).

Plaintiffs allege that they transacted at "artificial prices which directly led to injury and economic damages." Compl. ¶ 252. But they do not plead a net loss on any transaction. If Plaintiffs bought and sold futures or options at prices reduced by a constant amount, then they did not suffer any loss because the constant reduction produced a wash. *See, e.g.*, *In re LIBOR-Based Fin. Instruments*, 935 F. Supp. 2d at 716-17. And if Plaintiffs bought and sold futures or options at prices reduced by different amounts at different times, then they have not necessarily alleged a net loss, either. Whether they suffered a net loss would depend on the specifics of their trading activity, which they do not allege. *See id.*

Plaintiffs know their trading activity – after all, it is their own conduct. They know the publicly-reported prices of cattle futures and options. Compl. ¶ 200; *see Livestock*, CME Group, https://www.cmegroup.com/trading/agricultural/#livestock (last visited Sept. 12, 2019). They know the fed cattle prices that the USDA reports publicly. *E.g.*, Compl. ¶ 8 & fig. 2. And they know the slaughter volumes that the USDA reports publicly. *E.g.*, *id.* ¶ 11; *see id.* ¶ 140 n.72. That is the information that Plaintiffs could have used to allege transactions on which they lost money. Yet Plaintiffs have not attempted to do so, and so their CEA claims fail.

## V.   PLAINTIFFS FAIL TO PLEAD FRAUDULENT CONCEALMENT

Many of Plaintiffs' claims are time barred and cannot be saved through the doctrine of fraudulent concealment.

Plaintiffs filed the first complaint in this case on April 23, 2019 – more than four years after the start of the alleged conspiracy in January 2015.  Yet the limitations period for many of their claims is four years or less:  Sherman Act, 15 U.S.C. § 15b (four years); PSA, *Jackson*, 53 F.3d at 1460 (four years); Nebraska unjust-enrichment, Neb. Rev. Stat. § 25-206 (four years); Kansas unjust-enrichment, Kan. Stat. Ann. § 60-512(1) (three years); and CEA, 7 U.S.C. § 25(c) (two years).  So unless Plaintiffs can plead fraudulent concealment, those claims are all time-barred in part.

For fraudulent concealment, Plaintiffs must allege:  (1) Defendants took affirmative acts "solely to conceal" the alleged conspiracy; (2) Plaintiffs failed to discover the existence of the conspiracy; and (3) Plaintiffs exercised due diligence to uncover the relevant facts.  *In re Milk Prods.*, 84 F. Supp. 2d at 1022 (internal quotation marks omitted).  Allegations of fraudulent concealment must meet the heightened pleading standard of Rule 9(b), meaning that Plaintiffs must plead the "who, what, when, where, and how" of the alleged concealment.  *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011) (internal quotation marks omitted); *see Podpeskar v. Makita USA Inc.*, 247 F. Supp. 3d 1001, 1010 (D. Minn. 2017).  Plaintiffs have not done so here.

### A.    Plaintiffs do not plead concealment

Because "a conspiracy . . . is by nature a crime of secrecy and cover-up," to satisfy the concealment element "Plaintiffs must show acts, *other than the acts constituting the conspiracy*, that demonstrate fraudulent concealment of that conspiracy."  *In re Monosodium Glutamate Antitrust Litig.*, No. CIV. 00MDL1328PAM, 2003 WL 297287, at *3 (D. Minn. Feb. 6, 2003) (emphasis added); *see Ripplinger v. Amoco Oil Co.*, 916 F.2d

441, 442 (8th Cir. 1990).  And those acts must be pleaded with particularity.  *Summerhill*,

637 F.3d at 880.

> The entirety of Plaintiffs' allegations of fraudulent concealment are as follows:
>
> Packing Defendants actively concealed their violations of law from Plaintiffs and both Classes by, amongst other matters, (i) relying on non-public forms of communication; (ii) offering pre-textual justifications for their plant closures, slaughter reductions and withdrawal from the cash cattle trade; (iii) explicitly and implicitly representing that the fed cattle bids and contract terms Packing Defendants offered Plaintiffs and the Producer Class were the product of honest competition and not a conspiracy; and (iv) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws.

