# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **IN RE CATTLE ANTITRUST LITIGATION** | Civil No. 19-cv-1222 (JRT/HB) |
| *This document relates to:*<br><br>ALL CASES | SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |

# TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................... 1

II.    PARTIES ............................................................................................................... 12

    A.   Plaintiffs.......................................................................................................... 12
    B.   The Tyson Defendants .................................................................................... 16
    C.   The JBS Defendants ........................................................................................ 17
    D.   The Cargill Defendants ................................................................................... 18
    E.   National Beef .................................................................................................. 19
    F.   Packing Defendants ........................................................................................ 20
    G.   John Doe Defendants ...................................................................................... 21
    H.   Agents and Affiliates ...................................................................................... 21

III.   JURISDICTION, VENUE AND COMMERCE ................................................ 21

IV.    OVERVIEW OF THE FED CATTLE MARKET ............................................. 25

V.     PACKING DEFENDANTS CONSPIRED TO DEPRESS FED
      CATTLE PRICES ............................................................................................... 33

    A.   Packing Defendants Agreed to Collusive Slaughter Reduction ..................... 35
    B.   Packing Defendants Agreed to Slash Cash Cattle Purchases During Slaughter
          Reductions....................................................................................................... 42
    C.   Packing Defendants Coordinated their Procurement Practices for Cash Cattle ... 45
    D.   Packing Defendants Uneconomically Imported Extra-Territorial Live Cattle
          to Depress Demand for Fed Cattle................................................................. 61
    E.   Packing Defendants Agreed to Refrain from Expanding Their Slaughtering
          Capacity .......................................................................................................... 66

VI.    PACKING DEFENDANTS' CONSPIRACY CAUSED THE 2015 PRICE
      COLLAPSE AND SUPPRESSED PRICES THEREAFTER ..................................... 69

    A.   Packing Defendants' Conduct Precipitated the Collapse in Fed Cattle
          Prices in 2015................................................................................................. 69
    B.   Packing Defendants' Ongoing Conduct Continues to Depress Fed
          Cattle Prices ................................................................................................... 80
    C.   USDA Investigates Packers ............................................................................ 83
    D.   Packing Defendants Publicly Affirmed Their Commitment to Supply
          Restraint ......................................................................................................... 85
    E.   Economic Analysis Supports the Existence of the Alleged Conspiracy.............. 87
        1.   Supply and Demand Drivers Do Not Explain the 2015 Price
             Collapse or Subsequent Low Prices.......................................................... 88
        2.   Econometric Analysis Corroborates the Alleged Conspiracy ................... 98
        3.   Explanations Proffered for the Drop in Fed Cattle Prices Do Not
             Withstand Scrutiny................................................................................... 103

VII.   THE FED CATTLE MARKET IS CONDUCIVE TO COLLUSION ................... 105

    A.   The Fed Cattle Packing Industry Has Experienced High Consolidation and Is
          Highly Concentrated ...................................................................................... 106

B.     The Supply of Fed Cattle and Demand for Beef Are Relatively Insensitive to Short-Term Changes in Price ........................................................... 106

C.     Fed Cattle Producers Face Significant Market Access Risk .............................. 107

D.     There Are Numerous Trade Organizations and Opportunities for Packing Defendants to Meet and Collude ......................................................................... 109

E.     Packing Defendants Benefit from High Barriers to Entry ................................. 110

F.     Packing Defendants Have Similar Cost Structures and Have Significant Oversight of Each Other's Price and Production Decisions ............................... 112

**VIII.   PACKING DEFENDANTS ARE RECIDIVISTS WITH A HISTORY OF COLLUSION .............................................................................................. 114**

**IX.    MANIPULATION OF LIVE CATTLE FUTURES AND OPTIONS ..................... 117**

A.     Futures and Options Generally ........................................................................... 117

B.     Live Cattle Contracts ......................................................................................... 119

       1.    Live Cattle Futures ................................................................................. 119

       2.    Live Cattle Options ................................................................................ 122

C.     Relationship Between Live Cattle Futures and Cattle Spot (Cash) Prices ......... 123

D.     Packing Defendants Traded CME Live Cattle Futures and Options ................. 129

E.     Packing Defendants Directly Caused CME Live Cattle Futures and Options Prices to Be Artificial ........................................................................... 133

**X.     CLASS ACTION ALLEGATIONS ........................................................................ 134**

**XI.    STATUTE OF LIMITATIONS AND TOLLING .................................................. 138**

A.     Fraudulent Concealment .................................................................................... 138

       1.    The Tyson Defendants ........................................................................... 139

       2.    The JBS Defendants ............................................................................... 141

       3.    The Cargill Defendants .......................................................................... 142

       4.    National Beef ......................................................................................... 143

B.     Continuing Violations ........................................................................................ 149

**XII.   CLAIMS FOR RELIEF ........................................................................................... 150**

**XIII.  PRAYER FOR RELIEF .......................................................................................... 158**

**XIV.  JURY DEMAND ...................................................................................................... 159**

Plaintiffs Ranchers Cattlemen Action Legal Fund United Stockgrowers of America, Farmers Educational and Cooperative Union of America, Weinreis Brothers Partnership, Minatare Feedlot, Inc., Charles Weinreis, Eric Nelson, James Jensen d/b/a Lucky 7 Angus, Richard Chambers as trustee of the Richard C. Chambers Living Trust, Steven Graham, and Nathan Graham ("Plaintiffs"), on behalf of themselves and all other similarly situated persons and entities, bring claims against the following for their violations of law from at least January 1, 2015 through the present (the "Class Period"): Tyson Foods, Inc., Tyson Fresh Meats, Inc., JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., Cargill, Incorporated, Cargill Meat Solutions Corporation, and National Beef Packing Company, LLC (the "Packing Defendants"), and John Does 1-10 (who traded in cattle futures and options on the Chicago Mercantile Exchange ("CME"), which is owned by the CME Group Inc.) (the "John Doe Defendants") (collectively, the "Defendants").[1]  Based upon personal knowledge, information and belief, and investigation of counsel, Plaintiffs allege as follows:

## I.    INTRODUCTION

1.     From at least January 1, 2015 through the present, Tyson, JBS, Cargill, and National Beef conspired to fix and suppress – and did, in fact, fix and suppress – the price of fed cattle in the United States.  Armed with consistent control of the purchase of nearly 85% of fed cattle in the United States during the Class Period, these meatpacking conglomerates each caused substantial damages to Plaintiffs and members of the Producer

---

[1]     Plaintiffs reserve the right to amend their Complaint once the identities of any further alleged conspirators are established.

Class (as defined below) whose livelihoods depend on getting competitive prices for the cattle they sell, inevitably, to Packing Defendants.

2.      Witness accounts, trade records, and economic evidence confirms this.

3.      As a direct and proximate effect of Packing Defendants' conspiracy and overt acts taken in furtherance thereof, Packing Defendants paid lower prices for fed cattle directly to Producer Plaintiffs and members of the Producer Class than they would have in a competitive market.  At the same time, those transacting live cattle futures and options (the "Exchange Class", as defined below), including certain Plaintiffs, suffered significant harm as a result of Defendants' conduct.

4.      Fed cattle are steers and heifers raised and fed for the production and sale of high quality beef products.  Packing Defendants are beef packers who purchase fed cattle from Plaintiffs and other producers of fed cattle (the "Producer Class") for slaughter. Packing Defendants then process the resulting carcasses into beef for sale to other processors, wholesalers, and retail outlets.  Live cattle futures contracts are standardized contracts traded on the CME in which the contract buyer agrees to take delivery, from the seller, of a standardized quantity of fed cattle, at a predetermined price on a future delivery date.

5.      Packing Defendants control the U.S. market for the purchase of slaughter-weight fed cattle.  Following a series of mergers and acquisitions beginning in the 1980s and culminating in 2013, Packing Defendants have purchased and slaughtered between 82

and 87% of all fed cattle sold within the United States on an annual basis.[2]   Figure 1 demonstrates Packing Defendants' overwhelming dominance of the market for the purchase of fed cattle:

**Figure 1.  Packing Defendants' Share of Annual U.S. Fed Cattle Slaughter Volumes**[3]



6.       Packing Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef. As the supply of fed cattle is insensitive to short-term changes of price – owing to the long

---

[2]      Cattle Buyers Weekly, "Top 30 Beef Packers" Annual Reports, 2008-2018, http://www.cattlebuyersweekly.com/users/rankings/index.php ("CBW Top 30 Beef Packers"); *2017 Meat & Poultry Facts*, 46th Ed., NORTH AMERICAN MEAT INSTITUTE, 2018, at 11 ("2017 Meat & Poultry Facts").  Unless otherwise indicated, all websites cited in this Complaint were last accessed on October 3, 2019.

[3]      *Id.*

life cycle of fed cattle, their perishable nature, and their lack of any alternative use – and as beef demand is relatively insensitive to changes in price, the meat margin is very sensitive to changes in aggregate industry slaughter levels.  Consequently, Packing Defendants can increase the meat margin, and thus their profitability, by working cooperatively to reduce their respective slaughter volumes, thereby depressing the price of fed cattle.

7.      Packing Defendants procure about 70% of their fed cattle though alternative marketing agreements ("AMAs"), such as "formula" and "forward" contracts.  Under these contracts, the producer agrees to deliver its cattle to a Packing Defendant once they have reached slaughter-weight at a price to be determined at or around the time of delivery.  The price formulas used by formula contracts typically incorporate reported prices of fed cattle sold in the weekly cash cattle trade, the industry's spot market.  The price formulas used by forward contracts incorporate live cattle futures prices, which, in turn, are directly impacted by reported cash cattle prices.  As a result, the prices paid for fed cattle in the cash cattle trade – which constitutes a mere 20-25% of all fed cattle sold in the United States – determines the price of almost all fed cattle sold to Packing Defendants by Plaintiffs and members of the Producer Class.

8.      In 2009-2014, the years leading up to the Class Period, fed cattle prices had been increasing steadily in response to strong beef demand and a shortage of fed cattle following the droughts of late 2010 through 2013.  After prices peaked in November 2014, the industry expected the price of fed cattle to stabilize in 2015 and continue at or around that competitive level for a number of years.

9.      Packing Defendants colluded to make sure that the widely predicted period of price stability would never happen.  Packing Defendants used their market power and the relatively small cash cattle trade to their advantage and embarked upon a conspiracy to depress fed cattle prices that began in 2015 and continues through to this day.  Packing Defendants carried out their conspiracy to reduce fed cattle prices, and thereby increase the meat margin, through at least the following coordinated conduct:

- Reducing purchase and slaughter volumes of fed cattle, in particular cash cattle;

- Orchestrating and enforcing anticompetitive procurement practices;

- Continuing to import foreign cattle after it became uneconomical for them to do so; and

- Closing and idling plants.

10.     Tyson, JBS, Cargill, and National Beef all engaged in periodic and parallel slaughter reductions throughout the Class Period.  The impact of the Packing Defendants' respective slaughter reductions upon their annual slaughter volumes is illustrated in Figures 2 and 3 below.

11.     Figure 2 compares the average annual slaughter volume of the Packing Defendants during the pre-Class period and the portion of the Class Period for which data exists against that of the other US beef packers.  It shows that Tyson, JBS, Cargill, and National Beef have all reduced their annual slaughter volumes relative to the pre-Class Period, while independent regional packing businesses ("Independent Packers") increased their slaughter volume as a whole.

**Figure 2.    Average Pre- & Post-Class Period Fed Cattle Slaughter – Packing Defendants vs Others**[4]



12.    Figure 3 also compares the Packing Defendants' and the Independent Packers' annual slaughter volumes during the Class Period and the pre-Class Period, but breaks out the slaughter volume for each year of the Class Period for which data is available.    The graph confirms that Tyson, JBS, Cargill, and National Beef each slaughtered less fed cattle in every year in the Class Period compared to their pre-Class Period averages.    It also shows that while Tyson, JBS, Cargill, and National Beef each gradually increased their slaughter volume in the years following 2015, their rate of

---

[4]        CBW Top 30 Beef Packers; 2017 Meat & Poultry Facts, at 11.

increase was vastly outpaced by the slaughter volume increases of Independent Packers during the same period.

**Figure 3.   Average Pre- & Post-Class Period Fed Cattle Slaughter – Packing Defendants vs Others**[5]



13.     As shown in Figures 2 and 3 above, each Packing Defendant slashed its fed cattle slaughter levels in 2015, and then maintained artificially low slaughter levels throughout the remainder of the class period.

14.     Packing Defendants' conspiracy succeeded in precipitating an unprecedented collapse in fed cattle prices in the second half of 2015, and continued to suppress fed cattle prices thereafter:

---

[5]     CBW Top 30 Beef Packers; 2017 Meat & Poultry Facts, at 11.

**Figure 4.  Fed Cattle Prices vs. Retail Beef Prices**



15.     Despite the drastic collapse in fed cattle prices caused by Packing Defendants' conspiracy, Packing Defendants and their wholesale customers continued to benefit from record retail beef prices.  This disconnect allowed Packing Defendants to reap record per-head meat margins during the Class Period at the expense of fed cattle producers, as illustrated in the chart below:

**Figure 5.  Weekly Packer Per-Head Meat Margin (1,399 lb. Avg. Live Steer 65-80% Choice; 874 lb. Avg. Dressed Carcass)[6]**



16.     Confidential witness accounts confirm the existence of the Packing Defendants' price fixing conspiracy.  To begin with, a confidential witness previously employed by a Packing Defendant ("Witness 1"), has confirmed that each of the Packing Defendants expressly agreed to periodically reduce their respective purchase and slaughter volumes in order to reduce the prices they would otherwise pay for fed cattle during the

---

[6]     Table prepared using USDA Market News Service Reports: 5-Area Weekly Live Steer Price per CWT (LM_CT150), National Weekly Boxed Beef Cutout and Boxed Beef Cuts - Negotiated Sales (LM_XB459) and By-Product Drop Value data available here: https://marketnews.usda.gov/mnp/ls-report-config.

Class Period.   Transaction data and slaughter volume records reported by Packing Defendants and published by the United States Department of Agriculture ("USDA") – as well as Packing Defendants' public calls for industry-wide slaughter and capacity reductions – corroborate Witness 1's account.

17.     The same data demonstrate that Packing Defendants drastically reduced their purchases of cash cattle during these periods of slaughter restraint.   Packing Defendants did so in an attempt to "back-up" (that is, create a glut in) the number of slaughter-ready cash cattle and encourage producers to accept lower prices for their highly perishable product.   Doing so not only dropped cash cattle prices, but also the prices paid under Packing Defendants' formula and forward contracts.

18.     Once Packing Defendants had broken the cash cattle trade and created a relative supply glut, Packing Defendants collectively ramped up their cash cattle purchases and reaped supra-competitive profits at the expense of the producers.

19.     In addition, Packing Defendants also engaged in various collusive bidding practices that further suppressed prices.   In particular, Packing Defendants collectively adhered to an antiquated "queuing protocol" and enforced it with producers via threats of boycott.   The convention significantly limited cash cattle sellers' ability to generate price competition among Packing Defendants.   Packing Defendants also often conducted all, or substantially all, of their weekly cash cattle purchasing during a short 30- to 60-minute window late on Friday, and would adhere to the price established by the Packing Defendant that had opened the weekly cash cattle trade.

20.     The bidding practices of Packing Defendants differed from the practices of regional Independent Packers (a small percentage of the fed cattle purchasers), which bid on and purchased cash cattle throughout the week during the Class Period.

21.     Packing Defendants employed other procurement methods to depress the cash cattle price reports incorporated directly into their formula contracts and also into their forward contracts.  In particular, import data show that Packing Defendants continued importing large numbers of live cattle for slaughter from Canada, even after it became uneconomical for them to do so.  Such conduct would not have been economically rational but for Packing Defendants' agreement to curtail their domestic cash cattle purchases.

22.     Finally, Packing Defendants' closure and idling of certain plants immediately prior to and during the Class Period is strongly suggestive of an agreement among Packing Defendants to reduce or restrain their respective slaughter capacities and limit competition for the available supply of fed cattle.

23.     All of this conduct occurred in a market that is highly conducive to collusion for numerous reasons, including: the small number of big market beef packers, the high barriers to entry, and frequent, easily accessible means of communications among Packing Defendants.   Packing Defendants' field buyers had ample opportunity to meet and exchange commercially sensitive information with each other each week as they inspected feedlots within their respective territories.[7]  Field buyers routinely communicated "market color" obtained from the field – including reports of their competitors' activities obtained

---

[7]     A feedlot is a plot of land on which cattle are fed intensively so as to reach slaughter weight.

from producers – back to their head office and their firms' other field buyers through daily conference calls.  Packing Defendants were also members of various trade and industry organizations, which provided additional opportunities to conspire.

24.     The economic facts further support the existence of the alleged conspiracy. Plaintiffs' economic analysis shows that:

a.     Supply and demand drivers of fed cattle prices, and other commonly proffered explanations, do not explain the 2015 collapse in fed cattle prices or the low prices that have prevailed since then; and

b.     Fed cattle prices have been artificially depressed by an average of 7.9% in the three years since January 2015.

25.     Plaintiffs seek relief under the Sherman Antitrust Act, the Clayton Antitrust Act, the Packers and Stockyards Act, and the Commodity Exchange Act for the injury and damages they and other members of the Classes suffered during the Class Period.

## II.     PARTIES

### A.     <u>Plaintiffs</u>

26.     Plaintiff Ranchers Cattlemen Action Legal Fund United Stockgrowers of America ("R-CALF USA") is a non-profit public benefit corporation existing under the laws of the State of Montana, and has its principal place of business in Billings, Montana. It is the largest cattle producer-only based membership trade organization, and works to "address the market interest of U.S. cattle producers with the primary purpose of addressing the threats posed to the domestic live cattle industry by unfair and illegal trade practices

and imports."[8]  Its members include fed cattle producers who sold fed cattle to Packing Defendants and individuals who transacted cattle futures and options on the CME during the Class Period.

27.    Plaintiff Farmers Educational and Cooperative Union of America, commonly known as National Farmers Union ("NFU"), is a national federation of state Farmers Union organizations existing under the laws of the State of Texas, and has its principal place of business in Washington, D.C.  Founded in 1902, NFU is the oldest and second largest general farm organization in the United States and represents nearly 200,000 U.S. family farmers and ranchers, with organized chapters across 33 different states.  NFU works to protect and enhance the economic well-being and quality of life for family farmers, fishers, ranchers, and rural communities through educational efforts and by advocating for policy positions that are developed by the grassroots membership.  Nineteen of the NFU's state divisions are recognized by the USDA as Certified Nominating Organizations (CNOs) for the Cattlemen's Beef Promotion and Research Board and, as such, have certified to the Secretary of Agriculture that "a primary or overriding purpose of this organization or association is to promote the economic welfare of cattle producers." NFU members include fed cattle producers who sold fed cattle to Packing Defendants and individuals who transacted cattle futures and options on the CME during the Class Period.

28.    R-CALF USA and NFU, respectively, have standing to bring this action pursuant to established Supreme Court precedent for: (a) declaratory and injunctive relief

---

[8]      R-CALF USA Amended Articles of Incorporation dated April 21, 2009, Art. VI.

in a representative capacity on behalf of their respective members, who are adversely affected by Packing Defendants' misconduct described herein and whose participation is not required for the declaratory and injunctive relief sought; and (b) damages in their personal capacity for that same misconduct, which has frustrated their respective missions to protect the interests of their members, and diverted their resources to help their members mitigate damages and prevent further breaches of the law by Packing Defendants. *United Food & Commer. Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 553 (1996) and *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

29.     Plaintiff Weinreis Brothers Partnership ("Weinreis Brothers") is a general partnership organized under the laws of the State of North Dakota, and has its principal place of business in Scottsbluff, Nebraska.

30.     Plaintiff Minatare Feedlot Inc. ("Minatare") is a Nebraska corporation with its principal place of business located at Scottsbluff, Nebraska.

31.     Plaintiff Charles "Chuck" Weinreis ("Weinreis") is an individual, a partner of Weinreis Brothers, president of Minatare, and a sole proprietor with a principal place of business in Scottsbluff, Nebraska.

32.     Plaintiff Eric Nelson ("Nelson") is an individual and sole proprietor with a principal place of business in Moville, Iowa.

33.     Plaintiff James "Jim" Jensen d/b/a Lucky 7 Angus ("Lucky 7 Angus") is an individual and sole proprietor with a principal place of business in Riverton, Wyoming.

34.     Plaintiff Richard "Rick" Chambers ("Chambers") is the trustee of the Richard C. Chambers Living Trust ("Chambers Trust"), a trust organized under the laws

of the State of Kansas, with a principal place of business in Hays, Kansas.  Chambers is also a beneficiary of the Chambers Trust.

35.    Plaintiffs Steven Graham and Nathan Graham own a cattle feeding business with a principal place of business in Cherokee, Iowa.  Steven Graham operated the business as a sole proprietor until in or around 2018.  Beginning in or around 2018, Steven Graham operated the business in partnership with Nathan Graham.  The Graham's feedlot, at times, conducted business under the name "Graham Feedlot."  Steven Graham, Nathan Graham, and the Graham Feedlot are collectively referred to herein as "the Grahams."

36.    During the Class Period, the Weinreis Brothers, Minatare, Weinreis, Nelson, Lucky 7 Angus, Chambers as trustee of the Chambers Trust, and the Grahams (the "Producer Plaintiffs") each sold fed cattle directly to one or more of the Packing Defendants, and Weinreis Brothers, Weinreis, Nelson, Lucky 7 Angus, Chambers as trustee of the Chambers Trust, and Steve Graham (the "Exchange Plaintiffs") each transacted live cattle futures and/or options on the CME.

37.    As a consequence of the conduct described in this Complaint:

    a.    Producer Plaintiffs and Producer Class members suffered damages in that they received less for their sales of fed cattle to Packing Defendants than they would have in the absence of the breaches of the law alleged herein; and

    b.    Exchange Plaintiffs suffered damages from a manipulated live cattle futures and options market.  Exchange Plaintiffs suffered monetary losses by transacting in live cattle futures and options at artificial

15

prices directly resulting from Packing Defendants' conduct, including their suppression of fed cattle prices.  Further, during the Class Period, Plaintiffs Weinreis Brothers, Weinreis, Lucky 7 Angus, Chambers as trustee of the Chambers Trust, and Exchange Class members suffered aggregate net trading losses on their respective combined purchases and sales of CME live cattle futures and options.

**B.    The Tyson Defendants**

38.    Defendant Tyson Foods, Inc. ("Tyson Foods") is a Delaware corporation with its principal place of business located at 2200 Don Tyson Parkway, Springdale, Arkansas 72762.  Tyson Foods is the parent company of the Tyson group.

39.    Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh Meats") is a wholly owned subsidiary of Tyson Foods.  Tyson Fresh Meats is a Delaware corporation with its principal place of business located at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049. Tyson Fresh Meats is the principal operating entity within Tyson's U.S. cattle and beef business.   On information and belief, Tyson Fresh Meats owns directly, or indirectly through its subsidiaries, Tyson's U.S. fed cattle slaughter plants, and contracts for the purchase of cattle slaughtered there.

40.    As detailed in Appendix 1, during the Class Period, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of both Classes in the United States and in this District.

41.     Defendants Tyson Foods and Tyson Fresh Meats are referred to collectively herein as "Tyson" or the "Tyson Defendants."

## C.     The JBS Defendants

42.     Defendant JBS S.A. is a Brazilian corporation with its principal place of business located at Av. Marginal Direta do Tiete, 500 Bloco 3-3o. andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil.  JBS S.A. is the parent company of the JBS group.

43.     Defendant JBS USA Food Company ("JBS USA") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634.  JBS USA is the principal operating entity of JBS's U.S. cattle/beef business.  On information and belief, it is the principal operating entity within JBS's U.S. cattle and beef business, and the contracting entity for certain of JBS's purchases of fed cattle in the USA.

44.     Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634.  Swift owns directly, or indirectly through its subsidiaries, certain of JBS's U.S. fed cattle slaughter plants including the Cactus, Texas; Greeley, Colorado; Grand Island, Nebraska; and Hyrum, Utah plants.

45.     Defendant JBS Packerland, Inc. ("JBS Packerland") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634.  On information and belief JBS Packerland owns directly, or indirectly through its subsidiaries, certain of JBS's U.S. fed and dairy cattle slaughter plants, including the Packerland packing plants in Green Bay, Wisconsin and Plainwell, Michigan;

the Sun Land Beef plant in Tolleson, Arizona; and the Moyer Packing plant in Souderton, Pennsylvania.

46.     Defendants JBS USA, Swift, and JBS Packerland were, throughout the Class Period, wholly-owned, direct or indirect subsidiaries of JBS S.A.

47.     Defendants JBS S.A., JBS USA, Swift, and JBS Packerland are referred to collectively herein as "JBS" or the "JBS Defendants."

48.     As detailed in Appendix 1, during the Class Period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of both Classes in the United States and in this District.

**D.     The Cargill Defendants**

49.     Defendant Cargill, Incorporated ("Cargill") is a Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391. Cargill, Incorporated is the parent company of the Cargill group.

50.     Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) ("Cargill Meat"), a subsidiary of Cargill, is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202.   Cargill Meat is the principal operating entity within Cargill's U.S. cattle and beef business and a wholly owned subsidiary of Cargill.   On information and belief, Cargill Meat owns directly, or indirectly through its subsidiaries, Cargill's U.S. fed cattle slaughter plants, and contracts for the purchase of cattle slaughtered there.

