## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **IN RE CATTLE ANTITRUST LITIGATION**<br><br>This document relates to:<br><br>ALL CASES | Case No. 19-cv-1222-JRT-HB |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Introduction ........................................................................................................ 1

Legal standard.................................................................................................... 8

Argument ......................................................................................................... 10

I.   Plaintiffs fail to plead a violation of the Sherman Act (Count I) ............. 10

   A.   The confidential witness allegations do not provide sufficient direct
        evidence of a conspiracy .................................................................... 12

        1.   Plaintiffs do not sufficiently identify the confidential witnesses ............ 13

        2.   The confidential witness allegations do not support a conspiracy .......... 18

   B.   Plaintiffs fail to plead parallel conduct supporting the inference of a
        conspiracy ......................................................................................... 21

        1.   Plaintiffs fail to plead that Defendants engaged in periodic
             slaughter reductions ................................................................. 23

        2.   Plaintiffs fail to plead that Defendants curtailed purchases of cash
             cattle ...................................................................................... 28

        3.   Plaintiffs fail to plead that Defendants coordinated procurement
             practices ................................................................................. 29

        4.   Plaintiffs fail to plead that Defendants uneconomically imported
             cattle ...................................................................................... 33

        5.   Plaintiffs fail to plead that Defendants reduced slaughter capacity ........ 34

   C.   Plaintiffs fail to plead other facts supporting the inference of a
        conspiracy ......................................................................................... 38

        1.   Plaintiffs do not allege sufficient plus factors ........................................ 38

        2.   Plaintiffs' regression model does not show a conspiracy ....................... 45

        3.   The complaint explains why fed cattle prices actually fell ..................... 48

   D.   R-CALF and NFU lack standing to seek money damages .............................. 49

II.  Plaintiffs fail to plead a violation of the Packers and Stockyards Act (Count
     II)........................................................................................................... 50

   A.   The conspiracy allegations are insufficient ...................................... 51

   B.   No alleged act violates the PSA........................................................ 51

III. Plaintiffs fail to plead a violation of the Commodity Exchange Act (Counts
     III-VI)..................................................................................................... 53

   A.   Plaintiffs' CEA claims are derivative of their Sherman Act claims................ 55

**TABLE OF CONTENTS**
**(continued)**

B.    Plaintiffs fail to meet the heightened pleading standard applicable to CEA claims ........................................................................................... 55

C.    Plaintiffs fail to sufficiently allege a net loss resulting from the claimed CEA violations ............................................................................... 56

IV.   Plaintiffs' claims are time-barred ............................................................... 57

A.    Plaintiffs do not plead fraudulent concealment ................................. 58

1.    Plaintiffs do not plead concealment ......................................... 59

2.    Plaintiffs do not allege that they failed to timely discover the conspiracy ................................................................................. 61

3.    Plaintiffs do not plead due diligence ........................................ 62

B.    The continuing violation doctrine does not permit recovery here .................... 63

V.    Plaintiffs' claims should be dismissed with prejudice ................................ 65

Conclusion ......................................................................................................... 67

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*In re Amaranth Nat. Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008) ......................................................... 55

*In re Amaranth Nat. Gas Commodities Litig.*,
    269 F.R.D. 366 (S.D.N.Y. 2010) .............................................................. 54

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................... 8, 9, 38, 47

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) .................................................................................. 50

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) ..................................................................... 40

*Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
    94 F. Supp. 3d 1035 (D. Minn. 2015) ...................................................... 45

*In re Beef Indus. Antitrust Litig. MDL Docket No. 248*,
    710 F.2d 216 (5th Cir. 1983) ................................................................. 8, 44

*In re Beef Indus. Antitrust Litig. MDL Docket No. 248*,
    907 F.2d 510 (5th Cir. 1990) ................................................................. 8, 44

*Been v. O.K. Indus., Inc.*,
    495 F.3d 1217 (10th Cir. 2007) ................................................................ 50

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................... *passim*

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*,
    203 F.3d 1028 (8th Cir. 2000) .......................................................... *passim*

*Brown v. Medtronic, Inc.*,
    628 F.3d 451 (8th Cir. 2010) ...................................................................... 9

*Buetow v. A.L.S. Enters. Inc.*,
    564 F. Supp. 2d 1038 (D. Minn. 2008) ..................................................... 10

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) ..................................................................... 40

## TABLE OF AUTHORITIES
### (continued)

**Cases – continued**                                                  **Page(s)**

*CFTC v. Kraft Foods Grp., Inc.*,
   153 F. Supp. 3d 996 (N.D. Ill. 2015) .......................................................... 55

*CFTC v. Kratville*,
   796 F.3d 873 (8th Cir. 2015) ..................................................................... 53

*Chamberlain v. Reddy Ice Holdings, Inc.*,
   757 F. Supp. 2d 683 (E.D. Mich. 2010)........................................... 15, 16, 17

*In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*,
   390 F. Supp. 3d 916 (N.D. Ill. 2019) .......................................................... 57

*In re Chocolate Confectionary Antitrust Litig.*,
   801 F.3d 383 (3d Cir. 2015)........................................................................ 43

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) ................................................................. 13, 14

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
   851 F.2d 478 (1st Cir. 1988)...................................................................... 11

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
   No. 11-MD-2213(RPP), 2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013) .................... 22

*In re Crude Oil Commodity Litig.*,
   No. 06 Civ. 6677(NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007).................... 56

*ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*,
   355 F. Supp. 3d 785 (D. Minn. 2019)......................................................... 67

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007)......................................................................... 42

*Erie Cty. v. Morton Salt, Inc.*,
   702 F.3d 860 (6th Cir. 2012) ..................................................................... 39

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
   788 F. Supp. 1042 (D. Minn. 1992).......................................................... 41

*In re Flat Glass Antitrust Litig.*,
   191 F.R.D. 472 (W.D. Pa. 1999) ............................................................... 63

# TABLE OF AUTHORITIES
## (continued)

**Cases – continued**                                                        **Page(s)**

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) .................................................................. 35

*Griffin v. Smithfield Foods, Inc.*,
    183 F. Supp. 2d 824 (E.D. Va. 2002) ....................................................................... 53

*In re GSE Bonds Antitrust Litig.*,
    396 F. Supp. 3d 354 (S.D.N.Y. 2019) ......................................................... 19, 20, 46

*Hershey v. Energy Transfer Partners, L.P.*,
    610 F.3d 239 (5th Cir. 2010) .................................................................................... 54

*Hinds Cty. v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009) ..................................................................... 43

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
    231 F. Supp. 2d 1253 (N.D. Ga. 2002) ........................................................ 39, 43, 45

*IBP, Inc. v. Glickman*,
    187 F.3d 974 (8th Cir. 1999) ............................................................................*passim*

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ............................................................................. 19, 39

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*,
    661 F. Supp. 2d 1039 (D. Minn. 2009) .................................................................... 10

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
    No. 13-2664 ADM/SER, 2014 WL 943224 (D. Minn. Mar. 11, 2014) ..................... 62

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
    797 F.3d 538 (8th Cir. 2015) ..................................................................... 9, 10, 11, 51

*Jackson v. Swift Eckrich, Inc.*,
    53 F.3d 1452 (8th Cir. 1995) ....................................................................... 51, 53, 58

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
    910 F.3d 927 (7th Cir. 2018) .............................................................................. 27, 28

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ................................................................................................. 64

## TABLE OF AUTHORITIES
### (continued)

**Cases – continued**                                                  **Page(s)**

*In re Late Fee & Over-Limit Fee Litig.*,
  528 F. Supp. 2d 953 (N.D. Cal. 2007) ........................................................ 40

*Lerma v. Univision Commc'ns, Inc.*,
  52 F. Supp. 2d 1011 (E.D. Wis. 1999) ...................................................... 23

*Levy v. BASF Metals Ltd.*,
  917 F.3d 106 (2d Cir. 2019) ...................................................................... 58

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  935 F. Supp. 2d 666 (S.D.N.Y. 2013) ......................................... 55, 56, 57

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  213 F. Supp. 3d 530 (S.D.N.Y. 2016) ...................................................... 54

*In re LTL Shipping Servs. Antitrust Litig.*,
  No. 1:08-MD-01895-WSD, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009) .................. 40

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .................................................................................. 11

*McDonough v. Anoka Cty.*,
  799 F.3d 931 (8th Cir. 2015) ................................................................. 6, 9

*McKie Ford, Inc. v. Sec'y of Labor*,
  191 F.3d 853 (8th Cir. 1999) .................................................................... 30

*In re Metawave Commc'ns Corp. Sec. Litig.*,
  298 F. Supp. 2d 1056 (W.D. Wash. 2003) ......................................... 17, 19

*Midwest Commc'ns, Inc. v. Minn. Twins, Inc.*,
  779 F.2d 444 (8th Cir. 1985) .................................................................... 50

*In re Milk Prods. Antitrust Litig.*,
  84 F. Supp. 2d 1016 (D. Minn. 1997) ......................................... 22, 58, 63

*In re Monosodium Glutamate Antitrust Litig.*,
  No. CIV. 00MDL1328PAM, 2003 WL 297287 (D. Minn. Feb. 6, 2003) .................. 59

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) .................................................................. 38

## TABLE OF AUTHORITIES
### (continued)

**Cases – continued**                                                     **Page(s)**

*In re Mylan N.V. Sec. Litig.*,
    379 F. Supp. 3d 198 (S.D.N.Y. 2019)........................................................ 19

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002)................................................................................... 63

*In re NextWave Pers. Commc'ns, Inc.*,
    200 F.3d 43 (2d Cir. 1999)......................................................................... 30

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp. 2d 987 (E.D. Mich. 2010)....................................... 2, 13, 15, 16

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018) ............................................................... 35, 38

*Pickett v. Tyson Fresh Meats, Inc.*,
    315 F. Supp. 2d 1172 (M.D. Ala. 2004) ................................................. 5, 52

*Pickett v. Tyson Fresh Meats, Inc.*,
    420 F.3d 1272 (11th Cir. 2005) .................................................................. 44

*In re Pilgrim's Pride Corp.*,
    728 F.3d 457 (5th Cir. 2013) ...................................................................... 52

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)......................................................... 55

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
    828 F.2d 211 (4th Cir. 1987) ................................................................ 61, 63

*Podpeskar v. Makita U.S.A. Inc.*,
    247 F. Supp. 3d 1001 (D. Minn. 2017)....................................................... 59

*In re Pork Antitrust Litig.*,
    No. 18-cv-1776 (JRT/LIB), 2019 WL 3752497 (D. Minn. Aug. 8, 2019)........... *passim*

*In re Possis Med., Inc. Sec. Litig.*,
    No. 05-CV-1084 (JMR/FLN), 2007 WL 335051 (D. Minn. Feb. 1, 2007)............. 2, 13

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    860 F.3d 1059 (8th Cir. 2017) .................................................................... 64

# TABLE OF AUTHORITIES
### (continued)

**Cases – continued**                                                    **Page(s)**

*In re Pre-Filled Propane Tank Antitrust Litig.*,
   893 F.3d 1047 (8th Cir. 2018) .......................................................... 9, 18, 67

*In re Refrigerant Compressors Antitrust Litig.*,
   92 F. Supp. 3d 652 (E.D. Mich. 2015)........................................................ 63

*Ripplinger v. Amoco Oil Co.*,
   916 F.2d 441 (8th Cir. 1990) ...................................................................... 59

*Schumacher v. Cargill Meat Sols. Corp.*,
   515 F.3d 867 (8th Cir. 2008) ........................................................... 8, 44, 50

*Shoemaker v. Cardiovascular Sys., Inc.*,
   No. 16-CV-568 (DWF/KMM), 2017 WL 1180444 (D. Minn. Mar. 29, 2017) .... 13, 16

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
   277 F. Supp. 3d 521 (S.D.N.Y. 2017)........................................................ 56

*Stahl v. U.S. Dep't of Agric.*,
   327 F.3d 697 (8th Cir. 2003) ...................................................................... 9

*Summerhill v. Terminix, Inc.*,
   637 F.3d 877 (8th Cir. 2011) ............................................................... 58, 59

*Tatone v. SunTrust Mortg., Inc.*,
   857 F. Supp. 2d 821 (D. Minn. 2012)........................................................ 22

*Terry v. Tyson Farms, Inc.*,
   604 F.3d 272 (6th Cir. 2010) ...................................................................... 50

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ...................................................................... 67

*In re Tyson Foods, Inc. Sec. Litig.*,
   275 F. Supp. 3d 970 (W.D. Ark. 2017)........................................................ 39

*Washington Cty. Health Care Auth. Inc. v. Baxter Int'l Inc.*,
   328 F. Supp. 3d 824 (N.D. Ill. 2018) ........................................................ 36

*Wheeler v. Pilgrim's Pride Corp.*,
   591 F.3d 355 (5th Cir. 2009) ...................................................................... 51

# TABLE OF AUTHORITIES
## (continued)

**Cases – continued**                                                               **Page(s)**

*In re Wholesale Grocery Prods. Antitrust Litig.*,
  722 F. Supp. 2d 1079 (D. Minn. 2010) ........................................................................ 63

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971) ...................................................................................................... 58

**Statutes**

Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ................................................................ 1

    7 U.S.C § 13(a)(2) ........................................................................................................ 53

    7 U.S.C. § 25(a)(1) ................................................................................................ 54, 56

    7 U.S.C. § 25(c) ........................................................................................................... 58

Packers & Stockyards Act, 7 U.S.C. § 181 *et seq.* ............................................................ 1

    7 U.S.C. § 192 ............................................................................................................. 50

    7 U.S.C. § 192(e) ........................................................................................................ 52

7 U.S.C. § 1638 ................................................................................................................ 34

Sherman Act, 15 U.S.C. § 1 *et seq.* ................................................................................... 1

    15 U.S.C. § 1 .............................................................................................................. 10

    15 U.S.C. § 15b ........................................................................................................... 58

Consolidated Appropriations Act of 2016,
  Pub. L. No. 114-113, 129 Stat. 2242 (2015) ............................................................... 33

**Rules & Regulations**

17 C.F.R. § 180.1 .............................................................................................................. 53

17 C.F.R. § 180.2 .............................................................................................................. 53

17 C.F.R. § 229.303(a)(3)(ii) ........................................................................................... 45

Fed. R. Civ. P. 9(b) .............................................................................................. 55, 58, 59

## TABLE OF AUTHORITIES
### (continued)

**Rules & Regulations – continued**                                    **Page(s)**

Fed. R. Civ. P. 12(b)(6) ................................................................. 8

Fed. R. Evid. 404(b)(1) ................................................................. 43

**Other Authorities**

Cattle Buyers Weekly, *Top 30 Beef Packers Annual Reports, 2008-2018* ................ 25, 26

CME Grp., *Livestock*, https://www.cmegroup.com/trading/agricultural/#livestock ......... 57

H.R. Rep. No. 85-1048 (1957) ........................................................ 50

Ltr. from Bill Bullard, CEO, R-CALF, to Sen. Charles E. Grassley,
Chairman of the Sen. Comm. on the Jud. (Jan. 5, 2016),
https://perma.cc/Z5U4-948P ...................................................... 62, 66

Lynch, David. J, *"America First" May Be Last Hope for These Cattle
Ranchers*, Wash. Post (May 3, 2019) ............................................... 34

Muth, Mary K. *et al.*, *Differences in Prices and Price Risk Across
Alternative Marketing Arrangements Used in the Fed Cattle Industry*,
33 J. Agric. & Res. Econ. 118 (2008) ............................................. 46

Nat'l Cattlemen's Beef Ass'n, *About*, https://www.ncba.org/about.aspx ........................ 41

Poulot, Sebastian & Daniel A. Sumner, *Differential Impacts of Country of
Origin Labelling:  COOL Econometric Evidence from Cattle Markets*,
49 Food Policy 107 (2014) ......................................................... 46

Restatement (Second) of Contracts (Am. Law. Inst. 1981) .............................. 30

Rutherford, Burt, *Increase in U.S. Packing Capacity Is Good News for the
Beef Business*, Beef Magazine (Feb. 2, 2015) ...................................... 6

Tyson Foods, Inc., *Q2 2014 Earnings Call Transcript*, Seeking Alpha
(May 5, 2014) ..................................................................... 44

U.S. Gov't Accountability Off., GAO-18-296, *U.S. Department of
Agriculture:  Additional Data Analysis Could Enhance Monitoring of U.S.
Cattle Market* (Apr. 2018), https://www.gao.gov/assets/700/691178.pdf ............ *passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Other Authorities – continued**                                    **Page(s)**

USDA Econ. Research Serv., *Historical Monthly Price Spread Data for Beef,*
   *Pork, Broilers* (Feb. 28, 2019), https://www.ers.usda.gov/webdocs/
   DataFiles/52160/history.xls ........................................................................ 48

USDA Econ. Research Serv., *Livestock Prices* (Oct. 28, 2019)
   https://www.ers.usda.gov/webdocs/DataFiles/51875/LivestockPrices.xlsx ............... 48

**INTRODUCTION**

Common sense – and economic theory – dictate that commodity prices follow the law of supply and demand.  So when fed cattle prices hit a historic peak in late 2014, driven in large part by reduced supply (caused by a significant drought), the market responded as expected.  Producers increased the supply of fed cattle, and fed cattle prices fell accordingly.

