## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **IN RE CATTLE ANTITRUST LITIGATION**<br><br>This document relates to:<br><br>ALL CASES | Case No. 19-cv-1222-JRT-HB |

## MEMORANDUM OF LAW BY CARGILL, INCORPORATED AND CARGILL MEAT SOLUTIONS CORPORATION IN SUPPORT OF THE MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Legal standard............................................................................................................... 2

Argument ...................................................................................................................... 2

    A.   The confidential witness allegations do not show that Cargill was part of the alleged conspiracy........................................................................................ 4

    B.   The complaint does not show that Cargill took any of the five actions of the alleged conspiracy ........................................................................................ 6

        1.   The complaint shows that Cargill did not reduce its fed cattle slaughter in any year of the alleged conspiracy ........................................ 6

        2.   The complaint does not show that Cargill reduced its cash cattle purchases ............................................................................................... 8

        3.   The complaint shows that Cargill did not "blackball" feedlots that refused to comply with the alleged "queuing convention" ....................... 8

        4.   The complaint's allegation about imports pleads only lawful conduct...... 9

        5.   The complaint's allegation about plant closings does not support a conspiracy ........................................................................................... 10

    C.   The remaining allegations involving Cargill do not support a conspiracy....... 10

Conclusion ................................................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................... 2

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*,
   203 F.3d 1028 (8th Cir. 2000) .................................................................... 10

*In re Chocolate Confectionary Antitrust Litig.*,
   801 F.3d 383 (3d Cir. 2015) ....................................................................... 13

*Ginsburg v. InBev NV/SA*,
   623 F.3d 1229 (8th Cir. 2010) ..................................................................... 2

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   797 F.3d 538 (8th Cir. 2015) ....................................................................... 2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).................................................................................... 2

*In re Milk Prods. Antitrust Litig.*,
   84 F. Supp. 2d 1016 (D. Minn. 1997) ......................................................... 13

*Pickett v. Tyson Fresh Meats, Inc.*,
   420 F.3d 1272 (11th Cir. 2005) ................................................................. 12

*In re Pork Antitrust Litig.*,
   No. 18-cv-1776 (JRT/LIB), 2019 WL 3752497 (D. Minn. Aug. 8, 2019)........... *passim*

*In re Pre-Filled Propane Tank Antitrust Litig.*,
   893 F.3d 1047 (8th Cir. 2018) ..................................................................... 2

*United States v. Bestfoods*,
   524 U.S. 51 (1998)...................................................................................... 3

*Wiles v. Capitol Indem. Corp.*,
   280 F.3d 868, 870 (8th Cir. 2002) ............................................................. 11

**Other Authorities**

Cattle Buyers Weekly, *Top 30 Beef Packers Annual Reports 2008-2018* ......................... 7

## INTRODUCTION

The Second Consolidated Amended Class Action Complaint (ECF No. 125) (SAC), alleges a massive, multi-year, multi-billion-dollar antitrust conspiracy in the meatpacking industry.  The joint motion to dismiss (ECF No. 140) explains why the complaint fails to plausibly allege that conspiracy – namely, because the barebones confidential-witness allegations do not show that any Defendant participated in a conspiracy; the complaint relies primarily on industry-wide data rather than defendant-specific allegations; the complaint fails to plead parallel conduct; and the conduct alleged is completely consistent with lawful competition.

The allegations against Cargill, Incorporated and its subsidiary Cargill Meat Solutions Corporation (which the complaint combines as "Cargill," SAC ¶ 52) illustrate the complaint's deficiencies.  The complaint does not link "Cargill" to any conspiracy.  The confidential witnesses do not show a conspiracy, let alone one that involves Cargill.  The remaining allegations also do not show that Cargill was part of an antitrust conspiracy – and several allegations actually refute that claim.  For example, the complaint recognizes that Cargill actually increased its fed cattle slaughter every year of the alleged conspiracy – how is that consistent with a conspiracy to *reduce* the supply of fed cattle?

Despite three years of investigation and one substantive amendment to their complaint, Plaintiffs have not pleaded allegations sufficient to state a claim of a conspiracy among packers with respect to Cargill or the other Defendants.  This Court therefore should dismiss the complaint with prejudice.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint alleging an antitrust conspiracy must plead "specific facts plausibly suggesting (not merely consistent with) agreement in restraint of trade." *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1233 (8th Cir. 2010) (internal quotation marks omitted). That evidence can be in the form of direct evidence of an agreement, or parallel conduct and plus factors that (when considered together) tend to exclude the possibility that the defendants were acting lawfully. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986).

