# NITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

IN RE CATTLE ANTITRUST LITIGATION

This Document Relates To:

*All Actions.*

Civil No. 19-1222

---

KENNETH PETERSON, RICHARD KIMBLE,
WILLIAM GEE, BRENDA KING, ANDREW
COHEN, CHONG LOR, KAREN CARTER,
MARCELO LOPEZ, APRIL
O'CONNOR,CINDY ABERNATHY, TANYA
LEWS, BRENT, RASMUSSEN, CHARLIE
MORGAN, SHARON DAWSON-GREEN,
KENT WINCHESTER, SHARON KILLMON,
LISA MELEGARI, NICOLE GUTIERREZ, and
MICHELLE OVERSEN,

                                    Plaintiffs,

v.

JBS USA FOOD COMPANY HOLDINGS,
CARGILL, INC., NATIONAL BEEF PACKING
COMPANY, and TYSON FOODS, INC.,

                                    Defendants.

Civil No. 19-1129 (JRT/HB)

---

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
## MOTIONS TO DISMISS

---

Thomas J. Undlin, **ROBINS KAPLAN LLP**, 800 LaSalle Avenue, Suite 2800,
Minneapolis, Minnesota 55402; Amanda F. Lawrence, **SCOTT & SCOTT,
ATTORNEYS AT LAW, LLP**, 156 South Main Street, P.O. Box 192, Colchester,
Connecticut 06415; Anthony F. Fata, **CAFFERTY CLOBES MERIWETHER &**

**SPRENGEL LLP**, 150 South Wacker Drive, Suite 3000, Chicago, Illinois 60606 for Direct Purchaser Plaintiffs.

Brian D. Clark and W. Joseph Bruckner, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, Minnesota 55401; Steve W. Berman, **HAGENS BERMAN SOBOL SHAPIRO LLP,** 1301 2nd Avenue, Suite 2000, Seattle, Washington 98101; Shana Scarlett, **HAGENS BERMAN SOBOL SHAPIRO LLP**, 715 Hearst Avenue, Suite 202, Berkeley, California 94710, for Indirect Purchaser Plaintiffs.

Kathryn N. Hibbard, **GREENE ESPEL PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, Minnesota 55402; Nicole A. Saharsky, **MAYER BROWN LLP**, 1999 K Street N.W., Washington, District of Columbia 20006, for Defendants Cargill, Inc., and Cargill Meat Solutions Corp.

Benjamin L. Ellison, **JONES DAY**, 90 South Seventh Street, Suite 4950, Minneapolis, Minnesota 55402 for Defendant National Beef Packing Co., LLC.

Jon B. Jacobs, **PERKINS COIE**, 700 13th Street N.W., Suite 600, Washington, District of Columbia, 20005 for Defendants Tyson Foods, Inc., and Tyson Fresh Meats, Inc.

Sami H. Rashid, **QUINN EMANUEL URQUHART & SULLIVAN LLP**, 51 Madison Avenue, New York, New York 10010; Patrick E. Brookhouser, Jr., **MCGRATH NORTH**, 1601 Dodge Street, Suite 3700, Omaha, Nebraska 68102 for Defendants JBS S.A., JBS USA Food Company, Swift Beef Co., and JBS Packerland, Inc.

Plaintiffs allege that Defendants, the nation's largest meat-packers, conspired to fix and suppress the price of fed cattle in violation of federal and state antitrust laws. Defendants now move to dismiss the claims against them. Because Plaintiffs have not pleaded their direct evidence with sufficient detail and because they have not pleaded parallel conduct sufficient to support an inference of a price-fixing conspiracy, the Court

will grant Defendants' Motions to Dismiss.  The Court will also grant Plaintiffs leave to amend their Complaints.

