# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **IN RE CATTLE ANTITRUST LITIGATION** | Civil No. 19-cv-1222 (JRT/HB) |
| *This document relates to:*<br><br>ALL CASES | THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................... 1

II.     PARTIES .......................................................................................................... 15

     A.     Plaintiffs ................................................................................................ 15
     B.     The Tyson Defendants ......................................................................... 18
     C.     The JBS Defendants ............................................................................ 20
     D.     The Cargill Defendants ....................................................................... 22
     E.     National Beef ....................................................................................... 24
     F.     Packing Defendants ............................................................................. 25
     G.     John Doe Defendants ........................................................................... 25
     H.     Agents and Affiliates ........................................................................... 26

III.    JURISDICTION, VENUE AND COMMERCE ............................................ 26

IV.    OVERVIEW OF THE FED CATTLE MARKET ........................................ 29

V.     PACKING DEFENDANTS CONSPIRED TO DEPRESS FED
       CATTLE PRICES .......................................................................................... 40

     A.     Packing Defendants Agreed to Reduce and Restrain Their Collective
           Slaughter Volumes and to Pressure Cash Cattle Sellers ...................... 42
           1.     Mr. Hooker Was Well Positioned to Know About Defendants'
                 Agreement .............................................................................. 44
           2.     Witness 1 Learns of an Agreement Among Defendants ........... 47
           3.     The Available Data Corroborates Witness 1's Account ........... 49
           4.     Packing Defendants Agreed to Slash Cash Cattle Purchases During
                 Slaughter Reductions ............................................................. 55
     B.     Packing Defendants Coordinated Their Procurement Practices for Cash Cattle .. 61
     C.     Packing Defendants Uneconomically Imported Extra-Territorial Cattle to
           Depress Demand for Fed Cattle ........................................................... 79
     D.     Packing Defendants Agreed to Restrict Their Slaughtering Capacity ................. 83

VI.    PACKING DEFENDANTS' CONSPIRACY CAUSED THE 2015 PRICE
       COLLAPSE AND SUPPRESSED PRICES THEREAFTER ..................... 87

     A.     Packing Defendants' Conduct Precipitated the Collapse in Fed Cattle
           Prices in 2015 ...................................................................................... 87
     B.     Packing Defendants' Ongoing Conduct Continues to Depress Fed Cattle
           Prices Throughout 2016 ..................................................................... 101
     C.     Packing Defendants Continue Their Scheme in 2017 and 2018 Despite
           Increased Cattle Availability .............................................................. 108
     D.     The Years of 2019 and 2020 Bring Continued Parallel Slaughter and
           Pricing Behavior, a Fire at a Plant, and Regulatory Investigations ................... 111
           1.     Packing Defendants React to a Processing Plant Fire by Dropping
                 Cattle Prices and Raising Beef Prices .................................... 121
           2.     USDA Continues to Investigate Packing Defendants' Price
                 Manipulation Following the Holcomb Fire and During the COVID Crisis
                  ............................................................................................... 126

E.     Economic Analysis Supports the Existence of the Alleged Conspiracy............. 128
      1.     Supply and Demand Principles Do Not Explain the 2015 Price Collapse or Subsequent Low Prices......................................................... 129
      2.     Econometric Analysis Shows Artificially Depressed Fed Cattle Prices................................................................................................... 140
      3.     Explanations Proffered for the Drop in Fed Cattle Prices Do Not Withstand Scrutiny.................................................................... 144

**VII.    THE FED CATTLE MARKET IS CONDUCIVE TO COLLUSION ................... 147**

    A.     The Fed Cattle Packing Industry Has Experienced High Consolidation and Is Highly Concentrated ......................................................... 147
    B.     The Supply of Fed Cattle and Demand for Beef Are Relatively Insensitive to Short-Term Changes in Price.............................................. 148
    C.     Fed Cattle Producers Face Significant Market Access Risk.............................. 149
    D.     There Are Numerous Trade Organizations and Opportunities for Packing Defendants to Meet and Collude.................................................. 150
    E.     Packing Defendants Benefit from High Barriers to Entry .................................. 156
    F.     Packing Defendants Have Similar Cost Structures and Have Significant Oversight Over Each Other's Price and Production Decisions ......................... 158

**VIII.   PACKING DEFENDANTS' CONDUCT IS THE SUBJECT OF ONGOING INVESTIGATIONS IN THIS AND RELATED INDUSTRIES ............................... 160**

    A.     The DOJ Is Investigating Packing Defendants for Price-Fixing, Market Manipulation, and Unfair Practices in the Cattle and Beef Markets ................. 160
    B.     The USDA Is Investigating Defendants' Activities in Light of the Fire at Tyson's Holcomb Plant and COVID-19-Related Market Disruptions.............. 163

**IX.    MANIPULATION OF LIVE CATTLE FUTURES AND OPTIONS ..................... 169**

    A.     Futures and Options Generally ........................................................................ 171
      1.     CME Live Cattle Futures ..................................................................... 174
      2.     Options on Live Cattle Futures Contracts.............................................. 177
    B.     Packing Defendants Traded in Live Cattle Futures and Controlled the Delivery Process ............................................................................................. 179
    C.     Live Cattle Futures and Cattle Spot (Cash) Prices are Highly Correlated and Inextricably Linked .................................................................................. 183
    D.     Packing Defendants' Conspiracy to Suppress Physical Cattle Prices Created Artificial Live Cattle Futures Prices....................................................... 190
    E.     Packing Defendants Established Net Short Positions........................................ 191
      1.     Packing Defendants Established Net Short Positions in the Live Cattle Futures Markets to Suppress Cash Cattle.................................... 196
      2.     Packing Defendants Established Net Short Positions in the Live Cattle Futures Markets to Suppress the Price of Cattle Purchased Under Forward Contracts ...................................................................... 197
    F.     The Futures Trading Defendants Lacked the Commercial Need to Establish Short Positions................................................................................ 197
    G.     Allegations Derived from CFTC Whistleblower ................................................ 199

**X.**  **CLASS ACTION ALLEGATIONS** ............................................................ **200**

**XI.**  **STATUTE OF LIMITATIONS AND TOLLING** .................................... **204**

    A.    Continuing Violation ........................................................... 204

    B.    Inquiry Notice and Due Diligence .................................... 205

    C.    Fraudulent Concealment ..................................................... 207

**XII.**  **CLAIMS FOR RELIEF** ...................................................................... **210**

**XIII.**  **PRAYER FOR RELIEF** ...................................................................... **218**

**XIV.**  **JURY DEMAND** ................................................................................. **219**

Plaintiffs Ranchers Cattlemen Action Legal Fund United Stockgrowers of America, Farmers Educational and Cooperative Union of America, Weinreis Brothers Partnership, Minatare Feedlot, Inc., Charles Weinreis, Eric Nelson, James Jensen d/b/a Lucky 7 Angus, Richard Chambers as trustee of the Richard C. Chambers Living Trust, Steven Graham, and Nathan Graham ("Plaintiffs"), on behalf of themselves and all other similarly situated persons and entities, bring claims against the following for their violations of law from at least January 1, 2015, through the present (the "Class Period"): Tyson Foods, Inc., Tyson Fresh Meats, Inc. ("Tyson Fresh") (collectively, "Tyson"), JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc. (collectively, "JBS"), Cargill, Incorporated, Cargill Meat Solutions Corporation (collectively, "Cargill"), and National Beef Packing Company, LLC ("National Beef," and all collectively, the "Packing Defendants"), and John Does 1-10 (who traded in cattle futures and options on the Chicago Mercantile Exchange ("CME"), which is owned by the CME Group Inc.) (the "John Doe Defendants") (collectively with the Packing Defendants, the "Defendants").[1]  Based upon personal knowledge, information and belief, and investigation of counsel, Plaintiffs allege as follows:

## I.    INTRODUCTION

1.      From at least January 1, 2015, through the present, Packing Defendants conspired to fix and suppress – and did, in fact, fix and suppress – the price of fed cattle in the United States.  Leveraging their consistent control of the purchase of nearly 85% of fed

---

[1]      Plaintiffs reserve the right to amend their complaint once the identities of any further alleged conspirators are established.

cattle in the United States during the Class Period, these meatpacking conglomerates each caused substantial damages to Plaintiffs and members of the Producer Class (as defined below), whose livelihoods depend on getting competitive prices for the cattle they sell, inevitably, to Packing Defendants.  Witness accounts, Packing Defendants' trade records, and economic evidence confirm this anticompetitive conduct.

2.     As a direct and proximate result of Packing Defendants' conspiracy and overt acts taken in furtherance thereof, Packing Defendants paid lower prices for fed cattle directly to Producer Plaintiffs (as defined below) and members of the Producer Class than they would have in a competitive market.  At the same time, those transacting in live cattle futures and options (the "Exchange Class," as defined below), including certain Plaintiffs, suffered significant harm as a result of Defendants' conduct.

3.     As background, fed cattle are steers and heifers raised and fed for the production and sale of high quality beef products.  Packing Defendants are beef packers who purchase fed cattle from Plaintiffs and other producers of fed cattle (the "Producer Class") for slaughter.  Packing Defendants then process the resulting carcasses into beef for sale to other processers, wholesalers, and retail outlets.  Live Cattle Futures contracts are standardized contracts traded on the CME in which the contract buyer agrees to take delivery, from the contract seller, of a standardized quantity of fed cattle, at a predetermined price on a future delivery date.[2]

---

[2]     For purposes of this complaint, references to "Live Cattle Futures" include live cattle futures and options on Live Cattle futures traded on the CME.

4.      Packing Defendants control the U.S. market for the purchase of slaughter-weight fed cattle.  Following a series of mergers and acquisitions beginning in the 1980s and culminating in 2013, Packing Defendants, through their operating subsidiaries, Tyson Fresh, Swift/Packerland, CMS, and National Beef (defined below in Section II) have purchased and slaughtered between 82% and 87% of all fed cattle sold within the United States on an annual basis.[3]  Figure 1 demonstrates Packing Defendants' overwhelming dominance of the market for the purchase of fed cattle:

**Figure 1.  Packing Defendants' Share of Annual U.S. Fed Cattle Slaughter Volumes**[4]





---

[3]      Cattle Buyers Weekly, "Top 30 Beef Packers" Annual Reports, 2008-2019, http://www.cattlebuyersweekly.com/users/rankings/index.php  ("CBW Top 30 Beef Packers"); *2018 Meat & Poultry Facts*, 47th Ed., NORTH AMERICAN MEAT INSTITUTE, 2019, at 12 ("2018 Meat & Poultry Facts"); USDA Market News Service Report: Actual Slaughter Under Federal Inspection (SJ_LS711).  (Unless otherwise indicated, all websites cited in this Complaint were last accessed on December 22, 2020.)

[4]      *Id.*  The same sources were used to compile Figures 3 and 4.

3

5.     Packing Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef. As the supply of fed cattle is insensitive to short-term changes of price – owing to the long life cycle of fed cattle, their perishable nature, and their lack of any alternative use – and as beef demand is also relatively insensitive to changes in price, the meat margin is very sensitive to changes in aggregate industry slaughter levels.   Consequently, Packing Defendants can increase the meat margin, and thus their profitability, by working cooperatively to reduce their respective slaughter volumes, thereby depressing the price of fed cattle.

6.     Packing Defendants each procure about 70% of their fed cattle though alternative marketing agreements ("AMAs"), such as "formula" and "forward" contracts. Under these contracts, the producer agrees to deliver its cattle to a Packing Defendant once they have reached slaughter-weight at a price to be determined at or around the time of delivery.  The price formulas used by formula contracts typically incorporate reported prices of fed cattle sold in the weekly cash cattle trade, the industry's spot market.  The price formulas used by forward contracts incorporate Live Cattle futures prices, which, in turn, are directly impacted by reported cash cattle prices.  As a result, the prices paid for fed cattle in the cash cattle trade – which constitutes a mere 20%-25% of all fed cattle sold in the United States – determines the price of almost all fed cattle sold to Packing Defendants by Plaintiffs and members of the Producer Class.

7.     In 2009-2014, the years leading up to the Class Period, fed cattle prices increased steadily in response to strong beef demand and a shortage of fed cattle following

the droughts of late 2010 through 2013. After prices peaked in November 2014, the industry expected the price of fed cattle to stabilize in 2015 and to continue at or around the $150 per hundredweight ("cwt") mark for a number of years before experiencing a gradual decline.

8.    Packing Defendants colluded to make sure, notwithstanding growing beef demand, that this widely predicted period of price stability would never happen. Packing Defendants used their market power and the relatively small cash cattle trade to their advantage and embarked upon a conspiracy to depress fed cattle prices that began no later than January 2015 and continues through to this day.

9.    Packing Defendants carried out their conspiracy to reduce fed cattle prices, and thereby increase the meat margin, through at least the following coordinated conduct, implemented by their operating subsidiaries:

- Jointly managing their fed cattle purchases below the available supply of fed cattle, including by simultaneously and periodically reducing purchase and slaughter volumes of fed cattle, and in particular, cash cattle;

- Orchestrating, monitoring, and enforcing anticompetitive procurement practices;

- Continuing to import foreign cattle after it became uneconomical for them to do so; and

- Closing and idling plants.

10.    Most egregiously, Packing Defendants all engaged in periodic and parallel slaughter reductions throughout the Class Period. As explained by Tyson Fresh's

5

President, Stephen Stouffer, on the eve of the Class Period, because Packing Defendants'

beef packing business was "a margin spread game," Tyson and its competitors could be

profitable notwithstanding the shortage of fed cattle they faced in the coming years:

> By rationing that supply, by lowering that volume coming into the market
> we are able to generate that margin spread.  And that is not going to change
> anytime soon.  As we continue on in these tightened supply periods we're
> going to continue to manage margin.[5]

11.     Packing Defendants' joint management of their respective slaughter volumes

during the Class Period is immediately apparent from Figure 2 below, which tracks their

quarterly slaughter volumes and shows them moving in tandem:

**Figure 2: Packing Defendants' Quarterly Fed Cattle Slaughter Volume**



---

[5]     Stephen Stouffer, President, Tyson Fresh, Presentation at Tyson Foods Investor Day
(December 10, 2014).

12.     In particular, Figure 2 shows the reduction in each Packing Defendant's slaughter volumes across 2015, precipitating the collapse in fed cattle prices discussed below.  It also shows the consistent reductions made by Packing Defendants in the late winter/spring and fall of each year – highlighted in their Q1 and Q4 slaughter figures.  And while the quarterly reporting period obscures certain shorter reductions described below in Section VI, it also highlights the remarkable extent to which Packing Defendants' quarter-to-quarter slaughter changes move in lockstep, consistent with an agreement to jointly manage their collective demand below the available cattle supply.   Remarkably, notwithstanding that Packing Defendants' benefitted from record margins throughout the Class Period, none sought to increase their profits by increasing their market share of the available cattle.

13.     Packing Defendants' agreement to manage their demand below the available cattle supply directly impacted their annual slaughter volumes, as is illustrated in Figures 3 and 4 below.  Figure 3 compares the average annual slaughter volume of the Packing Defendants during the pre-Class Period and the portion of the Class Period for which data exists against that of the other U.S. beef packers.  It shows that each Packing Defendant reduced its annual slaughter volumes relative to the pre-Class Period, while independent regional packing businesses ("Independent Packers") increased their slaughter volume as a whole.

**Figure 3. Average Pre- & Post-Class Period Fed Cattle Slaughter – Packing Defendants vs. Independent Packers**



14.     Figure 4 also compares Packing Defendants' and Independent Packers' annual slaughter volumes during the Class Period and the pre-Class Period, but breaks out the slaughter volume for each year of the Class Period for which data is available.  It confirms that Tyson, JBS, Cargill, and National Beef each slaughtered less fed cattle in every year in the Class Period compared to their pre-Class Period averages.  It also shows that while each Packing Defendant gradually increased its slaughter volume from 2016 as the supply of fed cattle increased, each Packing Defendant's rate of increase was vastly outpaced by the slaughter volume increases of Independent Packers during the same period.  Packing Defendants thus used periodic slaughter reductions and underutilized plant capacity to ensure their collective demand for fed cattle never outstripped the available

supply of slaughter-weight fed cattle, thereby ensuring the continued suppression of fed cattle prices.

**Figure 4.   Average Pre- & Post-Class Period Fed Cattle Slaughter – Packing Defendants vs Independent Packers**[6]



15.   The figures above thus clearly show that each Packing Defendant slaughtered significantly less fed cattle in 2015 than its respective pre-Class Period averages, and then maintained artificially low slaughter levels throughout the remainder of the Class Period.

16.   Packing Defendants' agreement to "ration" the available fed cattle rather than compete for the available supply worked to their advantage as it precipitated an unprecedented collapse in fed cattle prices in 2015, and continued to suppress fed cattle prices thereafter:

---

[6]   National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume.  Absent that acquisition, its year-over-year slaughter volume was flat against 2018, while Independent Packers' collective slaughter volume rose by approximately 100,000 head (netting out National Beef's acquisition of Iowa Premium).

**Figure 5.  Fed Cattle Prices vs. Retail Beef Prices**



17.    Even with the drastic collapse in fed cattle prices caused by Packing Defendants' conspiracy, Packing Defendants continued to benefit from record beef prices. This disconnect allowed Packing Defendants to post record per-head meat margins continually throughout the Class Period at the expense of fed cattle producers (Class Members), as illustrated in Figure 6 below:

**Figure 6.  Weekly Packer Per-Head Meat Margin (1,403 lb. Avg. Live Steer 65-80% Choice; 877 lb. Avg. Dressed Carcass)[7]**



18.    Confidential witness accounts confirm the existence of Packing Defendants' conspiracy to suppress fed cattle prices.  To begin with, a witness previously employed by Swift (JBS) at its Cactus, Texas slaughter plant confirmed that each Packing Defendant

---

[7]    Table prepared using USDA Market News Service Reports: 5-Area Weekly Live Steer Price per CWT (LM_CT150), National Weekly Boxed Beef Cutout and Boxed Beef Cuts - Negotiated Sales (LM_XB459) and By-Product Drop Value data available here: https://marketnews.usda.gov/mnp/ls-report-config.  During the COVID-19 pandemic, the meat margin rose above $800 per head in the week of April 17, 2020, peaking at approximately $2,600 per head in the week of May 15, 2020, before falling below $800 per head again in the week of June 12, 2020.

expressly agreed to periodically reduce its respective purchase and slaughter volumes in order to reduce the prices it would otherwise pay for fed cattle during the Class Period.

19.     Additionally, available transaction data and slaughter volume, both Defendant-specific and the aggregated data published by the United States Department of Agriculture ("USDA"), corroborate the witness's account.

20.     This data also demonstrates that Packing Defendants drastically reduced their purchases of cash cattle during these periods of slaughter restraint.  Packing Defendants did so in an attempt to "back-up" (that is, create a glut in) the number of slaughter-ready cash cattle and encourage producers to accept lower prices for their highly perishable product.  Doing so not only dropped cash cattle prices, but also the prices paid under Packing Defendants' formula and forward contracts.

21.      Once Packing Defendants cratered the cash cattle trade and created a relative supply glut, they each ramped up their cash cattle purchases and forced other producers to accept formula and forward contracts, reaping supra-competitive profits at the expense of the producers who were left with no competitive marketing outlet for their cattle.

22.     In addition, Packing Defendants engaged in various collusive bidding practices that further suppressed prices.  In particular, they coordinated the timing of their purchases, the prices they would bid, the means of negotiating those bids, and the regions and feedlots where they would make those bids.  For example, available data suggests that Packing Defendants bought all or substantially all of their cash cattle in a short window on Friday in 36% of the trading weeks during the Class Period.  Packing Defendants' use of a

parallel purchasing window differed from the practices of regional Independent Packers, which bid on and purchased cash cattle throughout the entire week during the Class Period.

23.     Packing Defendants' coordinated procurement practices further pressured producers to sell their fed cattle cheaply or risk being left without a marketing outlet for their perishable commodity.  As a result, throughout the Class Period, producers had no ability to negotiate higher prices with the Packing Defendants, and were compelled to accept whatever low bid for their cattle they did actually receive.

24.     Packing Defendants employed other procurement methods to depress the cash cattle price reports incorporated directly into their formula contracts and also into their forward contracts.  In particular, import data show that Packing Defendants continued importing large numbers of live cattle for slaughter from Canada, even after it became uneconomical for them to do so.  Such conduct would not have been economically rational but for Packing Defendants' agreement to curtail their domestic cash cattle purchases.

25.     Finally, Packing Defendants' closure and idling of certain plants immediately prior to and during the Class Period is strongly suggestive of an agreement among Packing Defendants to reduce or restrain their respective slaughter capacities and to limit competition for the available supply of fed cattle.

26.     All of this conduct occurred in a market that is highly conducive to collusion for numerous reasons, including: the small number of big market beef packers, the high barriers to entry, and frequent, easily accessible means of communications among Packing Defendants.  Packing Defendants' field buyers had ample opportunity to meet and exchange commercially sensitive information with each other each week as they inspected

13

feedlots within their respective territories.[8]  Field buyers routinely communicated "market color" obtained from the field – including reports of their competitors' activities obtained from producers – back to their head offices and their firms' other field buyers through daily conference calls.  Packing Defendants were also members of various trade and industry organizations, which provided additional opportunities to conspire.

27.     Economic analysis further supports the existence of the alleged conspiracy. Plaintiffs' economic analysis shows that:

   a. Supply and demand drivers of fed cattle prices, and other commonly proffered explanations, do not explain the 2015 collapse in fed cattle prices or the low prices that have prevailed since then; and

   b. Fed cattle prices have been artificially depressed since January 2015.

28.     Plaintiffs seek relief under the Sherman Antitrust Act, the Clayton Antitrust Act, the Packers and Stockyards Act, and the Commodity Exchange Act for the injuries and damages they and other members of the Classes suffered during the Class Period.  In support of their allegations, Plaintiffs put forth (1) direct evidence of a conspiracy through the eye witness recollections of Witness 1 and Witness 2; (2) parallel conduct involving periodic slaughter restraint and coordinated fed cattle procurement practices; (3) plus factors showing the market is susceptible to collusion; and (4) economic analysis demonstrating anticompetitive effects including both the suppression of fed cattle prices

---

[8]     A feedlot is a plot of land on which cattle are fed intensively so as to reach slaughter weight.

and the historical margins enjoyed by Packing Defendants at the expense of the Classes. In addition, regulators are actively investigating the very same conduct.

## II.   PARTIES

### A.   Plaintiffs

29.   Plaintiff Ranchers Cattlemen Action Legal Fund United Stockgrowers of America ("R-CALF USA") is a non-profit public benefit corporation existing under the laws of the State of Montana, and has its principal place of business in Billings, Montana. It is the largest cattle producer-only based membership trade organization, and works to "address the market interest of U.S. cattle producers with the primary purpose of addressing the threats posed to the domestic live cattle industry by unfair and illegal trade practices and imports."[9]  Its members include fed cattle producers who sold fed cattle to Packing Defendants and individuals who transacted cattle futures and options on the CME during the Class Period.

30.   Plaintiff Farmers Educational and Cooperative Union of America, commonly known as National Farmers Union ("NFU"), is a national federation of state Farmers Union organizations existing under the laws of Texas, and has its principal place of business in Washington, the District of Columbia.  Founded in 1902, NFU is the oldest and second largest general farm organization in the United States and represents nearly 200,000 U.S. family farmers and ranchers, with organized chapters across 33 different states.  NFU works to protect and enhance the economic well-being and quality of life for

---

[9]     R-CALF USA Amended Articles of Incorporation dated April 21, 2009, Art. VI.

family farmers, fishers, ranchers, and rural communities through educational efforts and by advocating for policy positions that are developed by the grassroots membership. Nineteen of the NFU's state divisions are recognized by the USDA as Certified Nominating Organizations (CNOs) for the Cattlemen's Beef Promotion and Research Board and, as such, have certified to the Secretary of Agriculture that "a primary or overriding purpose of this organization or association is to promote the economic welfare of cattle producers." NFU members include fed cattle producers who sold fed cattle to Packing Defendants and individuals who transacted cattle futures and options on the CME during the Class Period.

31.     R-CALF USA and NFU, respectively, have standing to bring this action pursuant to established Supreme Court precedent for: (a) declaratory and injunctive relief in a representative capacity on behalf of their respective members, who are adversely affected by Packing Defendants' misconduct described herein and whose participation is not required for the declaratory and injunctive relief sought; and (b) damages in their personal capacity for that same misconduct, which has frustrated their respective missions to protect the interests of their members, and diverted their resources to help their members mitigate damages and prevent further breaches of the law by Packing Defendants.

32.     Plaintiff Weinreis Brothers Partnership ("Weinreis Brothers") is a general partnership organized under the laws of North Dakota, and has its principal place of business in Scottsbluff, Nebraska.

33.     Plaintiff Minatare Feedlot Inc. ("Minatare") is a Nebraska corporation with its principal place of business in Scottsbluff, Nebraska.

34.    Plaintiff Charles "Chuck" Weinreis ("Weinreis") is an individual, a partner of Weinreis Brothers, president of Minatare, and a sole proprietor with a principal place of business in Scottsbluff, Nebraska.

35.    Plaintiff Eric Nelson ("Nelson") is an individual and sole proprietor with a principal place of business in Moville, Iowa.

36.    Plaintiff James "Jim" Jensen d/b/a Lucky 7 Angus ("Lucky 7 Angus") is an individual and sole proprietor with a principal place of business in Riverton, Wyoming.

37.    Plaintiff Richard "Rick" Chambers ("Chambers") is the trustee of the Richard C. Chambers Living Trust ("Chambers Trust"), a trust organized under the laws of Kansas, with a principal place of business in Hays, Kansas.  Chambers is also a beneficiary of the Chambers Trust.

38.    Plaintiffs Steven Graham and Nathan Graham own a cattle feeding business with a principal place of business in Cherokee, Iowa.  Steven Graham operated the business as a sole proprietor until in or around 2018.  Beginning in or around 2018, Steven Graham operated the business in partnership with Nathan Graham.  The Graham's feedlot, at times, conducted business under the name "Graham Feedlot."  Steven Graham, Nathan Graham, and the Graham Feedlot are collectively referred to herein as "the Grahams."

39.    During the Class Period, the Weinreis Brothers, Weinreis, Nelson, Lucky 7 Angus, Chambers as trustee of the Chambers Trust, and the Grahams (collectively, the "Producer Plaintiffs") each sold fed cattle directly to one or more of the Packing Defendants.  During the Class Period, Minatare owned and sold fed cattle directly to one or more of the Packing Defendants on behalf of Weinreis.

40.     During the Class Period, the Weinreis Brothers, Weinreis, Nelson, Lucky 7 Angus, Chambers as trustee of the Chambers Trust, and Steven Graham (the "Exchange Plaintiffs") each transacted in Live Cattle futures and/or options on the CME.

41.     As a consequence of the conduct described in this Complaint:

a.     Producer Plaintiffs and Producer Class members suffered damages in that they received less for their sales of fed cattle to Packing Defendants than they would have in the absence of the violations of law alleged herein; and

b.     Exchange Plaintiffs suffered damages from a manipulated Live Cattle futures and options market.  Exchange Plaintiffs suffered monetary losses by transacting in Live Cattle futures and options at artificial prices directly resulting from Packing Defendants' conduct, including their suppression of fed cattle prices and Live Cattle futures.  Further, during the Class Period, Plaintiffs Weinreis Brothers, Weinreis, Lucky 7 Angus, Chambers as trustee of the Chambers Trust, and Exchange Class members suffered aggregate net trading losses on their respective combined purchases and sales of CME Live Cattle futures and options.

## B.    The Tyson Defendants

42.     Defendant Tyson Foods, Inc. ("Tyson Foods") is a Delaware corporation with its principal place of business located at 2200 Don Tyson Parkway, Springdale, Arkansas 72762.  Tyson Foods is the parent company of the Tyson group.

43.     Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh") is a wholly owned subsidiary of Tyson Foods.  Tyson Fresh is a Delaware corporation with its principal place of business located at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049.  Tyson Fresh is the principal operating entity within Tyson's U.S. cattle and beef business.  Tyson Fresh owns and operates directly, or indirectly through its subsidiaries, Tyson Fresh's U.S. fed cattle slaughter plants located at: Holcomb, Kansas; Dakota City, Nebraska; Lexington, Nebraska; Amarillo, Texas; Hillsdale, Illinois; and Pasco, Washington.  Tyson Fresh is the contracting entity for fed cattle purchased and slaughtered at these plants.

44.     Tyson Foods and Tyson Shared Services, Inc. (a Tyson group services company), both transacted Live Cattle futures and options contracts during the Class Period on behalf of Tyson's U.S. beef business, operated by Tyson Fresh.

45.     As detailed in Appendix 1, during the Class Period, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct that caused injury to, and derived direct benefit from, members of both Classes in the United States and in this District.

46.     Defendants Tyson Foods and Tyson Fresh are referred to collectively herein as "Tyson" or the "Tyson Defendants."  However, where Plaintiffs ascribe an action to "Tyson," including through use of the defined term "Packing Defendants," unless stated otherwise, the action is alleged to have been taken by Tyson Fresh.  For the avoidance of doubt, Plaintiffs' allegations regarding "Tyson's" purchase and slaughter of fed cattle, the operation of slaughter plants, and sale of resultant beef, are directed at Tyson Fresh, as the operating entity of the Tyson single enterprise.  Allegations as to "Tyson's" participation

19

in the continuing agreement, understanding, and conspiracy alleged herein are directed to both Tyson Foods and Tyson Fresh.

### C. The JBS Defendants

47.     Defendant JBS S.A. is a Brazilian corporation with its principal place of business located at Av. Marginal Direta do Tiete, 500 Bloco 3-3o. andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil.  JBS S.A. is the parent company of the JBS group.

48.     Defendant JBS USA Food Company ("JBS USA") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634.  JBS USA acts as both an operating entity and holding company within JBS's U.S. cattle and beef business.  It is the contracting entity for certain of JBS's purchases of fed cattle in the USA and associated freight contracts.

49.     Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634. Swift operates and owns directly, or indirectly through its subsidiaries, JBS's U.S. fed cattle slaughter plants in Cactus, Texas; Greeley, Colorado; Grand Island, Nebraska; and Hyrum, Utah plants.  Swift also contracts for the majority of purchases of fed cattle to be slaughtered at these plants.

50.     Defendant JBS Packerland, Inc. ("JBS Packerland" or "Packerland") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634.  Packerland operates JBS's Regional Beef business unit. In that capacity, Packerland owns directly, or indirectly through its subsidiaries, certain of JBS's U.S. fed and dairy cattle slaughter plants, including the Packerland packing plants

20

in Green Bay, Wisconsin; Plainwell, Michigan; Omaha, Nebraska; the Sun Land Beef plant in Tolleson, Arizona; and the Moyer Packing plant in Souderton, Pennsylvania. Packerland also contracts for the majority purchases of fed cattle to be slaughtered at these plants.

51. Various senior staff and executives responsible for the operation of JBS's U.S. fed cattle and beef business during the Class Period were employed by each of JBS USA, Swift, and Packerland.[10]

52. JBS USA transacted in Live Cattle futures and options on behalf of JBS's U.S. fed cattle and beef business during the Class Period,[11] as did JBS S.A.[12] Other affiliates, including J&F Oklahoma Holdings, Inc. and JBS Five Rivers Cattle Feeding LLC, which was a wholly-owned indirect subsidiary of JBS USA until its divestment in 2018, also transacted in Live Cattle futures and options.

53. Defendants JBS USA, Swift, and Packerland were, throughout the Class Period, wholly-owned, direct or indirect subsidiaries of JBS S.A.

54. Defendants JBS S.A., JBS USA, Swift, and Packerland are referred to collectively herein as "JBS" or the "JBS Defendants." Swift and Packerland are collectively referred herein as Swift/Packerland.

55. As detailed in Appendix 1, during the Class Period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance

---

[10]   JBS USA Food Company's, Swift Beef Company's, and JBS Packerland, Inc.'s Disclosures, Pursuant to Attachment 1 of ECF No. 196, June 12, 2020, at 8-10, 14.

[11]   JBS S.A., 2017 Annual Report at 62 (Mar. 29, 2018), available at https://sec.report/otc/financial-report/189800.

[12]   *Id.* at 59, 62.

of the conspiracy that purposefully directed conduct that caused injury to, and derived direct benefit from, members of both Classes in the United States and in this District.

56.     Where Plaintiffs ascribe an action to "JBS," including through use of the defined term "Packing Defendants," unless stated otherwise, the action is alleged to have been taken by Swift and Packerland.  For the avoidance of doubt, Plaintiffs' allegations regarding "JBS's" purchase and slaughter of fed cattle, the operation of slaughter plants, and sale of resultant beef, are directed at Swift and Packerland, the operating entities of the JBS single enterprise.  Allegations as to "JBS's" participation in the continuing agreement, understanding, and conspiracy alleged herein are directed at each of JBS S.A., JBS USA, Swift, and Packerland.

### D.     The Cargill Defendants

57.     Defendant Cargill, Incorporated ("Cargill, Inc.") is a Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391. Cargill, Inc. is the parent company of the Cargill group.

58.     Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) ("CMS"), a subsidiary of Cargill, Inc., is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202.  CMS is the principal operating entity within Cargill's U.S. cattle and beef business and a wholly owned subsidiary of Cargill, Inc.  CMS owns and operates, directly, or indirectly through its subsidiaries, Cargill's U.S. fed cattle slaughter plants located at: Dodge City, Kansas; Schuyler, Nebraska; Friona, Texas; Fort Morgan, Colorado; Fresno, California;

Wyalusing, Pennsylvania.[13]   CMS is the contracting entity for fed cattle purchased and slaughtered at these plants.  On information and belief, Cargill Inc. and CMS transacted Live Cattle futures and options and reported Large Trader Position Data to the CFTC during the Class Period.

59.     Defendants Cargill, Inc. and CMS are referred to collectively herein as "Cargill" or the "Cargill Defendants."

60.     As detailed in Appendix 1, during the Class Period, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct that caused injury to, and derived direct benefit from, members of both Classes in the United States and in this District.

61.     Where Plaintiffs ascribe an action to "Cargill," including through use of the defined term "Packing Defendants," unless stated otherwise, the action is alleged to have been taken by CMS.   For the avoidance of doubt, Plaintiffs' allegations regarding "Cargill's" purchase and slaughter of fed cattle, the operation of slaughter plants, and sale of resultant beef, are directed at CMS, as the operating entity of the Cargill single enterprise.   Allegations as to "Cargill's" participation in the continuing agreement, understanding, and conspiracy alleged herein are directed to both Cargill Inc. and CMS.

---

[13]     CMS also processes non-fed cattle, principally at its Fresno, California and Wyalusing, Pennsylvania plants.  Such cattle are estimated to comprise between 11-13% of its total slaughter volume annually.

E.      **National Beef**

62.     Defendant National Beef Packing Company, LLC ("National Beef") is a Delaware limited liability company with its principal place of business located at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163.  National Beef owns and operates, directly, or indirectly through its subsidiaries, National Beef's U.S. fed cattle slaughter plants, located at: Dodge City, Kansas; Liberal, Kansas; and Tama, Iowa.[14] National Beef is the contracting entity for fed cattle purchased and slaughtered at these plants.  National Beef transacts Live Cattle futures and options and reported Large Trader Position Data to the CFTC during the Class Period.

63.     Marfrig Global Foods S.A. ("Marfrig") is a Brazilian meatpacking conglomerate with operations around the world and, since June 2018, owns a controlling interest in National Beef Packing Company, LLC.[15]  Prior to this sale, Jefferies Financial Group, Inc. ("Jefferies Financial Group") was National Beef's controlling shareholder.[16] Throughout the period, U.S. Premium Beef, LLC, was a minority shareholder in National Beef.

---

[14]     National Beef acquired the Tama, Iowa plant in June 2019 from Iowa Premium, LLC, a regional Independent Packer.

[15]     *Marfrig Concludes Acquisition of National Beef*, Marfrig (Jun. 6, 2018), http://www.marfrig.com.br/en/documentos?id=780.

[16]     Jefferies Financial Group Inc., Annual Report, (Form 10-K) at 6 (Jan. 10, 2019) ("Jefferies 2018 Annual Report").  After the acquisition, Jefferies Financial Group, retained a 31% interest in National Beef.