Compl. ¶ 223.  The Complaint provides no examples of any "non-public forms of

communication."  The Complaint also provides no examples of any Defendant "explicitly

[or] implicitly representing that the fed cattle bids . . . were the product of honest

competition."  As for allegedly "pre-textual justifications," the Complaint provides one

example – from 2014, before the alleged conspiracy even began.  *See id.* ¶ 107 & n.42.

That simply is not enough to plead fraudulent concealment with particularity.  *See In re

Milk Prods.*, 84 F. Supp. 2d at 1024 ("Vaguely alleging that 'something' occurred at 'some

time' fails to satisfy the particularity requirement.").

That leaves Defendants' alleged "affirmativ[e] misrepresent[ations] that they

complied with applicable laws and regulations."  Compl. ¶ 223.  Yet all Plaintiffs point to

are generalized statements in Defendants' annual reports and other public filings.  *See id.*

For example, the Complaint quotes JBS's 2014 annual report as saying that JBS "had

[policies] in place to 'ensure ethical conduct and integrity in the management of its

business.'"  *Id.* ¶ 223(b).  But Plaintiffs have not alleged any facts to show that this public

56

statement is fraudulent or to connect it to the allegations in this case.  If those types of generic statements were enough to constitute fraudulent concealment, it would "effectively nullify the statute of limitations" in antitrust cases.  *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987).

### B.    Plaintiffs do not allege that they failed to discover the conspiracy

Plaintiffs likewise do not establish the second element of fraudulent concealment – concealment.  They assert that they "were not aware of Packing Defendants' misconduct . . . until recently."  Compl. ¶ 225.  But Plaintiffs provide no explanation of why that would be the case.  The Complaint itself belies that claim, because it principally relies on publicly-available data collected by the federal government and published contemporaneously on a daily or weekly basis.  *E.g.*, *id.* ¶¶ 8, 9, 72, 98, 100, 108, 111, 116, 117, 121, 131, 137; *see id.* ¶ 73 n.18 (explaining that packers report prices and purchase volumes to the USDA "on a daily and weekly basis"); *id.* ¶ 140 n.72 (explaining that the USDA publishes daily fed cattle pricing data).

The Complaint also cites news articles published contemporaneously with the fall in fed cattle prices in 2015.  Compl. ¶¶ 87 n.28, 88 n.29, 90 n.31, 110 nn.43-44, 112-13, 114 n.48, 115 n.49.  And R-CALF first publicly aired its suspicions about Defendants' conduct no later than January 2016, when it wrote to a number of Senators, accusing the "dominant meatpackers" of "antitrust and anticompetitive conduct."  Ltr. from Bill Bullard, CEO, R-CALF, to Sen. Charles E. Grassley, Chairman of the Sen. Comm. on the Jud. 2 (Jan. 5, 2016), https://perma.cc/Z5U4-948P (Jan. Bullard Ltr.).  This letter prompted the GAO investigation, which resulted in a public report of the GAO's conclusion that there

was no evidence that packers colluded.  *See* Ltr. from Sen. Charles E. Grassley, Chairman of the Sen. Comm. on the Jud., to Gene L. Dodaro, Comptroller General 1 (Apr. 20, 2016), https://perma.cc/Z5U4-948P.  The claim that Plaintiffs did not suspect anything "until recently" is simply not plausible.

### C.    Plaintiffs do not plead due diligence

To establish fraudulent concealment, Plaintiffs must show that they worked diligently to discover their claim.  *In re Milk Prods.*, 84 F. Supp. 2d at 1022.  Plaintiffs assert that they "could not have discovered [the alleged conspiracy] through the exercise of due diligence until recently."  Compl. ¶ 225.  Again, Plaintiffs provide no explanation of why that is so.