18

51.     As detailed in Appendix 1, during the Class Period, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of both Classes in the United States and in this District.

52.     Defendants Cargill and Cargill Meat are referred to collectively herein as "Cargill" or the "Cargill Defendants."

### E.     **National Beef**

53.     Defendant National Beef Packing Company, LLC ("National Beef") is a Delaware limited liability company with its principal place of business located at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163.   On information and belief, National Beef owns directly, or indirectly through its subsidiaries, National Beef's U.S. fed cattle slaughter plants, and contracts for the purchase of cattle slaughtered there.

54.     Marfrig Global Foods S.A. ("Marfrig") is a Brazilian meatpacking conglomerate with operations around the world and, since June 2018, owns a controlling

interest in National Beef Packing Company, LLC.[9]  Prior to this sale, Jefferies Financial

Group, Inc. ("Jefferies Financial Group") was National Beef's controlling shareholder.[10]

### F.    Packing Defendants

55.    During the Class Period, each Packing Defendant purchased fed cattle in the

United States.  In 2017, Tyson, JBS, Cargill, and National Beef accounted for 26%, 21%,

22%, and 12.5% of the total U.S. fed cattle slaughter, respectively.[11]  In their 2017 fiscal

years, Tyson, JBS, Cargill, and National Beef had approximately $14.5 billion, $13.4

billion, $13.1 billion, and $7.34 billion in sales in their respective beef segments.[12]

56.    During the Class Period, each Packing Defendant exploited the relationship

between physical cash cattle and the CME live cattle market and transacted in cattle futures

and/or options at prices that they had suppressed.

57.    Each Packing Defendant was a co-conspirator with the other Packing

Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the

United States and in this District.

---

[9]      *Marfrig Concludes Acquisition of National Beef*, Marfrig (Jun. 6, 2018),
http://www.marfrig.com.br/en/documentos?id=780.

[10]     Jefferies Financial Group Inc., Annual Report, (Form 10-K) at 6 (Jan. 10, 2019)
("Jefferies 2018 Annual Report").  After the acquisition, Jefferies Financial Group,
retained a 31% interest in National Beef.

[11]     *See* CBW Market Share; CBW Top 30 Beef Packers; 2017 Meat & Poultry Facts.

[12]     Jefferies 2018 Annual Report at 38; *Directions statistics*, NATIONAL
CATTLEMEN'S BEEF ASSOCIATION (2008), at 2,
http://www.beefusa.org/CMDocs/BeefUSA/Publications/CattleFaxSection.pdf; CBW
Top 30 Beef Packers.

### G.    John Doe Defendants

58.     John Doe Defendants are those packing firms, financial institutions, and/or trading firms that participated in the manipulation of the live cattle futures and options market, as described herein.  The identity of individuals and firms that trade CME futures and options is anonymous and not available to the public.  Plaintiffs will be able to identify the John Doe Defendants through discovery of trading records in possession of the CME Group Inc. that it is required to maintain under the Commodity Exchange Act ("CEA") including, but not limited to, Order Entry Operator identifications, Tag 50 IDs, User Assigned IDs, and Clearing Information.

### H.    Agents and Affiliates

59.     "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, and directors.

60.     Whenever reference is made to any act, deed, or transaction of any corporate group, corporation, or partnership, the allegation means that the corporate group, corporation, or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parents, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

## III.   JURISDICTION, VENUE AND COMMERCE

61.     This action arises under Section 1 of the Sherman Act (15 U.S.C. §1), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), Sections 202 and 308 of the

Packers and Stockyards Act (7 U.S.C. §§192, 209), and Sections 2(a), 6(c) and 22 of the Commodity Exchange Act (7 U.S.C. §1 *et. seq*).   The action is for injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorneys' fees.

62.     This Court has federal question subject matter jurisdiction under 28 U.S.C. §§1331, 1332(d), and 1337, Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), and Section 22 of the Commodity Exchange Act (7 U.S.C. §25).

63.     Venue is proper in this District under 15 U.S.C. §§15 and 22 and 28 U.S.C. §1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District, including:

      a.     Cargill is domiciled in this District;

      b.     Packing Defendants purchased fed cattle owned or located in this District,[13] including from members of the Class; and

---

[13]     The 2017 USDA Census of Agriculture records that approximately 1.4 million beef cattle were sold from Minnesota farms in 2017.  *See* U.S. Dep't of Agric., *2017 Census of Agriculture – State Data*, Volume 1, Chapter 1: State Level Data: Minnesota, Table 16, https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_State_Level/Minnesota/st27_1_0015_0016.pdf.  *See also Feedlots*, AMERICAN ANGUS ASSOCIATION, https://www.angus.org/Commercial/Links/CommFeedlotRpt.aspx#MN.  Tyson, JBS, Cargill, and National Beef each employed field buyers whose assigned territory included Minnesota.  Various individuals within each of Tyson, JBS, Cargill, and National Beef,

      c.     Packing Defendants processed the resultant beef at plants located in this District and/or sold resultant beef products to customers located in this District.[14]

64.    The conduct detailed in ¶63 furthered Defendants' conspiracy to profit from the violations of law alleged herein.

65.    Defendants' conspiracy and conduct were within the flow of, and were intended to and did have a substantial effect on, the interstate commerce of the United States.   During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal scheme.

66.    This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, is located, or its co-conspirators committed overt acts in furtherance of the illegal conspiracy and manipulation of the cattle futures and options market, in the United States, including in this District. Defendants should, therefore, have foreseen the possibility of being brought before this Court to answer for any illegal acts related to their business conducted here.

67.    The Court has personal jurisdiction over all non-resident Defendants under Minnesota's long-arm statute, Minn. Stat. §543.19, because each such Defendant: (a) owns, possesses, or uses real or personal property in Minnesota; (b) transacts business within

---

including field buyers active in Minnesota, maintained Minnesota Department of Agriculture livestock meat packing company agent licenses throughout the Class Period.

[14]    Specifically, Cargill operated a protein processing plant in Albert Lea, Minnesota, which processed beef during the Class Period.

Minnesota; (c) commits acts in Minnesota causing injury or property damage; and/or (d) commits acts outside Minnesota causing injury or property damage within Minnesota. Moreover, Minnesota has a substantial interest in providing a forum and the burden placed on Defendants by being brought under the state's jurisdiction does not violate fairness and substantial justice.

68.     During the Class Period, all Defendants, both foreign and domestic, engaged in conduct within the United States related to Plaintiffs' allegations.  Defendants' misconduct was purposefully directed at the United States and was specifically intended to affect the prices of fed cattle bought within the United States and live cattle futures and options transacted by the Defendants with U.S. counterparties.  Defendants' acts were acts in furtherance of the conspiracy that, because they occurred in the United States by Defendants' domestic entities, provide specific personal jurisdiction over all conspirators.

69.     The conspiracy and the overt acts taken in furtherance of it, were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

70.     As members of the conspiracy, foreign-based Defendants are liable for acts taken in furtherance of the conspiracy by domestic Defendants over whom they exert direct and complete control, as well as their own actions taken in the United States, and personal jurisdiction attaches, regardless of whether some portion of the conduct in furtherance of the conspiracy might have occurred overseas.

## IV.    OVERVIEW OF THE FED CATTLE MARKET

71.    In 2017, 25.8 million fed cattle were slaughtered and processed into beef products, accounting for 80% of the 32.2 million commercial cattle slaughtered across the United States.[15]

72.    The cattle production cycle, running from birth to slaughter, typically ranges between 15 to 24 months, and is the longest of all animals typically raised for meat.  Fed cattle availability varies seasonally, with supplies being more plentiful over the summer months owing to the fact that the majority of calves are born in the spring.

73.    Fed cattle progress through three interrelated sectors prior to slaughter: cow/calf; stocking and background; and feedlots, as detailed in Figure 6 below.

---

[15]    The remaining volume comprised slaughter cows (female cattle that have birthed a calf) and bulls, whose meat is typically used for lesser quality beef products such as hamburger patties.  2017 Meat & Poultry Facts at 11.

**Figure 6.  Cattle and Beef Industry from Breeding to Consumption**[16]



74.     Once cattle reach between around 950 and 1,500 pounds, they are marketed,

transported to, and slaughtered at a packing plant operated by a beef packer such as Packing

Defendants.  Packing Defendants process the carcasses into various primal cuts that are

then vacuum-packed and boxed for sale to customers of "boxed beef" who process it into

cuts that are ultimately sold to consumers at retail, restaurants, and other foodservice

---

[16]     U.S. Gov't Accountability Off., GAO-18-296, U.S. DEPARTMENT OF AGRICULTURE: ADDITIONAL DATA ANALYSIS COULD ENHANCE MONITORING OF U.S. CATTLE MARKET 6 (Apr. 2018) ("2018 GAO Report"), https://www.gao.gov/assets/700/691178.pdf.

operations.   Customers of boxed beef include foodservice companies such as Sysco and US Foods and large retailers such as Costco and Sam's Club.   Boxed beef is a commodity product, and competition to sell boxed beef is primarily on price as between boxes of equivalent USDA quality and yield grades.[17]   Packing Defendants also process boxed beef in-house, and sell case-ready beef and other value added products (*e.g.*, sausages) directly to retailers, restaurants, hospitals, and others at a premium over boxed beef prices.   Certain customers will purchase both boxed beef and processed products from Packing Defendants.

75.     As a perishable product, the majority of beef sold domestically is sold on short-term contracts.   Certain large purchasers, such as Walmart or national restaurant chains like Outback Steakhouse, purchase some of their beef on "forward" contracts (pursuant to which beef is sold 22 days or more prior to delivery) and other long-term supply agreements.

76.     Tyson, JBS, Cargill, and National Beef all operate a live cattle procurement team, run by a head buyer, who is supported by a number of "field buyers" who are responsible for stated territories.   Field buyers acquire cattle from feedlots situated inside their territory.   They conduct negotiations directly with the fed cattle producers and their agents within the parameters set by their head buyer.[18]

---

[17]     Amended Complaint, ¶24, *U.S. v. JBS SA*, No. 08-cv-05992, (N.D. Ill. Nov. 7, 2008) ("*U.S. v. JBS* Amended Complaint").

[18]     Producers commonly delegate authority for marketing their cattle to the commercial feedlot which has fed their cattle or to third-party marketing cooperatives.   A small portion of the fed cattle sales to Packing Defendants also occur at public auctions.

77.     Tyson, JBS, Cargill, and National Beef each conduct daily meetings, attended by representatives of their respective cattle procurement, plant operations, scheduling, beef sales, and risk management teams, among others, to make decisions regarding their respective cattle and beef operations.  Among other matters, the attendees of these meetings will discuss the number of cattle their firm will procure, the terms on which they will be bought, plant scheduling (including slaughter rates), and beef sales strategy.

78.     Each Packing Defendant seeks to procure sufficient fed cattle to operate its slaughter plants at its chosen utilization rates without interruption.  Weekly plant capacity is determined not only by plant size, but by the number and length of shifts run in a given week, and the "chain-speed" at which those shifts are run.[19]  Packing Defendants' average cost of production increases if they underutilize their plant capacity.  Thus, it is in the individual interest of each Packing Defendant to make sure that it has timely access to sufficient fed cattle to run its plants efficiently.

79.     Prior to the consolidation of the beef packing industry, almost all fed cattle was sold through the "cash" or "negotiated" cattle trade:[20] meat packers' buyers went to

---

[19]     "Chain-speed" refers to the head per hour rate at which a plant slaughters and fabricates cattle.

[20]     For the avoidance of doubt, Plaintiffs do not allege that there are separate or sub-markets in the U.S. product market for the purchase of fed cattle, whether demarcated by contracting type or otherwise.

feedlots and auctions and paid a cattle price set each day at the dollar mark where supply and demand met.

80.     However, by 2015, the cash cattle trade had been drastically thinned, and now accounts for only 20-25% of national fed cattle sales.[21]  Despite this, the cash cattle trade remains the industry's price discovery mechanism and continues to determine the price of the nearly 71% of fed cattle bought pursuant to "formula" or "forward" contracts. Under these agreements, commonly referred to as "captive supply" agreements, producers commit to deliver their cattle to a packer once they have obtained slaughter-weight at a price to be determined at or around the point of delivery pursuant to an agreed-upon formula.

---

[21]     A by-region breakdown of these figures appears in Appendix 4.

**Figure 7.  USDA Records of Fed Cattle Procurement Methods – U.S. – 2005 to 2018**[22]



81.    The price of cattle delivered under formula contracts is determined by reference to a stipulated measure of cash cattle prices at, or just prior to, the date of delivery. These contracts commonly incorporate a specified average cash price reported by the USDA Agricultural Marketing Service's ("AMS") Livestock Mandatory Reporting's

---

[22]    Under negotiated grid contracts, the seller and buyer negotiate a base price, which is then raised or lowered through the application of premiums or discounts after slaughter based on carcass performance.  Negotiated grid contracts' base prices tend to move in parallel with cash cattle prices.

("LMR") cattle transaction price summaries.[23]   Moreover, the price of cattle delivered under forward contracts is typically established by reference to the price of the live cattle futures contract settling in the month of or adjacent to the expected delivery date.   As explained in Section IX, the price of live cattle futures contracts is directly impacted by current and expected cash cattle prices.   Thus, the price of cash cattle sets or drives the price of the bulk of Packing Defendants' fed cattle purchases, despite constituting only a small percentage of total fed cattle purchases.[24]

82.   Tyson, JBS, Cargill, and National Beef each use captive supply agreements for the bulk of its procurement needs.   This has both incentivized and facilitated Packing Defendants' suppression of cash cattle prices.   The greater a Packing Defendant's supply of captive cattle, the less reliant it becomes on participating in the cash cattle trade to procure sufficient cattle to operate its slaughter plants at its chosen utilization rates.   This, in turn, allows a Packing Defendant to abstain from purchasing cash cattle when it regards market prices to be too high.   All things being equal, a reduction in demand for cash cattle results in a drop in cash cattle prices, as producers are forced to lower their asking price in order to attract a buyer willing to purchase and slaughter the producer's perishable product (*see* section VII(C) below).   And because cash cattle prices are used to set the prices paid

---

[23]   These price series collate the information Packing Defendants and others are required to submit to the USDA on a daily and weekly basis regarding their live cattle purchases and deliveries pursuant to the Livestock Mandatory Reporting Act of 1999.   The Act imposes similar reporting obligations upon packers in relation to their boxed beef sales.

[24]   The base prices used in negotiated grid contracts are also impacted by changes in cash cattle prices.

under formula contracts and directly impact the live cattle futures prices incorporated into forward agreements, a reduction in cash cattle prices reduces the price paid by Packing Defendants for cattle bought on such contracts.

83.      As the cost of fed cattle constitutes the majority of their costs of production, Packing Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef.[25]  The meat margin is very sensitive to changes in industry aggregate slaughter levels, and Tyson, JBS, Cargill, and National Beef can, through cooperation, increase it.  As noted by the U.S. Department of Justice ("DOJ"), "all else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase.  Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits."[26]  As a result of these sensitivities, Tyson, JBS, Cargill, and National Beef can improve their profitability by coordinating their respective slaughter levels at or below the prevailing supply of slaughter-weight fed cattle.

---

[25]      Jefferies Financial Group Inc., 2018 Annual Report (Form 10-K) at 36 (Jan. 29, 2019) ("National Beef's profitability is dependent, in large part, on the spread between its costs for live cattle, the primary raw material for its business, and the value received from selling boxed beef and other products, coupled with its overall volume.").

[26]      *U.S. v. JBS* Amended Complaint, ¶26-27.  *See also* Section VII(B) below regarding the elasticities of fed cattle and beef.

84.     The fed cattle market itself is highly concentrated.  In fact, during the Class Period, Packing Defendants have collectively purchased and slaughtered between 82% to 83% of the 23 to 26 million fed cattle slaughtered in the United States annually.[27]  *See* Appendix 3.

85.     During the Class Period, Packing Defendants' respective shares of annual fed cattle slaughter volumes have remained relatively stable despite.  *See* Figure 1 above and Appendix 3.  The remainder of the U.S.'s fed cattle slaughter capacity is predominately provided by regional Independent Packers such as Greater Omaha and Nebraska Beef, which typically only operate one plant.[28]

## V.     PACKING DEFENDANTS CONSPIRED TO DEPRESS FED CATTLE PRICES

86.     Fed cattle prices increased consistently from 2009 through 2014, peaking in November 2014 at approximately $170 per hundredweight ("CWT").[29]  Market analysts, such as the USDA Economic Research Service, predicted that the price levels established

---

[27]     2017 Meat & Poultry Facts at 11; CBW Top 30 Beef Packers.

[28]     Lee Schulz, *et al.*, *Economic Importance of Iowa's Beef Industry*, IOWA STATE UNIVERSITY (Dec. 2017), https://store.extension.iastate.edu/product/Economic-Importance-of-Iowas-Beef-Industry; and CBW Market Share.

[29]     Cattle are typically priced on a live-weight basis (the price per CWT applied to the live-weight of the animal prior to slaughter, typically immediately prior to delivery) or a carcass-weight or "dressed" basis (the price per CWT applied to the animal once "dressed," *i.e.*, slaughtered with its head, hide, and internal organs removed).  References to fed cattle prices in this Complaint are on a live-weight basis unless otherwise stated.  Live-weight and carcass-weight prices typically move together, as both are based on the expected value of the cattle once slaughtered.

in 2014 would continue for a number of years before experiencing a gradual decline.[30]

Some forecasters even foresaw no drastic change from 2014 prices "barring any outside

market shocks like drought or a U.S. economic recession."[31]

87.     While Packing Defendants initially benefited from the rise in fed cattle prices

because wholesale beef prices rose in parallel, the meat margin fell to a low of

approximately $50 in the months leading up to 2015, sending the packers' margins into the

red.

88.     In response, Packing Defendants commenced and/or accelerated their

conspiracy to depress and stabilize the price of fed cattle purchased in the United States.

The core of their collusion was an agreement to reduce and then manage their respective

slaughter volumes: a classic abuse of monopsony, or unfair buying power.  Packing

Defendants implemented their conspiracy, by, among other conduct, agreeing to: (1)

periodically restrain or reduce slaughter numbers so as to reduce demand for fed cattle; (2)

curtail their purchases of cash cattle during these periods; (3) coordinate their procurement

---

[30]     U.S. DEP'T OF AGRIC., OCE-2015-1, OFF. OF THE CHIEF ECONOMIST: USDA AGRICULTURAL PROJECTIONS TO 2024, INTERAGENCY AGRICULTURAL PROJECTIONS COMMITTEE             81             (February             2015), https://www.usda.gov/oce/commodity/projections/USDA_Agricultural_Projections_to_2 024.pdf.

[31]     *Livestock Monitor, A Newsletter for Extension Staff*, LIVESTOCK MARKETING INFORMATION CENTER, STATE EXTENSION SERVICES IN COOPERATION WITH USDA 2 (Jan. 12, 2015); and *CattleFax Predicts Strong Prices to Remain in 2015*, AGWEB (Feb. 6, 2015),         https://www.agweb.com/article/cattlefax-predicts-strong-prices-to-remain-in-2015-naa-news-release/ ("Analyst[s] . . . expect fed cattle prices averaging in the mid-$150s [per CWT in 2015], slightly higher than last year.  Prices will trade in a range from the near $140 [per CWT] in the lows to near $170 [per CWT] in the highs in the year ahead.").

practices with respect to the cash cattle they did in fact purchase; (4) import foreign cattle to depress demand for cheaper domestic cattle; and (5) close or idle slaughter plants and refrain from expanding their remaining slaughtering capacity.

### A.    Packing Defendants Agreed to Collusive Slaughter Reduction

89.    As confirmed by Witness 1, each of the Packing Defendants expressly agreed to periodically reduce their respective purchase and slaughter volumes in order to reduce the prices they would otherwise pay for fed cattle during the Class Period.

90.    Witness 1 is a former employee of one of the Packing Defendants ("Defendant 1"). Witness 1 was a quality assurance officer ("QA") at one of Defendant 1's slaughter plants located within the Texas Panhandle / Western Kansas region ("Slaughter Plant 1" and "Panhandle Region", respectively) for over 10 years until his employment ceased in 2018.

91.    During the Class Period, Witness 1 acted as a head QA and had primary responsibility for the plant's kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed, *i.e.*, head, hide, and internal organs removed. The carcasses are then moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts.

92.    Witness 1 learned of the Packing Defendants' collusive purchase and slaughter reduction "agreement" from another employee in a position to know about the unlawful "agreement" – Slaughter Plant 1's head of fabrication ("Fabrication Manager").

93.    Witness 1 reports having multiple discussions with the Fabrication Manager during which the Fabrication Manager explained that all of the Packing Defendants

reduced their purchase and slaughter volume in order to reduce fed cattle prices when Packing Defendants viewed fed cattle prices as being or becoming "too high" for their liking.  For example, during one conversation, the Fabrication manager specifically admitted that the Packing Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.

94.    That conversation occurred sometime in 2015 or early 2016.  Witness 1 reports that he was in the Fabrication Manager's office when the Fabrication Manager received an angry phone call from his immediate supervisor, who worked out of Defendant 1's central office.

95.    After the call concluded, Witness 1 reports that he asked the Fabrication Manager how "many are we [Slaughter Plant 1] cutting [*i.e.*, fabricating]?"  Witness 1 reports that the Fabrication Manager replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).[32]  Witness 1 then reports asking the Fabrication Manager whether other Packing Defendants' plants in the Panhandle Region were also cutting back their kill.  Witness 1 reports he recalls that the Fabrication Manager answered Witness 1's question as follows: "Yes, they are. We have had that agreement that we don't kill while prices are up for a while" (or words to that effect).

---

[32]    Witness 1 reports that there was typically a lag between the commencement of a slaughter reduction and the reduction of fabrication activities.  Among other reasons, this reflected the fact that Slaughter Plant 1's fabrication team had to continue to process the carcasses the were already hanging in the coolers.

96.     Witness 1 recalls specifically that the Fabrication Manager used the word "*agreement*" and understood that he was referring to at least all Packing Defendants' plants in the Panhandle Region, namely Tyson Amarillo, Texas; JBS Cactus, Texas; Cargill Friona, Texas; and National Beef, Liberal, Kansas.  Each of these plants provide a significant portion of each Packing Defendants' fed cattle slaughter capacity (at least 20% in the case of each Packing Defendant).

97.     Witness 1 is certain that the Fabrication Manager intended to convey that all of the Packing Defendants were reducing their slaughter volumes by agreement in response to high prices, and was not simply commenting on the fact that one or some of the Packing Defendants had independently decided to do so.

98.     Witness 1 understands that the Fabrication Manager had first-hand knowledge of Packing Defendants' anticompetitive agreement.  The Fabrication Manager continues to work at Slaughter Plant 1, where he has worked for over 15 years in that role. In that capacity, the Fabrication Manager reported directly to Defendant 1's head office. As head of fabrication, the Fabrication Manager needed to be informed as to cattle buying, cattle slaughter, and beef selling aspects of Defendant 1's business.  He thus interacted with personnel across Defendant 1's business.

99.     Witness 1 reports that prior to working for Defendant 1, the Fabrication Manager worked at another Packing Defendant ("Defendant 2") for a number of years. Witness 1 understands that Fabrication Manager was head of fabrication for the slaughter plant operated by Defendant 2 in the Panhandle Region at which he was employed ("Slaughter Plant 2").

37

100.   The Fabrication Manager regularly told Witness 1 that he was in contact with his former colleagues at Slaughter Plant 2, including his replacement there.   The Fabrication Manager also told Witness 1 that he had friends and former colleagues with whom he stayed in touch at other Packing Defendant plants.

101.   The Fabrication Manager would often provide Witness 1 with detailed information as to the current and future operations of the Packing Defendants' nearby packing plants.   Witness 1 regularly stopped by the Fabrication Manager's office prior to starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days, as this affected the execution of his and his team's responsibilities. Witness 1 and the Fabrication Manager had a good working relationship.

102.   Witness 1 stated that the purpose of the agreed slaughter reductions was to force cattle producers (in particular, cash cattle producers) to feed their cattle for longer periods, and in doing so, create a condition of oversupply that would encourage producers to either accept lower cash prices for their cattle or commit their cattle in advance on captive supply agreements.   Put another way, by creating and encouraging an apprehension among producers that they might not be able to "get their cattle dead," Tyson, JBS, Cargill, and National Beef sought to increase their collective leverage over producers.   As Witness 1 noted, once cattle are fed beyond their ideal slaughter-weight, producers face increasing "pressure to drop their prices in order to get rid of their [perishable] cattle."

103.   Witness 1 stated that Slaughter Plant 1 had a 5,500-6,000 head per day slaughtering capacity and might drop its kill level back to around 4,800-5,200 head per day when implementing Packing Defendants' agreement.   While Defendant 1 implemented the

Packing Defendants' agreement by buying and slaughtering fewer cattle, the second order consequences of these actions included running its slaughter plants at reduced hours, operating those plants at lower "chain speeds," and/or scheduling maintenance shutdowns.