Plaintiffs, producers who raise fed cattle and two organizations that represent them, refuse to accept that ordinary market forces responded to correct an extraordinary market situation.  Instead, Plaintiffs dream up an elaborate scheme in which Defendants purportedly agreed to suppress cattle prices in response to the historically high prices.  Plaintiffs allege that Defendants colluded in five ways:  by reducing slaughter volumes; curtailing fed cattle purchases in the cash market; coordinating procurement practices; uneconomically importing fed cattle; and reducing slaughter capacity.

That conspiracy, Plaintiffs allege, violated the Sherman Act, 15 U.S.C. § 1 *et seq.*; the Packers and Stockyard Act, 7 U.S.C. § 181 *et seq.* (PSA); and the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* (CEA).  Plaintiffs make these allegations even though they acknowledge that the federal government investigated the fall in fed cattle prices and attributed that fall to market forces, and not anticompetitive behavior.  U.S. Gov't Accountability Off., GAO-18-296, *U.S. Department of Agriculture:  Additional Data Analysis Could Enhance Monitoring of U.S. Cattle Market* 16 (Apr. 2018) (GAO Report), https://www.gao.gov/assets/700/691178.pdf.

1

To plead an antitrust conspiracy, a plaintiff must provide direct evidence of an unlawful agreement or point to facts showing that the defendants acted in parallel along with facts that tend to exclude the possibility that the defendants acted independently. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). After all, that companies in an industry might take similar actions in response to market conditions – *i.e.*, engage in parallel conduct – does not mean that they have conspired to do so. Courts carefully scrutinize antitrust conspiracy claims because discovery in antitrust cases is "inevitably costly and protracted." *Id*. at 558 (internal quotation marks omitted).

Even after amending their complaint, Plaintiffs still do not come close to alleging facts necessary to support their claim of a massive conspiracy in the beef industry. The Second Consolidated Amended Class Action Complaint (ECF No. 125) (SAC) still does not provide any plausible direct evidence of a conspiracy; still does not sufficiently allege parallel conduct; and still does not plead additional facts suggesting that any Defendant's conduct was due to a conspiracy. And because all of Plaintiffs' claims depend on the claimed conspiracy, they all fail as a matter of law.

**The alleged confidential witnesses do not show a conspiracy.** Plaintiffs claim that two confidential witnesses provide direct evidence of a conspiracy. Plaintiffs fail to describe each witness "with sufficient particularity," and as a result, the Court cannot determine whether it is plausible that "a person in the position occupied by the source would possess the information alleged." *In re Possis Med., Inc. Sec. Litig.*, No. 05-CV-1084 (JMR/FLN), 2007 WL 335051, at *4 (D. Minn. Feb. 1, 2007) (internal quotation marks omitted); *see In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1013 (E.D.

2

Mich. 2010) (confidential witnesses must be "sufficiently identified" before their allegations are taken as true).

Even after amending their complaint, Plaintiffs still provide almost no particulars about the confidential witnesses. The complaint does not name the witnesses or the companies for whom they worked. And the complaint admits that the witnesses do not have personal knowledge to support their claims; the witnesses rely only on statements from other, unnamed individuals and their own speculation. Defendants asked Plaintiffs for basic identifying information about the confidential witnesses, and Plaintiffs refused to provide it by letter or through additional allegations in their amended complaint. The Court should not allow this case to proceed to discovery on such barebones allegations, particularly when Plaintiffs have had multiple opportunities to provide additional information.

Even if credited, the confidential witness allegations would not support the claim of a conspiracy. Witness 1 claims that Defendants agreed to cut production, but he does not identify when any Defendant cut production, how, or to what extent, or when and how Defendants entered into the supposed agreement. Witness 2 claims that Defendants enforced a "queuing convention" for bidding on cattle – a term Plaintiffs appear to have made up – but the only example he provides shows that some Defendants did not even adhere to the supposed convention. And the bidding practices he describes are not anticompetitive in the first place.

**Plaintiffs fail to plead parallel conduct of a type and nature sufficient to support a conspiracy.** It simply is not enough to plead "industry-wide data" and then ask

a court to assume that each defendant behaved in accordance with those industry trends, rather than alleging specific actions taken by specific defendants. *In re Pork Antitrust Litig.*, No. 18-cv-1776 (JRT/LIB), 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019). Yet that is precisely what Plaintiffs have done. They provide defendant-specific allegations for only two of the actions (periodic slaughter reductions and plant closings) and rely on group pleading for the rest.

None of the allegations shows that Defendants acted in parallel. For example, the complaint alleges that each Defendant reduced fed cattle slaughter during the period of the alleged conspiracy. But the complaint actually shows that each Defendant *increased* its slaughter volumes during the supposed conspiracy, and that there is no discernible pattern to their conduct. The complaint also alleges that Defendants collectively closed five slaughter plants. But four of the five plant closings occurred before the alleged conspiracy began. And the complaint acknowledges that the closures were not done in parallel; that they can be explained by lawful market reasons; and that some Defendants expanded their plants during the supposed conspiracy.

All of the actions that Plaintiffs claim Defendants took to further the conspiracy either are directly contradicted by other allegations in the complaint or are consistent with lawful competition. For example, Plaintiffs claim that Defendants reduced their purchases of cash cattle during the conspiracy. The complaint provides only industry-wide data, and it admits that cash cattle purchases actually increased during the alleged conspiracy.

**Plaintiffs fail to plead plus factors or other evidence suggesting a conspiracy.** In addition to failing to allege parallel conduct, Plaintiffs' claims also fail because their

asserted plus factors do not support an inference that Defendants colluded with one another. Of Plaintiffs' eight asserted plus factors, four describe market characteristics (industry concentration, inelastic supply and demand, relative bargaining power, and barriers to entry) that simply show a concentrated market, not a conspiracy.

Plaintiffs' other four asserted plus factors (similar cost structures, opportunities to collude, prior conduct, and public statements) all are consistent with lawful competition. For example, Plaintiffs point to two Defendants' public statements about the industry. But the complaint does not link those statements – which do not mention any other Defendants – to any specific actions taken by any Defendant. Those types of general industry statements do not support a claim of conspiracy. *In re Pork*, 2019 WL 3752497, at *9.

**Plaintiffs' other claims fail because they are derivative of the antitrust claim and for additional, independent reasons.** Plaintiffs' claims under the PSA and the CEA rest on the same conspiracy as Plaintiffs' Sherman Act claims, and they should be dismissed for the same reasons. They also fail for independent reasons. In the PSA claim, Plaintiffs complain about the use of marketing agreements in the cattle industry. But those agreements are completely lawful, not anticompetitive. *See IBP, Inc. v. Glickman*, 187 F.3d 974 (8th Cir. 1999); *Pickett v. Tyson Fresh Meats, Inc.*, 315 F. Supp. 2d 1172 (M.D. Ala. 2004), *aff'd*, 420 F.3d 1272 (11th Cir. 2005). The CEA claims fail because Plaintiffs do not allege a key element of those claims – a net loss on specific commodities transactions due to the supposed conspiracy.

**Plaintiffs' claims are untimely.** All of Plaintiffs' claims are time-barred. Plaintiffs filed their first complaint in this case more than four years after the start of the alleged

conspiracy.  The statutes of limitations for each of their claims is four years or less.  In an attempt to get around this problem, Plaintiffs assert fraudulent concealment – but the complaint does not allege the necessary predicates for it.  Nothing here was concealed.  The complaint relies almost exclusively on publicly-available data, and Plaintiffs have been publicly accusing Defendants of this conspiracy for years.  Plaintiffs also invoke the continuing violation doctrine, but in the antitrust context, they cannot recover for harms that were allegedly incurred outside the statutory period.

**Plaintiffs cannot fix the flaws in the complaint by repleading their claims (again).**  Even after a substantive amendment, the complaint is full of factual allegations that either directly contradict Plaintiffs' claims or undercut the claim of a conspiracy by providing "obvious alternative explanation[s]" for the fall in prices.  *McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (internal quotation marks omitted).

The gravamen of Plaintiffs' claims is that because fed cattle prices fell starting in 2015, Defendants must have been colluding.  Plaintiffs rely on Figure 4 in their complaint, which shows the fall in prices.  But looking at prices in the broader context, the fall in prices is unremarkable, because prices had been building to a historic peak.  This is clear from an expanded version of Figure 4, which uses the same data from the U.S. Department of Agriculture (USDA) to show fed cattle prices starting in 2000:

*Figure 1:  Plaintiffs' Figure 4 – "Fed Cattle Prices vs. Retail Beef Prices," expanded to January 2000*



The complaint itself acknowledges *why* prices reached the historic high (drought and strong beef demand), and why prices fell (the drought ended, the fed cattle supply increased, and demand for domestic fed cattle decreased).

Those obvious alternative explanations are why Plaintiffs' allegations of packer collusion already have been rejected many times.  At the urging of one of the Plaintiffs, the General Accounting Office studied what caused the drop in fed cattle prices in 2015.  The GAO investigated for two years, reviewing "economic and other market data," including "transaction data on . . . packer . . . purchases of fed cattle," GAO Report 28 – the same evidence on which Plaintiffs rely.  The GAO then issued a 56-page report concluding that the fall in prices was caused by market forces such as "drought, costs for feed, and the price of substitute proteins," and not anticompetitive behavior by packers.  *Id.* at 12-14, 16.  Over the years, Plaintiffs have filed other lawsuits alleging similar claims, and courts repeatedly have rejected their allegations of wrongdoing against packers in the U.S. beef market.  *See,*

*e.g.*, *Schumacher v. Cargill Meat Sols. Corp.*, 515 F.3d 867 (8th Cir. 2008); *IBP, Inc.*, 187 F.3d 974; *In re Beef Indus. Antitrust Litig. MDL Docket No. 248*, 907 F.2d 510 (5th Cir. 1990); *In re Beef Indus. Antitrust Litig. MDL Docket No. 248*, 710 F.2d 216 (5th Cir. 1983).

Plaintiffs want a return to the historically high prices for fed cattle. But the antitrust laws do not require that outcome. Defendants were allowed to offer cattle producers less money when the supplies of cattle increased. The fact that Defendants took ordinary, common-sense actions in reaction to market forces does not permit an inference that they conspired together to do so. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1037 (8th Cir. 2000) (en banc) ("[W]here there is an independent business justification for the defendant[s'] behavior, no inference of conspiracy can be drawn.").

Plaintiffs have had years to build a case, and they have already amended the complaint after being advised of these substantive concerns. But their amended complaint still plainly is deficient. There is no reason to believe that Plaintiffs' claims are going to become plausible with repleading. The Court therefore should dismiss all of Plaintiffs' claims with prejudice.

## LEGAL STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "sufficient factual matter" that if "accepted as true" "'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Instead, the complaint must plead facts that tend to support the claim of unlawful behavior. A complaint that "pleads

facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

To meet that standard, plaintiffs pleading an antitrust conspiracy must plead "factual content" – such as the "relevant individuals, acts, and conversations" – that "raise a right to relief above the speculative level." *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1056-57 (8th Cir. 2018) (citations and internal quotation marks omitted). The allegations must be specific to the defendants; plaintiffs cannot plead industry-wide trends and ask the court to speculate that the defendants contributed to those trends. *In re Pork Antitrust Litig.*, No, 18-cv-1776 (JRT/LIB), 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019). The court also considers "whether there are lawful, 'obvious alternative explanation[s]' for the alleged conduct." *McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 682).

In determining whether plaintiffs have pleaded facts sufficient to support an inference of unlawful conduct, the court may look to the complaint itself and to documents attached to or incorporated by reference in the complaint. *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459-60 (8th Cir. 2010); *see Twombly*, 550 U.S. at 568 n.13. The court also may consider items in the public record. *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003).

Courts are particularly vigilant about "weeding out meritless antitrust claims at the pleading stage." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (internal quotation marks omitted). That is because of the "unusually high cost of discovery in antitrust cases" coupled with the "limited success of judicial supervision in

checking discovery abuse." *Id.* (internal quotation marks omitted). Thus, while it "is one

thing to be cautious before dismissing an antitrust complaint in advance of discovery," it

is "quite another to forget that proceeding to antitrust discovery can be expensive."

*Twombly*, 550 U.S. at 558.

## ARGUMENT

## I.   PLAINTIFFS FAIL TO PLEAD A VIOLATION OF THE SHERMAN ACT (COUNT I)

Plaintiffs fail to plead an antitrust conspiracy, and without a conspiracy, all their

claims fail.  To make out a claim under Section 1 of the Sherman Act, "a plaintiff must

demonstrate (1) that there was a contract, combination, or conspiracy; (2) that the

agreement unreasonably restrained trade under either a *per se* rule of illegality or a rule of

reason analysis; and (3) that the restraint affected interstate commerce." *Insignia Sys., Inc.*

*v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009) (internal

quotation marks omitted); *see* 15 U.S.C. § 1.  Because the "hallmark of [a] conspiracy is

agreement," *Buetow v. A.L.S. Enters. Inc.*, 564 F. Supp. 2d 1038, 1041 (D. Minn. 2008)

(internal quotation marks omitted), the plaintiff "must demonstrate that the defendants

shared a unity of purpose or a common design and understanding, or a meeting of the

minds," *Insulate SB, Inc. v. Advanced Finishing Sys.*, 797 F.3d 538, 543 (8th Cir. 2015)

(citation and internal quotation marks omitted).