In either case, the complaint must plead "factual content," such as the "relevant individuals, acts, and conversations" that, if accepted as true, would plausibly state a conspiracy. *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1057 (8th Cir. 2018) (internal quotation marks omitted). And the complaint must include "specific information regarding each Defendant"; plaintiffs cannot plead industry-wide trends and ask the court to speculate that the defendants contributed to those trends. *In re Pork Antitrust Litig.*, No. 18-cv-1776 (JRT/LIB), 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019). Courts rigorously enforce this standard in antitrust class actions because discovery is extraordinarily expensive. *See Twombly*, 550 U.S. at 558; *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543-44 (8th Cir. 2015).

## ARGUMENT

The complaint alleges that Defendants were part of a conspiracy to depress fed cattle prices starting in January 2015. SAC ¶ 1. Plaintiffs allege that Defendants carried out that

2

conspiracy in five ways, by (1) periodically reducing slaughter volumes; (2) curtailing purchases of cash cattle; (3) using the same procurement practices as other packers for cash cattle purchases; (4) importing more foreign cattle to depress demand for domestic cattle; and (5) closing, idling, or not expanding slaughter plants. *Id*. ¶ 88. The complaint fails to allege facts showing that either Cargill, Incorporated or Cargill Meat Solutions Corporation took *any* of these actions.

As an initial matter, the complaint improperly combines Cargill, Incorporated with its subsidiary, Cargill Meat Solutions Corporation. Because ordinarily "a parent corporation . . . is not liable for the acts of its subsidiaries," *United States v. Bestfoods*, 524 U.S. 51, 61 (1998), a plaintiff that brings antitrust allegations against a parent company and its wholly-owned subsidiary must allege that "the parent company actually engaged in anti-competitive conduct and not merely that it served as parent to [that] subsidiary," *In re Pork Antitrust Litig.*, No. 18-cv-1776 (JRT/LIB), 2019 WL 3752497, at *9 n.11 (D. Minn. Aug. 8, 2019) (internal quotation marks omitted). The complaint recognizes that Cargill Meat Solutions Corporation is a separate entity from Cargill, Incorporated. SAC ¶ 50. But the complaint does not even try to allege specific actions by either company; it simply combines them. Even combining Cargill, Incorporated and Cargill Meat Solutions Corporation, the complaint does not come close to alleging that "Cargill" was involved in the supposed conspiracy.

**A.     The confidential witness allegations do not show that Cargill was part of the alleged conspiracy**

The complaint includes allegations from two unnamed confidential witnesses about the first and third actions of the conspiracy (reducing slaughter volumes and coordinating procurement practices).  Allegations of a conspiracy must be defendant-specific.  *In re Pork*, 2019 WL 3752497, at *8.  Here, neither witness establishes that Cargill was part of a conspiracy.

Witness 1 was a quality assurance officer at an unspecified Defendant's plant in the Texas Panhandle.  SAC ¶ 90.  He states that he heard from an unnamed fabrication manager at that plant about an "agreement" to reduce cattle slaughter volumes.  *Id.* ¶¶ 89-104.  Witness 1 alleges that he "understood" that "Cargill['s] Friona, Texas" plant was part of that agreement.  *Id.* ¶ 96.

Witness 1 admits that he had no personal knowledge of the alleged conspiracy to coordinate slaughter reductions.  He states only that he heard about the alleged conspiracy from the fabrication manager, and he does not explain how the manager learned of the conspiracy.  SAC ¶ 95.  Witness 1 also admits that he is speculating that Cargill was part of the supposed conspiracy.  He states that he "understood" the manager to imply that Cargill's Friona, Texas plant was involved, *id.* ¶ 96, and that he thinks the manager "intended to convey" that Cargill was part of the supposed conspiracy, *id.* ¶ 97 – not that the manager told him so directly.  Further, he does not explain how that manager would have any personal knowledge about a specific Cargill plant.

Witness 1 is unable to tie Cargill to any conspiracy because he does not actually know who was involved in the alleged conspiracy.  And he makes clear that he was not in a position to know whether Cargill was involved in a conspiracy; everything he heard was, at best, double hearsay.  Moreover, the complaint itself refutes the allegation that Cargill conspired to reduce slaughter volumes, because as explained below (pp. 6-8, *infra*), Cargill actually increased its slaughter volumes during the period of the supposed conspiracy.

Witness 2 was a feedlot manager who states that Defendants were coordinating their purchases of fed cattle.  SAC ¶¶ 118-21.  He alleges that sometime before "the fall of 2012," two other Defendants – but not Cargill – boycotted his feedlot because his feedlot did not adhere to a "queuing convention" in which the feedlot would give the first high bidder the right of first refusal to buy the cattle at that price.  *Id.* ¶ 119.  So that allegation cannot draw Cargill into any conspiracy.