## BACKGROUND

This case represents the consolidation of several separately filed putative class actions.[1]  There are two sets of Plaintiffs.  First, there are institutional/organizational plaintiffs (1) Ranchers Cattlemen Action Legal Fund United Stockgrowers of America ("R-CALF USA"), a Montana nonprofit public benefit corporation; and (2) Farmers Educational and Cooperative Union of America ("Farmers Union" or "NFU"), a "national federation of state Farmers Union organizations existing under the laws of the State of Texas[.]"  (Civil No. 19-1222, Second Cons. Am. Compl. ("SCAC") ¶¶ 26–27, Oct. 4, 2019, Docket No. 125.) R-CALF USA and NFU seek "declaratory and injunctive relief in a representative capacity" and "damages in their personal capacity," because the alleged anticompetitive behavior "frustrated their respective missions . . . and diverted their resources to help their members mitigate damages and prevent further breaches of the law[.]"  (*Id.* ¶ 28.)

---

[1] The consolidated cases are all direct purchaser plaintiffs.  In addition, the Court is hearing jointly the Motions to Dismiss in the as-of-yet unconsolidated case, Civil No. 19-1129 *Peterson et al. v. JBS USA Food Co. et al.*, in which the plaintiffs are indirect purchasers bringing an equitable claim under federal law and related state-law damage claims.

Second, there are individual and business plaintiffs who "each sold fed cattle directly to one or more of the" four meat-packing Defendants.[2]  (*Id.* ¶ 36.)

Together, the four meat-packing Defendants purchase 83 percent of the slaughter-weight fed cattle in the United States.  (*Id.* ¶¶ 5, 84, App'x 3.)  After purchasing the cattle, Defendants process them into beef for sale to other processors, wholesalers, and retail outlets.  (*Id.* ¶ 4.)  Plaintiffs allege that from at least January 1, 2015 and continuing to the present day, Defendants conspired to fix and suppress the price of fed cattle in the United States.  (*Id.* ¶ 1.)

This alleged conspiracy was facilitated in part by a significant shift in how Defendants purchase fed cattle.  In 2005, "almost all" fed-cattle purchases were cash sales, meaning that meat packers sent agents "to feedlots and auctions" and those agents paid a "price set each day at the dollar mark where supply and demand met."  (*Id.* ¶ 79.)  Over the following decade the proportion of all fed-cattle purchases made by cash sale dropped to approximately 21%.  (*Id.* ¶ 80.)  In 2015, more than 60% of all fed-cattle purchases were made via so-called formula contracts.  (*Id.*, fig. 7)

Under formula contracts, fed-cattle producers agree to supply cattle to a packer once it reaches slaughter weight.  (*Id.*)  The contract price for the cattle is set by a formula that is driven by average cash-sale prices prevailing at, or just before, delivery, as reported

---

[2] Cargill, Inc., and Cargill Meat Solutions Corp., (together "Cargill"); JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc. (together, "JBS" ); National Beef Packing Co., LLC; and Tyson Foods, Inc., and Tyson Fresh Meats, Inc. (together, "Tyson").

by the USDA Agricultural Marketing Service's ("AMS") Livestock Mandatory Reporting ("LMR").[3]  (*Id.* ¶ 81.)  So, even though actual cash sales make up less than a quarter of Defendants fed-cattle purchases, the average cash-sale price affects approximately 85% of those purchases.  (*Id.*)

Defendants' profits are driven by the difference between the price paid for fed cattle and the price of beef—what is known as the "meat margin."  (*Id.* ¶ 83.)  In November 2014, fed-cattle prices peaked at $170 per hundredweight ("CWT").[4]  (*Id.* ¶ 86.)  Although Defendants "initially benefited from the rise" in fed-cattle prices "because wholesale beef prices rose in parallel," the meat margin eventually "fell to a low of approximately $50 in the months leading up to 2015" which sent Defendants' "margins into the red."  (*Id.* ¶ 87.)

Plaintiffs allege that Defendants engaged in a conspiracy to artificially drive down the price of fed cattle in order to maximize the meat margin.  This goal was accomplished, according to Plaintiffs, by an agreement to:

> (1) periodically restrain or reduce slaughter numbers so as to reduce demand for fed cattle; (2) curtail their purchases of cash cattle during these periods; (3) coordinate their procurement practices with respect to the cash cattle they did

---

[3] The purchases made by the four Defendants "provide over 90% of reported transactions" in the AMS LMR.  (SCAC ¶ 161.)