### F.     Packing Defendants

64.     During the Class Period, each Packing Defendant purchased fed cattle in the United States and sold the resultant beef.[17]

65.     During the Class Period, at least Tyson Foods, JBS S.A., JBS USA, CMS, and National Beef exploited the relationship between physical cash cattle and the CME Live Cattle market and transacted in cattle futures and/or options at prices that they had suppressed.

66.     Each Packing Defendant was a co-conspirator with the other Packing Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

67.     Where Plaintiffs ascribe an action to "Packing Defendants," unless stated otherwise, the action is alleged to have been taken by each of Tyson, JBS, Cargill and National Beef.

### G.     John Doe Defendants

68.     John Doe Defendants are those packing firms, financial institutions, and/or trading firms that participated in the manipulation of the Live Cattle futures and options market, as described herein.  The identity of individuals and firms that trade CME futures and options is anonymous and not available to the public.  Plaintiffs will be able to identify the John Doe Defendants through discovery of trading records in possession of the CME Group Inc. that it is required to maintain under the Commodity Exchange Act ("CEA")

---

[17]     CBW Top 30 Beef Packers.

including, but not limited to, Order Entry Operator identifications, Tag 50 IDs, User Assigned IDs, and Clearing Information.

### H.   Agents and Affiliates

69.   "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, and directors.

70.   Whenever reference is made to any act, deed, or transaction of any corporate group, corporation, or partnership, the allegation means that the corporate group, corporation, or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parents, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

## III.   JURISDICTION, VENUE AND COMMERCE

71.   This action arises under Section 1 of the Sherman Act (15 U.S.C. §1), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), Sections 202 and 308 of the Packers and Stockyards Act (7 U.S.C. §§192, 209), and Sections 2(a), 6(c) and 22 of the Commodity Exchange Act (7 U.S.C. §1, *et. seq.*).   The action is for injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorneys' fees.

72.   This Court has federal question subject matter jurisdiction under 28 U.S.C. §§1331, 1332(d), and 1337, Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), and Section 22 of the Commodity Exchange Act (7 U.S.C. §25).

73.    Venue is proper in this District under 15 U.S.C. §§15 and 22 and 28 U.S.C. §1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District, including:

a.    Cargill, Inc. is domiciled in this District;

b.    Packing Defendants purchased fed cattle owned or located in this District,[18] including from members of the Producer Class; and

c.    Packing Defendants processed the resultant beef at plants located in this District and/or sold resultant beef products to customers located in this District.[19]

---

[18]    The 2017 USDA Census of Agriculture records that approximately 1.4 million beef cattle were sold from Minnesota farms in 2017. *See* U.S. Dep't of Agric., *2017 Census of Agriculture – State Data*, Volume 1, Chapter 1: State Level Data: Minnesota, Table 16, https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_State_Level/Minnesota/st27_1_0015_0016.pdf.    *See also Feedlots*, AMERICAN ANGUS ASSOCIATION, https://www.angus.org/Commercial/Links/CommFeedlotRpt.aspx#MN.    Tyson Fresh, Swift, Packerland, CMS, and National Beef each employed field buyers whose assigned territory included Minnesota.    Various individuals within each of Tyson Fresh, Swift, Packerland, CMS, and National Beef, including field buyers active in Minnesota, maintained Minnesota Department of Agriculture livestock meat packing company agent licenses throughout the Class Period.

[19]    Specifically, CMS operated a protein processing plant in Albert Lea, Minnesota, which processed beef during the Class Period.

27

74.   The conduct detailed in ¶73 furthered Defendants' conspiracy to profit from the violations of law alleged herein.

75.   Defendants' conspiracy and conduct were within the flow of, and were intended to and did have a substantial effect on, the interstate commerce of the United States.   During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal scheme.

76.   This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, is located, or its co-conspirators committed overt acts in furtherance of the conspiracy to depress fed cattle prices and the manipulation of the cattle futures and options market, in the United States, including in this District.   Defendants should, therefore, have foreseen the possibility of being brought before this Court to answer for any illegal acts related to their business conducted here.

77.   The Court has personal jurisdiction over all non-resident Defendants under Minnesota's long-arm statute, Minn. Stat. §543.19, because each such Defendant: (a) owns, possesses, or uses real or personal property in Minnesota; (b) transacts business within Minnesota; (c) commits acts in Minnesota causing injury or property damage; and (d) commits acts outside Minnesota causing injury or property damage within Minnesota. Moreover, Minnesota has a substantial interest in providing a forum and the burden placed on Defendants by being brought under the state's jurisdiction does not violate fairness and substantial justice.

78.     During the Class Period, all Defendants, both foreign and domestic, engaged in conduct within the United States related to Plaintiffs' allegations.   Defendants' misconduct was purposefully directed at the United States and was specifically intended to affect the prices of fed cattle bought within the United States and Live Cattle futures and options transacted by the Defendants with U.S. counterparties.   Defendants' acts were acts in furtherance of the conspiracy that, because they occurred in the United States by Defendants' domestic entities, provide specific personal jurisdiction over all conspirators.

79.     The conspiracy and the overt acts taken in furtherance of it, were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

80.     Therefore, as members of the conspiracy, foreign-based Defendants are liable for acts taken in furtherance of the conspiracy by domestic Defendants over whom they exert direct and complete control, as well as their own actions taken in the United States, and personal jurisdiction attaches, regardless of whether some portion of the conduct in furtherance of the conspiracy might have occurred overseas.

## IV.   OVERVIEW OF THE FED CATTLE MARKET

81.     The market for fed cattle in the United States is enormous.   For example, in 2017 alone, 25.8 million fed cattle were slaughtered and processed into beef products.   This

amount accounted for 80% of the 32.2 million commercial cattle slaughtered across the United States.[20]

82.     The cattle production cycle, running from birth to slaughter, typically ranges between 15 to 24 months, and is the longest of all animals typically raised for meat.  Fed cattle progress through three interrelated sectors prior to slaughter: cow/calf; stocking and background; and feedlots, as detailed in Figure 7 below.

---

[20]     The remaining volume comprised slaughter cows (female cattle that have birthed a calf) and bulls, whose meat is typically used for lesser quality beef products such as hamburger patties.  2018 Meat & Poultry Facts at 12.

**Figure 7.  Cattle and Beef Industry from Breeding to Consumption**[21]



83.     Once cattle reach between around 950 and 1,500 pounds, they are marketed,

transported to, and slaughtered at a packing plant operated by a beef packer such as Packing

Defendants.  Because fed cattle are a perishable commodity, producers face significant

pressure to sell their cattle within a matter of weeks once they reach slaughter-weight.[22]

---

[21]     U.S. Gov't Accountability Off., GAO-18-296, U.S. DEPARTMENT OF AGRICULTURE: ADDITIONAL DATA ANALYSIS COULD ENHANCE MONITORING OF U.S. CATTLE MARKET 6 (Apr. 2018) ("2018 GAO Report"), https://www.gao.gov/assets/700/691178.pdf.

[22]     RTI International, *GIPSA Livestock and Meat Marketing Study, Vol. 3: Fed Cattle and Beef Industries*, *prepared for* U.S.D.A. GRAIN INSPECTION, PACKERS AND

As noted by Grain Inspection, Packers and Stockyards Administration (now a part of the USDA Agricultural Marketing Service ("AMS")) and shown by Plaintiffs' regression analysis detailed in Section VI(E)(2) below, "[c]attle held beyond the optimal marketing period begin to decrease in value because of excessive fat gain and the rising cost of gain."[23] Further, continuing to hold slaughter-weight cattle increases the risk of death loss, which elevates after cattle spend more than 5-6 months in the feedlot.[24] This limits producers' ability to hold out for higher prices, particularly as compared to producers of storable commodities, such as grains.

84.     Packing Defendants process the carcasses into various primal cuts and smaller sub-primal cuts that are then vacuum-packed and boxed for sale to customers of "boxed beef" who process it into cuts that are ultimately sold to consumers at retail, restaurants, and other foodservice operations. Fed cattle beef is also used to produce ground beef.

85.     Customers of boxed beef include foodservice companies such as Sysco and US Foods and large retailers such as Costco and Sam's Club. Boxed beef is a commodity product, and competition to sell boxed beef is primarily on price as between boxes of

---

[23]     STOCKYARD ADMINISTRATION (2007), at 5-4, https://www.gipsa.usda.gov/psp/publication/livemarketstudy/LMMS_Vol_3.pdf.

[23]     *Id.*

[24]     David Cooper, *Feedyard data reveals higher death losses*, PROGRESSIVE CATTLEMAN (Dec. 24, 2015), https://www.progressivecattle.com/topics/herd-health/feedyard-data-reveals-higher-death-losses.

equivalent USDA quality and yield grades.[25]  Packing Defendants also process boxed beef in-house, and sell case-ready beef and other value added products (*e.g.*, sausages) directly to retailers, restaurants, hospitals, and others at a premium over boxed beef prices.  Certain customers will purchase both boxed beef and processed products from Packing Defendants.

86.     As a perishable product, the majority of beef sold domestically is sold through short-term contracts.[26]  Certain large purchasers, such as Walmart or national restaurant chains like Outback Steakhouse, purchase some of their beef through "forward" contracts (pursuant to which beef is sold 22 days or more prior to delivery) and other long-term supply agreements.

87.     Packing Defendants all operate a live fed cattle procurement team, run by a head buyer, who is supported by a number of field buyers who are responsible for defined territories.  Field buyers acquire cattle from feedlots situated inside their territory.  They conduct negotiations directly with the fed cattle producers and their agents[27] within the parameters set by their head buyer.[28]

---

[25]     Amended Complaint, ¶24, *U.S. v. JBS SA*, No. 08-cv-05992, ECF No. 48 (N.D. Ill. Nov. 7, 2008) ("*U.S. v. JBS* Amended Complaint").

[26]     Packing Defendants freeze fresh beef they have been unable to sell for its subsequent sale as frozen beef at discounted rates.

[27]     Producers commonly delegate authority for marketing their cattle to the commercial feedlot which has fed their cattle or to third-party marketing cooperatives.  A small portion of the fed cattle sales to Packing Defendants also occur at public auctions.

[28]     Tyson Fresh, Swift, CMS, and National Beef each ensure that their respective field buyers offer producers a common maximum bid.  This limits producer's ability to use reports of higher prices paid elsewhere for negotiating.

88.     Packing Defendants each conduct daily meetings, typically from their head office, attended by representatives of their respective cattle procurement, plant operations, scheduling, beef sales, and risk management teams, among others, to make decisions regarding their respective cattle and beef operations.  Among other matters, the attendees of these meetings will discuss the number of cattle their fed cattle business will procure, the terms on which they will be bought, plant scheduling (including slaughter rates) across each of their slaughter facilities, and beef sales strategy.

89.     Each Packing Defendant seeks to procure sufficient fed cattle to operate its slaughter plants at its chosen utilization rates without interruption.  Weekly plant capacity is determined not only by plant size, but by the number and length of shifts run in a given week, and the "chain-speed" at which those shifts are run.[29]  Packing Defendants' average cost of production increases if they underutilize their plant capacity.  Thus, it is in the individual interest of each Packing Defendant to make sure that it has timely access to sufficient fed cattle to run its plants efficiently.

90.     Prior to the consolidation of the beef packing industry, almost all fed cattle was sold through the "cash" or "negotiated" cattle trade: meat packers' buyers went to feedlots and auctions and paid a cattle price set each day at the dollar mark where supply

---

[29]     "Chain-speed" refers to the head per hour rate at which a plant slaughters and fabricates cattle.

and demand met.[30]   These cattle were then delivered to the slaughter plant within the customary seven-day pick-up period.

91.     However, by 2015, the cash cattle trade volume had dramatically shrunk, and now accounts for only 20-25% of national fed cattle sales.[31]   Despite this, the cash cattle trade remains the industry's price discovery mechanism and continues to determine the price of the nearly 71% of fed cattle bought pursuant to "formula" or "forward" contracts. Under these agreements, commonly referred to as "captive supply" agreements, producers commit to deliver their cattle to a packer once they have obtained slaughter-weight at a price to be determined at or around the point of delivery pursuant to an agreed-upon formula.[32]   Figure 8 below shows the changes in fed cattle procurement methods over the last 15 years:

---

[30]     For the avoidance of doubt, Plaintiffs do not allege that there are separate or sub-markets in the U.S. product market for the purchase of fed cattle, whether demarcated by contracting type or otherwise.

[31]     A by-region breakdown of these figures appears in Appendix 3.

[32]     Formula cattle transactions also include "top-of the market bids," discussed further below.

**Figure 8.  USDA Records of Fed Cattle Procurement Methods – U.S. – 2005 to 2019**[33]



92.     The price of cattle delivered under formula contracts is determined by reference to a stipulated measure of cash cattle prices at, or just prior to, the date of delivery. These contracts commonly incorporate a specified average cash price reported by AMS's Livestock Mandatory Reporting ("LMR") cattle transaction price summaries, particularly

---

[33]     Under negotiated grid contracts, the seller and buyer negotiate a base price, which is then raised or lowered through the application of premiums or discounts after slaughter based on carcass performance.  Negotiated grid contracts' base prices move in parallel with cash cattle prices.

those from the AMS LMR Five Area states.[34]  Moreover, the price of cattle delivered under forward contracts is typically established by reference to the price of the Live Cattle Futures contract settling in the month of or adjacent to the expected delivery date.  As explained in Section IX, the price of Live Cattle Futures contracts is directly impacted by current and expected cash cattle prices.  Thus, the price of cash cattle sets or drives the price of the bulk of Packing Defendants' fed cattle purchases, despite constituting only a small percentage of total fed cattle purchases.[35]

93.   Tyson, JBS, Cargill, and National Beef each use captive supply agreements for the bulk of their procurement needs.  ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████. [36]

94.   Packing Defendants' use of captive supply agreements has both incentivized and facilitated their suppression of cash cattle prices.  The greater a Packing Defendant's supply of captive cattle is, the less reliant it becomes on participating in the cash cattle trade to procure sufficient cattle to operate its slaughter plants at its chosen utilization rates.  This, in turn, allows a Packing Defendant to abstain from purchasing cash cattle when it

---

[34]   These price series collate the information Packing Defendants and others are required to submit to the USDA on a daily and weekly basis regarding their live cattle purchases and deliveries pursuant to the Livestock Mandatory Reporting Act of 1999.  The Act imposes similar reporting obligations upon packers in relation to their boxed beef sales.

[35]   The base prices used in negotiated grid contracts are also impacted by changes in cash cattle prices.

[36]   ██████████████████████████████████████████████████. There is no public record of their individualized transactions.

regards market prices to be too high, and provides it with leverage to require a would-be cash seller to agree to a formula deal. All things being equal, a reduction in demand for cash cattle results in a drop in cash cattle prices, as producers are forced to lower their asking price in order to attract a buyer willing to purchase and slaughter the producer's perishable product. And because cash cattle prices are used to set the prices paid by Packing Defendants under their formula contracts and directly impact the Live Cattle futures prices incorporated into forward agreements, a reduction in cash cattle prices reduces the price paid by Packing Defendants for cattle bought on such contracts.

95.     As the cost of fed cattle constitutes the majority of their costs of production, Packing Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef. The meat margin is very sensitive to changes in industry aggregate slaughter levels, and Packing Defendants can increase it through cooperation. As noted by the U.S. Department of Justice ("DOJ"), "all else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits."[37] As a result of these sensitivities, Packing Defendants can improve

---

[37]     *U.S. v. JBS* Amended Complaint, ¶26-27. *See also* Section VII(B) below regarding the elasticities of fed cattle and beef.

their respective profitability by coordinating their respective slaughter levels at or below the prevailing supply of slaughter-weight fed cattle.

96.     The fed cattle market is highly concentrated.  In fact, during the Class Period, Packing Defendants collectively purchased and slaughtered between 81% to 83% of the 23 to 26 million fed cattle slaughtered in the United States annually.  *See* Figure 1 above and Appendix 2.  During this time, Packing Defendants' relative market shares as against each other remained remarkably stable.  *Id*.  The remainder of the U.S.'s fed cattle slaughter capacity is predominately provided by regional Independent Packers such as Greater Omaha, Nebraska Beef, One World Beef, Agri Beef, and Creekstone Farms, each of whom only operate one plant.[38]

97.     Due to their limited slaughter capacity and narrower marketing outlets, the Independent Packers cannot readily absorb all of the excess cattle supply caused by a reduction in slaughter volume by Packing Defendants.  As a result, when faced with such a slaughter reduction, certain producers are forced to sell their fed cattle at small, non-federally inspected slaughter facilities, which process approximately 10-50 head per day.  However, there are not sufficient small plants within the cattle feeding regions to accommodate the cattle held over during Packing Defendants' slaughter reductions.  Thus, producers do not have viable marketing outlets when Packing Defendants' reduce their slaughter volumes.

---

[38]     Lee Schulz, *et al.*, *Economic Importance of Iowa's Beef Industry*, IOWA STATE UNIVERSITY (Dec. 2017), https://store.extension.iastate.edu/product/Economic-Importance-of-Iowas-Beef-Industry; and CBW Market Share.

## V.   PACKING DEFENDANTS CONSPIRED TO DEPRESS FED CATTLE PRICES

98.    Fed cattle prices rose consistently from 2009 through 2014, peaking in November 2014 at approximately $170/cwt per hundredweight ("cwt").[39] Market analysts, such as the USDA Economic Research Service, predicted that the price levels established in 2014 would continue for a number of years before experiencing a gradual decline.[40] Some forecasters even foresaw no change from 2014 prices "barring any outside market shocks like drought or a U.S. economic recession."[41] This predicted price stability reflected the industry's understanding of rising beef demand (see Figure 42 below) and knowledge

---

[39]    Cattle are typically priced on a live-weight basis (the price per cwt applied to the live-weight of the animal prior to slaughter, typically immediately prior to delivery) or a carcass-weight or "dressed" basis (the price per cwt applied to the animal once "dressed," *i.e.*, slaughtered with its head, hide, and internal organs removed).  References to fed cattle prices in this complaint are on a live-weight basis unless otherwise stated.  Live-weight and carcass-weight prices typically move together, as both are based on the expected value of the cattle once slaughtered.

[40]    U.S. DEP'T OF AGRIC., OCE-2015-1, OFF. OF THE CHIEF ECONOMIST: USDA AGRICULTURAL PROJECTIONS TO 2024, INTERAGENCY AGRICULTURAL PROJECTIONS COMMITTEE          81          (February          2015), https://www.usda.gov/oce/commodity/projections/USDA_Agricultural_Projections_to_2024.pdf.

[41]    *Livestock Monitor, A Newsletter for Extension Staff*, LIVESTOCK MARKETING INFORMATION CENTER, STATE EXTENSION SERVICES IN COOPERATION WITH USDA 2 (Jan. 12, 2015); and *CattleFax Predicts Strong Prices to Remain in 2015*, AGWEB (Feb. 6, 2015),          https://www.agweb.com/article/cattlefax-predicts-strong-prices-to-remain-in-2015-naa-news-release/ ("Analyst[s] . . . expect fed cattle prices averaging in the mid-$150s [per CWT in 2015], slightly higher than last year.  Prices will trade in a range from the near $140 [per CWT] in the lows to near $170 [per CWT] in the highs in the year ahead.").

that slaughter-weight fed cattle numbers would remain low into 2015 and 2016 before gradually rising.

99.     Although Packing Defendants initially benefited from the rise in fed cattle prices because wholesale beef prices rose in parallel, the meat margin fell to a low of approximately $50 in the months leading up to 2015, sending their margins into the red.

100.     In response, Packing Defendants commenced or accelerated their conspiracy to depress and stabilize the price of fed cattle purchased in the United States.  At the core of their collusion was an agreement to reduce and then manage their respective slaughter volumes: a classic abuse of monopsony, or unfair buying power.  Packing Defendants implemented their conspiracy by periodically restraining or reducing slaughter numbers to limit or "ration" demand for fed cattle, and by curtailing their purchases of cash cattle during these periods.  Packing Defendants also coordinated their procurement practices with respect to the cash cattle they did actually purchase.  They further uneconomically imported foreign cattle to depress demand for domestic cattle and closed or idled slaughter plants to refrain from expanding their remaining slaughtering capacity despite the availability of record margins.  Packing Defendants' coordinated procurement practices reduced or eliminated the ability of producers to generate price competition for their cattle, which further supported Packing Defendants' collusive agreement to depress and stabilize the price of fed cattle.  At the same time, Packing Defendants also benefitted from strong and increasing beef demand throughout the Class Period, causing them to reap record margins.  *See* Figures 6 above and 40 and 43 below.

41

A.     **Packing Defendants Agreed to Reduce and Restrain Their Collective Slaughter Volumes and to Pressure Cash Cattle Sellers**

101.    As confirmed by Jason F. ("Witness 1"), based on conversations with James Hooker, head of fabrication at Swift's Cactus, Texas plant, each of the Packing Defendants expressly agreed to periodically reduce their respective purchase and slaughter volumes in order to reduce the prices they would otherwise pay for fed cattle during the Class Period.

102.    Witness 1 is a former employee of Defendant Swift. Witness 1 was a quality assurance officer ("QA") at Swift's Cactus, Texas slaughter plant, located in the Texas Panhandle. He worked there for over 10 years until his employment ceased in early 2018.

103.    During the period of his employment coinciding with the Class Period, Witness 1 was a head QA and had primary responsibility for the plant's kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed, *i.e.*, the head, hide, and internal organs are removed. The carcasses are then moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts.

104.    Witness 1 learned of Packing Defendants' collusive purchase and slaughter reduction agreement from Mr. Hooker. As he was the head of fabrication at Swift's Cactus, Texas plant, as explained below, Mr. Hooker was in a position to know about the unlawful agreement.

105.    Witness 1 regularly stopped by Mr. Hooker's office prior to starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days. These numbers affected the execution of Witness 1 and his team's responsibilities, including the

42

placement of his team, arrangement of hotbox and cooler space, the number of carcasses they would need to process through the hotbox and coolers that day, and his interactions with USDA inspectors.  In addition to the fabrication plan, Mr. Hooker, like Witness 1, also needed to understand the number of cattle scheduled to be slaughtered each day.  If the kill volume was lower but the price of beef remained favorable, the fabrication floor would continue to process carcasses at typical rates.  However, when kill volumes were reduced and the price of beef was unfavorable, Mr. Hooker may order the carcasses to spend a longer time in the hot boxes and coolers before being fabricated into beef cuts so as to improve grading performance.  In this circumstance, Witness 1 and his team would allow more space between each carcass in the hotboxes.  If the kill volume was higher, Mr. Hooker may need to increase the number of carcasses fabricated to ensure there was sufficient space in the hotboxes and coolers, and Witness 1 would need to space the carcasses closer together when filling the hotboxes.  Further, the number of carcasses expected to be put into the hotboxes would dictate the amount of air and water Witness 1 and his team used to ensure proper cooling speeds.  It was essential to both Mr. Hooker and Witness 1 that they know the plant's planned slaughter figures in order to perform their core job duties.

106.   Witness 1 reports having had a "decent" working relationship with Mr. Hooker.

### 1.   Mr. Hooker Was Well Positioned to Know About Defendants' Agreement

107.   Plaintiffs understand that Mr. Hooker continues to work at Swift's Cactus, Texas plant, where he has worked for over 15 years in that role, including a short stint as head of slaughter operations.  Witness 1 reports that prior to working for Swift in the early 2000s, Mr. Hooker worked at Tyson Fresh's Amarillo, Texas slaughter plant, where he was also responsible for fabrication.

108.   As a fabrication manager for Swift, Mr. Hooker reported directly both to Cactus's General Manager, Manny Guerrero[42] and directly to the beef production department of JBS USA/Swift/Packerland's head office in Greeley, Colorado.

109.   As head of fabrication, Mr. Hooker needed to be informed as to cattle buying/scheduling, cattle slaughter, and beef selling aspects of JBS U.S.'s fed cattle business.  He thus interacted with personnel across JBS's business.  In particular, in addition to his direct reports, Mr. Hooker would also speak directly to other managers within the JBS corporate office about plant operations, including scheduled slaughter and fabrication volumes, and fabrication priorities.

110.   For example, Mr. Hooker would speak directly to Sergio Sampaio Nogueira, Head of Operations and Executive Vice-President of Plant Operations for JBS's Fed Beef Business during the Class Period, when Mr. Nogueira visited the Cactus plant, which occurred regularly.  Witness 1 understands that Mr. Hooker would also speak to Mr.

---

[42]   Mr. Guerrero worked for CMS for approximately 17 years prior to his move to JBS's Cactus Plant.  He was Plant Manager for CMS's Fresno, California plant prior to his departure in early 2012.

Nogueira at other times.  Mr. Hooker's contact with senior management reflects that JBS senior executives maintained direct connections with plant-level managers like Mr. Hooker during the Class Period. [43]

111.    Mr. Nogueira was installed by Wesley Batista, JBS S.A.'s former CEO,[44] and was regarded as Mr. Batista's "right hand man" in regards to JBS's U.S. beef operations.  Mr. Nogueria had primary responsibility for Swift's fed cattle plant scheduling and/or operations during the Class Period.

112.    In addition, Mr. Hooker was responsible for the Cactus plant in the absence of Mr. Guerrero and the Plant Engineer, along with Ryan Wagnon, Head of Slaughter Operations at Cactus.  When acting as the Cactus plant's General Manager, Mr. Hooker would liaise closely with fed beef executives from across JBS's head office.

113.    Therefore, Mr. Hooker spoke regularly to individuals very highly placed at JBS.  Indeed, the following recent photo shows the close working relationship he had with such management:[45]

---

[43]    David E. Bell and Catherine Ross, *JBS Swift & Co.*, Harvard Business School, N9-509-021, at 7-8 (Dec. 12, 2008), http://cfile234.uf.daum.net/attach/144DF8464F540FDF2D8F22.

[44]    Wesley Batista is one of the sons of JBS S.A. founder Jose Batista Sobrinho. Wesley Batista and his brother Joesley Batista took control of JBS S.A. in the early 2000s, prior to JBS' acquisition of Swift and Pilgrim's Pride.  Wesley was CEO of JBS S.A. and directed JBS' takeover of Swift.  He remained in that role, and as a director and senior executive of JBS USA, Swift, and Packerland, until he was implicated in a 2017 bribery and corruption scandal in Brazil, for which he was ousted as CEO and spent time in prison. That same conduct led to the FCPA fines discussed in Section VIII below.

[45]    From right to left: James Hooker - Cactus Fabrication Operations Manager; Donna Estrada - Cactus Technical Services Manager; Al Almanza - JBS Global Food Safety



114.    Mr. Hooker, Mr. Nogueria, and Mr. Wagnon, are respectively pictured on the far left, fourth from the left, and far right.

115.    In addition to having corporate information for JBS, Mr. Hooker had information regarding the other Packing Defendants.  Mr. Hooker regularly told Witness 1 that he was in contact with his former colleagues at Tyson Fresh's Amarillo plant, including his replacement there.  Mr. Hooker also told Witness 1 that he had friends and former colleagues with whom he stayed in touch at other Packing Defendants' plants.  Mr. Hooker

Director; Sergio Sampaio Nogueira - JBS Corporate Director of Operations; Paul Kieker - FSIS Undersecretary USDA Operations; Dr. Hafeez - Texas USDA FLS; Dr. Mindy Brashears - FSIS Undersecretary USDA FS; Brian McFarlane - JBS Corporate Director of Technical Services; Mark DeRaad - Cactus Value Added Manager; Ryan Wagnon - JBS Slaughter Operations Manager.  *See* https://www.facebook.com/jbsbeefcactus/photos /a.760788460716768/2857652041030389/?type=3&is_lookaside=1 (last visited Dec. 15, 2020).

would often provide Witness 1 with detailed information as to the current and future operations of Tyson Fresh, CMS, and National Beef's nearby packing plants.

### 2.   Witness 1 Learns of an Agreement Among Defendants

116.   Witness 1 reports having multiple discussions with Mr. Hooker during which Mr. Hooker explained that all Packing Defendants reduced their purchase and slaughter volumes in order to reduce fed cattle prices when Packing Defendants viewed fed cattle prices as being or becoming "too high" for their liking.  During one such conversation, Mr. Hooker specifically admitted that Packing Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.

117.   That conversation occurred sometime in 2015.  Witness 1 reports that he was in Mr. Hooker's office when Mr. Hooker received an angry phone call from his immediate supervisor, who worked out of JBS's central office in Greeley, Colorado.

118.   After the call concluded, Witness 1 reports that he asked Mr. Hooker how "many are we [Swift, Cactus] cutting [*i.e.*, fabricating]?"  Witness 1 reports that Mr. Hooker replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).[46]  Witness 1 then reports asking Mr. Hooker whether Swift Cactus's competitor plants were also cutting back their kill.  Witness 1 recalls that Mr. Hooker answered Witness 1's question as follows:

---

[46]   Witness 1 reports that there was typically a lag between the commencement of a slaughter reduction and the reduction of fabrication activities.  Among other reasons, this reflected the fact that Slaughter Plant 1's fabrication team had to continue to process the carcasses that were already hanging in the coolers.

"Yes, they are.  We have had that agreement that we don't kill while prices are up for a while" (or words to that effect).

119.   Witness 1 is certain that Mr. Hooker intended to convey that all of the Packing Defendants were reducing their slaughter volumes by agreement in response to high prices, and was not simply commenting on the fact that one or some of the Packing Defendants had independently decided to do so.

120.   Witness 1 stated that the purpose of the agreed slaughter reductions was to force cattle producers (in particular, cash cattle producers) to feed their cattle for longer periods, and in doing so, create a condition of oversupply that would encourage producers to either accept lower cash prices for their cattle or commit their cattle in advance on captive supply agreements.  Put another way, by creating and encouraging an apprehension among producers that they might not be able to "get their cattle dead," Packing Defendants sought to increase their collective leverage over producers.  As Witness 1 noted, once cattle are fed beyond their ideal slaughter weight, producers face increasing "pressure to drop their prices in order to get rid of their [perishable] cattle."

121.   Witness 1 stated that Swift's Cactus plant had a 5,500-6,000 head per day slaughtering capacity and might drop its kill level back to around 4,800-5,200 head per day when implementing Packing Defendants' agreement.  When Swift implemented the Packing Defendants' agreement by buying and slaughtering fewer cattle, consequences included running its slaughter plants at reduced hours, operating those plants at lower "chain speeds," and/or scheduling maintenance shutdowns. Witness 1 recalls management at Swift's Cactus plant, including Mr. Guerrero and Mr. Wagnon, telling staff during these

periods of reduced slaughter during the Class Period that kill levels were being reduced in response to fed cattle prices.

122.    Witness 1 reports that Swift's Cactus Plant would also reduce its slaughter around November and then regularly maintain lower kill volumes through April the following year.

### 3.    The Available Data Corroborates Witness 1's Account

123.    Public reports, Packing Defendants' slaughter data, and the cattle sales data in Plaintiffs' possession indicate that all Packing Defendants reduced and rationed their slaughter volumes during periods of high or rising prices for fed cattle to suppress those prices.  Packing Defendants also managed their respective slaughter volumes throughout the Class Period in relative lockstep to ensure that their collective demand for cattle did not exceed the available supply.  Packing Defendants did so even as the supply of cattle grew and Packing Defendants' margins ballooned.

124.    Fed cattle prices typically rise in the late winter/early spring, decline in the summer months, typically bottoming out in July for a few weeks, before again rising in the fall.  Here, the slaughter reductions, while most obvious at the beginning of each year to suppress the seasonal rise in fed cattle prices typically experienced in late winter/early spring, occurred throughout the Class Period.  In particular, Packing Defendants moderated their slaughter volume across the second and third quarters of most years in a successful attempt to both lower and to extend the yearly July price trough across a number of months, thereby also forestalling both the onset and minimizing the effect of the fall's seasonal rise in fed cattle prices.  *See, e.g.*, Section VI(A)-(B).  Packing Defendants also reacted to short

49

one-to-two week rallies in prices (*see*, *e.g.*, ¶¶229-232), and opportunistically to one-off opportunities presented by market shocks such as the fire at Tyson Fresh's Holcomb plant in August 2019.  *See* Section VI(D).

125.    Notably, Packing Defendants' joint slaughter management was not a reaction to changes in beef demand, which, as admitted by Tyson Fresh's head of procurement in 2018, had been "off the charts."[47] *See also* Figure 42 below, demonstrating rising beef demand throughout Class Period.

126.    Nor did any Packing Defendant break from Packing Defendants' collective restraint and buy more cattle in an attempt to capture greater margin share, despite all Packing Defendants posting profit margins that clearly demonstrated no Packing Defendant was running at or near their marginal cost of production.  From the end of the first quarter of 2015 through the end of the Class Period, Packing Defendants posted record per head net margins.  Even excluding 2019 and 2020, during which Packing Defendants' margins skyrocketed in the aftermath of the Holcomb fire and COVID disruptions (discussed below), Packing Defendants' average per head net margins across the Class Period for the first, second, third, and fourth quarters vastly exceeded their pre-Class Period averages: $37 v. $0, $127 v. $21, $134 v. $25 and $116 v. -$16 respectively.[48]

---

[47]    Tyson Fresh Meats: What the Consumer Demands - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, from the 2018 NIAA Antibiotic Symposium: New Science & Technology Tools for Antibiotic Stewardship, November 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.

[48]    Per-head net margin estimates cited in the Complaint sourced from the Sterling Profit Tracker produced by Sterling Marketing Inc. and published weekly on

127.   Packing Defendants' rationing of the fed cattle supply amongst themselves throughout the Class Period is demonstrated in Figure 2 below, which records each Packing Defendant's estimated quarterly slaughter volume.

**Figure 2: Packing Defendants' Quarterly Fed Cattle Slaughter Volume**[49]



---

www.drovers.com, unless stated otherwise.  Pre-Class Period average per head margins calculated across 1997 to 2014.

[49]    To derive Tyson, JBS and National's beef slaughter volume figures produced in Figure 2, Plaintiffs used Packing Defendants' (in the case of National Beef, its shareholders') financial disclosures and Cattle Buyers Weekly's record of each Defendant's fed cattle and non-fed cattle slaughter ratio to isolate the portion of their reported quarterly revenue figures attributed to beef and by-products produced from fed cattle slaughtered within the United States.  Plaintiffs then determined the volume of fed cattle (and beef) necessary to generate the disclosed revenue, taking into account prevailing beef and by-product prices (as reported by USDA AMS boxed beef cutout reports and USDA drop-credit values), carcass weights, carcass grading performance (by region), and hot carcass/dressing percentages.  Having derived Tyson, JBS, and National Beef's quarterly slaughter volumes, Plaintiffs then derived Cargill's quarterly slaughter figures by reference to Cargill's market share over time, ███████████████████████████████ ████████████████████████.

128.     Figure 2 highlights that Tyson, JBS, and National Beef each reduced its slaughter across 2015, while Cargill held its slaughter volumes steady following its 2014 cuts.  These artificial reductions caused the dramatic decline in fed cattle prices across 2015.

129.     Figure 2 also shows the consistent reductions made by all Packing Defendants in the first quarters throughout the Class Period to constrain the seasonal rise in fed cattle prices historically experienced in the run up to spring, and the extension of these cuts in 2018 and 2019 to encompass the fourth quarter as well.

130.     This uniform reduction during periods of seasonally lower cattle availability is not evident in the pre-Class Period.  For example, in the fourth quarter of 2012, both Cargill and JBS significantly increased their slaughter volumes (3.7% and 12%, respectively on a quarter-over-quarter basis), while Tyson held its steady (0.1% increase) and National Beef engaged in notable cuts (-4% decline).  Similarly, in Q3 2013, Tyson and National Beef increased their slaughter volumes, while JBS and Cargill reduced theirs.  Across 2Q to 4Q 2014, JBS evidently sought to capture market share, first substantially increasing its slaughter volume in second quarter (16.3% increase against other Packing Defendants' increases of between 4.8%-10.2%) before holding it steady across the third and fourth quarters while each of the other Packing Defendant's volumes declined noticeably in those two quarters.

131.     And although the quarterly reporting period obscures certain shorter reductions in each Packing Defendant's slaughter volumes during the Class Period (described below in Section VI), it does detail the remarkable extent to which Packing

Defendants' quarter-to-quarter slaughter changes move in lockstep with each other.  This parallelism is consistent with an agreement to jointly manage their collective demand.