The Complaint is completely silent as to what efforts Plaintiffs took, if any, to investigate the fall in cattle prices in 2015 and how such efforts were thwarted by Defendants' supposed concealment.  *See Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-2664 ADM/SER, 2014 WL 943224, at *5 (D. Minn. Mar. 11, 2014) ("A plaintiff who becomes aware of facts and activities that would 'create notice and excite attention' requires inquiry on the part of the plaintiff." (citation omitted)), *aff'd*, 797 F.3d 538. Tellingly, Plaintiffs do not explain what new information has come to light "recently" that allowed them to "discover" the conspiracy they have been alleging *since January 2016*. The Complaint's conclusory allegation of due diligence is not enough, especially when the Complaint itself relies on public information, thereby undercutting the notion that Plaintiffs were unaware of their claim.  Plaintiffs thus fail to plead fraudulent concealment.

58

## VI.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE

Defendants understand that courts ordinarily give plaintiffs a chance to replead their claims when their complaint is insufficient to state a claim.  But this is the rare case in which the complaint is so deficient that the Court should grant the motion to dismiss with prejudice.

Plaintiffs have had multiple opportunities to make their case.  R-CALF has been accusing Defendants of engineering the fall in fed cattle prices for more than three years, since January 2016.  Jan. Bullard Ltr. 2.  The cattle industry is extensively covered by dedicated industry news sources.  *See, e.g.*, Compl. ¶ 87 n.28.  The data about this industry is remarkably robust – the USDA publishes extensive industry-wide data on a daily or weekly basis.  *See id.* ¶ 73 n.18.  And Plaintiffs' counsel are "experience[d] in the prosecution and leadership of class action antitrust, commodities manipulation and other complex litigation." *Id.* ¶ 217.  So it is fair to conclude that this Complaint contains all of the facts Plaintiffs have been able to find to support their claim of an antitrust conspiracy.

Yet in more than one hundred pages of pleadings, Plaintiffs have conspicuously failed to tie any of the individual Defendants to any conspiracy, or even adduce facts suggesting that a conspiracy exists.  Nearly all of the allegations are not specific to any Defendant, so the Court has "no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of [cattle]." *In re Pork*, 2019 WL 3752497, at *8.  If that is all Plaintiffs can come up with after over three years of investigation, what more can they add in an amended Complaint?

Defendants already have given Plaintiffs an opportunity to cure one glaring deficiency in the Complaint. The very first things that Plaintiffs cite as evidence backing up their claims are the statements of the two confidential witnesses. Compl. ¶ 1. Their refusal to provide more information about the identities of either witness speaks volumes. *See* Ex. B. The logical inference is that Plaintiffs simply do not have the facts to back up their extraordinary allegations.

Finally, many of the allegations in the Complaint undermine Plaintiffs' claim of a conspiracy, by either directly contradicting Plaintiffs' claims or by presenting obvious alternative and lawful explanations for the alleged conduct. So the problem is not just that Plaintiffs failed to provide sufficient factual allegations – it is that Plaintiffs have pleaded themselves out of an antitrust conspiracy. No amount of amendment can get around these foundational flaws in Plaintiffs' case. *See ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*, 355 F. Supp. 3d 785, 794 (D. Minn. 2019) (plaintiff may only amend a complaint "with additional allegations that are consistent with the challenged pleading and that do not contradict the allegations in the original complaint" (internal quotation marks omitted)).

## CONCLUSION

Courts are demanding at the motion-to-dismiss stage in antitrust cases because permitting "a complex case of extremely dubious merit to proceed" – thereby "immers[ing] the parties in the discovery swamp" – "create[s] irrevocable as well as unjustifiable harm to the defendant." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 625-26 (7th Cir. 2010). Like in the pork antitrust case, this Complaint simply does not have the "factual enhancement" – the "relevant individuals, acts, and conversations" – to allege an antitrust

60

conspiracy. *In re Pre-Filled Propane Tank*, 893 F.3d at 1057 (citations and internal quotation marks omitted). And given the obvious market explanations for why fed cattle prices fell, it is clear that the Complaint never will be able to state an antitrust conspiracy.