104.   Witness 1 reported that Slaughter Plant 1 would reduce its slaughter during periods associated with seasonal rises in fed cattle prices, such as those traditionally experienced in the late winter/early spring. He believes such actions formed part of the Packing Defendants' anticompetitive agreement. Public reports indicate that all Packing Defendants reduce their slaughter volume during these periods to suppress price rises in fed cattle by ensuring that their collective demand for cattle did not exceed the available supply.[33]

105.   The impact of Tyson, JBS, Cargill, and National Beef's periodic slaughter reductions throughout the Class Period is illustrated in Figures 2 and 3 below, reproduced here. Figure 2 compares the average annual slaughter volume of the Packing Defendants during the pre-Class period and the portion of the Class Period for which data exists against that of the other US beef packers. It shows that Tyson, JBS, Cargill, and National Beef have each reduced their annual slaughter volumes relative to the pre-Class Period, while Independent Packers have increased their volume as a whole.

_____

[33]     *See, e.g.*, Cassie Fish, *And the Beat Goes On*, THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/. ("Packers also know that February is typically the lightest slaughter month and even though they are killing more cattle than a year ago – some plant 'dark days' began yesterday as plans to keep the balance between supply and demand are paramount. Some plants will undertake maintenance or upgrade projects and some will honor holidays such as Monday's President's Day. Others will pull back hours to 36-hour work week.").

**Figure 2.   Average Pre- & Post-Class Period Fed Cattle Slaughter – Packing Defendants vs Others**[34]



106.   Figure 3 also compares the Packing Defendants' and the Independent Packers' annual slaughter volumes during the Class Period and the pre-Class Period, but breaks out the slaughter volumes for each year of the Class Period for which data is available.   The graph confirms that Tyson, JBS, Cargill, and National Beef each slaughtered less in every year in the Class Period compared to their pre-Class Period averages. It also shows that while Tyson, JBS, Cargill, and National Beef each gradually

---

[34]     CBW Top 30 Beef Packers; 2017 Meat & Poultry Facts, at 11.

increased their slaughter volume from 2015 onward, their rate of increase was far slower than that of the Independent Packers.

**Figure 3.   Average Pre- & Post-Class Period Fed Cattle Slaughter – Packing Defendants vs Others**[35]



107.    As shown in Figures 2 and 3 above, each Packing Defendant slashed its fed cattle slaughter levels in 2015, and then maintained artificially low slaughter levels throughout the remainder of the class period.  That Packing Defendants slowly raised their slaughter levels as the availability of fed cattle increased during the class period does not negate the existence of the alleged agreement to periodically reduce their respective

---

[35]    CBW Top 30 Beef Packers; 2017 Meat & Poultry Facts, at 11.

slaughter volume. The purpose of such action was not necessarily to reduce their respective slaughter volume in the long run – which is, in part, a function of the cattle supply – but to create artificial gluts in supply and place pressure on producers to drop their prices in the short to medium run. That this is so can clearly be seen in Section VI below, which details how Tyson, JBS, Cargill, and National Beef's reduced slaughter volume in the summers of 2015 and 2016 caused fed cattle prices to fall and enabled each Packing Defendant to engage in unseasonably large kills in the subsequent months.

### B.    Packing Defendants Agreed to Slash Cash Cattle Purchases During Slaughter Reductions

108.    To place further pressure on cattle prices, Packing Defendants also agreed to drastically reduce their purchase of cash cattle during periods of agreed slaughter reduction or restraint. When doing so, Tyson, JBS, Cargill, and National Beef could still obtain the cattle needed to satisfy their curtailed kill numbers by pulling forward cattle deliverable under previously-agreed formula and forward contracts.[36] Cargill and JBS could also lean on their own cattle being fed at their own feedlots.[37]

---

[36]    *See also* Cassie Fish, *Futures Treading Water; Packers Keep Pressure On*, THE BEEF (Jun. 17, 2015), https://www.thebeefread.com/2015/06/17/futures-treading-water-packers-keep-pressure-on/ ("The news is well known this week and the packer has the upper hand. Boxes are higher and margins are black but packers are keeping kills small. The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.").

[37]    Until April 2017 and March 2018, respectively, Defendants Cargill and JBS owned two of the nation's largest feedlot businesses and fed a large number of their own cattle for slaughter at their respective plants. Both continue to purchase all of the cattle fed by their former feedlots. *See also* JBS S.A., Q2 2017 Earnings Call, Bloomberg Transcript (Aug. 16, 2017), at 16-17 (JBS's André Nogueira noted the sale of JBS Five Rivers would not

109.    And, because Tyson, JBS, Cargill, and National Beef had each largely transitioned to formula and forward contracts in the decade preceding 2015, drastically thinning the cash cattle trade, even small reductions in their cash cattle purchases had an outsized impact on cash cattle demand.   For example, and as detailed in section VI(A) below, the 7% year-on-year decline in slaughter volumes witnessed across the second and third quarters of 2015 was driven by a 22% year-on-year decline in the slaughter of cash cattle.

110.    By reducing their purchases of cash cattle, Packing Defendants sought to reduce the price of all cattle by utilizing the link between cash cattle prices and the prices paid under formula and forward contracts.   As noted above, by reducing their cash cattle purchases for a period of weeks or months, Packing Defendants could "back-up" the volume of slaughter-ready cash cattle, thereby encouraging producers to overfeed their cattle and/or accept lower prices or enter captive supply agreements to timely market their perishable product.[38]

---

impact cattle availability – "Around 25% of the cattle that we buy, we buy from Five Rivers, and we will continue to buy from Five Rivers after the sale").

[38]    Cassie Fish, *Whatever Happened to a Fair Fight*, THE BEEF (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/    ("The conversation is no longer, what's cash going to be, but rather, who needs any. . . The smaller feeder is left to fight it out.  Hoping he can get a buyer to come by and look at his cattle.  Pressured to sell cattle with time.  Anything to get cattle gone.  Those that attempt to fight the market run the risk of making cattle too big even by today's standards or worse, alienate their local buyer.  Powerlessness is widely felt by smaller producers on a regular basis.").

111.   One former feedlot manager, who managed a 35,000 head commercial feedlot in the Panhandle region from 2012 until early 2016 ("Witness 2"), explained the limited incentives for a producer to try to bid up Packing Defendants in such circumstances.[39]   Witness 2 elaborated:

> There was a good chance that you wouldn't get your cattle sold if you rejected the [top-of the market] basis bid.[40]   Even if you did succeed in getting a higher [cash] bid on Friday, you had taken a huge risk for which others, who just accepted the [top-of the market] basis bid, got to benefit from [*i.e.*, through the higher reported cash prices used to set prices under their contracts].   But by accepting the bid, you added to the packers' captive supply and helped them push the prices down, which of course hurt you as well [through the lower reported cash prices].

112.   The lower reported cash prices were then incorporated into Packing Defendants' formula and forward contacts – the latter via a depression of live cattle future prices – thereby lowering the costs of all the cattle delivered to Packing Defendants'

---

[39]   As manager of the feedlot, Witness 2 was responsible for marketing all of the cattle fed there, whether owned by the feedlot or its customers.   In this capacity, Witness 2 negotiated with field buyers from Tyson, JBS, Cargill, and National Beef on a weekly basis.   Most weeks, Witness 2 would market between 600 to 1,500 head of cattle on behalf of the feedlot.   The feedlot marketed the majority of its cattle via the cash cattle market. Witness 2 reports that by 2015, Tyson, JBS, Cargill, and National Beef would predominately offer only basis bids for the cattle fed at his feedlot.

[40]   The "basis bid" is a form of most favored nation contract under which the packer offers to pay the producer marketing cattle on the cash cattle market some variant of that week's top reported cash price, with or without a premium.   For example, a packer might offer to pay the producer the top price reported by the USDA in relation to Kansas for that week, plus a $1 per CWT, provided that top price was paid for at least 20% of the reported cattle sales.   Tyson, JBS, Cargill, and National Beef used such bids during the Class Period to further reduce the number of cattle whose price they needed to negotiate during the weekly cash cattle trade, which was typically conducted on Friday.   This further reduced the leverage of those producers who sought to generate price competition among the Packing Defendants, thereby putting further pressure on cash cattle prices.

plants.[41]  And once a condition of actual or perceived oversupply had been created, Packing Defendants could gradually increase their cash cattle purchases (and slaughter volumes) without putting any significant upward pressure on prices.

113.    As detailed in Section VI below, Packing Defendants' implementation of this scheme precipitated the dramatic collapse in fed cattle prices in 2015.

C.    **Packing Defendants Coordinated their Procurement Practices for Cash Cattle**

114.    A third prong of Defendants' conspiracy involved coordinating the means by which each Packing Defendant purchased cash cattle.

115.    First, Tyson, JBS, Cargill, and National Beef supported their conspiracy by collectively adhering to an antiquated queuing convention and enforcing it with producers via threats of boycott.  That convention, which operated predominately in relation to those cattle sold in the cash market (including basis bids), works as follows:  once a producer receives a bid from Packer A, the producer may either accept the bid or pass on it, but may not "shop" that bid to other packers. [42]  If the producer passes on the bid to seek further

---

[41]    Cassie Fish, *Cash Trade Volume Tiny; Futures Shake It Off*, THE BEEF (Jun. 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156, though the official USDA tally isn't out yet.  But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive.").

[42]    In a standard ascending bid auction, which is generally considered a competitive procurement method, the current high bid binds the high bidder until a new higher bid is received from another bidder. That is, the seller invariably "shops" the current highest bid to other bidders. *See, e.g.*, Paul Klemperer, AUCTIONS: THEORY AND PRACTICE 1-2, 11 (2004).  Under the "no shop" rule, the current bidder is not bound by their current bid if the seller attempts to solicit higher bids from other packers. Thus, relative to a standard

bids from other packers, the producer must inform the other packers wishing to bid on the

pen that it was bid "X" by Packer A that it passed on and that it can, therefore, only accept

bids of X+$1.[43]  If Packer B is willing to pay X+$1, the producer may again choose to

accept that bid or pass on it, but may not "shop" that higher bid to other packers.  If Packer

B is only willing to bid X or if the producer wants to change its reservation price, the

producer is obligated to first return to Packer A, who is "on the cattle" at price X and offer

it a right-of-first-refusal.[44]  Only if Packer A declines can the producer offer to sell to

Packer B at X or the producer's new reservation price.  At this point, however, Packer B is

under no obligation to purchase from the producer.

116.    The queuing convention evolved into its present form from practices

developed when cattle were sold by sales agents in public markets in urban centers such as

---

ascending bid auction, the queuing convention amounts to a series of individual negotiations, each of which shifts substantial risk onto the seller. This has a depressing effect on the price received.  *See* Jeremy Bulow and Paul Klemperer, *Auctions Versus Negotiations*, 86 THE AMERICAN ECONOMIC REVIEW 180, 180 (March 1996).  The need for buyers to coordinate on the enforcement of the "no shop" rule shows that sellers have an incentive to deviate from the rule and individual buyers have an incentive to deviate from it (by unilaterally offering higher prices) as well, but that buyers are collectively advantaged by it. For a discussion of the effects of bidder collusion on auction prices *see* Robert C. Marshall and Leslie M. Marx, *The Economics of Collusion: Cartels and Bidding Rings*, THE MIT PRESS (2012, second printing February 2013), especially Section III.

[43]    In certain instances, it may be acceptable to offer/accept bids in $0.50 per CWT increments.

[44]    The right-of-first-refusal, as well as the requirement that the producer must disclose to other packers the identity and bid amount of the packer whose bid it passed on, provides packers with information relevant for monitoring compliance with collusively set prices among the packers.  Such information is critical to sustaining an effective cartel.  *See, e.g.,* J. George Stigler, *Theory of Oligopoly*, 72 THE JOURNAL OF POLITICAL ECONOMY 44, 46 (Feb. 1964); Marshall, *supra* n.42, Section 10.1.

Chicago and Kansas City.  At those markets, which remained prevalent until the 1950s, buyers wishing to bid on an agent's cattle were required to wait in the alley if another buyer was presently negotiating with the agent.  Only once that buyer's negotiations had ceased could the new buyer enter the agent's stall and begin negotiations.

117.    Tyson, JBS, Cargill, and National Beef (and their predecessors) have adhered to and enforced the convention since those times, and treat it as a mandatory industry custom.  The convention is more readily applied and enforced in relation to live bids than dressed bids, as the latter are subject to additional variables which impact the value of a given bid (*e.g.*, freight and likely yield).  Dressed bids are common in eastern Nebraska, Iowa, Minnesota, and south-eastern South Dakota, while in western Nebraska, Colorado, Kansas, Texas, Oklahoma, and New Mexico, the bids are predominantly live.

118.    Witness 2 confirmed that the field buyers from Tyson, JBS, Cargill, and National Beef who visited his feedlot enforced strict adherence to this convention with threats of retaliation.  He reported that each of these field buyers individually spoke to him about the importance of his feedlot complying with the convention, and that they would not "come by" anymore should he break with it.[45]

---

[45]    Again, this shows that the queuing convention is not sustainable through unilateral conduct by the Packing Defendants, and its enforcement requires explicit, coordinated action.  The enforcement is accomplished through a collective boycott of a producer that does not comply with the rules of the convention.  A coordinated boycott is a mechanism for supporting collusion. *See*, *e.g.*, *Group Boycotts*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-competitors/group-boycotts; G. W. Stocking, and M. W. Watkins, CARTELS IN ACTION: CASE STUDIES IN INTERNATIONAL BUSINESS DIPLOMACY 190, 403 (1991).

119.    In this regard, Witness 2 reports that when he took over management of the feedlot in 2012, the feedlot would only receive bids from National Beef and Cargill.  When he subsequently spoke to the field buyers from Tyson and JBS responsible for his region in the fall of 2012, they both told him that they had stopped visiting the feedlot because Witness 2's predecessor had broken with the convention by "shopping" their bids.  Witness 2 reports that the Tyson and JBS field buyers re-commenced visiting the feedlot after he confirmed his commitment to following the convention.

120.    Witness 2 also heard from the Defendants' field buyers and other industry participants about other producers being "blackballed" for breaking with the queuing convention.  In those circumstances, Witness 2 understood that the Packing Defendant who was "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer whom the producer contacted while shopping the Packing Defendant's bid, or would ex-post pressure the producer for details of their sale.

121.    However, Witness 2 reports that very few producers or their agents would be willing to break with the convention for fear of alienating one or more of their buyers.  He reports never breaking the convention for this reason.  He said that commercial feedlots or third party marketing bodies, such as his feedlot, were particularly reluctant to risk retaliation given the duties they owed to their clients.  As such, Tyson, JBS, Cargill, and National Beef's threats of boycott were typically sufficient to ensure adherence to the convention.

122.    The queuing convention is an allocation mechanism imposed on the cash market by the packers; it was not chosen by producers. It depresses fed cattle prices by

limiting price competition among beef packers. It does so, in part by requiring producers to relinquish their current offer in order to seek higher offers, thus reducing their incentives to reject the initial offer in the hope of generating better offers. Moreover, the queuing convention and other features of the bidding process also rendered the cash cattle market susceptible to collusion and enabled Tyson, JBS, Cargill, and National Beef to monitor each other's bidding behavior.[46]

123.   The convention's effect was magnified by the market conditions that prevailed during the Class Period, in particular, the thin cash cattle trade, Packing Defendants' collective shunning of the cash market periodically (*see* ¶¶82-83) – and the Packing Defendants' coordination of their practices regarding offers made to producers (discussed immediately below). In these market conditions, the convention created an artificial sense of urgency that encouraged producers to accept the Packing Defendants' low initial offers.[47] This effectively reduced competition among Packing Defendants for any particular pen of cash cattle to which Packing Defendant would be first to deliver what essentially amounts to a take-it-or-leave-it offer, with no fear of subsequent price competition.

124.   Witness 2 reports that in late 2014 or early 2015, the Tyson, JBS, Cargill, and National Beef field buyers who attended his feedlot jointly demanded that he determine

---

[46]   For the importance of monitoring by cartels, see footnote 44.

[47]   Economic literature finds that sellers, here the producers, tend to accept lower prices when they feel time is running out and their other options are relatively unattractive. Ariel Rubinstein, *Perfect Equilibrium in a Bargaining Model*, 50 ECONOMETRICA 97 (1982).

who had the right to make the first bid each week by having them draw cards in his office. Witness 2 reports that he acquiesced under duress.

125.    Thereafter, and at least until Witness 2 left the feedlot in early 2016, the field buyers from Tyson, JBS, Cargill, and National Beef would draw cards to determine who could place the first bid.[48]   Witness 2 cannot recall a single week in 2015 in which one of the other field buyers actually raised the initial bid placed by the winner of the card draw. That is, Witness 2 reports that Tyson, JBS, Cargill, and National Beef did not engage in any price competition for the cattle sold by Witness 2's feedlot.

126.    The field buyers tried to justify the card drawing scheme to Witness 2 by saying it would allow them to avoid attending the feedlot at increasingly early hours in an attempt to place the first bid.   In a competitive market, however, in which the purchasers engaged in genuine competition to acquire a producer's products, no purchaser would have a unilateral incentive to propose or adhere to such a scheme (nor would a producer have an incentive to agree to such a scheme).   Rather, each purchaser would instead have a unilateral incentive to preserve the right to make an offer to the producer and rely on its ability to offer the best terms to acquire the producer's products.

---

[48]    Randomization devices like this have been used by other cartels. For example, the electrical contractors cartel used the phase of the Moon to determine which of the bidding ring members had the right to bid, free from competition from other members of the ring. *See*, *e.g.*, J. Asker, *Bidding Rings, in* THE NEW PALGRAVE DICTIONARY OF ECONOMICS (In: Palgrave Macmillan eds., 2010); R. Preston McAfee and John McMillan, *Bidding Rings*, 82 AMERICAN ECONOMIC REVIEW 580, 585 (June 1992).

127.     Second, Tyson, JBS, Cargill, and National Beef suspiciously all chose to reserve most of their weekly negotiated cash trade procurement activity for Friday, often after the CME had closed.[49]  While the exact time on Friday varied, Packing Defendants would regularly conduct all, or substantially all, of their weekly cash cattle trade during the same 30- to 60-minute window on a Friday.

128.     During that window, Tyson, JBS, Cargill, and National Beef would typically adhere to the price level established by the Packing Defendant that opened the weekly cash cattle trade, which would quickly be circulated across the market via word-of-mouth and industry reporting.  If a Packing Defendant felt it necessary to offer prices above this price level to secure the cattle it required, it would often hold such bids back until after the core trading window had closed.  This reduced the chance that reports of such bids might impact negotiations conducted during the core trading window.  In contrast, Independent Packers continued to purchase cash cattle across nearly every day of the week, thereby securing pens of high quality cattle with limited competition.

129.     This practice further reduced producers' ability and incentive to generate price competition.  Producers who passed on the initial bid they received during the trading window would rarely receive a higher bid from one of the other Packing Defendants.  At best, they would typically receive the same bid.  And if the producer then wished to sell at

---

[49]     A fact regularly commented on by industry participants. *Se,e e.g.*, Top Third Ag (@TopThird),        TWITTER,        (Feb.        19,        2016        8:33        PM), https://twitter.com/TopThird/status/700855757500076032 ("Only 4 Places are doing business at 7PM on Fridays: 1. White Castles 2. Bars 3. Whichever nightclub . . . is at 4. #Cattle Trade.").

that price, they were required by the queuing convention to return to the initial bidder who was "on the cattle" at that price.  However, given the shortness of the trading window, the initial bidder would regularly be unwilling or unable to renew their bid.  This forced the producer to return to the second bidder, who was then commonly unwilling or unable to renew their bid, even if it were given minutes before.

130.    Plaintiffs' analysis of the reported cash cattle trade across AMS LMR's five price reporting regions confirms both that Packing Defendants reduced their participation in the cash cattle trade and that they conducted the bulk of the trading on Fridays.  In particular, that analysis finds that, starting in or around 2014 and 2015, Packing Defendants dramatically ***increased*** the number of days per month on which they ***did not conduct any*** cash cattle transactions within the five AMS LMR reporting regions.[50]  Figures 8 to 12 below plot these days:

---

[50]     This trend is evident in each LMS reporting region bar except Iowa-Minnesota, which retains a comparably robust cash cattle trade.  *See* Appendix 4.

**Figure 8.  Days per Month without Reported Cash Transactions in TX-OK-NM**



**Figure 9.  Days per Month without Reported Cash Transactions in Nebraska**



**Figure 10.  Days per Month without Reported Cash Transactions in Kansas**



**Figure 11.  Days per Month without Reported Cash Transactions in Colorado**



**Figure 12.  Days per Month without Reported Cash Transactions in IA-MN**



131.    The data reported above are consistent with the existence of an agreement among Packing Defendants to both: (1) limit their purchases of cash cattle; and (2) conduct all, or substantially all, of their cash cattle trade in short weekly windows.[51]  If any single Packing Defendant took these actions in the absence of such an agreement, that Packing

---

[51]    But for Packing Defendants' agreement to conduct the majority of their cash cattle procurement on Fridays, there would be fewer days per month with no reported transactions as Packing Defendants could reasonably be expected to conduct their purchases across the week.  As the daily transaction reports published by AMS capture purchases agreed between at or around 2:00 PM Central the prior day until at or around 2:00 PM Central the current day, it is not possible to identify specifically the number of transactions conducted, as opposed to reported, per day.  However, analysis does confirm that the vast majority of weekly cash cattle transactions over the Class Period were reported on Fridays and Mondays.  This is further evidence that the majority of Packing Defendants' cash cattle purchasers are made on Fridays, given that: a) Friday's reports include purchases made between at or around 2:00 PM Thursday and at or around 2:00 PM Friday; b) Monday's reports include purchases made between at or around 2:00 PM Friday and at or around 2:00 PM Monday; and c) very few trades occur on Mondays.

Defendant would risk failing to secure a sufficient quantity or quality of cattle to operate its plants at the most efficient capacity and/or meet customer demand, without any guarantee that its actions would have the desired impact on fed cattle or beef prices. The graphs are even more striking when one considers that Independent Packers continued to purchase cash cattle throughout the week and thus can be regarded as being responsible for the bulk of the transactions reported mid-week.

132.    Tyson, JBS, Cargill, and National Beef's increased reliance upon formula and forward contracts and the corresponding decrease in the number of cash cattle transactions does not explain the pattern observed above. While the number of cash cattle bought annually fell continuously from 2005 to 2015, it was not until 2014/2015 that the data show a dramatic increase in the number of days without any reported cash transaction. This rise is then sustained despite a slight increase in cash cattle buying year-on-year in 2016 and 2017. *See* Figures 13-15 below[52]:

---

[52]    A similar trend is evident in Colorado and Iowa-Minnesota during the period the LMS provided reporting in those regions (2011 onwards).

**Figure 13.  Yearly Total Headcount in Cash Cattle Transactions in TX-OK-NM**



**Figure 14.  Yearly Total Headcount in Cash Cattle Transactions in Nebraska**



**Figure 15.  Yearly Total Headcount in Cash Cattle Transactions in Kansas**



133.    In short, even though cash cattle slaughter numbers increased slightly after 2015, the number of days per month in which there were no cash cattle transactions also increased.  Consequently, there is no simple relation between cash cattle slaughter and active trading days, and Packing Defendants' coordinated reduction in the number of days on which they purchase cash cattle is not explained merely by the decline in the number of cash cattle purchased annually.

134.    Third, a Packing Defendant would, for periods of time, sometimes extending across many months, offer the only bid (or the only credible bid) for a particular feedlot's fed cattle (or substantially all its fed cattle) week to week, ensuring that the feedlots affected could not regularly procure credible bids from the other Packing Defendants.  Buyers for these other Packing Defendants would even routinely fail to take or return calls from the producer until after the Friday trading window had closed.  These arrangements – akin to

58

a "home-market" market allocation scheme – point to an agreement among Packing Defendants to respect each other's relationships with their preferred suppliers.

135.    Fourth, Packing Defendants would, at times, stop buying cash cattle from feedlots located in a particular region for a number of weeks.  In doing so they intended to back-up cash cattle in those regions and break the resolve of affected producers to hold-out for higher prices.   Having boycotted a region for a number of weeks, Packing Defendants would then begin purchasing cattle from that region again during the same week.  When executing this scheme, Packing Defendants would often seek to initiate their weekly cash cattle trade in the region recently boycotted.  This allowed them to use the lower prices agreed to in that region to set the "market" for the remainder of the trade.  In doing so, Packing Defendants were able to influence the prices of fed cattle sales across the United States.[53]

136.    The Packing Defendants' conduct across Nebraska, Kansas, and Colorado in late March to early May 2016 is illustrative of this practice.  The average live steer price in Nebraska for the weeks ending Sunday, March 27 and Sunday, April 3, was steady at around $136/cwt.  On information and belief, in the two trading weeks which followed, each Packing Defendant reduced their purchase of cash cattle across Nebraska.  The AMS reported that negotiated Nebraska sales during those two weeks were 17% and 10% lower than the average reported volume for those corresponding weeks between 2011 and 2014.

---

[53]     For similar reasons, Packing Defendants would also, at times, seek to set the market price lower by opening the weekly trade by purchasing a pen of poor quality cattle at a discount.

In the subsequent trading week, ending Sunday, April 24, 2019, Packing Defendants were able to take advantage of the artificial surplus of Nebraskan cattle carried over from the prior weeks by buying significantly more cattle a lower price of $126/cwt.

137.   After isolating Nebraskan producers, the Packing Defendants then shifted to isolate Kansas feedlots.  The average live steer price in Kansas across the weeks ending Sundays, April 10 and 17, 2016 was steady at around $133/cwt.