A plaintiff alleging an antitrust conspiracy can plead direct evidence of an

agreement, or can plead that the defendants acted in parallel and that there is "substantial

additional evidence – often referred to as 'plus factors'" – that tends to exclude the

possibility that the defendants were acting lawfully. *In re Pork Antitrust Litig.*, No. 18-cv-1776 (JRT/LIB), 2019 WL 3752497, at *6 (D. Minn. Aug. 8, 2019) (internal quotation marks omitted); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). For a plaintiff proceeding without direct evidence, pleading parallel conduct is necessary but not sufficient. Defendants taking similar actions at the same time does not establish that they agreed to take those actions in order to restrain trade. *Insulate SB, Inc.*, 797 F.3d at 544; *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988). "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *see Twombly*, 550 U.S. at 554.

Plaintiffs have failed to plead the necessary facts to sufficiently allege an antitrust conspiracy. First, the allegations from the two confidential witnesses do not plausibly support the allegation that Defendants agreed to conspire. Second, the complaint's few defendant-specific allegations actually undercut the broader allegations of parallel conduct, and all of the conduct alleged is consistent with lawful conduct. Third, Plaintiffs' asserted plus factors do not suggest that the alleged parallel conduct was part of a conspiracy, rather than independent, lawful conduct. Even though this Court provided significant guidance in *Pork*, and Defendants pointed out the problems with Plaintiffs' allegations in the previous motion to dismiss, Plaintiffs still have not pleaded an antitrust conspiracy.

A. **The confidential witness allegations do not provide sufficient direct evidence of a conspiracy**

Plaintiffs rely on the statements from two unnamed confidential witnesses, but those statements do not support Plaintiffs' claim of an antitrust conspiracy. Witness 1 is a "former employee" of an unnamed Defendant, at an unnamed plant, whose "employment ceased in 2018." SAC ¶ 90. Plaintiffs allege that Witness 1 heard from a fabrication manager at his plant about an "agreement" between Defendants to cut cattle slaughter volumes. *Id.* ¶¶ 95-96.

Witness 2 is a "former feedlot manager, who managed a 35,000 head commercial feedlot in the Panhandle region from 2012 until early 2016." SAC ¶ 111. He claims that Defendants coordinated cattle purchases through what Plaintiffs call a "queuing convention." *Id.* ¶ 115. Under the alleged convention, Defendants withdrew offers that producers did not accept right away (instead of leaving those offers open while producers sought better offers from other packers, as the producers would prefer) and required producers to give the first high bidder on a pen of cattle the right to buy at that price. *Id.* ¶¶ 115-20.

The confidential witness allegations do not plausibly suggest a conspiracy. The confidential witnesses are not identified with sufficient particularity so the Court can determine whether their allegations are plausible. The allegations also do not support a reasonable inference of conspiracy; in fact, they are undercut by other facts alleged in the complaint.

### 1.    Plaintiffs do not sufficiently identify the confidential witnesses

"Courts are understandably wary of 'testimony' by unidentified 'witnesses.'" *In re Possis Med., Inc. Sec. Litig.*, No. 05-CV-1084 (JMR/FLN), 2007 WL 335051, at *4 (D. Minn. Feb. 1, 2007) (internal quotation marks omitted).  A confidential witness "may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, [or] may even be nonexistent." *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013).  A plaintiff who relies on a confidential witness therefore must provide sufficient identifying information so that the court can determine whether a "person in the position occupied by the source would possess the information alleged." *In re Possis Med., Inc.*, 2007 WL 335051, at *4 (internal quotation marks omitted); *see Shoemaker v. Cardiovascular Sys., Inc.*, No. 16-CV-568 (DWF/KMM), 2017 WL 1180444, at *8 (D. Minn. Mar. 29, 2017) ("Recognizing that confidential witnesses could have a variety of reasons for speaking to plaintiff's counsel, courts routinely evaluate and disregard the statements on a motion to dismiss." (citation omitted)).  In other words, confidential witnesses must be "sufficiently identified" before their allegations can be accepted as true. *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1013 (E.D. Mich. 2010).[1]

---

[1]  Nearly all of the decisions involving confidential witness statements at the motion-to-dismiss stage are securities fraud cases subject to heightened pleading requirements.  Those decisions nonetheless are instructive, because a plaintiff always must provide enough identifying information so that the court can evaluate the plausibility of the witness's allegations.

Plaintiffs do not provide that necessary information.  The complaint does not include Witness 1's name, the name of his former employer, or the name or location of his former processing plant.  All the complaint says is that the plant was somewhere in the Texas Panhandle region.  SAC ¶ 96.  The complaint also admits that Witness 1 is a "former employee" whose "employment ceased in 2018," *id.* ¶ 90 – so he therefore is a person who might be "acting from spite rather than knowledge," *City of Livonia*, 711 F.3d at 759.

The complaint makes clear that Witness 1's information is a combination of at best double hearsay and his own speculation.  Witness 1 alleges that he learned about an alleged "agreement" from the plant's fabrication manager.  SAC ¶ 92.  But the allegations show that Witness 1 only is guessing as to who was involved in that agreement or which geographic area it covered.  The complaint conspicuously does not identify the fabrication manager or say that the manager told Witness 1 any of those details.  Witness 1 alleges only that he "*understood* that [the manager] was referring to at least all Packing Defendants' plants in the Panhandle Region," and that he "is certain that the Fabrication Manager *intended to convey* that all of the Packing Defendants were reducing their slaughter volumes by agreement."  *Id.* ¶¶ 96-97 (emphases added).

Further, the complaint does not identify the source of the fabrication manager's information or explain how he was in a position to know of an agreement by all Defendants. The manager "needed to be informed as to cattle buying, cattle slaughter, and beef selling" by the "head office"; he was not a company decision-maker who would have known about the supposed conspiracy involving all Defendants.  SAC ¶ 98.  The complaint says that the manager "interacted with personnel across [his employer's] business" and had "friends and

14

colleagues . . . at other Packing Defendant plants," but it does not say who those people were, what job titles they held, what information they provided, or how they would have known about the alleged conspiracy. *Id.* ¶¶ 98, 100. The Witness 1 allegations thus are unknowns on top of unknowns. The Court should not send this case into expensive antitrust discovery based on this chain of unidentified sources.

The allegations about Witness 2 similarly are insufficient. The complaint says that Witness 2 managed a feedlot from sometime in 2012 until "early 2016," SAC ¶¶ 119, 125, but it does not provide Witness 2's name or identify the feedlot where he worked. Further, Witness 2, like Witness 1, primarily relies on other, unidentified sources, rather than his own personal knowledge. His purported information about Defendants "blackball[ing]" producers for not following what Plaintiffs call a "queuing convention" comes from unidentified "field buyers and other industry participants." *Id.* ¶ 120. The complaint does not provide the names of those field buyers or industry participants, the dates of those conversations, any facts to show that they were speaking from personal knowledge, or any explanation of how they were even in a position to enter into a conspiracy. So there is no way to judge the plausibility of those allegations.

*Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683 (E.D. Mich. 2010), and *In re Packaged Ice*, 723 F. Supp. 2d 987, highlight the problems with Plaintiffs' confidential witness allegations. In those two related cases, decided by the same district court judge, the judge rejected allegations similar to those made here. The first complaint raised securities fraud claims and the second complaint raised antitrust claims, and both relied in significant part on confidential witnesses. The *Chamberlain* complaint included

15

statements from four confidential witnesses that were intended to corroborate statements from a named whistleblower.  757 F. Supp. 2d at 690-91.  The court credited some of the testimony of the first three confidential witnesses because the complaint had included their employers, dates of employment, job titles, details of how the witnesses learned of the conspiracy, and specific details about the conspiracy, and because those witnesses' allegations were consistent with the named whistleblower's statements and with details in multiple unsealed guilty pleas.  *Id.* at 690-93, 704-06.

But the *Chamberlain* court disregarded the allegations of the fourth witness.  That witness's hearsay allegations are similar to Witness 1's allegations in this case:

> [The fourth witness] is a former Reddy Ice plant manager for one of Reddy Ice's large manufacturing facilities in Arizona from mid-2007 through late-2008.  According to [the fourth witness], he was told by other Reddy Ice employees that Reddy Ice and Arctic Glacier had "management meetings" during which a deal was struck whereby Arctic Glacier agreed to leave California while Reddy Ice agreed to stay out of Arizona.

*Chamberlain*, 757 F. Supp. 2d at 692.  Because the fourth witness's knowledge was "alleged to have been gained from 'other Reddy Ice employees' and 'co-workers,'" the court determined that the complaint offered an "insufficient basis . . . to provide the foundation for [his] testimony."  *Id*. at 705-06.  The court took the same tack with the antitrust complaint, crediting the allegations of two of the first three confidential witnesses, but not the fourth witness.  *See In re Packaged Ice*, 723 F. Supp. 2d at 1013-14.  Other judges have rejected similar confidential witness allegations that lack detail and are based on second-hand information.  *See, e.g.*, *Shoemaker*, 2017 WL 1180444, at *9 (disregarding confidential witness allegations that were "vague or based on second-hand knowledge");

16

*In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1069 (W.D. Wash. 2003) (disregarding confidential witness allegations that were "based on hearsay [and] [could] not be imputed to the Individual Defendants").

The complaint here provides even less detail about the confidential witnesses than the *Chamberlain* complaint did about the fourth confidential witness. That complaint at least identified the witness's employer, the facility in which he worked, and his dates of employment. *Chamberlain*, 757 F. Supp. 2d at 692. Here, the complaint identifies the job titles of Witnesses 1 and 2 but omits the names of their previous employers or the facilities where they worked (even though Plaintiffs no doubt have that information). Nor does the complaint explain how the witnesses (or the fabrication manager) could know about any agreement to collude or about the conduct of Defendants that did not employ them. Their allegations stand alone; they are not supported by any guilty pleas, statements from other whistleblowers or witnesses, or other data. These witnesses are not "speaking from personal knowledge," but instead are much more likely to be "merely regurgitating gossip and innuendo." *In re Metawave Commc'ns Corp.*, 298 F. Supp. 2d at 1068 (internal quotation marks omitted).

Defendants sent Plaintiffs a letter requesting that Plaintiffs provide the names of, or other identifying information about, those witnesses. *See* Ltr. from Mark W. Ryan, Mayer Brown, to Patrick McGahan, Scott & Scott 1 (Aug. 8, 2019) (attached as Exhibit A). Plaintiffs' counsel refused, stating that Defendants had not identified any authority requiring Plaintiffs to provide that information "at this stage of the litigation, or indeed, at any stage of the litigation." Ltr. from Patrick McGahan, Scott & Scott, to Mark W. Ryan,

17

Mayer Brown 1 (Aug. 12, 2019) (attached as Exhibit B). Then, after Defendants filed a motion to dismiss pointing out the problems with the confidential witness allegations, Plaintiffs filed an amended complaint, but they still did not provide the critical identifying information. Plaintiffs have not offered any reason as to why they must keep the witnesses confidential. Neither confidential witness is a current employee of any Defendant, SAC ¶¶ 90, 111, and the complaint does not allege that either could be the subject of retaliation.

Because the complaint fails to provide sufficient identifying information about the confidential witnesses for the Court to assess the plausibility of their allegations, the Court should disregard those anonymous allegations.

## 2. The confidential witness allegations do not support a conspiracy

Even if credited, the confidential witness allegations fail to provide sufficient "factual content" to support the "reasonable inference" of a conspiracy. *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1057 (8th Cir. 2018) (internal quotation marks omitted).

Witness 1 alleges that Defendants "had an 'agreement' to reduce their purchase and slaughter volumes" (the first alleged means of executing the conspiracy). SAC ¶ 93. He does not describe what slaughter reductions were agreed upon and when; how and when the individual Defendants implemented those reductions; or how long those reductions lasted. The allegations make clear that he does not have personal knowledge of which (if any) Defendants were part of the alleged agreement, or what geographic area was covered by the agreement. *Id.* ¶ 96.

18

Further, Witness 1 appears to be unsure whether any reductions even were due to a conspiracy. He claims that the plant he worked at "might" have dropped its slaughter levels as part of the alleged agreement, and he does not allege how other Defendants implemented the purported agreement. SAC ¶ 103. All the complaint says is that "[p]ublic reports indicate" that Defendants reduced their slaughter volumes seasonally – but the complaint does not allege any specific reductions. *Id.* ¶ 104. And anyway, seasonal reductions are consistent with lawful behavior; packers generally must balance slaughter levels with beef demand.

Witness 1's vague and conclusory allegations do not show the agreement necessary for a conspiracy. "Allegations of direct evidence of an agreement" must be "sufficiently detailed." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323-24 (3d Cir. 2010). That means identifying, among other things, "the contours of the alleged agreement[]" – *i.e.*, the "specific time, place, [and] person involved in the alleged conspirac[y]." *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 209 (S.D.N.Y. 2019) (internal quotation marks omitted). Here, Witness 1 provides no such detail. He does not specify when the conspiracy was formed, where it was formed, or who formed it and what they agreed to do. And he appears to be speculating as to which Defendants were involved in the supposed agreement. *See, e.g.*, *In re Metawave Commc'ns Corp.*, 298 F. Supp. 2d at 1069 (dismissing a confidential witness's allegations as "merely opinion, or vague").

*In re GSE Bonds Antitrust Litigation*, 396 F. Supp. 3d 354 (S.D.N.Y. 2019), is instructive. There, the court concluded that allegations similar to those made here were insufficient to plead collusion. In that case, plaintiffs alleged that banks were colluding to

fix the price of government bonds. To support that allegation, they pointed to chat room logs in which employees of some of the banks discussed price-fixing. *Id*. at 358-59. The whistleblower who provided the chat-room logs alleged that other banks were involved in the conspiracy, but he did not provide "any specifics" of their involvement. *Id*. at 364. The district court concluded that the chat room logs were direct evidence of a conspiracy with respect to the banks that appeared in those logs, but that the whistleblower's "unadorned" assertion that other banks were involved was insufficient to tie those banks to the alleged conspiracy. *Id*.

The same principle applies here. Witness 1 (who, unlike the whistleblower in *GSE Bonds*, claims no personal knowledge of any conspiracy) provides only an unadorned assertion that Defendants supposedly were involved in the alleged conspiracy, without any specifics. Witness 1's statement is not evidence that any Defendant was involved in a conspiracy. At best, it is "generalizations as to . . . defendants as a group," which "cannot salvage the pleading." *In re GSE Bonds*, 396 F. Supp. 3d at 363-64 (internal quotation marks omitted).

Witness 2's allegations similarly do not support a conspiracy. Witness 2 alleges that Defendants "enforced" a "queuing convention" for buying cattle (the third means of executing the alleged conspiracy). He claims that this was a practice in which Defendants withdrew offers if producers passed on them (instead of leaving the offers open while producers shopped for better offers) and required producers to give the first high bidder a right of first refusal to buy at that price (so that if another packer matched that bid, the producer had to offer the cattle to the first bidder at that price). SAC ¶¶ 115-23.