Witness 2 also alleges that an unnamed Cargill field buyer, along with field buyers from other Defendants, required him to draw cards to determine which packer would place the first bid each week.  SAC ¶¶ 125-26.  Witness 2 does not name the Cargill field buyer, and the claimed conduct may predate the supposed conspiracy (he states it occurred "in late 2014 or early 2015").  *Id.* ¶ 124.  Even if credited, this allegation does not show Cargill was in an antitrust conspiracy, because there is nothing anticompetitive about drawing cards to randomly decide which packer will *start* bidding.  *See* ECF No. 140 at 31.

Witness 2 further alleges that an unnamed Cargill buyer would call his feedlot each week to ask who had purchased his cattle that week, and that he would provide the buyer

that information.  SAC ¶ 233.  Again, Witness 2 provides no details about the Cargill buyer or explain how calling a feedlot would be anticompetitive.

The anonymous witnesses therefore provide no basis for linking Cargill to the supposed conspiracy.

**B.    The complaint does not show that Cargill took any of the five actions of the alleged conspiracy**

The complaint fails to allege even a single example of Cargill taking any of the actions of the conspiracy during the period alleged – and several allegations show that Cargill was *not* part of any conspiracy.

**1.    The complaint shows that Cargill did not reduce its fed cattle slaughter in any year of the alleged conspiracy**

Although the complaint alleges a conspiracy to reduce fed cattle slaughter volumes, SAC ¶ 89, it also admits that Cargill *increased* its fed cattle slaughter during the alleged conspiracy.  That is shown in the complaint's Figure 3, reproduced below:

*Figure 1:  Plaintiffs' Figure 3 – "Average Pre- & Post-Class Period Fed Cattle Slaughter – Packing Defendants vs Others"*



SAC ¶ 106 fig.3.  Cargill's slaughter volumes are shown in the box outlined in red.  They show that between 2015 (orange) and 2017 (yellow), Cargill increased its slaughter volumes each year.

Although plaintiffs suggest that there was a reduction in 2015, SAC ¶ 107, the figure does not actually show that.  Figure 3 does not compare Cargill's 2015 slaughter volume to its 2014 slaughter volume.  Instead, it compares the 2015 slaughter volume to the average slaughter volume for 2007-2014.  That is telling, because if one looks at the 2014 data, it shows that Cargill's slaughter volume actually *increased* from 2014 to 2015.  Cattle Buyers Weekly, *Top 30 Beef Packers Annual Reports 2008-2018* (ECF No. 142) (cited in SAC ¶ 106 n.35) (reporting that Cargill slaughtered 4.7 million head of fed cattle in 2014 and 4.8 million in 2015).

The complaint also suggests that even if slaughter volumes did not decrease yearly, they decreased "in the short to medium run."  SAC ¶ 107; *see id.* ¶¶ 156-63.  But the complaint provides no "short to medium run" data (such as quarterly data) for Cargill or any other Defendant.  The complaint provides only industry-wide trends.  *See id.* ¶ 162 & figs.19-20.  To credit this allegation, the Court would need "infer that the individual Defendants all contributed to the decreased production, seemingly simply because they make up the majority of the industry."  *In re Pork*, 2019 WL 3752497, at *8.  This Court has refused to "engage in such speculation" before, *id.*, and should refuse to do so here.  That speculation would be particularly unwarranted with respect to Cargill, since the complaint admits that Cargill's slaughter volumes increased during the supposed conspiracy.

### 2. The complaint does not show that Cargill reduced its cash cattle purchases

The complaint alleges that Defendants reduced their cash cattle purchases when they reduced their slaughter volumes (the second means of the alleged conspiracy).  The complaint provides no defendant-specific allegations to support this allegation.  *See* SAC ¶¶ 108-13.  There is therefore no basis for concluding that Cargill reduced its cash cattle purchases during the period of the supposed conspiracy, much less in coordination with supposed reductions in slaughter volume.

### 3. The complaint shows that Cargill did not "blackball" feedlots that refused to comply with the alleged "queuing convention"

Although the complaint alleges that Defendants engaged in coordinated cattle procurement practices (the third means of the alleged conspiracy), it admits that Cargill

was not involved. Specifically, the complaint alleges that Defendants adhered to a "queuing convention," where the first packer to bid on a pen of cattle gains the right of first refusal to buy the pen at that price, and enforced that convention by "blackball[ing]" ranchers who do not adhere to it. SAC ¶ 120. It alleges only one instance of blackballing, which predates the alleged conspiracy. *See id.* ¶ 119.