[4] "A hundredweight (cwt) is a unit of measurement used in certain commodities trading contracts. . . .  In the United States, a hundredweight is a unit of mass equal to 100 pounds."  James Chen, *Hundredweight (Cwt)*, Investopedia, https://www.investopedia .com/terms/h/hundredweight.asp

in fact purchase; (4) import foreign cattle to depress demand
for cheaper domestic cattle; and (5) close or idle slaughter
plants and refrain from expanding their remaining
slaughtering capacity.

(*Id.* ¶ 88.)  In 2015, JBS reduced its annual slaughter volume by 17%, National Beef by 6%,
and Tyson by 4%.  (*Id.* ¶ 163.)  Cargill "remained flat year-on-year, [but] it was significantly
below historic levels."  (*Id.*)  Plaintiffs also allege that Defendants were at the same time
importing cattle from abroad when domestic prices were low and failing to expand
slaughter operations when the price of cattle dropped.  (*Id.* ¶¶ 141–54.)  In the years that
followed, Defendants increased their slaughter volumes but never returned to pre-2015
levels.  (*Id.* ¶ 106, Fig. 3.)  These rates contrast with independent packers, which represent
the remaining 17% of purchases of fed cattle, whose average slaughter increased in 2015
and every year thereafter.  (*Id.*)  By the end of 2015 the price of fed cattle fell from $170
CWT to $120 CWT.  (*Id.* ¶¶ 86, 155–60.)  The shift equated to approximately a loss of $560
per 1400-pound steer inflicting historic losses on Plaintiffs.  (*Id.* ¶¶ 171–72, fig. 24.)
Plaintiffs allege Defendants then took advantage of this glut and increased their
respective purchase and slaughter volumes in the final quarter of 2015, an atypical time
of year to do so.  (*Id.* ¶ 162.)  A similar pattern followed in 2016, with the final year's price
"hover[ing] between $110 [and] $117 through December."  (*Id.* ¶ 175.)  Plaintiffs allege

that Defendants continued to keep prices artificially low in 2018 and 2019, in part by sounding an alarm about the glut of cattle reaching slaughter weight.[5]  (*Id.* ¶ 177–78.)

Plaintiffs also offer the testimony of two confidential witnesses.  (*Id.* ¶¶ 89–104, 111–21.)  Witness 1 was a quality-assurance officer at a Defendant's "slaughter plants located within the Texas Panhandle/Western Kansas region . . . for over 10 years until his employment ceased in 2018."  (*Id.* ¶ 90.)  Plaintiffs recount details of "multiple discussions" that Witness 1 had with the head of fabrication ("Fabrication Manager") at their plant, where "the Fabrication Manager explained that all of the Packing Defendants reduced their purchase and slaughter volume in order to reduce fed-cattle prices when Packing Defendants viewed fed-cattle prices as being 'too high' for their liking." (*Id.* ¶ 93.) Plaintiffs further allege that the Witness 1 and the Fabrication Manager had a discussion sometime in 2015 or early 2016 where the Fabrication Manager "specifically admitted that the Packing Defendants had an 'agreement' to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices."  (*Id.*)

Witness 2 was a feedlot manager, "who managed a 35,000 head commercial feedlot in the Panhandle region from 2012 until early 2016."  (*Id.* ¶ 111.)  Witness 2 described an anticompetitive "queuing convention," in which the price for cash sales are

---

[5] On August 28, 2019, U.S. Secretary of Agriculture Perdue announced he had "directed USDA's Packers and Stockyards Division to launch an investigation into recent beef pricing margins to determine if there is any evidence of price manipulation, collusion, restrictions of competition or other unfair practices."  (SCAC ¶ 179, n.92.)  The investigation is ongoing.

set not by competitive bidding but instead by a complicated system requiring producers to either agree to a bid or reject it but then requiring the producer to accept only a bid greater than the original price.  (*Id.* ¶ 115.)  If no buyer offers a higher price, the producer must return to the first bidder and offer a right-of-first refusal because that packer remains "on the cattle."  (*Id.*)  Witness 2 described the negative consequences of a failure to adhere to this convention; producers could be blackballed or boycotted for breaking with it. (*Id.* ¶ 119–20.)  Additionally, the four Defendants would allocate who made the first bid each week by "draw[ing] cards in his office."  (*Id.* ¶ 124.)