132.   The impact of Packing Defendants' periodic coordinated slaughter reductions throughout the Class Period is further illustrated in Figures 3 and 4 below, reproduced here.  Figure 3 compares the average annual slaughter volume of Packing Defendants during the pre-Class Period and the portion of the Class Period for which data exists against that of the other U.S. beef packers.  It shows that Tyson, JBS, Cargill, and National Beef each reduced their annual slaughter volumes relative to the pre-Class Period.

**Figure 3.   Average Pre- & Post-Class Period Fed Cattle Slaughter–Packing Defendants vs. Independent Packers**[50]



133.   Figure 4 also compares Packing Defendants' and the Independent Packers' annual slaughter volumes during the Class Period and the pre-Class Period, but breaks out

---

[50]    CBW presents Swift and Packerland's cattle slaughter collectively.

the slaughter volumes for each year of the Class Period for which data is available.  The

graph confirms that Tyson, JBS, Cargill, and National Beef each slaughtered less in every

year of the Class Period compared to their pre-Class Period averages.  It also shows that

while Tyson, JBS, Cargill, and National Beef each gradually increased their slaughter

volume from 2015 onward, their rate of increase was far slower than that of the Independent

Packers, consistent with a coordinated effort to manage their collective demand for fed

cattle below the available supply.

**Figure 4.    Average Pre- & Post-Class Period Fed Cattle Slaughter–Packing Defendants vs. Independent Packers** [51]



134.    The fact that Packing Defendants each slowly raised their slaughter levels as

the availability of fed cattle increased during the Class Period only reinforces the likelihood

of a collective agreement to manage slaughter levels after their initial cut.  Fully 5 years

later, none of the Packing Defendants has returned to its pre-2015 slaughter levels despite

---

[51]    National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume.  Absent that acquisition, its 2019 slaughter volume was flat as against 2018, while Independent Packers' collective slaughter volume rose by approximately 100,000 head (net of Iowa Premium disposal).

record profitability.  By contrast, Independent Packers' slaughter volume is up nearly 50% against their pre-Class Period average, and 25% against their 2015 levels.  By managing their collective demand such that it never outpaced supply, Packing Defendants' ensured constant downward pressure on producers' prices, stalled price rallies, and extended price troughs.  Packing Defendants' coordinated action is further outlined in Section VI below, which details how Packing Defendants reduced or limited their slaughter volume at various points during the Class Period.

### 4. Packing Defendants Agreed to Slash Cash Cattle Purchases During Slaughter Reductions

135.   To place further downward pressure on cattle prices, Packing Defendants also agreed to drastically reduce their cash cattle purchases during periods of agreed slaughter reduction or restraint.  When doing so, Packing Defendants would rely on taking early delivery of cattle deliverable under previously-agreed formula and forward contracts and pressuring would-be cash sellers to commit their cattle on formula trades lest they be left without a marketing outlet.[52]

136.   And, because Packing Defendants had each largely transitioned to formula and forward contracts in the decade preceding 2015, which drastically thinned the cash cattle trade already, even small reductions in their cash cattle purchases had an outsized

---

[52]   *See also* Cassie Fish, *Futures Treading Water; Packers Keep Pressure On*, THE BEEF (Jun. 17, 2015), https://www.thebeefread.com/2015/06/17/futures-treading-water-packers-keep-pressure-on/ ("The news is well known this week and the packer has the upper hand.  Boxes are higher and margins are black but packers are keeping kills small. ***The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper***.").

impact on cash cattle demand.  For example, and as detailed in Section VI(A) below, the 7% year-over-year decline in slaughter volumes witnessed across the second and third quarters of 2015 was driven by a 22% year-over-year decline in the slaughter of cash cattle.

137.   Plaintiffs' analysis of fed cattle sales records constituting approximately 4% of all fed cattle sales from 2012-2019, and 11% of all cash fed cattle sales during that period ("Dataset A")[53] supports the conclusion that each Packing Defendant leveraged their market power over the cash cattle prices in this manner as compared to 2014:

**Table 1: Year-Over-Year Change in Cash Cattle Volumes Recorded in Dataset A: 2015 vs. 2014**[54]

| Comparison | Tyson Fresh | Swift | CMS | National Beef |
|---|---|---|---|---|
| 2Q2015    v 2Q2014 | -56% | -73% | -56% | -92% |
| 3Q2015    v 3Q2014 | -28% | -29% | -65% | -98% |

138.   Similar declines are seen when Packing Defendants' activity in 2015 is compared against their 2012-2014 average cash cattle purchase volume:

---

[53]      Purchases by Tyson Fresh, Swift, CMS, and National Beef constitute 93.7% of all sales within Dataset A on a per head basis between 2012 and 2019.  Their percentage shares of purchases within Dataset A during this period are 15.5%, 23.9%, 24.8%, and 29.5%, respectively.  Dataset A contains sales from all the major feeding regions, including Colorado (6%), Kansas (31%), Nebraska (16%), Oklahoma (2%), Texas (39%), and Wyoming (5%).

[54]      These year-over-year declines are even more remarkable given the 8% year-over-year *increase* in total transactions recorded in Dataset A in 2015 (on a per head basis).

**Table 2: Year-Over-Year Change in Cash Cattle Volumes Recorded in Dataset A: 2015 vs. 2012-2014 Average**[55]

| Comparison | Tyson Fresh | Swift | CMS | National Beef |
|---|---|---|---|---|
| 2Q2015 v 2Q 2012-14 | -28% | -71% | -83% | -94% |
| 3Q2015 v 3Q 2012-14 | -24% | -69% | -78% | -98% |

139.   By reducing their purchases of cash cattle, Tyson, JBS, Cargill, and National Beef sought to reduce the price of all cattle by utilizing the link between cash cattle prices and the prices paid under formula and forward contracts.  As noted above, by reducing their cash cattle purchases for a period of weeks or months, Packing Defendants could "back-up" the volume of slaughter-ready cash cattle, thereby encouraging producers to overfeed their cattle and/or accept lower prices.[56]

140.   Packing Defendants also used their market power to force producers to accept formula (including top-of-the-market formulas[57]) or forward contract deals as a

---

[55]    These year-over-year declines are only partially explained by the 11% reduction in total transactions recorded in Dataset A in 2015 (on a per head basis) as compared to the 2012 to 2014 average.

[56]    Cassie Fish, *Whatever Happened to a Fair Fight*, THE BEEF (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/    ("The conversation is no longer, what's cash going to be, but rather, who needs any. . . The smaller feeder is left to fight it out.  Hoping he can get a buyer to come by and look at his cattle.  Pressured to sell cattle with time.  Anything to get cattle gone.  Those that attempt to fight the market run the risk of making cattle too big even by today's standards or worse, alienate their local buyer.  Powerlessness is widely felt by smaller producers on a regular basis.").

[57]    The "basis bid" or "top-of-the-market bid" is a formula contract under which the packer offers to pay the producer attempting to market cattle on the cash cattle market some variant of that week's top reported cash price, with or without a premium.  For example, a

condition for getting their perishable cattle sold. Top-of-the-market bids became commonplace when, in parallel, Packing Defendants started to push such bids on cash cattle sellers at the end of 2014.

141.    This practice of pushing top-of-the-market deals on cash cattle sellers further reduced the number of cattle each Packing Defendant had to purchase in the cash cattle trade. This reduced demand for cash cattle then further reduced whatever remaining leverage cash cattle sellers had to generate price competition. This in turn helped depress not just cash cattle prices, but all those cattle whose prices were linked to the cash market.

142.    Dataset A shows that Tyson Fresh, Swift, CMS, and National Beef each substantially increased the volume of cattle procured on top-of-the-market bids in 2015, as against 2014:

**Table 3: Percentage of Packing Defendant's Total Purchases in Dataset A on "Top-Of The Market" Bids: 2014 vs. 2015**

| Year | Tyson Fresh | Swift | CMS | National Beef |
|------|-------------|-------|-----|---------------|
| 2014 | 6.8% | 6% | 0.2% | 4.5% |
| 2015 | 25.7% | 8.4% | 8.6% | 15.8% |

143.    One former feedlot manager, Matt T. ("Witness 2"), explained the limited incentives for a producer to try to bid up Packing Defendants during those periods during

---

packer might offer to pay the producer the top price reported by the USDA in relation to Kansas for that week, plus or minus a premium (expressed as a dollar per CWT figure), provided that top price was paid for at least 20% of the reported cattle sales.

which they all limited their cash purchases.[58]   Witness 2 managed a 35,000 head commercial feedlot, Carrizo Feeders, in Texline, Texas, from 2012 until on or around July 1, 2015.[59]  Witness 2 elaborated:

> There was a good chance, during my final 9 months at the feedlot, that you would not get your cattle sold if you rejected the (top-of-the-market) basis bid early in the week.  In some cases, holding out for a cash bid would result in you forcing the packers to raise their cash bid at the end of the week when cash cattle traded.  However, if you took this substantial risk and won, all those that didn't take this risk and just accepted the top-of-the-market bid would not only get the higher base price that you worked to negotiate, but they would get the additional premium offered on Mondays to take the cattle out of the cash market (usually $1.50/cwt) that you would not get.  The feedlot manager that had rejected the basis bid and taken the risk to help raise the cash basis would then get pressure from owners of cattle angry that other feedlots sold cattle for $1.50/cwt more than their own cattle sold for.  But by accepting the top-of-the-market basis bid early in the week and taking the premium to the base market, you added to the packer's captive supply and helped them push the base price down across all their formula purchases.  The packers realized that they bought cattle cheaper overall by offering these premiums to take cattle out of the cash market, and thus worked to get the numbers of open cash cattle, whose sale would be used to set the base of their formula purchases, as low as possible.

---

[58]   As manager of the feedlot, Witness 2 was responsible for marketing all of the cattle fed there, whether owned by the feedlot or its customers.  In this capacity, Witness 2 negotiated with field buyers from Tyson Fresh, Swift, CMS, and National Beef on a weekly basis.  Most weeks, Witness 2 would market between 600 and 1,500 head of cattle on behalf of the feedlot.  Witness 2 also managed certain of the feedlot customers' risk positions by trading Live Cattle contracts on their behalf.  The feedlot marketed the majority of its cattle via the cash cattle market.  Witness 2 reports that by 2015, Tyson Fresh, Swift, CMS, and National Beef would predominately offer only top-of-the-market bids for the cattle fed at his feedlot.

[59]   Carrizo Feeders was purchased by DBM Cattle Feeders LLC (part of Oppliger Feeders) in or around April 2015.  Witness 2 continued as manager of the feedlot until his departure on or around July 1, 2015.  Witness 2 continued to be involved in the cattle industry afterwards in various roles.

144.    The lower cash prices realized by Packing Defendants' reduced purchases were then incorporated into Packing Defendants' formula and forward contracts – the latter via a depression of Live Cattle future prices – thereby lowering the costs of all the cattle delivered to Packing Defendants' plants.[60]  Once actual or perceived oversupply had been created, Packing Defendants could gradually increase their cash cattle purchases (and slaughter volumes) without putting any significant upward pressure on prices.

145.    For example, having cratered cash cattle prices in 2015, and with it, the leverage of producers from whom they purchased, each Packing Defendant effectively abandoned their use of top-of-the-market deals in 2016, preferring instead to buy more cash cattle, and buy them cheaper as they pushed prices lower across 2016.  *See* Section VI(B) below.  These dramatic parallel changes in each of the Packing Defendant's purchasing practices – both the sudden adoption of top-of-the-market bids, and their subsequent abandonment – were unlikely to emerge absent agreement.

---

[60]    Cassie Fish, *Cash Trade Volume Tiny; Futures Shake It Off*, THE BEEF (Jun. 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156, though the official USDA tally isn't out yet.  But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive.").

**Table 4: Percentage of Packing Defendant's Total Purchases in Dataset A on "Top-of-the-Market" Bids and Cash Trades: 2014 to 2016**

| Year | Tyson Fresh | Swift | CMS | National Beef |
|---|---|---|---|---|
| *2014* | | | | |
| Top-of-the-Market | 6.8% | 6% | 0.2% | 4.5% |
| Cash | 46.6% | 81.1% | 78.4% | 85.1% |
| *2015* | | | | |
| Top-of-the-Market | 25.7% | 8.4% | 8.6% | 15.8% |
| Cash | 32.2% | 43.2% | 21.7% | 14.3% |
| *2016* | | | | |
| Top-of-the-Market | 3.1% | 0.9% | 1.2% | 0.2% |
| Cash | 73.9% | 95.3% | 92.4% | 53.1% |

146.   As detailed below, Packing Defendants' joint slaughter management precipitated the dramatic collapse in fed cattle prices in 2015 and was repeatedly used throughout the Class Period to further suppress fed cattle prices.

### B.   Packing Defendants Coordinated Their Procurement Practices for Cash Cattle

147.   Another prong of Defendants' conspiracy involved coordinating the means by which each Packing Defendant purchased cattle during the weekly cash cattle trade.  In particular, Packing Defendants coordinated the timing of their purchases, the bids they would make, the means of negotiating those bids, and the regions and feedlots where they would offer those bids.  These activities exacerbated and reinforced the pressure placed upon producers by Packing Defendants' slaughter reductions to sell their fed cattle cheaply

or risk being left without a marketing outlet for their perishable commodity.  As a result, throughout the Class Period, producers had no ability to negotiate higher prices with the Packing Defendants and were compelled to accept whatever low bid for their cattle they did actually receive (or to sell their cattle to Packing Defendants on formula contracts), which further depressed demand for cash cattle.

148.   To begin with, Packing Defendants suspiciously choose to reserve most of their weekly cash cattle procurement activity for Friday, often after the CME had closed.[61] While the exact time on Friday varied, Packing Defendants would regularly conduct all, or substantially all, of their weekly cash cattle purchases during the same 30- to 60-minute window on a Friday.  Even when the Packing Defendants' cash cattle purchases occurred earlier in the week, the bulk of each Packing Defendant's cash cattle purchases would regularly be conducted during the same short window of time.  By only purchasing within a short, common window, Packing Defendants sought to condition producers to accept whatever offer they received, lest they be left without a buyer should they try (and fail) to solicit better bids at a different time.

---

[61]   A fact regularly commented on by industry participants. *See e.g.*, Top Third Ag (@TopThird), TWITTER, (Feb. 19, 2016 8:33 PM), https://twitter.com/TopThird/status/700855757500076032 ("Only 4 Places are doing business at 7PM on Fridays: 1. White Castles 2. Bars 3. Whichever nightclub . . . is at 4. #Cattle Trade."); T Heinle (@ndsuhsker), TWITTER, (Feb. 25, 2019 10:03 PM), https://twitter.com/ndsuhsker/status/1100244930318888960 ("You know it's not the packer selling the fats.........we as cattle feeders say yes or no to the price. If we don't want the price we can pass, at 5pm on a Friday.").

149.   Moreover, during that purchasing window, and across each trading week more generally, Packing Defendants would typically adhere to the price level established by the Packing Defendant that opened the weekly cash cattle trade, which would quickly be circulated across the market via the Packing Defendants' field buyers' interactions with producers, word-of-mouth, and industry reporting.[62]  Packing Defendants' respective head offices would give their field buyers no discretion to offer prices above that price level.  In seeking to justify this price to producers, field buyers would claim that this opening purchase established "market" and that their head office would permit them to offer no more.

150.   In contrast, during the Class Period, Independent Packers purchased cash cattle across nearly each and every day of the week, thereby securing pens of high quality cattle with limited competition.

151.   Packing Defendants' use of this coordinated purchasing window is demonstrated by the data presently available to Plaintiffs.  Dataset A records that Packing Defendants bought all or the majority of their cash cattle solely on Friday in 36% of all trading weeks between 2015 and 2019, up from 29% from between 2012 and 2014.  Packing Defendants' simultaneous Friday cash cattle trade was particularly prevalent in 2015, occurring 23 weeks of the year, up from 10 in 2014.  Even more egregious, Dataset

---

[62]   Packing Defendants, rather than Independent Packers, typically set the market prices for fed cattle during the Class Period.  The first trade each week conducted by a Packing Defendant would be used by that Packing Defendant and the other Packing Defendants as setting the market price for that week.

A demonstrates that Defendants limited their cash cattle purchases to Fridays during 26 (roughly half) of the trading weeks in 2018.

152.   Packing Defendants' purchase records from January 2, 2019 to April 4, 2019, further show remarkable similarities in the prices paid by each for negotiated fed cattle:



63

153.    Had any Packing Defendant sought a greater share of the cash cattle trade during the Class Period to take advantage of the record beef demand (*see* Figure 42 below), one would expect to see significantly greater divergence in the prices paid by the Packing Defendants.  The strikingly similar prices paid by each Packing Defendant for cash cattle is consistent with their agreement to limit their purchases and limit price competition for cash cattle in order to suppress the reported prices incorporated into their formula agreements.  Figure 9 also demonstrates that the prices paid by Packing Defendants' drive the AMS LMR industry-wide price reports used throughout this Complaint.

154.    Plaintiffs' analysis of the reported cash cattle trade across AMS LMR's five price-reporting regions further confirms both that Packing Defendants reduced their participation in the cash cattle trade and that they conducted the bulk of the trading on Fridays.  In particular, that analysis finds that, starting in or around 2014 and 2015, Packing Defendants dramatically ***increased*** the number of days per month on which they ***did not conduct any*** cash cattle transactions within the five AMS LMR reporting regions.[64] Figures 10 to 14 below plot these days:

---

[64]    This trend is evident in each LMS reporting region except Iowa-Minnesota, which retains a comparably robust cash cattle trade.  *See* Appendix 3.

**Figure 10.  Days per Month Without Reported Cash Transactions in TX-OK-NM**



**Figure 11.  Days per Month Without Reported Cash Transactions in Nebraska**



**Figure 12. Days per Month Without Reported Cash Transactions in Kansas**



**Figure 13. Days per Month Without Reported Cash Transactions in Colorado**



**Figure 14.  Days per Month Without Reported Cash Transactions in IA-MN**



155.    The data reported above is consistent with the existence of an agreement among Packing Defendants to both: (1) limit their purchases of cash cattle; and (2) conduct all, or substantially all, of their cash cattle trade in short, weekly windows.[65]  If any single Packing Defendant took these actions in the absence of such an agreement, that entity

---

[65]    But for Packing Defendants' agreement to conduct the majority of their cash cattle procurement on Fridays, there would be fewer days per month with no reported transactions as Packing Defendants could reasonably be expected to conduct their purchases across the week.  Because the daily transaction reports published by AMS capture purchases agreed between at or around 2:00 PM Central the prior day until at or around 2:00 PM Central the current day, it is not possible to identify specifically the number of transactions conducted, as opposed to reported, per day.  However, analysis does confirm that the vast majority of weekly cash cattle transactions over the Class Period were reported by the AMS on Fridays and Mondays.  This is further evidence that the majority of Packing Defendants' cash cattle purchasers were made on Fridays, given that: a) Friday's reports include purchases made between at or around 2:00 PM Thursday and at or around 2:00 PM Friday; b) Monday's reports include purchases made between at or around 2:00 PM Friday and at or around 2:00 PM Monday; and c) very few trades occur on Mondays.

would risk failing to secure a sufficient quantity or quality of cattle to operate its plants at the most efficient capacity and/or meet customer demand, without any guarantee that its actions would have the desired impact on fed cattle or beef prices.  The graphs are even more striking when one considers that Independent Packers continued to purchase cash cattle throughout the week and thus can be regarded as being responsible for the bulk of the transactions reported mid-week.  Independent Packers' behavior is consistent with buyers' behavior in other, more competitive, physical commodity spot markets, such as the grain market, which trade throughout the week, as opposed to across arbitrarily short windows of time.

156.    Packing Defendants' increased reliance upon formula and forward contracts and the corresponding decrease in the number of cash cattle transactions does not and cannot explain the pattern observed above.  While the number of cash cattle bought annually, expressed as a percentage of total sales, fell continuously from 2005 to 2015, it was not until 2014/2015 that the data shows a dramatic increase in the number of days without any reported cash transaction.  This increase was sustained despite a slight increase in cash cattle buying year-over-year in the subsequent years.

157.    In short, even though cash cattle slaughter numbers increased slightly after 2015, the number of days per month in which there were no cash cattle transactions also increased.  Consequently, the Class Period data demonstrates no connection between cash cattle slaughter volumes and active trading days, and Packing Defendants' coordinated reduction in the number of days on which they purchased cash cattle is not explained merely by the decline in the number of cash cattle purchased annually.

69

158.   Packing Defendants' use of a limited trading window and adherence to common prices reduced producers' ability to generate price competition.  Producers who passed on the initial bid they received during the trading window would rarely receive a higher bid from one of the other Packing Defendants.  At best, the producer would typically receive the same bid (as all Packing Defendants would adhere to that same price).  And if the producer then decided that it was willing to sell at that price, it was required by the queuing convention (discussed immediately below) to return to the initial bidder who was "on the cattle" at that price.  However, given the shortness of the trading window, and the limited volume of cash cattle each Packing Defendant would purchase each week, the initial field buyer would regularly be unwilling or unable to renew its bid.  The common refrain of the Packing Defendant field buyer in such circumstances was that his/her employer was "full," because it had secured the limited cash cattle it needed from that week's trade.  This forced the producer to return to the second bidder, who was then commonly unwilling or unable to renew its bid as it too was "full" by that stage, even if its initial bid was given mere minutes before.  Thus, those producers who sought to negotiate higher prices for their cash cattle during the Class Period were often left with no buyer for their perishable product at the end of the week, and were forced to hold them over in the subsequent week's trade.  This conditioned producers selling into the cash market to simply accept any bid they actually received.

159.   In addition to Packing Defendants' reduced cash cattle purchases, short trading window, and common pricing, each employed an antiquated "queuing convention"

throughout the Class Period that served to limit producers' ability to generate price competition for their cattle.

160.   The queuing convention is an allocation mechanism imposed on the cash market by the packers; it was not chosen by the producers.  It depresses fed cattle prices by limiting price competition among beef packers.  It does so, in part, by requiring producers to relinquish their current offer in order to seek higher offers, thus reducing their incentives to pass on the initial offer in the hope of generating better offers.  The queuing convention and other features of the bidding process also rendered the cash cattle market even more susceptible to collusion as it enabled Packing Defendants to monitor each other's bidding behavior.

161.   The convention, which operates predominately in relation to those cattle sold in the cash market, works as follows:  once a producer receives a bid from Packer A, the producer may either accept the bid or pass on it, but may not "shop" that bid to other packers.  If the producer passes on the bid to seek further bids from other packers, the producer must inform the other packers wishing to bid on the pen that it was bid "X per cwt" by Packer A, that it passed on that bid, and that it can, therefore, only accept bids of X+$1 per cwt.[66]  If Packer B is willing to pay X+$1 per cwt, the producer may choose to accept that bid (without reverting to Packer A) or pass on it and seek further bids.  But again, the producer may not "shop" that higher bid to other packers.

---

[66]   In certain instances, it may be acceptable to offer/accept bids in $0.50 per CWT increments.

162.    If Packer B is only willing to bid X per cwt and the producer decides that it is now willing to accept that price, or otherwise revise down its reservation price (*e.g.*, from X+$5 to X+$3), the producer is obligated to first return to Packer A, which is "on the cattle" at price X per cwt and provide it with an opportunity to renew its bid at that price or the producer's new reservation price.[67]  Only if Packer A declines can the producer offer to sell to Packer B at X per cwt or the producer's new reservation price.  At this point, however, Packer B is under no obligation to purchase from the producer.  If a third packer, Packer C, had also offered X per cwt after Packer B's bid, the producer could only offer to sell to it at that price after both Packer A and B declined to renew their bids at that price. Again, Packer C would be under no obligation to purchase from the producer at this price.

163.    By contrast, if the producer rejects a bid from Packer B of X+$1 per cwt, Packer B would then be "on the cattle."  In that case, and assuming the producer received no further bids above X+$1 per cwt, it would be obligated to return to Packer B, rather than Packer A, to offer it an opportunity to buy its cattle X+$1 per if the producer subsequently decided to accept that price or the producer's new reservation price.

164.    The obligation to return to the packer which is "on the cattle" is effectively a right of first refusal granted without consideration under threat of boycott.  Tyson, JBS, Cargill, and National Beef have adhered to and enforced the convention for decades, including across the Class Period, and treat it as a mandatory industry custom.

---

[67]     The right-of-first-refusal, as well as the requirement that the producer must disclose to other packers the identity and bid amount of the packer whose bid it passed on, provides packers with information relevant for monitoring compliance with collusively set prices among the packers.

165.    The convention's effect was magnified by the market conditions that prevailed during the Class Period, in particular the thin cash cattle trade, Packing Defendants' collective shunning of the cash market periodically and the Packing Defendants' coordination of both their price and trading windows.   In such market conditions, the convention created an artificial sense of urgency that encouraged producers to accept the first offer they received from a Packing Defendant. *See* ¶158.  This effectively reduced competition among Packing Defendants for any particular pen of cash cattle to which Packing Defendant would be first to deliver what essentially amounted to a take-it-or-leave-it offer, with no fear of subsequent price competition.

166.    Witness 2 confirmed that the field buyers from Tyson Fresh (Brian Alsup), Swift (Chad Miller and then Levi Canales), CMS (Steve Brown and then Rick Vogel), and National Beef (Richard Duffy) who visited his feedlot enforced strict adherence to this convention with threats of retaliation.  In particular, each of these field buyers individually spoke to him about the importance of his feedlot complying with the convention, and that they would not "come by" anymore should he break with it.

167.    Witness 2 further reports that when he took over management of the feedlot in 2012, the feedlot would only receive bids from National Beef and CMS.  When he subsequently spoke to the field buyers from Tyson Fresh (Mr. Alsup) and Swift (Mr. Miller) responsible for his region in the fall of 2012, they both told him that they had stopped visiting the feedlot because Witness 2's predecessor had broken with the convention by "shopping" their bids.  Witness 2 reports that the Tyson Fresh and Swift

field buyers re-commenced visiting the feedlot after he committed to following the convention.

168.   Witness 2 also heard from the Defendants' field buyers and other industry participants about other producers being "blackballed" for breaking with the queuing convention.  In those circumstances, Witness 2 understood that the Packing Defendant who was "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer whom the producer contacted while shopping the Packing Defendant's bid, or would ex-post pressure the producer for details of its sale.

169.   Witness 2 recalls that very few producers or their agents were willing to break with the convention for fear of alienating one or more of the Packing Defendant field buyers who visited their yard.  He reports never breaking the convention for this reason. He said that commercial feedlots or third party marketing bodies, such as his feedlot, were unwilling to risk Packing Defendants' retaliation given the duties they owed to their clients. Cattle owners are not willing to feed their cattle at commercial yards or market their cattle with organizations that have poor relations with Packing Defendants, which constitute most producers only marketing outlets.  Plaintiffs are not aware of examples of producers or their agents breaking with the convention for these reasons.  Packing Defendants' threats of boycott were sufficient to ensure adherence to the convention.

170.   In addition to the queuing convention, Witness 2 elaborated on further examples of artificial market dynamics at play.  For example, he reports that in late 2014 or early 2015, the Tyson Fresh (Mr. Alsup), Swift (Mr. Canales), CMS (Mr. Vogel), and National Beef (Mr. Duffy) field buyers who attended his feedlot jointly demanded that he

determine who had the right to make the first bid each week by having them draw cards in his office. Witness 2 reported that he felt obligated to acquiesce, as he remained anxious to ensure that each Packing Defendant visited his feedlot.

171. Thereafter, and at least until Witness 2 left the feedlot in or around July 1, 2015, the Packing Defendant field buyers wishing to bid on the cattle being marketed by the feedlot during that week drew cards to determine who would place the first bid. Witness 2 cannot recall a single week during this period in which one of the other three Packing Defendant field buyers actually raised the initial bid placed by the field buyer who won the card draw. That is, Witness 2 reports that during this period Tyson, JBS, Cargill, and National Beef did not engage in any price competition for the cattle sold by Witness 2's feedlot.

172. The field buyers tried to justify the card-drawing scheme to Witness 2 by saying it would allow them to avoid attending the feedlot at increasingly early hours in an attempt to place the first bid. In a competitive market, however, in which the purchasers engaged in genuine competition to acquire a producer's products, no purchaser would have a unilateral incentive to propose or adhere to such a scheme (nor would a producer have an incentive to agree to such a scheme). Rather, each purchaser would instead have a unilateral incentive to preserve the right to make an offer to the producer and rely on its ability to offer the best terms to acquire the producer's products. This pressure is especially present when the first bid at a given price carries with it an automatic right of first refusal, which has commercial value.

173.   A Packing Defendant would, for periods of time, sometimes extending across many months, offer the only bid (or the only credible bid) for a particular feedlot's fed cattle week to week, ensuring that the feedlots affected could not regularly procure credible bids from the other Packing Defendants.  Buyers for these other Packing Defendants would even routinely fail to take or return calls from the producer until after the Friday trading window had closed, even where their respective employers operated slaughter plants at closer proximity to the feedlot than the other Defendant.  These arrangements – akin to a market allocation scheme – point to an agreement among Packing Defendants to respect each other's relationships with their preferred suppliers.

174.   Additionally, Packing Defendants would, at times, stop buying cash cattle from feedlots located in a particular region for a number of weeks.  In doing so, they intended to back up cash cattle in those regions and break the resolve of affected producers to hold-out for higher prices.  After boycotting a region for a number of weeks, Packing Defendants would then all begin purchasing cattle from that region again during the same week.  When executing this scheme, Packing Defendants would often seek to initiate their weekly cash cattle trade in the region recently boycotted.  This allowed them to use the lower prices agreed to in that region to set the "market" for the remainder of the cash cattle trade that week.  In doing so, Packing Defendants were able to influence the prices of fed cattle sales across the United States.[68]

---

[68]   For similar reasons, Packing Defendants would also, at times, seek to set the market price lower by opening the weekly trade by purchasing a pen of poor quality cattle at a discount.

175.   Packing Defendants' conduct across Nebraska, Kansas, and Colorado from late March to early May 2016 is particularly illustrative of this practice.  The average live steer price in Nebraska for the weeks heading into April 2016 was steady at around $136/cwt.  In the two trading weeks starting Monday April 4, 2016, Packing Defendants each reduced their purchase of cash cattle across Nebraska.[69]  In the subsequent trading week, Packing Defendants were able to take advantage of the artificial surplus of Nebraskan cattle carried over from the prior weeks by buying significantly more cattle at a lower price of $126/cwt.[70]  Consistent with AMS reporting, Dataset A records just 1,176 and 1,340 cash cattle sold in Nebraska in the weeks commencing Monday, April 4 and Monday, April 11, 2016 respectively.  The Defendant buyers were Swift and National Beef.  By contrast, it records 3,760 cash cattle sold in Nebraska the week commencing Monday, April 18, 2016, all sold on Friday April 22, 2016, with each Packing Defendant purchasing lots.

176.   The same thing then occurred in Kansas.  The average live steer price in Kansas across the weeks commencing Mondays, April 4 and 11, 2016, was steady at around $133/cwt.  In the two trading weeks that started on April 18, 2016, each Packing Defendant reduced its purchase of cash cattle across Kansas, and Tyson Fresh, trucked

---

[69]   The AMS reported that negotiated Nebraska sales during those two weeks were 17% and 10% lower than the average reported volume for those corresponding weeks between 2011 and 2014.

[70]   The AMS reported that negotiated Nebraska sales during this week was 8% above the average reported volume for that corresponding week between 2011 and 2014.

Texas captive cattle to its Holcomb, Kansas plant.[71]  As a result, AMS reported 44% and 28% fewer cash cattle sales in Kansas during those weeks as compared to the average reported volume for those  corresponding weeks between 2011 and 2014.  Aided by the price suppression begun by the Defendants' prior isolation of Nebraska, live Kansas steer prices were also suppressed, dropping to $127/cwt for the week commencing Monday, April 18, before falling again to $124/cwt for the week ending Monday, April 25, 2016.

177.    Not surprisingly, each Packing Defendant then increased its purchase of cash cattle in Kansas in the first week of May, taking advantage of the artificial supply glut they had created across the course of the two prior weeks.  For this week, AMS reported a total of 24,000 cash sales in Kansas, a 7,000 head increase from the average reported sales of the two prior weeks, and a 2,000 head increase on the weekly average for the period between 2011 and 2014.  Despite this significant uptake in purchases, the average price for live steers in Kansas remained low at $127/cwt.[72]

178.    Packing Defendants then moved on to Colorado.  Colorado reported 41% and 67% relative declines in reported cash sales for the trading weeks commencing Monday, April 25 and May 2, 2016, as compared to the average reported volume for those

---

[71]    "the radical left of cattle twit" (@trdaaron), TWITTER, (April 14, 2016, 4:36 PM), https://twitter.com/trdaaron/status/720712349338832896?s=20 ("So tyson pulling lots of contract cattle from TX up to KS next two weeks which pushes rest of my cattle into first week of May.").

[72]    USDA Market News Service Report: LM_CT164 Kansas Weekly Weighted Average Direct Slaughter Cattle - Negotiated.  Any of the USDA Market News Service Reports referenced in this complaint can be generated at https://marketnews.usda.gov/mnp/ls-report-config.

corresponding weeks between 2011 and 2014.  In the trading week that followed, Colorado cash sales rose 3,000 head to 4,000 head, 7% above historical averages.

179.    These coordinated procurement practices limited competition for cash cattle, thereby reinforcing the price depressive effect of Packing Defendants' coordinated slaughter reductions.

## C.    Packing Defendants Uneconomically Imported Extra-Territorial Cattle to Depress Demand for Fed Cattle

180.    Packing Defendants also engaged in coordinated import and shipping practices that reduced demand for domestic fed cattle and suppressed the cash price transaction reports used to set the price of cattle procured under captive supply agreements during the Class Period.   In particular, Packing Defendants shipped cattle over uneconomically long distances to their slaughter plants, from locations both inside the United States and from Canada, to avoid bidding up the reported price of cattle in closer AMS LMR reporting regions.[73]

---

[73]    In relation to cross-region shipping in the U.S., *see*, for example, El Carnicero (@blakealbers), TWITTER (Nov. 16, 2015, 12:02 PM), https://twitter.com/blakealbers/status/666300194338660353 ("The amount of cattle going south to dodge city and the like is incredible"); T. Heinle (@ndsuhsker), TWITTER (Feb. 26, 2016, 7:37 AM, https://twitter.com/ndsuhsker/status/703197081205391360 ("Shipping cattle from wne to ene to be slaughtered #dontfigure!"); and T. Heinle (@ndsuhsker), TWITTER (Apr. 14, 2016, 5:45 PM), https://twitter.com/ndsuhsker/status/720729811241414656 ("Truckers are the packer's best friend, first haul south early now haul north! #everycattlefeederbuytrk!" -- response from Where's The Beef (@CornfedBeef) Twitter (Apr. 14, 2016, 9:19 PM): "Apparently paying freight must be cheaper than paying up for cash cattle in the region they need them! #BuyLowAndHaul").

181.    Because of the additional freight costs incurred in procuring fed cattle from Canada or regions within the U.S. outside a slaughter plant's typical procurement radius, it is only economical for a Packing Defendant to do so where the prevailing price differences as against domestic/local prices exceeded these additional costs.  But Plaintiffs' analysis suggests that Packing Defendants' import of live cattle began to increase slightly in 2014, and continued, even after it became uneconomical for them to do so in or around mid-2015:

**Figure 15.  Live Slaughter Cattle Imports into the U.S.**[74]



---

[74]    Fed cattle slaughter volumes sourced from USDA Market News Service Report: LM_CT106-National Daily Direct slaughter, committed and delivered.  Plaintiffs understand that Tyson, JBS, and Cargill are responsible for the bulk of all live cattle imports for slaughter.

182.    Figure 15 demonstrates that live cattle imports gradually declined until 2014 when they stabilized and began a slight upward trend.  Throughout this period, imports of Canadian cattle comprised the substantial majority of all live cattle imports for slaughter.

183.    While such imports were originally economical considering the prevailing price differences from 2005 to early 2015, from mid-2015 onwards, they were often uneconomical, and became increasingly so as the Class Period continued.  Yet Defendants continued to uneconomically purchase cattle from Canada.