The Court should dismiss the Complaint with prejudice.

Date: September 13, 2019

Respectfully submitted,

s/ Christopher R. Morris
Lewis A. Remele, Jr., Reg. No. 90724
Christopher R. Morris, Reg. No. 230613
**BASSFORD REMELE, PA**
100 South 5th Street, Suite 1500
Minneapolis, MN 55402
(612) 333-3000
lremele@bassford.com
cmorris@bassford.com

William F. Hargens
Mark F. Enenbach
Patrick E. Brookhouser, Jr.
Matthew G. Munro
**MCGRATH NORTH MULLIN &
KRATZ, PC LLO**
First National Tower, Suite 3700
1601 Dodge Street
Omaha, NE 68102
(402) 341-3070
whargens@mcgrathnorth.com
menenbach@mcgrathnorth.com
pbrookhouser@mcgrathnorth.com
mmunro@mcgrathnorth.com
*Admitted Pro Hac Vice*

*Counsel for Defendants JBS USA Food
Company, JBS Packerland, Inc. and Swift
Beef Company, and Special Appearance for
Defendant JBS S.A.*

s/ David P. Graham
David P. Graham, Reg. No. 0185462
**DYKEMA GOSSETT, PLLC**
4000 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

Jon B. Jacobs
Jeremy C. Keeney
**PERKINS COIE LLP**
700 13th Street, NW, Suite 600
Washington, DC 20005
(202) 654-1758
jbjacobs@perkinscoie.com
jkeeney@perkinscoie.com
*Admitted Pro Hac Vice*

Susan E. Foster
Ulrike B. Connelly
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
(206) 359-8846
sfoster@perkinscoie.com
uconnelly@perkinscoie.com
*Admitted Pro Hac Vice*

*Counsel for Defendants Tyson Foods, Inc.
and Tyson Fresh Meats, Inc.*

61

s/ Kathryn N. Hibbard
Kathryn N. Hibbard, Reg. No. 0387155
X. Kevin Zhao, Reg. No. 0391302
**GREENE ESPEL PLLP**
222 South 9th Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
khibbard@greeneespel.com
kzhao@greeneespel.com

Mark W. Ryan
Michael E. Lackey, Jr.
Nicole A. Saharsky
**MAYER BROWN LLP**
1999 K Street, NW
Washington, DC 20009
(202) 263-3338
mryan@mayerbrown.com
mlackey@mayerbrown.com
nsaharsky@mayerbrown.com
*Admitted Pro Hac Vice*

*Counsel for Defendants Cargill,*
*Incorporated and Cargill Meat Solutions*
*Corporation*

s/ Ben Ellison
Andrew M. Luger, Reg. No. 0189261
Benjamin L. Ellison, Reg. No. 0392777
**JONES DAY**
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
(612) 217-8862
aluger@jonesday.com
bellison@jonesday.com

Julia E. McEvoy
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3867
jmcevoy@jonesday.com
*Admitted Pro Hac Vice*

Paula W. Render
**JONES DAY**
77 West Wacker, Suite 3500
Chicago, Illinois  60601-1692
(312) 269-1555
prender@jonesday.com
*Admitted Pro Hac Vice*

*Counsel for Defendant National Beef*
*Packing Company*

s/ Daniel L. Scott
Daniel L. Scott, Reg. No. 0240837
Peter J. Schwingler, Reg. No. 0399453
Jon M. Woodruff, Reg. No. 0388909
**STINSON LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
dan.scott@stinson.com
peter.schwingler@stinson.com
jon.woodruff@stinson.com

Leonid Feller, P.C.
Daniel R. Lombard
Brianne Straka
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
191 N. Wacker Drive Suite 2700
Chicago, IL 60606
(312) 705-7400
leonidfeller@quinnemanuel.com
daniellombard@quinnemanuel.com
briannestraka@quinnemanuel.com
*Admitted Pro Hac Vice*

*Special Appearance for Defendant Marfrig
Global Foods S.A.*

63