138.   On information and belief, in the two trading weeks which followed, each Packing Defendant reduced their purchase of cash cattle across Kansas, and, at least Tyson, trucked Texas captive cattle to its Holcomb, Kansas plant.[54]  As a result, AMS reported 44% and 28% fewer cash cattle sales in Kansas during those weeks as compared to the average reported volume for those  corresponding weeks between 2011 and 2014.  Aided by the price suppression begun by the Defendants' prior isolation of Nebraska, live Kansas steer prices were also suppressed, dropping to $127/cwt for the week ending Sunday, April 24, before falling again to $124/cwt for the week ending Sunday, May 1, 2016.

139.   On information and belief, each of Tyson, JBS, Cargill, and National Beef then increased their purchase of cash cattle in Kansas in the first week of May, taking advantage of the artificial supply glut they had created across the course of the two prior weeks.  For this week, AMS reported a total of 24,000 cash sales in Kansas, a 7,000 head

---

[54]   "the radical left of cattle twit" (@trdaaron), TWITTER, (April 14, 2016, 4:36 PM), https://twitter.com/trdaaron/status/720712349338832896?s=20 ("So tyson pulling lots of contract cattle from TX up to KS next two weeks which pushes rest of my cattle into first week of May.").

increase from the average reported sales of the two prior weeks, and a 2,000 head increase on the weekly average for the period between 2011 and 2014.  Despite this significant uptake in purchases, the average price for live steers in Kansas remained low at $127/cwt.[55]

140.    The Packing Defendants then moved to isolate Colorado feedlots.  Colorado reported 41% and 67% relative declines in reported cash sales for the trading weeks ending Sundays, May 1 and 8, 2016 as compared to the average reported volume for those corresponding weeks between 2011 and 2014.  In the trading week that followed, Colorado cash sales rose 3,000 head to 4,000 head, 7% above historical averages.

D.    **Packing Defendants Uneconomically Imported Extra-Territorial Live Cattle to Depress Demand for Fed Cattle**

141.    Packing Defendants also engaged in coordinated import and shipping practices that reduced demand for domestic fed cattle and suppressed the cash price transaction reports used to set the price of cattle procured under captive supply agreements. In particular, Packing Defendants would ship cattle over uneconomically long distances to their slaughter plants, from locations both inside the United States and from Canada, to avoid bidding up the reported price of cattle in closer AMS LMR reporting regions.[56]

---

[55]    USDA Market News Service Report: LM_CT164 Kansas Weekly Weighted Average Direct Slaughter Cattle - Negotiated.  Any of the USDA Market News Service Reports referenced in this complaint can be generated at https://marketnews.usda.gov/mnp/ls-report-config.

[56]    In relation to cross-region shipping in the U.S., *see*, for example, The_Meat_Gentleman (@blakealbers), TWITTER (Nov. 16, 2015, 12:02 PM), https://twitter.com/blakealbers/status/666300194338660353 ("The amount of cattle going south to dodge city and the like is incredible"); T. Heinle (@ndsuhsker), TWITTER (Feb. 26, 2016, 7:37 AM, https://twitter.com/ndsuhsker/status/703197081205391360 ("Shipping cattle from wne to ene to be slaughtered #dontfigure!"); and T. Heinle (@ndsuhsker),

142.    Given the additional freight costs incurred in procuring fed cattle from Canada or regions within the U.S. outside a slaughter plants' typical procurement radius, it is only economical for a Packing Defendant to do so where the prevailing price differences as against domestic/local prices exceeded these additional costs.  But Plaintiffs' analysis suggests that Packing Defendants' import of live cattle began to increase slightly in 2014, and continued, even after it became uneconomical for them to do so in or around mid-2015:[57]

---

TWITTER           (Apr.           14,           2016,           5:45           PM), https://twitter.com/ndsuhsker/status/720729811241414656 (Truckers are the packer's best friend, first haul south early now haul north! #everycattlefeederbuytrk! -- @CornfedBeef response: Apparently paying freight must be cheaper than paying up for cash cattle in the region they need them! #BuyLowAndHaul").

[57]    On information and belief, Plaintiffs understand that Tyson, JBS, and Cargill are responsible for the bulk of all live cattle imports for slaughter.

**Figure 16.  Live Slaughter Cattle Imports into the U.S.**[58]



143.    As can be seen from this graph, live cattle imports had gradually declined until 2014 when they stabilized and began a slight upward trend.  Throughout this period, imports of Canadian cattle comprised the substantial majority of all live cattle imports for slaughter.

144.    While such imports were originally economical, considering the prevailing price differences (adjusted for shipping costs and exchange rates), from mid-2015 onwards, they were often uneconomical, and became increasingly so as the Class Period continued.

---

[58]     Fed cattle slaughter volumes sourced from USDA Market News Service Report: LM_CT106-National Daily Direct slaughter, committed and delivered.

**Figure 17.   Difference between Nebraska Fed Cattle Prices and Alberta Fed Cattle Prices Adjusted for Shipping Costs**[59]



145.   As can be seen from Figure 17 above, procuring Canadian cattle for immediate slaughter from mid-2015 onwards was regularly more expensive than procuring fed cattle from the adjacent U.S. feeding regions.  These periods of uneconomical imports

---

[59]      To construct comparable price series for Canadian imports, Plaintiffs adjusted Alberta fed cattle prices for shipping costs and the exchange rate between the U.S. dollar and the Canadian dollar.  To do so, Plaintiffs accounted for the following factors which impact shipping cost per CWT:  the cost per pound, per loaded truck to haul cattle, the capacity of the trailers used to haul cattle, the distance between Alberta and Nebraska, and fuel costs.  AMS LMR price series for Nebraska are selected as the appropriate proxies as they are the nearest U.S. price reporting regions to Alberta.  Alberta is the key cattle exporting region of Canada.  ALBERTA GOVERNMENT, *Livestock Prices*, accessed December 26, 2018, https://economicdashboard.alberta.ca/LivestockPrices.  Canadian dollars per cwt of live cattle in Alberta converted to USD per cwt.

are identified by the portions of Figure 17 where the live cattle price difference line graph dips below zero.

146.    Packing Defendants have acknowledged importing fed cattle from Canada for slaughter at their U.S. facilities.  For example, in 2016, an executive at Defendant JBS acknowledged that "a lot of cattle [were] moving from Canada to U.S." and stated that such imports had an "important impact."[60] Similarly, Defendant Tyson has acknowledged "buying cattle directly from Canadian cattle feeders" and is reportedly the third largest buyer of Canadian cattle, behind Defendants JBS and Cargill.[61]

147.    On information and belief, suppressing the demand for U.S. fed cattle through the strategic importation of Canadian fed cattle is a practice that Defendants Tyson, JBS, and Cargill have used during the Class Period and continue to use.  Defendants Tyson, JBS, and Cargill have sought and received regulatory approval to import fed cattle for immediate slaughter at their packing facilities, including: a) Tyson's packing plants in Pasco, Washington and Joslin, Illinois; b) JBS's packing plants in Greeley, Colorado; Hyrum, Utah; Plainwell, Michigan; Omaha, Nebraska; Souderton, Pennsylvania; and

---

[60]    JBS, Q1 2016 Earnings Call, Bloomberg Transcript (May 12, 2016).

[61]    *Tyson halts Canadian beef imports due to higher costs*, THE CATTLE BUSINESS WEEK (Oct. 31, 2013), https://www.cattlebusinessweekly.com/articles/tyson-halts-canadian-beef-imports-due-to-higher-costs/.  While Tyson claimed that it was halting Canadian cattle imports in late 2013 in opposition to Country of Origin Labeling (COOL) requirements, when COOL was repealed in early 2016, Tyson is understood to have increased its imports of live cattle for slaughter.

Green Bay, Wisconsin; and c) Cargill's packing plants in Ft. Morgan, Colorado; Wyalusing, Pennsylvania; and Fresno, California.[62]

148.    These actions are consistent with an intent to depress U.S. fed cattle cash prices.  A Packing Defendant would not incur the additional cost associated with the import and purchase of foreign or extra-regional cattle in the hope of lowering its fed cattle supply procurement costs unless it was certain that its major competitors would do the same thing, and therefore, also abstain from bidding up local cash cattle prices.

### E.    Packing Defendants Agreed to Refrain from Expanding Their Slaughtering Capacity

149.    In furtherance of their conspiracy to manipulate the fed cattle market, Packing Defendants also appeared to have agreed to refrain from expanding their respective slaughtering capacity, or from increasing their utilization of existing capacity.

150.    Indeed, during the run-up of fed cattle prices until their precipitous fall in mid-2015, Packing Defendants first sought to reduce demand through a series of plant closures:  Cargill closed its Plainview, Texas and Milwaukee, Wisconsin plants (4,000 and 1,300-1,400 head per day capacities, respectively) in February 2013 and August 2014, respectively;  National Beef shut its Brawley, California plant (2,000 head per day) in June 2014;  Tyson closed its Denison, Iowa plant (2,000 head per day) in August 2015;  and, JBS left the Nampa, Idaho plant it acquired in April 2013 closed throughout the class period.

---

[62]    USDA, List of Plants Approved to Receive Immediate Slaughter Animals, https://www.aphis.usda.gov/import_export/downloads/slaughter_list.pdf.

151.   Tyson additionally closed a beef processing plant in Cherokee, Iowa in September 2014, before telling local government officials that it would not considering selling the facility to "any firm that they believe is competition."[63]  It ultimately sold the facility to an independent food processing company, pursuant to an agreement which "limits the amount of cattle that can be processed at the plant for . . . 10 years".[64]

152.   Packing Defendants' slaughter plant closures, even excluding the continued idling of the Nampa plant, stripped out approximately two million head from the industry's annual slaughter capacity, thereby limiting demand for fed cattle.   In relation to each closure, the relevant Packing Defendant offered pre-textual explanations, such as a lack of available cattle in the adjacent regions and plant inefficiencies.[65]

153.   As a result, and as shown in Figure 18 below, the United States has experienced both a decline in fed cattle slaughter capacity and an underutilization of that

---

[63]   Kevin Hardy, *Held 'hostage' by Tyson: An Iowa town's dilemma*, DES MOINES REGISTER, July 8, 2016, updated July 16, 2016, https://www.desmoinesregister.com/story/money/business/2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/.

[64]   Kevin Hardy, *'No hard feelings': Tyson finally agrees to leave empty Iowa facility as new meat processor opens shop*, DES MOINES REGISTER, September 19, 2018, updated July 16, 2016, https://www.desmoinesregister.com/story/money/business/2018/09/19/tyson-foods-cherokee-iowa-plant-iowa-food-group-moves-justin-robinson-pork-beef-chicken-processing/1356962002/.

[65]   National Beef even rejected a significant package of incentives offered by local government, utilities, and nearby feedlots when it decided to close its Brawley plant. *National Beef plant closing Brawley Facility*, PROGRESSIVE CATTLEMAN (March 24, 2014),        https://www.progressivecattle.com/news/industry-news/national-beef-plant-closing-brawley-facility.

capacity.  This decline in marketing outlets for fed cattle producers has been compounded in certain regions, where fed cattle producers now only have one, or possibly two, slaughter plants to which they are able to sell their cattle.

154.   While Figure 18 does show an increase in slaughter capacity between 2016 and 2017, this is attributable to One World Beef Packing's reopening of the Brawley, California plant closed by National Beef.  Iowa Premium Beef (Tama, Iowa, 1,100 head per day) and Lime Springs Beef (Lime Springs, Iowa, 540 head per day) also entered the market in 2015 to partially offset some the Packing Defendants' closures.[66]  Of the Packing Defendants, only JBS undertook any notable capital investment that increased industry slaughter capacity during the Class Period.  Even then, its expansion of its Hyrum, Utah plant in 2015 and 2016 was directed at increasing its cull cow slaughter capacity, as opposed to fed cattle.[67]  And while Tyson finally completed its upgrades to its Dakota City, Nebraska plant in April 2015, the project, commenced in March 2012, had been scheduled for completion in mid-2013, and reported to be near completion as early as March 2013.  Further, and as noted above at paragraphs 105-107, while slaughter volumes have improved from 2014 and 2015's lows, this has been driven by Independent Packers.  By comparison, each Packing Defendant has been slow to raise their slaughter volumes.

---

[66]   Burt Rutherfood, *Increase in U.S. packing capacity is good news for the beef business*, BEEF, (February 2, 2015), https://www.beefmagazine.com/blog/increase-us-packing-capacity-good-news-beef-business.

[67]   National Beef's acquisition of Iowa Premium, which was finalized on June 10, 2019, did not add to industry capacity.

**Figure 18.  Annual U.S. Fed Cattle Slaughter Capacity and Utilization Over Time**



Annual Fed Cattle Slaughter
Annual Fed Cattle Slaughter Capacity (thousands of head)

**Utilization Rates**

| | |
|---|---|
| 2000-2012 | 91.3% |
| 2013 | 84.3% |
| 2014 | 81.9% |
| 2015 | 80.5% |
| 2016 | 85.4% |
| 2017 | 87.9% |
| 2018 | 89.3% |

## VI.   PACKING DEFENDANTS' CONSPIRACY CAUSED THE 2015 PRICE COLLAPSE AND SUPPRESSED PRICES THEREAFTER

### A.   Packing Defendants' Conduct Precipitated the Collapse in Fed Cattle Prices in 2015

155.   Packing Defendants' coordinated conduct was successful.  Responding to the compression of their margins in late 2014, Packing Defendants coordinated a reduction of their respective slaughter volume.  This reduction in slaughter levels had the desired effect.  For the first half of 2015, prices fluctuated at or around $160/cwt, $10/cwt (or about $130 per head) lower than the high established in November 2014.  Elsewhere, prices are listed as $XX/cwt

156.   Not satisfied with this, Tyson, JBS, Cargill, and National Beef embarked upon an unprecedented joint slaughter reduction during the second and third quarters of 2015.  To place further pressure on cattle prices, Tyson, JBS, Cargill, and National Beef also drastically reduced their respective purchases of cash cattle, leaning heavily on their

69

captive supplies and, in the case of Cargill and JBS, their own cattle, to satisfy their curtailed kill numbers.[68]   Packing Defendants' strategy was immediately successful, with cash cattle – and thus formula cattle – prices falling continuously across June to about $150/cwt.[69]   Meanwhile, with lower slaughter volumes and lower boxed beef output, the meat margin expanded rapidly, bloating each Packing Defendants' margins.  *See* Figure 5 above and Figures 24, 29, and 32 below.

157.   Packing Defendants' determination to "break" cash cattle prices through their collective slaughter reductions and reduced cash cattle purchases was remarked upon by industry analysts at the time.  On June 12, 2015, analyst Cassandra Fish of "The Beef"

---

[68]   JBS and Cargill's slaughter levels of their own cattle across the second half of 2015 were steady on a year-on-year basis.  *See* USDA Market News Service Report: LM_CT153 – National Weekly Direct Slaughter Cattle – Prior Week Slaughter and Contract Purchases. *See also* Cassie Fish, *Cash Trade Volume Tiny; Futures Shake It Off*, THE BEEF (Jun. 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156, though the official USDA tally isn't out yet.  But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive.  Only problem is, packers weren't able to secure enough cattle cheaper, even when relying on captives, to easily fill an even curtailed kill expected this week at 540,000 head.  June forward contracts are rumored being called in as a way to offset the absence of negotiated purchases."); and Fish, *Futures Treading Water; Packers Keep Pressure On*, *supra* n.36 ("The news is well known this week and the packer has the upper hand.  Boxes are higher and margins are black but packers are keeping kills small.  The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.").

[69]   Cassie Fish, *Smack Down*, THE BEEF (Jun. 15, 2015), https://www.thebeefread.com/2015/06/15/smack-down/ ("Cash cattle prices broke hard Friday as packers successfully executed a strategy of slashed kills and limited negotiated purchases.").

and formerly a risk manager at Tyson, speculated as to when one of Packing Defendants might break ranks:

> Rarely has this industry segment [the beef packers,] been an all-for-one and one-for-all group. All packers need to buy cattle inventory. Most have cut hours. So will someone break ranks, pay up for cattle and add hours to capture the better realization that the next boxed beef rally will bring? Will one short a customer only to find that order filled by a competitor?[70]

158.   Ms. Fish answered her own question a few weeks later, remarking on June 25, 2015 that the "packers refuse to reach for cattle and are currently in command. After 3 weeks of sharply curtailed kills, packers are exhibiting incredible discipline and letting the kill increase gradually," limiting the ability "of feeders to get all cattle marketed [*i.e.*, sold] in a timely fashion."[71]

159.   Packing Defendants tightened the screws during the remainder of 2015. They continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that slaughter-ready cattle had been "backed up" and were reaching historically heavy weights.[72]

160.   This was particularly evident in September 2015, when Tyson, JBS, Cargill and National Beef each utilized the leverage they had collectively established over producers in the prior months to great effect, pushing prices down to $120/cwt by months'

---

[70]   Cassie Fish, *Futures Holding Gains; Waiting on Cash*, THE BEEF (Jun. 11, 2015), https://www.thebeefread.com/2015/06/11/futures-holding-gains-waiting-on-cash/.

[71]   Cassie Fish, *Another Round of the Blues*, THE BEEF (Jun. 25, 2015), https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/.

[72]   Cassie Fish, *Kills Too Small For Too Long*, THE BEEF (Sep. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/.

end, despite increasing their purchases of cash cattle.  Packing Defendants also demanded extended delivery periods of two to four weeks as a condition of trade throughout the month, providing them with further leverage over producers who still had cattle to sell.[73] As a result, large numbers of the cash cattle sold in September were not slaughtered until October.

161.    Tyson, JBS, Cargill, and National Beef's concerted actions to depress cattle prices are summarized by the below two charts.  Figures 19 and 20 both compare the price of fed cattle across 2015 against the number of fed cattle slaughtered across 2014 and 2015 at packing plants subject to AMS LMR reporting obligations.[74]  These figures are a very good proxy for Tyson, JBS, Cargill, and National Beef's cumulative slaughter volume as Packing Defendants operate the substantial majority of such plants and appear to provide over 90% of the reported transactions.[75]

162.    Figure 19 details the price and slaughter volumes of all fed cattle, however procured by Packing Defendants, whereas Figure 20 details the price and slaughter volumes of cash cattle.  The average monthly slaughter volumes between 2010 and 2014 are also detailed.  As shown by these figures, the decline in cash cattle slaughter across the

---

[73]    *See, e.g.*, Cassie Fish, *No bottom in sight*, THE BEEF (Sep. 16, 2015), https://www.thebeefread.com/2015/09/16/no-bottom-in-sight/.

[74]    Figures 19 and 20 were prepared using USDA Market News Service Reports: LM_CT106-National direct slaughter, committed and delivered, LM_CT151-National Weekly-Formula, Forward, Negotiated Net (Domestic), and LM_CT154-Weekly National direct slaughter, negotiated.  Fed cattle prices shown in Figure 19 is the weighted average price of all four purchase categories (formula, forward, negotiated (*i.e.*, cash), negotiated grid).

[75]    See Appendix 3.

second and third quarters of 2015 depressed the price of all fed cattle.  This enabled Packing

Defendants to increase their slaughter volumes in the final quarter of 2015 by purchasing

cheaply the oversupply of cash cattle they had created across the preceding two quarters.

**Figure 19.  Total Fed Cattle Slaughter Volumes and Fed Cattle Prices – all purchase types**



**Figure 20.  Cash Cattle Slaughter Volumes and Cash Cattle Prices**



163.    Despite increasing their respective slaughter volumes in the final quarter of

2015 to take advantage of the comparative glut they had created, Tyson, JBS, and National

Beef's annual slaughter volumes were down 4%, 17%, and 6% on 2014 levels,

respectively.[76]   While Cargill's slaughter volume remained flat year-on-year, it was

significantly below historic levels.[77]

---

[76]     CBW Top 30 Beef Packers.

[77]     *Id.*

164.    Tight fed cattle supplies do not explain Tyson, JBS, Cargill, and National Beef's coordinated reduction of their respective slaughter volume over the summer months of 2015.  And neither can the drastic drop in prices or Tyson, JBS, Cargill, and National Beef's unseasonable rise in slaughter in the fourth quarter of 2015 be attributed to a significant increase in the availability of slaughter weight cattle.

165.    An analysis of the USDA's Cattle on Feed reports confirms this.[78]  This monthly publication reports data on the number of fed cattle in U.S. feedlots (inventory), the number of cattle being placed into feedlots during the report month (placements), the number of cattle shipped out of feedlots for slaughter during the report month (marketings) and other disappearances (*e.g.*, death loss or move to pasture).[79]

166.    Figure 21 below compares fed cattle inventory across 2014 and 2015.  It shows that fed cattle inventory was at or slightly above 2014 levels in almost every month of 2015.  While these changes may reflect, in part, the continuing rebuild of the cow-herd, the key driver of the year-on-year increases in inventory across May to November 2015 was Tyson, JBS, Cargill, and National Beef's respective slaughter reductions.  These reductions forced producers to feed their cattle longer, causing feedlots to carryover cattle into subsequent reporting months.

---

[78]    USDA National Agricultural Statistics Service ("NASS"), *Cattle on Feed*, ECONOMICS, STATISTICS AND MARKET INFORMATION SYSTEM, usda.library.cornell.edu/concern/publications/m326m174z?locale-en ("Cattle on Feed").

[79]    Cattle on Feed reports estimates pertain to fed cattle fed in feedlots with a 1,000 head or greater capacity.  Such feedlots typically hold between 80 and 85% of all fed cattle on feed in the United States.

**Figure 21.  Cattle on Feed Inventory Levels in 1000+ Head Feedlots – 2014 vs 2015**



167.   This is confirmed by Figure 22 below, which estimates the number of cattle reaching slaughter weight across each month of 2014 and 2015, sometimes referred to as a placement against supply estimate.  The figure utilizes monthly Cattle on Feed placement numbers and assumes a standard feeding period of around six months.[80]

---

[80]   For example, an estimate of the available number of slaughter weight cattle in July 2015 is derived by advancing the placements numbers from January 2015 forward six months.

**Figure 22.  Slaughter Weight Fed Cattle in 1000+ Head Feedlots – 2014 vs 2015**



168.    As can be seen from Figure 22, the number of fed cattle scheduled to reach

slaughter weight in 2015 was down on a year-on-year basis.  Therefore, the year-on-year

increases in inventory levels experienced from May to November 2015 was not driven by

an increase in the availability of slaughter weight fed cattle.  Rather, it was driven by a

decrease in each Packing Defendant's slaughter volume, which caused an artificial glut of

supply by forcing producers to feed their cattle beyond their optimal weight.

169.    This artificial increase in inventory levels is also confirmed by Figure 23's

comparison of Cattle on Feed reports' record of marketings across 2014 and 2015.

**Figure 23.  Marketings in 1000+ Head Feedlots – 2014 vs 2015**



170.    Consistent with Figures 19 and 20 above, Figure 23 shows slaughter volume across the first three quarters of 2015 to be appreciably lower than 2014 levels before rising in the final quarter.  In sum, Figure 21 shows that there were more cattle in feedyards in 2015 than in 2014, despite Figure 22 showing that there were fewer cattle due to reach slaughter weight in 2015 than in 2014.  The cause of this was Packing Defendants' slaughter reductions, as shown by Figure 23.

171.    The Packing Defendants' conduct across 2015 was neatly summarized by Ms. Fish, who lamented on November 10, 2015, the "[p]ackers no longer compete against

each other to buy fed cattle each week," and were consequently reaping "gangbuster profits."[81]   The financial impact of Packing Defendants' conspiracy can be seen in the chart below, which estimates producers' and packers' respective per head margins:

**Figure 24.  Producer vs Packer per-head margins across 2015**[82]



172.    As shown above, during the second half of 2015, after Tyson, JBS, Cargill and National Beef's embarked on their collusive reduction in slaughter volume, producer margins were materially reduced, while Packing Defendants' margins remained positive.

---

[81]    Fish, *Whatever Happened to a Fair Fight*, *supra* n.38.

[82]    Per-head margin estimates sourced from the Sterling Profit Tracker produced by Sterling Marketing Inc. and published weekly on www.drovers.com.

B.     **Packing Defendants' Ongoing Conduct Continues to Depress Fed Cattle Prices**

173.    Following their successful 2015, Packing Defendants continued to restrain their collective slaughter numbers and cash cattle purchases in 2016.  While monthly slaughter volumes for the first three quarters of 2016 were up on 2015's record lows, they remained flat or below 2014 levels despite the available supply of fed cattle having risen slightly again.

174.    As a result, the price of fed cattle continued to fall across 2016 to a low of approximately $98 CWT in mid-October.  As in 2015, Packing Defendants responded by dramatically increasing kill volumes in the fourth quarter.  Kill levels in November 2016 alone were up 24% and 19% on a year-on-year basis as compared to 2014 and 2015, respectively.[83]

175.    Packing Defendants' success in "backing-up" cash cattle across the summer of 2016 is confirmed by the fact that Packing Defendants were able to raise cash cattle slaughter levels 38% and 24% in the fourth quarter of 2016 as against 2014 and 2015 levels without causing a dramatic rise in prices.[84]  In fact, during the fourth quarter of 2016, prices

---

[83]    Year-on-year comparisons calculated using USDA Market News Service Report: LM_CT106-National direct slaughter, committed and delivered.