20

Witness 2 provides only one example of supposed enforcement of this practice, and it contradicts rather than supports his claim.   That incident allegedly occurred before Witness 2 "took over management of the feedlot in 2012," SAC ¶ 119 – well before the conspiracy supposedly began in 2015.   It therefore cannot be evidence of the claimed conspiracy.  *See Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1037 n.7 (8th Cir. 2000) (en banc).   And that lone example shows that Defendants did not uniformly enforce the "convention."   Witness 2 claims that two Defendants allegedly "stopped visiting [his] feedlot" because that feedlot had failed to follow the convention, but he admits that the other two Defendants continued to come to that feedlot and continued to bid on the feedlot's cattle, even after the feedlot supposedly had failed to comply with the convention.  SAC ¶ 119.

Witness 2 claims that he heard about other instances where Defendants enforced the convention from other unspecified "field buyers and other industry participants."   SAC ¶ 120.  But he provides no specifics.   Nor does he provide any specifics about any other aspect of the conspiracy, such as who was involved or how it was carried out.   So like Witness 1's allegations, Witness 2's allegations are vague and conclusory.   They do not support Plaintiffs' claim of massive collusion in the beef industry.

### B.    Plaintiffs fail to plead parallel conduct supporting the inference of a conspiracy

To show that Defendants acted in parallel, Plaintiffs must plead "specific information regarding each Defendant" showing parallel conduct supporting an alleged conspiracy.  *In re Pork*, 2019 WL 3752497, at *8.  Without defendant-specific allegations,

"the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted" in furtherance of the alleged conspiracy. *Id.*; *see, e.g.*, *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012); *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1020 (D. Minn. 1997), *aff'd*, 195 F.3d 430 (8th Cir. 1999). Those allegations must be "temporally proximate" to constitute parallel conduct. *In re Pork*, 2019 WL 3752497, at *8.

Plaintiffs cannot meet that standard by simply attributing industry-wide trends to each Defendant. That is because industry-wide data "does nothing to indicate how any of the individual Defendants acted." *In re Pork*, 2019 WL 3752497, at *8; *see, e.g.*, *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, No. 11-MD-2213(RPP), 2013 WL 1100770, at *4 (S.D.N.Y. Mar. 18, 2013), *aff'd*, 560 F. App'x 84 (2d Cir. 2014) (unpublished). The Court would have to "speculat[e]" that each individual Defendant took the actions alleged "seemingly simply because they make up the majority of the industry." *In re Pork*, 2019 WL 3752497, at *8.

Even though Plaintiffs have amended their complaint, the complaint still has the same problems as in *Pork*. In that case, the plaintiffs alleged that eight producers conspired to raise the wholesale and retail prices of pork. 2019 WL 3752497, at *2. They alleged that the pork producers colluded to limit pork production by "exchang[ing] detailed, competitively sensitive, and closely guarded non-public information" through Agri Stats, an industry bench-marking company. *Id.* This Court dismissed the complaint because the plaintiffs failed to plead facts showing that each defendant decreased pork production

during the conspiracy, let alone as part of an agreement. *Id.* at *8-9. A key problem was the lack of allegations linking each defendant to the supposed conspiracy. *Id.*

The allegations here are weaker than those dismissed in *Pork*. Plaintiffs allege Defendants colluded by periodically reducing slaughter volumes; curtailing fed cattle purchases in the cash market; coordinating procurement practices; uneconomically importing fed cattle; and reducing slaughter capacity. SAC ¶ 88. There is nothing tying these disparate actions together, the way Agri Stats allegedly did in *Pork*. The complaint here principally relies on industry-wide data. The complaint includes defendant-specific allegations for only two of the five actions, and those defendant-specific allegations actually show that Defendants did *not* act in parallel. And each of the five actions Defendants supposedly took as part of a conspiracy is equally consistent with normal, independent competitive behavior. Plaintiffs' conspiracy theory thus does not make "economic and factual sense" and should be dismissed. *Lerma v. Univision Commc'ns, Inc.*, 52 F. Supp. 2d 1011, 1025 (E.D. Wis. 1999).

1.     **Plaintiffs fail to plead that Defendants engaged in periodic slaughter reductions**

Plaintiffs claim that Defendants "all engaged in periodic and parallel slaughter reductions throughout the Class Period," while independent packers "increased their [slaughter] volume as a whole." SAC ¶¶ 10, 105. They rely on Witness 1's allegations and on Figures 2 and 3 in the complaint. *See id.* ¶¶ 89-107 & figs.2-3.

23

Those allegations do not support Plaintiffs' claim of coordinated periodic slaughter reductions.   As explained, Witness 1 provides no specifics of any alleged slaughter reduction.

Further, Figures 2 and 3 show that all Defendants increased, rather than decreased, their fed cattle slaughter volumes during the alleged conspiracy.   The two figures use the same data.  Figure 2 shows each Defendant's average yearly slaughter volume for 2007 to 2014 (the eight years before the alleged conspiracy) and average for 2015 to 2017 (the first three years of the conspiracy).   SAC ¶ 105 fig.2.   Figure 3 provides the same information with more detail about the years of the supposed conspiracy.   It shows average slaughter volumes for 2007 to 2014 and yearly slaughter volumes for 2015, 2016, and 2017:

*Figure 2:  Plaintiffs' Figure 3 – "Average Pre- & Post-Class Period Fed Cattle Slaughter – Packing Defendants vs Others"*



*Id.* ¶ 106 fig.3.  This figure shows that slaughter volumes actually increased during the supposed conspiracy; for each Defendant, the bar for 2017 (yellow) is higher than the bar for 2015 (orange).  The complaint admits this.  *See id.* ¶ 107 (acknowledging that Defendants "raised their slaughter levels . . . during the class period").  The figure also shows that Defendants' slaughter volumes varied in different ways; it does not show they acted in parallel to reduce slaughter volumes.

Figures 2 and 3 do not show that any Defendant reduced fed cattle slaughter volumes in 2015, the first year of the alleged conspiracy, much less that they did so in parallel. Figure 3 compares Defendants' 2015 slaughter volumes only to each Defendant's average slaughter volume for the eight-year period between 2007 and 2014 (the blue bars), not to 2014 volumes.  The data for 2014 is available in the source Plaintiffs cite, *see* SAC ¶ 163; why didn't they use it?  It is because the 2014 data does not fit their alleged conspiracy; it shows that Defendants did not all reduce their fed cattle slaughter volume from 2014 to 2015.  *See* Cattle Buyers Weekly, *Top 30 Beef Packers Annual Reports, 2008-2018* (*CBW Reports*) (showing that Cargill slaughtered 4.8 million head of fed cattle in 2015 compared to 4.7 million in 2014).[2]  That flatly contradicts Plaintiffs' claim that each Defendant "slashed its fed cattle slaughter levels in 2015."  SAC ¶ 107.  Plaintiffs try to get around this problem by claiming that Defendants "periodically" reduced slaughter volumes "in the short to medium run" but not the "long run."  *Id.*; *see id.* ¶¶ 156-63 (alleging that

---

[2]  Because the *CBW Reports* are not publicly available, the data is filed under seal as Exhibit C.

Defendants reduced slaughter volumes "during the second and third quarters of 2015"). But the complaint does not include any "short run" data, such as monthly or quarterly slaughter volumes for each Defendant, to support that claim.

The complaint also does not show that any Defendant's changes in fed cattle slaughter volumes paralleled any other Defendant's. Figure 3 shows the opposite. So does the following figure, which Defendants created from the data underlying Figures 2 and 3. This figure shows how each Defendant increased or decreased its fed cattle slaughter volume in 2015, 2016, and 2017, as compared to the previous year:

*Figure 3: Defendants' Year-on-Year Change in Fed Cattle Slaughter Volume*



(This figure was created using data from *CBW Reports*, cited in SAC ¶ 106 n.35). As this figure shows, there is no discernable pattern common to all Defendants; in every year at

least one Defendant did not act like the others.  The complaint's own allegations thus refute the claim that Defendants acted in parallel to reduce slaughter volumes.

Even if the complaint had shown periodic reductions in plant hours and production, that would be consistent with ordinary market behavior.  A plant's capacity is not a fixed number:  "Weekly plant capacity is determined not only by plant size, but by the number and length of shifts run in a given week."  SAC ¶ 78.  In determining how many shifts to run (and how long to run each one), plant managers consider the supply of fed cattle in the surrounding region (because significant transportation costs make it costly to purchase cattle from other regions), *see id.* ¶ 142, as well as other factors such as maintenance needs and available labor.  And because "[f]ed cattle availability varies seasonally," *id.* ¶ 72, seasonal reductions in slaughter volumes should be expected because sometimes fewer cattle are available.  In other words, a bare allegation that Defendants "periodically" reduced cattle slaughter is perfectly consistent with market realities and not at all indicative of a conspiracy.

Any periodic slaughter reductions also would be easily reversible, further undermining any inference of a conspiracy.  Reducing production by underusing machinery – essentially what Plaintiffs allege here – "is the kind of flexible behavior that is consistent with rational attempts to raise prices through watchful attention to one's competitors' actions."  *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938 (7th Cir. 2018).  Had the "[defendant's] efforts not paid off, it could have increased its output quickly."  *Id*.  For that reason, the fact that a company took an easily reversible step to cut

production does not support an inference that it participated in a conspiracy.  *Id.*  That is all the complaint alleges.

### 2.    Plaintiffs fail to plead that Defendants curtailed purchases of cash cattle

Plaintiffs allege that, while Defendants were slaughtering fewer cattle, they agreed to "drastically" reduce their purchases of fed cattle in the cash market.  SAC ¶ 108.  But there are no allegations identifying *any* specific Defendant's cash cattle purchases.  So the complaint does not show that any individual Defendant reduced its cash cattle purchases during the period of the alleged conspiracy.  If anything, the data in the complaint suggests the opposite.  Plaintiffs' Figures 13-15 indicate that after years of decline, the number of fed cattle purchased in the cash market increased in every region from 2015 to 2017 (during the alleged conspiracy).  *See id.* ¶ 132 figs.13-15. So these figures contradict Plaintiffs' allegations about Defendants agreeing to decrease purchases of cash cattle.

Further, buying fewer cash cattle during the time packers were slaughtering fewer cattle would be just as consistent with lawful competition as it would be with an unlawful conspiracy.  If packers were slaughtering fewer cattle, then they would need fewer cattle, and they likely would meet that goal by reducing their purchases in the cash market.  Over 70% of fed cattle are sold under marketing agreements, in which cattle producers commit to deliver their cattle once they achieve slaughter weight.  SAC ¶ 80.  If a beef packer needed fewer cattle in a given week, the most obvious place to reduce its purchases would be in the cash market, because unlike purchases made pursuant to marketing agreements, it has not already committed to making cash cattle purchases.

28

### 3. Plaintiffs fail to plead that Defendants coordinated procurement practices

Plaintiffs allege that Defendants engaged in a number of coordinated procurement practices.  Each of these practices is consistent with lawful competition.  Plaintiffs offer insufficient facts to show collusion.

**"Queuing Convention."**   Plaintiffs allege that Defendants imposed a "queuing convention" for buying certain types of cattle in certain parts of the country, and "blackballed" producers who did not comply with this convention.  SAC ¶¶ 115-23.  As explained, the complaint contains exactly one example of supposed blackballing, which occurred years before the alleged conspiracy and involved only two Defendants.  *Id.* ¶ 119.  Plaintiffs also admit the alleged queuing convention was not uniformly applied:  They say it was "more readily applied and enforced" in relation to bids for "live" cattle, in western Nebraska, Colorado, Kansas, Texas, Oklahoma, and New Mexico but did not apply (or was less readily enforced) with bids for "dressed" cattle in eastern Nebraska, Iowa, Minnesota, and southeastern South Dakota.  *Id.* ¶ 117.  And an "antiquated" practice that "evolved into its present form" sometime before "the 1950s," *id.* ¶¶ 115-16, hardly supports the inference of a conspiracy that allegedly began in 2015.

Further, the purported queuing convention, as alleged, reflects standard contract principles of offer and acceptance, and not anything nefarious.  As alleged, when a packer bids on a pen of cattle, the producer can accept the bid or pass on it.  SAC ¶ 115.  If the producer passes on the bid, it can seek a better price from other packers, and can accept or

reject any higher bid it receives. *Id.* If the producer receives a bid that is the same as the initial high bid, it must give the initial high bidder the chance to buy the cattle. *Id.*

There is nothing anticompetitive about this practice. Plaintiffs' attack on this practice is that a producer cannot "shop" each packer's bid – that is, that a producer cannot force a packer to keep its bid open indefinitely until the producer has decided which bid he wants to accept. SAC ¶¶ 115, 122. But it is basic contract law that an offeror has the right to rescind its offer at any time prior to the offeree's acceptance. *See, e.g.*, *McKie Ford, Inc. v. Sec'y of Labor*, 191 F.3d 853, 857 (8th Cir. 1999) ("It is, of course, well settled that a party may revoke an offer before acceptance."); *see also* Restatement (Second) of Contracts § 42 (Am. Law. Inst. 1981). And contrary to Plaintiffs' claims, SAC ¶ 115 n.42, this also is true in a standard auction, *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 60 (2d Cir. 1999). So packers are entitled to include immediate acceptance as part of their offers; no conspiracy is needed.

Plaintiffs also claim that the first packer to bid at a price has the right of first refusal if another packer offers the same price. SAC ¶ 115 & n.44. But they allege nothing about how this right of first refusal hurts price competition or injures Plaintiffs. They speculate that this gives Defendants "information relevant for monitoring compliance with collusively set prices," *id.*, but Plaintiffs have failed to allege price collusion in the first place and have not alleged any facts to show that such monitoring occurred.

The Eighth Circuit has upheld a similar "right of first refusal" in the cattle industry. *IBP, Inc. v. Glickman*, 187 F.3d 974, 977 (8th Cir. 1999). The court explained that such arrangements do not "ha[ve] the actual effect of suppressing or reducing competition" for

30

fed cattle.  *Id.*  Here,  the queuing convention alleged is even more procompetitive than the arrangement upheld in *IBP*:  The arrangement in *IBP* allowed the defendant to buy a pen of cattle by merely matching, rather than outbidding, a higher bid from another packer.  *Id.* at 976.

**Drawing Cards.**   Witness 2 alleges that unnamed field buyers for Tyson, JBS, Cargill, and National Beef jointly demanded that the first bidder for cattle at his feedlot be determined each week by drawing cards.  SAC ¶ 124.  It is unclear whether this alleged incident was during the period of the conspiracy; the complaint says it occurred "in late 2014 or early 2015."  *Id.*  This allegation does not suggest a conspiracy to reduce prices. Plaintiffs claim that without an agreement, packers would not agree to use a random draw to decide the first bidder, because packers would want to preserve their ability to outbid each other.  *Id*. ¶ 126.  But Plaintiffs do not explain how using a random draw to *start* the bidding affects each packer's ability to compete when, as Plaintiffs admit, other packers could offer higher bids than the opening bid.  *See id*. ¶ 125.  This practice apparently was nothing more than the field buyers trying to avoid the inconvenience of camping out at feedlots overnight to place the first bid.  *Id*. ¶ 126.