More importantly, the complaint admits that Cargill did *not* follow the alleged convention. Witness 2 states that Cargill continued to bid on the unnamed feedlot's cattle even after the feedlot supposedly broke with the convention. SAC ¶ 119. The rest of the complaint's allegations about coordinated procurement practices are not specific to any Defendant. *See id.* ¶¶ 127-40.

### 4. The complaint's allegation about imports pleads only lawful conduct

The complaint alleges that Cargill "suppress[ed] the demand for U.S. fed cattle through the strategic importation of Canadian fed cattle" (the fourth means of the conspiracy). SAC ¶ 147. But it provides no specifics to back up this assertion, such as particular imports or terms of those imports. It simply alleges that Cargill is one of the two largest buyers of Canadian cattle and that Cargill "sought and received regulatory approval to import fed cattle for immediate slaughter" at three of its facilities. *Id.* ¶¶ 146-47. Importing Canadian cattle with the approval of the Department of Agriculture does not show an unlawful conspiracy.

### 5.    The complaint's allegation about plant closings does not support a conspiracy

The complaint alleges that Cargill closed two plants as part of a conspiracy to reduce slaughter capacity (the fifth means of the conspiracy).  According to the complaint, Cargill "closed its Plainview, Texas and Milwaukee, Wisconsin plants (4,000 and 1,300-1,400 head per day capacities, respectively) in February 2013 and August 2014, respectively," SAC ¶ 150.  Both instances were *before* the start of the alleged conspiracy in January 2015, *id.* ¶ 1, and they therefore cannot be evidence of the supposed conspiracy, *see Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1037 n.7 (8th Cir. 2000) (en banc).

Further, the complaint itself provides a lawful alternative explanation for the closures.  They took place when there was a period of "shortage of fed cattle following the droughts of late 2010 through 2013."  SAC ¶ 8.  When fewer cattle are available, less capacity is needed to process cattle.  The complaint asserts that, "[i]n relation to each closure, the relevant Packing Defendant offered pre-textual explanations such as a lack of available cattle in the adjacent regions and plant inefficiencies." *Id.* ¶ 152.  But the complaint does not state Cargill's supposed explanations or explain why they were pretextual.  And the closures were before the alleged conspiracy; the complaint admits that during the years of the alleged conspiracy, Cargill increased its slaughter volumes. *Id.* ¶¶ 106 fig.3, 163.

### C.    The remaining allegations involving Cargill do not support a conspiracy

The rest of the complaint's allegations against Cargill do not show that it was involved in the asserted conspiracy.

First, the complaint includes a number of allegations against "Tyson, JBS, Cargill, and National Beef," without providing any allegations specific to Cargill. *E.g.*, SAC ¶ 76 ("Tyson, JBS, Cargill, and National Beef all operate a live cattle procurement team."); *see id.* ¶¶ 1, 10, 77, 82-83, 102, 107-09, 111 n.40, 115, 117, 121-22, 127-28, 132, 139, 156, 160-61, 164, 166, 172, 177, 181, 183, 234-35. That group pleading is insufficient to allege an antitrust conspiracy against *Cargill. See In re Pork*, 2019 WL 3752497, at *8.

Second, the complaint includes a number of entirely benign statements about Cargill's business, none of which shows a conspiracy. In their entirety, the remaining allegations against Cargill are as follows:

- Cargill, Incorporated is a Delaware corporation with its principal place of business in Wayzata, Minnesota (which is in this judicial district). SAC ¶ 49; *see id.* ¶ 63 & n.14. Cargill Meat Solutions Corporation, a subsidiary of Cargill, Incorporated, is a Delaware corporation with its principal place of business in Wichita, Kansas. *Id.* ¶ 50. Cargill Meat Solutions Corporation is the "principal operating entity within Cargill's U.S. cattle and beef business." *Id.* The companies are referred to collectively as "Cargill." *Id.* ¶ 52.

  o These allegations would establish only that Cargill Meat Solutions Corporation is a subsidiary of Cargill, Incorporated, and that Cargill, Incorporated is subject to this Court's jurisdiction.

- Cargill, Incorporated and Cargill Meat Solutions Corporation "shared a unity of corporate interest and operated as part of a single enterprise in furtherance" of the alleged conspiracy. SAC ¶ 51; *see id.* app. 1 ¶¶ 20-29.

  o This is a legal conclusion "cast in the form of [a] factual allegation[]" that this Court is "free to ignore." *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002).

- In 2017, Cargill accounted for 22% of the total U.S. fed cattle slaughter and sold approximately $13.1 billion in beef. SAC ¶ 55; *see id.* ¶ 5 fig. 1.

  o These allegations would establish that Cargill is a meatpacker – nothing more.