Based on the facts above, Plaintiffs allege that Defendants engaged in a price-fixing conspiracy to artificially depress the price of fed cattle, a per se violation of § 1 of the Sherman Act, 15. U.S.C. § 1.   The Direct Purchaser Plaintiffs bring a claim for treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15(a); Indirect Plaintiffs in *Peterson* bring a claim for injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26.[6]  The Indirect Plaintiffs also bring claims for damages under (1) the antitrust laws of 26

---

[6] Concluding that allowing otherwise "would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge," the Supreme Court has held that only direct purchasers may sue for damages in Sherman Act price-fixing cases. *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 737 (1977).   However, "the [*Illinois Brick*] direct-purchaser doctrine does not foreclose equitable relief." *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003).

jurisdictions;[7] (2) the consumer-protection laws of 20 jurisdictions;[8] and (3) the unjust-enrichment law of 28 jurisdictions.[9]   Finally, Plaintiffs also bring claims under the Commodities and Exchange Act ("CEA"), 7 U.S.C § 1 *et seq.*, and its related regulations, and the Packers and Stockyard Act ("PSA"), 7. U.S.C. § 181 *et seq.*

## DISCUSSION

## I.   STANDARD OF REVIEW

When reviewing a motion to dismiss brought under Rule 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a claim for "relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Although the Court accepts the complaint's factual allegations as true, it

---

[7] Arizona, California, the District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

[8] California, the District of Columbia, Florida, Hawaii, Illinois, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, and Utah.

[9] Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Historically, courts were somewhat hesitant to dismiss antitrust claims. *See Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976) (noting that "in antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.") (cleaned up).   However, the Supreme Court appeared to implicitly move away from that standard in *Twombly*, which was itself a Sherman Act case.  The Eighth Circuit has also recently taken a somewhat stricter view:

> Given the unusually high cost of discovery in antitrust cases, the limited success of judicial supervision in checking discovery abuse, and the threat that discovery expense will push cost-conscious defendants to settle even anemic cases[,] the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage.

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (cleaned up).

## II.    THE SHERMAN ACT

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  To establish a claim under § 1 "a plaintiff must demonstrate '(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under

either a *per se* rule of illegality or a rule of reason analysis; and (3) that the restraint

affected interstate commerce.'" *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F.

Supp. 2d 1039, 1062 (D. Minn. 2009) (quoting *Minn. Ass'n of Nurse Anesthetists v. Unity

Hosp.*, 5 F. Supp. 2d 694, 703 (D. Minn. 1998)).   Because § 1 "does not prohibit all

unreasonable restraints of trade. but only restraints effected by a contract, combination,

or conspiracy, the crucial question is whether the challenged anticompetitive conduct

stems from independent decision or from an agreement, tacit or express." *Twombly*, 550

U.S. at 553 (cleaned up).

"Certain agreements, such as horizontal price fixing . . . are thought so inherently

anticompetitive that each is illegal per se without inquiry into the harm it has actually

caused." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984).  Thus, where

plaintiffs allege horizontal price fixing or agreements between competing retailers to limit

output in order to increase price, the only thing that must be alleged at the motion-to-

dismiss stage is that defendants acted collectively or with concerted action.

"To satisfy the concerted action requirement, the plaintiff must demonstrate that

the defendants shared a unity of purpose or a common design and understanding, or a

meeting of the minds." *Insulate*, 797 F.3d at 543 (cleaned up). "Allegations of direct

evidence of an agreement, if sufficiently detailed, are independently adequate." *In re Ins.

Brokerage Antitrust Litig.*, 618 F.3d 300, 323–24 (3rd Cir. 2010) (citing *Twombly*, 550 U.S.

at 564).  However, direct evidence of an agreement is rare, particularly at the pleading

stage. *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 553–54 (8th Cir. 1991) ("[I]t is axiomatic that the typical conspiracy is rarely evidenced by explicit agreements, but must almost always be proved by inferences that may be drawn from the behavior of the alleged conspirators.").