**Figure 16.  Difference between Nebraska Fed Cattle Prices and Alberta Fed Cattle Prices Adjusted for Shipping Costs**[75]



---

[75]    To construct comparable price series for Canadian imports, Plaintiffs adjusted Alberta fed cattle prices for shipping costs and the exchange rate between the U.S. Dollar and the Canadian Dollar.  To do so, Plaintiffs accounted for the following factors which impact shipping cost per CWT:  the cost per pound, per loaded truck to haul cattle, the capacity of the trailers used to haul cattle, the distance between Alberta and Nebraska, and fuel costs.  AMS LMR price series for Nebraska are selected as the appropriate proxies as

184.   Figure 16 demonstrates that procuring Canadian cattle for immediate slaughter from mid-2015 onwards was regularly more expensive than procuring fed cattle from the adjacent U.S. feeding regions.   These periods of uneconomical imports are identified by the portions of Figure 16 where the live cattle price difference line dips below zero.

185.   Tyson and JBS acknowledge importing fed cattle from Canada for slaughter at their U.S. facilities.   For example, in 2016, an executive at JBS stated that "a lot of cattle [were] moving from Canada to U.S." and that such imports had an "important impact."[76] Similarly, Defendant Tyson acknowledged "buying cattle directly from Canadian cattle feeders" and is reportedly the third largest buyer of Canadian cattle, behind JBS and Cargill.[77]

186.   Suppressing the demand for U.S. fed cattle through the strategic importation of Canadian fed cattle is a practice that Tyson, JBS, and Cargill used during the Class Period and continue to use. ███████████████████████

---

they are the nearest U.S. price reporting regions to Alberta.   Alberta is the key cattle exporting region of Canada.   ALBERTA GOVERNMENT, *Livestock Prices*, accessed December 26, 2018, https://economicdashboard.alberta.ca/LivestockPrices.   Canadian dollars per cwt of live cattle in Alberta converted to USD per cwt.

[76]   JBS, Q1 2016 Earnings Call (May 12, 2016).

[77]   *Tyson halts Canadian beef imports due to higher costs*, THE CATTLE BUSINESS WEEK (Oct. 31, 2013), https://www.cattlebusinessweekly.com/articles/tyson-halts-canadian-beef-imports-due-to-higher-costs/.   While Tyson claimed that it was halting Canadian cattle imports in late 2013 in opposition to Country of Origin Labeling (COOL) requirements, when COOL was repealed in early 2016, Tyson is understood to have increased its imports of live cattle for slaughter.

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

187.   Moreover, Tyson, JBS, and Cargill have sought and received regulatory approval to import fed cattle for immediate slaughter at least at the following packing facilities: a) Tyson's packing plants in Pasco, Washington and Joslin, Illinois; b) JBS's packing plants in Greeley, Colorado; Hyrum, Utah; Plainwell, Michigan; Omaha, Nebraska; Souderton, Pennsylvania; and Green Bay, Wisconsin; and c) Cargill's packing plants in Ft. Morgan, Colorado; Wyalusing, Pennsylvania; and Fresno, California.[78]

188.   These actions evidence an intent to depress U.S. fed cattle cash prices because a Packing Defendant would not incur the additional costs associated with the import and purchase of foreign or extra-regional cattle in the hope of lowering its fed cattle supply procurement costs unless it was certain that its major competitors would do the same thing.

### D.   Packing Defendants Agreed to Restrict Their Slaughtering Capacity

189.   In furtherance of their conspiracy to manipulate the fed cattle market, Packing Defendants also agreed to eliminate their slaughtering capacity and refrain from future capacity expansion.

190.   Indeed, during the run-up of fed cattle prices until their precipitous fall in mid-2015, Packing Defendants first sought to reduce demand through a series of plant

---

[78]   USDA, List of Plants Approved to Receive Immediate Slaughter Animals, https://www.aphis.usda.gov/import_export/downloads/slaughter_list.pdf.

closures:  Cargill closed its Plainview, Texas and Milwaukee, Wisconsin plants (4,000 and 1,300-1,400 head per day capacities, respectively) in February 2013 and August 2014, respectively.  National Beef shut its Brawley, California plant (2,000 head per day) in June 2014.  Tyson closed its Denison, Iowa plant (2,000 head per day) in August 2015.  JBS kept the Nampa, Idaho plant it acquired in April 2013 closed throughout the Class Period.[79]

191.    The 125,500 head per day of industry-wide capacity remaining after Packing Defendants implemented their final plant closure was the lowest in the modern history of the industry.

192.    Defendants closed these plants on the pretense of low cattle availability, despite the fact that by early 2013 the drought had passed, forage availability in cow-calf producing regions had reached above-average levels, and producers' heifer retention rate – that is, the percentage of heifers retained for breeding as opposed sent to the feedlot in preparation to slaughter – was already increasing, foreshadowing the gradual increase in

---

[79]    Tyson Fresh additionally closed a beef processing plant in Cherokee, Iowa in September 2014, before telling local government officials that it would not consider selling the facility to "any firm that they believe is competition."  Kevin Hardy, *Held 'hostage' by Tyson: An Iowa town's dilemma*, DES MOINES REGISTER, July 8, 2016, updated July 16, 2016, https://www.desmoinesregister.com/story/money/business/2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/.  It ultimately sold the facility to an independent food processing company, pursuant to an agreement which "limits the amount of cattle that can be processed at the plant for . . . 10 years," notwithstanding that Tyson did not use it to slaughter fed cattle.  Kevin Hardy, *'No hard feelings': Tyson finally agrees to leave empty Iowa facility as new meat processor opens shop*, DES MOINES REGISTER, September                                                       19,                                                       2018, https://www.desmoinesregister.com/story/money/business/2018/09/19/tyson-foods-cherokee-iowa-plant-iowa-food-group-moves-justin-robinson-pork-beef-chicken-processing/1356962002/.  The plant was primarily used to produce hot dogs.

slaughter-weight fed cattle the industry would witness from 2016 onwards.[80]  Defendants

were undoubtedly aware of the expected gradual rebuild of the beef cattle herd, as they

routinely tout their visibility of upcoming supply numbers.[81]

193.   Packing Defendants' slaughter plant closures, even excluding the continued

idling of the Nampa, Idaho plant, stripped out approximately two million head from the

industry's annual slaughter capacity, thereby limiting demand for fed cattle.  In relation to

each closure, the responsible Packing Defendant offered pretextual explanations, such as a

lack of available cattle in the adjacent regions and "plant inefficiencies."[82]

194.   Packing Defendants' executives praised each other's efforts to reduce

industry-wide slaughter capacity through plant closures.  For example,  André Nogueira,

CEO of JBS USA, Swift, and JBS Packerland, noted in November 2015 that the closures

---

[80]    Heifer placements in feedlots as a percentage of total placements fell from 38.2% in January 2012 to 36.3% in October 2012, before continuing to steadily decline to 31% in April 2015, signifying the retention of heifers for breeding.  Thereafter, the heifer placement percentages gradually increased again, reaching 39.2% in October 2019.

[81]    *See, e.g.*, JBS, Q3 2013 JBS SA Earnings Call (Nov 15, 2013) ("[W]e've seen some heifer retention of the US -- some cow retention in the US, which indicates that we're at the beginning of a recovery in the herd size in the US, something we've been talking about for some time."); Tyson, Q3 2014 Tyson Foods Earnings, (July 28, 2014) ("[W]e expect next year [2015] to look a lot like this year [2014] from a cattle supply . . . and we're starting to see signs of heifer retention"); and Jefferies Financial Group Inc., "Leucadia National Corporate 2015 Investor Day," (Oct. 8, 2015), Slides 113-14 (noting increase in heifer retention, and projecting increase in slaughter-weight fed cattle from 2016 onwards).

[82]    National Beef even rejected a significant package of incentives offered by local government, utilities, and nearby feedlots when it decided to close its Brawley, California plant.  *National Beef plant closing Brawley Facility*, PROGRESSIVE CATTLEMAN (March 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plant-closing-brawley-facility.

had left the industry in "a very good position, [to achieve] balance in the industry in 2016, 2017, and 2018."[83]

195.    Tyson Food's Donnie Smith similarly let slip during Tyson's Q4 2015 Earnings Call that Tyson's preference would be for further capacity reduction to further reduce producers' negotiating leverage with the Packing Defendants:[84]

> You've got relatively low cattle supply, you've got too much -- well, not to say too much, ***probably not the right way to say it***, but you've got excess industry capacity.  And that limits our ability to drive margins above the 1.5% to 3%, we think.

196.    As a result of Packing Defendants' closures, the United States experienced both a decline in fed cattle slaughter capacity and an underutilization of that capacity.  This decline in marketing outlets for fed cattle producers was compounded in certain regions, where fed cattle producers now only have one, or possibly two, slaughter plants to which they are able to sell their cattle.

197.    While industry wide slaughter capacity increased slightly between 2016 and 2017, this increase is attributable to One World Beef Packing's reopening of the Brawley, California plant closed by National Beef.  Iowa Premium Beef (Tama, Iowa, 1,100 head per day) and Lime Springs Beef (Lime Springs, Iowa, 540 head per day) also entered the market in 2015 to partially offset some of the Packing Defendants' closures.[85]  While JBS

---

undertook a capital investment to increase slaughter capacity during the Class Period, its expansion of its Hyrum, Utah plant in 2015 and 2016 was directed at increasing its **cull cow** slaughter capacity, as opposed to **fed cattle**.[86]  And although Tyson finally completed its upgrades to its Dakota City, Nebraska plant in April 2015, the project, commenced in March 2012, had been scheduled for completion in mid-2013, and reported to be near completion as early as March 2013.  Further, and as noted above at paragraphs 105-107, while slaughter volumes improved from 2014 and 2015's lows, this was driven by Independent Packers.

## VI.   PACKING DEFENDANTS' CONSPIRACY CAUSED THE 2015 PRICE COLLAPSE AND SUPPRESSED PRICES THEREAFTER

### A.   Packing Defendants' Conduct Precipitated the Collapse in Fed Cattle Prices in 2015

198.   Packing Defendants' coordinated conduct was successful.  Responding to the compression of their margins in late 2014, Packing Defendants coordinated a reduction of their respective slaughter volume.  *See* Figure 2 above.[87]

---

capacity-good-news-beef-business.  *See also* n.207 below regarding the assistance Iowa Premium Beef required from Sysco to enter the market.

[86]   "Idaho Cow Market Will Heat Up," CATTLE BUYERS WEEKLY (February 2, 2015) ("The complete project will allow for the increase of production levels by more than 400 head per day . . . says JBS.  All of the 400-head increase will be cows."); *see* Declaration of Christopher M. Burke, dated December 13, 2019, in Support of Plaintiffs' Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss, ECF No. 163-D.  National Beef's acquisition of Iowa Premium, which was finalized on June 10, 2019, did not add to industry capacity.

[87]   Dataset A records a reduction in Tyson Fresh, Swift, CMS, and National Beef's year-over-year first quarter cash purchases of -52%, -89%, -97% and -43%.

199.   In quarter one of 2015, Tyson, JBS, and National Beef's year-over-year slaughter volume was down by approximately -1.8%, -11.2%, and -8.6%, respectively. And although Cargill's quarterly slaughter volume rose slightly year-over-year in the first quarter, like the others, its slaughter volume was still down on its fourth quarter 2014 volume.

200.   These declines were reflected in Defendants' public reporting.  Tyson's May 4, 2015 10-Q noted that its "sales volume decreased [in the quarter ending March 28, 2015 year-over-year] due to a reduction in live cattle processed."  Jefferies, National Beef's then majority shareholder, noted in its 10-Q filed May 8, 2015, that National Beef's revenues were down year-over-year for the first quarter "due primarily to lower sales volume, as fewer cattle were processed."[88]  JBS S.A.'s earnings presentation for the first quarter noted a 1.1% year-over-year decline in the "number of animals processed" by its JBS USA beef unit.[89]

---

[88]     Leucadia National Corporation, Quarterly Report (Form 10-Q) at 57 (May 8, 2015).

[89]     JBS S.A., 1Q 2015 Results, May 13, 2015 at 15, https://mz-filemanager.s3.amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-resultadoscentral-de-downloads/8bc0bd99f655d7c38a18d265a7ed397678c5e9774341f1efd1c98745f1a8a360/1q15_earnings_release.pdf.  JBS USA's beef segment also encompasses JBS S.A.'s much smaller Australian and Canadian beef businesses and Australian sheep operations.  This also noted a -1.1% decline in cattle processing (both fed and non-fed) across its US, Australian and Canadian beef businesses.  JBS USA's fed cattle to non-fed cattle slaughter ratio throughout the Class Period was 80% fed, 20% non-fed.

201.   This reduction in slaughter levels had the desired effect.  For the first half of 2015, prices fluctuated at or around $160/cwt, $10/cwt lower than the high established in November 2014.

202.   Not satisfied with this slight decrease, Packing Defendants extended their joint slaughter reduction during the second and into the third quarters of 2015.  Across the second quarter, Tyson, JBS and National Beef's year-over-year slaughter was down by approximately -5.4%, -12.8%, and -6.2%, respectively.  Cargill continued to hold to its low 2014 volume.  While it posted a modest year-over-year growth of 1.8% in the second quarter, this still left it 12.7% below its 2012-14 Q2 average.

203.   Again, this reduction in cattle purchases was also reflected in Tyson Foods,[90] JBS S.A.,[91] and Jefferies (National Beef's)[92] financial reporting.

---

[90]   Tyson's 10-Q for its quarter ending June 27, 2015, recorded year-over-year declines in sales in its beef segment revenue due to a "reduction in live cattle processed."  *See* Tyson Foods, Inc., Quarterly Report (Form 10-Q), at 38 (Aug. 3, 2015).  *See also* Tyson Foods, Inc., Annual Report (Form 10-K), at 29 (Nov. 23, 2015) (noting reduction in sales revenue in FY 2015 as against FY 2014 due to lower cattle processing).

[91]   JBS S.A., 2Q 2015 Results, August 13, 2015 at 15, https://mz-filemanager.s3.amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-resultadoscentral-de-downloads/02fd1b6f7f1cee632e5af617767bc7a98017ead954465d63d1e8633b2ec5a3cd/2q15_earnings_release.pdf (noting -0.9% decline in cattle processing (both fed and non-fed) across its US, Australian and Canadian beef businesses).

[92]   Leucadia National Corporation, Quarterly Report (Form 10-Q) (Aug. 5, 2015), at 52, https://ir.jefferies.com/reports-filings/sec-filings/sec-filings-details/default.aspx?FilingId=10842047 (noting revenues for three and six month 2015 periods decreased year-over-year "primarily due to lower sales volume, as fewer cattle were processed"); Leucadia National Corporation, Quarterly Report (Form 10-Q) (Nov. 5, 2015), at 53, https://ir.jefferies.com/reports-filings/sec-filings/sec-filings-

204.   To place further pressure on cattle prices during 2015, Tyson, JBS, Cargill, and National Beef also drastically reduced their respective purchases of cash cattle, leaning heavily on their captive supplies and, in the case of Cargill and JBS, their own cattle, to satisfy their curtailed kill numbers.[93]   Packing Defendants also pressured cash sellers to accept formula trades as a condition of getting their cattle harvested.   *See* Tables 1-4 above, detailing Dataset A's year-over-year decline in Packing Defendants' purchases of cash cattle during the second and third quarter of 2015, and increase in formula top-of-the-market trades.

205.   Packing Defendants' strategy was immediately successful, with cash cattle – and thus formula cattle – prices falling continuously across June to about $150/cwt.[94] Meanwhile, with lower slaughter volumes and lower boxed beef output, the meat margin expanded rapidly, bloating each Packing Defendants' margins.   *See* Figure 6 above and Figures 22, 40, and 43 below.

---

details/default.aspx?FilingId=10990831 (noting the same in relation to 3Q 2015 and first three quarters of 2015).

[93]    Cassie Fish, *Cash Trade Volume Tiny; Futures Shake It Off*, THE BEEF (Jun. 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156. . . .  But . . . it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive.  Only problem is, packers weren't able to secure enough cattle cheaper, even when relying on captives, to easily fill an even curtailed kill expected this week at 540,000 head.  June forward contracts are rumored being called in as a way to offset the absence of negotiated purchases.").

[94]    Cassie Fish, *Smack Down*, THE BEEF (Jun. 15, 2015), https://www.thebeefread.com/2015/06/15/smack-down/ ("Cash cattle prices broke hard Friday as packers successfully executed a strategy of slashed kills and limited negotiated purchases.").

206.   Industry analysts at the time commented on Packing Defendants' determination to "break" cash cattle prices through their collective slaughter reductions and reduced cash cattle purchases.  On June 12, 2015, analyst Cassandra Fish of "The Beef" and formerly a risk manager at Tyson, speculated as to when one of Packing Defendants might break ranks:

> Rarely has this industry segment [the beef packers,] been an all-for-one and one-for-all group.  All packers need to buy cattle inventory.  Most have cut hours.  So will someone break ranks, pay up for cattle and add hours to capture the better realization that the next boxed beef rally will bring?  Will one short a customer only to find that order filled by a competitor?[95]

207.   Ms. Fish answered her own question a few weeks later, remarking on June 25, 2015 that the "packers refuse to reach for cattle and are currently in command.  After 3 weeks of sharply curtailed kills, packers are exhibiting incredible discipline and letting the kill increase gradually," limiting the ability "of feeders to get all cattle marketed [*i.e.*, sold] in a timely fashion."[96]

208.   During the remainder of 2015, Packing Defendants continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that

---

[95]   Cassie Fish, *Futures Holding Gains; Waiting on Cash*, THE BEEF (Jun. 11, 2015), https://www.thebeefread.com/2015/06/11/futures-holding-gains-waiting-on-cash/.

[96]   Cassie Fish, *Another Round of the Blues*, THE BEEF (Jun. 25, 2015), https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/.  Dataset A records that Packing Defendants conducted all or substantially all of their cash cattle purchases on the Friday of the two trading weeks commencing Mondays 11 and 18 June 2020.

slaughter-ready cattle had been "backed up" and were reaching historically heavy weights.[97]  They did so even though underutilizing their plants would hurt their margins.

209.   Tyson's CEO, Donnie Smith, admitted as much August 3, 2015, when discussing Tyson's decreased purchases over the preceding quarter, noting "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs.  In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term."[98]   In response to a question regarding the consequent impact of Tyson's underutilization of its plant capacity, Mr. Smith elaborated:

> In terms of quantifying the impact, we know when we're running 34s and 36s a week in our plants that that does cost us. It raises the cost in our plant, makes us a lot less efficient, so it does have a cost to us. I don't know that I can quantify that right off the bat, but it does impact margin.[99]

210.   Although Tyson was unwilling to disclose the impact on its bottom line, the impact on producers was particularly evident in September 2015, when Tyson, JBS, Cargill, and National Beef each utilized the leverage they had collectively established over producers in the prior months to push prices down to $120/cwt by months' end, despite increasing their purchases of cash cattle.  Packing Defendants also demanded extended

---

[97]   Cassie Fish, *Kills Too Small For Too Long*, THE BEEF (Sep. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/.

[98]   Tyson Foods, Q3 2015 Earnings Call (Aug. 3, 2015).

[99]   *Id.*

delivery periods of two to four weeks as a condition of trade throughout the month, providing them with further leverage over producers who still had cattle to sell.[100]

211.    Packing Defendants' concerted actions to depress cattle prices across 2015 (and their successes) are summarized by the below two charts.  Figures 17 and 18 both compare the price of fed cattle across 2015 against the number of fed cattle slaughtered across 2014 and 2015 at packing plants subject to AMS LMR reporting obligations.[101] These figures are a very good proxy for Tyson, JBS, Cargill, and National Beef's cumulative slaughter volume as they operate the substantial majority of such plants and appear to provide over 90% of the reported transactions.  *See* Appendix 2 and Figure 9.

212.    Figure 17 details the price and slaughter volumes of all fed cattle and tracks Packing Defendants' quarterly slaughter volumes detailed in Figure 2 above.  Figure 18 details the price and slaughter volumes of cash cattle.  The average monthly slaughter volumes between 2010 and 2014 are also presented.  As shown by these figures, the decline in cash cattle slaughter across the second and third quarters of 2015 depressed the price of all fed cattle.  This depression enabled Packing Defendants to boost their slaughter volumes

---

[100]    *See, e.g.*, Cassie Fish, *No bottom in sight*, THE BEEF (Sep. 16, 2015), https://www.thebeefread.com/2015/09/16/no-bottom-in-sight/.

[101]    Figures 17 and 18 were prepared using USDA Market News Service Reports: LM_CT106-National direct slaughter, committed and delivered, LM_CT151-National Weekly-Formula, Forward, Negotiated Net (Domestic), and LM_CT154-Weekly National direct slaughter, negotiated.  Fed cattle prices shown in Figure 17 are the weighted average price of all four purchase categories (formula, forward, negotiated (*i.e.*, cash), negotiated grid).

in the final quarter of 2015 by purchasing cheaply the oversupply of cash cattle they had created over the preceding two quarters.

**Figure 17.  Total Fed Cattle Slaughter Volumes and Fed Cattle Prices – All Purchase Types**



**Figure 18.  Cash Cattle Slaughter Volumes and Cash Cattle Prices**



213.    Despite increasing their respective slaughter volumes of cash cattle over prior years during the final quarter of 2015 to take advantage of the comparative glut they had created, each Packing Defendant slaughtered between 5.8% and 17.1% less cattle in the fourth quarter of 2015 than their 2012 to 2014 average.

214.    Importantly, Tyson, JBS, and National Beef's annual slaughter volumes were down 4%, 17%, and 6% on 2014 levels, respectively.[102]   Although Cargill's slaughter volume remained flat year-over-year as a result of its low 2014 slaughter volumes in the

---

[102]    CBW Top 30 Beef Packers.

aftermath of its two plant closures, its 2015 slaughter volume was significantly below historic levels.[103]  Moreover, as shown by Figure 2, and Tables 1-4, Cargill did participate in Packing Defendants' reduced purchase and slaughter volumes across 2015 before increasing its cash purchase volume in the final months of the year.

215.   Moreover, each Packing Defendant's conduct stands apart from Independent Packers who *increased* their annual slaughter volume in 2015 by 7.8% year-over-year.

216.   Tight fed cattle supplies do not explain Packing Defendants' coordinated reduction of their respective slaughter volume across 2015.  And neither can the drastic drop in prices or Packing Defendants' unseasonable rise in slaughter of cash cattle in the fourth quarter of 2015 be attributed to a significant increase in the availability of slaughter-weight cattle.

217.   An analysis of the USDA's Cattle on Feed reports confirms the absence of an "innocent" explanation.[104]  This monthly publication reports data on the number of fed cattle in U.S. feedlots (inventory), the number of cattle being placed into feedlots during the report month (placements), the number of cattle shipped out of feedlots for slaughter during the report month (marketings), and other disappearances (*e.g.*, death loss or move to pasture).[105]

---

[103]    *Id.*

[104]    USDA National Agricultural Statistics Service ("NASS"), *Cattle on Feed*, ECONOMICS, STATISTICS AND MARKET INFORMATION SYSTEM, usda.library.cornell.edu/concern/publications/m326m174z?locale-en ("Cattle on Feed").

[105]    Cattle on Feed reports estimates pertain to fed cattle fed in feedlots with a 1,000 head or greater capacity.  Such feedlots typically hold between 80 and 85% of all fed cattle on feed in the United States.

218.    Figure 19 below compares fed cattle inventory across 2014 and 2015.  It shows that fed cattle inventory was at or slightly above 2014 levels in almost every month of 2015.  While these changes may reflect, in part, the continuing rebuild of the cow-herd, the key driver of the year-over-year increases in inventory was Packing Defendants' respective slaughter reductions.  These reductions forced producers to feed their cattle longer, causing feedlots to carry cattle over into subsequent reporting months.

**Figure 19.  Cattle on Feed Inventory Levels in 1000+ Head Feedlots – 2014 vs. 2015**



219.    Figure 20 below confirms these results.  It estimates the number of cattle reaching slaughter weight across each month of 2014 and 2015, sometimes referred to as a

placement against supply estimate.  Figure 20 utilizes monthly Cattle on Feed placement numbers and assumes a standard feeding period of around six months.[106]

**Figure 20.  Slaughter-Weight Fed Cattle in 1000+ Head Feedlots – 2014 vs. 2015**



220.    As can be seen from Figure 20, the number of fed cattle scheduled to reach slaughter weight in 2015 was down on a year-over-year basis.  Therefore, the year-over-year increases in inventory levels experienced from May to November 2015 was not driven by an increase in the availability of slaughter-weight fed cattle.  Rather, it was driven by a

---

[106]    For example, an estimate of the available number of slaughter-weight cattle in July 2015 is derived by advancing the placements numbers from January 2015 forward six months.

decrease in each Packing Defendant's slaughter volume, which caused an artificial glut of supply by forcing producers to feed their cattle beyond their optimal weight.

221.    This artificial increase in inventory levels is also confirmed by Figure 21 (below), which compares Cattle on Feed reports' record of marketings (*i.e.*, sales from feedlots) across 2014 and 2015.

**Figure 21.  Marketings in 1000+ Head Feedlots – 2014 vs. 2015**



222.    Consistent with Figures 17 and 18 above, Figure 21 shows slaughter volume during the first three quarters of 2015 to be appreciably lower than 2014 volumes before rising in the final quarter.  In sum, Figure 19 shows that there were more cattle in feedyards

in 2015 than in 2014, despite Figure 20 showing that there were fewer cattle due to reach slaughter weight in 2015 than in 2014.   The cause of this was Packing Defendants' slaughter reductions, as shown by Figure 21.

223.   Packing Defendants' conduct in 2015 was neatly summarized by Ms. Fish, who lamented on November 10, 2015, the "*[p]ackers no longer compete against each other to buy fed cattle each week*," [emphasis added] and were consequently reaping "gangbuster profits."[107]   The financial impact of Packing Defendants' conspiracy can be seen in the chart below, which estimates producers' and packers' respective per head margins:

**Figure 22.  Producer vs. Packer Per-Head Margins Across 2015**



---

[107]    Fish, *Whatever Happened to a Fair Fight*, *supra* n.56.

100

224.   As shown in Figure 22, during the second half of 2015, after Packing Defendants embarked on their collusive reduction in slaughter volume, producer margins were materially reduced, averaging -$51, -$1, and -$359 per head across the second, third, and fourth quarters, respectively.   At the same time, Packing Defendants posted average per head margins of between approximately $47 and $66 across the three quarters, well above their pre-Class Period averages of between -$16 and $25/head.[108]

## B.   Packing Defendants' Ongoing Conduct Continues to Depress Fed Cattle Prices Throughout 2016

225.   Because Packing Defendants worked through the glut of cattle they created in the second half of 2015, they were expected to have to pay up to secure their share of limited cattle supplies.   But Packing Defendants regrouped in early 2016.   By "ration[ing] their new purchases [of cattle]" and running shorter 32-hour weeks in early January, they dampened rising cattle prices and extended the rally in boxed beef prices.[109]   Packing Defendants then further suppressed prices by sustaining low kills across February and March.[110]

---

[108]   Pre-Class Period average margins are calculated from between 1997 and 2014.

[109]   Cassie Fish, *Global Sell Off Smacks Cattle*, THE BEEF (Jan. 4, 2016), https://www.thebeefread.com/2016/01/04/global-sell-off-smacks-cattle/.

[110]   Cassie Fish, *Yet More Consolidation*, THE BEEF (Jan. 6, 2016), https://www.thebeefread.com/2016/01/06/yet-more-consolidation/.

226.   Each Packing Defendant reduced its slaughter volumes in the first quarter of 2016.[111]   As a result, each Packing Defendant slaughtered less cattle in the first quarter of 2016 than it did on average across the first quarters of 2012-2014.[112]   Dataset A also records that while each Packing Defendant's cash cattle purchases were higher in the first quarter of 2016 year-over-year (consistent with the drastic price decline they had forced across 2015), it remained below their respective average Q1 cash cattle purchase volume across 2012-2014.

227.   As a result, fed cattle prices remained in the mid-$130s/cwt through the end of March, well below the expected seasonal high, even as boxed beef enjoyed several rallies.   By rationing the available cattle amongst themselves, Packing Defendants posted average weekly margins of approximately $63 per head.   At that time, this was one of their "best Q1 in history" and well above their pre-Class Period first quarter average of $0 per head.[113]

228.   Going into the second quarter of 2016, Packing Defendants, knowing that feedlots had been left holding over cattle from the first quarter, increased their kills

---

[111]   Quarter-over-quarter change: Tyson (-0.7%), JBS (-16.3%), Cargill (-3.3%), National Beef's (-4.4%).

[112]   Year-over-year against 2012-14 averages: Tyson (-4.5%), JBS (-21.7%), Cargill (-9.3%), and National Beef (-14.9%).

[113]   Cassie Fish, *Futures Weakness Drags On*, THE BEEF (Mar. 29, 2016), https://www.thebeefread.com/2016/03/29/futures-weakness-drags-on/ ("Packers continue to do a masterful job of matching throughput to supply and demand and margins, looking at the comprehensive cutout and $3 lower cash last week- are still solidly black.").   [This quote is not in this article]

gradually.  *See* Figure 2.  As a result, fed cattle prices began to decline, dropping $10/cwt across April and leaving producers well in the red.

229.    After clawing back some of that decline in May 2016, cash prices continued to hover between mid-$120s/cwt to low-$130s/cwt until the trading week ending Friday, June 16, when cattle prices broke from $128/cwt to approximately $121/cwt, fueled by Packing Defendants' limited participation in the spot market.[114]  Having bought a paltry amount of cash cattle, Packing Defendants were expected to pay up for inventory in the week ending Friday, June 25, 2016.  Instead they continued to step cattle prices down.

230.    After cattle prices declined down to $114/cwt in the last week of July, a level not seen since July 2012, analysts believed that the summer low had been reached.[115] Instead, Packing Defendants extracted further concessions from cattle sellers.  Cash cattle purchases across June and July were down 21% on 2014 levels, despite increased cattle availability, driving a 1% decline in slaughter volumes.  Dataset A records Packing Defendants' June and July cash purchases were down between 16% and 83% against their 2012-2014 averages.

---

[114]    Cassie Fish, *Another Limit-Down Monday*, THE BEEF (June 20, 2016), https://www.thebeefread.com/2016/06/20/another-limit-down-monday/ ("It is not a stretch that with such a big kill last week and this week coupled with a 5-area negotiated cash trade volume of a mere 48k head, that the packer will be forced to buy big volume this week and a significant transfer of ownership from feeder to packer is imminent.")

[115]    Cassie Fish, *Onward and Upward*, THE BEEF (July 28, 2016), https://www.thebeefread.com/2016/07/28/onward-and-upward/;  Cassie Fish, *Erode. Erode. Erode.*, THE BEEF (Aug. 24, 2016) https://www.thebeefread.com/2016/08/24/erode-erode-erode/.

231.    In August 2016, Packing Defendants each then increased their cash cattle purchases, taking advantage of cattle supply they had generated.   Importantly, each maintained steady kills, ensuring that they could easily supply their needs without generating price competition amongst themselves.   Cattle prices fell steadily from $118/cwt in mid-August to below $110/cwt in the first week of September, leaving Ms. Fish to remark that "*[t]his [2-year consecutive] break in cattle prices stands alone for its magnitude and its lack of an external market-moving event*."[116] [Emphasis added].

232.    The rout continued through the fall of 2016, as feedlots struggled to get current with their marketings, and were left holding over cattle week-to-week.   Packing Defendants bought cattle cheaper, and bought them with extended delivery periods (*i.e.*, "with time"), displacing the start of the typical fall rally in fed cattle.   Packing Defendants responded to any rare rise in prices by dropping their respective slaughter volumes and/or cash cattle purchases the following week, thereby ensuring that no price rally could persist. For example, fed cattle slaughter dropped 20,000 head in the week commencing Monday, September 19, 2016, as Packing Defendants significantly reduced their cash cattle purchases.[117]   Not surprisingly, the week prior had seen a modest $4/cwt uptick in cattle

---

[116]    Cassie Fish, *A Grave Time in History*, THE BEEF (Sep. 3, 2016), https://www.thebeefread.com/2016/09/02/a-grave-time-in-history/.

[117]    Cassie Fish, *Feeders Take the Lead; Packers Play It Cool*, THE BEEF (Sep. 22, 2016), https://www.thebeefread.com/2016/09/22/feeders-take-the-lead-packers-play-it-cool/ ("It has been the behavior of the packer that has slowed down the upward momentum this week.  Taking 20k head out of this week's fed kill coupled with adequate inventories seems to have been enough to return the balance of power to the packer for now.") Cassie Fish, *Wild and Wooly*, THE BEEF (Sep. 26, 2016), https://www.thebeefread.com/2016/09/26/wild-and-wooly/ ("Last week's cash cattle trade

prices after declining continuously for over a month.  Packing Defendants' strategy worked, with cattle prices declining about $3/cwt by week's end on September 23, 2016, before continuing its downward trajectory the following week.[118]  Thereafter, the price of fed cattle continued to fall across 2016 to a low of approximately $98/cwt in mid-October. In the second and third quarters, each Packing Defendant's kill volume remained below their 2012 to 2014 averages.

233.   Packing Defendants responded to this price decline and cattle glut by unseasonably increasing kill volumes in the fourth quarter.  Their fourth quarter kills were up between an estimated 8.3% and 21.5%  year-over-year and 3.0% to 9.2% on a quarter-to-quarter basis.[119]  These increases reflect Packing Defendants' slaughter restraint across the second and third quarters of 2016.

---

[118]   Cassie Fish, *And It All Falls Down*, THE BEEF (Sept. 27, 2016), https://www.thebeefread.com/2016/09/27/and-it-all-falls-down/  ("The big carryover of unsold negotiated cattle from last week has gained negative status as the hours have rolled by, with packers willing and able to sit back and lower bids to $104, $6 lower than 2 weeks ago and $3 lower than the few that traded Friday and Saturday"); Cassie Fish, *Despondency*, THE BEEF (Oct. 11, 2018), https://www.thebeefread.com/2016/10/11/despondency/ ("As if on cue, kills this week are now rumored to be cutback to 585k-595k, with a cooler cleaning and Saturday kills out . . . . A pull back in the kill with record packer margins cements the reality that easily and efficiently killing our way through the numbers, which used to be a reality, isn't any longer. This makes it difficult for the market to return to fully current marketing status if there is any slowdown in kill.").

[119]   Tyson, Cargill, and National Beef's volume was also up 2.3%, 3.3%, and 10.9%, respectively against their fourth quarter 2012 to 2014 averages.

The footnote at the top of the page reads:

was inadequate and lots of cattle were carried over into this week. . . . Unquestionably, last week was the lightest movement of negotiated cattle in months coming in at just under 50k. This volume is about half of the normal.").

234.    As a result, industry-wide kill levels in November 2016 alone were up 24% and 19% on a year-over-year basis as compared to 2014 and 2015, respectively.[120]

235.    Packing Defendants' success in "backing-up" cash cattle across the summer of 2016 is confirmed by the fact that Packing Defendants were able to raise cash cattle slaughter levels 38% and 24% in the fourth quarter of 2016 as against 2014 and 2015 levels without causing a dramatic rise in prices.[121]  Moreover, they were again able to buy significant portions of the cattle with extended delivery periods, exerting their control into subsequent weeks.[122]

236.    In fact, during the fourth quarter of 2016, prices remained steady at or around $100-$105/cwt until late November, when Packing Defendants finally bought the bulk of the held over cattle.  Prices then remained between $109-$115/cwt before closing at $107 on December 31.[123]

---

[120]    Year-over-year comparisons calculated using USDA Market News Service Report: LM_CT106-National direct slaughter, committed and delivered.

[121]    Cassie Fish, *Futures Bounce Amidst Mixed Signals*, THE BEEF (Nov. 8, 2016), https://www.thebeefread.com/2016/11/08/futures-bounce-amidst-mixed-signals/   ("Last week's [negotiated] trade ended up at 90k head though 24k were with a 15-30-day delivery, the second week in a row with numbers at that level.").

[122]    *Id*.