[84]    *Id.  See also* Cassie Fish, *And it All Falls Down*, THE BEEF (Sep. 27, 2016), https://www.thebeefread.com/2016/09/27/and-it-all-falls-down/  ("The big carryover of unsold negotiated cattle from last week has gained negative status as the hours have rolled by, with packers willing and able to sit back and lower bids to $104, $6 lower than 2 weeks ago and $3 lower than the few that traded Friday and Saturday"); and Fish, *Despondency*, THE BEEF (Oct. 11, 2018), https://www.thebeefread.com/2016/10/11/despondency/ ("As if on cue, kills this week are now rumored to be cutback to 585k-595k, with a cooler cleaning and Saturday kills out. . . .  A pull back in the kill with record packer margins cements the

remained steady at or around $100-$105/cwt until late November.  Prices then hovered between $110-$117 through December.[85]  This gradual price increase was consistent with the seasonal rise in fed cattle prices typically experienced in the fourth quarter of each year as the availability of slaughter-weight cattle declines.  But for the glut in slaughter-ready cattle created by Packing Defendants' coordinated actions, prices would have risen significantly higher in response to the Defendants' dramatic increase in year-on-year slaughter numbers.

176.    Again, despite the increased availability of fed cattle and Packing Defendants' unseasonable large Q4 harvest, except for Cargill, each Packing Defendant's annual slaughter volume in 2016 remained below (Tyson (-6%) and JBS (-6%)) or flat (National Beef) against 2014 levels.[86]  While Cargill's 2016 slaughter volume rose 10% as against 2014, it remained significantly below historic levels (see Figure 3 above).[87]

177.    As the cattle herd continued to rebuild, and more fed cattle became available for slaughter in 2017 and into 2018, Tyson, JBS, Cargill, and National Beef responded accordingly.  Having already reduced their slaughter volumes below historic levels and

---

reality that easily and efficiently killing our way through the numbers, which used to be a reality, isn't any longer.  This makes it difficult for the market to return to fully current marketing status if there is any slowdown in kill.").

[85]    At these prices, Packing Defendants were purchasing cash cattle at a significant discount even compared to 2015's depressed prices.

[86]    Total industry slaughter was 24.56 million head in 2016, up from 24.11 million in 2014.  2017 Meat & Poultry Facts, p.11.

[87]    CBW Top 30 Beef Packers.

curtailed their cash cattle purchases, each Packing Defendant began to tell the market that they had, as a result of the plant closures discussed above, insufficient capacity to slaughter the supposed "wall of cattle" due to reach slaughter-weight in the summer of 2018.[88]   Each Packing Defendant encouraged producers to commit their cattle early on captive supply agreements to ensure they could "get their cattle dead" before Packing Defendants ran out of "hook" or "shackle space."[89]   At the same time, Packing Defendants managed their respective slaughter volumes to ensure that their collective demand did not exceed the available supply.[90]

178.   Packing Defendants' tactics succeeded.  Prices fell during late Winter/Spring 2018, despite record strong beef demand and tight supplies of slaughter-ready cattle across March and April.  Indeed, prices fell from approximately $129/cwt at the beginning of March 2018 to $110/cwt by the beginning of May 2018.  Prices stayed at or around that

---

[88]   Cassie Fish, *Still Green*!?!, THE BEEF (Mar. 27, 2018), https://www.thebeefread.com/2018/03/27/still-green/ ("The [packers'] mechanical [slaughter] capacity exceeds needs [across Q2 2018].  The limitation perception is linked to labor.  The perception of there being a limitation has created fear and inspired some cattle feeders to "get in line" by selling [cattle] out-front [*i.e.*, on captive supply agreements].").

[89]   *See* Cassie Fish, *Holding Gain*, THE BEEF (Apr. 18, 2018), https://www.thebeefread.com/2018/04/18/holding-gains/ ("Cattle feeders, still fearful of growing supplies in May, June and beyond continue to sell cattle for May at substantially lower prices than current values.").

[90]   Cassie Fish, *Futures Trade Both Sides; Cash Poised To Trade Lower*, THE BEEF (Apr. 2, 2018), https://www.thebeefread.com/2018/04/02/futures-trade-both-sides-cash-poised-to-trade-lower/ ("Looking back at March's fed slaughter rate, it underperformed expectations. . . ..  Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable.").

mark until mid-November 2018, a significant extension of the one to two-month summer low typically experienced by the market.  And of course, Packing Defendants never did reach slaughter capacity.[91]

## C.   **USDA Investigates Packers**

179.   On August 28, 2019, the U.S. Secretary of Agriculture announced that Packers and Stockyards Division, the division of the USDA responsible for enforcement of the Packers and Stockyards Act, had launched an investigation into the conduct of the Packing Defendants and other beef packers in the aftermath of a fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019.[92]  Tyson closed the plant in the aftermath of the fire and suggested in early September 2019 that it will remain partially closed until early 2020 while repairs are conducted.[93]

---

[91]    Cassie Fish, *Quiet Conclusion*, THE BEEF (Jun. 1, 2018), https://www.thebeefread.com/2018/06/01/quiet-conclusion/ ("As each week goes by in June, the calendar will take the industry into the heart of one of the most well-advertised 'walls' of market-ready cattle in memory.  Now that it is a known fact that the industry can kill 540k head of fed cattle and that demand can absorb the largest beef production in 10-years, the panic experienced in March seems overdone.").

[92]    *Secretary Perdue Statement on Beef Processing Facility in Holcomb, Kansas*, U.S. DEP'T OF AGRIC. (August 28, 2019), https://www.usda.gov/media/press-releases/2019/08/28/secretary-perdue-statement-beef-processing-facility-holcomb-kansas ("I have directed USDA's Packers and Stockyards Division to launch an investigation into recent beef pricing margins to determine if there is any evidence of price manipulation, collusion, restrictions of competition or other unfair practices. If any unfair practices are detected, we will take quick enforcement action. . . . I know this is a difficult time for the industry as a whole. USDA is committed to ensuring support is available to ranchers who work hard to the feed the United States and the world.").

[93]    *Tyson Plant Back Online By January*, FEEDLOT (September 6, 2019), http://feedlotmagazine.com/tyson-plant-back-online-by-january/.

180.    Immediately following the plant fire Tyson, JBS, Cargill, and National Beef all slashed their fed cattle bids by at least $5/cwt and hiked their beef prices.  These actions caused a $5/cwt drop in fed cattle prices and a $14/cwt rise in wholesale beef prices the following trading week.[94]  This saw packer per head margins raise from $191 to $358. While Packing Defendants' blamed the loss of Holcomb's 5,500-6,000 head per day slaughter capacity for these price changes, weekly fed slaughter volume actually remained steady in the weeks that followed the fire (averaging around 521,900 head in the three weeks that followed the fire, as compared to the 521,700 killed in the week of the fire).[95] Tyson has subsequently confirmed that it expects its slaughter volume loss to be "somewhat minimal."[96]

181.    Tyson, JBS, Cargill, and National Beef also drastically reduced their respective cash cattle purchases after the fire, and relied upon their captive supplies.  Tyson, in particular, was largely absent from the cash cattle market in the weeks that followed the fire.  This placed further pressure on cash cattle prices (and thus reduced the price of each

---

[94]    *Sterling Beef Profit Tracker: week ending August 16, 2019*, STERLING MARKETING INC.   (August   20,   2019),   https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf.  Live cattle futures contracts were also negatively impacted, with the market responding with two limit-down trading days on September 12 and 13, 2019.

[95]    These declines also reflected seasonally declining supplies of fed cattle.

[96]    FEEDLOT, *supra* n.93.

Packing Defendants' contracted cattle).[97]   Tyson, JBS, Cargill, and National Beef continued to drop their bids in lockstep.

182.   As a result, cash cattle prices continued to slide in the following weeks, with 5-Area Choice Steers bottoming out at around the $100/cwt in the week ending September 13, 2019, down from $113/cwt in the week of the fire.

183.   Tyson, JBS, Cargill, and National Beef have consequently enjoyed significant increases to already record high margins in the weeks that followed the Holcomb fire by stepping down fed cattle prices and raising beef prices in parallel.  By the week ending September 13 the spread between packer and producers' per head margin exceeded $600, with packers making over $400 per head while producers sustained $200 per head losses.[98]

## D.   **Packing Defendants Publicly Affirmed Their Commitment to Supply Restraint**

184.   Packing Defendants' joint efforts to periodically curtail slaughter levels so as to "balance" their demand to supply are further evidenced by public statements by their senior executives about their firms' commitment to production restraint and operating a "margin" rather than a "market share" business.  Explicit and implicit in the executives'

---

[97]   An overview of the industry wide drop in cash cattle sales is available here: *National Weekly Fed Cattle Comprehensive*, U.S. DEP'T OF AGRIC. (September 24, 2019), https://www.ams.usda.gov/market-news/national-direct-slaughter-cattle-reports;   and *Weekly Newsletter*, CATTLE BUYERS WEEKLY (August 26, 2019), http://www.cattlebuyersweekly.com/users/newsletters.php/2019/0826.txt.

[98]   *Sterling Beef Profit Tracker: week ending September 13, 2019*, STERLING MARKETING INC. (September 18, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf.

statements was the importance of restricting slaughter levels and capacity across the industry as a whole.

185.   For example, commenting on National Beef's decision to close its Brawley, California plant on January 31, 2014, Tyson's COO stated "it is consistent, I guess, with what we've been saying all along, as the calf crop declines and the noncompetitive feedlot areas or noncompetitive plants or the combination thereof, we'll probably have to curtail production . . . to some extent, we've always felt that - and anticipated something like that would happen."[99]

186.   In August 2014, JBS CEO Wesley Batista highlighted that the recent closure of five plants was going to improve JBS and its competitors' performance: "A year-and-a-half, we saw five plants that shut down in U.S. and that definitely is going to help to balance the supply and the industry capacity to be much balanced that we – we are fortunate that we are going to see good improvement on the beef business."[100]

187.   Even after fed cattle prices had begun to collapse, Tyson's then-CEO Donnie Smith still publicly stressed the need for further slaughter reductions in August 2015: "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and

---

[99]   Tyson Foods, Q1 2014 Earnings Call, Seeking Alpha Transcript (Jan. 31, 2014), at 4.

[100]   JBS, Q3 2015  Earnings Call, Bloomberg Transcript (Nov. 12, 2015), at 9.

added costs.  In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term."[101]

188.   JBS's André Nogueira went further and publicly praised Packing Defendants' efforts to reduce industry-wide slaughter capacity through plant closures, noting that it had left the industry in "a very good position, [to achieve] balance in the industry in 2016, 2017, and 2018."[102]

189.   Packing Defendants' executives evidently knew that they needed to tread a narrow line in their public exhortations for slaughter restraint, as shown by Tyson's then CEO Donnie Smith's slip during his discussion of output restraint during Tyson's Q4 2015 Earnings Call:[103]

> You've got relatively low cattle supply, you've got too much -- well, not to say too much, probably not the right way to say it, but you've got excess industry capacity.  And that limits our ability to drive margins above the 1.5% to 3%, we think.

## E.   Economic Analysis Supports the Existence of the Alleged Conspiracy

190.   Economic analysis corroborates the direct and circumstantial evidence of the alleged conspiracy, including the accounts of Witness 1 and Witness 2.  In particular, it confirms that: (a) the collapse in fed cattle prices in 2015 cannot be explained by common supply or demand drivers; (b) from at least January 1, 2015, fed cattle prices were

---

[101]   Tyson Foods, Q2 2014 Earnings Call, Seeking Alpha Transcript (Aug. 15, 2014), at 5.

[102]   JBS, Q3 2015 Earnings Call, Bloomberg Transcript (Nov. 12, 2015), at 9.

[103]   Tyson Foods, Q4 2015 Earnings Call, Seeking Alpha Transcript (Nov. 24, 2015).

artificially depressed by an average of 7.9%; and (c) other explanations potentially offered for the 2015 price collapse do not withstand scrutiny.

**1.    Supply and Demand Drivers Do Not Explain the 2015 Price Collapse or Subsequent Low Prices**

191.    The prices for fed cattle bought across the United States followed a discernable pattern: increasing consistently from 2009 through 2014 (accounting for seasonal fluctuations in prices), collapsing dramatically in 2015, and then stabilizing below the prior trend line:[104]

---

[104]    The below graphs are not adjusted for seasonal changes in fed cattle prices, which do not explain the dramatic depression of fed cattle prices during the Class Period. Historically fed cattle prices tend to gradually rise during the first quarter until the early part of the second quarter, peaking in March or April.  Prices then tend to trend downwards to a summer low typically established in June or July, before commencing an upward trend that typically peaks in November.  *Annual and Seasonal Price Patterns for Cattle*, CORNHUSKER ECONOMICS, University of Nebraska-Lincoln (Aug. 19, 2015), https://agecon.unl.edu/cornhusker-economics/2015/annual-and-seasonal-price-patterns-for-cattle.

**Figure 25.  AMS LMR Reported Prices for Fed Cattle by Reporting Region**[105]



192.    Fed cattle producers' main cost – purchasing feeder cattle – also increased and decreased during this period.  But the decline in feeder cattle costs did not occur until after fed cattle prices collapsed in 2015:

**Figure 26.  Fed Cattle Input Costs - Feeder Cattle Costs**[106]



<hr />

[105]    The series presented are for negotiated cash prices for mixed lots of steers, heifers, and cows, 80% or more choice, delivered live and priced free-on-board (FOB) feedlot.  The same pricing pattern is generally evident in all AMS LMR categories, *i.e.*, for different qualities, for live or dressed, priced FOB feedlot or delivered, whether steers, heifers, or mixed.

[106]    Figures 26, 27, and 28 were prepared utilizing Iowa State University's estimate of the break-even price (*i.e.*, the cost) associated with feeding a 750-pound yearling to a market weight of 1,300 pounds.  Ag Econ Department, Cooperative Extension Service,

193.    That a decline in the fed cattle producers' costs did not cause the 2015 decline

is evident when one compares fed cattle prices to fed cattle producers' total costs:

**Figure 27.  Fed Cattle Price vs. Producers' Total Input Costs**[107]



194.    In fact, during 2015, when fed cattle prices underwent a drastic decline, the

costs borne by fed cattle producers actually increased.  Specifically, from January 2015 to

January 2016, fed cattle prices in Iowa and Minnesota, for example, decreased by

approximately 20.7%, whereas input costs increased by approximately 2.6%.

---

*Estimated Livestock Returns (Estimated Returns: Finishing Yearling Steers)*, IOWA STATE
UNIVERSITY, http://www2.econ.iastate.edu/estimated-returns/.

[107]    *Id.*

195.     As a result of this dramatic disconnect between fed cattle prices and input

costs, fed cattle producers suffered their largest losses in 30 years during 2015 and 2016,

as shown below:

**Figure 28.  Fed Cattle Producers' Margins Per Head Overtime: IA and MN**[108]



196.     While fed cattle producers did enjoy a profitable 2017, this was largely due

to a significant drop in the input costs associated with fed cattle marketed during that year,

and in particular, the price of feeder cattle.  Packing Defendants were able to constrain the

---

[108]     *Id.*  Margins calculated are for Iowa and Minnesota but similar patterns can be
observed in other cattle feeding regions.

typical seasonal rise in fed cattle prices across the first half of 2017 and continued to profit

from historic margins:

**Figure 29.  Packers' Estimated Per Head Margins**



197.   Nor do changes in beef demand or consumer preferences explain the

depression of fed cattle prices.  As shown in Figure 30 below, while there was a 5.67%

decline in retail beef prices from January 2015 to January 2016, prices rebounded in the

months that followed, before undulating down, then up again thereafter.  Importantly, the

spread between retail beef prices and fed cattle prices continued its gradual increase,

consistent with its upward trend during the past 20 years, suggesting beef demand remained

robust.  That beef demand remained strong during this period is also evident from Figure

31 below:

**Figure 30.  Retail Beef Prices vs Fed Cattle Prices**[109]



---

[109]     U.S. Dep't of Agric., Economic Research Service ("ERS"), *Meat Price Spreads*, accessed April 16, 2019 at https://www.ers.usda.gov/data-products/meat-price-spreads/.

**Figure 31.  Monthly Beef Demand Indices, Jan. 1988 – Oct. 2017**[110]



198.   Importantly, what did change in 2015 was the meat margin.  As shown in Figure 5 (reproduced below), the meat margins realized by Packing Defendants in the aftermath of the 2015 price collapse – which at times exceeded $600 per head – were historically unprecedented:

---

[110]   Glynn Tonsor, Jason Lusk, Ted Schroeder, *Assessing Beef Demand Determinants*, (Jan. 18, 2018) at 7-9, https://www.beefboard.org/wp-content/uploads/2019/06/Assessing-Beef-Demand-Determinants_FullReport.pdf.  Chart prepared using USDA ERS record of All-Fresh Retail price and using 1988 as the base year.

**Figure 5.  Weekly Packer Per-Head Meat Margin (1,399 lb. Avg. Live Steer 65-80% Choice; 874 lb. Avg. Dressed Carcass)**



199.    This widening of the meat margin was acknowledged by Tyson in its Q4 2016, earnings call: "The dynamic is that the livestock prices have not come – they've come down faster than the retail prices have, which has allowed us to make the margins that we have right now in both beef . . ."[111]

200.    The unprecedented decoupling of the wholesale and retail price of beef from the price of fed cattle after the 2015 collapse has led to heretofore unheard of levels of

---

[111]    Tyson, Q4 2016 Earnings Call, Seeking Alpha Transcript (Nov. 21, 2016) at 15.

profitability in the Packing Defendants' beef businesses. As Figure 32 shows, while Tyson, JBS, and National Beef's margins were initially hampered by their deliberate underutilization of their respective plant capacities across 2015 and 2016, the resulting expansion of the meat margin caused their margins to balloon across the remainder of the Class Period.

**Figure 32.   Rolling 12 Month EBITDA of JBS, Tyson, and National Beef US Beef Operations[112]**



---

[112]     These EBITDA figures are derived from each of the publicly traded Packer Defendant's investor relations materials. National Beef's margins were reported by Jefferies Financial Group through the first quarter of 2017. National Beef's margins were not reported by Marfrig thereafter in a manner that would permit comparison. Tyson's reported EBITDA has been shifted to line up with calendar quarters, as Tyson's fiscal year ends at the conclusion of what would typically be the end of the first quarter.

### 2. Econometric Analysis Corroborates the Alleged Conspiracy

201.   Consistent with the existence of a conspiracy among Packing Defendants to decrease fed cattle prices, Plaintiffs' econometric analysis confirms that fed cattle prices were artificially depressed by an average of 7.9% in the three years following January 1, 2015.

202.   Plaintiffs used a professionally accepted multivariate regression-based methodology to demonstrate the degree to which fed cattle prices were depressed. Plaintiffs' model of fed cattle prices over time (the "Model") tested whether AMS LMR daily reported negotiated prices[113] for fed cattle were significantly depressed starting in January 2015 compared to the earlier period beginning November 2002.

203.   The Model controls for changes in the supply and demand factors that explain fed cattle prices, so that any residual, unexplained price decrease can reasonably be ascribed to artificial price suppression.  In particular, aside from the AMS LMR price

---

[113]   The AMS publishes 359 daily fed cattle negotiated price series, for a combination of transaction, region and cattle characteristics.  The effect of the transaction, region, and cattle characteristics on fed cattle prices are controlled for by including "fixed-effect variables" for each possible combination, while cattle weight and dress percentage are controlled for by including both as continuous variables in the model.  Specifically, each of the 359 fixed-effect variables for these combinations takes the value 1 when data points meet the characteristics for that specific combination (*e.g.*, negotiated cash prices, for mixed lots of steers, heifers, and cows, with 80% or more choice, delivered live, FOB, in Kansas) and 0 when data points do not.  In this way, the model controls for the fact that prices for each combination are historically and consistently different than each other.

data, the Model incorporates the following variables that impact fed cattle prices and which are commonly selected by academics in their empirical models of fed cattle prices:[114]

    a.    General determinants of demand, such as population and GDP;[115]

    b.    Inflation;[116]

    c.    Costs faced by fed cattle producers, which were lagged by one month consistent with the academic literature;

    d.    Prices of substitutes: namely pork, chicken, and turkey;

    e.    Net imports of beef and live cattle;

    f.    Indicators of relative market power between buyers and sellers, such as the number of packer plants nationwide, the number of feedlots nationwide, and the average feedlot capacity;

    g.    Episodes of Mad Cow disease;[117]

---

[114]    The use of these variables is well-supported by academic literature that seeks to capture cattle price movements. *See, e.g.*, Mary K. Muth, *et al*, *Differences in Prices and Price Risk Across Alternative Marketing Arrangements Used in the Fed Cattle Industry*, 33 JOURNAL OF AGRICULTURAL AND RESOURCE ECONOMICS 118, 126, Table 2 (2008); Sebastien Pouliot and Daniel A. Sumner, *Differential impacts of country of origin labeling: COOL econometric evidence from cattle markets*, 49 FOOD POLICY 107, 114, Table 3 (2014); 2018 GAO Report, at 12 & 14.

[115]    *World agriculture: towards 2015/2030*, *Chapter 5 Livestock production*, 2003, FAO, http://www.fao.org/3/y4252e/y4252e05.pdf, at p. 159.

[116]    Inflation was controlled for by adjusting all dollar denominated variables to October 2018 values using the consumer price index.

[117]    Plaintiffs' modelling is performed in accordance with the conclusions reached in the literature that the effects of Mad Cow disease are driven primarily by the reactions of foreign governments in terms of trade, rather than by the fears of U.S. consumers.  Thus,

        h.       The implementation and then repeal of Mandatory Country of Origin Labeling ("COOL");[118] and

        i.       Time of year, to control for seasonality.[119]

204.    As shown in Table 1 below, fed cattle prices have been depressed by an average of 7.9% since January 1, 2015. This result is highly statistically significant. The Model has an R-squared of 95%, meaning it explains 95% of the variation in fed cattle prices:

---

the indicator variable used reflects the period over which the trade for beef was meaningfully impacted by the disease, *i.e.*, May 2003 through December 2005.

[118]    Events such as the implementation of COOL can also impact cattle prices. As a result, researchers examining the effect of COOL commonly use an indicator variable to demarcate the period during which it occurred. Pouliot, *supra* n.114, at 111. A COOL indicator variable is used to demark the implementation period specific to the market for beef, namely September 30, 2008 to February 2016.

[119]    Plaintiffs use a set of indicator variables corresponding to different months of the year to account for seasonality in fed cattle prices. Muth, *supra* n.114, at 125 .

**Table 1.  Results of Plaintiffs' Regression Analysis**[120]

| Independent variable: | Coefficient[121] |
|---|---|
| Underpayment indicator: Estimate January 2015 through December 2017 | -0.08*** (7.9%) |
| Product and transaction characteristics | |
| Log cattle weight | -0.05*** |
| Dress percentage, expressed as a proportion | 0.04 |
| Fixed effects (cattle type, fob/delivered, 5 area region, percentage choice, live/dressed, cash/grid) | ✓ |
| Demand | |
| Log (real) GDP | 0.77*** |
| Log population size | 0.19*** |
| Supply (costs) | |
| Log (real) breakeven cost (1-month lag) | 0.40*** |
| Possible Substitutes | |
| Log (real) pork price | 0.94*** |
| Log (real) chicken price | -0.35*** |
| Log (real) turkey price | -0.18*** |
| Imports/Exports | |
| Net imports of beef, expressed as a proportion of U.S. production | -0.44*** |
| Net imports of cattle, expressed as a proportion of U.S. production | 1.20*** |
| Other | |
| Log Packer plants count | 1.12*** |
| Log Feedlots count | -0.25*** |
| Log average Feedlot capacity | -0.64*** |
| Mad cow disease indicator | 0.08*** |
| COOL in effect indicator | 0.07*** |
| Seasonality | |
| Indicators for each month of year | ✓ |
| Constant term | -9.63*** |
| Number of observations | 124,497 |
| R-squared | 95% |

205.   Further, the Model's estimates for its control variables are consistent with economic theory.  For example, the negative coefficient on cattle weight in the Model reflects that fatter cattle tend to be of lower quality.  Higher demand for beef (either as a

result of having more consumers or existing consumers having higher disposable income) and higher costs faced by producers are both expected to drive prices for fed cattle up. The positive coefficients on GDP, population, and breakeven cost reflect this.

206.    The coefficient on the price of pork is positive, as is expected for a substitute for beef. The coefficients on chicken and turkey prices are negative, but they are correlated with pork prices, so this is likely due to an issue known as multicollinearity and is not a concern for present purposes.[122]

207.    Importantly, the Model finds that the number of packing plants has a positive impact on fed cattle prices. This is consistent with Plaintiffs' theory that greater slaughter capacity results in more competitive bidding for fed cattle and accordingly higher prices, and *vice versa*.

208.    In sum, the Model's results are consistent with Packing Defendants having acted in a concerted fashion beginning in or around January 2015 in an attempt to depress fed cattle prices.[123]

---

[120]    *, **, and *** represent 90%, 95%, and 99% levels of confidence, respectively.

[121]    The regression is estimated in log-log form, by transforming all non-indicator and non-proportion variables into natural logarithms. This transformation permits the interpretation of the coefficients as elasticities: *i.e.*, a coefficient of 1 represents a 1% change in the independent variable being associated with a 1% change in the price variable.