**Selective Bidding.**   Plaintiffs allege that only a single packer would solicit certain feedlots as part of a supposed "home-market" allocation scheme.  SAC ¶ 134.  The complaint provides no specific allegations of who did what when as a part of this scheme.

And in any event, this conduct would not be illegal.  It makes sense for packers to bid for cattle at feedlots near their processing plants, because in this industry transportation costs matter.  SAC ¶¶ 141-42.  The complaint acknowledges that in some regions,

"producers now only have one, or possibly two, slaughter plants to which they are able to sell their cattle" because of their distance from other plants. *Id.* ¶ 153. Plaintiffs offer no facts to suggest that any Defendant decided to bid at feedlots near its plants because of collusion, rather than for independent business reasons. In light of the sheer number of feedlots, it would not be surprising if each packer visits only a limited number of feedlots each week. *See* GAO Report 39 (indicating that there are over 2,400 feedlots with 1,000 head of cattle or more).

**"Backing Up" Cattle.** Plaintiffs also allege Defendants acted to "back up" cattle, meaning that they would refrain from buying cattle in certain regions for several weeks, so the prices of cattle in those regions would fall, and then they could buy cattle in those regions at the lower prices. SAC ¶ 135. There are no defendant-specific allegations about any purchases like this. Plaintiffs allege only "on information and belief" that, three times in 2016, Defendants reduced cattle purchases from one region when prices were high and increased cattle purchases when prices were low. *Id.* ¶¶ 136-40. In any event, buying cattle in regions with lower prices (as opposed to regions with higher prices) is exactly what rational economic actors would do. It does not indicate a collusive agreement.

**Friday Trades.** Finally, Plaintiffs allege Defendants made most of their weekly cash trades during a limited trading window on Friday, usually after the Chicago Mercantile Exchange closed. SAC ¶ 127. Again, they provide no allegations about any specific Defendant's cash trades. And Plaintiffs' claim does not make sense. The complaint alleges that this arrangement reduced competition for cash cattle bids because it prevented bid prices from being reported until the next trading day, *see id.*, but then

immediately contradicts that claim by alleging that packers' bids during the trading window are "quickly . . . circulated across the market via word-of-mouth and industry reporting," *id.* ¶ 128. Further, the complaint concedes that packers could (and did) bid higher prices for cash cattle outside of that window. *See id.* So the complaint entirely fails to allege how that arrangement was anticompetitive.[3]

### 4.      Plaintiffs fail to plead that Defendants uneconomically imported cattle

Plaintiffs allege that Defendants agreed to import cattle from Canada that were more expensive than domestic cattle, in order to suppress prices for domestic fed cattle. SAC ¶¶ 141-48. Plaintiffs do not allege who imported what, from where, for which plants, when, or at what cost – or that any particular imports were done pursuant to an agreement. All the complaint says is that cattle imports increased slightly in 2014. *Id.* ¶ 142 & fig.16. That is consistent with lawful activity. A packer with a plant near the Canadian border (such as Tyson's plant in Washington state, *id.* ¶ 147) may reasonably decide to import Canadian cattle rather than buy and transport cattle from farther away in the United States.

There is another obvious lawful explanation for increased imports. In 2016, Congress repealed the Mandatory Country of Origin Labeling (COOL) rule for beef. *See* SAC ¶ 203(h) & n.118; Consolidated Appropriations Act of 2016, Pub. L. No. 114-113,

---

[3] The complaint asserts that a Defendant would not wait until after the market closes to place bids without an agreement to do so, because that Defendant risks failing to secure a sufficient quantity of cattle. SAC ¶ 131. But the complaint elsewhere alleges that packers get over 70% of their cattle through marketing agreements, which meets the great majority of their needs, *id.* ¶ 80, and that the supply of fed cattle increased through 2015 and beyond, *id.* ¶ 173. In light of those facts, a Defendant rationally could decide to wait until after the market closed on Friday to place its bids without an anticompetitive agreement.

§ 759, 129 Stat. 2242, 2284-85 (2015) (amending 7 U.S.C. § 1638).  When the rule was in place, domestic feedlots could charge higher prices than foreign feedlots because of the premium paid for domestic beef.  *See* SAC ¶ 204 tbl.1; David J. Lynch, *"America First" May Be Last Hope for These Cattle Ranchers*, Wash. Post (May 3, 2019), https://perma.cc/7LQT-MQU8?type=image (R-CALF CEO's recognition of positive effect of labeling requirement on domestic fed cattle prices).  After the rule was repealed, foreign beef no longer had to be labelled as such.  That spurred additional imports and caused domestic cattle prices to fall.  The complaint concedes that one Defendant increased its imports from Canada after the Mandatory COOL repeal.  SAC ¶ 146 n.61.

Plaintiffs attempt to show uneconomical imports by constructing "trend lines" estimating the periods in which it would have been uneconomical to import Canadian cattle from Alberta to Nebraska.  *See* SAC ¶ 145 & fig.17.  That figure is all hypothetical – it is based on hypothetical shipping costs and hypothetical cattle prices, and it does not link those hypothetical costs and prices to any Defendant in this case.  An assertion is no less conclusory if it is presented in a figure rather than in words.

### 5.   Plaintiffs fail to plead that Defendants reduced slaughter capacity

Plaintiffs claim that "Defendants first sought to reduce demand through a series of plant closures."  SAC ¶ 150.  The complaint cites five instances of plant closures:

| Closure date | Defendant | Plant location | Capacity |
|---|---|---|---|
| February 2013 | Cargill | Plainview, TX | 4,000 head/day |
| June 2014 | National Beef | Brawley, CA | 2,000 head/day |
| August 2014 | Cargill | Milwaukee, WI | 1,300-1,400 head/day |
| September 2014 | Tyson | Cherokee, IA | Not pleaded |
| August 2015 | Tyson | Denison, IA | 2,000 head/day |

34

*Id.* ¶¶ 150-51.  The complaint also alleges that JBS "left the Nampa, Idaho plant it acquired in April 2013 closed throughout the class period," acknowledging that the plant already was closed when JBS bought it.  *Id.* ¶ 150.

The complaint's allegations of plant closures do not support Plaintiffs' claim, for five reasons:  (1) All but one of the closures occurred before the supposed conspiracy began; (2) the closures were not simultaneous with each other; (3) the closures did not occur on a predictable pattern or scale and were not tied to any other evidence of collusion; (4) two Defendants made capital investments during that period; and (5) a shortage of fed cattle provides an obvious, lawful explanation for the closures.

First, four of the five alleged plant closures occurred before the supposed conspiracy began.  According to the complaint, the conspiracy began in January 2015, SAC ¶ 1, but the first four alleged plant closures occurred before that date, *id.* ¶ 150.  So those plant closures cannot be evidence of the claimed conspiracy.  *See Blomkest Fertilizer, Inc.*, 203 F.3d at 1037 n.7 (act occurring "before the class contends the conspiracy ever began . . . is . . . of little relevance").

Second, these alleged closures occurred too far apart to be parallel conduct.  Over a year separated the first and second closures, and approximately another year separated the fourth and fifth closures.  That is not parallel conduct.  *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018) (holding that conduct "executed under dissimilar circumstances and separated by six months" did not permit an inference of parallel conduct); *In re Graphics Processing Units Antitrust Litig.*, 527 F.

35

Supp. 2d 1011, 1022 (N.D. Cal. 2007) (holding that a three-month separation did not show parallel conduct).

Third, the alleged closures did not occur in any pattern suggesting parallel conduct. The first closure reduced industry capacity by 4,000 head/day. SAC ¶ 150. Then, after more than a year, three more closures happened within three months, reducing capacity by an unpleaded amount. *Id.* ¶¶ 150-51. Nearly a year after that, the fifth plant closed, reducing capacity by 2,000 head/day. *Id.* ¶ 150. There is no discernible pattern to these closures, and Plaintiffs do not attempt to tie these closures to any evidence of collusion, such as a particular meeting or conversation. When acts do not "occur in a predictable pattern or scale," that "tends to undermine, rather than support, the notion that the defendants engaged in parallel conduct." *Washington Cty. Health Care Auth. Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 836-37 (N.D. Ill. 2018).

Fourth, Plaintiffs admit that some Defendants significantly *expanded* their slaughter capacity during the time period of the conspiracy. The complaint acknowledges that JBS expanded its plant in Hyrum, Utah, in 2015 and 2016, at a cost of $75 million, and that Tyson completed upgrading its plant in Dakota City, Nebraska, in April 2015. SAC ¶ 154; Burt Rutherford, *Increase in U.S. Packing Capacity Is Good News for the Beef Business*, Beef Magazine (Feb. 2, 2015) (cited in SAC ¶ 154 n.66). Presumably, if Defendants had conspired to reduce slaughter output, JBS and Tyson would not have completed these significant expansions while the conspiracy allegedly was ongoing.

Finally, these closures had an obvious lawful explanation. As Plaintiffs acknowledge, there was a "shortage of fed cattle" in 2013 and 2014 caused by a significant

drought.   SAC ¶ 8; *see* GAO Report 12 ("[F]rom 2010 through early 2013 a prolonged drought . . . caused the supply of young cattle to decrease"; the domestic cattle inventory "decreased from about 96.5 million in 2007 to about 88.5 million in 2014.").   In this industry, packers' margins directly depend on how well they utilize their plants.   The complaint acknowledges this.   SAC ¶ 78 (explaining that "average cost of production increases if [packers] underutilize their plant capacity").   So when fed cattle volumes fell, packers had a strong economic incentive to close underutilized and inefficient plants and concentrate their production into newer, more-efficient plants.

The complaint's Figure 18, reproduced below, shows the link between slaughter capacity and slaughter volumes.   In particular, in the part highlighted in the red box, it shows that the industry's fed cattle slaughter capacity (orange columns) decreased in 2013-2015, tracking the fall in fed cattle slaughter volumes (blue line):

*Figure 4:  Plaintiffs' Figure 18 – "Annual U.S. Fed Cattle Slaughter Capacity and Utilization Over Time"*



SAC ¶ 154 fig.18.   Figure 18 also shows that industry slaughter capacity increased from 2015 onward, during the period of the alleged conspiracy.   Plaintiffs claim that increase was due to two independent packers.   *Id.* ¶ 154.   But they recognize that some Defendants also increased plant capacity during that period.   *Id.*   Given these allegations, this figure does not show a reduction in slaughter capacity due to a conspiracy.

### C.   Plaintiffs fail to plead other facts supporting the inference of a conspiracy

Plaintiffs must not only plead parallel conduct; they must show an unlawful agreement, *i.e.*, facts indicating that Defendants' "behavior . . . would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."   *In re Pork*, 2019 WL 3752497, at *6 n.6 (quoting *Twombly*, 550 U.S. at 557 n.4).   "Where a complaint pleads facts that are merely *consistent with* a defendant's liability, it stops short of the line between possibility and plausibility" and thus should be dismissed.   *Id.* at *5 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (emphasis added).

### 1.   Plaintiffs do not allege sufficient plus factors

Because Plaintiffs do not plausibly plead parallel conduct, "no discussion of any 'plus factors' is necessary."   *Park Irmat Drug Corp.*, 911 F.3d at 517.   Plaintiffs' allegations of "plus factors" do not support a conspiracy in any event.

"[P]lus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."   *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015).   Examples of

plus factors include "a common motive to conspire"; evidence the "parallel acts were against the apparent individual economic self-interests of the alleged conspirators"; and "evidence of a high level of interfirm communications." *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 991 (W.D. Ark. 2017) (internal quotation marks omitted).

In the complaint, Plaintiffs allege eight plus factors.  SAC ¶¶ 179-89, 216-42.  Four of them address market characteristics and thus have no bearing on whether Defendants' conduct was conspiratorial.  The remaining four are consistent with ordinary competition and have been rejected by courts.

**Factors 1-4:  Market characteristics.**  Plaintiffs allege four characteristics of the fed cattle industry:  (1) the industry is concentrated, SAC ¶¶ 84, 216; (2) fed cattle supply and beef demand are somewhat inelastic, *id*. ¶¶ 217-18; (3) "the parties' relative bargaining power" creates market access risk, *id*. ¶¶ 219-22; and (4) there are high barriers to entry, *id*. ¶¶ 227-30.

These allegations merely describe a concentrated market, not evidence of a conspiracy.  *See In re Ins. Brokerage*, 618 F.3d at 322 (the fact that "defendants operate in an oligopolistic market . . . [is] legally insufficient" evidence of a conspiracy); *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1305 (N.D. Ga. 2002) ("[T]he 'nature of the market' is not a 'plus factor.'"), *aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003).  "[D]escriptions of the market . . . do not give rise to an inference of an unlawful agreement." *Erie Cty. v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012).

**Factor 5: Similar cost structures.** Plaintiffs allege that as "a result of their similar cost structures, Packing Defendants have a limited ability to steal market share from each other." SAC ¶ 231. But an allegation of similar cost structures actually undercuts the inference of a conspiracy. If competitors have similar costs, then the prices they charge (and their other conduct) "would naturally be similar without the need for any agreement." *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014). That is because each competitor "would be equally impacted by market variables, such as . . . labor costs, taxes, and unanticipated costs" and "would have the same incentive" to react to those market variables in the same way. *In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 WL 323219, at *15 (N.D. Ga. Jan. 28, 2009).

Similarly, Plaintiffs allege that Defendants reported "unheard of levels of profitability" in their beef businesses, with profit margins for three Defendants ranging from approximately negative 0.5% to 8% during the alleged conspiracy. According to Plaintiffs, those profits must have been due to a conspiracy. SAC ¶ 200 & fig.32. But in a "free capitalistic society, all entrepreneurs have a legitimate understandable motive to increase profits." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 229 (3d Cir. 2011) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 137 (3d Cir. 1999)). And "without a 'scintilla of evidence of concerted, collusive conduct,' this motive does not on its own constitute evidence of a 'plus factor.'" *Id.* (quoting *In re Baby Food*, 166 F.3d at 137).

**Factor 6:    Opportunities to collude.**    The complaint claims numerous "opportunities to collude," including trade association meetings, field buyer activities, and inter-competitor sales.  None plausibly amounts to a plus factor.

First, Plaintiffs allege that "Defendants' management and employees have regular opportunities to meet and collude through their membership in various trade and industry associations."  SAC ¶¶ 223-26.  But the complaint does not describe a single meeting or communication that occurred during any trade association meeting.  Nor does it list individuals who attended these meetings or explain how they had an opportunity to collude. And the complaint does not attempt to link the timing of any meeting with any actions taken in furtherance of the alleged conspiracy.  Time and again, courts have held that "belong[ing] to the same trade guild" does not establish a plausible inference of a conspiracy.  *Twombly*, 550 U.S. at 567 n.12; *see, e.g.*, *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1049 n.5 (D. Minn. 1992) ("A trade association is not a 'walking conspiracy' of its members.").  That is all Plaintiffs allege here.

Plaintiffs' allegations about cattle industry trade organizations are particularly unpersuasive because producers like Plaintiffs are members of at least one of the organizations listed in the complaint and obviously see value in those organizations. Specifically, the National Cattlemen's Beef Association (SAC ¶ 224) "represents more than 175,000 cattle producers and feeders."  Nat'l Cattlemen's Beef Ass'n, *About*, https://www.ncba.org/about.aspx (last visited Nov. 13, 2019).  It is not plausible to assert, without additional factual allegations, that Defendants used Plaintiffs' own trade organization to hatch a conspiracy aimed at harming Plaintiffs.