11

- Until April 2017, Cargill owned a feedlot business, from which Cargill procured cattle for slaughter. SAC ¶ 108 & n.37. Cargill continues to purchase all of the cattle fed by that feedlot. *Id.*

   o These allegations would establish that Cargill buys fed cattle from a feedlot that it used to own. Plaintiffs do not allege that there is anything unlawful about that. Nor could they. *See Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1287-88 (11th Cir. 2005) (purchasing fed cattle through marketing agreements serves competitive purposes).

- Following a fire at a Tyson plant in August 2019, Cargill reduced its fed cattle bids by at least $5 per hundredweight. SAC ¶¶ 179-80.

   o This allegation is perfectly consistent with normal competitive behavior in the wake of a significant disruption to the industry.

- Cargill holds leadership positions in "certain working groups" of the U.S. Roundtables for Sustainable Beef, a trade organization. SAC ¶ 223 & n.141.

   o These allegations would establish that Cargill is involved in issues important to the beef industry. They do not suggest that Cargill colluded during any such meetings.

- "Cargill was the fourth largest U.S. pork processor until it sold its pork business to JBS in October 2015." SAC ¶ 237.

   o This allegation that Cargill used to be in the pork business is entirely irrelevant to this case involving the beef industry.

- Cargill "trades actively in the cattle futures markets." SAC ¶ 276.

   o This allegation pleads only lawful conduct.

- In 2017 and 2018, Cargill stated that rising demand for beef contributed to the results of its Animal Nutrition & Protein business. SAC ¶¶ 304-05.

   o These are simply observations about the industry. Plaintiffs plead no facts suggesting these statements are untrue, or that they are connected to the conspiracy in this case.

- Cargill's 2015 Corporate Responsibility report states that Cargill "compl[ies] with the laws and regulations that support fair competition and integrity in the marketplace." SAC ¶ 310(c) (internal quotation marks omitted). Cargill "reiterated this message" in subsequent years. *Id.*

- o This is simply a statement that Cargill complies with applicable laws.  Plaintiffs again plead no facts suggesting that the statement is untrue, or that it is connected to the conspiracy alleged in this case.

- Between 1997 and 2017, Cargill was involved in 13 regulatory actions.  SAC app. 2 at 8-11.

  - o None of the regulatory actions listed involved antitrust claims in the U.S. beef industry.  In any event, "[i]llegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy."  *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 402 (3d Cir. 2015) (internal quotation marks omitted).

These allegations do not plead that Cargill was part of a conspiracy to reduce fed cattle prices, or anything close to it.  They do not amount to direct evidence of a conspiracy, or parallel conduct and plus factors, or even reveal a motive to join a conspiracy.

## CONCLUSION

Given the dearth of Cargill-specific allegations in the complaint, it appears that Plaintiffs simply included Cargill in the complaint because Cargill Meat Solutions Corporation is a large meatpacker.  That is not enough to plausibly plead an antitrust conspiracy and proceed to discovery.  *See, e.g.*, *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1020 (D. Minn. 1997) (dismissing claims where the complaint "attempt[s] to lump [defendant] in with the other defendants"), *aff'd*, 195 F.3d 430 (8th Cir. 1999). And the few Cargill-specific allegations make clear that Cargill was not part of that conspiracy.  Accordingly, if the Court does not dismiss the complaint altogether, the Court should at a minimum dismiss the claims against Cargill, Incorporated and Cargill Meat Solutions Corporation.  And for the reasons provided in the joint motion to dismiss, that dismissal should be with prejudice.

Date:  November 13, 2019                 Respectfully submitted,

                                         s/ *Kathryn N. Hibbard*
                                         Kathryn N. Hibbard, Reg. No. 0387155
                                         X. Kevin Zhao, Reg. No. 0391302
                                         **GREENE ESPEL PLLP**
                                         222 South 9th Street, Suite 2200
                                         Minneapolis, MN 55402
                                         (612) 373-0830
                                         khibbard@greeneespel.com
                                         kzhao@greeneespel.com

                                         Mark W. Ryan
                                         Michael E. Lackey, Jr.
                                         Nicole A. Saharsky
                                         **MAYER BROWN LLP**
                                         1999 K Street, NW
                                         Washington, DC 20009
                                         (202) 263-3338
                                         mryan@mayerbrown.com
                                         mlackey@mayerbrown.com
                                         nsaharsky@mayerbrown.com
                                         *Admitted Pro Hac Vice*

                                         *Counsel for Defendants Cargill,*
                                         *Incorporated and Cargill Meat Solutions*
                                         *Corporation*