Concerted action may also be demonstrated via circumstantial evidence through a showing of parallel conduct among defendants showing that their similar behavior "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S at 557, n.4 (cleaned up).

The Eighth Circuit has adopted a rule that to survive a motion to dismiss when the allegations point to parallel conduct, antitrust plaintiffs must also plead plus factors.[10] *See, e.g.*, *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) ("An agreement is properly inferred from conscious parallelism only when certain 'plus factors' exist.").  These plus factors might include (1) a shared motive to conspire; (2) action against self-interest; (3) market concentration; and (4) a substantial amount of interfirm communication in conjunction with the parallel conduct. *See, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194–95 (9th Cir. 2015).

---

[10] "A plus factor refers to 'the additional facts or factors required to be proved as a prerequisite to finding that parallel [price] action amounts to a conspiracy.'" *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3rd Cir. 1999)).

Thus, in order to survive a defendant's 12(b)(6) motion, plaintiffs alleging a price-fixing conspiracy must plausibly allege either (1) direct evidence of a conspiracy or (2) both concerted action (including parallel conduct) and at least one plus factor.

### A.    Direct Evidence

Defendants argue that the Confidential Witnesses are insufficiently identified to allow the Court to credit their testimony.  Defendants point to securities-litigation cases in which a heightened pleading standard is required by statute.  Defendants point to no authority in which such a heightened standard has been imported into the antitrust context.  The Court is not persuaded that such a heightened standard is required—as *Twombly* makes clear.

The question, then, is simply whether the Confidential Witnesses and their claims are "sufficiently detailed."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 323.  Plaintiffs do not provide the employer of the Witness 1 or the name of the feedlot at which Witness 2 worked.  Because of the lack of detail regarding the firms by which the Confidential Witnesses were employed, Plaintiffs do not adequately explain their jobs and how their interactions in those jobs would lead to them acquiring the knowledge they allegedly possess.  *Cf. Hinds Cty. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 396 n.5 (S.D.N.Y. 2010) (describing the particularity with which plaintiffs had pleaded how their confidential witnesses would have known what they were alleged to know).  The "queuing convention" alleged by Witness 2—which the Court could broadly view as a concerted

refusal to deal, which is itself a violation of the Sherman Act—is not the same anticompetitve behavior alleged by Witness 1, artificially limiting demand for fed cattle— which is the main thrust of Plaintiffs' alleged price-fixing conspiracy.  In all, the lack of detail about the Confidential Witnesses, combined with the mismatched nature of what they allege, lead the Court to conclude their claims are not sufficiently detailed to survive Defendants' Motion to Dismiss.

### B.    Indirect Evidence

#### 1. Plus Factors

Many of the same plus factors that the Court recently credited in *In re Pork Antitrust Litigation*, No. 18-1776, 2019 WL 3752497, at *7 (D. Minn. Aug. 8, 2019), are present in here.   The fed-cattle market is highly concentrated; indeed, the four Defendants make up 83% of the market, compared to eight firms controlling a similar share of the pork-processing market.  *In re Pork*, 2019 WL 3752497, at *1.  Demand for fed cattle, as a commodity, is similarly inelastic.   The Defendants belong to trade associations and regularly communicate through them, along with attending conferences together.   Plaintiffs also allege that Defendants engaged in actions against self-interest, such as importing cattle from abroad when domestic prices were low.   The market-wide change in pricing practices from cash sales to formula contracts also serve as a plus factor. The Court concludes that "[t]he plus factors identified and discussed by Plaintiff[s] are

undoubtedly strong and are of the type often used to support an inference of an agreement." *In re Pork*, 2019 WL 3752497, at *7.

### 2. Parallel Conduct

As in *In re Pork*, the Court concludes that although "Plaintiffs' cited plus factors are strong, the allegations at this point regarding parallel conduct are sparse and conclusory." *Id.* They do little to allege how the individual Defendants acted and instead resort to group pleading, arguing that the market did this or that. "Without specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted[.]" *Id.* at *8. The most specific allegations relate to a single year, 2015, where JBS reduced its annual slaughter volume by 17%, National Beef by 6%, and Tyson by 4%. Plaintiffs then go on to say little about the individual Defendants in the years that follow when slaughter volumes actually increase. As for the other allegations, such as a reduction in the amount of purchased cash cattle, Plaintiffs "rely almost exclusively on industry-wide data and ask the Court to infer that the individual Defendants all contributed to the decrease[] . . . simply because they make up the majority of the industry." *Id.* The Court declined to do so in *In re Pork* and it declines to do so here.