[123]    At these prices, Packing Defendants were purchasing cash cattle at a significant discount even compared to 2015's depressed prices.  Furthermore, the slight price increase in late November/December from the October low was consistent with the seasonal rise in fed cattle prices typically experienced in the fourth quarter of each year as the availability of slaughter-weight cattle declines and beef prices improve.  But for the glut in slaughter-ready cattle created by Packing Defendants' coordinated actions, prices would have risen significantly higher, and much earlier, in response to the Defendants' dramatic increase in year-over-year slaughter numbers

237.    Again, despite the increased availability of fed cattle and Packing Defendants' unseasonably large Q4 harvest, except for Cargill, each Packing Defendant's annual slaughter volume in 2016 remained below (Tyson (-6%) and JBS (-6%)) or flat (National Beef) against 2014 levels.[124]   Although Cargill's 2016 slaughter volume rose 10% as against 2014, it remained significantly below historic levels (see Figure 4 above).[125] Again, by contrast, Independent Packers raised their annual collective slaughter volume by 10.4% year-over-year.

238.    Each Packing Defendant's refusal to break from their collective adherence to rationing the available cattle supply is all the more remarkable given the margins on offer to Packing Defendants across 2016.   In the third and fourth quarters alone, Packing Defendants realized average per head margins on their fed cattle purchases of $123 and $153 per head.  Not only were these margins significantly above pre-Class Period averages ($25 and -$16 per head), but they also exceeded the Packing Defendants' most profitable third and fourth quarters in modern times by about $30 and $100 per head, respectively. Packing Defendants therefore had both the incentive and the ability to buy more cattle. Meanwhile, producers lost on average -$67 per head across 2016.

---

[124]    Total industry slaughter was 24.56 million head in 2016, up from 24.11 million in 2014.  2018 Meat & Poultry Facts, at 12.

[125]    CBW Top 30 Beef Packers.

### C.     Packing Defendants Continue Their Scheme in 2017 and 2018 Despite Increased Cattle Availability

239.    Going into 2017, Packing Defendants worked to ensure that any increase in their collective slaughter volumes did not outpace the growth in slaughter-weight cattle availability. Tyson, JBS, Cargill, and National Beef each reduced their volumes in lockstep during the first quarter,[126] before raising them together across the second quarter.[127]  *See* Figure 2.

240.    And while cattle prices did rise at the beginning of February to a high in the first week of May (similar to pre-Class Period spring highs), each Packing Defendant responded by reducing its kills. Feedlots again struggled to sell their inventory and prices fell steadily to a yearly low of $105/cwt in mid-September. This constituted a significant expansion of the typical summer low, historically reached in July. It also enabled Packing Defendants to each post year-over-year and quarter-over-quarter slaughter increases in the third quarter. Tyson, JBS, Cargill, and National Beef slaughtered approximately 8.5%, 9.0%, 16.0%, and 17.7% more cattle in the third quarter of 2017 than they did the prior year.

241.    As with 2016, Packing Defendants enjoyed substantial profits during 2017, posting then record per-head margins in the second and third quarters ($128 and $147 per head, respectively). Indeed, Packing Defendants' average per head margins for the first

---

[126]    Quarter-over-quarter change: Tyson (-6.1%), JBS (-6.6%), Cargill (-4.6%), National Beef (-17.9%).

[127]    Quarter-over-quarter change: Tyson (7.5%), JBS (5.3%), Cargill (7.7%), National Beef (12.4%).

and fourth quarter, $42 and $88 per head, respectively, stood second only to the quarterly profits they generated in 2016. And again, each Packing Defendant refused to increase cattle purchases to expand its market share despite the obvious profit potential. Instead, they kept their production in lockstep with one another, rationing supply amongst themselves to ensure the continued suppression of cattle prices.

242. Their scheme continued into 2018. Each Packing Defendant also began to tell the market that, as a result of the plant closures discussed above, they had insufficient capacity to slaughter the supposedly large volume of cattle due to reach slaughter-weight in the spring and summer of 2018.[128] They therefore encouraged producers to commit their cattle early on captive supply agreements to ensure they could "get their cattle dead" before Packing Defendants ran out of "hook" or "shackle space."[129] At the same time, Packing Defendants backed off their respective kill schedules during the first quarter of 2018 and into the beginning of the second to ensure that there would be a glut of slaughter-weight cattle available over the summer months of their own making.[130] *See* Figure 2 detailing

---

[128]   Cassie Fish, *Still Green*!?!, THE BEEF (Mar. 27, 2018), https://www.thebeefread.com/2018/03/27/still-green/ ("The [packers'] mechanical [slaughter] capacity exceeds needs [across Q2 2018]. The limitation perception is linked to labor. The perception of there being a limitation has created fear and inspired some cattle feeders to "get in line" by selling [cattle] out-front [*i.e.*, on captive supply agreements].").

[129]   *See* Cassie Fish, *Holding Gain*, THE BEEF (Apr. 18, 2018), https://www.thebeefread.com/2018/04/18/holding-gains/ ("Cattle feeders, still fearful of growing supplies in May, June and beyond continue to sell cattle for May at substantially lower prices than current values.").

[130]   Cassie Fish, *Futures Trade Both Sides; Cash Poised to Trade Lower*, THE BEEF (Apr. 2, 2018), https://www.thebeefread.com/2018/04/02/futures-trade-both-sides-cash-

significant decline in first quarter 2018 slaughter as against fourth quarter 2017: Tyson (-8.6%), JBS (-14.4%), Cargill (-10.5%), and National Beef (-4.7%).

243.    Packing Defendants' tactics succeeded.  Prices fell during late winter/spring 2018, despite record strong beef demand (*see* Figure 42 below) and tight supplies of slaughter-ready cattle across March and April.  Indeed, prices fell from approximately $126/cwt at the beginning of March 2018 to $110/cwt by the end of May 2018.  Prices stayed at or around that mark until mid-November 2018, trading between $106/cwt and $115/cwt, a significant extension of the one- to two-month summer low typically experienced by the market.

244.    And, of course, Packing Defendants never did reach slaughter capacity.[131] After having broken cattle prices by early May, each Packing Defendant increased its slaughter volume by approximately 11.4%-13.6% in the second quarter, easily processing the glut they themselves had created.  Packing Defendants then, in parallel, held their slaughter volumes across the third quarter so as not to get in front of the available supply, posting remarkably similar quarter-over-quarter slaughter changes: Tyson (0.5%), JBS (-0.7%), Cargill (-0.2%), and National Beef (-0.7%).  As the supply of fed cattle decreased

---

poised-to-trade-lower/ ("Looking back at March's fed slaughter rate, it underperformed expectations. . . .  Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable.").

[131]    Cassie Fish, *Quiet Conclusion*, THE BEEF (Jun. 1, 2018), https://www.thebeefread.com/2018/06/01/quiet-conclusion/ ("As each week goes by in June, the calendar will take the industry into the heart of one of the most well-advertised 'walls' of market-ready cattle in memory.  Now that it is a known fact that the industry can kill 540k head of fed cattle and that demand can absorb the largest beef production in 10-years, the panic experienced in March seems overdone.").

into the fourth quarter of 2018, each Packing Defendant reduced its slaughter volumes, posting similar quarter-over-quarter declines: Tyson (-3.7%), JBS (-4.2%), Cargill (-4.0%), and National Beef (-4.1%)

245.    Packing Defendants' slaughter restraint resulted in each posting record margins across the second, third and fourth quarters ($229, $198, and $175 per head, respectively).  Meanwhile producers suffered per head losses of $30 and $41 per head in the second and third quarters, before a modest $27 per head profit in the fourth, well below the pre-Class Period average of $89 per head.

246.    As a result of their commitment to rationing the available cattle amongst themselves, across 2017 and 2018, Packing Defendants' annual slaughter volumes remained between 5.4% and 12.8% below their pre-Class Period averages.  *See* Figures 3-4.  By contrast, Independent Packers' slaughter volumes across 2017 and 2018 were up 46.5% and 56.1%, respectively, on their collective pre-Class Period averages.

### D.    The Years of 2019 and 2020 Bring Continued Parallel Slaughter and Pricing Behavior, a Fire at a Plant, and Regulatory Investigations

247.    Severe weather during the winter of 2018/19 stripped pounds off cattle in feed yards, driving down slaughter weights as much as 15 pounds year-over-year.  After the snow thawed, cattle feeders were hit with a very wet spring, which further eroded their ability to add pounds to their cattle.  At the same time, beef demand remained "terrific," encouraging packers to run plants to meet customers' demand.[132]  In ordinary times, this

---

[132]    Cassie Fish, *How About That,* THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/2019/02/11/how-about-that-3/ ("Rather obviously, beef demand is terrific.").

would portend a substantial rally in cattle prices, over and above the typical rise experienced in winter/early spring, as Packing Defendants would be compelled to compete to secure a greater number of cattle to make up for their lower weights.

248.    However, Packing Defendants continued to work together to constrain and limit the advance in cattle prices that market conditions warranted.  Following their slaughter reductions in the fourth quarter of 2018, each Packing Defendant maintained comparably lighter slaughter volumes across the first three months of 2019, ensuring that their collective demand did not exceed the available supply.[133]  *See* Figures 23-32 below and Figure 2 above.

249.    Packing Defendants placed further pressure on cattle prices by reducing the volume of cash cattle they bought during this period.  *See* Figures 28-32 below.  To facilitate this, each Packing Defendant pulled formula and forward contract cattle forward, and pressured cash sellers to sell with "time" (*i.e.*, more than one week before delivery, which is the industry standard).[134]  *See* Figure 35 below.  By coordinating their actions in

---

[133]    *See, e.g.*, Cassie Fish, *And the Beat Goes On*, THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/ ("Packers also know that February is typically the lightest slaughter month and even though they are killing more cattle than a year ago – some plant 'dark days' began yesterday as plans to keep the balance between supply and demand are paramount.  Some plants will undertake maintenance or upgrade projects and some will honor holidays such as Monday's President's Day.  Others will pull back hours to 36-hour work week.").

[134]    Cassie Fish, *Picking Up,* THE BEEF (Jan. 16, 2019), https://www.thebeefread.com/2019/01/16/picking-up/ ("In the country, packer bids are virtually non-existent as packers schedule as many formula and contracted cattle as possible.").  *See also* Cassie Fish, *CME Cattle Retreat,* THE BEEF (Jan. 4, 2019), https://www.thebeefread.com/2019/01/04/cme-cattle-futures-retreat/ ("Packers are pulling contracts and using the board weakness to their advantage and next week's cash cattle

accumulating inventory in this manner, constraining weekly kill volume, and declining to increase production to meet beef demand, Packing Defendants prevented producers from receiving fair market cattle prices.[135]

250.   Each Packing Defendant's slaughter reductions were most pronounced in February, with only marginal increases in March.  The result was that by April 2019, producers were not current with their marketings, and a relative supply glut developed. Packing Defendants used this artificial oversupply to "strategically back cash cattle prices down into summer and to keep them down."[136]  The results were predictable, with prices rapidly falling from around $127 per/cwt on Friday, April 26, 2019, to $123/cwt the following Friday, May 3, and $120/cwt on May 10, 2019.  Packing Defendants then took advantage of the pressure they had created, buying increasing volumes of cash cattle at knockdown prices throughout May 2019.  *See* Figures 9 above and 28-32 below.

---

prices may weaken a buck"); Cassie Fish, *Cash Market Slips and Bids Surface,* THE BEEF (Jan. 23, 2019), https://www.thebeefread.com/2019/01/23/cash-market-slips-and-bids-surface/ ("packers have masterly utilized a large number of formula cattle received in January as leverage against negotiated sellers, which has kept a lid on prices").

[135]   Cassie Fish, *Here We Are,* THE BEEF (Mar. 8, 2019), https://www.thebeefread.com/2019/03/08/here-we-are/ ("Behind the scenes of this week's negotiated cash cattle trade was the bearish fact that the majority of cattle that traded in the south and the west sold with time, generally 2 weeks.  Packers have been masterful at keeping long inventory and forcing producers to sell with time all year thus far- something that will continue and only increase as 2019 goes forward.  It's hard to force prices higher if the buyer owns inventory."); Cassie Fish, *Hogs On Fire,* THE BEEF (Mar. 20, 2019), https://www.thebeefread.com/2019/03/20/hogs-on-fire/ ("The packer has done a masterful job managing inventory, buying with time and keeping supply and demand in balance.").

[136]   Cassie Fish, *A Bounce*, THE BEEF (May 1, 2019), https://www.thebeefread.com/2019/05/01/a-bounce/.











251.   The same slaughter pattern detailed in Figures 23-32 above is observed if one limits the analysis to fed cattle purchased by Packing Defendants from the USDA AMS LMR Five Area states.  *See* Appendix 5.  AMS LMR reports of cash cattle purchases from these states are commonly incorporated into Packing Defendants' formula contracts.

252.   Packing Defendants' efforts to create a glut of cattle across the start of 2019 is demonstrated by Figure 33 below, which shows both that sales of cattle from 1000+ head feedlots in February, March, and April were significantly less than the available supply of slaughter-weight cattle, and that the cattle consequently held over into the summer were then bought across the summer:

**Figure 33.  Cattle on Feed:  Slaughter-weight Fed Cattle (Placements Against Supply) vs. Marketings in 1000+ Head Feedlots – 2019**



253.    The resulting impact of Packing Defendants' slaughter restraint at the beginning of 2019 and their continued adherence to a common pricing strategy caused cash prices to continue to fall across the summer, working their way to an apparent bottom of about $109-$110/cwt in the end of June.  *See* Figure 9 below.  This left producers facing an average $106 per head loss, against Packing Defendants' startling per head profit of $257.[137]

254.    With continuing robust beef demand – wholesale beef prices remained higher on a year-over-year basis – fed cattle prices were expected to rise steadily into the fall high. However, prices largely remained the same, as Packing Defendants worked to extend the summer lows:

> Using the last two years as a roadmap, ***packers pressed feeders hard this week*** and successfully cheapened their inventory at by $1 to $1.50 so far. The smaller packers more dependent on high grading cattle paid steady earlier in the week for the right kind, but the ***majors tipped the market over since***… Attitudes in the country [amongst producers] are discouraged and fatigued.  ***Most cattle being sold are losing money***, replacement costs are high and bargaining leverage is slim.  Like another world, the ***wholesale beef news is sizzling, but zero of that money is being passed on to cattle feeders***. . . . The voraciousness of beef demand is surprising pretty much everyone in the business.[138]

[Emphasis added].

---

[137]    Greg Henderson, *Profit Tracker: Feeding Losses Reach Triple Digits*, DROVERS (June 26, 2019), https://www.drovers.com/news/industry/profit-tracker-feeding-losses-reach-triple-digits.

[138]    Cassie Fish, *Packers Press and Cash Softens,* THE BEEF (Aug. 9, 2019), https://www.thebeefread.com/2019/08/09/packers-press-and-cash-softens/.

255.   A slight $2-$3/cwt rise in prices allowed producers to realize a paltry per head profit of about $24 by the week ending August 9, 2020, against the Packing Defendants' profit of $192 per head.[139]

### 1.   Packing Defendants React to a Processing Plant Fire by Dropping Cattle Prices and Raising Beef Prices

256.   Notwithstanding the predicted cash cattle strength during August, a chance fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019, provided an opportunity for Packing Defendants to work cattle prices lower still, sending producers back into the red.  Following the plant fire, Tyson closed the plant indefinitely and Packing Defendants all slashed their fed cattle bids and hiked their beef prices.  These actions caused a $5/cwt drop in fed cattle prices and a $14/cwt rise in wholesale beef prices the following trading week.  Meanwhile, Packing Defendants' per head margins rose from $191 to $358 in the week ending August 16, 2019.[140]  The following week, packer margins continued to expand, with the spread between fed cattle prices and boxed beef values extending to a then-record high of $67.17/cwt., $39.51/cwt above the average spread for the same week across 2016-2018.

---

[139]   Greg Henderson, *Profit Tracker: Margins Lower on Soft Cash,* DROVERS (Aug. 13, 2019), https://www.drovers.com/markets/profit-tracker/profit-tracker-margins-lower-soft-cash.

[140]   *Sterling Beef Profit Tracker: week ending August 16, 2019*, STERLING MARKETING INC. (Aug. 20, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf.  Live Cattle Futures contracts were also negatively impacted, with the market responding with two limit-down trading days on September 12 and 13, 2019.

257.    Although Packing Defendants blamed the loss of Holcomb's 5,500-6,000 head per day slaughter capacity for these price changes, Packing Defendants' slaughter volume actually remained steady in the weeks that followed the fire to take advantage of the huge meat margin they had opened up.  *See* Figures 23-27 (demonstrating steady total kill volumes in August 2019 against prior month).  As a result, industry slaughter volume averages averaged around 521,900 head in the three weeks that followed the fire, as compared to the 521,700 killed in the week of the fire.

258.    To support their slashed cash cattle bids, Packing Defendants drastically reduced their respective cash cattle purchases after the fire.[141]  Tyson, in particular, was largely absent from the cash cattle market in the weeks that followed the fire.  This drop is reflected in Figures 28-32 above, and became particularly severe in September, as Packing Defendants each sought to defend the wide meat margin they had established in the aftermath of the fire.  Although National Beef's July and August cash slaughter volume increased quarter-over-quarter (Figure 32), this largely reflects its acquisition of Iowa Premium's Tama, Iowa plant in mid-June.  The Tama plant sourced substantially all of its 1,100 head per day capacity from cash cattle sellers while owned by Iowa Premium, and continued to do so under National Beef's management until at least late 2019, when it finalized arrangements to accept formula grid cattle.

---

[141]    Cassie Fish, *Back from the Brink,* THE BEEF (Sept. 3, 2019), https://www.thebeefread.com/2019/09/03/back-from-the-brink/ ("Last week's negotiated cash cattle trade was small for the fourth week running . . . and clean up at the feedyard is lacking. . . .  Prices were $2 to $3 lower, averaging $105.54, the lowest since 2018").

259.    This reduction in cash cattle purchases in the aftermath of the fire placed further pressure on cash cattle prices (and thus reduced the price of each Packing Defendant's contracted cattle).  Packing Defendants continued to drop their bids in lockstep and, as a result, cash cattle prices continued to slide in the following weeks, bottoming out at around $100/cwt (with some trades as low as $97/cwt) in the week ending September 13, 2019, down from $113/cwt in the week of the fire.



260.    Packing Defendants' purchase and kill reductions in the aftermath of the Holcomb fire ensured that their collective demand remained below the available supply of cattle, as evidenced by the noticeable increase in average carcass weights of the cattle

slaughtered by each Packing Defendant during this period shown in Figure 34 below. Carcass weights increase the longer a steer or heifer is on feed. Thus, increasing carcass weights are a sign that producers have not been able to stay current with their marketings and have been forced to feed their cattle longer than is optimal. Consistent with the increase in carcass weights shown in Figure 34 below, reported carcass weights were up on average by six pounds across October and November 2019, year-over-year:



261.   Packing Defendants consequently reaped record high margins in the weeks that followed the Holcomb fire by stepping down fed cattle prices and raising beef prices in parallel. By September 13, 2019, the spread between packer and producers' per head

margin exceeded $600, with **packers making over $400 per head** while **producers sustained $200 per head losses**.[143]   *See* Figures 6 above and 40 and 43 below.

262.   Having left many cash cattle producers without a bid for the two months that followed the Holcomb fire, Packing Defendants took advantage of battered producers in the final quarter of 2019, drastically increasing cash cattle purchases (*see* Figures 28-32 above), and securing cattle with extended delivery periods.  *See* Figure 35 below.  Fed cattle prices did not recover to their supposed yearly bottom, set in July, until November 2019, with producers continuing to sell fed cattle at a loss until that point.[144]

---

[143]   *Sterling Beef Profit Tracker: week ending September 13, 2019*, STERLING MARKETING INC. (Sept. 18, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf.

[144]   While Tyson might not have initially taken advantage of the glut of cash cattle supplies to the same extent as Swift/Packerland, Cargill, and National Beef, it, too, drastically increased its cash cattle purchases that December once it reopened the Holcomb plant.  *See* Figure 28 above.  Press Release, Tyson Foods Inc., *Tyson Beef Plant in Kansas to Resume Operations in December* (Nov. 18, 2019), https://www.tysonfoods.com/news/news-releases/2019/11/tyson-beef-plant-kansas-resume-operations-december.



**2.    USDA Continues to Investigate Packing Defendants' Price Manipulation Following the Holcomb Fire and During the COVID Crisis**

263.   On August 28, 2019, the U.S. Secretary of Agriculture announced that the Packers and Stockyards Division, the division of the USDA responsible for enforcement of the Packers and Stockyards Act, had launched an investigation into the conduct of the Packing Defendants and other beef packers in the aftermath of the fire at Tyson's Holcomb plant.[145]

---

[145]    *Secretary Perdue Statement on Beef Processing Facility in Holcomb, Kansas*, U.S. DEP'T OF AGRIC. (Aug. 28, 2019), https://www.usda.gov/media/press-releases/2019/08/28/secretary-perdue-statement-beef-processing-facility-holcomb-kansas

████████████████████████████████████████████████

███████████████████████████████████ [146]

264.    By the last week of April 2020, disruptions in U.S. beef production peaked when nearly 40% of the nation's beef processing capacity was idled due to COVID-19 illnesses among packing plant employees.  During the second week of May, the largest difference – or spread – between the boxed beef cutout value and fed cattle prices since the inception of Mandatory Price Reporting in 2001 was recorded at just over $279/cwt.  This constituted a 323% increase from the $66/cwt spread that existed in early April 2020, which was already close to the prior record set in the aftermath of the Holcomb fire.  This gap between cattle and beef prices caused each Packing Defendant to realize the startling margins depicted in Figures 6 above and 40 and 43 below, and estimated by Sterling Marketing to reach as high as $891 per head in the first week of June 2020.  In contrast, just a few weeks later, producers actually able to find a marketing outlet for their cattle incurred triple digit losses of around $250 per head.

265.    On July 22, 2020, the USDA AMS issued The Boxed Beef & Fed Cattle

---

("I have directed USDA's Packers and Stockyards Division to launch an investigation into recent beef pricing margins to determine if there is any evidence of price manipulation, collusion, restrictions of competition or other unfair practices. If any unfair practices are detected, we will take quick enforcement action.").

[146] ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████.

Price Spread Investigation Report ("Report") summarizing market conditions, fed cattle prices, boxed beef values, and the spread before and during the COVID-19 pandemic, including the period just after the Holcomb plant fire.[147]  The Report stated that the USDA's investigation into potential violations of the Packers and Stockyards Act was ongoing and that the Report did "not examine" such violations.[148]  It further stated:

> [The] [f]indings thus far do not preclude the possibility that individual entities or groups of entities violated the Packers and Stockyards Act during the aftermath of the Tyson Holcomb fire and the COVID-19 pandemic.  The investigation into potential violations under the Packers and Stockyards Act is continuing.
>
> USDA does not solely own investigatory authority over anticompetitive practices in the meat packing industry and has been engaged in discussions with the Department of Justice (DOJ) regarding allegations of anticompetitive practices in the meat packing industry.  Should USDA find a violation of the Packers and Stockyards Act, it is authorized to report the violation to DOJ for prosecution.[149]

At the time of filing this complaint, the USDA's investigation, alongside the DOJ's Sherman Act investigation into the Packing Defendants (see Section VIII below), remains ongoing.

### E.  Economic Analysis Supports the Existence of the Alleged Conspiracy

266.  Economic analysis corroborates the circumstantial and direct evidence of the alleged conspiracy, including the accounts of Witness 1 and Witness 2.  In particular, it

---

[147]  *Boxed Beef & Fed Cattle Price Spread Investigation Report*, U.S. DEP'T OF AGRIC. AGRIC. MKTG. SERV. (July 22, 2020), https://www.ams.usda.gov/sites/default/files/media/CattleandBeefPriceMarginReport.pdf.

[148]  *Id.* at 2.

[149]  *Id.* at 10.

confirms that: (a) the collapse in fed cattle prices in 2015 cannot be explained by common supply or demand drivers; (b) from at least January 1, 2015, fed cattle prices were artificially depressed and are not explained by supply and demand drivers; and (c) other explanations potentially offered for the 2015 price collapse do not withstand scrutiny.

### 1.  Supply and Demand Principles Do Not Explain the 2015 Price Collapse or Subsequent Low Prices

267.    The prices for fed cattle bought across the United States followed a discernable pattern: increasing consistently from 2009 through 2014 (accounting for seasonal fluctuations in prices), collapsing dramatically in 2015, and then stabilizing below the prior trend line:[150]

---

[150]    The below graphs are not adjusted for seasonal changes in fed cattle prices, which do not explain the dramatic depression of fed cattle prices during the Class Period. Historically, fed cattle prices tend to gradually rise during the first quarter until the early part of the second quarter, peaking in March and April.  Prices then tend to trend downwards to a summer low typically established in June or July, before commencing an upward trend that typically peaks in November.  *Annual and Seasonal Price Patterns for Cattle*, CORNHUSKER ECONOMICS, University of Nebraska-Lincoln (Aug. 19, 2015), https://agecon.unl.edu/cornhusker-economics/2015/annual-and-seasonal-price-patterns-for-cattle.

**Figure 36.  AMS LMR Reported Prices for Fed Cattle by Reporting Region**[151]



268.    Fed cattle producers' main cost – purchasing feeder cattle, steers, and heifers

mature enough to be fattened for slaughter in a feedlot – also increased and decreased

during this period.  But the decline in feeder cattle costs did not occur until ***after*** fed cattle prices collapsed in 2015:

**Figure 37.  Fed Cattle Input Costs - Feeder Cattle Costs**[152]



269.    That a decline in the fed cattle producers' costs did not cause the 2015 decline is even more evident when one compares fed cattle prices to fed cattle producers' total costs:

---

[152]    Figures 37-39 were prepared utilizing Iowa State University's estimate of the break-even price (*i.e.*, the cost) associated with feeding a 750-pound yearling to a market weight of 1,300 pounds.  Ag. Econ. Dep't, Coop. Extension Serv., *Estimated Livestock Returns (Estimated Returns: Finishing Yearling Steers)*, IOWA STATE UNIVERSITY, http://www2.econ.iastate.edu/estimated-returns/.

**Figure 38.  Fed Cattle Price vs. Producers' Total Input Costs**[153]



270.   In fact, during 2015, when fed cattle prices drastically declined, the costs borne by fed cattle producers actually ***increased***.  Specifically, from January 2015 to January 2016, fed cattle prices in Iowa and Minnesota, for example, decreased by approximately 20.7%, whereas input costs increased by approximately 2.6%.  This reflects the fact that feeder cattle prices, fed cattle producers' number one input cost, typically lag behind fed cattle prices.

---

[153]     *Id*.

271.    As a result of this dramatic disconnect between fed cattle prices and input costs, fed cattle producers suffered their largest losses in 30 years during 2015 and 2016, as shown below:

**Figure 39.  Fed Cattle Producers' Margins Per Head Overtime: IA and MN**[154]



272.    Although fed cattle producers did enjoy a profitable 2017, this was largely due to a significant drop in the input costs associated with fed cattle marketed during that year, and in particular, the price of feeder cattle.  Packing Defendants were, however, able

---

[154]    *Id.*  Margins calculated are for Iowa and Minnesota, but similar patterns can be observed in other cattle feeding regions.

to constrain the typical seasonal rise in fed cattle prices across the first half of 2017 and continued to profit from historic margins:

**Figure 40.  Packers' Estimated Per Head Net Margins**



273.    Changes in beef demand or consumer preferences do not explain the depression of fed cattle prices.  As shown in Figure 41 below, although there was a 5.67% decline in retail beef prices from January 2015 to January 2016, prices rebounded in the months that followed, before undulating down, then up again.  Importantly, the spread between retail beef prices and fed cattle prices continued its gradual increase, consistent with its upward trend during the past 20 years, suggesting beef demand remained robust. That beef demand not only remained strong during this period, but actually steadily increased from its prior lows in the immediate pre-Class Period, is also evident from Figure 42 below:

**Figure 41.  Retail Beef Prices vs. Fed Cattle Prices**[155]



---

[155]    U.S. Dep't of Agric., Econ. Research Serv. ("ERS"), *Meat Price Spreads*, https://www.ers.usda.gov/data-products/meat-price-spreads/ (last visited Apr. 16, 2019).

**Figure 42.  Monthly Beef Demand Indices, Jan. 1988 – Nov. 2020**[156]



274.   Tyson Fresh's Head of Fed Cattle Procurement, John Gerber, expressly acknowledged the striking increase in beef demand at a November 2018 industry conference:

---

[156]   Glynn Tonsor, *Monthly Domestic, Retail All-Fresh Beef Demand Index, 1988-present*, KANSAS STATE UNIVERSITY (Nov. 13, 2020), https://www.agmanager.info/livestock-meat/meat-demand/monthly-domestic-meat-demand-indices-usdabls-data/monthly-domestic-0.  *See also* Glynn Tonsor, Jason Lusk, Ted Schroeder, *Assessing Beef Demand Determinants*, CATTLEMEN'S BEEF BOARD (Jan. 18, 2018) at 7-9, https://www.beefboard.org/wp-content/uploads/2019/06/Assessing-Beef-Demand-Determinants_FullReport.pdf (detailing estimate of demand index and

[The] [c]onsumer will pay more for beef, and have to pay more for beef because it is worth more.  There is value out there in chicken and pork, but unless you have been living under a great big rock the last two years, you know that **beef demand is off the charts**.  We have a lot of supply coming at us, but we have been able to hold the price at a pretty good level, because of beef demand, it's been really good, and I think it will stay good.[157]

[Emphasis added].

275.   Importantly, what did change in 2015 was the meat margin.  As shown in Figure 6 (reproduced below), the meat margins realized by Packing Defendants in the aftermath of the 2015 price collapse – which at times exceeded $2,000 per head – were historically unprecedented:

---

calculation of price elasticity).  Demand index prepared using USDA ERS record of All-Fresh Retail price and using 1988 as the base year.

[157]   *Supra*, n.47.

**Figure 6.  Weekly Packer Per-Head Meat Margin (1,403 lb. Avg. Live Steer 65-80% Choice; 877 lb. Avg. Dressed Carcass)**[158]



276.    This widening of the meat margin was acknowledged by Tyson in its Q4 2016 earnings call: "The dynamic is that the livestock prices have not come – they've come down faster than the retail prices have, which has allowed us to make the margins that we have right now in both beef . . ."[159]

---

[158]    As noted above, during the COVID-19 crisis, the meat margin rose above $800 per head in the week of April 17, 2020, peaking at approximately $2,600 per head in the week of May 15, 2020, before falling below $800 per head again in the week of June 12, 2020.

[159]    Tyson Foods, Q4 2016 Earnings Call (Nov. 21, 2016).

277.    The unprecedented decoupling of the wholesale and retail price of beef from the price of fed cattle after the 2015 collapse led to unheard of levels of profitability in Packing Defendants' beef businesses.  As Figure 43 shows, although Tyson, JBS, and National Beef's margins were initially hampered by their deliberate underutilization of their respective plant capacities across 2015 and 2016, the resulting expansion of the meat margin caused their margins to balloon across the remainder of the Class Period.  Cargill, as a private company, does not report its financial performance.  However, as CMS pays strikingly similar prices for its cattle (*see* Figure 9 above), receives the same or similar prices for its beef, and has similar costs structures as the other Packing Defendants (see Section VII(F) below), Figure 43 below is also representative of CMS's margin performance during the Class Period.

**Figure 43. Rolling 12 Month Operational Income Percentages of JBS, Tyson, and National Beef US Beef Operations**[160]



### 2. Econometric Analysis Shows Artificially Depressed Fed Cattle Prices

278. Consistent with the existence of a conspiracy among Packing Defendants to decrease fed cattle prices, Plaintiffs' econometric analysis confirms that fed cattle prices

---

[160]   These operational income percentage figures are derived from SEC filings or investor relations materials. JBS S.A. does not report operational income at the segment level, so the above figure for JBS represents the EBITDA of its JBS USA beef operations. National Beef's operational incomes were reported by its shareholder U.S. Premium Beef, LLC. Tyson Foods's reported operational income for its U.S. beef business, operated by Tyson Fresh, has been shifted to line up with calendar quarters, as Tyson's fiscal year ends at the conclusion of what would typically be the end of the first quarter.

were artificially depressed by an average of 7.9% in the three years following January 1, 2015.

279.   Plaintiffs used a commonly accepted and reliable multivariate regression-based methodology to demonstrate the degree to which fed cattle prices were depressed. Plaintiffs' model of fed cattle prices over time (the "Model") tested whether AMS LMR daily reported negotiated prices[161] for fed cattle were significantly depressed starting in January 2015 compared to the earlier period beginning November 2002.

280.   The Model controls for changes in the supply and demand factors that explain fed cattle prices, so that any residual, unexplained price decrease can be ascribed to artificial price suppression.   In particular, aside from the AMS LMR price data, the Model incorporates the following variables that impact fed cattle prices and which are commonly selected by academics in their empirical models of fed cattle prices:[162]

    a.      General determinants of demand, such as population and GDP;[163]

---

[161]   The AMS publishes 359 daily fed cattle negotiated price series, for a combination of transaction, region, and cattle characteristics.  The effect of the transaction, region, and cattle characteristics on fed cattle prices are controlled for by including "fixed-effect variables" for each possible combination, while cattle weight and dress percentage are controlled for by including both as continuous variables in the model.

[162]   The use of these variables is well-supported by academic literature that seeks to capture cattle price movements.  *See, e.g.*, Mary K. Muth, *et al*, *Differences in Prices and Price Risk Across Alternative Marketing Arrangements Used in the Fed Cattle Industry*, 33 JOURNAL OF AGRICULTURAL AND RESOURCE ECONOMICS 118, 126, Table 2 (2008); Sebastien Pouliot and Daniel A. Sumner, *Differential impacts of country of origin labeling: COOL econometric evidence from cattle markets*, 49 FOOD POLICY 107, 114, Table 3 (2014); 2018 GAO Report, at 12 & 14.

[163]   *World agriculture: towards 2015/2030*, *Chapter 5 Livestock production*, 2003, FAO, http://www.fao.org/3/y4252e/y4252e05.pdf, at p. 159.

b.      Inflation;[164]

c.      Costs faced by fed cattle producers, which were lagged by one month consistent with the academic literature;

d.      Prices of substitutes: namely pork, chicken, and turkey;

e.      Net imports of beef and live cattle;

f.      Indicators of relative market power between buyers and sellers, such as the number of packer plants nationwide, the number of feedlots nationwide, and the average feedlot capacity;

g.      Episodes of Mad Cow disease;

h.      The implementation and then repeal of Mandatory Country of Origin Labeling ("COOL"); and

i.      Time of year, to control for seasonality.

281.    As shown in Table 5 below, fed cattle prices have been depressed by an average of 7.9% in the three years following January 1, 2015.[165]  This result is highly statistically significant at a 99% confidence level.  The Model has a high R-squared of 95%, meaning it is a "good fit" and explains 95% of the variation in fed cattle prices:

---

[164]    Inflation was controlled for by adjusting all dollar denominated variables to October 2018 values using the consumer price index.

[165]    Extending the Model through 2019 continues to show artificially depressed prices that cannot be explained by other variables and remains statistically significant.  Similarly, the addition of heifer retention rates to control for fed cattle supply over time produced substantively similar results to those highlighted in Table 5, and, in particular, still showed a price suppression.

**Table 5.  Results of Plaintiffs' Regression Analysis**[166]

| Independent variable: | Coefficient[167] |
|---|---|
|     Underpayment indicator: Estimate January 2015 through December 2017 | -0.08*** (7.9%) |
| Product and transaction characteristics | |
|     Log cattle weight | -0.05*** |
|     Dress percentage, expressed as a proportion | 0.04 |
|     Fixed effects (cattle type, fob/delivered, 5 area region, percentage choice, live/dressed, cash/grid) | ✓ |
| Demand | |
|     Log (real) GDP | 0.77*** |
|     Log population size | 0.19*** |
| Supply (costs) | |
|     Log (real) breakeven cost (1-month lag) | 0.40*** |
| Possible Substitutes | |
|     Log (real) pork price | 0.94*** |
|     Log (real) chicken price | -0.35*** |
|     Log (real) turkey price | -0.18*** |
| Imports/Exports | |
|     Net imports of beef, expressed as a proportion of U.S. production | -0.44*** |
|     Net imports of cattle, expressed as a proportion of U.S. production | 1.20*** |
| Other | |
| Log Packer plants count | 1.12*** |
| Log Feedlots count | -0.25*** |
| Log average Feedlot capacity | -0.64*** |
| Mad cow disease indicator | 0.08*** |
| COOL in effect indicator | 0.07*** |
| Seasonality | |
|     Indicators for each month of year | ✓ |
| Constant term | -9.63*** |
| Number of observations | 124,497 |
| R-squared | 95% |

---

[166]     *, **, and *** represent 90%, 95%, and 99% levels of confidence, respectively.