[122]    "Multicollinearity" can make it difficult to separately estimate coefficients on highly correlated variables. This is only a concern if one is specifically interested in those coefficients and is not a concern if one merely wants to control for their collective effect, which is Plaintiffs' goal here.

[123]    *See* Appendix 5, which contains a list of all sources for the data used in Plaintiffs' regression analysis.

### 3.      Explanations Proffered for the Drop in Fed Cattle Prices Do Not Withstand Scrutiny

209.    The United States Government Accountability Office's ("GAO") 2018 Report identifies certain "supply and demand factors . . . that affected fed cattle prices from 2013 through 2016." [124]  However,  it ***does not*** conclude that these factors were the sole or dominant cause of the 2015 price collapse, and stressed that potential antitrust violations by beef packers was beyond the scope of its review:

> "[w]e did not obtain and review internal packer documents, so **the scope of our analysis did not include a review of whether packers engaged in anticompetitive behavior**.  Such specific investigations would typically be carried out by entities with subpoena authority such as the Federal Trade Commission of the Antitrust Division in the Department of Justice." [125]

[Emphasis added].

210.    In any event, the supply and demand factors said by the GAO to have "affected" prices do not explain the dramatic collapse in prices seen in 2015 or the suppression of prices experienced thereafter.

211.    For example, the GAO Report mentions that the droughts of late 2010-2013 might have reduced the availability of forage to raise calves and feeder cattle, leading ranchers to reduce cattle inventory. [126]  Under this explanation, ranchers expanded their cow-calf inventory once the drought eased, and this "increased the number of fed cattle sold for slaughter by late 2015, and prices began to drop at that time."  However, any

---

[124]     2018 GAO Report at 12.

[125]     *Id.* at 29.

[126]     *Id.* at 12.

oversupply of feeder cattle should have caused a collapse in the price of feeder cattle, which did not happen until well after fed cattle prices had collapsed (*see* Figures 26 and 27 above). Further, while the cow herd had begun to rebuild by 2015, supplies of slaughter weight fed cattle remained close to that seen in 2014.  As a result, while cattle on fed cattle inventory numbers for 2015 remained at or slightly above those seen in 2014, industry annual slaughter volume for 2015 was slightly down compared to 2014 (driven by Packing Defendants slaughter reductions and the continuing tight supply of fed cattle – *see* Section VI(A) above).[127]  If GAO's suggested increase or oversupply of slaughter weight cattle were true, the industry would have exhibited ***low*** prices and ***high*** volume, and not ***low*** prices and continuing ***low*** volume.

212.    Moreover, Plaintiffs' regression model fully accounts for any effect of the drought on the price of feeder cattle and feed.  The regression includes as an explanatory variable the breakeven cost for finishing cattle, which is a composite variable based on the purchase price of the feeder cattle and on feed costs including corn, modified distiller grain, and hay, as well as other costs faced by producers finishing fed cattle in feedlots.  These are the principal variables through which the drought would have affected fed cattle prices.  Their inclusion in the Model therefore controls for the effect of the droughts of 2010-2013.

213.    The GAO also suggested that the increase supply of corn seen in the aftermath of the 2011 to 2013 droughts "may have" encouraged fed cattle producers to feed

---

[127]      *Id.* at 12.

their cattle for longer than they typically would.[128]  The resulting fatter cattle then received lower prices per CWT, as is customary.  Aside from the fact that Plaintiffs' regression analysis controlled for both cattle weight and the price of corn, the premise of the explanation is inconsistent with the facts.  The majority of producers did not choose to overfeed their cattle, but were forced into doing so by Packing Defendants' coordinated slaughter restrictions.[129]

214.   Finally, the strengthening of the U.S. dollar in 2014 and potentially related changes in the volume of U.S. imports and exports of live cattle and beef also cannot explain the price collapse.[130]  These events were not even in lock-step with the collapse in fed cattle prices in the second half of 2015.  In fact, during the second half of 2014, when net imports of beef and the U.S. dollar were increasing, fed cattle prices still increased to their November 2014 peak.  In the first half of 2015, net imports were transiently around 8% of total U.S. production, but by November 2015 – when fed cattle prices had bottomed out – net imports of beef had turned slightly negative.  Moreover, Plaintiffs' regression model controls for the effect of changing net imports on prices.

## VII.   THE FED CATTLE MARKET IS CONDUCIVE TO COLLUSION

215.   The structure and characteristics of the market for the purchase of fed cattle make the market highly susceptible to collusion.  These facts, when considered against the backdrop of the actions of Packing Defendants that are consistent with collusion and

---

[128]    *Id.* at 13.

[129]    A fact noted by commentators at the time.  *See* ¶¶157-159.

[130]    2018 GAO Report at 14.

inconsistent with the proper functioning of a competitive market, support an inference of the anticompetitive agreement alleged herein.

## A.   The Fed Cattle Packing Industry Has Experienced High Consolidation and Is Highly Concentrated

216.   The Fed Cattle Packing industry is highly concentrated.[131]   Since JBS's acquisition of Smithfield Beef Group, Inc. in 2008, Packing Defendants' cumulative share of annual purchases of U.S. fed cattle has approximated 82%-96% each year.   Each Packing Defendant's individual share of annual purchases have remained largely static, but have declined somewhat in recent years.[132]   No Independent Packer possesses a double-digit market share, with Greater Omaha, Packing Defendants' nearest rival, maintaining a 2.6%-3.5% market share through its Omaha, Nebraska plant.[133]

## B.   The Supply of Fed Cattle and Demand for Beef Are Relatively Insensitive to Short-Term Changes in Price

217.   Recent studies have shown that the quantity of beef U.S. consumers purchase has become less sensitive to changes in beef prices, and the impact of such price changes

---

[131]   The U.S. national four-firm concentration ratio (CR4) for beef packing rose from 25% in 1977 to 71% in 1992, the first year in which the national Herfindahl-Hirschmann Index ("HHI") exceeded 1800.   Since that time, the HHI index for the industry has only increased, particularly in certain regions.   *U.S. v. JBS* Amended Complaint, ¶¶36-37; Cai, Stiegert, and Koontz, *Regime Switching and Oligopsony power: the case of US beef processing*, 41 AGRICULTURAL ECONOMICS  99-109, 99 (2011); Cai, Stiegert and Koontz, *Oligopsony Fed Cattle Pricing:  Did Mandatory Price Reporting Increase Meatpacker Market*, 33(4) APPLIED ECONOMIC PERSPECTIVES AND POLICY 606 (2011).

[132]   CBW Top 30 Beef Packers; 2017 Meat & Poultry Facts.

[133]   CBW Top 30 Beef Packers; 2017 Meat & Poultry Facts.

on beef demand is economically small relative to other factors.[134]  Beef's own price elasticity for the period 2008-2017 was estimated at -0.479, indicating that a "10% price increase would reduce [beef] demand by 4.79%."[135]  As a result, Packing Defendants are incentivized to reduce fed cattle slaughter and beef production, as neither they, nor their immediate customers, are harmed by the resulting wholesale and retail price rises.

218.    Further, as noted at ¶83 above, reduced slaughter volumes and/or lower fed cattle prices are unlikely to significantly alter the immediately available supply of fed cattle.  Owing to cattle's comparably long life cycle, cattle producers typically require about 39 months to alter supply levels once a decision has been made to increase production.[136]  As a result, fed cattle supplies are relatively insensitive to short-term price changes, particularly given the absence of a substitute market into which fed cattle producers can sell their cattle.

## C.    Fed Cattle Producers Face Significant Market Access Risk

219.    As perishable commodities, producers face significant pressure to sell their cattle within a matter of weeks once they reach slaughter-weight.[137]  As noted by Grain

---

[134]    Tonsor, *supra* n.110, at 7-9.

[135]    *Id.*

[136]    *Investor Fact Book – Fiscal Year 2017*, TYSON FOODS INC. (2018), at 10, https://s22.q4cdn.com/104708849/files/doc_factbook/Tyson-Foods-FY17-Fact-Book-(rev-042518).pdf ("Tyson 2017 Fact Book"); 2018 GAO Report at 5.

[137]    RTI International, *GIPSA Livestock and Meat Marketing Study, Vol. 3: Fed Cattle and Beef Industries*, *prepared for* U.S.D.A. GRAIN INSPECTION, PACKERS AND STOCKYARD ADMINISTRATION (2007), at 5-4, https://www.gipsa.usda.gov/psp/publication/livemarketstudy/LMMS_Vol_3.pdf.

Inspection, Packers and Stockyards Administration (now a part of the AMS) and shown by Plaintiffs' regression above, "[c]attle held beyond the optimal marketing period begin to decrease in value because of excessive fat gain and the rising cost of gain."[138]   Further, continuing to hold slaughter-weight cattle increases the risk of death loss, which elevates after cattle spend more than 5-6 months in the feedlot.[139]

220.    These facts, coupled with the absence of a substitute market to sell fed cattle into, exposes fed cattle producers to market access risk, namely "the availability of a timely and appropriate market outlet."[140]

221.    That risk and the leverage it provides to Packing Defendants is exacerbated by the significant information asymmetry faced by producers *vis-à-vis* Packing Defendants with regard to the available supply of fed cattle and Packing Defendants' procurement needs.  In relation to the former, producers have only a limited ability to obtain information regarding the supply of fed cattle beyond the information conveyed by the USDA's Cattle on Feed Reports.   By contrast, Packing Defendants are able to construct detailed inventories of upcoming fed cattle supplies through their regular contacts with all the fed cattle producers situated within their respective procurement territories.

222.    The impact of market access risk upon the parties' relative bargaining power is significant.  As demonstrated by Packing Defendants' threats regarding 2018's supposed

---

[138]    *Id.*

[139]    David Cooper, *Feedyard data reveals higher death losses*, PROGRESSIVE CATTLEMAN   (Dec.   24,   2015),   https://www.progressivecattle.com/topics/herd-health/feedyard-data-reveals-higher-death-losses.

[140]    RTI International, *supra* n.137.

"wall of cattle," the mere use of coordinated threats of increased market access risk can be sufficient to coerce producers to commit cattle on captive supply agreements or accept lower cash prices.

D. **There Are Numerous Trade Organizations and Opportunities for Packing Defendants to Meet and Collude**

223. Packing Defendants' management and employees have regular opportunities to meet and collude through their membership in various trade and industry associations, including: the National Cattlemen's Beef Association ("NCBA"); the U.S. Meat Export Federation ("USMEF"); the Global and U.S. Roundtables for Sustainable Beef ("USRSB")[141]; and the North American Meat Institute ("NAMI") (which resulted from the merger of The North American Meat Association and the American Meat Institute).

224. For example, the NCBA holds an annual convention (known as "CattleCon"), a summer conference, a legislative conference, and regional meetings.[142] The NCBA Product Council, which includes Packing Defendants, other packers, and certain retailers and restaurants, meets quarterly for the Beef Executive Forum, an invitation-only event.[143] Representatives of each Packing Defendant typically attend these events. Packing Defendants also participate in meetings of the Beef Checkoff program run

---

[141] In 2015, Packing Defendants were among the founding members of the USRSB. Packing Defendants participate in its annual meetings (held in the spring), with JBS and Cargill additionally having leadership positions in certain working groups.

[142] *NCBA Allied Industry Membership*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), www.beefusa.org/CMDocs/BeefUSA/AboutUs/2019NCBA%20Allied%20Industry%20 Brochure.pdf.

[143] *Id.*

by the Federation of State Beef Councils that are held in conjunction with the NCBA summer and winter meetings.[144]

225.   Similarly, the USMEF – a trade association that develops export opportunities for U.S. protein producers and whose leadership includes current and former employees and officers of Packing Defendants – holds both spring and fall conferences and monthly international trade shows.[145]

226.   The NAMI – which is a national trade association that represents companies that process 95% of red meat – conducts a series of annual conference and educational workshops all across the country.[146]

### E.   Packing Defendants Benefit from High Barriers to Entry

227.   Packing Defendants benefit from substantial barriers to entry into the market. As a result of these barriers, the entry of new fed cattle slaughter businesses, or the repurposing of existing cow and bull slaughter facilities, is not likely to occur despite any decrease in the price of fed cattle or increase in the wholesale price of beef.[147]

---

[144]   *See also The Association*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/theassociation.aspx; and *Federation*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/federation.aspx.

[145]   *Events:   Meetings*, U.S.   MEAT   EXP.   FED'N   (2019), http://www.usmef.org/events/bod-meetings/; *Events: Trade Show Calendar*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/trade-shows/.

[146]   *See About NAMI*, NAT'L AM. MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204; *Events*, NAT'L AMERICAN MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422.

[147]   *U.S. v. JBS* Amended Complaint, ¶41.

228.   The construction of a large packing plant requires an investment of at least $250 million-$350 million, and two or more years to obtain necessary permits, plan, design, and build.[148]   The construction of smaller plants, with capacity to slaughter approximately 1,000 - 1,500 head per day, would take a similar period of time and cost at least $150 million.[149]   Re-purposing an existing plant, or reopening a similar sized, but previously shuttered, plant costs at least $40 million.[150]

229.   Aside from the costs and time associated with opening a plant, new entrants face difficulties complying with a significant volume of regulations, finding and training a workforce of between 1,500 to 3,000 staff, and finding marketing outlets for the resultant beef.[151]

230.   As a result, an industry rule of thumb is that a newly opened packing plant will lose at least 60% of its initial investment before it begins to profitably sell any of its

---

[148]   *Id.*  Plaintiffs understand that the last major plant constructed by Packing Defendants – Tyson's plant in Lexington, Nebraska – cost over $250 million to construct in 1991 and would likely cost significantly more in today's money.

[149]   Amanda Ranke, *What's the Future For Northern Beef Packers?*, BEEF (July 22, 2013), www.beefmagazine.com/blog/whats-future-northern-beef-packers; Press Release, *JR Simplot Company and Caviness Beef Packers to Build New Idaho Beef Processing Plant*, J.R. Simplot (Jan. 7 2015), www.simplot.com/news/jr_simplot_company_and_caviness_beef_packers_to_build_new _idaho_beef.

[150]   This is the amount Iowa Premium Beef spent refurbishing the previously shuttered Tama, Iowa plant.

[151]   For example, one recent successful entrance, namely Iowa Premium Beef's reopening of the Tama, Iowa plant, was made possible by Sysco's agreement to invest $36 million in the plant and take delivery of a significant volume of the resultant beef produced.

beef product.  Not surprisingly, recent years have seen the failure of new or re-launched

Independent Packer businesses, including Northern Beef Packers and Kane Beef.[152]

  **F.**  **Packing Defendants Have Similar Cost Structures and Have Significant
Oversight of Each Other's Price and Production Decisions**

  231. As a result of their similar cost structures,[153]  Packing Defendants have a

limited ability to steal market share from each other by operating with compressed meat

margins (*i.e.*, bidding high for cattle and asking low for beef).  But consequently, they do

have a shared interest in manipulating the meat margin to extract increased profits from

their existing market shares.

  232. Packing Defendants' field buyers' weekly trips to inspect the feedlots in their

territories provide an opportunity to meet and exchange commercially sensitive

information among each other.  Field buyers routinely communicate "market color"

obtained from the field, including reports of their competitors' activities obtained from

producers, back to their respective head offices and other field buyers through their daily

conference calls.

---

[152] Radke, *supra* n.149; Dirk Lammers, *Aberdeen beef plant open again and
slaughtering*, CAPITAL JOURNAL (Nov. 19, 2015), www.capjournal.com/news/aberdeen-
beef-plant-open-again-and-slaughtering-cattle/article_b0a76552-8f0b-11e5-aab0-
4747ca2759bc.html; Greg Henderson, *Kane Beef Now under Court Receivership*,
DROVERS (Oct. 16, 2018), www.drovers.com/article/kane-beef-now-under-court-
receivership.

[153] On information and belief, Packing Defendants' typical cut and kill costs per head
– *i.e.*, the costs of slaughter and beef preparation – is between $160-$170 when their plant,
or each shift at a plant, runs at or near 40 hours per week.  That cost increases by
approximately $20 per head if a plant runs at only 32 hours per week.

233.    For example, Witness 2 reported that the field buyers from Tyson, JBS, Cargill, and National Beef assigned to his feedlot would call him each week to confirm who bought his cattle that week and on what terms.  The field buyers would request such information even when they had not placed a bid that week.  Witness 2 felt obliged to provide such information and would acquiesce to their requests.  Field buyers from Tyson, JBS, Cargill, and National Beef make similar inquiries of other producers and feedlots across the feeding regions.  Most producers would provide such information on request, unwilling to risk alienating one of their buyers.

234.    Tyson, JBS, Cargill, and National Beef would also direct their field buyers and other staff to drive past their competitors' plants to determine and report upon those plants' operating levels (for example, whether the plant had reduced labor hours or was operating on Saturday).  Tyson had a standing policy which precluded these directives, and the resulting reports about their competitors' operations, from being put into writing.  Such communications were effectuated through phone calls.  On information and belief, JBS, Cargill, and National Beef operate similar policies.  The activities of their respective competitors, including their slaughter volumes, would also be discussed by those attending Tyson, JBS, Cargill, and National Beef's daily planning meetings (*see* ¶77).

235.    Tyson, JBS, Cargill, and National Beef also regularly purchased beef produced by each other.  Each Packing Defendant would typically use their competitor's beef to produce certain value-added beef products.

236.    These realities, combined with widespread formal and informal reporting of fed cattle and beef bids, transactions and volumes, and each slaughter plant's current and

planned output, enable Packing Defendants to monitor each other's adherence to any anticompetitive agreement. The purchasing dynamics of the fed cattle market, with its weekly cash trade, also provide Packing Defendants with the ability to punish any suspected non-compliance with such an agreement.[154]

## VIII.  PACKING DEFENDANTS ARE RECIDIVISTS WITH A HISTORY OF COLLUSION

237.    The conduct of Packing Defendants alleged herein is consistent with their previous use of production restraint to increase the price of other commodities such as broiler chicken and pork. JBS and Tyson maintain significant market shares in both the broiler chicken and pork processing markets. Cargill was the fourth largest U.S. pork processer until it sold its pork business to JBS in October 2015.

238.    Broiler chicken and pork processers, including JBS and Tyson, are alleged to have engaged in a series of synchronized production cuts or restrictions designed to raise wholesale prices. The broiler chicken processors are also said to have manipulated the "Georgia Dock" price benchmark – a self-reported benchmark commonly used by market participants to set wholesale chicken prices.

---

[154]    Research shows that markets, such as the fed cattle market, in which a large number of sellers make repetitive sales to a small group of purchasers, facilitate the formation and maintenance of price-fixing agreements as they provide opportunities for the purchasers to agree, sustain, and enforce market sharing arrangements. R. Posner, ANTITRUST LAW 68 (2nd ed. 2001); and *Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For*, U.S. DEPARTMENT OF JUSTICE, ANTITRUST DIVISION, www.justice.gov/atr/public/guidelines/211578.htm.

239.    In both cases, like here, the participants publicly called upon each other to maintain supply "discipline".[155]  Smithfield's CEO, Larry Pope, went as far as to confirm publicly in September 2009 that he had discussed pork production cuts with other "*sizable large producers*":

> The answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation. . . I think this industry has got to solve it collectively.  I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back. . . But the answer is, yes, there are others cutting back. We're not the only one.[156]

240.    Government investigations[157] and civil litigation[158] regarding the processers' alleged conspiracies are ongoing.  In particular, the DOJ opened a grand jury investigation

---

[155]    For example, on May 3, 2013, JBS/Pilgrim's Pride CFO, Bill Lovettee said: "So I think the [broiler] industry is doing an admirable job in being disciplined on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying. . . I believe the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken."

[156]    Event Brief of Q1 2010, Smithfield Earnings Conference Call (Sept. 8, 2009).

[157]    The Antitrust Section of the Florida Attorney General's office opened an investigation into the broiler chicken processors' alleged anticompetitive practices, issuing civil investigative demands to Tyson, among others.   The Georgia Department of Agriculture has suspended the Georgia Dock price index.

[158]    *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.) ("Broiler Chicken") and *In re Pork Antitrust Litigation*, 18-cv-1776 (D. Minn) ("Pork").  The U.S. District Court for Northern District of Illinois found that the broiler chicken processors' customers had alleged sufficient facts to plausibly suggest that defendants' conduct was the product of a conspiracy.  *See In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d 772 (2017) ("Defendants' business strategies during the relevant time period are indicative of a conspiracy.").  In *Pork*, this Court recently granted the defendants' motion to dismiss but gave plaintiffs leave to amend their complaint.  Amended Memorandum

into the alleged conspiracy in relation to broiler chickens in 2019.  In relation to that investigation, the DOJ issued subpoenas to Tyson and JBS's subsidiary, Pilgrim's Pride, among others, and successfully sought a stay of discovery in the civil matters in June 2019. On September 20, 2019, the DOJ applied for an extension of the discovery stay, citing "significant developments in [its] criminal investigation".[159]   Further, at least one defendant, Fieldale Farms, opted to settle with plaintiffs in the broiler civil matters.[160]

241.   Broiler chicken processers, including JBS and Tyson, also stand accused of conspiring to depress their employees' wages from January 2009 onwards.  The complaint filed on behalf of the processors' employees, citing witness evidence, claims that "senior executives of the Defendant Processors . . . held recurring 'off the books' in-person meetings at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, during which they exchanged information about, discussed, agreed upon and ultimately fixed the wages and benefits of Class Members at artificially depressed levels."[161]

242.   In addition, Packing Defendants have a long history of other misconduct, spanning breaches of the Packers and Stockyards Act as well as antitrust, anti-corruption,

---

Opinion and Order Granting Defendants' Motions to Dismiss Plaintiffs' Complaints, *Pork*, Docket #361.

[159]   Motion of Intervenor United States to Extend the Stay of Discovery, *Broiler Chicken*, Docket # 3093, at 1.

[160]   Order Granting Final Approval of Settlement with Defendant Fieldale Farms Corporation, *Broiler Chicken*, Docket # 1414.

[161]   Complaint, *Jien and others v. Perdue Farms, Inc. and others*, No. 19-cv-02521 (D. Md. Aug. 30, 2019), Docket # 1, at 6.

environmental, health and safety regulation, both domestic and foreign.  Further details of these violations are provided in Appendix 2.

## IX.   MANIPULATION OF LIVE CATTLE FUTURES AND OPTIONS

243.   Live cattle futures have traded on the CME since 1964. Live cattle options have traded on the CME since 1984.[162]  Both contracts, which are important tools used by producers, such as Plaintiffs, to manage the risks associated with their businesses, were impacted by Packing Defendants' conspiracy.

### A.   Futures and Options Generally

244.   A commodity futures contract is a standardized bilateral agreement for the purchase and sale of a particular commodity – like fed cattle – at a specified time.  In the context of futures trading, a commodity is the underlying asset upon which a futures contract is based.

245.   A futures contract typically involves two parties, with an exchange (in this case, the CME) acting as a central clearinghouse that guarantees both sides of the transaction, thereby eliminating counterparty risk.  The buyer of a futures contract is typically considered a "long," whose position will increase in value as the underlying physical or cash market price increases.  The seller of a futures contract is typically considered a "short," whose position will increase in value as the underlying physical or cash market price decreases.

---

[162]   *Historical First Trade Dates*, CME, https://www.cmegroup.com/media-room/historical-first-trade-dates.html.

246.    Rather than take delivery, futures market participants almost always "offset" their futures contracts prior to actual delivery.  For example, a purchaser of one live cattle futures contract may liquidate, cancel, or offset a future obligation to take delivery of the cattle by selling one live cattle futures contract.  The difference between the initial purchase price and the subsequent sale price represents the realized profit or loss for the trader.

247.    An options contract comes in two forms: a "call option" and a "put option." The buyer (sometimes called the "holder") of a call option has the right (but not the obligation) to purchase the underlying asset at a set price (the "strike price").  The seller of the call option (sometimes called the "writer") has the obligation to deliver the underlying asset at the strike price if the buyer exercises its right.  The buyer of a put option has the right (but not the obligation) to sell the underlying asset at a set price (the "strike" or "exercise" price).  The seller of a put option has the obligation to buy the underlying asset at the strike price if the buyer exercises their right.

248.    A trader's long call option increases in value when the price of the underlying commodity increases; a trader's long put option increases in value when the price of the underlying commodity decreases.  In the case of a call, the option becomes "in the money" when the underlying commodity price exceeds the strike price.  For puts, the option becomes in the money when the underlying commodity price is below the strike price. When the call (put) option strike price is above (below) the underlying commodity, the option is "out of the money" and will generally not be exercised by the holder.  The option writer makes money when the option stays out of the money; the option holder makes more money based on how much the contract is in the money.

B.     **Live Cattle Contracts**

249.   When fed cattle have reached slaughter-weight, they are referred to as "live,"
"finished," or "fat" cattle.  They can be distinguished from "feeder cattle", which refers to
fed cattle which weigh between 700-900 pounds and have yet to enter the feedlot.  Live
cattle, for purposes of CME live cattle futures contracts, weigh no less than 1,050 pounds
and no more than 1,550 pounds (or 1,350 pounds for heifers).

250.   Trading in CME live cattle futures and options is subject to the rules and
regulations of the CME, including Chapter 101[163] (live cattle futures), Chapter 101A[164]
(options on live cattle futures), and Chapter 101B[165] (options on live cattle futures calendar
spreads) of the CME Rulebook.