41

The complaint also alleges that "Defendants' field buyers' weekly trips to inspect the feedlots in their territories provide an opportunity to meet and exchange commercially sensitive information amongst each other." SAC ¶ 232. Again, there are no specifics – no communication or meeting where any discussion took place, and no allegations of the content of that discussion. The "mere opportunity to conspire" is "not necessarily probative evidence of [a] price-fixing conspiracy." *Blomkest Fertilizer, Inc.*, 203 F.3d at 1036. And anyway, individual field buyers would not be in a position within their companies to agree to a conspiracy. If the unidentified field buyers actually had exchanged commercially-sensitive information while inspecting feedlots, presumably Plaintiffs (many of which own feedlots) would have alleged specific examples of when those exchanges took place and between whom. They did not. Plaintiffs allege that Defendants' field buyers requested information from producers and drove by competitors' plants. SAC ¶¶ 233-34. That is just individual gathering of competitive intelligence, not agreeing to a massive antitrust conspiracy.

The complaint further alleges that Defendants "purchased beef produced by each other." SAC ¶ 235. Plaintiffs do not allege specific purchases or communications, or which companies or employees were involved. Nor they do explain how these purchases furthered the alleged conspiracy.

**Factor 7: Prior conduct.** Plaintiffs allege that Defendants are "recidivists with a history of collusion." SAC ¶¶ 237-42. This accusation is both irrelevant and false. Courts uniformly reject the "if it happened there, it could have happened here" argument. *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (per curiam) (internal

quotation marks omitted).  "A conspiracy elsewhere, without more, generally does not tend to prove a domestic conspiracy."  *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 403 (3d Cir. 2015).  Accordingly, courts do not use "'history of collusion' . . . as a plus factor."  *Holiday Wholesale Grocery Co.*, 231 F. Supp. 2d at 1305; *see, e.g.*, *Hinds Cty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009).  Indeed, that type of evidence generally would not be admissible at trial, *see* Fed. R. Evid. 404(b)(1), and perhaps even would be defamatory.

In any event, Plaintiffs' assertion of a "history of collusion" is wrong.  The *Broiler Chicken* civil cases are ongoing (and do not involve all of the Defendants in this case), SAC ¶¶ 238-41, as are the government investigations in that industry, *id.* ¶ 240 n.157.  This Court dismissed the *Pork* case (which also does not involve all of the Defendants here).  2019 WL 3752497, at *1.  The USDA's investigation into an August 2019 slaughter plant fire, SAC ¶¶ 179-83, similarly is irrelevant; there is no allegation that the investigation is related to the conspiracy asserted in this case.  In fact, the only inference to be drawn from these investigations is that it would be quite difficult to collude in an industry that is so closely watched by multiple federal and state agencies.

The so-called "history of other misconduct," SAC ¶ 242 & app. 2, does not relate to collusion in the U.S. beef market but instead relates primarily to alleged environmental and labor issues.  When Plaintiffs have tried to prove allegations of wrongdoing in the U.S.

beef market, they consistently have failed.[4]  And the GAO has thoroughly considered and rejected Plaintiffs' claims.  GAO Report 16.

**Factor 8:  Public statements.**  Plaintiffs allege that "Defendants publicly affirmed their commitment to supply restraint" through "public statements by their senior executives about their firms."  SAC ¶¶ 184-89.  Plaintiffs offer five alleged "public statements by [two Defendants'] senior executives about their firms' commitment to production restraint."  *Id.* ¶ 184.  These statements do not support a conspiracy.

The alleged statements were made by executives of the two publicly held Defendants (Tyson and JBS) during earning calls.  (The complaint does not allege that executives from Cargill or National Beef made any such statements.)  The Tyson and JBS statements were ordinary and legitimate communications to investors in the wake of the fall in fed cattle supply caused by the drought.  SAC ¶¶ 185-89.  At least two of the five statements are from before the start of the alleged conspiracy, *id.* ¶¶ 185-87,[5] so they do

---

[4]  *See Schumacher v. Cargill Meat Sols. Corp*, 515 F.3d 867, 872 (8th Cir. 2008) (producers failed to show that meat packers purposefully manipulated or controlled prices); *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1287-88 (11th Cir. 2005) (producers failed to show Tyson lacked a valid business reason for using marketing agreements); *IBP, Inc.*, 187 F.3d at 977-78 (right-of-first-refusal marketing agreements did not violate the PSA); *In re Beef Indus. Antitrust Litig. MDL Docket No. 248*, 907 F.2d 510, 514 (5th Cir. 1990) (producers failed to show that meat packers used Yellow Sheet, a daily cattle price publication, to stabilize and depress the price of fed cattle); *In re Beef Indus. Antitrust Litig. MDL Docket No. 248*, 710 F.2d 216, 220 (5th Cir. 1983) (producers failed to allege that retail grocery stores conspired to purchase beef from meat packers at artificially low prices).

[5]  Paragraph 187 alleges that one statement occurred in "August 2015," but the transcript cited is from 2014 and does not contain the quoted statement.  *See* SAC ¶ 187 & n.101 (citing Tyson Foods, Inc., *Q2 2014 Earnings Call Transcript*, Seeking Alpha (May 5, 2014)).

44

not provide evidence of the alleged conspiracy, *see Blomkest Fertilizer, Inc.*, 203 F.3d at 1037 n.7. Further, none of the statements refers to any other Defendant – or any other competitor – and none suggests that there were any communications between Defendants indicative of collusion. Indeed, one of the statements strongly suggests that Defendants were *not* acting in parallel: In November 2015, Tyson's then-CEO expressed his view there was "excess industry capacity," SAC ¶ 189 – which would not be the case if, as alleged, Defendants' conspiracy was in full swing, *see id.* ¶ 1. The statements therefore do not support an inference of parallel conduct or a conspiracy.

There is nothing "ominous or collusive" about "statements made every day by corporate executives to industry analysts." *Holiday Wholesale Grocery Co.*, 231 F. Supp. 2d at 1280; *see In re Pork*, 2019 WL 3752497, at *8-9 (statements that "generally refer to the industry as a whole, and are largely vague" do not support inference of a conspiracy). Those types of disclosures often are required for publicly traded companies. *See* 17 C.F.R. § 229.303(a)(3)(ii) (Reg. S-K) (requiring that publicly traded companies disclose "trends or uncertainties that have had or that [they] reasonably expect[] will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"); *Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1047 (D. Minn. 2015) (explaining Reg. S-K's disclosure requirements). So this alleged plus factor, like the others, fails to support Plaintiffs' alleged conspiracy.

## 2. Plaintiffs' regression model does not show a conspiracy

Plaintiffs provide statistical analysis in the form of a purported regression model, which they claim shows that fed cattle prices were "artificially depressed" beyond the

normal forces of supply and demand between January 2015 and December 2017.   SAC

¶ 201.  This model does not support an inference of a conspiracy.

As an initial matter, the model is not specific to any Defendant.  All of the data used

in the model – population, GDP, inflation, feed costs, prices of substitutes, net imports,

numbers of packer plants and feedlots, and feedlot capacity, *see* SAC ¶ 203 – is on an

aggregated, industry-wide basis.  So, like their other industry allegations, Plaintiffs' model

"do[es] not plausibly suggest that the particular defendants named in this suit were part of

[a] conspiracy."  *In re GSE Bonds*, 396 F. Supp. 3d at 365 (industry-wide statistical

analyses do not provide a "reason to believe that the . . . defendants named in this suit were

involved [in a conspiracy] apart from plaintiffs' say-so").

Further, Plaintiffs do not explain why they included the data they chose to include

or how they created their model.  They conclusorily assert that the types of data they used

are "well-supported by academic literature that seeks to capture cattle price movements."

SAC ¶ 203 n.114.  They cite two academic studies, but do not explain the relevance of

those studies or establish that the studies are statistically valid.  *See id.*  And in any event,

those studies did not use the same types of data that Plaintiffs used in their model.  *See*

Mary K. Muth *et al.*, *Differences in Prices and Price Risk Across Alternative Marketing*

*Arrangements Used in the Fed Cattle Industry*, 33 J. Agric. & Res. Econ. 118, 126 tbl.2

(2008) (not including, among others, population, GDP, inflation, feed costs, or the prices

of substitutes); Sebastian Poulot & Daniel A. Sumner, *Differential Impacts of Country of*

*Origin Labelling:  COOL Econometric Evidence from Cattle Markets*, 49 Food Policy 107,

114 tbl.3 (2014) (same).  Allegations of collusion based on unexplained methodologies are

nothing but conclusions, unsupported by facts, and are not entitled to a presumption of truth.  *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

Even assuming the model says something specific about Defendants (and that it is accurate), the model does not show what Plaintiffs claim it shows.  Plaintiffs claim that the model indicates that "fed cattle prices were artificially depressed by an average of 7.9%" during the time period of the alleged conspiracy.  SAC ¶ 201.  The model is not capable of determining the *reason* for any alleged price depression.  All the model shows is that the 17 variables Plaintiffs chose to include account for the vast majority of the movement in fed cattle prices; the model attributes the rest of the movement to what Plaintiffs call "underpayment" due to an antitrust conspiracy.  *Id.* ¶ 204 tbl.1; *see id.* ¶ 203 (explaining that the model "ascribe[s] to artificial price suppression" any "residual, unexplained price decrease" after taking into account the variables Plaintiffs provided the model).

There is no reason to believe that those 17 variables are the only possible variables affecting the price of fed cattle, or that anything not explained by those variables must be an antitrust conspiracy.  Notably, Plaintiffs did not include the supply of fed cattle as a variable, even though the complaint acknowledges that supply increased starting in 2015, SAC ¶ 154 & fig.18, and supply would be an obvious driver of fed cattle prices.  The model's conclusory allegations thus provide no support for Plaintiffs' claims.

### 3.   The complaint explains why fed cattle prices actually fell

Plaintiffs' overarching theory is that Defendants' conspiracy caused fed cattle prices to fall starting in 2015.  But the complaint itself presents obvious alternative explanations for that result.

As noted earlier, Plaintiffs' entire claim of conspiracy is based on the fall in fed cattle prices starting in 2015, shown in Figure 4 in the complaint.  *See* SAC ¶ 14 fig.4. Plaintiffs start this chart in July 2009.  When the same data is viewed over a longer time frame, it is clear that the key change in prices was not the 2015 decline, but rather the dramatic rise in prices that started in 2009:

*Figure 5:  Plaintiffs' Figure 4 – "Fed Cattle Prices vs. Retail Beef Prices," expanded to January 2000*



(This figure uses the same data as Figure 4, except it goes back to January 2000.[6])

---

[6]   *See* USDA Econ. Research Serv., *Livestock Prices* (Oct. 28, 2019), https://www.ers.usda.gov/webdocs/DataFiles/51875/LivestockPrices.xlsx;  USDA Econ. Research Serv., *Historical Monthly Price Spread Data for Beef, Pork, Broilers* (Feb. 28, 2019), https://www.ers.usda.gov/webdocs/DataFiles/52160/history.xls

Plaintiffs' real grievance is that prices did not stay at their all-time highs. Yet the complaint acknowledges the reasons why prices increased to the historic highs (drought and "strong beef demand"), SAC ¶ 8, and why prices then fell (the drought ended, the fed cattle supply increased, and demand for domestic fed cattle decreased), *see id.* ¶ 166 (the 2015 "fed cattle inventory was at or slightly above 2014 levels in almost every month" in part because of "the continuing rebuild of the cow-herd"); *id.* ¶ 173 ("[In 2016,] the available supply of fed cattle . . . r[ose] slightly again."); *id.* ¶ 177 ("As the cattle herd continued to rebuild . . . more fed cattle became available for slaughter in 2017 and into 2018."). The complaint also acknowledges the drop in prices of feeder cattle, which likely contributed to the increase in the fed cattle supply. *Id.* ¶ 192. And the complaint acknowledges that the demand for domestic fed cattle decreased, in part due to the repeal of the Mandatory COOL rule. *See id.* ¶ 203(h).

That all is consistent with the GAO's report. The GAO studied the causes of the fall in fed cattle prices for two years, and concluded that "supply and demand factors" – not collusion by packers – accounted for the changes in fed cattle prices. GAO Report 1, 16. Plaintiffs claim that the GAO's conclusion is unsound because the GAO did not review internal packer documents in its investigation. SAC ¶ 209; *see* GAO Report 29. But the GAO concluded that market forces accounted for all of the changes in fed cattle prices, and so there was no need to explore Plaintiffs' conspiracy theory further. GAO Report 12.

## D.     R-CALF and NFU lack standing to seek money damages

To the extent that the two trade association Plaintiffs seek antitrust damages, they lack standing to do so. The Ranchers Cattlemen Action Legal Fund United Stockgrowers

of America (R-CALF) and the National Farmers Union (NFU) seek "damages in their personal capacity" because (they claim) the alleged conspiracy has "frustrated their respective missions to protect the interests of their members, and diverted their resources to help their members mitigate damages and prevent further breaches of the law by Packing Defendants."   SAC ¶ 28; *see id.* ¶ 330.   But only those who are "the target of the anticompetitive activity" can seek antitrust damages; those "who [have] merely suffered indirect, secondary, or remote injury" cannot.   *Midwest Commc'ns, Inc. v. Minn. Twins, Inc.*, 779 F.2d 444, 451 (8th Cir. 1985) (internal quotation marks omitted).   Trade organizations in particular usually cannot seek antitrust damages because they do not participate directly in the market at issue.   *See, e.g.*, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 539 (1983).

Here, R-CALF and NFU do not participate in the market at issue.  They do not sell fed cattle, SAC ¶¶ 26-27, and they therefore lack standing to seek antitrust damages either for themselves or on behalf of their members.

## II.   PLAINTIFFS FAIL TO PLEAD A VIOLATION OF THE PACKERS AND STOCKYARDS ACT (COUNT II)

The Packers and Stockyards Act prohibits certain anticompetitive conduct in the poultry and meatpacking industries.  7 U.S.C. § 192.  Congress enacted it to "assure fair competition and fair trade practices" in those industries.  *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1228 (10th Cir. 2007) (quoting H.R. Rep. No. 85-1048, at 1 (1957)).  It is "essentially an antitrust statute" that primarily regulates packers.  *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 277 (6th Cir. 2010); *see Schumacher*, 515 F.3d at 871.  The Eighth

Circuit therefore construes the PSA in harmony with the Sherman Act. *See Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1460 (8th Cir. 1995) (applying the Sherman Act's four-year statute of limitations to PSA claims because the "PSA has its origins in antecedent antitrust legislation and primarily prevents conduct which injures competition").

Plaintiffs allege that Defendants violated the PSA by conspiring to "allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle, with the purpose or with the effect of suppressing and reducing competition among purchasers of fed cattle." SAC ¶ 336. There are two problems with those allegations. First, Plaintiffs' claim is based on their allegations of an antitrust conspiracy, which are insufficient to plausibly state a conspiracy. Second, the acts about which Plaintiffs complain are lawful under the PSA.