One important reason for the requirement of specific pleading when it comes to parallel conduct is that it allows the Court to conclude whether the allegations are plausible in the face of an "obvious alternative explanation." *Twombly*, 550 U.S. at 567–

68 (noting that there was "a natural explanation" for the noncompetition alleged by plaintiffs). Here, Defendants marshal alternative economic explanations for the aggregate data on which Plaintiffs rely; in the absence of individualized, specific allegations, the Court sees nothing more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 687 (citing *Twombly*, 550 U.S. at 556).

The Court finds that Plaintiffs have not adequately pleaded parallel conduct, which is an essential part of their Sherman Act claim. For that reason, the Court will grant Defendants' Motion to Dismiss.

## III.   STATE CLAIMS

In addition to their Sherman Act claims, the Indirect Plaintiffs in *Peterson* allege a variety of state-law antitrust, consumer-protection, and unjust-enrichment claims. Because these claims all rely on the same alleged price-fixing conspiracy creating the Sherman Act claim, which the Court finds deficient, the Court will grant Defendants' Motion to Dismiss these state claims as well.

## IV.   COMMODITY AND EXCHANGE ACT CLAIMS

The parties agree that the CEA claims rely on the same conspiracy alleged for the Sherman Act claims, but Plaintiffs oppose Defendants' assertion that the CEA claims should be dismissed in tandem with the Sherman Act claims.

It is possible for a CEA claim to continue when a Sherman Act claim fails. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F.Supp.2d 666, 695 (S.D.N.Y 2013)

(dismissing plaintiffs' antitrust claim but considering the merits of their CEA claim when claims are based on differing issues).  However, when the deficiencies in a Sherman Act claim are the allegations of Defendants' conspiracy and that conspiracy is the basis for a CEA claim, the CEA claim cannot continue.  *See In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 597–98 (S.D.N.Y. 2011) (noting that when the scienter allegations of the CEA claim are based on the same allegations that fail to allege a Sherman Act conspiracy, the CEA claim must fail).  The Court has concluded that Plaintiffs fail to allege a Sherman Act conspiracy; therefore, those allegations cannot adequately plead a CEA claim.  The Court will grant Defendants' Motion to Dismiss.

## V.      PACKERS & STOCKYARDS ACT CLAIMS

"[T]he 'chief evil' at which [the PSA] was aimed was 'the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper who sells, and unduly and arbitrarily to increase the price to the consumer who buys.'"  *Mahon v. Stowers*, 416 U.S. 100, 106 (1974) (quoting *Stafford v. Wallace*, 258 U.S. 495, 514–15 (1922)).  Plaintiffs concede that §§ 202(e), (f), and (g) of the PSA require the pleading of an antitrust conspiracy to survive dismissal.  Because the Court has found Plaintiffs' conspiracy claims insufficient, Plaintiffs claims under 7 U.S.C. §§ 192(e), (f), and (g) must also be dismissed.

This finding alone does not end the inquiry, however, because § 202(a) of the PSA is meant to be broader in scope than the Sherman Act.[11]  Therefore, Plaintiffs' failure to allege conspiracy under the Sherman Act is not necessarily fatal to their claim under § 202(a) of the PSA, and this portion of their complaint must be analyzed on its own merits.

Section 202(a) of the PSA reads: "It shall be unlawful for any packer . . . with respect to livestock . . . to . . . [e]ngage in or use any unfair, unjustly discriminatory, or deceptive practice or device."  7 U.S.C. § 192(a).  The Eighth Circuit has held that unlawful actions under § 202(a) of the PSA must have at least the potential to suppress or reduce competition.  *IBP, Inc. v. Glickman*, 187 F.3d 974, 977 (8th Cir. 1999); *Farrow v. U.S. Dep't of Agr.*, 760 F.2d 211, 214 (8th Cir. 1985).