282.   In sum, the Model's results are consistent with Packing Defendants having acted in a concerted fashion beginning in or around January 2015 in an attempt to depress fed cattle prices.[168]

### 3.   Explanations Proffered for the Drop in Fed Cattle Prices Do Not Withstand Scrutiny

283.   The United States Government Accountability Office's ("GAO") 2018 Report identifies certain "supply and demand factors . . . that affected fed cattle prices from 2013 through 2016." [169]  However,  it **does not** conclude that these factors were the sole or dominant cause of the 2015 price collapse, and stresses that potential antitrust violations by beef packers were beyond the scope of its review:

> [w]e did not obtain and review internal packer documents, so **the scope of our analysis did not include a review of whether packers engaged in anticompetitive behavior**.  Such specific investigations would typically be carried out by entities with subpoena authority such as the Federal Trade Commission of the Antitrust Division in the Department of Justice.[170]

[Emphasis added].

---

[167]   The regression is estimated in log-log form, by transforming all non-indicator and non-proportion variables into natural logarithms.  This transformation permits the interpretation of the coefficients as elasticities:  *i.e.*, a coefficient of 1 represents a 1% change in the independent variable being associated with a 1% change in the price variable.

[168]   *See* Appendix 4, which contains a list of all sources for the data used in Plaintiffs' regression analysis.

[169]   2018 GAO Report at 12.

[170]   *Id.* at 29.

284.   In any event, the supply and demand factors said by the GAO to have "affected" prices do not explain the dramatic collapse in prices seen in 2015 or the suppression of prices experienced thereafter.

285.   For example, the 2018 GAO Report mentions that the droughts of late 2010-2013 might have reduced the availability of forage to raise calves and feeder cattle, leading ranchers to reduce cattle inventory.[171]   Under this explanation, ranchers expanded their cow-calf inventory once the drought eased, and this "increased the number of fed cattle sold for slaughter by late 2015, and prices began to drop at that time."   However, any oversupply of feeder cattle should have caused a collapse in the price of feeder cattle, which did not happen until well after fed cattle prices had collapsed (*see* Figures 37 and 38 above). Further, while the cow herd had begun to rebuild by 2015, supplies of slaughter-weight fed cattle remained close to those seen in 2014.  As a result, while cattle on feed cattle inventory numbers for 2015 remained at or slightly above those seen in 2014, industry annual slaughter volume for 2015 was slightly down compared to 2014 (driven by Packing Defendants' slaughter reductions and the continuing tight supply of fed cattle – *see* Section VI(A) above).[172]  If the GAO's suggested increase or oversupply of slaughter- weight cattle were true, the industry would have exhibited *low* prices and ***high*** volume, and not *low* prices and continuing *low* volume.

---

[171]    *Id.* at 12.

[172]    *Id.*

286.    Moreover, Plaintiffs' Model fully accounts for any effect of the drought on the price of feeder cattle and feed.  The Model includes as an explanatory variable the breakeven cost for finishing cattle, which is a composite variable based on the purchase price of the feeder cattle and on feed costs including corn, modified distiller grain, and hay, as well as other costs faced by producers finishing fed cattle in feedlots.  These are the principal variables through which the drought would have affected fed cattle prices.  Their inclusion in the Model therefore controls for any effects of the droughts of 2010-2013.

287.    The GAO also suggested that the increased supply of corn seen in the aftermath of the 2011 to 2013 droughts "may have" encouraged fed cattle producers to feed their cattle for longer than they typically would.[173]  The resulting fatter cattle then received lower prices per cwt, as is customary.  Aside from the fact that Plaintiffs' regression analysis controlled for both cattle weight and the price of corn, the premise of this explanation is inconsistent with the facts.  The majority of producers did not choose to overfeed their cattle, but were forced into doing so by Packing Defendants' coordinated slaughter restrictions.[174]

288.    Finally, the strengthening of the U.S. dollar in 2014 and potentially related changes in the volume of U.S. imports and exports of live cattle and beef cannot explain the price collapse.[175]  These events were not in lockstep with the collapse in fed cattle prices in the second half of 2015.  In fact, during the second half of 2014, when net imports of

---

[173]    *Id.* at 13.

[174]    A fact noted by commentators at the time.  *See* ¶¶206-208.

[175]    2018 GAO Report at 14.

beef and the U.S. dollar were increasing, fed cattle prices still increased to their November 2014 peak.  In the first half of 2015, net imports were transiently around 8% of total U.S. production, but by November 2015 – when fed cattle prices had bottomed out – net imports of beef had turned slightly negative.  Moreover, Plaintiffs' Model controls for the effect of changing net imports on prices.

289.    Thus, the economic evidence suggests that not only were fed cattle prices suppressed during the Class Period, but that this suppression was not the product of supply and demand factors or any other proffered explanation other than collusion.

## VII.   THE FED CATTLE MARKET IS CONDUCIVE TO COLLUSION

290.    The structure and characteristics of the market for the purchase of fed cattle make the market highly susceptible to collusion.  These facts, when considered against the backdrop of the parallel conduct of Packing Defendants, are consistent with collusion and inconsistent with the proper functioning of a competitive market.  They therefore support an inference of the anticompetitive agreement alleged herein.

### A.    The Fed Cattle Packing Industry Has Experienced High Consolidation and Is Highly Concentrated

291.    The fed cattle packing industry is highly concentrated.[176]   Since 2008, Packing Defendants' cumulative share of annual purchases of U.S. fed cattle has

---

[176]    The U.S. national four-firm concentration ratio (CR4) for beef packing rose from 25% in 1977 to 71% in 1992, the first year in which the national Herfindahl-Hirschmann Index ("HHI") exceeded 1800.  Since that time, the HHI index for the industry has only increased, particularly in certain regions.  *U.S. v. JBS* Amended Complaint, ¶¶36-37; Cai, Stiegert, and Koontz, *Regime Switching and Oligopsony power: the case of US beef processing*, 41 AGRICULTURAL ECONOMICS  99-109, 99 (2011); Cai, Stiegert and Koontz,

approximated *82%-96%* each year.  No Independent Packer possesses a double-digit market share, with Greater Omaha and Nebraska Beef, Packing Defendants' nearest "competitors," maintaining a 2.6%-3.5% and 1.7%-2% market share, respectively.[177] Greater Omaha (2,900 head per/day capacity) and Nebraska Beef (2,400 head per/day capacity) are the only non-Defendant fed cattle slaughter plants with a capacity in excess of 1,600 head per day.  The daily slaughter capacities of Tyson Fresh (28,000), Swift/Packerland (29,000), CMS (23,000), and National Beef (13,200) therefore place them at a significant advantage over Independent Packers.

### B.    The Supply of Fed Cattle and Demand for Beef Are Relatively Insensitive to Short-Term Changes in Price

292.    Recent studies have shown that the quantity of beef U.S. consumers purchase has become less sensitive to changes in beef prices, and the impact of such price changes on beef demand is economically small relative to other factors.[178]  Beef's price elasticity for the period 2008-2017 was estimated at -0.479, indicating that a "10% price increase would reduce [beef] demand by 4.79%."[179]  As a result, Packing Defendants are incentivized to reduce fed cattle slaughter and beef production, as neither they, nor their immediate customers, are harmed by the resulting wholesale and retail price rises.

---

*Oligopsony Fed Cattle Pricing:  Did Mandatory Price Reporting Increase Meatpacker Market*, 33(4) APPLIED ECONOMIC PERSPECTIVES AND POLICY 606 (2011).

[177]    CBW Top 30 Beef Packers; 2018 Meat & Poultry Facts.

[178]    Tonsor, *Assessing Beef Demand Determinants*, *supra* n.156, at 7-9.

[179]    *Id.*

293.    Further, as noted at paragraph 95 above, reduced slaughter volumes and/or lower fed cattle prices are unlikely to significantly alter the immediately available supply of fed cattle.  Owing to cattle's comparably long life cycle, cattle producers typically require about 39 months to alter supply levels once a decision has been made to increase production.[180]  As a result, fed cattle supplies are relatively insensitive to short-term price changes, particularly given the absence of a substitute market into which fed cattle producers can sell their cattle.

### C.      Fed Cattle Producers Face Significant Market Access Risk

294.    As noted above at paragraph 83, fed cattle are a perishable commodity. Producers face significant pressure to sell their cattle within a matter of weeks once they reach slaughter-weight.[181]  This fact, coupled with the absence of a substitute market to sell fed cattle into, exposes fed cattle producers to market access risk, namely "the availability of a timely and appropriate market outlet."[182]

295.    That risk and the leverage it provides to Packing Defendants is exacerbated by the significant information asymmetry faced by producers vis-à-vis Packing Defendants with regard to the available supply of fed cattle and Packing Defendants' procurement

---

[180]    *Investor Fact Book – Fiscal Year 2017*, TYSON FOODS INC. (2018), at 10, https://s22.q4cdn.com/104708849/files/doc_factbook/Tyson-Foods-FY17-Fact-Book-(rev-042518).pdf ("Tyson 2017 Fact Book"); 2018 GAO Report at 5.

[181]    RTI International, *GIPSA Livestock and Meat Marketing Study, Vol. 3: Fed Cattle and Beef Industries*, *prepared for* U.S.D.A. GRAIN INSPECTION, PACKERS AND STOCKYARD ADMINISTRATION (2007), at 5-4, https://www.gipsa.usda.gov/psp/publication/livemarketstudy/LMMS_Vol_3.pdf.

[182]    *Id.*

needs. In relation to the former, producers have only a limited ability to obtain information regarding the supply of fed cattle beyond the information conveyed by the USDA's Cattle on Feed Reports. By contrast, Packing Defendants are able to construct detailed inventories of upcoming fed cattle supplies through their regular contacts with all the fed cattle producers situated within their respective procurement territories.

296. The impact of market access risk upon the parties' relative bargaining power is significant. As demonstrated by Packing Defendants' threats regarding 2018's supposed "wall of cattle," the mere use of coordinated threats of increased market access risk can be sufficient to coerce producers to commit cattle on captive supply agreements or accept lower cash prices.

### D. There Are Numerous Trade Organizations and Opportunities for Packing Defendants to Meet and Collude

297. Packing Defendants' executives and employees have regular opportunities to meet and collude, including through their membership and participation in various trade and industry associations and events such as: the National Cattlemen's Beef Association ("NCBA"); the U.S. Meat Export Federation ("USMEF"); the Global and U.S. Roundtables for Sustainable Beef ("USRSB")[183]; and the North American Meat Institute ("NAMI") (which resulted from the merger of the North American Meat Association and the American Meat Institute).

---

[183] In 2015, Packing Defendants were among the founding members of the USRSB. Packing Defendants participate in its annual meetings (held in the spring), with JBS and Cargill additionally having leadership positions in certain working groups.

298.    One of the associations Packing Defendants participate in is the NCBA, which holds an annual convention (known as "CattleCon"), a summer conference, a legislative conference, and regional meetings.[184]   The NCBA Product Council, which includes Packing Defendants, other packers, and certain retailers and restaurants, meets quarterly for the Beef Executive Forum, an invitation-only event.[185]   Representatives of each Packing Defendant typically attend these events.   For example, two of Packing Defendants' executives, former CMS/Cargill Vice President of Cattle Procurement Bill Thoni and former Tyson Senior Vice President of Beef Margin Management and Vice President of Boxed Beef Pricing Kevin Hueser, were both officers, board members, or formally designated participants of the NCBA during the Class Periods.[186]   Packing Defendants also participate in meetings of the Beef Checkoff program run by the Federation of State Beef Councils that are held in conjunction with the NCBA summer and winter meetings.[187]

299.    Another association at which Packing Defendants' executives and employees regularly meet is the USMEF – a trade association that develops export opportunities for

---

[184]    *NCBA Allied Industry Membership*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), www.beefusa.org/CMDocs/BeefUSA/AboutUs/2019NCBA%20Allied%20Industry%20Brochure.pdf.

[185]    *Id.*

[186]    Hueser was also a formal participant of the USRB.

[187]    *See also The Association*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/theassociation.aspx; and *Federation*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/federation.aspx.

U.S. protein producers – which holds both spring and fall conferences and monthly international trade shows.[188]  Numerous executives and employees of Packing Defendants participated or held leadership roles in the USMEF.  For example, former CMS/Cargill Vice President of International Sales Pat Binger was an officer, board member, or formally designated participant of the USMEF; former Tyson Foods Senior Vice President of International Sales Roel Andriessen served as the Chair, Vice Chair, and on the Executive Committee of the USMEF; former Tyson Foods Senior Vice President of International Sales and Vice President International Sales Robert Shuey was a formal participant of the USMEF; National Beef International President and former Vice President of International Sales Peter Michalski served on the Export Committee of the USMEF; and former National Beef NBP International Sales President Mark Domanski served on the Export Committee of the USMEF.  Also, in November 2017, Tyson's Roel Andriessen and CMS's Pat Binger both attended the USMEF Strategic Planning Conference in Tucson, Arizona.[189]

300.  The NAMI – a national trade association that represents companies that process 95% of red meat – conducts a series of annual conference and educational workshops all across the country.[190]  Executives and employees of Packing Defendants

---

[188]  *Events: Meetings*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/bod-meetings/; *Events: Trade Show Calendar*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/trade-shows/.

[189]  *USMEF Members Examine Challenges ahead, Elect New Officer Team*, U.S. MEAT EXP. FED'N (Nov. 3, 2017), https://www.usmef.org/news-statistics/member-news-archive/usmef-members-examine-challenges-ahead-elect-new-officer-team/.

[190]  *See About NAMI*, NAT'L AM. MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204; *Events*, NAT'L AM. MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422.

also participated and held leadership positions in the NAMI.  For example: CMS President of Business Operations & Supply Chain and former Cargill Beef President John Keating was an officer, board member, or formally designated participant of the NAMI; former Tyson Foods CEO, Group President of Fresh Meats & International, and COO Noel White served on the Executive Committee of the NAMI; former Tyson Foods CEO and President Thomas Hayes also served on the Executive Committee of the NAMI; National Beef President and CEO Timothy M. Klein served on the Executive Committee of the NAMI; and JBS USA, Swift, and Packerland CEO André Nogueira served on the Board of Directors of the NAMI.

301.   The NAMI and the Food Industry Association host an annual Meat Conference, which various executives and employees of Packing Defendants attend every year. [191]  In 2017, National Beef's Timothy Klein, Tyson Vice President of Boxed Beef Pricing Don Kieffer, JBS's Andre Nogueira, and CMS Vice President of Sales John Jay, amongst other Packing Defendant executives, were listed as attendees of the Meat Conference.[192] In 2018, National Beef's Timothy Klein, JBS's André Nogueira, Cargill Vice President of Retail Beef Business Lead Elizabeth Gutschenritter, and Tyson's Don

---

[191]   *Meat Conference*, NORTH AM. MEAT INST. AND FOOD INDUS. ASS'N, http://meatconference.com/ (last visited Dec. 9, 2020).

[192]   *2017 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N (Dec. 9, 2020)  https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId= 43A35D00000DFE&sortBy=name.

Kieffer attended the Meat Conference.[193]  In 2019, JBS's André Nogueira, Tyson's Noel White, National Beef's Timothy Klein, and Cargill's Elizabeth Gutschenritter were listed as attendees.[194]  In 2020, Tyson's Noel White and National Beef's Timothy Klein again signed up to attend the Meat Conference along with various other Cargill and JBS executives and employees.[195]

302.   Executives and employees of Packing Defendants also took part in other industry events.  For example, various Packing Defendants' executives and employees attended "AgCon," a joint conference from the Commodity Futures Trading Commission and the Center for Risk Management Education and Research at Kansas State University, in 2018.[196]  CMS's Bill Thoni and Tyson's Kevin Hueser were listed as attendees of the 2018 AgCon along with other Packing Defendant executives and employees, including Tyson Fresh's Vice President of Sourcing & Risk Management Randall Chambers; Tyson Fresh's Vice President of Cattle Procurement John Gerber; National Beef Vice President

---

[193]   *2018 Annual Meat Conference Attendee List as of 2.9.2018*, MEAT CONFERENCE (Feb. 9, 2018), http://meatconference.com/sites/default/files/books/2018%20AMC%20 Attendee%20List.pdf.

[194]   *Meat Conference 2019 Attendee List (as of 2/27)*, MEAT CONFERENCE (Feb. 27, 2019), http://meatconference.com/sites/default/files/books/2019-AMC-Attendee-List.pdf.

[195]   *2020 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N (Dec. 9, 2020), https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId =571D81000004FF&includeUnpaid=1&sortBy=title.

[196]   *Inaugural AgCon brings business, government together to discuss ag futures markets*, KANSAS STATE UNIV. (Mar. 8, 2018), https://www.ksre.k-state.edu/news/stories/2018/03/AgCon2018.html.

of Cattle Procurement Chad Barker; National Beef Vice President of Procurement and Risk

Management Phil Groetken; and JBS USA Head of Risk Management Marco Sampaio.[197]

303.    Tyson, JBS, and Cargill executives also had ample opportunities to meet

privately, particularly at the beginning of the conspiracy, as a result of JBS's acquisition

of Tyson and Cargill's Mexican and Brazilian chicken and U.S. pork operations,

respectively.  JBS S.A.'s purchase of Tyson's Brazilian and Mexican chicken operations

was announced on July 28, 2014, and closed on December 1, 2014, and June 29, 2015,

respectively,[198] while its purchase of Cargill's U.S. pork operations was announced on July

1, 2015, and closed on October 30, 2015.  Cargill, Tyson, and JBS executives with

responsibilities relating to beef and cattle such as then-Tyson CEO and President Donnie

Smith,[199]   JBS USA, Swift, and Packerland CEO André Nogueira,[200] and then-Cargill

Senior Vice President Todd Hall[201] were all involved in the acquisition discussions.  JBS

S.A.'s Wesley Batista stated in July 2015 that its "courtship" with Cargill in relation to its

---

[197]    *2018 AgCon Attendees*, KANSAS STATE UNIV. (Mar. 28, 2018), https://www.k-state.edu/riskmanagement/documents/Ag_Con_2018_Attendees_Mar30.pdf.

[198]    JBS Foods Int'l B.V., Registration Statement (Form F-1) at 112 (Dec. 5, 2016), https://www.sec.gov/Archives/edgar/data/1691004/000119312516785274/d304020df1.htm.

[199]    *Tyson to sell Mexico, Brazil poultry businesses to JBS*, REUTERS (July 29, 2014, 1:32 PM),   https://www.reuters.com/article/us-tyson-foods-results/tyson-to-sell-mexico-brazil-poultry-businesses-to-jbs-idUKKBN0FX0UR20140729.

[200]    Lawrence Aylward, *Inside the JBS, Cargill deal*, MEAT + POULTRY (July 2, 2015), https://www.meatpoultry.com/articles/13164-inside-the-jbs-cargill-deal.

[201]    Press Release, Cargill, JBS USA Pork agrees to purchase Cargill Pork business (July 1, 2015), https://www.cargill.com/news/releases/2015/NA31861255.jsp.

U.S. pork operations "started years ago," with discussions intensifying at the beginning of 2015, coinciding with the start of the Class Period.[202]

### E.    Packing Defendants Benefit from High Barriers to Entry

304.    Packing Defendants benefit from substantial barriers to entry into the market. As a result of these barriers, the entry of new fed cattle slaughter businesses, or the repurposing of existing cow and bull slaughter facilities, is not likely to occur despite any decrease in the price of fed cattle or increase in the wholesale price of beef.[203]

305.    The construction of a large packing plant requires an investment of at least $250 million-$350 million, and two or more years to obtain necessary permits and to plan, design, and build.[204]    The construction of smaller plants, with capacity to slaughter approximately 1,000 - 1,500 head per day, would take a similar period of time and cost at

---

[202]    Luciana Magalhaes, *With Cargill Purchase, Brazil's JBS Poised to Become No. 2 Pork Producer in U.S.*, WALL STREET JOURNAL (July 2, 2015, 3:18 PM), https://www.wsj.com/articles/with-cargill-purchase-brazils-jbs-poised-to-become-no-2-pork-producer-in-u-s-1435864508.

[203]    *U.S. v. JBS* Amended Complaint, ¶41.

[204]    Plaintiffs understand that the last major plant constructed by Packing Defendants – Tyson's plant in Lexington, Nebraska – cost over $250 million to construct in 1991 and would likely cost significantly more in today's money.

least $150 million.[205]   Re-purposing an existing plant, or reopening a similar sized, but previously shuttered, plant costs at least $40 million.[206]

306.   Aside from the costs and time associated with opening a plant, new entrants face difficulties complying with a significant volume of regulations, finding and training a workforce of between 1,500 to 3,000 staff, and locating marketing outlets for the resultant beef.[207]

307.   As a result, an industry rule of thumb is that a newly opened packing plant will lose at least 60% of its initial investment before it begins to profitably sell any of its beef product.   Not surprisingly, in recent years, new or re-launched Independent Packer businesses have failed, including Northern Beef Packers and Kane Beef.[208]

---

[205]   Amanda Ranke, *What's the Future For Northern Beef Packers?*, BEEF (July 22, 2013), www.beefmagazine.com/blog/whats-future-northern-beef-packers; Press Release, J.R. Simplot, JR Simplot Company and Caviness Beef Packers to Build New Idaho Beef Processing Plant, (Jan. 7 2015), www.simplot.com/news/jr_simplot_company_and_caviness_beef_packers_to_build_new _idaho_beef.

[206]   This is the amount Iowa Premium Beef spent refurbishing the previously shuttered Tama, Iowa plant.

[207]   For example, one recent successful entrance, namely Iowa Premium Beef's reopening of the Tama, Iowa plant, was made possible by Sysco's agreement to invest $36 million in the plant and take delivery of a significant volume of the resultant beef produced.

[208]   Ranke, *supra* n.205; Dirk Lammers, *Aberdeen beef plant open again and slaughtering*, CAPITAL JOURNAL (Nov. 19, 2015), www.capjournal.com/news/aberdeen-beef-plant-open-again-and-slaughtering-cattle/article_b0a76552-8f0b-11e5-aab0-4747ca2759bc.html; Greg Henderson, *Kane Beef Now under Court Receivership*, DROVERS (Oct. 16, 2018), www.drovers.com/article/kane-beef-now-under-court-receivership.

F.     **Packing Defendants Have Similar Cost Structures and Have Significant Oversight Over Each Other's Price and Production Decisions**

308.    As a result of their similar cost structures, Packing Defendants have limited ability to steal market share from each other by operating with compressed meat margins (*i.e.*, bidding high for cattle and asking low for beef).  But consequently, they have a shared interest in manipulating the meat margin to extract increased profits from their existing market shares.

309.    Packing Defendants' field buyers' weekly trips to inspect the feedlots in their territories provide an opportunity to meet and exchange commercially sensitive information among each other.  Field buyers routinely communicate "market color" obtained from the field, including reports of their competitors' activities obtained from producers, back to their respective head offices and other field buyers through their daily conference calls.

310.    For example, Witness 2 reported that the field buyers from Tyson Fresh, Swift, CMS, and National Beef assigned to his feedlot would call him each week to confirm who bought his cattle that week and on what terms.  The field buyers would request such information even when they had not placed a bid that week.  Witness 2 felt obligated to provide such information and would acquiesce to their requests.  Field buyers from Tyson, JBS, Cargill, and National Beef made similar inquiries of other producers and feedlots across the feeding regions.  Most producers would provide such information on request, unwilling to risk alienating one of their buyers.

311.   Packing Defendants would also direct their field buyers and other staff to drive past their competitors' plants to determine and report upon those plants' operating levels (for example, whether the plant had reduced labor hours or was operating on Saturday).  Tyson had a standing policy, which precluded these directives, and the resulting reports about their competitors' operations, from being put into writing.   Such communications were effectuated through phone calls.   On information and belief, JBS, Cargill, and National Beef operate similar policies.   The activities of their respective competitors, including their slaughter volumes, would also be discussed by those attending Tyson, JBS, Cargill, and National Beef's daily planning meetings.  *See* ¶88.

312.   Packing Defendants also regularly purchased beef produced by each other.  Each Packing Defendant would typically use their competitor's beef to produce certain value-added beef products.

313.   These realities, combined with widespread formal and informal reporting of fed cattle and beef bids, transactions and volumes, and each slaughter plant's current and planned output, enable Packing Defendants to monitor each other's adherence to any anticompetitive agreement.   The purchasing dynamics of the fed cattle market, with its weekly cash trade, also provide Packing Defendants with the ability to punish any suspected non-compliance with such an agreement.[209]

---

[209]    Research shows that markets, such as the fed cattle market, in which a large number of sellers make repetitive sales to a small group of purchasers, facilitate the formation and maintenance of price-fixing agreements as they provide opportunities for the purchasers to agree, sustain, and enforce market sharing arrangements.  R. Posner, ANTITRUST LAW 68 (2nd ed. 2001); Price *Fixing, Bid Rigging, and Market Allocation Schemes: What They Are*

## VIII.  PACKING DEFENDANTS' CONDUCT IS THE SUBJECT OF ONGOING INVESTIGATIONS IN THIS AND RELATED INDUSTRIES

### A.    The DOJ Is Investigating Packing Defendants for Price-Fixing, Market Manipulation, and Unfair Practices in the Cattle and Beef Markets

314.    The Defendants' conduct described above is the subject of ongoing investigations by federal regulators and enforcers and has elicited calls for further action from numerous U.S. Senators, Members of Congress, State Attorneys General, and other state officials.



315.

316.

317.

---

*and What to Look For*, U.S. DEPARTMENT OF JUSTICE, ANTITRUST DIVISION, www.justice.gov/atr/public/guidelines/211578.htm.

[210]    *Peterson, et al. v. JBS USA Food Co. Holdings, et al.*, No. 19-1129 (D. Minn).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

318.    The CIDs were issued after appeals by numerous federal and state legislators and regulators calling for investigations into potential illegal and anti-competitive practices by Packing Defendants.

319.    For instance, beginning in March 2020, numerous U.S. Senators urged the DOJ to investigate anticompetitive practices in the cattle and beef packing industry including, among other things, price-fixing, market manipulation, and unfair practices.[212]

_____

[211] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████.

[212]    *See* Letter from U.S. Senators Rounds, Cramer, Hoeven, and Daines to U.S. Attorney General Barr and Assistant Attorney General Delrahim (Mar. 19, 2020), https://www.rounds.senate.gov/imo/media/doc/Letter%20to%20Department%20of%20Justice%20Regarding%20Cattle%20Prices.pdf; Letter from U.S. Senator Grassley to U.S. Department of Agriculture Secretary Perdue and U.S. Attorney General Barr (Mar. 31, 2020), https://www.grassley.senate.gov/sites/default/files/documents/2020-03-31%20CEG%20to%20DOJ%2C%20USDA%20%28Meat%20Packers%20Market%20Manipulation%29.pdf; Letter from U.S. Senator Thune to U.S. Attorney General Barr (Apr. 9, 2020), https://www.thune.senate.gov/public/_cache/files/44f205ea-bdbf-42b0-aa17-5799f6f8069e/A5F971C3A71FD1DB1FC60E98C2416856.4.9.2020-final-cattle-market-doj-letter.pdf; Letter from U.S. Senators Tester, Booker, Jones, and Merkley to U.S. Attorney General Barr (Apr. 23, 2020), https://www.jones.senate.gov/imo/media/doc/2020-04-23%20Letter%20to%20US%20AG%20Barr%20re%20Cattle%20Markets.pdf; Letter  from U.S. Senators Fischer, Daines, Enzi, Hoeven, Cramer, Barrasso, McSally, Blackburn, Ernst, Baldwin, Crapo, Jones, Rounds, Smith, Hyde-Smith, Risch, Sasse, Hawley, and Thune to U.S. Attorney General Barr (May 12, 2020), https://www.fischer.senate.gov/public/_cache/files/86f483c7-9bcb-41c0-9b7c-01cb3d029104/final-senate-letter-to-doj-packers-investigation-request-

320.    State Attorneys General and other state officials have also urged the DOJ to investigate "the dynamics that are depriving cattle ranchers and American consumers of the benefits of a competitive cattle industry."[213]  For example, in a letter to former Attorney General Barr dated May 5, 2020, numerous state Attorneys General offered to "work with [the DOJ] on a careful examination of the competitive dynamics of this industry."[214]

321.    Other officials have called for action,[215] including Texas Department of Agriculture Commissioner Sid Miller[216] and U.S. Representative Lucas, who urged former Attorney General Barr "to share the findings of the Department's investigation with

---

finalwsignature.pdf.  Similarly, on July 15, 2020, U.S. Senator Daines requested the DOJ and the USDA to actively coordinate efforts in the ongoing investigations into the "allegations of market manipulation and anti-competitive behavior by meat packers in the cattle industry." Letter from U.S. Senator Daines to U.S. Department of Agriculture Secretary Perdue and U.S. Attorney General Barr (July 15, 2020), https://www.daines.senate.gov/imo/media/doc/2020.07.15%20USDA%20DOJ%20Cattle%20Investigation%20Expansion.pdf.

[213]    *See* Letter from Attorneys General Stenehjem (ND), Weiser (CO), Schmitt (MO), Fox (MT), Brnovich (AZ), Wasden (ID), Miller (IA), Ellison (MN), Peterson (NE), Ravnsborg (SD), and Hill (WY) to U.S. Attorney General Barr (May 5, 2020), https://attorneygeneral.nd.gov/sites/ag/files/documents/MediaAttachments/2020-05-05-Barr%2C%20AG%20William.pdf; *see also* Letter from Attorney General Reyes (UT) to U.S. Attorney General Barr (May 21, 2020), https://attorneygeneral.utah.gov/wp-content/uploads/2020/06/2020-05-21-Beef-Packing-Industry-Ltr-to-Attorney-General-William-Barr.pdf.

[214]    *Id.*

[215]    Letter from Kentucky Commissioner of Agriculture Quarles and Kentucky Attorney General Cameron to U.S. Attorney General Barr (May 15, 2020), https://kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=914.

[216]    Letter from Texas Department of Agriculture Commissioner Miller to U.S. Attorney General Barr (May 7, 2020), https://www.texasagriculture.gov/Portals/0/forms/COMM/Media/Beef_Ind_to_AG_Barr 20_v2.pdf.

Congress as soon as possible so that policymakers can address the concerns of their investigation and restore confidence back into cattle markets."[217]

322.   The DOJ's investigation remains ongoing.

**B.   The USDA Is Investigating Defendants' Activities in Light of the Fire at Tyson's Holcomb Plant and COVID-19-Related Market Disruptions**

323.   As noted above, on August 28, 2019, the USDA launched an investigation into the conduct of the Packing Defendants in the aftermath of a fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019.  *See* Section VI(D) above.

324.   After the fire, Senator Thune, among others, raised concerns with the integrity of the cattle market, observing that "[t]he fact that losing just one beef plant in the United States created so much volatility in the cattle marketplace, including decreased cattle prices for producers and increased boxed beef prices, is deeply concerning."[218]

325.   Seven months later, in March 2020, when beef packing plants were forced to close due to infections of plant employees from the COVID-19 virus, the Packing

---

[217]   Press Release, U.S. Representative Lucas, Lucas Statement on DOJ Investigation of Beef-Processing Industry (June 5, 2020), https://lucas.house.gov/news/press-releases/lucas-statement-doj-investigation-beef-processing-industry.

[218]   Press Release, U.S. Senator Thune, Thune Hears From Livestock Industry Leaders on Market Transparency (Sept. 26, 2019), https://www.thune.senate.gov/public/index.cfm/2019/9/thune-hears-from-livestock-industry-leaders-on-market-transparency.  Related concerns caused senators to request an investigation by the CFTC as to whether parties were taking advantage of the producers. *See* Letter from U.S. Senator Fischer to Commodity Futures Trading Commission Chairman Tarbert (Aug. 20, 2019), https://www.fischer.senate.gov/public/_cache/files/f33edda0-c81d-41bc-aa45-3ef1a7af3209/8.20.19-holcomb-letter-to-cftc.pdf.

Defendants' profits again soared – with the meat margin peaking at the highest level it had ever reached.

326.    Following calls for the expansion of the USDA's investigation of beef pricing margins to include the market impacts arising from the COVID-19 plant shutdowns,[219] Secretary of Agriculture Sonny Purdue agreed, announcing on April 8, 2020, that the USDA would investigate cattle pricing throughout the pandemic, in conjunction with its continuing probe related to the 2019 Tyson plant fire.[220]

327.    As noted above, on July 22, 2020, the USDA issued its initial report,[221] stating that the "[f]indings thus far do not preclude the possibility that individual entities or groups of entities violated the Packers and Stockyards Act during the aftermath of the Tyson Holcomb fire and the COVID-19 pandemic."[222]   It also stated that the investigation

---

[219]    Letter from U.S. Senator Fischer to U.S. Department of Agriculture Secretary Perdue (Apr. 6, 2020), https://www.fischer.senate.gov/public/_cache/files/29ace091-e363-403e-b64d-96a35a31362e/4.6.20-df-letter-to-usda-psa---final.pdf;   Letter from U.S. Senator Thune to U.S. Department of Agriculture Secretary Perdue (Apr. 8, 2020), https://www.thune.senate.gov/public/_cache/files/0ba58dff-e870-4e0e-98db-51f46b6f6d04/0A984CF95521AEFDB343398C84EE1564.4.8.2020-cattle-market-letter-to-perdue.pdf.

[220] Jacob Bunge & Brent Kendall, *Justice Department Issues Subpoenas to Beef-Processing Giants*, WALL STREET JOURNAL (June 5, 2020, 11:42 AM), https://www.wsj.com/articles/justice-department-issues-subpoenas-to-beef-processing-giants-11591371745.

[221]    *Boxed Beef & Fed Cattle Price Spread Investigation Report*, U.S. DEP'T OF AGRIC. AGRIC. MKTG. SERV. (July 22, 2020), https://www.ams.usda.gov/sites/default/files/media/CattleandBeefPriceMarginReport.pdf.

[222]    *Id.* at 10.

into potential violations of the Packers and Stockyards Act was ongoing.[223]

### A.   JBA S.A.'s Brazilian Parent and Related Companies Pleaded Guilty to Bribery and Corruption

328.   On October 14, 2020, J&F Investimentos S.A. ("J&F"), the parent company of Defendant JBS S.A, pleaded guilty to violations of the Foreign Corrupt Practices Act (FCPA), and agreed to pay $128.25 million in criminal fines, half of the $256.5 million fines levied, due to settlements made with Brazilian authorities.[224]

329.   In referencing the investigations that lead to the indictment and plea, Senators Rubio and Menendez stated: "[w]e are troubled that JBS S.A. used the ill-gotten financing that it received . . . , which totaled more than $1.3 billion, to acquire American companies . . . ."[225] "[This] only underscores our concerns that the ***questionable nature of JBS S.A.'s financial practices poses significant risks for its American subsidiaries*** and the U.S. food system."[226] [Emphasis added].

330.   The SEC also commenced a civil case against J&F, JBS, and related entities.

---

[223]   *Id.* at 2.

[224]   Press Release, Dept. of Justice, J&F Investimentos S.A. Pleads Guilty and Agrees to Pay Over $256 Million to Resolve Criminal Foreign Bribery Case (Oct. 14, 2020), https://www.justice.gov/opa/pr/jf-investimentos-sa-pleads-guilty-and-agrees-pay-over-256-million-resolve-criminal-foreign; Jody Godoy & Sabrina Valle, *Parent of Brazil's JBS pleads guilty to U.S. foreign bribery charges*, REUTERS (Oct. 14, 2020, 11:07 AM), https://www.reuters.com/article/us-j-f-brazil-crime/parent-of-brazils-jbs-pleads-guilty-to-u-s-foreign-bribery-charges-idUSKBN26Z2FZ.

[225]   Letter from U.S. Senators Menendez and Rubio to U.S. Department of Treasury Secretary Mnuchin (Oct. 8, 2019), https://www.foreign.senate.gov/imo/media/doc/10-08-19%20RM%20Rubio%20letter%20Brazil%20CFIUS.pdf.