251.   CME live cattle futures and options are traded electronically on CME's
Globex electronic trading platform.  While both live cattle futures and options were also
traded in CME's "open outcry" trading pits at the beginning of the Class Period, only live
cattle options continued to be traded in open outcry after the CME's decision to close down
most of its futures trading pits in July 2015.

1.     **Live Cattle Futures**

252.   Chapter 101 of the CME Rulebook sets forth the rules for trading in CME
live cattle futures – including contract size, trade dates, and tick sizes – as well as deliveries

---

[163]    CME Rulebook, CME, https://www.cmegroup.com/rulebook/CME/ ("CME
Rulebook"), Chapter 101.

[164]    *Id.*, Chapter 101A.

[165]    *Id.*, Chapter 101B.

on CME live cattle futures contracts, including, for example, weight deviations, location differentials, and delivery points.

253. One live cattle futures contract calls for the delivery of 40,000 pounds of live steers or live heifers producing 65% Choice, and 35% Select USDA grade of beef.[166]

254. Live cattle futures prices are quoted in cents per pound. The minimum tick size is $0.00025 per pound (or $10 per contract).[167] A one penny ($0.01) change in the per pound price results in a $400 change in the contract price.

255. Live cattle futures trade for the following contract months: February, April, June, August, October, and December. Nine contract months are eligible for trading at any given time. They include the six upcoming contract months and the next three contract months in the calendar cycle.[168] For example, in March 2019, the following contract months were eligible for trading: April 2019, June 2019, August 2019, October 2019, December 2019, February 2020, April 2020, June 2020, August 2020. Trading continues until the last business day of the given contract month at 12:00 p.m.[169]

---

[166]   *Id*., Chapter 101, Rules 10101, 10102.B.

[167]   *Live Cattle Futures Contract Specs*, CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_contract_specifications.html.

[168]   *Live Cattle Futures Quotes,* CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_quotes_globex.html.

[169]   *Live Cattle Futures Contract Specs, supra,* n.167.

256.    Live cattle futures are "physically" settled.  This means the buyer of a live cattle future has a right to receive (and the seller of a live cattle future has the obligation to deliver) 40,000 pounds of cattle per contract.[170]

257.    Buyers may choose either live graded deliveries or carcass graded deliveries.[171] Deliveries of live cattle are to be made at approved delivery points at approved livestock yards in the following territories: Colorado; Iowa / Minnesota / South Dakota; Kansas; Nebraska; Texas / Oklahoma / New Mexico.[172]  Buyers electing carcass graded delivery must specify an approved slaughter plant enumerated by the CME. Eligible slaughter plants include those enumerated for the livestock yards to which the cattle were tendered, and any other approved slaughter plant that is within 225 road miles of the originating feedlot.

258.    A live delivery unit must consist entirely of steers or entirely of heifers.[173] All cattle are required to be healthy,[174] and all cattle must be born and raised exclusively in the United States.[175]

---

[170]    *Self-Study Guide to Hedging with Livestock Futures and Options*, CME (Version 17) at 7, https://www.cmegroup.com/trading/agricultural/files/AC-215_SelfStuy_GuideNYMEX.pdf.

[171]    CME Rulebook, Chapter 101, Rules 10103.B, 10103.C.

[172]    *Id.*, Rule 10103.B.

[173]    *Id.*

[174]    *Id.*

[175]    *Id.*, Rule 10101.

2.      **Live Cattle Options**

259.    Chapter 101A of the CME Rulebook outlines the specifications for live cattle options.  The asset underlying a live cattle option is a live cattle futures contract.  A live cattle option permits the holder to buy, in the case of the call, or to sell, in the case of the put, one live cattle futures contract.  Live cattle options trade in cents-per-pound.  The minimum price fluctuation is $0.00025 per pound.[176]

260.    Live cattle options trade in the following contract months: February, April, June, August, October and December.[177] At any given time, ten contract months trade: the six months in the February bi-monthly cycle, plus the three next in that cycle in the following year, as well as one nearby "serial" month of January, March, May, July, September, or November.[178]  Trading in live cattle options ends on the first Friday of the contract month at 1:00 p.m.[179]

261.    For monthly options that expire in the February bi-monthly cycle (*i.e.*, February, April, June, August, October, and December), the underlying futures contract is the futures contract for the month in which the option expires.  For example, the underlying futures contract for an option that expires in February is the February futures contract.[180]

---

[176]    *Live Cattle Options Contract Specs*, CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_contractSpecs_options.html.

[177]    *Id.*

[178]    *Id.*

[179]    *Id.*

[180]    CME Rulebook, Chapter 101A, Rule 101A01.D.

262.   For monthly options that expire in months other than those in the February bi-monthly cycle (*i.e.*, January, March, May, July, September, and November), the underlying futures contract is the next futures contract in the February bi-monthly cycle that is nearest to the expiration of the option.  For example, the underlying futures contract for an option that expires in January is the February futures contract.

263.   Live cattle options are "American style," meaning that the option holders can exercise their options at any point prior to expiration of trading.[181]

264.   In addition, CME lists "live cattle calendar spread options," which trade pursuant to CME Rule 101B.  In the case of calendar spreads, the option is to buy (in the case of the call), or to sell (in the case of the put), one live cattle futures calendar spread.[182] A live cattle futures calendar spread option consists of a combination of a purchase in one futures contract month and a sale in another futures contract month.[183] Unlike American style options, these options can only be exercised on the day of expiration.[184]

**C.   Relationship Between Live Cattle Futures and Cattle Spot (Cash) Prices**

265.   There is a strong interplay between live cattle futures and the underlying fed cattle cash market.  As CME observes, "livestock cash prices and futures prices tend to

---

[181]   *Id.*, Rule 101A02.A.

[182]   CME Rulebook, Chapter 101B, Rule 101B01.

[183]   *Id.*

[184]   *Id.*, Rule 101B02.

move up and down together, which is what makes the concept of effective hedging possible."[185] "[F]utures prices [are] reflective of the main cash markets."[186]

266.    As the CME has recognized, livestock (including live cattle and feeder cattle) contract specifications are designed to ensure "a two-way relationship between the benchmark livestock futures market and the numerous livestock cash markets.  The price that is discovered in a futures market comes from the interaction between the supply (sellers' offers) and demand (buyers' bids)."[187]  Many futures market "bids and offers come from cash market participants."[188]

267.    "In turn, the futures contract price is then used by cash market participants to transact in the spot (current) market or for cash forward type contracts."[189]  The relationship between the cash market and the futures market is particularly strong with respect to live cattle futures because, as the CME has observed, "many cash market contracts are 'based on' or 'referenced to' the futures market price."[190]

---

[185]    *INTRODUCTION TO LIVESTOCK: Learn about Basis: Livestock,* CME, https://www.cmegroup.com/education/courses/introduction-to-livestock/learn-about-basis-livestock.html.

[186]    *Self-Study Guide to Hedging with Livestock Futures and Options,* CME (2009 Version), at 9, http://www.kisfutures.com/CMELivestockSelfStudy.pdf.

[187]    *Self-Study Guide to Hedging with Livestock Futures and Options*, *supra* n.170, at 6.

[188]    *Id.*

[189]    *Id.*

[190]    *Id.*

268. Live cattle futures contracts are designed so that their prices converge with physical cash cattle prices when they expire.[191] For physically settled contracts such as live cattle, "[t]he possibility of delivery on the futures contract generally causes the futures price during the delivery month to align with the cash price at the futures delivery locations."[192]

269. Regression analyses demonstrate a strong, statistically significant relationship between: (1) changes in the physical cash cattle prices reported in the afternoon of day 1 with live cattle futures market price changes on day 2; (2) changes in physical cash cattle prices reported on day 2 and live cattle futures market price changes on day 2; and (3) changes in live cattle futures market prices on day 2 and physical cash market prices changes reported on the morning of day 3.

270. The figures below depict the close relationship between price changes in the fed cattle cash market ("Cash am" and "Cash pm") and price changes in the live cattle futures market, across all contract months:

---

191    *Self-Study Guide to Hedging with Livestock Futures and Options, supra* n.186.

192    *Id.* at 11.

**Figure 33.  Relationship Between 2015 Live Cattle Futures Contracts and AMS LMR National Morning and Afternoon Cash Cattle Purchase Reports**



**Figure 34.  Relationship Between 2016 Live Cattle Futures Contracts and AMS LMR National Morning and Afternoon Cash Cattle Purchase Reports**



**Figure 35.  Relationship Between 2017 Live Cattle Futures Contracts and AMS LMR National Morning and Afternoon Cash Cattle Purchase Reports**



**Figure 36.  Relationship Between 2018 Live Cattle Futures Contracts and AMS LMR National Morning and Afternoon Cash Cattle Purchase Reports**



D.    **Packing Defendants Traded CME Live Cattle Futures and Options**

271.    Packing Defendants regularly trade live cattle futures and options.  Because the Packing Defendants manipulated the price of the underlying cattle commodity, their interactions with live cattle futures and options traded at the CME were tainted by the artificiality that they created.

272.    The Packing Defendants' specific trades in live cattle futures and options is not known or knowable at this time.  The Packing Defendants do not publicly disclose their trading activity.  The CME maintains the trade data of its customers – including the Packing

Defendants – in strict confidence. Although the CME, CFTC, and USDA generate reports regarding open interests, trading volume, *etc.*, this information does not identify which specific market participants are responsible for the trades or open interests. Nor does the CME, CFTC, and USDA identify the activity of beef packers as a group with respect to live cattle futures and options.

273. CME live cattle futures and options trading occurs through electronic systems. The participants in these electronic markets do not know the individuals responsible for particular trades or positions. The shift to an electronic trading environment and ensuing anonymity has only heightened the difficulty of ascertaining the specific live cattle futures and options trades and positions of the Packing Defendants.

274. Despite the severe limitations on data available to Plaintiffs at this time, it is clear that the Packing Defendants interact regularly with the CME live cattle markets.

275. During the period February 1, 2018 through January 31, 2019, for example, Packing Defendants had the only CME-approved slaughter plants for live cattle.[193] As a result, they are central participants in the CME live cattle market.

276. Cargill touts its ability to effectively "manage risk" in live and feeder cattle futures and options contracts. "Our risk management team has more than 20 years of experience helping customers manage price risks across 70-plus commodities markets"

---

[193]    *Chicago Mercantile Exchange Inc. 2018 Approved Slaughter Plants for Live Cattle*, CME GROUP, https://www.cmegroup.com/content/dam/cmegroup/notices/market-regulation/2018/01/2018-approved-slaughter-plants-for-live-cattle.pdf.

including "Live cattle" and "Feeder cattle."[194]  News reports indicate that it trades actively in the cattle futures markets.  For example, on January 25, 2016, Cargill stated through a spokesperson, "We've seen not only a very volatile cattle futures market, but prices were coming down a lot."[195]  Cargill's specific trading activity in the CME live cattle markets is not public information and is not otherwise available to Plaintiffs absent discovery.

277.    Tyson uses "derivative financial instruments, primarily futures and options, to reduce the effect of changing prices and as a mechanism to procure the underlying commodity."[196]  Tyson holds "certain positions, primarily in . . . livestock futures, that are not hedges for financial reporting purposes."[197]  And, as part of its "commodity risk management activities," Tyson uses "derivative financial instruments, primarily futures and options, to reduce [their] exposure to various market risks related to these purchases . . . ."[198]  Tyson's specific trading activity in the CME live cattle markets is not public information and is not otherwise available to Plaintiffs absent discovery.

---

[194]    *Agriculture   Risk   Management*, CARGILL,   https://www.cargill.com/price-risk/crm/agriculture.

[195]    Gregory Meyer, *Cattlemen lock horns with futures exchange over market volatility*, FINANCIAL TIMES (Jan. 25, 2016), https://www.ft.com/content/6eed1268-c130-11e5-846f-79b0e3d20eaf.

[196]    Tyson Foods, Inc., Annual Report (Form 10-K) at 8 and 43 (Sept. 29, 2018), https://s22.q4cdn.com/104708849/files/doc_financials/quartely/2018/q4/TSN-FY18-10-K.pdf.

[197]    *Id.* at 14.

[198]    *Id.* at 52.

278. JBS references the CME live cattle futures contract in its procurement contracts.[199] Its financial reports also indicate a high level of commodities, derivatives, and futures trading.[200] National Beef similarly stated that it used "futures contracts in order to reduce exposure associated with entering into firm commitments to purchase live cattle at prices determined prior to the delivery of the cattle . . . ."[201] Its two controlling shareholders during the Class Period, Jefferies Financial Group and Marfrig, made similar announcements.[202] JBS and National Beef's specific trading activity in the CME live cattle markets is not public information and is not otherwise available to Plaintiffs absent discovery.

---

[199] Jon Hansen, *Marketing Option for Holstein Steers, Sample Contract*, DRIFTLESS REGION BEEF CONFERENCE 2013, https://lib.dr.iastate.edu/driftlessconference/2013/papers/6.

[200] JBS S.A., Condensed Financial Statements and Independent auditors' report, at 46 (Sept. 30, 2018), https://jbss.infoinvest.com.br/enu/4812/DF%20JBS%20300918%20Ingls%20-%20Condensada%2013.11%2018h20_Parecer.pdf.

[201] National Beef Packing Company, LLC, Annual Report (Form 10-K) at F-15, (Nov. 16, 2011), https://www.sec.gov/Archives/edgar/data/1273784/000144530511003450/nbp201182710k.htm.

[202] Jefferies Financial Group Inc., 2017 Annual Report, (Form 10-K) at F-44 (Feb. 27, 2018) ("Jefferies 2017 Annual Report"), https://www.sec.gov/Archives/edgar/data/96223/000009622318000009/luk-2017123110k.htm; and Marfrig Global Foods, 2018 Management Report and Financial Statements at 61 (Feb. 27, 2019), http://www.marfrig.com.br/Uploads/Arquivos/Marfrig_RA18_eng.pdf.

279.   As stated above, the specifics of Packing Defendants' CME cattle futures and options trading and their positions during the Class Period can only be obtained through discovery from Packing Defendants and third parties such as CME.

### E.   Packing Defendants Directly Caused CME Live Cattle Futures and Options Prices to Be Artificial

280.   Slaughter-weight fed cattle is the commodity underlying CME live cattle futures and options.  A reduction in the price of slaughter-weight fed cattle will lead to a reduction in the price of CME live cattle futures.  As explained above, Packing Defendants suppressed the price of fed cattle.  In doing so, Packing Defendants necessarily and directly caused prices of live cattle futures and options to be artificially suppressed. The Packing Defendants' conduct amounts to manipulation, long prohibited by the CEA.

281.   Packing Defendants had the motive to cause artificial depression of futures prices, separate and apart from their futures transactions.  In particular, futures prices are used to set the price of cattle delivered under forward contracts, as explained above.  As such, by depressing live cattle futures contracts, Packing Defendants lower the cost of cattle procured under forward contracts.

282.   Packing Defendants' conduct in the cash cattle market had a direct and proximate impact on prices in the CME live cattle futures and options markets.  For example, on August 14, 2015, Tyson announced that it was closing its Denison, Iowa beef plant, which resulted in price declines in the cash and futures markets.  In particular, the spot or front-month August contract fell $0.004 per pound ($160 per live cattle future) and the October 2015 contract fell $0.01 per pound ($400 per live cattle future).  According to

one market participant, "[s]ome feedlots may have surrendered after seeing futures fall earlier in the session, partly on word that Tyson closed a beef plant."[203]

## X.   CLASS ACTION ALLEGATIONS

283.   Plaintiffs bring this action on behalf of themselves, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of all members of the following two classes:

**Producer Class**
All persons or entities within the United States that directly sold to a Defendant one or more fed cattle for slaughter during the Class Period other than on a cost-plus basis.

**Exchange Class**
All persons who transacted in live cattle futures and/or options traded on the CME or another U.S. exchange during the Class Period.[204]

284.   Excluded from both Classes are Defendants and their officers, directors, management, employees, subsidiaries, and affiliates.  Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

---

[203]   Theopolis Waters, *Livestock-CME live cattle futures sag with initial cash prices*, REUTERS, Aug. 14, 2015, https://www.reuters.com/article/markets-livestock-cattle/livestock-cme-live-cattle-futures-sag-with-initial-cash-prices-idUSL1N10P2MG20150814.

[204]   The Exchange Class includes persons who established positions prior to the commencement of the Class period but who closed out or stood for delivery on these positions after the Class Period commenced.  As noted below, Plaintiffs reserve the right to amend the Class definitions as the litigation progresses to include, by way of example and not limitation, all persons who transacted in CME feeder cattle futures and options during the Class Period.

285.    "Fed cattle" means steers and heifers, whether beef breeds or Holsteins, which are raised and fed specifically for beef production.  "Class Period" means the period from January 1, 2015 through the present.  "Cost-plus basis" means an agreement to sell fed cattle at a price determined by the producers' costs of production without regard to prevailing cash cattle prices.

286.    Members of the Classes are so numerous and geographically dispersed that joinder is impracticable.  Further, members of the Producer Class are readily identifiable from information and records in the possession of Packing Defendants or third parties (including commercial feedlots and marketing cooperatives engaged by certain Class members).  Members of the Exchange Class are readily identifiable from information and records in the possession of the CME, or capable of identification via third parties.

287.    Plaintiffs' claims are typical of the claims of the members of both Classes.  Plaintiffs and members of both Classes were damaged by the same wrongful conduct of Defendants.

288.    Plaintiffs will fairly and adequately protect and represent the interests of members of both Classes.  The interests of Plaintiffs are coincidental with, and not antagonistic to, those of members of the Classes.  Producer Plaintiffs and all members of the Producer Class are similarly affected by Packing Defendants' wrongful conduct in that they received artificially low prices for fed cattle sold to Packing Defendants.  Exchange Plaintiffs and all members of the Exchange Class are similarly affected by Defendants' course of conduct in violation of the CEA.

289.    Plaintiffs are represented by counsel with experience in the prosecution and leadership of class action antitrust, commodities manipulation, and other complex litigation, including class actions in the financial services industry.

290.    Questions of law and fact common to the members of both Classes predominate over questions that may affect only individual Class members, thereby making relief with respect to members of both Classes as a whole appropriate.  Questions of law and fact common to members of the Classes include, but are not limited to:

    a.    whether Packing Defendants engaged in a combination and conspiracy among themselves to fix, depress, suppress, and/or stabilize the prices of fed cattle purchased in the United States;

    b.    whether Packing Defendants engaged in a combination and conspiracy among themselves to allocate the market for the purchase of fed cattle offered for sale in the United States;

    c.    the identity of the participants of the alleged conspiracy;

    d.    the duration of the alleged conspiracy and the acts carried out by Packing Defendants in furtherance of the conspiracy;

    e.    whether Packing Defendants' alleged conspiracy violated federal antitrust laws;

    f.    whether Packing Defendants' alleged conspiracy and/or course of business violated the Packers and Stockyards Act;

    g.    whether Defendants' conduct violated Sections 6(c)(3), 9(a) and 22 of the CEA;

h.      whether Defendants' conduct violated Sections 6(c)(1) and 22 of the CEA;

i.      whether Defendants acted to aid and abet violations of the CEA;

j.      whether John Doe Defendants' unlawful conduct caused cognizable legal injury under the CEA;

k.      whether Plaintiffs and members of the Classes suffered injury;

l.      the amount of damages suffered by Plaintiffs and members of the Classes; and

m.      the appropriate type and scope of injunctive and related equitable relief.

291.   A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

292.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

293.    Plaintiffs have defined members of the Classes based on currently available information and hereby reserve the right to amend the definition of members of the Classes, including, without limitation, the length of the Class Period.

## XI.    STATUTE OF LIMITATIONS AND TOLLING

### A.    <u>Fraudulent Concealment</u>

294.    The statutes of limitations governing Plaintiffs' claims against Packing Defendants were tolled under the doctrine of fraudulent concealment.  The doctrine applies here because Packing Defendants fraudulently concealed their misconduct through their own affirmative acts, and because Defendants' conduct was inherently self-concealing.

295.    As described above and below, Packing Defendants took affirmative steps to actively conceal their violations of law from Plaintiffs and both Classes by, among other matters, (i) communicating with each other by telephone about their purchases and slaughter volumes so that they would not have written evidence of sharing this information with a competitor, as well as relying on non-public forms of communication; (ii) offering false or pre-textual reasons for low fed cattle prices; (iii) offering pre-textual justifications for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade; (iv) explicitly and implicitly representing that the fed cattle bids and contract terms Packing Defendants offered Plaintiffs and the Producer Class were the product of honest competition and not a conspiracy; (iv) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws; and (v) misrepresenting the

nature of their agreements (and purported adherence to competitive safeguards) to government officials and to the public.

296.   As alleged above, the Packing Defendants offered pre-textual justifications for plant closures, slaughter reductions, and withdrawal from the cash cattle trade.   The Packing Defendants also offered pre-textual reasons for low fed cattle prices.   Just some, but by no means all, examples are as follows:

### 1.   The Tyson Defendants

297.   As pleaded above, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy.

298.   In furtherance of the conspiracy, the Tyson Defendants repeatedly issued pre-textual public statements to conceal Defendants' conspiracy.   For example, in their SEC filings between 2015-2018, Tyson Defendants stated that they had "limited or no control" over the production and pricing of cattle, rather, the price is "determined by constantly changing market forces of supply and demand." [205]   According to the Tyson Defendants, factors that affect the cost of cattle include "weather patterns throughout the world, outbreaks of disease, the global level of supply inventories and demand for grains and other feed ingredients, as well as agricultural and energy policies of domestic and foreign

---

[205]   Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report (Form 10-K) at 6 (Sept. 30, 2017); Tyson Foods, Inc., Annual Report (Form 10-K), at 7-8 (Sept. 29, 2018).

governments."[206]   Additionally, the Tyson Defendants stated that they "ceased operations at our Denison, Iowa plant" in order to "better align our overall production capacity with current cattle supplies."[207]   Furthermore, the Tyson Defendants stated, "[t]he Beef segment earnings improved . . . due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."[208]

299.   The Tyson Defendants made these pre-textual public statements in order to conceal their participation in the conspiracy.   Rather than disclose that their improved earnings were in fact the supracompetitive profits of Defendants' unlawful conspiracy, Tyson Defendants instead offered the innocuous pretexts of "lower fed cattle costs" and "favorable market conditions."[209]

---

[206]   Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K), at 7 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report (Form 10-K) at 6 (Sept. 30, 2017); Tyson Foods, Inc., Annual Report (Form 10-K), at 7-8 (Sept. 29, 2018).

[207]   Tyson Foods, Inc., Annual Report (Form 10-K), at 56 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K), at 54, 68 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report (Form 10-K), at 57, 72 (Sept. 30, 2017).

[208]   Tyson Foods, Inc., Annual Report (Form 10-K) at 23 (Oct. 1, 2016); *see also* Tyson Foods, Inc., Annual Report (Form 10-K), at 23 (Sept. 30, 2017) ("The Beef segment experienced strong export demand and more favorable domestic market conditions associated with an increase in cattle supply."); Tyson Foods, Inc., Annual Report (Form 10-K), at 25 (Sept. 29, 2018) (same).

[209]   Tyson Foods, Inc., Annual Report (Form 10-K) at 23 (Oct. 1, 2016); *see also* Tyson Foods, Inc., Annual Report (Form 10-K), at 23 (Sept. 30, 2017) ("The Beef segment experienced strong export demand and more favorable domestic market conditions associated with an increase in cattle supply."); Tyson Foods, Inc., Annual Report (Form 10-K) at 25 (Sept. 29, 2018) (same).

### 2.   The JBS Defendants

300.   As pleaded above, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy.

301.   In furtherance of the conspiracy, the JBS Defendants repeatedly issued pretextual public statements to conceal Defendants' conspiracy.  For example, in November 2015, JBS executive, Andre Nogueira, stated that "Cattle price will go down [sic]" in the United States because "we are going to see more cattle available."[210]  In March 2016, JBS CEO, Wesley Mendonca Batista, similarly stated that JBS would enjoy "better margin[s]" because of an "increase in the herd in the U.S."[211]  Similar statements continued throughout 2016 and into 2017 and 2018, with JBS executives repeatedly stating that its strong financial performance in the United States was due to "more cattle available in the U.S.,"[212] "cattle price[s] . . . [being] back to the normal level,"[213] "greater cattle availability,"[214] and "strong demand for beef."[215]

302.   The JBS Defendants made these pre-textual public statements in order to conceal their participation in the conspiracy.  Rather than disclose that the "improvement in EBITDA margin"[216] the JBS Defendants touted, in fact, reflected the supracompetitive

---

[210]   JBS, Q3 2015 Earnings Call, Bloomberg Transcript (Nov. 12, 2015) at 11.

[211]   JBS, Q4 2015 Earnings Call, Bloomberg Transcript (Mar. 17, 2016) at 6.

[212]   JBS, Q2 2016 Earnings Call, Bloomberg Transcript (Aug. 11, 2016) at 6.

[213]   JBS, Q3 2016 Earnings Call, Bloomberg Transcript (Nov. 16, 2016) at 10.

[214]   JBS, Q1 2017 Earnings Call, Bloomberg Transcript (May 16, 2017) at 2.

[215]   JBS, Q2 2018 Earnings Call, Bloomberg Transcript (Aug. 15, 2018) at 4.

[216]   *Id.*

profits of Defendants' unlawful conspiracy, they instead offered the innocuous pretexts of "greater cattle availability" and cattle prices mysteriously being "back to the normal level."