### A.     The conspiracy allegations are insufficient

Plaintiffs fail to allege the facts necessary to establish a conspiracy, or even to allege parallel conduct by Defendants. Because Plaintiffs' claims are rooted in an alleged antitrust conspiracy, and because courts construe the PSA in harmony with the Sherman Act, *Jackson*, 53 F.3d at 1460, Plaintiffs' failure to state an antitrust conspiracy under the Sherman Act necessarily dooms their claim, *cf. Insulate SB, Inc.*, 797 F.3d at 547-48 (dismissing state antitrust claims where plaintiffs failed to plead a violation of the Sherman Act); *In re Pork*, 2019 WL 3752497, at *10 (same).

### B.     No alleged act violates the PSA

A practice that "does not potentially suppress or reduce competition" does not violate the PSA. *IBP, Inc.*, 187 F.3d at 977; *see Wheeler v. Pilgrim's Pride Corp.*, 591

51

F.3d 355, 357 (5th Cir. 2009) ("[O]nly those practices that will likely affect competition adversely violate the [PSA].").  Plaintiffs do not allege any anticompetitive acts.

Many of the acts about which Plaintiffs complain are permissible under the PSA. For example, Plaintiffs' allegation that Defendants reduced slaughter volumes, SAC ¶¶ 102-07, 155-56, does not violate the PSA.  "If a firm inadvertently over-produces a good and drives down prices, it does not break the law by cutting production so that prices may recover."  *In re Pilgrim's Pride Corp.*, 728 F.3d 457, 463 (5th Cir. 2013) (defendant "did not violate PSA § 192(e) by reducing its commodity chicken output").  Plaintiffs also take issue with Defendants' use of marketing agreements, SAC ¶¶ 109-10, but marketing agreements are perfectly lawful, *Pickett*, 315 F. Supp. 2d at 1177 (concluding that the use of "marketing agreements, joint ventures and forward contracts" does not violate the PSA).

Plaintiffs' reliance on the alleged right-of-first-refusal protocol, SAC ¶ 115, also is misplaced.  The Eighth Circuit concluded that a similar right-of-first-refusal protocol was found to be procompetitive and not a violation of the PSA.  *See IBP, Inc.*, 187 F.3d at 977 (concluding that an analogous right-of-first-refusal protocol did not potentially or actually suppress competition).  And Plaintiffs concede that two of the Defendants, National Beef and Cargill, continued visiting Witness 2's feedlot even after the feedlot broke from the alleged queuing convention.  SAC ¶ 119.  This allegation further undermines any inference of parallel conduct and suggests that each packer was acting in its own procompetitive interest.

Finally, all of the remaining acts about which Plaintiffs complain – drawing cards "to avoid attending the feedlot at increasingly early hours" to place bids, SAC ¶¶ 125-26;

conducting cash trades on Fridays, *id.* ¶ 127; seeking supply from certain regions, *id.* ¶¶ 134-40; and deciding to import cattle to meet a producer's needs, *id.* ¶¶ 141-48 – are merely Defendants' choices about with whom and when to contract. "[I]t has been long established that the intent of the PSA is not to 'upset the traditional principles of freedom of contract.'" *Griffin v. Smithfield Foods, Inc.*, 183 F. Supp. 2d 824, 828 (E.D. Va. 2002) (quoting *Jackson*, 53 F.3d at 1458). So these alleged actions cannot form the basis for a PSA claim.

R-CALF and its members are free to sell their cattle however they like, but they are not allowed to restrict how other producers sell cattle and how packers buy cattle, nor demand that Defendants conform to their preferred practices. Their attempts to dress their claim up as an antitrust conspiracy or a PSA violation does not change that logic. Plaintiffs' PSA claim therefore should be dismissed.

## III.   PLAINTIFFS FAIL TO PLEAD A VIOLATION OF THE COMMODITY EXCHANGE ACT (COUNTS III-VI)

The Commodity Exchange Act regulates commodities trading on organized exchanges. The CEA protects "the innocent individual investor," *CFTC v. Kratville*, 796 F.3d 873, 891 (8th Cir. 2015) (internal quotation marks omitted), by making it illegal for "[a]ny person to manipulate or attempt to manipulate" the price of any commodity, 7 U.S.C § 13(a)(2). Plaintiffs bring a market-manipulation claim under CFTC Regulation 180.2, 17 C.F.R. § 180.2 (Count III); a manipulative-device claim under CFTC Regulation 180.1, 17 C.F.R. § 180.1 (Count IV); a derivative claim for principal-agent liability (Count V); and an aiding-and-abetting claim (Count VI).

53

All of those claims require proof of actual damages. Specifically, to bring a CEA market-manipulation claim, a plaintiff must allege that the defendant intentionally manipulated the price of a commodity, so that its price was artificially increased or decreased. *In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 378 (S.D.N.Y. 2010); *see Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247-48 (5th Cir. 2010). To bring a manipulative-device claim, the plaintiff must allege that the defendant intentionally engaged in a manipulative trading practice. *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 569 (S.D.N.Y. 2016). Both the principal-agent and aiding-and-abetting claims require a predicate CEA violation. *Id.* at 570-71. For all of those claims, a plaintiff must have suffered "actual damages resulting from" the claimed CEA violation. 7 U.S.C. § 25(a)(1).

Some Plaintiffs allegedly traded cattle futures and options on the Chicago Mercantile Exchange during the claimed conspiracy. SAC ¶ 36. (A future is a contract to buy or sell a commodity at a specified time and price, *id.* ¶ 244; an option is a contract that gives the holder the right to buy or sell a commodity at a specified price, *id.* ¶ 247.) The prices of those financial instruments allegedly depended in part on fed cattle prices. *Id.* ¶ 265. The claimed antitrust conspiracy allegedly reduced fed cattle prices, in turn reducing the prices of the futures and options in which Plaintiffs traded. *Id.* ¶ 280.

Plaintiffs' CEA claims fail because they are entirely derivative of the antitrust conspiracy claim; they do not satisfy the heightened pleading standard applicable to CEA claims; and they do not allege net loss, a key element of a CEA claim.

## A.    Plaintiffs' CEA claims are derivative of their Sherman Act claims

Plaintiffs' CEA claims all depend on the same antitrust conspiracy as their Sherman

Act claims.  Specifically, Plaintiffs claim that Defendants artificially reduced fed cattle

prices, which artificially reduced fed cattle futures and options prices.  SAC ¶¶ 339-59.

Plaintiffs' CEA claims thus rely on the alleged antitrust conspiracy to suppress fed cattle

prices.  Because Plaintiffs have not sufficiently pleaded that conspiracy, their CEA claims

fail.  *See In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 598

(S.D.N.Y. 2011) (dismissing antitrust and CEA claims based on same alleged price fixing).

## B.    Plaintiffs fail to meet the heightened pleading standard applicable to CEA claims

A CEA claim based on manipulating prices by misleading the market about supply

and demand must comply with Federal Rule of Civil Procedure 9(b)'s heightened pleading

requirement.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d

666, 713-14 (S.D.N.Y. 2013), *rev'd on other grounds sub. nom. Gelboim v. Bank of Am.

Corp.*, 823 F.3d 759 (2d Cir. 2016).  So must a CEA claim alleging a manipulative device.

*CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1008-10 (N.D. Ill. 2015).  To meet

that heightened pleading standard, the plaintiff must plead "with particularity the nature,

purpose, and effect of the fraudulent conduct and the roles of the defendants."  *In re

Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 529 (S.D.N.Y. 2008)

(internal quotation marks omitted), *aff'd*, 730 F.3d 170 (2d Cir. 2013).

The complaint does not come close to meeting that standard.  Far from alleging the

"who, what, where, and when" of their alleged conspiracy, Plaintiffs just offer

undifferentiated group allegations and a few irrelevant defendant-specific allegations.  That

is insufficient.  *See, e.g., In re Crude Oil Commodity Litig*., No. 06 Civ. 6677(NRB), 2007

WL 1946553, at *6 (S.D.N.Y. June 28, 2007) ("[T]he complaint must specifically allege

the fraud perpetrated by each defendant, and 'lumping' all defendants together fails to

satisfy the particularity requirement.").

### C.      Plaintiffs fail to sufficiently allege a net loss resulting from the claimed CEA violations

The CEA's private right of action requires a plaintiff to establish "actual damages

resulting from" the claimed violation.  7 U.S.C. § 25(a)(1).  To satisfy this requirement, a

plaintiff must plausibly allege that the plaintiff suffered a net loss caused by the claimed

violation.  *See*, *e.g*., *In re LIBOR-Based Fin. Instruments*, 935 F. Supp. 2d at 716-17.  That

is, the plaintiff must allege that he lost money on the combined purchase and sale of a

commodity caused by the violation.  It is not enough that he bought a commodity at an

artificially reduced price, because he also could have sold that commodity at the same

reduced price, with no damages.  *See, e.g*., *Sonterra Capital Master Fund Ltd. v. Credit

Suisse Grp. AG*, 277 F. Supp. 3d 521, 570 (S.D.N.Y. 2017).

Plaintiffs allege that they transacted at "artificial prices which directly led to injury

and economic damages."  SAC ¶ 344.  In conclusory terms, Plaintiffs also allege that some

Plaintiffs "suffered aggregate net trading losses" on their combined purchases and sales of

live cattle futures and options.  *Id.* ¶ 37(b).

But Plaintiffs do not plead facts plausibly suggesting that the claimed violations

caused them to suffer net losses.  If Plaintiffs bought and sold futures or options at prices

reduced by constant amounts, then they did not suffer any losses caused by the constant reductions that produced a wash. *See, e.g., In re LIBOR-Based Fin. Instruments*, 935 F. Supp. 2d at 716-17. And if Plaintiffs bought and sold futures or options at prices reduced by different amounts at different times, then the reductions did not necessarily cause net losses, either. Whether they suffered net losses caused by the claimed violations would depend on the specifics of their trading activity, which they do not allege. *See id.* Simply suffering a loss on trading does not plausibly suggest that the loss *resulted from* the claimed violation. *See, e.g., In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 390 F. Supp. 3d 916, 936-37 (N.D. Ill. 2019).

Plaintiffs know their trading activity – after all, it is their own conduct. They know the publicly-reported prices of cattle futures and options. SAC ¶ 269; *see* CME Grp., *Livestock*, https://www.cmegroup.com/trading/agricultural/#livestock (last visited Nov. 13, 2019). They know the fed cattle prices that the USDA reports publicly. *E.g.*, SAC ¶ 14 & fig.4. And they know the slaughter volumes that the USDA reports publicly. *E.g.*, *id.* ¶ 16; *see id.* ¶ 202 n.113. That is the information that Plaintiffs could have used to allege transactions on which they lost money. Yet Plaintiffs have not attempted to do so. Conclusory allegations that they suffered a loss from trading are insufficient to plausibly suggest that the net loss resulted from the claimed CEA violations.

## IV.    PLAINTIFFS' CLAIMS ARE TIME-BARRED

Plaintiffs filed the first complaint in this case on April 23, 2019 – more than four years after the start of the alleged conspiracy in January 2015. Yet the limitations period for all of their claims is four years or less: The period is four years for their Sherman Act

and PSA claims, 15 U.S.C. § 15b (Sherman Act); *Jackson*, 53 F.3d at 1460 (PSA), and it "begins to run when a defendant commits an act that injures a plaintiff's business," *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). The period is two years for their CEA claims, 7 U.S.C. § 25(c), and it begins to run from the "discovery of the injury," *Levy v. BASF Metals Ltd.*, 917 F.3d 106, 108 (2d Cir. 2019) (internal quotation marks omitted). Here, Plaintiffs discovered their alleged injuries no later than January 2016, when R-CALF publicly accused Defendants of engineering the fall in fed cattle prices. SAC ¶ 312 n.232. So Plaintiffs' claims are all time-barred.

The doctrine of fraudulent concealment does not save Plaintiffs' claims. Plaintiffs do not allege any of the facts needed to invoke that doctrine; to the contrary, all of the facts on which they rely were available within the limitations periods. Nor can Plaintiffs rely on the continuing violation doctrine, because that doctrine does not allow them to recover for antitrust injuries outside the limitations period.

## A.     Plaintiffs do not plead fraudulent concealment

For fraudulent concealment, Plaintiffs must allege that (1) Defendants took affirmative acts "solely to conceal" the alleged conspiracy; (2) Plaintiffs failed to discover the existence of the conspiracy; and (3) Plaintiffs exercised due diligence to uncover the relevant facts. *In re Milk Prods.*, 84 F. Supp. 2d at 1022 (internal quotation marks omitted). Allegations of fraudulent concealment must meet the heightened pleading standard in Federal Rule of Civil Procedure 9(b), meaning that Plaintiffs must plead the "who, what, when, where, and how" of the alleged concealment. *Summerhill v. Terminix, Inc.*, 637 F.3d

877, 880 (8th Cir. 2011) (internal quotation marks omitted); *see Podpeskar v. Makita U.S.A. Inc.*, 247 F. Supp. 3d 1001, 1010 (D. Minn. 2017).

Plaintiffs do not plead facts supporting any of the elements of fraudulent concealment, much less with the particularity required by Rule 9(b).

### 1.    Plaintiffs do not plead concealment

Because "a conspiracy . . . is by nature a crime of secrecy and cover-up," to satisfy the concealment element "Plaintiffs must show acts, *other than the acts constituting the conspiracy*, that demonstrate fraudulent concealment of that conspiracy."   *In re Monosodium Glutamate Antitrust Litig.*, No. CIV. 00MDL1328PAM, 2003 WL 297287, at *3 (D. Minn. Feb. 6, 2003) (emphasis added); *see Ripplinger v. Amoco Oil Co.*, 916 F.2d 441, 442 (8th Cir. 1990).  And those acts must be pleaded with particularity.  *Summerhill*, 637 F.3d at 880.

Plaintiffs allege that Defendants concealed the alleged conspiracy by:

(i) communicating with each other by telephone about their purchases and slaughter volumes so that they would not have written evidence of sharing this information with a competitor, as well as relying on non-public forms of communication;

(ii) offering false or pre-textual reasons for low fed cattle prices;

(iii) offering pre-textual justifications for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade;

(iv) explicitly and implicitly representing that the fed cattle bids and contract terms Packing Defendants offered Plaintiffs and the Producer Class were the product of honest competition and not a conspiracy;

[(v)] affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws; and

[(vi)] misrepresenting the nature of their agreements (and purported adherence to competitive safeguards) to government officials and to the public.

SAC ¶ 295.  For numbers (i), (iv), and (vi), the complaint is devoid of any supporting allegations.  The complaint provides no examples of all four Defendants "communicating with each other by telephone" or through other "non-public forms of communication."  The complaint also provides no examples of any Defendant "explicitly [or] implicitly representing that the fed cattle bids . . . were the product of honest competition."  And the complaint provides no examples of Defendants' "misrepresent[ations] [about] the nature of their agreements."

That leaves (ii), (iii), and (v).  For Defendants' "pre-textual reasons for low fed cattle prices" and "pre-textual justifications for their plant closures," Plaintiffs point to generic statements about the cattle industry made in Defendants' public SEC filings or by some Defendants' executives during earnings calls.  *E.g.*, SAC ¶ 298 (alleging that Tyson's SEC filings stated that cattle prices and production are "determined by constantly changing market forces of supply and demand"); *id.* ¶ 301 (alleging that a JBS executive stated that cattle prices would decrease because "we are going to see more cattle available").