The question here, then, is whether Plaintiffs successfully allege behavior by Defendants that could potentially suppress or reduce competition.  The two main allegations of anticompetitive behavior are the reduced slaughter volume in 2015 and the

---

[11] *Farrow v. U.S. Dep't of Agr.*, 760 F.2d 211 (8th Cir. 1985) ("[T]he Packers and Stockyards Act 'should be broadly construed to give the Secretary of Agriculture the authority to deal with any practices that inhibit the fair trading of livestock by stockyards, market agencies, and dealers.'" (*quoting Rice v. Wilcox*, 630 F.2d 586, 590 (8th Cir.1980)); *Swift & Co. v. United States*, 393 F.2d 247, 253 (7th Cir. 1968) (finding that two meatpackers violated §192(a) despite the fact that their behavior, which could be characterized as a "simple refusal to deal," was permissible under the Sherman Act); *Swift & Co. v. United States*, 308 F.2d 849, 853 (7th Cir. 1962) ("[L]egislative history showed Congress understood the sections of the Packers and Stockyards Act under consideration were broader in scope than antecedent legislation such as the Sherman Antitrust Act").

queuing convention.  For the former, Defendants rely on *In re Pilgrim's Pride Corp*., 728 F.3d 457, 463 (5th Cir. 2013), but that case is doubly inapposite: first, it was an appeal decided after a bench trial, meaning there were findings of fact on which to base a decision about anticompetitive behavior, and second, the court was considering the question of the defendant's liability under § 202(e), rather than § 202(a).  However, even at the more forgiving motion-to-dismiss stage, Plaintiffs fail to allege actions by Defendants that could suppress or reduce competition.  Merely cutting back slaughter volume in a single year cannot itself serve as the anticompetitive basis for a claim under § 202(a).  Plaintiffs' queuing-convention allegations are also insufficient to independently support a § 202(a) PSA claim.  Indeed, the Eighth Circuit explicitly held that right-of-first-refusal agreements do not violate the PSA.  *Glickman*, 187 F.3d at 977.  Therefore, the Court concludes that Plaintiffs have not alleged anticompetitive behavior as required by the Eighth Circuit to maintain a PSA § 202(a) claim.  The Court will therefore grant Defendants' Motion to Dismiss.

## VI.    LEAVE TO AMEND

Plaintiffs seek leave to amend their Complaints.  Leave to amend should be freely given "where justice so requires."  Fed. R. Civ. P. 15(a)(2).  Courts may "appropriately" deny leave when the parties have shown "undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice

to the non-moving party, or futility of the amendment." *Moses.com Secs., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005).

Defendants argue that because Plaintiffs submitted their Second Amended Complaint after the Court's decision in *In re Pork*, Plaintiffs were on notice regarding the specificity the Court would require for pleading a Sherman Act claim. The Court is cognizant of that issue but also notes that this case contains the additional issues of the Confidential Witnesses and the additional claims under the CEA and PSA, about which the Court had not previously "identified any deficiencies[.]" *In re Pork*, 2019 WL 3752497, at *10. Therefore, the Court will allow Plaintiffs the opportunity to amend their Complaints.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants' Joint Motion to Dismiss [Civil No. 19-1222, Docket No. 139] is **GRANTED**;

2.    Defendants' Joint Motion to Dismiss [Civil No. 19-1129, Docket No. 117] is **GRANTED**;

3.    The Second Amended Complaint [Civil No. 19-1222, Docket No. 126] is **DISMISSED** without prejudice;

4.    The Second Amended Complaint [Civil No. 19-1129, Docket No. 114] is **DISMISSED** without prejudice;

5.      All individual Motions to Dismiss [Civil No. 19-1222, Docket Nos. 143, 146, 148, and 150; Civil No. 19-1129, Docket Nos. 122, 124, 126, and 128] and the Motion to Approve Alternative Service [Civil No. 19-1222, Docket No. 170] are **DENIED** as moot;

6.      Plaintiffs shall have ninety [90] dates from the date of this order to file amended complaints.


DATED:  September 28, 2020                    _____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                                    Chief Judge
                                                         United States District Court