[226]   *Id.*

It alleged that these companies engaged in a massive bribery scheme of Brazilian officials and others in order to obtain investments that would facilitate JBS's acquisition of Pilgrim's Pride Corporation, a U.S. company, and through that acquisition, its entry into the United States' markets.[227]  "'Engaging in bribery to finance their expansion into the U.S. markets and then continuing to engage in bribery while occupying senior board positions at Pilgrim's reflects a profound failure to exercise good corporate governance,' said Charles Cain, Chief of the SEC Enforcement Division's FCPA Unit. 'This brazen misconduct flies in the face of what investors should expect from those occupying the role of an officer or director of a U.S. issuer'" the SEC stated.[228]

331.    "J&F Investimentos S.A. and JBS S.A., a global meat and protein producer, and its principals have agreed to pay nearly $27 million to resolve" the SEC charges.[229]

**B.    The Conduct Alleged Here is Similar to Conduct in the Broiler Chicken and Pork Markets**

332.    The conduct of Packing Defendants alleged herein is consistent with their previous use of production restraint to increase the price of other commodities such as broiler chicken and pork.  JBS and Tyson maintain significant market shares in both the broiler chicken and pork processing markets.  Cargill was the fourth largest U.S. pork processer until it sold its pork business to JBS in October 2015.

333.    The DOJ opened a grand jury investigation into an alleged conspiracy in

---

[227]    In the Matter of JBS, S.A. et al., Exchange Act Release No. 90170 (Oct. 14, 2020).

[228]    Press Release, Sec. and Exch. Comm'n, SEC Charges Brazilian Meat Producers with FCPA Violations (Oct. 14, 2020), https://www.sec.gov/news/press-release/2020-254.

[229]    *Id.*

relation to broiler chickens in 2019. In relation to that investigation, the DOJ issued subpoenas to Defendant Tyson and Defendant JBS S.A.'s subsidiary, Pilgrim's Pride, along with other participants in the broiler chicken market.

334. In June 2020, Tyson announced that it is an ACPERA leniency applicant in relation to the criminal investigation.[230]

335. In June 2020, the DOJ announced indictments of several executives of Pilgrim's Pride for price-fixing and related criminal activity in the broiler chicken market.[231] In October 2020, the DOJ announced a new set of indictments, expanding the number of companies charged and employees linked to the criminal activity.[232] In addition to employees at Pilgrim's Pride (JBS), Claxton Foods, and George's Inc., former

---

[230] Tyson Foods, Inc., Current Report (Form 8-K) at 4 (June 10, 2020), http://d18rn0p25nwr6d.cloudfront.net/CIK-0000100493/e5ca416b-b5f0-4211-8ed1-5005577eabf0.pdf.

[231] Indictment, *United States v. Penn et al.*, 1:20-cr-00152-PAB, ECF No. 1 (D. Colo. June 2, 2020); *Pilgrim's Pride CEO indicted over alleged U.S. chicken price-fixing*, Reuters (June 3, 2020, 12:17 PM), https://www.reuters.com/article/us-usa-pilgrims-pride-charges/pilgrims-pride-ceo-indicted-over-alleged-u-s-chicken-price-fixing-idUSKBN23A2TF.

[232] Superseding Indictment, *United States v. Penn et al.*, 1:20-cr-00152-PAB, ECF No. 101 (D. Colo. Oct. 6, 2020); Jacob Bunge & Brent Kendall, *Six Chicken-Industry Officials are Indicted in Price-Fixing Probe*, WALL STREET JOURNAL (Oct. 7, 2020, 9:05 PM), https://www.wsj.com/articles/six-chicken-industry-officials-are-indicted-in-price-fixing-probe-11602085637; Greg Henderson, *New Indictments In DOJ Chicken Price-Fixing Probe*, AGWEB FARM JOURNAL (Oct. 7, 2020, 2:48 PM), https://www.agweb.com/article/new-indictments-doj-chicken-price-fixing-probe.

employees of Defendant Tyson Foods are also included in the October indictment.[233]

336.   On October 13, 2020, Pilgrim's Pride (JBS) announced it entered into a plea deal with the DOJ and agreed to pay $110.5 million to resolve the claims against it.[234]

337.   Some of these Defendants are also accused of slaughter restraint and other coordinated activity in the pork market.  Specifically, Defendants JBS and Tyson, along with other participants in the wholesale pork market, are alleged to have violated the Sherman Act and other laws "by coordinating output and limiting production with the intent and expected result of increasing pork prices in the United States."  JBS has entered into an agreement to settle these claims in return for a payment of $24.5 million and the provision of cooperation with the plaintiffs.[235]

338.   The below chart summarizes the regulatory investigations and actions concerning Packing Defendants:

---

[233]   Michael Hirtzer, *Expanded U.S. Chicken Probe Points to Tyson's Involvement*, BLOOMBERG (Oct. 7, 2020, 1:30 PM), https://www.bloomberg.com/news/articles/2020-10-07/chicken-price-fixing-case-expanded-by-u-s-with-six-indictments.

[234]   Pilgrim's Pride Corp., Current Report (Form 8-K) at 2, 4 (Oct. 14, 2020).

[235]   *See* Jennifer Shike, *JBS Pork Antitrust Lawsuit Plaintiffs Seek $24.5 Million Settlement*, FARM JOURNAL'S PORK (Dec. 3, 2020), https://www.porkbusiness.com/news/industry/jbs-pork-antitrust-lawsuit-plaintiffs-seek-245-million-settlement; Memorandum of Points and Authorities in Support of Motion for Preliminary Approval of the Class Action Settlement between the Direct Purchaser Plaintiffs and Defendant JBS, *In re Pork Antitrust Litig.,* No. 18-cv-1776, ECF No. 542 (D. Minn. Dec. 1, 2020).

| Defendant | DOJ CIDs Issued | USDA Investigation | Guilty of Bribery and Corruption | SEC Civil Case | Broiler Chicken Indictments | Pork Case |
|---|---|---|---|---|---|---|
| JBS | ✓ | ✓ | ✓ | ✓ | ✓ (plea deal) | ✓ |
| Cargill | ✓ | ✓ | | | | |
| Tyson | ✓ | ✓ | | | ✓ (ACPERA) | ✓ |
| National Beef | ✓ | ✓ | | | | |

## IX.    MANIPULATION OF LIVE CATTLE FUTURES AND OPTIONS

339.    Cattle producers, meat packers, other agricultural and livestock market participants, and investors utilize live cattle futures (and options on futures) to manage cattle price risk.

340.    Futures contracts are standardized, exchange-traded derivative contracts. Live Cattle futures contracts have traded on the CME since 1964, and options on Live Cattle futures contracts have traded on the CME since 1984.  As noted above, for purposes of this complaint, references to "Live Cattle Futures" include live cattle futures and options on Live Cattle Futures traded on the CME.

341.    Generally, the prices of futures contracts are closely related to the price of the underlying commodity product.  This is particularly true for Live Cattle Futures.  The CME recognizes that livestock (including live cattle and feeder cattle) contract specifications are designed to ensure "a two-way relationship" between the futures market and the cash markets: the futures market price "comes from the interaction between the supply (sellers' offers) and demand (buyers' bids)"; and "bids and offers in the futures

markets come from participants in the cash market."[236]   Here, Plaintiffs demonstrate through statistical analysis that the price of Live Cattle Futures is inextricably linked to the cash market, or the price of physical live cattle. *See* Section IX(C) below. This inextricable link means prices of physical live cattle are reflected in the prices of Live Cattle Futures, and vice-versa.

342.   The inextricable price link is well-known to physical cattle and Live Cattle Futures market participants. Each Packing Defendant relied extensively on the Live Cattle Futures market and recognized the impact that its anticompetitive conduct would have on that market.

343.   Packing Defendants were integral market participants in the Live Cattle Futures markets, routinely transacted in the Live Cattle Futures markets, and held sizeable positions in Live Cattle Futures throughout the Class Period. *See* Section IX(E) below.

344.   The Packing Defendants procured a significant portion of their physical live cattle through forward or basis contracts that directly incorporated and referenced the price of CME Live Cattle Futures. *See* Section IV above. During the Class Period, the Packing Defendants controlled the majority (and later all) of the CME-approved facilities for slaughter-weight cattle, *i.e.*, the commodity underlying Live Cattle Futures. *See* Section IX(B) below.

---

[236]   *Self-Study Guide to Hedging with Livestock Futures and Options*, CME (Version 17) at 6, https://www.cmegroup.com/trading/agricultural/files/AC-215_SelfStuy_GuideNYMEX.pdf.

345.    As alleged below, Defendants manipulated Live Cattle Futures in three related ways: *first*, as discussed above, the Packing Defendants conspired to suppress the price of physical cattle throughout the Class Period.  This anticompetitive suppression had a direct and corresponding price impact on Live Cattle Futures prices due to the close relationship between Live Cattle Futures and physical cattle.  ***Second***, certain Defendants ("Futures Trading Defendants") established large short positions in Live Cattle Futures knowing that these large short positions would lower Live Cattle Futures prices and, as a direct result, physical cattle prices.  ***Third***, by taking these large short positions in Live Cattle Futures, Futures Trading Defendants lowered the prices of physical live cattle they obtained through forward contracts that directly referenced and incorporated the Live Cattle Futures prices.  Futures Trading Defendants were thus able to directly impact the price of the physical cattle that Packing Defendants purchased under these forward contracts.

### A.    Futures and Options Generally

346.    As background, a derivative is a contract between two or more parties, the value of which is based on an underlying asset (*e.g.*, stock, agricultural product) or set of assets (*e.g.*, an index, market price, or interest rate).  Futures contracts, forward contracts, and options are commonly used derivatives.

347.    A commodity futures contract is a standardized bilateral agreement for the purchase and sale of a particular commodity, such as live cattle, at a specified time in the future.  In the context of futures trading, a commodity is the underlying asset upon which a futures contract is based.

348.    A futures contract involves two parties connected through an exchange (*e.g.*, the CME).   The exchange acts as a central clearinghouse and guarantees both party's performance under the contract and eliminates counterparty risk.

349.    For livestock futures (and futures generally), the buyer commits to taking the delivery of the underlying asset and is considered "long" that underlying asset.   The buyer's futures position increases in value as the underlying asset price increases.   The futures buyer locks in a purchase price for the underlying asset (the futures contract price) and, assuming that buyer has no other positions, hopes prices will rise before taking delivery. Then the buyer will be taking delivery of the underlying asset at the earlier, lower futures contract price versus the prevailing market price at the time of delivery.   As noted below, the CME explains in its literature that futures contracts provide meat packers the opportunity to hedge against the risk of price increases; by buying futures contracts, packers can lock in a fixed price at a future date.

350.    The seller of a futures contract commits to delivering the underlying asset and is considered "short" on the underlying asset.   The value of the seller's futures position will increase as the underlying asset price decreases.   The seller locks in a sale price for the underlying asset (the futures contract price) and hopes prices will fall before making delivery.   Then the seller will be making delivery of the underlying asset at the earlier, higher futures contract price versus the prevailing market price at the time of delivery.

351.    Rather than making or taking delivery of the physical underlying asset, futures market participants almost always offset their futures contracts prior to the delivery deadline.   For example, a purchaser of one Live Cattle futures contract can eliminate the

obligation to take delivery of the cattle by selling one Live Cattle futures contract of the same type.  The difference between the initial purchase price and the subsequent sale price represents the realized profit or loss for the trader.  The trader's position goes from "long" on one contract to "flat" after the offsetting sale.

352.    Conversely, a seller of one Live Cattle Futures contract can eliminate the obligation to make delivery of the underlying cattle by buying one Live Cattle Futures contract of the same type.  The difference between the initial futures contract sale price and the subsequent futures contract purchase price represents the realized profit or loss for the trader.  The trader's position goes from "short" one contract to "flat" after the offsetting purchase.

353.    As for options, an options contract comes in two forms: a "call option" and a "put option."  The buyer (sometimes called the "holder") of a call option has the "option" – a right, but not an obligation – to purchase the underlying asset at a set price (the "strike price").  The seller (sometimes called the "writer") of a call option has the obligation – it is not a mere "option" or "right" – to deliver the underlying asset at the strike price if the buyer exercises its right of purchase.

354.    The buyer of a put option has the "option" – a right, but not an obligation – to sell the underlying asset at a set price (the "strike" or "exercise" price).  The seller of a put option has the obligation – it is not a mere "option" or "right" – to buy the underlying asset at the strike price if the buyer exercises its right to sell.

355.    The purchase or sale price of an option is often referred to as a "premium."  The option buyer pays the option purchase price (or premium) to the seller.  This price is

different than the "strike" price. The option price is simply the price the buyer pays to have the option to buy (or sell) the futures contract at the strike price.

356.   A trader's long call option increases in value when the price of the underlying asset increases; a trader's long put option increases in value when the price of the underlying asset decreases.

357.   For call options on futures contracts, the option becomes "in the money" when the underlying futures price exceeds the call option strike price. For a put option, the option becomes "in the money" when the underlying futures price is below the put option strike price.

358.   When the call option strike price is above the futures price, or the put option strike price is below the futures price, the option is said to be "out of the money." There is no reason to exercise the option because the underlying asset (the futures contract) can be bought for less (in the case of a call option) or sold for more (in the case of a put option) in the futures market. The option generally will not be exercised by the holder. It will "expire worthless," and the option seller will pocket the sale price (the premium) without having to make delivery.

### 1.   CME Live Cattle Futures

359.   One Live Cattle Futures contract currently calls for the delivery of 40,000 pounds of live steers or heifers producing 70% Choice and 30% Select USDA grade beef

at an agreed date for an agreed price.[237]

360.   Live Cattle Futures prices are quoted in cents per pound.  The minimum tick size is $0.00025 per pound (or $10 per contract).[238]  A one penny ($0.01) change in the per pound price results in a $400 change in the contract price.

361.   "Live," "finished," or "fat" cattle are fed cattle that have reached slaughter-weight.  For purposes of CME Live Cattle Futures contracts, live cattle weigh no less than 1,050 pounds and no more than 1,550 pounds (or 1,350 pounds for heifers).

362.   CME Live Cattle Futures and options are traded electronically on CME's Globex electronic trading platform.  While both Live Cattle Futures and options were also traded in CME's "open outcry" trading pits at the beginning of the Class Period, only live cattle options continued to be traded in open outcry after the CME's decision to close down most of its futures trading pits in July 2015.

363.   The advent of anonymous electronic trading has made price manipulation far easier.  In open-outcry pit trading, market participants were able to see other market participants (or their brokers) behind orders and trades.  In electronic trading, market participants cannot see other market participants behind the orders and trades.  The

---

[237]   *See* CME Rulebook, CME, https://www.cmegroup.com/rulebook/CME/ ("CME Rulebook"), Chapter 101, Chapter 101, Rules 10101, 10102.B.  Previously, it called for 65% Choice and 35% Select.

[238]   *Live Cattle Futures Contract Specs*, CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_contract_specifications.html.

anonymous nature of electronic trading makes it more difficult for the futures market to detect manipulation and to police itself.

364.    Trading in CME Live Cattle Futures is subject to the rules and regulations of the CME, including Chapters 101 (Live Cattle Futures), 101A (options on Live Cattle Futures), and 101B (options on Live Cattle Futures calendar spreads) of the CME Rulebook.[239]

365.    Chapter 101 of the CME Rulebook sets forth the rules for (i) trading in CME Live Cattle Futures, including contract size, trade dates, and tick sizes, and (ii) deliveries on CME Live Cattle Futures contracts, including weight deviations, location differentials, and delivery points.

366.    Live Cattle Futures trade for the following contract months: February, April, June, August, October, and December.  Nine contract months are eligible for trading at any given time.  They include the six upcoming contract months and the next three contract months in the calendar cycle.[240]  For example, in March 2019, the following contract months were eligible for trading: April 2019, June 2019, August 2019, October 2019, December 2019, February 2020, April 2020, June 2020, and August 2020.  Trading continues until the last business day of the given contract month at 12:00 p.m. central time.[241]

---

[239]    CME Rulebook, Chapters 101-101B.

[240]    *Live Cattle Futures Contract Specs*, CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_contract_specifications.html.

[241]    *Id.*

367.    Deliveries of live cattle are made at approved delivery points at approved livestock yards in the following territories: Colorado; Iowa/Minnesota/South Dakota; Kansas; Nebraska; or Texas/Oklahoma/New Mexico.[242]   Buyers electing carcass graded delivery must specify a CME-approved slaughter plant.   Eligible slaughter plants include those enumerated for the livestock yards to which the cattle were tendered and any other approved slaughter plant that is within 225 road miles of the originating feedlot.

### 2.    Options on Live Cattle Futures Contracts

368.    Chapter 101A of the CME Rulebook outlines the specifications for live cattle options.   The asset underlying a live cattle option is a Live Cattle Futures contract.   A live cattle option permits the holder to buy, in the case of a call, or to sell, in the case of a put, one Live Cattle Futures contract.   Live cattle options trade in cents-per-pound.   The minimum price fluctuation is $0.00025 per pound.[243]

369.    Live cattle options trade in the following contract months: February, April, June, August, October, and December.[244]   At any given time, ten contract months trade: the six months in the February bi-monthly cycle, plus the next three in that cycle for the following year, as well as one nearby "serial" month of January, March, May, July,

---

[244]    CME Rulebook, Rule 10103.B.
[243]    *Live Cattle Options Contract Specs*, CME,   https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_contract_specifications.html.
[244]    *Id.*

September, or November.[245]  Trading in live cattle options ends on the first Friday of the contract month at 1:00 p.m. central time.[246]

370.    For monthly options that expire in the February bi-monthly cycle (*i.e.*, February, April, June, August, October, and December), the underlying futures contract is the Live Cattle Futures contract for the month in which the option expires.  For example, the underlying futures contract for an option that expires in February is the February Live Cattle Futures contract.[247]

371.    For monthly options that expire in months other than those in the February bi-monthly cycle (*i.e.*, January, March, May, July, September, and November), the underlying futures contract is the next futures contract in the February bi-monthly cycle that is nearest to the expiration of the option.  For example, the underlying futures contract for an option that expires in January is the February Live Cattle Futures contract.

372.    Options on Live Cattle Futures are "American style," meaning that the option holders can exercise their options at any point prior to expiration of trading.[248]

373.    In addition, the CME lists "live cattle calendar spread options," which trade pursuant to CME Rule 101B.  In the case of calendar spreads, the option is to buy (in the case of a call), or to sell (in the case of a put), one Live Cattle Futures calendar spread.[249]

---

[245]    *Id.*

[246]    *Id.*

[247]    CME Rulebook, Chapter 101A, Rule 101A01.D.

[248]    *Id.*, Rule 101A02.A.

[249]    *Id.*, Chapter 101B, Rule 101B01.

A Live Cattle Futures calendar spread option consists of a combination of a purchase in one futures contract month and a sale in another futures contract month.[250]  Unlike "American style" options, these options can only be exercised on the day of expiration.[251]

## B.   Packing Defendants Traded in Live Cattle Futures and Controlled the Delivery Process

374.   **JBS S.A.** regularly transacted in agricultural futures contracts, including Live Cattle Futures contracts, during the Class Period.  For example, in its 2017 Annual Report, JBS S.A. disclosed that "[t]he Company operates globally across (the entire livestock protein chain and related business) and during the regular course of its operations brings is exposed to price fluctuations in feeder cattle, live cattle, lean hogs, corn, soybeans, and energy, especially in the American, Australian and Brazilian markets."[252]  To manage commodity risk, JBS S.A. notes that its "Risk Management Department is responsible for mapping the exposures to commodity prices of the Company and its subsidiaries and proposing strategies to the Risk Management Committee, in order to mitigate such exposures."  *Id.*  To effectuate risk management strategies, JBS S.A. "participates in forward contracts to anticipate purchases with suppliers," and "[t]o complement these forward purchases, the Company uses derivative instruments to mitigate each specific exposure, most notably futures contracts, to mitigate the impact of price fluctuations - on inventories and sales contracts."  *Id.*

---

[250]   *Id.*

[251]   *Id.*, Rule 101B02.

[252]   JBS S.A., 2017 Annual Report at 59 (Mar. 29, 2018), available at https://sec.report/otc/financial-report/189800.

375.   JBS USA also trades Live Cattle Futures. It uses "securities pledged as collateral for derivative transactions with the commodities and futures whose balance at December 31, 2017 is R$353,625 (R$254,862 at December 31, 2016) (in thousands of reals).[253]

376.   **National Beef** regularly transacted in agricultural futures, including Live Cattle Futures, during the Class Period.  For example, prior to the Class Period, National Beef disclosed in a Form 10-K filed with the SEC on November 16, 2011 that the company used "futures contracts in order to reduce exposure associated with entering into firm commitments to purchase live cattle at prices determined prior to the delivery of the cattle . . . ."[254]   This practice continued during the Class Period.  National Beef's two controlling shareholders during the Class Period, Jefferies Financial Group and Marfrig, made similar announcements in its 2017 annual report[255] and 2018 management report and financial statements.[256]  For example, National Beef disclosed in its 2016 and 2018 Annual Reports that it maintained a short position in derivatives.[257]  National Beef's "derivatives"

---

[253]   *Id.* at 62.

[254]   National Beef Packing Company, LLC, Annual Report (Form 10-K) at F-15, (Nov. 16, 2011).

[255]   Leucadia National Corporation, 2017 Annual Report (Form 10-K), at F-44 (Feb. 27, 2018) ("Jefferies 2017 Annual Report").

[256]   Marfrig Global Foods, 2018 Management Report and Financial Statements at 61 (Feb. 27, 2019).

[257]   U.S. Premium Beef, LLC, Annual Report (Form 10-K) at F-36 (Mar. 9, 2017) (U.S Premium Beef, LLC owns controlling interest in National Beef); U.S. Premium Beef, LLC Annual Report (Form 10-K), at F-33 (March 13, 2019).

disclosures include both forward physical cash cattle purchases as well as live cattle exchange-traded futures contracts.

377.   **Tyson** regularly discloses in SEC filings summaries of its positions in derivative markets, including agricultural futures.  For example, in its Form 10-K filed with the SEC for the fiscal year ending September 29, 2018, Tyson disclosed that it uses "derivative financial instruments, primarily futures and options, to reduce the effect of changing prices and as a mechanism to procure the underlying commodity."[258] Additionally, as part of its "commodity risk management activities" Tyson uses "derivative financial instruments, primarily futures and options, to reduce [its] exposure to various market risks related to these purchases . . ."[259]  In addition, Tyson discloses, "[w]hile we use derivative financial instruments, primarily futures and options, to reduce the effect of changing prices and as a mechanism to procure the underlying commodity, we do not fully hedge against changes in commodities prices." [260]  As such, Tyson acknowledges taking speculative positions in agricultural futures markets.  Tyson Foods and Tyson Shared Services, Inc. (a Tyson group services company), both transacted Live Cattle futures and options contracts during the Class Period on behalf of Tyson's U.S. beef business, operated by Tyson Fresh.

---

[258]    *See, e.g.,* Tyson Foods, Inc., Annual Report (Form 10-K) at 8 and 43 (Sept. 29, 2018).

[259]    *Id.* at 52.

[260]    *Id.* at 8.

378.   **CMS and Cargill**, as privately held entities, do not disclose their derivatives holdings in publicly available filings.  Cargill's and CMS's specific trading activity in the CME live cattle markets is not public information and is not otherwise available to Plaintiffs absent discovery.  CMS is a CME-registered approved slaughter house.  News reports confirm that Cargill, Inc. trades actively in the cattle futures markets.  For example, on January 25, 2016, a Cargill spokesperson stated, "[w]e've seen not only a very volatile cattle futures market, but prices were coming down a lot."[261]  On information and belief, CMS and Cargill Inc. each traded Live Cattle Futures.

379.   Throughout the Class Period, Packing Defendants had control over each of the slaughter plants CME had approved for delivery, with the exception of PM Beef's Windom Minnesota plant, which was shut in 2015.[262]

380.   Figure 44 below details each of the CME-approved live cattle slaughter plants by company and year.  Specifically, "X" signifies years for which slaughter plants were licensed by the CME to accept delivery from corresponding livestock yards.

---

[261]   Gregory Meyer, *Cattlemen lock horns with futures exchange over market volatility*, FINANCIAL TIMES (Jan. 25, 2016), https://www.ft.com/content/6eed1268-c130-11e5-846f-79b0e3d20eaf.

[262]   The number of CME-approved slaughter plants is available for each year between 2009 through 2020.  *See, e.g., Chicago Mercantile Exchange Inc. 2018 Approved Slaughter Plants for Live Cattle*, CME GROUP, https://www.cmegroup.com/content/dam/cmegroup/notices/market-regulation/2018/01/2018-approved-slaughter-plants-for-live-cattle.pdf.

**Figure 44. CME Approved Live Cattle Slaughter Plants between 2009 and 2020**[263]

| Packer's Slaughter Plants Location | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cargill** | | | | | | | | | | | | |
| Dodge City, KS | X | X | X | X | X | X | X | X | X | X | X | X |
| Friona, TX | X | X | X | X | X | X | X | X | X | X | X | X |
| Ft. Morgan, CO | X | X | X | X | X | X | X | X | X | X | X | X |
| Plainview, TX | X | X | X | X | | | | | | | | |
| Schuyler, NE | X | X | X | X | X | X | X | X | X | X | X | X |
| **JBS** | | | | | | | | | | | | |
| Cactus, TX | | X | X | X | X | X | X | X | X | X | X | X |
| Dumas, TX | X | | | | | | | | | | | |
| Grand Island, NE | X | X | X | X | X | X | X | X | X | X | X | X |
| Greeley, CO | X | X | X | X | X | X | X | X | X | X | X | X |
| **National Beef** | | | | | | | | | | | | |
| Dodge City, KS | X | X | X | X | X | X | X | X | X | X | X | X |
| Liberal, KS | X | X | X | X | X | X | X | X | X | X | X | X |
| **PM Beef** | | | | | | | | | | | | |
| Windom, MN | X | X | X | X | X | X | X | | | | | |
| **Tyson** | | | | | | | | | | | | |
| Amarillo, TX | X | X | X | X | X | X | X | X | X | X | X | X |
| Dakota City, NE | X | X | X | X | X | X | X | X | X | X | X | X |
| Denison, IA | | X | X | X | X | X | X | | | | | |
| Holcomb, KS | X | X | X | X | X | X | X | X | X | X | X | X |
| Lexington, NE | X | X | X | X | X | X | X | X | X | X | X | X |

### C.   Live Cattle Futures and Cattle Spot (Cash) Prices are Highly Correlated and Inextricably Linked

381.   Live Cattle Futures operate in an efficient, anticipatory market.[264]   Changes to the underlying supply and demand of cattle, including changes to the slaughter capacity and underutilization of Packing Defendants' slaughter plants, will be reflected in the prices of Live Cattle Futures.

---

[263]   The JBS Dumas, TX plant is believed to be one and the same as the Cactus, TX plant.

[264]   *See* Figures 45-48, below; *see also Introduction to Futures; Price Discovery*, CME GROUP, https://www.cmegroup.com/education/courses/introduction-to-futures/price-discovery.html (noting that futures market is "efficien[t]"); *see also Live Cattle Product Overview*, CME GROUP, https://www.cmegroup.com/education/lessons/live-cattle-product-overview.html (noting that Live Cattle Futures effectuate price discovery by incorporating supply and demand considerations).

382.   The prices of Live Cattle Futures and physical cash cattle are highly correlated and inextricably linked.  Throughout the Class Period, the prices of Live Cattle Futures and physical cash cattle effectively moved in lockstep.  As the CME observes, "livestock cash prices and futures prices tend to move up and down together, which is what makes the concept of effective hedging possible."[265]  "[F]utures prices [are] reflective of the main cash markets."[266]

383.   As the CME has further recognized, livestock (including live cattle and feeder cattle) contract specifications ensure "a two-way relationship between the benchmark livestock futures market and the numerous livestock cash markets.  The price that is discovered in a futures market comes from the interaction between the supply (sellers' offers) and demand (buyers' bids)."[267]  Many futures market "bids and offers come from cash market participants."[268]

384.   The relationship between the cash market and the futures market is particularly strong with respect to Live Cattle Futures because, as the CME has observed, "many cash market contracts are 'based on' or 'referenced to' the futures market price."[269]

---

[265]   *INTRODUCTION TO LIVESTOCK: Learn about Basis: Livestock*, CME, available at https://www.cmegroup.com/education/courses/introduction-to-livestock/learn-about-basis-livestock.html.

[266]   *Self-Study Guide to Hedging with Livestock Futures and Options,* CME (2009 Version), at 9, http://www.kisfutures.com/CMELivestockSelfStudy.pdf.

[267]   *Self-Study Guide to Hedging with Livestock Futures and Options* (Version 17), *supra* n.236, at 6.

[268]   *Id.*

[269]   *Id.*

This two-way relationship is even stronger in Live Cattle Futures than in other contracts, because a sizeable percentage of packers' cash cattle purchases are settled using forward contracts that explicitly reference CME Live Cattle Futures prices. As the CME explains, "[i]n turn, the futures contract price is then used by cash market participants to transact in the spot (current) market or for cash forward type contracts."[270]

385. Live Cattle Futures contracts are designed so that their prices converge with physical cash cattle prices when they expire.[271] For physically settled contracts, such as Live Cattle Futures, "[t]he possibility of delivery on the futures contract generally causes the futures price during the delivery month to align with the cash price at the futures delivery locations."[272] The possibility of physical delivery ensures that prices for Live Cattle Futures contracts move in virtual lockstep with physical cash cattle prices.

386. The inextricable link between prices of Live Cattle Futures contracts and physical cash cattle prices is confirmed by examining the empirical relationship between the two. Regression analyses demonstrate a strong, statistically significant relationship between: (1) changes in the physical cash cattle prices reported in the afternoon of day 1 with Live Cattle Futures market price changes on day 2; (2) changes in physical cash cattle prices reported on day 2 and Live Cattle Futures market price changes on day 2; and (3)

---

[270]    *Id.*

[271]    *Self-Study Guide to Hedging with Livestock Futures and Options* (2009 Version), *supra* n.266.

[272]    *Id.* at 11.

changes in Live Cattle Futures market prices on day 2 and physical cash market price changes reported on the morning of day 3.

387.   Figures 45-48 below depict the close relationship between price changes in the cattle cash market ("Cash am" and "Cash pm") and price changes in the Live Cattle Futures market, across all contract months:

**Figure 45.  Relationship between 2015 Live Cattle Futures Contracts and AMS LMR National Morning and Afternoon Cash Cattle Purchase Reports**



**Figure 46.  Relationship between 2016 Live Cattle Futures Contracts and AMS LMR National Morning and Afternoon Cash Cattle Purchase Reports**



**Figure 47.  Relationship between 2017 Live Cattle Futures Contracts and AMS LMR National Morning and Afternoon Cash Cattle Purchase Reports**



**Figure 48.  Relationship between 2018 Live Cattle Futures Contracts and AMS LMR National Morning and Afternoon Cash Cattle Purchase Reports**



389.   As demonstrated in Figures 45-48 above, a strong statistical correlation exists between Live Cattle Futures contract prices and physical cash cattle prices; the two are inextricably linked.  Because of this link, a change in the price of one will be transmitted into the price of the other almost immediately.  Hence, when the price of cash cattle drops, Live Cattle Futures will also drop; conversely, when the price of Live Cattle Futures drops, the price of cash cattle will also drop.

**D.      Packing Defendants' Conspiracy to Suppress Physical Cattle Prices Created Artificial Live Cattle Futures Prices**

390.      A reduction in the price of slaughter-weight fed cattle leads to a reduction in the price of CME Live Cattle Futures.  As explained above, each Packing Defendant suppressed the price of fed cattle.  In doing so, Packing Defendants necessarily and directly caused prices of Live Cattle Futures and options to be artificially suppressed.  Packing Defendants' conduct amounts to prohibited price manipulation under the CEA, which outlaws manipulation of the "futures" price, manipulation of the "underlying commodity" price, and certainly manipulation of both the futures price and the underlying commodity price simultaneously.

391.      Packing Defendants' conduct in the cash cattle market had a direct and proximate impact on prices in the CME Live Cattle Futures and options markets.  For example, on August 14, 2015, Tyson announced that it was closing its Denison, Iowa beef plant, which resulted in price declines in the cash and futures markets.  In particular, the spot or front-month August contract fell $0.004 per pound ($160 per Live Cattle Future) and the October 2015 contract fell $0.01 per pound ($400 per Live Cattle Future).  According to one market participant, "[s]ome feedlots may have surrendered after seeing futures fall earlier in the session, partly on word that Tyson closed a beef plant."[273]

---

[273]      Theopolis Waters, *Livestock-CME live cattle futures sag with initial cash prices*, REUTERS, Aug. 14, 2015, https://www.reuters.com/article/markets-livestock-cattle/livestock-cme-live-cattle-futures-sag-with-initial-cash-prices-idUSL1N10P2MG20150814.

392.    Defendants' scheme to suppress cattle prices, as alleged above, had a direct and proximate impact on Live Cattle Futures.

### E.    Packing Defendants Established Net Short Positions

393.    Typically, livestock processors such as Packing Defendants would be ***buyers*** of Live Cattle Futures.  This would enable them to lock in prices and hedge against price increases.[274]

394.    Packing Defendants' specific trades in Live Cattle Futures and options are not known or knowable at this time as Defendants do not reveal this information. Futures market participants do not know who their counterparties are.  The CME maintains the trade data of its customers – including Packing Defendants – in strict confidence.  The CFTC also does not reveal this information.

395.    Reports published by the CFTC and the USDA include information regarding open interest and trading volume, generally.  This information does not identify which specific market participants are responsible for which trades or open interests. Likewise, the CME, CFTC, and USDA do not identify the activity of beef packers as a group with respect to Live Cattle Futures and options.

396.    Data obtained from the CFTC pursuant to a Freedom of Information Act ("FOIA") request indicates that certain of Packing Defendants deviated from traditional and legitimate hedging strategies (through which they would be buyers of Live Cattle

---

[274]    *See Introduction to Agriculture: Livestock Hedging and Risk Management, Livestock Hedging and Risk Management*, CHICAGO MERCANTILE EXCHANGE, https://www.cmegroup.com/education/courses/introduction-to-agriculture/livestock/ livestock-hedging-and-risk-management.html.

Futures) during the Class Period.  Instead, these Defendants amassed significant short positions, or in other words, they were *sellers*, in Live Cattle Futures.  Such a fundamental shift in futures market activity by packers could only have been intended to suppress the price of Live Cattle Futures and physical cash cattle, and to profit from the suppression of physical cattle prices.

397.    On January 23, 2020, Plaintiffs received data from the CFTC showing the Commitments of Traders Reports ("COT Reports")[275] from November 1, 2016, to December 17, 2019.   These reports provide more granular categories of market participants, although they do not identify the names of the market participants.   On information and belief, the COT Reports classified the Packing Defendants as "Livestock Slaughterers."[276]

---

[275]    The CFTC publishes Commitments of Traders Reports ("COT Reports") to help the public understand market dynamics.  Specifically, the COT Reports provide a breakdown of open interest for futures and options on futures markets.  Open interest refers to the total number of futures contracts that have been entered into and not yet liquidated by an offsetting transaction or fulfilled by delivery.  The COT Reports ordinarily published by the CFTC only include broad categories of marketing participants such as "commercial," "non-commercial," and "managed money."

[276]    The CFTC's COT Report classifications include: (i) "Livestock Feeder" (*e.g.*, cattle feeders), (ii) "Livestock Slaughterer," or (ii) "Other Livestock" (*e.g.*, cow/calf operator, meat processor, warehouseman, restaurant chain).  *See  CFTC Form 40: STATEMENT OF REPORTING TRADER*, CFTC, at Schedule 1, https://www.cftc.gov/sites/default/files/idc /groups/public/@forms/documents/file/cftcform40.pdf; Ing-Haw Cheng, et al., *Convective Risk Flows in Commodity Futures Markets*, NATIONAL BUREAU OF ECONOMIC RESEARCH, March 2012, at 33-34, https://www.nber.org/papers/w17921.pdf; Michael S. Haigh, et al.*, Price Dynamics, Price Discovery and Large Futures Trader Interactions in the Energy Complex* (working draft), CFTC, April 28, 2005, at 6 https://www.cftc.gov/sites/default/files/files/opa/press05/opacftc-managed-money-trader-study.pdf.

398.    The COT Reports evidence the open interest in both long and short futures and options for Livestock Slaughterers, as well as their net overall positions (*i.e.*, long positions minus short positions).  These COT Reports also show the percentage of long and short open interest that each class of traders (*e.g.*, Livestock Slaughterers) accounts for in the market.