### 3.    The Cargill Defendants

303.    As pleaded above, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy.

304.    In furtherance of the conspiracy, the Cargill Defendants repeatedly issued pre-textual public statements to conceal Defendants' conspiracy.  For example, in May 2018, Cargill reported that "excellent results in North American beef" led the company's Animal Nutrition & Protein segment to deliver the largest share of corporate earnings on the year.  Cargill concealed the true reason for its "excellent results," instead attributing them simply to "lower cattle costs and rising demand in both domestic and export markets."[217]  Similarly, in its 2017 Annual Report, Cargill reported that "favorable market conditions in North America" were simply the product of "[r]enewed consumer demand for beef . . . ."[218]  In 2018, Cargill announced that its Animal Nutrition & Protein business surpassed even the prior year's "strong performance," "fueled by rising domestic and export demand for North American beef . . . ."[219]

---

[217]    Cargill, Inc. Management's Discussion and Analysis of Financial Condition and Results of Operations for the three months and year ended May 31, 2018, Municipal Secondary Market Disclosure Filing Sheet, at 2 (Aug. 14, 2018).

[218]    Cargill, Inc., 2017 Annual Report at 1, https://www.cargill.com/doc/1432094802973/2017-annual-report.pdf.

[219]    Cargill, Inc., 2018 Annual Report at 3, https://www.cargill.com/doc/1432124831909/2018-annual-report.pdf.

305.    The Cargill Defendants made these pre-textual public statements in order to
conceal their participation in the conspiracy.   Rather than disclose that their "excellent
results" were in fact the supracompetitive profits of Defendants' unlawful conspiracy,
Cargill instead offered the innocuous pretexts of "lower cattle costs" and "rising demand."

### 4.    National Beef

306.    As pleaded above, Jefferies and Marfrig both owned a controlling share of
National Beef for portions of the Class Period and shared a unity of corporate interest and
operated as part of a single enterprise with National Beef during those periods.

307.    In furtherance of the conspiracy, National Beef/Jefferies/Marfrig repeatedly
issued pre-textual public statements to conceal Defendants' conspiracy.   On information
and belief, National Beef was the original and knowing source of every pre-textual public
statement ostensibly made by Jefferies and/or Marfrig to conceal Defendants' conspiracy.
For example, in October 2015, Jefferies Financial Group stated that the expected expansion
of the cow-herd "bodes well for [packing industry] margins as it will lead to an increase
in the number of fed cattle available for slaughter."[220]   In October 2016, Jefferies Financial
Group touted that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected
the market for fed cattle" when explaining how "[f]rom June 27, 2015 to June 25, 2016,
the average market price per pound of fed cattle has fallen from $1.48 to $1.16."[221]

---

[220]    Leucadia National Corporation (Jefferies Financial Group), 2015 Investor Day
Presentation at 118 (Oct. 8, 2015).

[221]    Leucadia National Corporation (Jefferies Financial Group), 2016 Investor Meeting
Presentation at 53 (Oct. 5, 2016).

Jefferies Financial Group continued to offer similar explanations throughout 2017 and 2018, noting, for example, that: "National Beef generated record results for [Last Twelve Months] on the back of a more balanced supply of cattle and robust end market demand";[222] "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016";[223] "pre-tax income grew by $78.3 million, as increased cattle availability and strong demand for beef continued to support strong margins";[224] and "because the peak in supply of fed cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins."[225]   National Beef's CEO and President, Tim Klien, attended the Jefferies Financial Group Investor Day presentations in 2015, 2016, and 2017 at which the above statements were made.[226]   Mr. Klien was the designated speaker for the portion of these events directed to National Beef's performance.

---

[222]   Leucadia National Corporation (Jefferies Financial Group), 2017 Investor Meeting at 1 (Oct. 5, 2017).

[223]   *Id*. at 58.

[224]   Jefferies Financial Group, 2017 Annual Report (Form 10-K) at 33 (Feb. 28, 2018).

[225]   Jefferies Financial Group Inc, 2018 Investor Meeting at 61 (Oct. 4, 2018).  National Beef director, and Jefferies Capital Partners Managing Director, Nick Daraviras, presented in relation to National Beef at this event, further noting that "favorable supply and demand dynamics continue, leading to an enhanced margin environment industry-wide".

[226]   Press Release, *Leucadia to Host Investor Day on October 8, 2015*, Leucadia National Corporation (Jefferies Financial Group) (Sept. 1, 2015), http://www.leucadia.com/All/1/1113; Press Release, *Leucadia to Host Investor Day on October 5, 2016*, Leucadia National Corporation (Jefferies Financial Group) (Sep. 12, 2015), http://www.leucadia.com/All/1/1113; Press Release, *Leucadia to Host Investor Day on October 5, 2017*, Leucadia National Corporation (Jefferies Financial Group) (Sept. 13, 2017), http://www.leucadia.com/All/1/1113.

308.    Marfrig continued to offer similar pre-textual explanations for the low prices caused by Packing Defendants' anticompetitive agreement after it bought a controlling stake in National Beef.  For example, in November 2018, Marfrig reported that "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better margins."[227]  Marfrig executives reiterated the point on the company's earnings call for the third quarter of 2018, stating that "the U.S. beef industry has delivered record results" thanks to "an ample supply of cattle" and "strong demands [sic] in both the domestic and international markets."[228]  Marfrig acknowledged that it achieved these "record results" and "better margins" while reducing cattle slaughter volumes – but the company claimed that its reduced slaughter volumes were merely the result of there being "fewer weeks in the third quarter 2018 compared to the third quarter 2017."[229]  National Beef CEO, Timothy M. Klein – referred to as "CEO of [Marfrig's] North American Operations" by Marfrig CEO, Eduardo de Oliveira Miron – participated in this call.[230]  Similarly, in the fourth quarter of 2018, Marfrig announced that it achieved a "[s]olid result from North America Operation, sustained by strong demand for beef protein and the higher cattle availability."[231]

---

[227]    Marfrig Global Foods S.A., Earnings Release 3Q18 (Nov. 5, 2018) at 2.

[228]    Marfrig, Q3 2018 Earnings Call, Bloomberg Transcript (Nov. 6, 2018) at 5.

[229]    *Id*. at 3.

[230]    *Id*. at 2.

[231]    Marfrig Global Foods, Earnings Conference Call 4Q18 and 2018 Presentation (Feb. 28, 2018) at 8.

309.    Jefferies and Marfrig made these pre-textual public statements on behalf of National Beef – which, as pleaded above, was the original and knowing source of the pre-textual public statements – in order to conceal its participation in the conspiracy.  Rather than disclose that its "record results" and "better margins" in fact reflected the supracompetitive profits of Packing Defendants' unlawful conspiracy, Jefferies and Marfrig echoed the innocuous pretexts offered up by the Tyson, JBS, and Cargill Defendants – suggesting, falsely, that "ample supply of cattle," "higher cattle availability," and "strong demand" were responsible for its supracompetitive profits.

310.    At the same time, the Packing Defendants publicly stated that they complied with antitrust law.  Below is a list of non-exhaustive examples of such statements that each Packing Defendant published during the Class Period:

    a.    Tyson's Code of Conduct extolled Tyson's compliance with antitrust laws throughout the Class Period.  The Code's most recent iteration, from October 2018, reports that Tyson "compete[s] in the market with integrity and compl[ies] with competition laws . . . .  We comply with the letter and spirit of competition laws . . . wherever we do business."

    b.    JBS's 2014 Annual Report detailed the policies it had in place to "ensure ethical conduct and integrity in the management of its business", including its Manual of Ethical Conduct, which "addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-

corruption practices and other sensitive topics."  JBS also launched an "Always Do The Right Thing" compliance program in July 2017.

c.  Cargill stressed in its 2015 Corporate Responsibility report that "[w]e obey the law.  Obeying the law is the foundation on which our reputation and Guiding Principles are built . . . .  We conduct our business with integrity . . . .  We compete vigorously, but do so fairly and ethically.  We . . . comply with the laws and regulations that support fair competition and integrity in the marketplace."  Cargill reiterated this message in its subsequent Corporate Responsibility reports.

d.  National Beef's former majority shareholder, Jefferies Financial Group (formerly Leucadia National Corporation) noted in its 2014 Annual Report that National Beef was "subject to extensive government regulation" including by the USDA.

311.  Packing Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation.  Had the public learned that Packing Defendants conspired to fix prices in the fed cattle market, their conspiracy could not have continued for as long as it did.  Accordingly, Plaintiffs could not have learned of Packing Defendants' anticompetitive conduct until recently when Witness 1 and Witness 2 came forward with otherwise inaccessible information.

312.  Among other things, Plaintiffs exercised due diligence by seeking explanations for the decline in fed cattle prices and artificial movements in live cattle

prices.  Plaintiffs continued to exercise due diligence by taking necessary steps to request a governmental investigation into these matters and Packing Defendants' conduct.[232]

313.    While Plaintiffs' requests did contribute to the GAO publishing the GAO Report in April 2018, that report did not reveal the Packing Defendants' anticompetitive conduct.  As noted above at paragraph 209, the GAO had limited investigative authority and "did not obtain and review internal packer documents."  Its report therefore explicitly did not consider whether Packing Defendants engaged in anticompetitive behavior of the kind complained herein.  Plaintiffs here have also not obtained or reviewed internal packer documents.

314.    Because of Packing Defendants' fraudulent concealment, Plaintiffs and both Classes had insufficient information concerning Packing Defendants' misconduct on which to base a complaint and could not have discovered it through the exercise of due diligence until recently.  Plaintiffs and members of both Classes have acted diligently in seeking to bring their claims promptly.

315.    Accordingly, Plaintiffs assert that the applicable statutes of limitations on Plaintiffs' claims were tolled.  Defendants are also equitably estopped from asserting any statute of limitations defense.

---

[232]    *See, e.g.*, Letter from Bill Bullard, CEO, R-CALF USA, to Sen. Charles E. Grassley, Chairman of the Sen. Comm. on the Jud. 2 (Jan. 5, 2016), https://perma.cc/Z5U4-948P ("January 2016 Bullard Letter") and Letter from Bill Bullard, CEO, R-CALF USA, to Saadeh A. Al-Jurf, Senior Trial Attorney, U.S. CFTC (Sept. 10, 2018).  As a board member of R-CALF USA since January 2019 and a member since 2002, Plaintiff Nelson assisted with R-CALF USA's efforts to prompt governmental investigations.  As members of R-CALF USA throughout the Class Period, Plaintiffs Chambers, Lucky 7 Angus, and Chuck Weinreis, supported R-CALF USA's efforts in relation to the same.

B.  **Continuing Violations**

316.  As alleged herein, Packing Defendants' price-fixing conspiracy lasted from at least January 1, 2015 and continues through the present.

317.  Each Packing Defendant engaged in the conspiracy to fix and suppress the price of fed cattle in the United States.

318.  As a result of the anticompetitive conduct challenged in this Complaint, throughout the Class Period, Packing Defendants were able to and did (i) purchase cattle at artificially suppressed cash prices, (ii) purchase cattle at artificially suppressed prices pursuant to formula, forward, and/or grid contracts throughout the Class Period, and (iii) transact in live cattle futures and options at artificially suppressed prices.

319.  Producer Plaintiffs and members of the proposed Producer Class sold cattle directly to Packing Defendants at prices artificially suppressed by the conduct challenged in this Complaint throughout the Class Period.  That conduct also caused the Exchange Plaintiffs and members of the Exchange Class to transact live cattle futures and options at artificial prices, either when opening a position, closing a position, or both.

320.  Thus, each Packing Defendant's purchase for fed cattle at artificial and non-competitive price constituted a new overt act causing injury to the proposed Classes.

321.  Packing Defendants' purchases pursuant to the conspiracy continued throughout the Class Period and, accordingly, Producer Plaintiffs, Exchange Plaintiffs, and members of the proposed Classes were injured and may recover for damages suffered at any point in the conspiracy.

322.    Packing Defendants continue to engage in the anticompetitive conduct alleged herein, and continue to be able to and do (i) purchase cattle at artificially suppressed cash prices; (ii) purchase cattle at artificially suppressed prices pursuant to formula, forward, and/or grid contracts throughout the Class Period; and (iii) transact in live cattle futures and options at artificially suppressed prices and cause live cattle futures and options to be transacted at artificial prices.

323.    Packing Defendants' unlawful communications regarding pricing and procurement decisions continue to this day.

## XII.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**PRICE-FIXING IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §1**
**(Alleged Against All Packing Defendants)**

324.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

325.    During the Class Period, Packing Defendants controlled the slaughter of fed cattle in the United States and thus the available marketing outlets for fed cattle producers. Packing Defendants were horizontal competitors in the market for the purchase of fed cattle.

326.    From at least January 1, 2015 and continuing to the present, the exact dates being unknown to Plaintiffs, Packing Defendants engaged in a continuing agreement, understanding, and conspiracy in an unreasonable and unlawful restraint of trade to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.  Packing Defendants' conspiracy

150

is a *per se* violation of federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

327.   Packing Defendants' conspiracy and the resulting impact on fed cattle prices received by producers occurred in and affected U.S. interstate commerce.

328.   As a material and proximate result of Packing Defendants' unlawful conduct, Producer Plaintiffs and members of the Producer Class have suffered injury to their business or property.  These injuries included, but were not limited to, receiving artificial and non-competitive prices for fed cattle sold to Packing Defendants.  Producer Plaintiffs and the Producer Class were also deprived of the benefits of free and open competition in the market for the purchase of fed cattle.  Producer Plaintiffs and members of the Producer Class are each entitled to treble damages for Packing Defendants' violations of the Sherman Act alleged herein.

329.   As a material and proximate result of Packing Defendants' unlawful conduct, Exchange Plaintiffs and members of the Exchange Class have suffered injury to their business or property.  These injuries include, but are not limited to, transacting in live cattle futures and options at artificial and non-competitive prices.  Exchange Plaintiffs and members of the Exchange Class were also deprived of the benefits of free and open competition in the market for live cattle futures and options.  Exchange Plaintiffs and members of the Exchange Class are each entitled to treble damages for Packing Defendants' violation of the Sherman Act alleged herein.

330.   As a material and proximate result of Packing Defendants' unlawful conduct, R-CALF USA and NFU have suffered injury to their business and property.  These injuries

included, but were not limited to, the frustration of their respective missions to protect the interests of their respective members, and diversion of their resources to: (a) help their respective members mitigate the injuries incurred as a proximate result of Packing Defendants' unlawful conduct; and (b) to prevent further breaches of the law by the same.

331.   Producer Plaintiffs, Exchange Plaintiffs, R-CALF USA, NFU, and the members of the Producer Class are threatened with future injury to their businesses and property unless the injunctive relief requested is granted.

**SECOND CLAIM FOR RELIEF**
**VIOLATIONS OF PACKERS AND STOCKYARDS ACT, 7 U.S.C. §§192 and 209**
**(Alleged Against All Packing Defendants)**

332.   Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

333.   Title 7 U.S.C. §192 provides, in pertinent part, "[i]t shall be unlawful for any packer with respect to livestock . . . to . . . (a) [e]ngage in or use any unfair, unjustly discriminatory, or deceptive trade practice or device; or . . . (e) [e]ngage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or (f) [c]onspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or (g) [c]onspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e)."

334.   Title 7 U.S.C. §209 further provides that, "[i]f any person subject to this chapter violates any of the provisions of this chapter . . . relating to the purchase, sale, or handling of livestock, . . . he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation."  Such liability may be enforced "by suit in any district court of the United States of competent jurisdiction[.]"

335.   Deceptive trade practices under the Packers and Stockyards Act are addressed in the Code of Federal Regulations in Part 201 of Title 9.  Section 201.70 states "[e]ach packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged."

336.   From at least January 1, 2015 and continuing to the present, the exact dates being unknown to Plaintiffs, Packing Defendants violated 7 U.S.C. §192(a), (e), (f), and (g) by engaging in a course of business and doing acts for the purpose or with the effect of reaching and implementing a conspiracy, combination, agreement, or arrangement to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle, with the purpose or with the effect of suppressing and reducing competition among purchasers of fed cattle.

337.   The effect and potential effect of these acts and this conspiracy, combination, agreement, or arrangement, was to fix, depress, suppress, stabilize, or otherwise artificially manipulate the price of fed cattle bought by Packing Defendants, with the purpose or with the effect of suppressing and reducing competition among purchasers of fed cattle.  Packing

Defendants had no competitive or otherwise legitimate business justification for these acts and this conspiracy, combination, agreement, or arrangement.

338.    As a proximate result of Packing Defendants' breaches of the Packers and Stockyards Act, Producer Plaintiffs, R-CALF USA, NFU and the members of the Producer Class have been injured and damaged in their respective businesses and property, including those injuries detailed at ¶¶328 and 330.

**THIRD CLAIM FOR RELIEF**
**COMMODITIES MANIPULATION**
**IN VIOLATION OF THE COMMODITY EXCHANGE ACT**
**7 U.S.C. §§1, *ET SEQ.*, AND CFTC REGULATION 180.2, 17 C.F.R. §180.2**
**(Alleged Against All Packing Defendants and John Does 1-10)**

339.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

340.    During the Class Period, Packing Defendants, through their own conduct and through the conduct of John Does 1-10, specifically intended to manipulate the prices of fed cattle, the physical commodity underlying the CME live cattle futures and options contracts, and specifically intended to manipulate the prices of CME live cattle futures and options.

341.    Packing Defendants, through their own conduct and the conduct of John Does 1-10, had the ability to cause artificial prices in fed cattle and live cattle futures and options.  They did so through, among other things, their dominant position in the market for the purchase of fed cattle, their superior access to information and reporting mechanisms, their financial wherewithal, and their extensive involvement in the CME live cattle futures and options trading and delivery processes.

342.   Packing Defendants, through their own conduct and the conduct of John Does 1-10, in fact caused artificial prices in the physical fed cattle market as well as in live cattle futures and options markets.   Their conduct resulted in, among other things, artificially low prices in the commodity underlying CME live cattle futures and options prices and in the live cattle futures and options prices themselves.

343.   Packing Defendants and John Does 1-10 therefore engaged in unlawful manipulation of CME live cattle and futures and options and their underlying physical commodity in violation of Sections 6(c)(3), 7 U.S.C §9(3), 9(a) of the CEA, 7 U.S.C. §13(a), Section 22 of the CEA, 7 U.S.C. §25(a), and CFTC Rule 180.2, 17 C.F.R. §180.2.

344.   The manipulation by Packing Defendants and their conspirators and agents, including John Does 1-10, deprived Exchange Plaintiffs and the Exchange Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

345.   Exchange Plaintiffs and Exchange Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

## FOURTH CLAIM FOR RELIEF
## MANIPULATIVE AND DECEPTIVE DEVICE
## IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1, *ET SEQ.* AND CFTC REGULATION 180.1(A), 17 C.F.R. §180.1(a)
### (Alleged Against All Packing Defendants and John Does 1-10)

346.   Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

347.    Packing Defendants intended to affect or acted recklessly with regards to affecting prices of CME live cattle futures and options contracts and engaged in overt acts in furtherance of that intent.

348.    Packing Defendants intentionally or recklessly used or employed a manipulative device or artifice to defraud, and engaged in acts, practices, and/or courses of business which operated as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the CEA, 7 U.S.C. §9, and Section 22 of the CEA (7 U.S.C. §25), and Regulation 180.1(a), 17 C.F.R. §180.1(a).

349.    Packing Defendants' conduct proximately caused injury to Exchange Plaintiffs and other members of the Exchange Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

350.    The manipulative and deceptive devices employed by Packing Defendants and their conspirators and agents, including John Does 1-10, deprived Exchange Plaintiffs and the Exchange Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

351.    Exchange Plaintiffs and Exchange Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

**FIFTH CLAIM FOR RELIEF**
**PRINCIPAL-AGENT LIABILITY**
**IN VIOLATION OF THE COMMODITY EXCHANGE ACT,7 U.S.C. §§1, *ET***
***SEQ.* AND CFTC REGULATION 1.2, 17 C.F.R. §1.2**
**(Alleged Against All Packing Defendants and John Does 1-10)**

352.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

353.    Packing Defendants' traders, employees, and/or officers, and conspirators, including John Does 1-10, acted as agents for their principals, Packing Defendants, when engaging in the manipulation and manipulative and deceptive devices and schemes described herein.

354.    Packing Defendants are liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B) and Regulation 1.2, 17 C.F.R. §1.2, for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

355.    The principal-agent violations by Packing Defendants and their conspirators and agents, including John Does 1-10, deprived Plaintiffs and the Exchange Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

356.    Exchange Plaintiffs and Exchange Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

**SIXTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1, *ET SEQ.***
**(Alleged Against All Packing Defendants and John Does 1-10)**

357.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

358.    Packing Defendants and John Does 1-10 knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein, including violations by the other Packing Defendants and John Does 1-10.

359.    Packing Defendants and John Does 1-10 did so knowing of their violations of the CEA and willfully intended to assist these manipulations, which resulted in CME live cattle futures and options prices, and their underlying physical commodity becoming artificial, during the Class Period.

360.    Through their aiding and abetting violations, Packing Defendants and John Does 1-10 violated Section 22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

361.    Exchange Plaintiffs and Exchange Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

## XIII.  PRAYER FOR RELIEF

362.    Plaintiffs, on behalf of themselves and members of the Classes, request relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that the Plaintiffs be named as Class Representatives, that the undersigned be named as Lead Class Counsel of both Classes, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal laws set forth above;

C.    That the Court award Plaintiffs and members of the Classes damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

D.    That the Court issue appropriate injunctive and other equitable relief, including structural relief, against Defendants;

E.     That the Court award Plaintiffs pre- and post-judgment interest;

F.     That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts; and

G.     That the Court award any and all such other relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

363.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all matters so triable.

Dated:  October 4, 2019

SCOTT+SCOTT
ATTORNEYS AT LAW LLP

/s Christopher M. Burke
Christopher M. Burke (*pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA  92101
Tel.:   619-233-4565
Fax:   619-233-0508
cburke@scott-scott.com

David R. Scott (*pro hac vice*)
Amanda F. Lawrence (*pro hac vice*)
Michael P. Srodoski
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Tel.:   860-537-5537
Fax:   860-537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com

Peter A. Barile III (*pro hac vice*)
Anjali Bhat (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue
17th Floor
New York, NY  10169
Tel.:   212-223-6444
Fax:    212-223-6334
pbarile@scott-scott.com
abhat@scott-scott.com

Anthony F. Fata (*pro hac vice*)
Christopher P.T. Tourek (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER &**
**SPRENGEL LLP**
150 S. Wacker
Suite 3000
Chicago, IL 60606
Tel.:   312-782-4882
Fax:    312-782-4485
afata@caffertyclobes.com
ctourek@caffertyclobes.com
boconnell@caffertyclobes.com

Ellen Meriwether (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER &**
**SPRENGEL LLP**
 205 N. Monroe St.
Media, PA 19063
Tel.:   215-864-2800
Fax:    215-864-2810
emeriwether@caffertyclobes.com

*Interim Co-Lead Counsel for the Cattle*
*Plaintiffs*

K. Craig Wildfang (Bar No. 0117043)
Thomas J. Undlin (Bar No. 0183751)
Stacey P. Slaughter (Bar No. 0296971)

**ROBINS KAPLAN LLP**
800 LaSalle Avenue
Suite 2800
Minneapolis, MN  55402
Tel:    612-349-8500
Fax:    612-339-4181
kcwildfang@robinskaplan.com
tundlin@robinskaplan.com
sslaughter@robinskaplan.com

Hollis Salzman
Kellie Lerner
**ROBINS KAPLAN LLP**
 399 Park Avenue
Suite 3600
New York, NY  10022
Tel:    212-980-7400
Fax:    212-980-7499
hsalzman@robinskaplan.com
klerner@robinskaplan.com

*Liaison Counsel for the Cattle Plaintiffs*

Eric H. Gibbs (*pro hac vice*)
Michael L. Schrag (*pro hac vice*)
Joshua Bloomfield (*pro hac vice*)
George Sampson (*pro hac vice*)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Tel:    (510) 350-9700
ehg@classlawgroup.com
mls@classlawgroup.com
jjb@classlawgroup.com
gws@classlawgroup.com

David E. Kovel (*pro hac vice*)
Thomas W. Elrod (*pro hac vice*)
Karen Lerner (*pro hac vice*)
Anthony E. Maneiro (*pro hac vice*)
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Tel:    (212) 371-6600

161

dkovel@kmllp.com
telrod@kmllp.com
klerner@kmllp.com
amaneiro@kmllp.com

Richard M. Paul III  (*pro hac vice*)
Sean Cooper  (*pro hac vice forthcoming*)
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Tel:    (816) 984-8100
Rick@PaulLLP.com
Sean@PaulLLP.com

Melissa S. Weiner (Bar No. 0387900)
Joseph C. Bourne (Bar No. 0389922)
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Tel:    (612) 389-0600
mweiner@pswlaw.com
jbourne@pswlaw.com

Bruce L. Simon (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Tel:    (415) 433-9000
bsimon@pswlaw.com

Daniel L. Warshaw (*pro hac vice*)
Bobby Pouya (*pro hac vice*)
Matthew A. Pearson (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Tel:    (818) 788-8300
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mapearson@pswlaw.com

*Plaintiffs' Executive Committee*