For the alleged "affirmativ[e] misrepresent[ations]" about compliance (number (v)), Plaintiffs point to generalized statements in Defendants' annual reports and other public filings.  *E.g.*, SAC ¶ 310(c) (quoting Cargill's 2015 Corporate Responsibility report as stating that Cargill "compl[ies] with the laws and regulations that support fair competition").  Plaintiffs do not give any reason to believe these public statements are false or fraudulent, or are even connected to the allegations in this case.  If those types of generic

60

statements were enough to constitute fraudulent concealment, it would "effectively nullify the statute of limitations" in antitrust cases. *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987).

### 2. Plaintiffs do not allege that they failed to timely discover the conspiracy

Plaintiffs do not establish the second element of fraudulent concealment, which is that they failed to discover the alleged conspiracy during the limitations periods.  They assert that they "could not have learned of Packing Defendants' anticompetitive conduct . . . until recently when Witness 1 and Witness 2 came forward with otherwise inaccessible information."  SAC ¶ 311.  But Plaintiffs do not allege specifically when Witness 1 or Witness 2 came forward, or that the witnesses came forward only after the statutes of limitations had run.  So the witnesses do not support Plaintiffs' claim of lack of discovery.

In any event, Plaintiffs' claim is implausible because the complaint principally relies on information that was available at the time of the supposed conspiracy.  The complaint extensively cites publicly-available data collected by the federal government and published contemporaneously on a daily or weekly basis.  *E.g.*, SAC ¶¶ 14, 15, 80, 130, 132, 136, 138, 139, 142, 165-68; *see id.* ¶ 81 n.23 (explaining that packers report prices and purchase volumes to the USDA "on a daily and weekly basis"); *id.* ¶ 202 n.113 (explaining that the USDA publishes daily fed cattle pricing data).  The complaint also cites news articles published contemporaneously with the fall in fed cattle prices in 2015.  *Id.* ¶¶ 104 n.33, 108 n.36, 110 n.38, 112 n.41, 156 nn.68-69, 157-58, 171, 175 n.84, 177 nn.88-90.

In fact, as Plaintiffs acknowledge, R-CALF first publicly aired its suspicions about Defendants' conduct no later than January 2016, when it wrote to a number of Senators, accusing the "dominant meatpackers" of "antitrust and anticompetitive conduct." Ltr. from Bill Bullard, CEO, R-CALF, to Sen. Charles E. Grassley, Chairman of the Sen. Comm. on the Jud. 2 (Jan. 5, 2016) (Jan. Bullard Ltr.), https://perma.cc/Z5U4-948P; *see* SAC ¶ 312 n.232. And as Plaintiffs also acknowledge, the resulting GAO Report did *not* find any misconduct on the part of Defendants. SAC ¶ 313. So Plaintiffs fail to explain what new information has come to light "recently" that allowed them to "discover" the conspiracy that R-CALF has been alleging since January 2016.

### 3.     Plaintiffs do not plead due diligence

To establish fraudulent concealment, Plaintiffs must show that they worked diligently to discover their claim once they became aware "of facts and activities that would 'create notice and excite attention.'" *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-2664 ADM/SER, 2014 WL 943224, at *5 (D. Minn. Mar. 11, 2014) (citation omitted), *aff'd*, 797 F.3d 538 (8th Cir. 2015). Although Plaintiffs assert that they "could not have discovered [the alleged conspiracy] through the exercise of due diligence until recently," SAC ¶ 314, their allegations of diligence are conclusory and insufficient.

Plaintiffs allege that they exercised diligence "by seeking explanations for the decline in fed cattle prices" and by "request[ing] a governmental investigation into . . . Packing Defendants' conduct." SAC ¶ 312. They provide no examples of when they sought any explanations, what they asked, who they asked, or whether they pursued those inquiries any further. A plaintiff does not demonstrate diligence simply by asking a

defendant to explain its actions. *Pocahontas Supreme Coal Co.*, 828 F.2d at 218-19; *see In re Wholesale Grocery Prods. Antitrust Litig.*, 722 F. Supp. 2d 1079, 1085-86 (D. Minn. 2010) (plaintiffs do not satisfy the diligence requirement by alleging in a "non-specific, conclusory fashion that [they] inquir[ed] about higher prices on several occasions").

Similarly, Plaintiffs cannot rely on the government's investigation as establishing their own diligence without alleging that they took their own investigative steps. *See In re Milk Prods.*, 84 F. Supp. 2d at 1024; *cf. In re Refrigerant Compressors Antitrust Litig.*, 92 F. Supp. 3d 652, 670 (E.D. Mich. 2015) (plaintiffs adequately alleged diligence because they took investigative steps before and after the government announced its investigation). Further, only one Plaintiff (R-CALF) requested that the government investigate, *see* Jan. Bullard Ltr. 2, so that cannot show that each Plaintiff exercised due diligence, *see In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 487 (W.D. Pa. 1999). (The complaint conclusorily alleges that some other Plaintiffs "supported" R-CALF's efforts, but provides no details as to that support. SAC ¶ 312 n.232.) And of course, the government's investigation resulted in a report rejecting the claim of anticompetitive conduct. The complaint's allegations of due diligence thus are inadequate.

### B. The continuing violation doctrine does not permit recovery here

Plaintiffs allege that because the alleged conspiracy is still ongoing, the continuing violation doctrine applies to their claims. SAC ¶ 316. In the employment law context, the "continuing violation" doctrine allows a plaintiff to sue for conduct outside the limitations period if the conduct continues into the limitations period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

But that doctrine does not apply that same way in antitrust law.  In the antitrust context, each allegedly unlawful act "starts the statutory period running again" but "does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997) (internal quotation marks omitted); *see In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1068 (8th Cir. 2017) (en banc).  That means that in the antitrust context, a plaintiff can assert claims when each violation occurs, but those claims must be within the limitations period.  A defendant may not reach back to claims before the limitations period.

So here, Plaintiffs could recover only for violations within the statutes of limitations (*i.e.*, the most recent violations in a series of violations) but could not reach back to resuscitate time-barred claims.  Plaintiffs therefore could not recover for any injuries allegedly incurred before April 23, 2015, for their Sherman Act and PSA claims, or before April 23, 2017, for their CEA claims.

Plaintiffs do not assert claims within the limitations periods.  Plaintiffs include virtually no allegations about any alleged conspiracy beyond 2016.  The gravamen of Plaintiffs' conspiracy claim is a supposed plan to suppress fed cattle prices in 2015 by coordinating production cuts, continuing into 2016.  *See* SAC ¶¶ 155-75; *see also id.* ¶ 94 (alleging that Witness 1's overheard conversation "occurred sometime in 2015 or early 2016").  The complaint is completely silent about any actions that any Defendant took in 2017, and it includes only one allegation about conduct in 2018.  *See id.* ¶ 177 (alleging, without supporting evidence, that in 2018 "each Packing Defendant began to tell the market that they had . . . insufficient capacity to slaughter" the expected volume of cattle).

64

Plaintiffs' other post-2015 allegations undercut the claim of an ongoing conspiracy. Those allegations show that industry slaughter volumes increased between 2015 and 2018, SAC ¶ 154 fig.18; that industry cash cattle purchases increased between 2015 and 2017, *id.* ¶ 132 figs.13-15; and that each individual Defendant increased its slaughter volumes between 2015 and 2017, *id.* ¶ 106 fig.3. So not only have Plaintiffs not plausibly alleged a conspiracy to suppress fed cattle prices in 2015, they have done even less to allege a conspiracy lasted from 2015 to the present.

## V.  PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE

Plaintiffs have had multiple opportunities, including one substantive amendment in response to Defendants' first motion to dismiss, to make their case. They still fail to plausibly allege an antitrust conspiracy or tie any individual Defendant to that conspiracy. The amended complaint is so deficient that the Court should dismiss it with prejudice.

Plaintiffs were on notice that they needed to plausibly allege an antitrust conspiracy to allege facts tying each Defendant to the alleged conspiracy. Defendants' original joint and individual motions to dismiss laid out in detail all of the flaws in the prior complaint, including that the prior complaint did not plausibly allege a conspiracy or plausibly allege that any specific Defendant was part of that conspiracy. *See* ECF Nos. 103, 106, 108, 110, 113. Plaintiffs also had the benefit of this Court's decision in *Pork*, in which this Court dismissed an antitrust complaint because it did not plead facts specific to each defendant. *See* 2019 WL 3752497, at *8.

Yet Plaintiffs still fail to plausibly allege either direct evidence of a conspiracy or parallel conduct and plus factors, and Plaintiffs continue to rely primarily on aggregated,

industry-wide trends.  Further, the amended complaint makes clear that the key pieces of evidence backing up Plaintiffs' claims – the statements of the confidential witnesses – also do not tie each Defendant to the alleged conspiracy:  Witness 1 did not have personal knowledge of who (if anyone) was involved in the "agreement" he allegedly overheard, *see* SAC ¶ 96, and Witness 2 admits that Defendants did not uniformly follow the same cattle procurement practices, *id.* ¶ 119.

The complaint no doubt contains all of the facts Plaintiffs have been able to find to support their claim of an antitrust conspiracy.  R-CALF has been accusing Defendants of engineering the fall in fed cattle prices for more than three years, since January 2016.  Jan. Bullard Ltr. 2.  The cattle industry is extensively covered by dedicated industry news sources.  *See, e.g.*, SAC ¶ 85 n.28.  The data about this industry is remarkably robust – the USDA publishes extensive industry-wide data on a daily or weekly basis.  *See id.* ¶ 76 n.18. And Plaintiffs' counsel are "experience[d] in the prosecution and leadership of class action antitrust, commodities manipulation and other complex litigation."  *Id.* ¶ 289.  If that is all Plaintiffs can come up with after over three years of investigation and one substantive amendment, what more could they add in a further amended complaint?

An amendment would be futile because many of the allegations in the complaint actually undermine Plaintiffs' claim of a conspiracy, by either directly contradicting Plaintiffs' claims or by presenting obvious alternative and lawful explanations for the alleged conduct.  The problem is not just that Plaintiffs failed to provide sufficient factual allegations – it is that Plaintiffs have pleaded themselves out of an antitrust conspiracy.  No amount of amendment can get around those foundational flaws in Plaintiffs' case.  *See*

*ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*, 355 F. Supp. 3d 785, 794 (D. Minn. 2019) (plaintiff may only amend a complaint "with additional allegations that are consistent with the challenged pleading and that do not contradict the allegations in the original complaint" (internal quotation marks omitted)).

## CONCLUSION

Courts are demanding at the motion-to-dismiss stage in antitrust cases because permitting "a complex case of extremely dubious merit to proceed" – thereby "immers[ing] the parties in the discovery swamp" – "create[s] irrevocable as well as unjustifiable harm to the defendant." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 625-26 (7th Cir. 2010) (internal quotation marks omitted). As in *Pork*, this complaint simply does not have the "factual enhancement" – the "relevant individuals, acts, and conversations" – to allege an antitrust conspiracy. *In re Pre-Filled Propane Tank*, 893 F.3d at 1057 (internal quotation marks omitted). And given the obvious market explanations for why fed cattle prices fell, it is clear that Plaintiffs never will be able to state an antitrust conspiracy.

The Court should dismiss the Second Consolidated Amended Class Action Complaint with prejudice.

Date:  November 13, 2019                                 Respectfully submitted,


s/ *Lewis A. Remele, Jr.*                                s/ *David P. Graham*
Lewis A. Remele, Jr., Reg. No. 90724                     David P. Graham, Reg. No. 0185462
Christopher R. Morris, Reg. No. 230613                   **DYKEMA GOSSETT, PLLC**
**BASSFORD REMELE, PA**                                  4000 Wells Fargo Center
100 South 5th Street, Suite 1500                         90 South 7th Street
Minneapolis, MN 55402                                    Minneapolis, MN 55402
(612) 333-3000                                           (612) 486-1521
lremele@bassford.com                                     dgraham@dykema.com
cmorris@bassford.com

                                                         Jon B. Jacobs
William F. Hargens                                       Jeremy C. Keeney
Mark F. Enenbach                                         **PERKINS COIE LLP**
Patrick E. Brookhouser, Jr.                              700 13th Street, NW, Suite 600
Matthew G. Munro                                         Washington, DC 20005
**MCGRATH NORTH MULLIN &**                               (202) 654-1758
**KRATZ, PC LLO**                                        jbjacobs@perkinscoie.com
First National Tower, Suite 3700                         jkeeney@perkinscoie.com
1601 Dodge Street                                        *Admitted Pro Hac Vice*
Omaha, NE 68102
(402) 341-3070                                           Susan E. Foster
whargens@mcgrathnorth.com                                Ulrike B. Connelly
menenbach@mcgrathnorth.com                               **PERKINS COIE LLP**
pbrookhouser@mcgrathnorth.com                            1201 Third Avenue, Suite 4900
mmunro@mcgrathnorth.com                                  Seattle, WA 98101-3099
*Admitted Pro Hac Vice*                                  (206) 359-8846
                                                         sfoster@perkinscoie.com
*Counsel for Defendants JBS USA Food*                    uconnelly@perkinscoie.com
*Company, JBS Packerland, Inc., and*                     *Admitted Pro Hac Vice*
*Swift Beef Company, and Special*
*Appearance for Defendant JBS S.A.*                      *Counsel for Defendants Tyson Foods, Inc.*
                                                         *and Tyson Fresh Meats, Inc.*

68

s/ *Kathryn N. Hibbard*

Kathryn N. Hibbard, Reg. No. 0387155

X. Kevin Zhao, Reg. No. 0391302

**GREENE ESPEL PLLP**

222 South 9th Street, Suite 2200

Minneapolis, MN 55402

(612) 373-0830

khibbard@greeneespel.com

kzhao@greeneespel.com

Mark W. Ryan

Michael E. Lackey, Jr.

Nicole A. Saharsky

**MAYER BROWN LLP**

1999 K Street, NW

Washington, DC 20009

(202) 263-3338

mryan@mayerbrown.com

mlackey@mayerbrown.com

nsaharsky@mayerbrown.com

*Admitted Pro Hac Vice*

*Counsel for Defendants Cargill,*
*Incorporated and Cargill Meat Solutions*
*Corporation*

s/ *Andrew M. Lufer*

Andrew M. Luger, Reg. No. 0189261

Benjamin L. Ellison, Reg. No. 0392777

**JONES DAY**

90 South Seventh Street, Suite 4950

Minneapolis, MN 55402

(612) 217-8862

aluger@jonesday.com

bellison@jonesday.com

Julia E. McEvoy

**JONES DAY**

51 Louisiana Avenue, N.W.

Washington, D.C. 20001-2113

(202) 879-3867

jmcevoy@jonesday.com

*Admitted Pro Hac Vice*

Paula W. Render

**JONES DAY**

77 West Wacker, Suite 3500

Chicago, Illinois  60601-1692

(312) 269-1555

prender@jonesday.com

*Admitted Pro Hac Vice*

*Counsel for Defendant National Beef*
*Packing Company, LLC*