399.    For example, on June 5, 2017, the COT Report demonstrates open interest of 471,011 Live Cattle Futures contracts.   Livestock Slaughterers (*i.e.*, the Packing Defendants) had long positions of 2,018 (0.4% of overall long open interest) and short positions of 70,780 (15.0% of overall short open interest), for an overall net short position of 68,762 Live Cattle Futures contracts.  There is no legitimate economic rationale to explain why the Packing Defendants would be ***sellers*** of cattle in the futures market.

400.    According to the COT Reports, Livestock Slaughterers/Packing Defendants were consistently short Live Cattle Futures contracts throughout the entirety of the three-year period.[277]

401.    The following chart demonstrates that during the period between November 2016 and December 2019, Livestock Slaughterers/Packing Defendants established net short Live Cattle Futures positions.  In other words, Livestock Slaughters held more outstanding short contracts than long contracts.  Indeed, COT Reports demonstrate that the Livestock Slaughterers were overwhelmingly short, with short positions exceeding their long positions by an average of over 7.5 to 1 during this period.  The data are consistent

---

[277]    Reports for periods prior to 2016 have not been produced by the CFTC.

throughout the entire range: Livestock Slaughterers were short Live Cattle Futures Contracts throughout the entire 3-year period:

**Figure 49: Slaughterer Net Position - CME Live Cattle Futures**



402.   The Live Slaughterers' net short position reflected in Figure 49 is consistent with Packing Defendants' overarching goal of suppressing the price of physical cattle prices.   As discussed above, the price of Live Cattle Futures is inextricably linked to physical cattle.   *See* ¶¶386-387 above.   When Packing Defendants suppressed the price of Live Cattle Futures by establishing large short futures positions, the suppression is reflected in the price of physical cattle.

403.   As set forth above, neither the CME nor Packing Defendants publicly disclose the individual Packing Defendants' positions in CME Live Cattle Futures.

Anecdotal evidence exists, however, demonstrating that the individual Packing Defendants established net short positions in Live Cattle Futures during the Class Period.  For example, Tyson reported it had short derivative positions in multiple earnings reports.[278]  In Tyson's 2018 First Quarter Earnings Report, it reported that it was short $13 million in derivatives not designated as hedging.[279]  Tyson separates its forward contracts from its other derivatives in its earnings reports and uses forward contracts extensively to procure physical cattle.

404.  Similarly, JBS frequently disclosed that it maintained short derivatives positions throughout the class period.  For example, JBS S.A., announced in its Third Quarter 2018 Earnings Report that it held a net short position of -181,080,000, Brazil Real in cattle futures.[280]  In the same report, JBS disclosed that it also had a short position in Live Cattle Futures in the third quarter 2017.[281]  JBS's financial reports also indicate a high level of commodities, derivatives, and futures trading.[282]

---

[278]    *See, e.g.,* Tyson Foods, Inc., Quarterly Report (Form 10-Q) at 19 (Feb. 8, 2018) (short $13 million); Tyson Foods, Inc., Annual Report (Form 10-K) at 66 (Nov. 12, 2019) (short $26 million).

[279]    Tyson Foods, Inc., 2018 Q-1 10-K, *supra* n.278,  at 19.

[280]    *See, e.g.*, JBS S.A. Condensed financial statements and Independent auditors report as of September 30, 2018, at 44 (Nov. 13, 2018), https://mz-filemanager.s3. amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-resultadosrelatori os-cvmcentral-de-downloads/4ce5180b5f8cbb44aac53fb14bdcb003cb0e2ebfd3b4f9f2f67 3c21ef8513ea2/3q18_financial_statements.pdf.

[281]    *Id.*

[282]    *Id.* at 46.

405.   National Beef disclosed in its 2016 and 2018 Annual Reports that it maintained a short position in derivatives.[283]   National Beef's "derivatives" disclosures include both forward physical cash cattle purchases as well as live cattle exchange-traded futures contracts.

### 1.   Packing Defendants Established Net Short Positions in the Live Cattle Futures Markets to Suppress Cash Cattle

406.   Armed with the knowledge of the relationship between physical cattle prices and futures prices, Futures Trading Defendants established these large net short positions in order to suppress the prices of Live Cattle Futures and physical, cash cattle.  Large short positions drive down futures and cash prices.[284]  Futures Trading Defendants' short positions allowed Packing Defendants to purchase cash cattle at suppressed prices.

407.   In addition to cash cattle, formula contracts in the physical market often refer to and directly incorporate fed cattle sold in the "cash" market, *see* Section IV above, and the futures market, as explained below.  By suppressing Live Cattle Futures and cash prices, Defendants also artificially suppressed physical cattle obtained through their captive supply (forward) agreements tied to the cash cattle market.

---

[283]     *Supra*, n.257.

[284]     *See, e.g.*, Doojin Ryu, *The Information Content of Trades: An Analysis of KOSPI 200 Index Derivative*s, 35 J. FUTURES MKTS. 201 (2015) (study of Korean futures trading has permanent price impact on subsequent prices); Robert W. Holthausen, *Large-block transactions, the speed of response, and temporary and permanent stock-price effects*, 26 J. FIN. ECON. 71 71-95(1990) (Demonstrating that of the price effect associated with large trades is permanent and is related to order size).

2.   **Packing Defendants Established Net Short Positions in the Live Cattle Futures Markets to Suppress the Price of Cattle Purchased Under Forward Contracts**

408.   Similarly, during the Class Period, each of the Packing Defendants relied on forward contracts to procure physical cattle.  *See* Section IV above.  This reliance on forward contracts gave the Futures Trading Defendants' motive to manipulate the Live Cattle Futures market.  Forward contracts refer to the prices of Live Cattle Futures settling in the month of or adjacent to the expected delivery date.  Thus, a Defendant who established a large short position in the futures market would be suppressing prices that the Defendant would have to pay for cattle under such forward contracts.  Packing Defendants intentionally suppressed the price of Live Cattle Futures contracts to acquire physical cattle under forward contracts.

F.   **The Futures Trading Defendants Lacked the Commercial Need to Establish Short Positions**

409.   Futures Trading Defendants established these short positions without the commercial need to do so.  As discussed above (*see* Section IX(B)), Packing Defendants disclose their use of Live Cattle Futures for, *inter alia*, hedging purposes.  In general terms, the CME explains that "[f]eed lot operators, meat packers and importers and others who expect to acquire livestock and meat products in the future have a short cash position."[285]

410.   The CME explains that a hedging meat packer will want to protect against the risk of rising physical prices by purchasing futures contracts (*i.e.*, long positions).

---

[285]   *Introduction to Agriculture: Livestock Hedging and Risk Management, Livestock Hedging and Risk Management*, *supra* n.274.

Packers hedge to mitigate risk: "[s]ince the cash and futures prices tend to move up and down together, any gains or losses in the cash market will be counterbalanced with gains or losses in the futures market."[286]

411.   According to the CME, "[a]t all times during the life of a long hedge, the futures market position has to be opposite the cash market position.  For a long hedge, the initial cash market position is short the physical livestock or product, which means they do not currently own it but will need to buy it in the future." [287]   The CME illustrates why a hedging meat packer, using a hog slaughterer as an example, would be long in the futures market:

> For instance, a meat packer expecting to purchase hogs for **processing** would be concerned about an increase in hog prices before he is ready to purchase the stock he needs.  He would lock in a purchase price **by taking a long position in the Lean Hog futures market**.  In other words, they would buy Lean Hog futures contracts now and sell them later when he is ready to purchase the hogs that he needs.[288]

[Emphasis added].

412.   Given that meat packers, including Packing Defendants, have short positions in the physical cash cattle market, they would have a compelling, inherent economic incentive to enter into *long* positions in the Live Cattle Futures market to hedge the risk of rising physical cattle prices.

---

[286]    *Id.*

[287]    *Self-Study Guide to Hedging with Livestock Futures and Options* (Version 17), *supra* n.236, at 25.

[288]    *Introduction to Agriculture: Livestock Hedging and Risk Management, Livestock Hedging and Risk Management*, *supra* n.274.

### G.    Allegations Derived from CFTC Whistleblower

413.    A January 5, 2018 whistleblower complaint filed with the CFTC Division of Enforcement illustrates how the aggressive and manipulative selling of CME Live Cattle Futures contracts suppresses prices of cash cattle and futures contracts.  The complaint alleges manipulation in "the final 20 minutes of trade [sic] on January 5th[,] 2018 and during the pre-open and initial minutes of trad[ing] on January 6th."  Specifically, the whistleblower alleges manipulation of the February 2018 Live Cattle Futures contract, stating that "nearly 1600 contracts crossed the bid in aggression [] in the [sic] closing minutes on the 5th" and that "packers were able to purchase physical cattle at much lower than anticipated prices after the break in the futures." [Emphasis added].  Plaintiffs reviewed price data and confirmed that prices dropped from $123.635 on Thursday, January 4 to $116.785 on Monday, January 8.  This conduct demonstrates that an unidentified actor suppressed Live Cattle futures prices based upon the relationship between the cash market and futures, which allowed market participants to buy physical cattle at suppressed prices.

414.    The whistleblower identified itself as a rancher with 20,000 head of cattle whose customers and family suffered "losses in the hundreds of thousands."  The whistleblower alleged that the manipulation occurred in "abusive order types after Tuesday's reporting period that often results in a disappointing cash cattle trade and excessive packer margins."

## X.     CLASS ACTION ALLEGATIONS

415.     Plaintiffs bring this action on behalf of themselves, and, under Rules 23(a)

and (b) of the Federal Rules of Civil Procedure, on behalf of all members of the following

two classes:

> **Producer Class**
> All persons or entities within the United States that directly sold to a Defendant one
> or more fed cattle for slaughter during the Class Period other than on a cost-plus
> basis.
>
> **Exchange Class**
> All persons who transacted in Live Cattle futures and/or options traded on the CME
> or another U.S. exchange during the Class Period.[289]

416.     Excluded from both Classes are Defendants and their officers, directors,

management, employees, subsidiaries, and affiliates.  Also excluded is the Judge presiding

over this action, his or her law clerks, spouse, and any person within the third degree of

relationship living in the Judge's household and the spouse of such a person.

417.     "Fed cattle" means steers and heifers, whether beef breeds or Holsteins,

which are raised and fed specifically for beef production.  "Class Period" means the period

from January 1, 2015 through the present.  "Cost-plus basis" means an agreement to sell

fed cattle at a price determined by the producers' costs of production without regard to

prevailing cash cattle prices.

---

[289]     The Exchange Class includes persons who established positions prior to the
commencement of the Class period but who closed out or stood for delivery on these
positions after the Class Period commenced.  As noted below, Plaintiffs reserve the right
to amend the Class definitions as the litigation progresses to include, by way of example
and not limitation, all persons who transacted in CME feeder cattle futures and options
during the Class Period.

418. Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Producer Class are readily identifiable from information and records in the possession of Packing Defendants or third parties. Members of the Exchange Class are readily identifiable from information and records in the possession of the CME, or capable of identification via third parties.

419. Plaintiffs' claims are typical of the claims of the members of both Classes. Plaintiffs and members of both Classes were damaged by the same wrongful conduct of Defendants.

420. Plaintiffs will fairly and adequately protect and represent the interests of members of both Classes. The interests of Plaintiffs are coincidental with, and not antagonistic to, those of members of the Classes. Producer Plaintiffs and all members of the Producer Class are similarly affected by Packing Defendants' wrongful conduct in that they received artificially low prices for fed cattle sold to Packing Defendants. Exchange Plaintiffs and all members of the Exchange Class are similarly affected by Defendants' course of conduct in violation of the CEA.

421. Plaintiffs are represented by counsel with experience in the prosecution and leadership of class action antitrust, commodities manipulation, and other complex litigation, including class actions in the financial services industry.

422. Questions of law and fact common to the members of both Classes predominate over questions that may affect only individual members, thereby making relief with respect to members of both Classes as a whole appropriate. Questions of law and fact common to members of the Classes include, but are not limited to:

a.      whether Packing Defendants engaged in a combination and conspiracy among themselves to fix, depress, suppress, and/or stabilize the prices of fed cattle purchased in the United States;

b.      whether Packing Defendants engaged in a combination and conspiracy among themselves to allocate the market for the purchase of fed cattle offered for sale in the United States;

c.      the identity of the participants in the alleged conspiracy;

d.      the duration of the alleged conspiracy and the acts carried out by Packing Defendants in furtherance of the conspiracy;

e.      whether Packing Defendants' alleged conspiracy violated federal antitrust laws;

f.      whether Packing Defendants' alleged conspiracy and/or course of business violated the Packers and Stockyards Act;

g.      whether Defendants' conduct violated Sections 6(c)(3), 9(a) and 22 of the CEA;

h.      whether Defendants' conduct violated Sections 6(c)(1) and 22 of the CEA;

i.      whether Defendants acted to aid and abet violations of the CEA;

j.      whether John Doe Defendants' unlawful conduct caused cognizable legal injury under the CEA;

k.      whether Plaintiffs and members of the Classes suffered injury;

l.     the amount of damages suffered by Plaintiffs and members of the Classes; and

m.    the appropriate type and scope of injunctive and related equitable relief.

423.   A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all members of the Classes is impracticable.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many members of the Classes who could not afford individually to litigate claims such as those asserted in this complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

424.   Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

425.   Plaintiffs have defined members of the Classes based on currently available information and hereby reserve the right to amend the definitions of members of the Classes, including, without limitation, the length of the Class Period.

## XI.   STATUTE OF LIMITATIONS AND TOLLING

### A.   Continuing Violation

426.   Plaintiffs' Sherman Act claim and their claim arising under the Packers and Stockyards Act, both of which are subject to a four-year statute of limitations period, are timely under the continuing violations doctrine.  Plaintiffs' first complaint was filed in this action on April 23, 2019.  The conspiracy alleged above began at least as early as January 1, 2015 and continued into the non-time-barred class period, April 23, 2015 and beyond.

427.   This complaint alleges numerous conspiratorial acts and parallel conduct by each Packing Defendant occurring within the four-year statutory period.  *See* Sections V and VI above.

428.   As a result of the anticompetitive conduct challenged in this complaint, throughout the Class Period and to the present, Packing Defendants were able to and did (i) purchase cash cattle at artificially suppressed cash prices, (ii) purchase cattle at artificially suppressed prices pursuant to formula, forward, and/or negotiated grid contracts, and (iii) transact in Live Cattle futures and options at artificially suppressed prices.

429.   Producer Plaintiffs and members of the proposed Producer Class sold cattle directly to Packing Defendants at prices artificially suppressed by the conduct challenged in this complaint throughout the Class Period.  That conduct also caused the Exchange Plaintiffs and members of the Exchange Class to transact Live Cattle futures and options at artificial prices, either when opening a position, closing a position, or both.

430.   Thus, each Packing Defendant's purchase of fed cattle at artificial and non-competitive prices constituted a new overt act causing injury to the proposed Classes.

431.   Accordingly, Producer Plaintiffs, Exchange Plaintiffs, and members of the proposed Classes were injured and may recover for damages suffered at any point in the conspiracy.

432.   Packing Defendants' unlawful acts and practices described above continue to this day.

### B.    Inquiry Notice and Due Diligence

433.   The CEA claims are timely under the two-year statute of limitations applicable to those claims because this case was commenced within two years of the date that Plaintiffs knew, or in the exercise of due diligence should have known, of the existence of the violation.  Specifically, Plaintiffs, despite their diligence as described below, did not learn, and could not have learned, of Packing Defendants' misconduct until late January 2019, when Witness 1 stepped forward and shared with Plaintiffs details of Packing Defendants' express agreement.

434.   After the collapse in fed cattle prices in 2015, Plaintiffs exercised due diligence by taking necessary steps to request a governmental investigation into these matters and Packing Defendants' conduct.  Specifically, on January 5, 2016, Plaintiff R-CALF USA, in an effort to address market interest of U.S. cattle producers (members of

the putative Classes), requested the U.S. Senate Committee on the Judiciary to investigate the decline in fed cattle prices and the volatility in the Live Cattle futures market.[290]

435.    While R-CALF USA's request contributed to the publication of the GAO Report in April 2018,[291] that report did not reveal Packing Defendants' anticompetitive conduct.  As noted above at paragraph 283, the GAO had limited investigative authority and "did not obtain and review internal packer documents."  Its report therefore explicitly did not consider whether Packing Defendants engaged in anticompetitive behavior of the kind complained herein.

436.    R-CALF USA continued its due diligence and on September 10, 2018, it requested the Division of Enforcement of the CFTC to investigate packer-related or packer-directed trading activities.[292]

437.    Despite these diligent efforts, neither R-CALF USA nor any of the other Plaintiffs had actual or constructive knowledge of Defendants' manipulation of fed cattle prices, or their intent to cause artificial futures prices until well after April 24, 2017 (two

---

[290]    Letter from Bill Bullard, CEO, R-CALF USA, to Sen. Charles E. Grassley, Chairman of the Sen. Comm. on the Jud. 2 (Jan. 5, 2016), https://perma.cc/Z5U4-948P.  As a board member of R-CALF USA since January 2019 and a member since 2002, Plaintiff Nelson assisted with R-CALF USA's efforts to prompt governmental investigations.  As members of R-CALF USA throughout the Class Period, Plaintiffs Chambers, Lucky 7 Angus, and Chuck Weinreis, supported R-CALF USA's efforts in relation to the same.

[291]    Letter from Sen. Chuck Grassley, Chairman of the Senate Committee on the Judiciary, et al., to Hon. Gene L. Dodaro, Comptroller General of the United States (Apr. 20, 2016), https://r-calfusa.com/wp-content/uploads/2013/04/160420-Senate-Judiciary-GAO-Letter.pdf.

[292]    Letter from Bill Bullard, CEO, R-CALF USA, to Saadeh A. Al-Jurf, Senior Trial Attorney, U.S. CFTC (Sept. 10, 2018), https://www.r-calfusa.com/group-asks-cftc-investigate-packer-trades-specific-dates-led-record-packer-margins-2/.

years prior to the commencement of the action).  Plaintiffs and members of both Classes have acted diligently in seeking to bring their claims promptly.

438.    Accordingly, all of Plaintiffs' claims are timely.

**C.    Fraudulent Concealment**

439.    Although tolling through fraudulent concealment is not necessary to render Plaintiffs' claims timely, the doctrine applies here because Packing Defendants fraudulently concealed their misconduct through their own affirmative acts.

440.    Packing Defendants took affirmative steps to actively conceal their violations of law from Plaintiffs and both Classes by, among other matters, (i) giving false or pre-textual reasons for low fed cattle prices; (ii) offering pre-textual justifications for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade; (iii) explicitly and implicitly representing that the fed cattle bids and contract terms Packing Defendants offered Plaintiffs and the Producer Class were the product of honest competition and not a conspiracy; (iv) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws; and (v) misrepresenting the nature of their agreements (and purported adherence to competitive safeguards) to government officials and to the public.

441.    Specifically, as alleged above, although each Packing Defendant directed its field buyers and other staff to drive past its competitors' plants to determine and report upon those plants' operating levels (for example, whether the plant had reduced labor hours or was operating on Saturday), Tyson (and on information and belief, each of the other Defendants) had policies that precluded these directives, and the resulting reports

about their competitors' operations, from being put into writing.  Such communications were effectuated through phone calls only.

442.  In addition, as alleged above, Packing Defendants offered pre-textual justifications for low fed cattle prices, plant closures, slaughter reductions, withdrawal from the cash cattle trade and their improved financial performance.  Examples include, *inter alia*:

- In its SEC filings between 2015-2018, Tyson Foods stated that its U.S. fed cattle business had "limited or no control" over the production and pricing of cattle, rather, the price is "determined by constantly changing market forces of supply and demand."[293]

- Tyson Foods stated, "[t]he Beef segment earnings improved . . . due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."[294]

- Statements by JBS executives throughout 2016 and into 2017 claiming that its strong financial performance in the United States was due to "more cattle available in the U.S.,"[295] "cattle price[s] . . . [being] back to the normal level,"[296] "greater cattle availability,"[297] and "strong demand for beef."[298]

---

[293]    Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report (Form 10-K) at 6 (Sept. 30, 2017); Tyson Foods, Inc., Annual Report (Form 10-K), at 7-8 (Sept. 29, 2018).

[294]    Tyson Foods, Inc., Annual Report (Form 10-K) at 23 (Oct. 1, 2016); *see also* Tyson Foods, Inc., Annual Report (Form 10-K), at 23 (Sept. 30, 2017) ("The Beef segment experienced strong export demand and more favorable domestic market conditions associated with an increase in cattle supply."); Tyson Foods, Inc., Annual Report (Form 10-K), at 25 (Sept. 29, 2018) (same).

[295]    JBS, Q2 2016 Earnings Call (Aug. 11, 2016).

[296]    JBS, Q3 2016 Earnings Call (Nov. 16, 2016).

[297]    JBS, Q1 2017 Earnings Call (May 16, 2017).

[298]    JBS, Q2 2018 Earnings Call (Aug. 15, 2018).

- In its 2017 Annual Report, Cargill reported that "favorable market conditions in North America" were simply the product of "[r]enewed consumer demand for beef . . . ."[299]

- In October 2016, Jefferies Financial Group, speaking for National Beef, touted that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected the market for fed cattle" when explaining how "[f]rom June 27, 2015 to June 25, 2016, the average market price per pound of fed cattle has fallen from $1.48 to $1.16."[300]

- Marfrig executives, speaking for National Beef, stated on the company's earnings call for the third quarter of 2018 that "the U.S. beef industry has delivered record results" thanks to "an ample supply of cattle" and "strong demands [sic] in both the domestic and international markets."[301]

443.   At the same time, Packing Defendants publicly stated in their Annual Reports and other public documents that they complied with the antitrust laws and the laws and regulations that support fair competition and integrity in the marketplace, and that they act ethically and with integrity, all while colluding to suppress fed cattle prices for their own benefit and at the expense of the Classes.

444.   Because of Packing Defendants' fraudulent concealment, Plaintiffs and Class Members had insufficient information concerning Packing Defendants' misconduct

---

[299]   Cargill, Inc., 2017 Annual Report at 1, https://www.cargill.com/doc/1432094802973/2017-annual-report.pdf.

[300]   Leucadia National Corporation (Jefferies Financial Group), 2016 Investor Meeting Presentation at 53 (Oct. 5, 2016).

[301]   Marfrig, Q3 2018 Earnings Call (Nov. 6, 2018).  As pleaded above, Jefferies and Marfrig both owned a controlling share of National Beef for portions of the Class Period and shared a unity of corporate interest and operated as part of a single enterprise with National Beef during those periods.  On information and belief, National Beef was the original and knowing source of every pre-textual public statement ostensibly made by Jefferies and/or Marfrig to conceal Defendants' conspiracy.

on which to base a complaint until January 2019, when Witnesses 1 stepped forward with confidential information regarding Packing Defendants' express agreement.

445.    Accordingly, the applicable statutes of limitations on Plaintiffs' claims were tolled.  Defendants are also equitably estopped from asserting any statute of limitations defense.

## XII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### PRICE-FIXING IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §1
### (Alleged Against All Packing Defendants)

446.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

447.    During the Class Period, Packing Defendants controlled the slaughter of fed cattle in the United States and thus the available marketing outlets for fed cattle producers. Packing Defendants were horizontal competitors in the market for the purchase of fed cattle.

448.    From at least January 1, 2015 and continuing to the present, the exact dates being unknown to Plaintiffs, Packing Defendants engaged in a continuing agreement, understanding, and conspiracy in an unreasonable and unlawful restraint of trade to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.  Packing Defendants' conspiracy is a *per se* violation of federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

449.   Packing Defendants' conspiracy and the resulting impact on fed cattle prices received by producers occurred in and affected U.S. interstate commerce.

450.   As a material and proximate result of Packing Defendants' unlawful conduct, Producer Plaintiffs and members of the Producer Class have suffered injury to their business or property.  These injuries include, but are not limited to, receiving artificial and non-competitive prices for fed cattle sold to Packing Defendants.  Producer Plaintiffs and the Producer Class were also deprived of the benefits of free and open competition in the market for the purchase of fed cattle.  Producer Plaintiffs and members of the Producer Class are each entitled to treble damages for Packing Defendants' violations of the Sherman Act alleged herein.

451.   As a material and proximate result of Packing Defendants' unlawful conduct, Exchange Plaintiffs and members of the Exchange Class have suffered injury to their business or property.  These injuries include, but are not limited to, transacting in Live Cattle futures and options at artificial and non-competitive prices.  Exchange Plaintiffs and members of the Exchange Class were also deprived of the benefits of free and open competition in the market for Live Cattle futures and options.  Exchange Plaintiffs and members of the Exchange Class are each entitled to treble damages for Packing Defendants' violation of the Sherman Act alleged herein.

452.   As a material and proximate result of Packing Defendants' unlawful conduct, R-CALF USA and NFU have suffered injury to their business and property.  These injuries include, but are not limited to, the frustration of their respective missions to protect the interests of their respective members, and diversion of their resources to: (a) help their

respective members mitigate the injuries incurred as a proximate result of Packing Defendants' unlawful conduct; and (b) to prevent further breaches of the law by the same.

453.     Producer Plaintiffs, Exchange Plaintiffs, R-CALF USA, NFU, and the members of the Producer Class and the Exchange Class are threatened with future injury to their businesses and property unless the injunctive relief requested is granted.

## SECOND CLAIM FOR RELIEF
## VIOLATIONS OF PACKERS AND STOCKYARDS ACT, 7 U.S.C. §§192 and 209
### (Alleged Against All Packing Defendants)

454.     Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

455.     Title 7 U.S.C. §192 provides, in pertinent part, "[i]t shall be unlawful for any packer with respect to livestock . . . to . . . (a) [e]ngage in or use any unfair, unjustly discriminatory, or deceptive trade practice or device; or . . . (e) [e]ngage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or (f) [c]onspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or (g) [c]onspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e)."

456.     Title 7 U.S.C. §209 further provides that, "[i]f any person subject to this chapter violates any of the provisions of this chapter . . . relating to the purchase, sale, or handling of livestock, . . . he shall be liable to the person or persons injured thereby for the

full amount of damages sustained in consequence of such violation."  Such liability may be enforced "by suit in any district court of the United States of competent jurisdiction[.]"

457.    Deceptive trade practices under the Packers and Stockyards Act are addressed in the Code of Federal Regulations in Part 201 of Title 9.  Section 201.70 states "[e]ach packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged."

458.    From at least January 1, 2015 and continuing to the present, the exact dates being unknown to Plaintiffs, Packing Defendants violated 7 U.S.C. §192(a), (e), (f), and (g) by engaging in a course of business and doing acts for the purpose or with the effect of reaching and implementing a conspiracy, combination, agreement, or arrangement to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle, with the purpose or with the effect of suppressing and reducing competition among purchasers of fed cattle.

459.    The effect and potential effect of these acts and this conspiracy, combination, agreement, or arrangement, was to fix, depress, suppress, stabilize, or otherwise artificially manipulate the price of fed cattle bought by Packing Defendants, with the purpose or with the effect of suppressing and reducing competition among purchasers of fed cattle.  Packing Defendants had no competitive or otherwise legitimate business justification for these acts and this conspiracy, combination, agreement, or arrangement.

460.    As a proximate result of Packing Defendants' breaches of the Packers and Stockyards Act, Producer Plaintiffs, R-CALF USA, NFU and the members of the Producer

Class have been injured and damaged in their respective businesses and property, including those injuries detailed at ¶¶450 and 452.

### THIRD CLAIM FOR RELIEF
### MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT
### 7 U.S.C. §§1, *ET SEQ.*, AND CFTC REGULATION 180.2, 17 C.F.R. §180.2
### (Alleged Against All Packing Defendants and John Does 1-10)

461.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

462.    During the Class Period, Packing Defendants, through their own conduct and through the conduct of John Does 1-10, each specifically intended to manipulate the prices of fed cattle, the physical commodity underlying the CME Live Cattle futures and options contracts, and specifically intended to manipulate the prices of CME Live Cattle futures and options.

463.    Packing Defendants, through their own conduct and the conduct of John Does 1-10, each had the ability to cause artificial prices in fed cattle and Live Cattle futures and options.  They did so through, among other things, their dominant position in the market for the purchase of fed cattle, their superior access to information and reporting mechanisms, their financial wherewithal, and their extensive involvement in the CME Live Cattle futures and options trading and delivery processes.

464.    Packing Defendants, through their own conduct and the conduct of John Does 1-10, in fact, each caused artificial prices in the physical fed cattle market as well as in Live Cattle futures and options markets.  Their conduct resulted in, among other things,

artificially low prices in the commodity underlying CME Live Cattle futures and options prices and in the Live Cattle futures and options prices themselves.

465.    Packing Defendants and John Does 1-10 therefore engaged in unlawful manipulation of CME Live Cattle futures and options and their underlying physical commodity in violation of Sections 6(c)(3), 7 U.S.C §9(3), 9(a) of the CEA, 7 U.S.C. §13(a), Section 22 of the CEA, 7 U.S.C. §25(a), and CFTC Rule 180.2, 17 C.F.R. §180.2.

466.    The manipulation by Packing Defendants and their conspirators and agents, including John Does 1-10, deprived Exchange Plaintiffs and the Exchange Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

467.    Exchange Plaintiffs and Exchange Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

### FOURTH CLAIM FOR RELIEF
### MANIPULATIVE AND DECEPTIVE DEVICE
### IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1, *ET SEQ.* AND CFTC REGULATION 180.1(A), 17 C.F.R. §180.1(a)
### (Alleged Against All Packing Defendants and John Does 1-10)

468.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

469.    Packing Defendants intended to affect or acted recklessly with regards to affecting prices of CME Live Cattle futures and options contracts and engaged in overt acts in furtherance of that intent.

470.    Packing Defendants intentionally or recklessly used or employed a manipulative device or artifice to defraud, and engaged in acts, practices, and/or courses of

business which operated as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the CEA, 7 U.S.C. §9, and Section 22 of the CEA (7 U.S.C. §25), and Regulation 180.1(a), 17 C.F.R. §180.1(a).

471.   Packing Defendants' conduct proximately caused injury to Exchange Plaintiffs and other members of the Exchange Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

472.   The manipulative and deceptive devices employed by Packing Defendants and their conspirators and agents, including John Does 1-10, deprived Exchange Plaintiffs and the Exchange Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

473.   Exchange Plaintiffs and Exchange Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

**FIFTH CLAIM FOR RELIEF**
**PRINCIPAL-AGENT LIABILITY**
**IN VIOLATION OF THE COMMODITY EXCHANGE ACT,7 U.S.C. §§1, *ET SEQ*. AND CFTC REGULATION 1.2, 17 C.F.R. §1.2**
**(Alleged Against All Packing Defendants and John Does 1-10)**

474.   Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

475.   Packing Defendants' traders, employees, and/or officers, and conspirators, including John Does 1-10, acted as agents for their principals, Packing Defendants, when engaging in the manipulation and manipulative and deceptive devices and schemes described herein.

476.   Packing Defendants are liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B) and Regulation 1.2, 17 C.F.R. §1.2, for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

477.   The principal-agent violations by Packing Defendants and their conspirators and agents, including John Does 1-10, deprived Exchange Plaintiffs and the Exchange Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

478.   Exchange Plaintiffs and Exchange Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

## SIXTH CLAIM FOR RELIEF
## AIDING AND ABETTING
## IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1, *ET SEQ.*
### (Alleged Against All Packing Defendants and John Does 1-10)

479.   Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

480.   Packing Defendants and John Does 1-10 knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein, including violations by the other Packing Defendants and John Does 1-10.

481.   Packing Defendants and John Does 1-10 did so knowing of their violations of the CEA and willfully intended to assist these manipulations, which resulted in CME Live Cattle futures and options prices, and their underlying physical commodity becoming artificial, during the Class Period.

482.    Through their aiding and abetting violations, Packing Defendants and John Does 1-10 violated Section 22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

483.    Exchange Plaintiffs and Exchange Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

## XIII.  PRAYER FOR RELIEF

484.    Plaintiffs, on behalf of themselves and members of the Classes, request relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that the Plaintiffs be named as Class Representatives, that the undersigned be named as Lead Class Counsel of both Classes, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Classes;

B.    That the Court enter an order declaring that Defendants' actions, as set forth in this complaint, violate the federal laws set forth above;

C.    That the Court award Plaintiffs and members of the Classes damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

D.    That the Court issue appropriate injunctive and other equitable relief, including structural relief, against Defendants;

E.    That the Court award Plaintiffs pre- and post-judgment interest;

F.    That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts; and

G.     That the Court award any and all such other relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

485.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all matters so triable.

Dated:  December 28, 2020

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**

/s Christopher M. Burke
Christopher M. Burke (*pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA  92101
Tel.:   619-233-4565
Fax:   619-233-0508
cburke@scott-scott.com

David R. Scott (*pro hac vice*)
Amanda F. Lawrence (*pro hac vice*)
Patrick J. McGahan (*pro hac vice*)
Michael P. Srodoski
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Tel.:   860-537-5537
Fax:   860-537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Joseph P. Guglielmo (*pro hac vice*)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue
17th Floor

219

New York, NY  10169
Tel.:   212-223-6444
Fax:   212-223-6334
jguglielmo@scott-scott.com

Anthony F. Fata (*pro hac vice*)
Christopher P.T. Tourek (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
Jennifer W. Sprengel (*pro hac vice*)
Kaitlin Naughton (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
150 S. Wacker
Suite 3000
Chicago, IL 60606
Tel.:   312-782-4882
Fax:   312-782-4485
afata@caffertyclobes.com
jsprengel@caffertyclobes.com
ctourek@caffertyclobes.com
boconnell@caffertyclobes.com
knaughton@caffertyclobes.com

Ellen Meriwether (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
 205 N. Monroe St.
Media, PA 19063
Tel.:   215-864-2800
Fax:   215-864-2810
emeriwether@caffertyclobes.com

*Interim Co-Lead Counsel for the Cattle
Plaintiffs*

K. Craig Wildfang (Bar No. 0117043)
Thomas J. Undlin (Bar No. 0183751)
Stacey P. Slaughter (Bar No. 0296971)
Geoff Kozen
Eric P. Barstad
**ROBINS KAPLAN LLP**
800 LaSalle Avenue

220

Suite 2800
Minneapolis, MN  55402
Tel:    612-349-8500
Fax:    612-339-4181
kcwildfang@robinskaplan.com
tundlin@robinskaplan.com
sslaughter@robinskaplan.com
gkozen@robinskaplan.com
ebarstad@robinskaplan.com

Kellie Lerner
**ROBINS KAPLAN LLP**
399 Park Avenue
Suite 3600
New York, NY  10022
Tel:    212-980-7400
Fax:    212-980-7499
klerner@robinskaplan.com

*Liaison Counsel for the Cattle Plaintiffs*

Eric H. Gibbs (*pro hac vice*)
Michael L. Schrag (*pro hac vice*)
Joshua Bloomfield (*pro hac vice*)
George Sampson (*pro hac vice*)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Tel:    (510) 350-9700
ehg@classlawgroup.com
mls@classlawgroup.com
jjb@classlawgroup.com
gws@classlawgroup.com

David E. Kovel (*pro hac vice*)
Thomas W. Elrod *(pro hac vice)*
Karen Lerner (*pro hac vice*)
Anthony E. Maneiro (*pro hac vice*)
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Tel:    (212) 371-6600
dkovel@kmllp.com
telrod@kmllp.com

221

klerner@kmllp.com
amaneiro@kmllp.com

Richard M. Paul III  (*pro hac vice*)
Sean Cooper  (*pro hac vice forthcoming*)
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Tel:    (816) 984-8100
Rick@PaulLLP.com
Sean@PaulLLP.com

Melissa S. Weiner (Bar No. 0387900)
Joseph C. Bourne (Bar No. 0389922)
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Tel:    (612) 389-0600
mweiner@pswlaw.com
jbourne@pswlaw.com

Bruce L. Simon (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Tel:    (415) 433-9000
bsimon@pswlaw.com

Daniel L. Warshaw (*pro hac vice*)
Bobby Pouya (*pro hac vice*)
Matthew A. Pearson (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Tel:    (818) 788-8300
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mapearson@pswlaw.com

*Plaintiffs' Executive Committee*

222