## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE CATTLE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | Case No. 0:19-cv-1222-JRT-HB |
| PETERSON, et al.,<br>　　　　　　　　　Plaintiffs,<br>　　　v.<br>JBS S.A., et al.,<br>　　　　　　　　　Defendants. | Case No. 0:19-cv-01129-JRT-HB |
| IN RE DPP BEEF LITIGATION<br><br>This document relates to:<br><br>ALL CASES | Case No. 0:20-cv-1319-JRT-HB |
| ERBERT & GERBERT'S, INC.,<br>　　　　　　　　　Plaintiff,<br>　　　v.<br>JBS USA FOOD COMPANY HOLDINGS, et al.,<br>　　　　　　　　　Defendants. | Case No. 0:20-cv-01414-JRT-HB |

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS THE COMPLAINTS BY DEFENDANTS JBS S.A., JBS USA FOOD COMPANY, JBS USA FOOD COMPANY HOLDINGS, SWIFT BEEF COMPANY, AND JBS PACKERLAND, INC.

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 4

I.      THE COMPLAINTS STATE CLAIMS AGAINST EACH JBS ENTITY ...................... 4

        A.      Plaintiffs State Claims Against Swift with Direct Evidence .................................. 6

        B.      Plaintiffs State Claims Against Packerland ............................................................ 8

        C.      Plaintiffs State Claims Against JBS USA ............................................................ 11

        D.      Plaintiffs State Claims Against JBS S.A. ............................................................. 14

II.     PLAINTIFFS' ALLEGATIONS AGAINST JBS ARE CONSISTENT WITH THEIR
        THEORY OF HARM ..................................................................................................... 15

III.    CATTLE PLAINTIFFS STATE A CLAIM UNDER THE COMMODITY EXCHANGE
        ACT ............................................................................................................................... 19

IV.     THE COURT HAS PERSONAL JURISDICTION OVER JBS S.A. .............................. 22

V.      PLAINTIFFS PROPERLY SERVED JBS S.A. ............................................................. 24

        A.      The Inter-American Convention Does Not Require that Cattle Plaintiffs Use
                Letters Rogatory .................................................................................................... 26

        B.      Under Brazilian Law, JBS S.A. Has Cured Any Defect of Service Through its
                Appearance in the Cattle Case .............................................................................. 28

CONCLUSION ............................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Dairy Farmers of Am., Inc.*,
  2010 WL 3893601 (D. Minn. Sept. 30, 2010) ..............................................21

*Anderson v. Dassault Aviation*, 361 F.3d 449 (8th Cir. 2004) ..........................23

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623 (9th Cir. 2018) ....... 4, 13

*City of Philadelphia v. Bank of Am. Corp.*,
  2020 WL 643030 (S.D.N.Y. Nov. 2, 2020) .....................................................8

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) ..........................4

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018) ......................23

*Clune v. Alimak AB*, 233 F.3d 538 (8th Cir. 2000) ..........................................23

*Epps v. Stewart Information Servs. Corp.*, 327 F.3d 642 (8th Cir. 2003) ........................23

*Fraserside IP LLC v. Letyagin*, 280 F.R.D. 630 (N.D. Iowa 2012) ..................................25

*H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531 (8th Cir. 1989) ..................................14

*In re BRF, S.A. Sec. Litig.*, 18-cv-2213, 2019 WL 257971 (S.D.N.Y. Jan. 18, 2019) ......28

*In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017).............. 15, 16

*In re Bulk Popcorn Antitrust Litig.* (*Bulk Popcorn II*),
  783 F. Supp. 1194 (D. Minn. 1991) ..............................................................13

*In re Cattle Antitrust Litig.*, 2020 WL 5884676 (D. Minn. Sept. 29, 2020) ........... 1, 2, 3, 7

*In re GSE Bonds Antitrust Litig.*, 2019 WL 579179 (S.D.N.Y. Oct. 15, 2019) .................9

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696 (E.D. La. 2013) .... 13

*In Re Pork Antitrust Litig.*, 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ........................13

*In re Pork Antitrust Litig.*, 2020 WL 6149666 (D. Minn. Oct. 20, 2020)............... 3, 15, 18

*In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011) ........... 12

*Intelcav Cartões Ltda. v. Stmicroeletronics Inc*,
  Special Court of Brazilian Superior Court of Justice, February 13, 2019 .................... 28

*Iowa Pub. Empls.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  340 F. Supp. 3d 285 (S.D.N.Y. 2018) ............................................................................ 6

*Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634 (5th Cir. 1994) .................... 26

*MCMC v. VCN [Sec. of Justice]*,
  Special Court of Brazilian Superior Court of Justice, February 15, 2017 .................... 27

*Melea, Ltd. v. Jawer SA*, 511 F.3d 1060 (10th Cir. 2007) .................................................. 23

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ................................. 25

*Nuevos Destinos, LLC v. Peck*, 2019 WL 6481441 (D.N.D. Dec. 2, 2019) ..................... 26

*Personalized Brokerage Servs., LLC v. Lucius*,
  2006 WL 208781 (D. Minn. Jan. 26, 2006) .................................................................. 22

*Reg'l Multiple Listing Serv. of Minnesota., Inc. v. Am. Home Realty Network, Inc.*, 9 F. Supp. 3d 1032 (D. Minn. 2014) ................................................ 13, 14

*Roberts v. Michaels*, 219 F.3d 775 (8th Cir. 2000) .......................................................... 11

*Romak USA, Inc. v. Rich*, 384 F.3d 979 (8th Cir. 2004) .................................................. 23

*Roulo v. Keystone Shipping Co.*, 2018 WL 5619723 (D. Minn. Oct. 30, 2018) .............. 24

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015) ........................... 16

*Textor v. Bd. of Regents of N. Illinois Univ.*, 711 F.2d 1387 (7th Cir. 1983) .................. 23

*Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322 (4th Cir. 2013) ....................................... 23

*Viasystems, Inc. v. EBM-Papst St. Georgen GMBH & Co., KG*,
  646 F.3d 589 (8th Cir. 2011) ........................................................................................ 23

*Whitesell Int'l Corp. v. Amtek Auto Ltd*,
  2014 WL 12603144 (S.D. Iowa Feb. 19, 2014) ........................................................... 24

*Yellow Brick Rd., LLC v. Childs*, 36 F. Supp. 3d 855 (D. Minn. 2014) ........................... 22

## Statutes and Rules

7 U.S.C. § 25(a)(1) ............................................................................................. 20

7 U.S.C. § 25(a)(1)(D)(ii) .................................................................................. 20

Fed. R. Civ. P. Rule 4(f)(2)(A) ........................................................................... 27

## Other Authorities

5C Wright & Miller, Fed. Prac. & Proc. Civ. § 1334 (3d ed. & Aug. 2019 Supp.) .......... 27

Joost M. E. Pennings, Andres Trujillo-Barrera, & Geraldo Costa Jr., *Concentration and Liquidity Costs in Emerging Commodity Exchanges*, 43(3) JOURNAL OF AGRICULTURAL AND RESOURCE ECONOMICS 441-456 (2018), 10.22004/ag.econ.276504 .............................................................................. 21

## INTRODUCTION

Plaintiffs' amended Complaints cure the deficiencies the Court identified in its September 28, 2020 Order.[1]  *In re Cattle Antitrust Litig.*, Civil No. 19-1129 (JRT/HB), 2020 WL 5884676, at *5 (D. Minn. Sept. 29, 2020) ("*Cattle*").  As explained in Plaintiffs' Omnibus Opposition, Plaintiffs sufficiently detail the direct evidence Jason F. ("Jason" or "Witness 1") and Matt T. ("Matt" or "Witness 2") provided, and include Defendant-specific allegations of parallel conduct, including against JBS.

To begin with, Plaintiffs identify Jason, his employer, Swift, and how his work at Swift brought him into regular contact with James Hooker ("Hooker"), Fabrication Manager at Swift's Cactus, Texas plant.  The Complaints also provide detail about Hooker's contacts across the spectrum of JBS's beef business, including his direct connections with senior management of JBS's U.S. Fed Beef Business during the Class Period.  The Complaints explain that Hooker specifically told Jason about an "agreement" among all Defendants, including JBS, to cut slaughter volumes when prices were "too high."  Hooker was in frequent contact with friends and former colleagues at other Defendants' packing plants, including Defendants' nearby packing plants in Amarillo

---

[1]   All capitalized terms and acronyms not otherwise defined herein have the meaning ascribed in Plaintiffs' Omnibus Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Federal Claims filed contemporaneously herewith ("Omnibus Opposition" or "Omnibus Opp."), or the Cattle Complaint.  References to "ECF No." are to *In re Cattle Antitrust Litigation*, 19-cv-1222 (JRT/HB)' docket, unless stated otherwise.  All "¶_," "¶¶_," "Appendix," "Figure," and "Table" references are to the Cattle Complaint unless stated otherwise.  All references to "JBS.Br." are to JBS Defendants' Memorandum in Support of Their Motion to Dismiss (ECF No. 339).  References to "DPP," "Peterson," and "E&G" are references to the DPP, Peterson, and E&G Complaints, respectively.

(Tyson Fresh), Friona (CMS), and Liberal (National Beef). The Complaints describe how Hooker provided Jason with detailed information about other Defendants' current and future operations at those plants. These allegations alone are sufficient to state a claim against JBS.[2]

In addition to the direct evidence of collusive slaughter restraint provided by Jason, Plaintiffs also added additional detailed allegations from Matt, who provides direct evidence of a collusive procurement practice, the queuing convention. The queuing convention limited Producers' ability to generate price competition for their cash cattle, and was enforced by all Defendants, including Swift, at Matt's feedlot. The queuing convention was another means by which Defendants accomplished their goal of artificially driving down the price of fed cattle and maximizing the meat margin. *See Cattle*, 2020 WL 5884676, at *3, *5.

Moreover, Plaintiffs include allegations specific to JBS S.A., JBS USA, Packerland, and Swift to demonstrate their role in the conspiracy. Among other conduct, Plaintiffs use individualized data to lay out how JBS Defendants:

- set the stage for the conspiracy by idling their Nampa, Idaho plant and keeping it idle for years, effectively eliminating that capacity from the market, including through periods in which the meat margin reached historic highs;

- regularly changed their slaughter volumes in parallel with all Defendants throughout the Class Period, in a manner they had not done prior to the Class Period;

---

[2]     JBS Defendants are JBS S.A., JBS USA, Inc. ("JBS USA"), JBS Packerland, Inc. ("Packerland"), Swift Beef Company ("Swift"), and JBS USA Food Company Holdings ("Holdings").

- reduced their cash cattle purchases in parallel with all Defendants at key moments during the Class Period; and

- maintained their annual slaughter volume below the 2007-14 average throughout the Class Period, in parallel with other Defendants, despite record meat margins and opportunities to grow market share, and in contrast to Independent Packers.

Each of those allegations describe conduct JBS entities specifically undertook in parallel with the other Defendants. Though JBS quibbles about slight differences in the degree of conduct it undertook compared to other Defendants, the law does not support dismissal based on minor fluctuations in otherwise parallel conduct. And, when coupled with Plaintiffs' "undoubtedly strong" plus factors, *Cattle*, 2020 WL 5884676, at *6,[3] these new facts detailing JBS's participation in Defendants' parallel conduct "survive the relatively low bar of the pleading stage," even absent direct evidence. *In re Pork Antitrust Litig.*, Civil No. 18-1776 (JRT/LIB), 2020 WL 6149666, at *6 (D. Minn. Oct. 20, 2020) ("*Pork II*").

Finally, personal jurisdiction exists over JBS S.A. because it traded live cattle futures on the CME, is subject to conspiracy jurisdiction, and actively directed the conspiratorial conduct of the other JBS Defendants. In addition, Cattle Plaintiffs properly served JBS S.A. in Brazil in accordance with the requirements of Brazilian law in May 2019. Plaintiffs therefore request that the Court deny JBS's motion to dismiss in its entirety.

---

[3]     Unless otherwise noted, internal citations are omitted and emphasis is added.

## ARGUMENT

## I.   THE COMPLAINTS STATE CLAIMS AGAINST EACH JBS ENTITY

Plaintiffs allege that JBS Defendants "operated as part of a single enterprise in furtherance of the conspiracy." ¶55;[4] Sch.4. Antitrust law treats corporate affiliates as a "single enterprise" when they engage in "coordinated activity." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984). It is sufficient that "the conduct of the *enterprise* they jointly compose . . . be shown to satisfy the elements of a [claim]." *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 631 (9th Cir. 2018) (emphasis in original).[5] Each affiliate can be found liable for the enterprise's anticompetitive conduct if each "in fact participated in coordinated activity in furtherance of the alleged . . . conspiracy." *Id.* at 634.

Here, Plaintiffs plead specific facts demonstrating that each JBS entity operates as a part of the "greater JBS enterprise," that "purchase[d] and slaughter[ed] . . . cattle" and joined Defendants' conspiracy. ¶¶47-55, Appendix 1, ¶¶13-26; Sch.4. Specifically, Plaintiffs allege:

- JBS S.A. is not a mere holding company, rather it uses subsidiaries (JBS USA, Swift, and Packerland) to carry out its business activities, including the purchase and slaughter of cattle and the sale of beef. Absent creation or acquisition of these subsidiaries, JBS S.A. would have performed these functions itself;

---

[4]   This brief principally cites to the Cattle Complaint. Equivalent cites to the DPP, Peterson, and E&G Complaints can be found in Exhibit B to the Declaration of Patrick McGahan in Support of Plaintiffs Memorandum of Law in Opposition to Defendants' Joint Rule 12(b)(6) Motion to Dismiss Federal Claims. *See* Omnibus Opp. at 6 n.6.

[5]   JBS's request, JBS.Br. at 9-10, that this Court decline to follow *Arandell* is addressed in Plaintiffs' Opposition to Cargill and CMS's Joint Motion to Dismiss at §IV.

- JBS holds itself out as a single unified enterprise, and the operations and profits of JBS USA (and, by extension, its subsidiaries, Swift and Packerland) are co-mingled with discussion of the operations and profits of JBS S.A. on investor calls;

- JBS S.A. commonly refers to JBS USA as its "USA Beef business";

- JBS USA is the principal operating entity of JBS's U.S. beef business and purchased fed cattle directly from the Producer Class;

- Swift and Packerland owned and operated JBS's U.S. slaughter plants, and purchased fed cattle directly from the Producer Class at depressed prices;

- Swift and Packerland operated those plants under JBS S.A.'s complete control;

- JBS USA directs and oversees all of JBS's U.S. cattle procurement, slaughter and fabrication activities;

- The packing operations of Swift and Packerland are presented as those of JBS USA;

- The entire purpose of the subsidiaries is to carry out JBS S.A.'s directives; and

- JBS was the 100% owner of the subsidiaries and used them to sell beef in interstate commerce (DPP, ¶43).

¶¶47-55, Appendix 1, ¶¶13-26; Sch.4.  Indeed, JBS USA, Swift, and Packerland's own Rule 26 disclosures in this case show that JBS USA employees managed and oversaw Swift and Packerland on a day-to-day basis, in addition to procuring cattle at collusively depressed prices for slaughter at their plants.  Appendix 1, ¶¶20-23; Sch.4.

Thus, Plaintiffs do not, as JBS claims, engage in "improper group pleading." JBS.Br. at 2.  Rather, Plaintiffs have adequately alleged that **all** JBS Defendants – as constituent parts of a single economic entity operating JBS's Beef businesses in the U.S. – engaged in coordinated conduct that contributed to JBS's enterprise's participation in the

alleged conspiracy.[6]

### A.    Plaintiffs State Claims Against Swift with Direct Evidence

JBS half-heartedly argues in one paragraph that Plaintiffs' (admittedly) specific allegations against Swift somehow show it did not participate in the conspiracy. JBS.Br. at 13.   It meekly suggests Plaintiffs still have not provided enough details regarding Jason and Hooker, who both **worked at Swift's Cactus, Texas facility**, to tie Swift to the conspiracy.  JBS.Br. at 7; ¶¶101-02; Sch.8.  While employed by Swift in 2015, Jason learned about Defendants' collusion from James Hooker, Swift's fabrication manager, who admitted to him that Swift and the other Defendants had "an agreement" to reduce their purchase and slaughter volumes when prices for fed cattle became too high. ¶¶101, 104, 116-18; Sch.8; Omnibus Opp. at §II.A (addressing Defendants' attempts to parse Jason's allegations).

Jason's allegations cannot be casually dismissed in two sentences, as JBS tries to do.  JBS.Br. at 7.  Plaintiffs have now provided the information the Court previously found to be missing, including Jason's identity, his employer, job title, and responsibilities, as well as details relating to Hooker, who was in regular contact with both plant and corporate-level management at JBS, and with employees of all Defendants.  ¶¶101-22; Sch.8.  These facts render Jason's description of Hooker's admission sufficient in and of itself to

---

[6]    Therefore, it is not necessary to particularize which JBS entity engaged in each of the actions attributed to "JBS" in Plaintiffs' Complaints.  *Iowa Pub. Empls.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018) (permitted to name multiple affiliates while pleading allegations using a more generic name, such as "Credit Suisse").

plausibly allege Defendants' agreement.  Omnibus Opp. at §II.A.

Matt's allegations also provide direct evidence of collusive procurement practices imposed on his feedlot, and tie Swift directly to them.[7]  Defendants' conspiracy to suppress fed cattle prices and enlarge the meat margin was furthered by collusive procurement practices designed to suppress cash cattle price competition.  *See* Omnibus Opp. at §II.C. Matt provides a detailed eyewitness account of the operation of one collusive practice, the queuing convention, at his feedlot from 2012 until mid-2015 (six months into the Class Period).  ¶¶143, 159-69; Sch.11, 13.  Matt provides evidence linking each Operating Defendant, including Swift, to the queuing convention – a practice that the Court correctly described as "a concerted refusal to deal." *Cattle*, 2020 WL 5884676, at \*5; *see* Omnibus Opp. at §II.C.

Matt explains how, as manager of a Texas feedlot, he negotiated with field buyers from each Operating Defendant on a weekly basis – explicitly including two buyers from Swift, Mr. Miller and Mr. Canales.  ¶¶143, 166-67; Sch.11, 13.  Matt confirms that "each" Defendant field buyer he negotiated with – including Mr. Miller and Mr. Canales – required him to adhere to the "queuing convention" under threat of boycott, and that "each" of Mr. Miller and Mr. Canales communicated that threat to him.  ¶¶159, 161-166; Sch.13.  Indeed, Mr. Miller and Mr. Canales, like the field buyers from all Defendants, took steps to monitor Matt's adherence to the queuing convention, calling him weekly to confirm who bought

---

[7]      JBS's claim that Matt's direct evidence is "mismatched" to Defendants' alleged slaughter reduction and restraint, JBS.Br. at 7, is addressed in the Omnibus Opposition at §II.C.

his cattle that week on what terms.  ¶¶166, 310; Sch.30.

Matt also directly ties Mr. Canales to an anticompetitive "card-drawing" agreement whereby Mr. Canales and the field buyers from all Defendants jointly required that Matt grant the right to make the first bid under the queuing convention each week to the winner of a random card draw.  ¶170; Sch.13.  This card-drawing scheme conferred valuable rights on its winner and helped eliminate any remaining price competition among the field buyers. Omnibus Opp. at §II.C.

Taken as true, as they must be at the motion to dismiss stage, both Jason and Matt's allegations unquestionably tie Swift to the alleged conspiracy.

### B.    Plaintiffs State Claims Against Packerland

Plaintiffs allege that Packerland owns and operates JBS's U.S.'s fed cattle slaughter plants in Wisconsin, Michigan, Nebraska, Arizona, and Pennsylvania.   ¶50; Sch.4. Plaintiffs further allege that those plants slaughtered and processed Class members' fed cattle and contracted for transactions relating to those cattle at artificial rates.  *Id.*.   These entities, therefore, are at the center of Plaintiffs' allegations.   While JBS suggests the Court should disregard any of Plaintiffs' pleadings that require any inferences, Plaintiffs are not only entitled to a presumption of truth regarding the facts they allege, but also to all reasonable inferences that can be drawn from those facts. *City of Philadelphia v. Bank of Am. Corp.*, No. 19-CV-1608 (JMF), 2020 WL 6430307, at *8 (S.D.N.Y. Nov. 2, 2020) ("Taking all of Plaintiffs' allegations together and drawing all reasonable inferences in their favor, as the Court must … the Court concludes that Plaintiffs meet that burden on their federal antitrust claims.").

First and foremost, JBS ignores Hooker's admission that JBS's U.S. fed beef business agreed with other Defendants to reduce their slaughter volumes when prices were high.  Packerland formed part of JBS's U.S fed beef business that was comprised of JBS USA, Swift, and Packerland, and was run as a single economic enterprise.  ¶¶53, 55, Appendix 1, ¶¶13-15; Sch.4.  It is implausible "on its face that such an agreement would be limited to" the fed cattle bought by Swift, but not the fed cattle bought by Packerland. *In re GSE Bonds Antitrust Litig.*, No. 19-CV-1704 (JSR), 2019 WL 5791793, at *4 (S.D.N.Y. Oct. 15, 2019) (chats showing price fixing for one type of bond plausibly established an agreement to fix other related types of bonds).  Because Packerland's cash cattle purchases impacted the prices Swift and its co-Defendants paid for fed cattle, Packerland's fed cattle procurement and slaughter operations needed to be aligned with Swift's if Defendants were to benefit from their agreement to collectively manage their fed cattle slaughter volume.[8]  ¶¶10, 94-95, 155; Sch.7.

Second, JBS's attempts to parse the 2019 Packerland slaughter volume allegations fare no better.  JBS admits that both Packerland and Swift, like all Operating Defendants, raised their cash purchases in May, having maintained lower volumes for the first quarter as alleged.  JBS.Br. at 13; ¶¶247-52, Figures 29-30; Sch.21.  Nor does JBS dispute that both Packerland and Swift's absolute slaughter volumes also were lower in the first quarter

---

[8]     JBS's claim that Packerland was "differently-situated" is also misdirected. JBS.Br. at 12.  All Plaintiff stated was that Packerland typically purchases cattle at lower prices because it purchases a greater volume of Holstein (dairy breed) fed cattle, which typically trade at a discount to beef breed fed cattle.  It still participated in Defendants' slaughter restraint.

of 2019, consistent with the slaughter reductions of all Operating Defendants at this time. Figures 23-27. Rather, it asks the Court to draw an inference in its favor by claiming that such parallel conduct is merely to be "expected in the high-season of beef demand." JBS.Br. at 13. But this claim is both premature and contradicted by Plaintiffs' factual allegations. Omnibus Opp. at §II.B.1.

JBS also contends that Plaintiffs do not tie Packerland or Swift to Operating Defendants' efforts to reduce or restrain their cash cattle purchases in August and September to support each Operating Defendant's drastic expansion of the meat margin after the August 9, 2019 Holcomb fire. *Compare* JBS.Br. at 13 *with* ¶258, Figures 9, 29-30; Sch.21; *see also* DPP, ¶168. But Swift purchased less cash cattle in August than it did in the prior three months, and only marginally increased its volume in September before drastically increasing its volume in October and November to purchase the glut of cash cattle it helped create. Figure 29. Importantly, it offered the same prices as its co-Defendants, rather than offering more competitive prices to gain market share. Figure 9.

Packerland posted only modest increases in cash cattle in August and September (about ███ head apiece) before further increasing its volumes in October. Figure 30. Packerland's modest increases in its cash cattle volumes in August and September – which would not have dented the huge gap in demand for cash cattle created by Operating Defendants' reduced purchases – are consistent with it having made a conscious decision to support the other Operating Defendants' slaughter reductions and avoid placing upward pressure on cattle prices.

Third, Plaintiffs' quarterly estimates of Swift and Packerland's cumulative slaughter

volumes, contained in Figure 2 and addressed throughout the Complaints, also tie Packerland to the alleged parallel conduct.  Plaintiffs could not prepare separate estimates for Swift and Packerland as JBS's financial reports do not distinguish the two, consistent with these entities forming part of a single U.S. fed beef business.  However, the Court can reasonably infer that both Swift and Packerland acted in accordance with the movements represented in Figure 2.

The 2019 slaughter data, which is the only data presently available that distinguishes between Swift and Packerland's purchases, shows that both acted in accordance with Plaintiffs' allegations.  ¶¶247-62, Figures 24-25, 29-30; Sch.21.  Furthermore, if Packerland acted significantly differently from Swift and the other Defendants, one would expect Figure 2 to show Swift/Packerland's collective slaughter volumes moving in a manner inconsistent with Defendants. This is not what Figure 2 shows.

### C.   Plaintiffs State Claims Against JBS USA

Plaintiffs allege that JBS USA[9] operates JBS's U.S. beef business, and "directs and

---

[9]   Cattle Plaintiffs name "JBS USA Food Company" as a Defendant.  DPP, Peterson, and E&G direct allegations against JBS USA Food Company but mistakenly named JBS USA Food Company Holdings as a Defendant.  Each Complaint also named the correct entity in the Complaint itself.  *See* Peterson, ¶55; DPP, ¶77; E&G, ¶75.  Under Federal Rules of Civil Procedure 15(c)(1) and 4(a)(2), Peterson, DPP, and E&G should be allowed to amend their summons and Complaints to name the proper entity.  The claim against JBS USA Food Company would not change and, as such, the claim arises out of the same conduct from the original pleadings. Furthermore, the correct entity – JBS USA Food Company – has actual knowledge of these lawsuits by being served in *Cattle* and knows that it is the intended party.  As Defendant JBS notes, "The DPP, Erbert, and Peterson Plaintiffs name Holdings, instead of JBS USA Food Company . . ." JBS.Br. at 11. Finally, JBS USA Food Company Holdings and JBS USA Food Company share the same address.  As such, amendment and relation back are appropriate here to correctly name the proper

oversees all of JBS' U.S. cattle procurement, slaughter and fabrication activities and beef processing and sales operations."   ¶48; Appendix 1, ¶18; Sch.4.  Plaintiffs also allege that JBS USA was the principal operating entity of JBS's cattle and beef business and that JBS USA was the contracting entity for certain of JBS's purchases of fed cattle in the U.S.  ¶48, Appendix 1, ¶¶18, 21, 23; Sch.4.  JBS USA's executives actively participated in trade organizations, thus furthering the scheme: CEO André Nogueira's served as a director of the North American Meat Institute while JBS USA's head of risk management Marco Sampaio's attended the annual "AgCon" event.  ¶¶300-02, Appendix 1, ¶10; Sch.28.[10]

JBS argues that these facts are mere "conclusions."  JBS.Br. at 10-11.  This is incorrect.  Stating, for example, that JBS USA operates the Company's cattle procurement business, or is the contracting entity for certain of JBS's purchases of fed cattle, are statements of fact.  These statements are entitled to a presumption of truth on a motion to dismiss.  *In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 732 (E.D. Pa. 2011) ("The statement that Daybreak 'adopt[ed] UEP Certified guidelines to reduce chick hatch' constitutes just such a factual allegation that the Court thus must accept as true without an artificial or surgical parsing of the language Plaintiffs used.").

Further, Plaintiffs' allegations that JBS USA contracted for purchases of fed cattle

---

entity.  *See Roberts v. Michaels*, 219 F.3d 775, 778 (8th Cir. 2000) (allowing relation back of amendment "in cases where the plaintiff has sued a corporation but misnamed it").

[10]     JBS S.A. and JBS USA executives, including Wesley Batista, JBS S.A.'s then CEO, and Nogueira also had opportunities to collude with representatives of Tyson Foods and Cargill, Inc. while purchasing Tyson's Brazilian and Mexican poultry operations in December 2014 and June 2015 and Cargill's U.S. pork operations in mid-2015.  ¶303; Sch.28.

constitute direct conspiratorial conduct, because as a result of the conspiracy, those purchases were made at artificially fixed prices.  ¶48; Sch.4.  *Arandell*, 900 F.3d at 634-35 (subsidiaries' acts in selling gas at prices fixed by the parent company was sufficient to create a triable issue concerning its liability for the alleged anticompetitive conduct).  That Plaintiffs claim the majority of fed cattle bought by the JBS single entity were contracted for by Swift and Packerland does not change this fact.  JBS.Br. at 10; *cf.  In re Bulk Popcorn Antitrust Litig.*, 783 F. Supp. 1194, 1197 (D. Minn. 1991) (Magnuson, J.) ("*Bulk Popcorn II*") (finding at summary judgment, "[o]nce a conspiracy is established, even **slight evidence** connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement") (emphasis in original).  Plaintiffs thus plead that JBS USA contributed to JBS Defendants' participation in the alleged conspiracy, meeting the "direct and independent participation" standard under *Reg'l Multiple Listing Serv. of Minnesota., Inc. v. Am. Home Realty Network, Inc.*, 9 F. Supp. 3d 1032, 1045 (D. Minn. 2014) (Tunheim, J.) ("*MLS*").

Finally, JBS's contention that statements made by the CEO of JBS USA, Swift and Packerland, Mr. Nogueira, are irrelevant relies on a misstatement of this Court's ruling in *Pork I.*  There*,* this Court actually found exactly the opposite: "public statements are often considered relevant in determining whether a conspiracy was adequately alleged," *In Re Pork Antitrust Litig.*, Civil No. 18–1776 (JRT/HB), 2019 WL 3752497, at \*8 (D. Minn. Aug. 8, 2019) ("*Pork I*"), and may be considered as "plus factors" supporting the inference of conspiracy.  *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013) (listing "signaling" as one of many plus factors identified by courts). In

13

this context, Mr. Nogueria's statements praising Defendants' efforts to reduce slaughter capacity through plant closures, ¶194; DPP, ¶179, and confirming JBS's commitment to "balancing" their demand for cattle, DPP, ¶179, support Plaintiffs' conspiracy claims and ties JBS USA to them.

### D.      Plaintiffs State Claims Against JBS S.A.

JBS argues that JBS S.A. is itself not alleged to have participated in the conspiracy. This is not true.  In addition to the single entity doctrine discussed above, a plaintiff adequately states an antitrust claim against a parent entity when it alleges that the parent took specific action, separate and apart from the subsidiary's actions, that "generally furthered the alleged anticompetitive conspiracy."  *MLS*, 9 F. Supp. 3d at 1045; *see also H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1549 (8th Cir. 1989) (noting that a parent is liable for a subsidiary's anticompetitive conduct where it "actively influenced [the subsidiary] in its violations'').

That standard is not onerous.  It was met, for example, where a plaintiff alleged only that the parent sent a cease-and-desist letter to a competitor of the subsidiary, allegedly in an attempt to intimidate that competitor out of the market.  *MLS*, 9 F. Supp. 3d at 1045. There, this Court ruled that allegation alone amounted to "direct and independent participation in the alleged conspiracy," and was "sufficient to state a claim." *Id.*

Here, Plaintiffs allege that JBS S.A. took affirmative essential steps to conceal the conspiracy.  ¶¶200, 441-43, n.295-98; DPP, ¶¶263-69.  Plaintiffs further allege that JBS S.A., unlike in its cited cases, is ***not*** a mere holding company.  Appendix 1, ¶13; Sch.4. Rather, JBS S.A. established subsidiaries, including JBS USA, Swift, and Packerland, to

act as representatives of JBS S.A. *as part of JBS S.A.'s active meat business*. Thus, JBS S.A. executives, who use the modifier "Global," describe JBS USA as a "division" or "business unit" in their statements to investors. Appendix 1, ¶14; Sch.4. Likewise, JBS S.A. commonly refers to JBS USA as *its* "JBS USA beef business," noting that JBS USA constitutes *its* beef businesses in the USA. Appendix 1, ¶15; Sch.4. Not surprisingly, the statements of Mr. Nogueria, discussed above, were made on JBS S.A.'s behalf during its earning calls. ¶194; DPP, ¶179.

Further, JBS S.A.'s corporate structure is co-mingled, such that the CEO of JBS USA "report[s] directly" to the CEO of JBS Global Operations – not the Board of JBS USA. Appendix 1, ¶16; Sch.4. JBS S.A. exercises pervasive control over JBS USA, including through the appointment of key executives such as Sergio Sampaio Nogueira, one of Hooker's key contacts. ¶¶110-11; Sch.8. The exercise of this control renders JBS USA its agent in fact. Appendix 1, ¶18; Sch.4. As the principal exercising direction and control over JBS USA via its CEO, JBS S.A. is ultimately responsible for JBS USA's participation in the alleged conspiracy.

## II.   PLAINTIFFS' ALLEGATIONS AGAINST JBS ARE CONSISTENT WITH THEIR THEORY OF HARM

In the face of clear allegations showing how the JBS entity acted in concert with Defendants to widen the meat margin, JBS attempts to either twist the pleadings in its favor, or to simply disagree with them, rather than accept them as true. JBS.Br. at 2-7. As this Court recognized in *Pork II*, Plaintiffs need not show that each Defendant reduced its slaughter volume or cash cattle purchases in the same manner to demonstrate parallel

15

conduct. *Pork II*, 2020 WL 6149666, at *6, n.12; *see also In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791-92 (N.D. Ill. 2017) ("*Broiler Chicken*") (rejecting argument that the "alleged production cuts are too varied in methods and amounts" to be considered parallel, holding courts "have not required such uniformity"). The *Broiler Chicken* court's explanation is instructive:

> It is more than plausible that conspirators would leave the precise means of cutting production up to each conspirator, where multiple options would accomplish the intended goal. Permitting flexibility, where possible, in the means of effectuating price increases, would enable a greater number of producers to participate in the conspiracy, and might help to conceal the collusive nature of their conduct.

*Id.* at 792; *see also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015). Each argument should thus be rejected.

As an initial matter, by lumping a number of core allegations under the heading "Plaintiffs' Remaining Allegations," JBS.Br. at 7, JBS fails to address Plaintiffs' allegations demonstrating that Swift/Packerland's quarterly slaughter volumes moved in parallel with the other Operating Defendants. *See* Omnibus Opp. at §II.B.1; *see also* ¶¶200 n.89, 203 n.91 (JBS S.A.'s quarterly financial statements admitted the year-on-year declines alleged in 1H 2015); DPP, ¶143; Sch.18. JBS likewise ignores Plaintiffs' specific allegations showing that Swift, alongside all Defendants, significantly reduced its cash cattle purchases on a year-on-year basis across 2015 and in the summer of 2016. ¶¶136-40, 211-13, 230; Sch.11, 18-19; *see also* Omnibus Opp. at §§II.B.2-5, II.D.2-3. Nor, as noted above, does JBS address Jason and Matt's direct evidence specifically tying it to the alleged conspiracy.

JBS's then tries to distance itself from Defendants' parallel conduct in at least four unavailing ways.  First, it misleadingly contends it did not idle any plants during the Class Period.  JBS.Br. at 3.  Plaintiffs specifically allege that JBS acquired a cattle facility in Nampa, Idaho *and kept that facility idle for years, effectively eliminating the capacity from the market* even as the meat margin grew to historic proportions.  ¶¶190, 275, Figure 6; DPP, ¶173(b); Sch.16.  Thus, JBS took action in parallel with the other Defendants' plant closures that reduced slaughter capacity and kept it down.

Second, JBS faults Plaintiffs' unequivocal allegation that the Hyrum plant expansion did not increase its capacity to slaughter fed cattle.  ¶197 (JBS's "expansion of its Hyrum, Utah plant in 2015 and 2016 was directed at increasing its *cull cow* slaughter capacity, as opposed to *fed cattle*."); *see also* DPP, ¶177 n.45; Sch.16.  While JBS *admits* that the article Plaintiffs cite supports that proposition ("the article discusses how a '400-head increase will be cows[.]" JBS.Br. at 4), it then asks the Court to infer, based only on the article's *silence*, that expansion may have increased the plant's fed cattle slaughter capacity.  JBS.Br. at 4-5.  Even if JBS were entitled to a counter-factual inference from the article (and it's not), at best, the portion of the article quoted by JBS suggests that it *may* have spent money to upgrade Hyrum's facilities to fabricate beef cuts from fed cattle carcasses.  Without any corresponding increase in the volume of fed cattle carcasses the plant could process, such an investment would not impact the throughput of fed cattle at the Hyrum plant, nor the quantity of fed cattle beef produced. Thus, JBS's requested (improper) inference does not even contradict Plaintiffs' allegations.

Third, JBS's attempt to explain Figure 9 (showing the prices paid by Defendants for

fed cattle from January 2019 to April 2020 moved in parallel) merits little attention. JBS argues that the parallelism demonstrated by Figure 9 is insufficient because Swift paid slightly more than the others at certain times. JBS.Br. at 6. Plaintiffs are not required to establish absolute uniformity, *Pork II*, 2020 WL 6149666, at *6 n.12, and JBS's argument misses the point.

As explained in the Omnibus Opposition, Figure 9, alongside Plaintiffs' other analysis of Defendants' January 2019 to April 2020 transaction data, show that each Defendant, Swift and Packerland included, acted against its own economic self-interest by passing up the opportunity to increase their market share and profits in the wake of the Holcomb plant fire in August 2019. Omnibus Opp. at §§II.B.2, II.D.1. That Swift and Packerland did not capitalize on a fire at a ***Tyson*** plant, and did not hold their cash cattle prices higher and seek to process more beef despite record beef demand, supports an inference that they were colluding with the other Defendants. Omnibus Opp. at §§II.B.2, II.D.1.

Finally, JBS finds fault with Plaintiffs' demonstration that each Defendant supported their boycott of the cash cattle market in 2015 by pushing cash cattle sellers to accept top-of-the-market formula bids in parallel. It notes that the percentage of JBS's total purchases bought on top-of-the-market contracts did not increase by as many percentage points year-on-year as the other Defendants. JBS.Br. at 7. But this completely ignores that ***each*** Defendant, ***in parallel***, increased its top-of-the-market bids between 2014 and 2015, each having only started to push top-of-the-market bids on cash cattle sellers at the end of 2014. ¶¶140-42, Table 3; Sch.11. JBS also omits that Swift, like every other

Defendant, drastically reduced its use of top-of-the-market contracts in 2016, "having cratered cash cattle prices in 2015." ¶145, Table 4; Sch.11. Nor does JBS address the fact that these changes form part of Plaintiffs' wider allegation that Swift, in parallel with all Defendants, drastically decreased its cash cattle purchases between 2014 and 2015 (by around 70%). ¶137, Table 1, ¶138, Table 2; Sch.11. As a result, the comparatively smaller observed change in Swift's use of top-of-the-market contracts in fact represents part of a much more significant change in the rate that cash cattle were purchased.

Plaintiffs have pleaded that JBS engaged in conduct in parallel with the other Defendants indicative of a conspiracy among Defendants to suppress fed cattle prices and to inflate beef prices **both** by jointly managing their demand below available supply **and** by engaging in collusive procurement practices designed to suppress cash cattle price competition.

## III.   CATTLE PLAINTIFFS STATE A CLAIM UNDER THE COMMODITY EXCHANGE ACT

Plaintiffs allege that JBS manipulated CME live cattle futures by suppressing prices in the physical market for fed cattle, the "commodity underlying" CME live cattle futures. ¶¶390-92. Specifically, they allege:

- JBS established a significant, manipulative "short" position in CME live cattle futures. ¶¶393-408;

- JBS S.A. and JBS USA regularly transacted cattle futures. ¶¶374, 375;

- JBS owned and operated three CME-approved live cattle slaughter plants from 2015-2020. ¶380, Figure 44;

- JBS acknowledges taking short positions in cattle futures. ¶404; and

- JBS is part of the "Livestock Slaughterers" category that the U.S. Commodity Futures Trading Commission indicated held a significant short position in CME live cattle futures from November 2016-November 2019. ¶¶397- 401.

Neither JBS S.A. nor JBS USA disputes that their conduct in the physical market – if manipulative – constitutes manipulation of the "commodity underlying" live cattle futures in violation of the CEA.  7 U.S.C. § 25(a)(1)(D)(ii).  Nor do they challenge that, as principals, they are liable for the manipulation by their agents, 7 U.S.C. § 2(a)(1)(B), and those whom they aided and abetted. 7 U.S.C. § 25(a)(1).  *See* JBS.Br. at 14-15.

Instead, JBS S.A. argues that Plaintiffs do not allege that it traded CME live cattle futures.[11] JBS.Br. at 13-14. This factual dispute is inappropriate at this juncture.  Based on limited publicly available data (CME futures trading is anonymous), Plaintiffs allege that JBS S.A. did in fact trade CME live cattle futures.  ¶374.  JBS S.A. touts that it operates in American markets, and that its "Risk Management Department" manages "exposure to commodity prices" through derivatives, "most notably futures contracts."  ¶374 n.252.  JBS S.A. also acknowledges that it uses "proprietary and third party information systems . . . to manage market risk," including "commodity risk," "to measure [the] Company's net exposure as well as the cash flow risk with the BM&FB Bovespa [a Brazilian futures exchange] *and the Chicago Mercantile Exchange*." JBS S.A., 2017 Annual Report at 92 (Mar. 29, 2018) (cited ¶374 n.252).  *See also JBS* S.A., Condensed Financial Statements and Independent Auditors Report as of September 30, 2018 at 42 (Nov. 13, 2018) (cited ¶404 n.280).  Ignoring these paragraphs, JBS S.A. cherry-picks from a single passage in

---

[11]     JBS USA does not make a similar argument.

its 2017 annual report to argue that it only traded on the Brazilian futures exchange. JBS.Br. at 14. The CME hosts the preeminent cattle futures contract globally.[12] JBS S.A.'s trading CME live cattle futures is reasonably inferred from these allegations.

JBS USA does not dispute that it shorted CME live cattle futures, but instead, disputes Plaintiffs' well-pled allegations concerning its intent to manipulate. JBS.Br. at 14. Plaintiffs allege that JBS USA should not have held a net short position in live cattle futures because, as a buyer (and thus short) in the physical market, it should be long in the futures market to hedge against price risk. ¶¶409-12. JBS did not price-hedge, but instead, did the opposite. It established a short position in the futures market that was designed to suppress physical cash, forward contract, and formula contract prices. ¶¶402, 412.

Ignoring these allegations, JBS parses CME guidance identified in the Complaint and argues that hedging against price risk is just one of many trading strategies that may be appropriate. JBS.Br. at 14. But the CME source clearly states that a "meat packer" expecting to purchase livestock for processing would "lock in a purchase price by taking a long position" in the futures market. ¶411. The Complaint alleges no alternative motive (other than price manipulation) for JBS USA's short position. JBS USA's intent may thus be inferred. *Anderson v. Dairy Farmers of Am., Inc.*, Civil No. 08-4726, 2010 WL

---

[12]  *See* Joost M. E. Pennings, Andres Trujillo-Barrera, & Geraldo Costa Jr., *Concentration and Liquidity Costs in Emerging Commodity Exchanges*, 43(3) JOURNAL OF AGRICULTURAL AND RESOURCE ECONOMICS 441-456 (2018), 10.22004/ag.econ.276504 (explaining the contract volume disparity between the CME Live Cattle Contract and the Brazilian (B3) cattle futures contract); *see also Most Active Livestock and Dairy Futures*, BAR CHART, https://www.barchart.com/futures/most-active/meats?viewName=main (listing the most traded livestock futures contracts).

3893601, at *8 (D. Minn. Sept. 30, 2010). JBS USA offers no alternative explanation for its short position, and in any event, such an alternative explanation would be inappropriate on a motion to dismiss.

## IV. THE COURT HAS PERSONAL JURISDICTION OVER JBS S.A.

JBS S.A. is subject to specific personal jurisdiction because Plaintiffs allege that JBS S.A. traded live cattle futures and options on the CME. ¶¶52, 374. JBS S.A. is also subject to specific personal jurisdiction because it: a) entered a conspiracy to suppress the price of fed cattle in the United States; and b) it exercised direction and control over its conspiring subsidiaries.

Conspiracy personal jurisdiction exists where the plaintiff pleads that "(1) a conspiracy existed, (2) the non-resident defendant participated in or joined the conspiracy, and (3) an overt act was taken in furtherance of the conspiracy within the forum's borders." *Yellow Brick Rd., LLC v. Childs*, 36 F. Supp. 3d 855, 866–67 (D. Minn. 2014) (Tunheim, J.); *see also Personalized Brokerage Servs., LLC v. Lucius*, No. 05-CIV-1663 PAM/FLN, 2006 WL 208781, at *4 (D. Minn. Jan. 26, 2006) (personal jurisdiction is a question of state law and "Minnesota has endorsed the conspiracy theory of personal jurisdiction").

 Plaintiffs meet each element as they have plausibly alleged (1) Defendants' anticompetitive agreement; (2) JBS S.A.'s participation in that conspiracy and direction of its subsidiaries to conspiratorial ends, *see* §I.D above; and (3) Swift, Packerland and other Defendants purchased fed cattle and sold beef at artificial prices in Minnesota, an overt act in furtherance of a price-fixing conspiracy. *See* ¶73(b)-(c); DPP, ¶30.

Further, though the Eighth Circuit has not yet to addressed the issue, the conspiracy

theory of personal jurisdiction has been upheld by every court of appeals that has. *Cf.* JBS.Br. at 17 *with Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) (upholding conspiracy jurisdiction); *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013) (same); *Textor v. Bd. of Regents of N. Illinois Univ.*, 711 F.2d 1387, 1392-93 (7th Cir. 1983) (same); *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1069-70 (10th Cir. 2007) (same).

JBS S.A. is also subject to personal jurisdiction because JBS USA, Packerland, and Swift engaged in conspiratorial conduct as its agents and at its direction and control. Appendix 1, ¶¶13-25; Sch.4; s*ee* above at §I.D; *see also Romak USA, Inc. v. Rich*, 384 F.3d 979, 985 (8th Cir. 2004) ("a court may exercise jurisdiction over a defendant through the acts of [an] agent"). Nothing in the case law imposes a ***higher*** bar to establishing jurisdiction over a subsidiary agent than any other agent. *Anderson v. Dassault Aviation*, 361 F.3d 449, 452 (8th Cir. 2004) (piercing corporate veil unnecessary to establish jurisdiction over a corporate parent principal). Consequently, where a subsidiary's "affairs are so conducted that it is, in fact, a mere instrumentality[,]" jurisdiction over the parent is proper. *Epps v. Stewart Information Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003); *see also Clune v. Alimak AB*, 233 F.3d 538, 547 (8th Cir. 2000) (Bright, J. concurring) (noting the significance of a controlling relationship in which, without the existence of its subsidiaries, the parent would be unable to carry out its business).

Defendants' contrary cites do not require otherwise. The facts before the court in *Viasystems, Inc. v. EBM-Papst St. Georgen GMBH & Co.*, *KG*, 646 F.3d 589, 596 (8th Cir.

2011) did not involve an in-forum subsidiary.  Subsequent cases confirm that the agency theory of specific jurisdiction remains intact in the Eighth Circuit. *Whitesell Int'l Corp. v. Amtek Auto Ltd*, No. 4:13-CV-00056-JAJ, 2014 WL 12603144, at *7 (S.D. Iowa Feb. 19, 2014) ("Eighth Circuit has recognized jurisdiction over parent corporations where the parent corporation so controls and dominates the activity of its resident subsidiary that a finding of jurisdiction would satisfy due process.").  Moreover, unlike the plaintiff in *Roulo v. Keystone Shipping Co.*, No. 17-CV-5538 (JRT/LIB), 2018 WL 5619723, at *10 (D. Minn. Oct. 30, 2018), Plaintiffs here allege more than a close relationship "aimed toward effect[ing] client service" between JBS S.A. and the other JBS Defendants.  The Court should reject JBS S.A.'s personal jurisdiction arguments.

## V.   PLAINTIFFS PROPERLY SERVED JBS S.A.

The Cattle Plaintiffs took steps to serve JBS S.A. in Brazil in May 2019, before Brazil's agreement to the Hague Convention came into effect.  They engaged Legal Language Services ("LLS") in April 2019 to serve JBS S.A. in accordance with the requirements of Brazilian law.  *See* Declaration of Tom McLean, ECF No. 172, ¶¶5-8 ("McLean First Decl.").  LLS, in turn, engaged B.M. Investigations, Inc., who engaged Emanoel Damasio Mendoça of Performance Consultoria Empresaria Ltda. *Id.*, ¶5.  Mr. Mendoça served JBS S.A. via personal service and certified mail on May 17, 2019, and May 23, 2019, respectively.  *See* Declaration of Emanoel Damasio Mendoça, ECF No. 82, ¶¶4-7 ("Affidavit of Service").

LLS advised Cattle Plaintiffs' counsel that personal service and certified mail delivery constituted an effective means of service under Brazilian law, and was consistent

with the letters rogatory process of the Inter-American Convention on Letters Rogatory and Additional Protocol ("IAC").  McLean First Decl., ¶6.  LLS further informed Cattle Plaintiffs' counsel that it had successfully served other Brazilian entities involved in U.S. litigation via personal service and certified mail.  *Id.,* ¶¶6-8.

The Cattle Plaintiffs therefore considered that service upon JBS S.A. by certified mail and personal delivery constituted an acceptable means of service pursuant to Federal Rule of Civil Procedure 4(f)(2)(A) ("Rule 4(f)(2)(A)").  *See also* Declaration of Caio Campello de Menezes in Support of Plaintiffs' Opposition to JBS S.A.'s Motion to Dismiss ("Menezes First Decl."), ECF No. 167, ¶¶29-39; Second Declaration of Mr. Menezes in Support of Plaintiffs' Opposition to JBS S.A.'s Motion to Dismiss, ¶¶36-38 (filed contemporaneously herewith) ("Menezes Second Decl.").

To meet due process, service must be reasonable under the totality of the circumstances.  *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).  A method of service is reasonable if it is calculated "to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Fraserside IP LLC v. Letyagin*, 280 F.R.D. 630, 631 (N.D. Iowa 2012).

Cattle Plaintiffs served JBS S.A. in a manner "prescribed by [Brazil's] law for service in [Brazil] in an action in its courts of general jurisdiction[,]" which satisfies Rule 4(f)(2)(A).  Since at least 2016, Brazil has allowed plaintiffs in foreign proceedings to serve process on Brazilian corporations by certified mail, so long as: 1) the defendant obtains knowledge of the lawsuit and has an opportunity to be heard; and 2) the jurisdiction issuing the process does not prohibit service abroad by mail. Menezes First Decl., ¶¶8-23; Menezes

Second Decl., ¶¶10-11, 26.  Plaintiffs served JBS S.A. at its Brazilian headquarters by certified mail, delivered on May 27, 2019, having previously effected personal service on JBS S.A. on May 17, 2019.  Affidavit of Service, ¶¶5-7.  This was effective service as JBS S.A. obtained undisputed knowledge of the proceedings and an opportunity to defend itself, and there is no provision of law that prohibits service by certified mail of Brazilian defendants abroad.  Menezes First Decl., ¶¶32-39; Menezes Second Decl., ¶¶10, 12-13, 19-20.

### A.   The Inter-American Convention Does Not Require that Cattle Plaintiffs Use Letters Rogatory

JBS S.A. contends that in May 2019 Brazil's law required service by letters rogatory.  JBS.Br. at 19.  This position does not comport with domestic decisions interpreting the IAC or current Brazilian law.  Rather, U.S. courts deny that IAC preempts all other forms of service. *See, e.g.*, *Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634, 644 (5th Cir. 1994) ("[W]e conclude that the Convention does not preempt other methods of service."); *Nuevos Destinos, LLC v. Peck*, No. 3:19-CV-00045, 2019 WL 6481441, at *5 (D.N.D. Dec. 2, 2019) (same).  This is because the text of the IAC limits its scope to only letters rogatory, unlike the Hague Convention, whose scope "is much broader, applying as it does to *all* service abroad upon defendants residing within signatory States." *Kreimerman*, 22 F.3d at 640 (emphasis in original).  The IAC allows for service pursuant to "Rule 4(f)(2) because the Inter-American Convention 'allows but does not specify other means' for service." *Nuevos Destinos*, 2019 WL 6481441, at *5.

Because the IAC permits other means of service, a foreign defendant is properly

served pursuant to Rule 4(f)(2)(A) if the method of service chosen is "prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction." Fed. R. Civ. P. Rule 4(f)(2)(A). Courts interpret Rule 4(f)(2)(A) as requiring service on a foreign defendant to comply with the recipient country's procedural rules for serving its residents with process from courts outside the recipient country, if those rules differ from the recipient country's domestic rules of service. 5C Wright & Miller, FED. PRAC. & PROC. CIV. § 1334 (3d ed. & Aug. 2019 Supp.).[13]

Service here satisfies these criteria. The Brazilian Superior Court of Justice ("SCJ"), in a series of decisions, has relaxed its formerly rigid requirement that foreign plaintiffs use letters rogatory to effect service on Brazilian defendants. Menezes First Decl., ¶¶18-19; Menezes Second Decl., ¶¶11-13, 16, 20, 24, 33-34. The SCJ directly acknowledged its prior holdings, and has explicitly moved away from them. *MCMC v. VCN [Sec. of Justice]*, Special Court of Brazilian Superior Court of Justice, February 15, 2017, Translation at 110. The "[SCJ] admits that the service of process is evidenced by other means, provided that the opportunity of defense to the defendant has been faithfully complied with and evidenced." *Id*. This clarification of the law has been repeatedly stated by the SCJ since 2016. Menezes First Decl., ¶18 (and cases cited therein); Menezes Second Decl., ¶¶24-26, 33-34. Pursuant to this authority, service of foreign

---

[13]    JBS admits this point of law, JBS.Br. at 20, but instructed its Brazilian law expert, Professor Didier, that Brazil's rules for serving domestic process should govern. Didier Decl., ECF No. 184, ¶3 (instructed to "provide an opinion as to whether service on JBS S.A. in this case was 'as prescribed by [Brazil's] law for service in that country in an action in it courts of general jurisdiction.'"); ECF No. 184-A.

process on a Brazilian defendant by certified mail is deemed sufficient so long as the defendant was adequately put on notice of the lawsuit and provided that the jurisdiction issuing the process did not prohibit service by mail.  Menezes First Decl., ¶21; Menezes Second Decl., ¶¶10, 24-25, 33, 36.

The SCJ's change in jurisprudence, Menezes First Decl., ¶¶8, 23, accords with Federal court decisions approving alternative service on a Brazilian defendant due to the unreasonable length of time service with letters rogatory in Brazil entails.  *See, e.g.*, *In re BRF, S.A. Sec. Litig.*, 18-cv-2213, 2019 WL 257971, at *4 (S.D.N.Y. Jan. 18, 2019) (allowing alternative service because of likelihood of substantial delay arising from service by letters rogatory).

Brazil's adoption of the Hague Convention on June 1, 2019, after Plaintiffs served JBS S.A., is irrelevant.  *Cf.* JBS.Br. at 19.  Procedural law in Brazil is not retroactively applied.  *See* Menezes First Decl., ¶¶28, 37.

**B.    Under Brazilian Law, JBS S.A. Has Cured Any Defect of Service Through its Appearance in the Cattle Case**

Under Brazilian law, any defect in the service of process is cured by the defendant's appearance and participation in the proceedings. "Upon evidenced the spontaneous appearance of the defendant in the foreign case, there will be no nullity of the service of process." *Intelcav Cartões Ltda. v. Stmicroeletronics Inc*, Special Court of Brazilian Superior Court of Justice, February 13, 2019, Translation at 176; *see also* Menezes First Decl., ¶¶24-25, 33, 36.  Therefore, under Brazilian law, JBS S.A.'s participation in the *Cattle* proceeding cured any perceivable defect in service.  Indeed, JBS's expert's cited

28

cases acknowledge that any failure to use letters rogatory would be cured by the Brazilian domicile's appearance and participation in the foreign suit.  Menezes Second Decl., ¶¶13, 23, 31-32.

By appearing and filing multiple briefs before this Court, JBS S.A. cannot claim to lack adequate notice.  Nor can JBS S.A. point to any U.S. law prohibiting the Cattle Plaintiffs' use of certified mail to effect service abroad where the recipient jurisdiction permits it. Therefore, service on JBS S.A. was proper. The Court should deny JBS S.A. motion to dismiss Plaintiffs' Complaint for insufficient service.

## <u>CONCLUSION</u>

The Court should deny JBS's motion to dismiss in its entirety.

Dated: April 5, 2021

Respectfully Submitted,
*/s/ Christopher M. Burke*
Christopher M. Burke (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508
cburke@scott-scott.com

David R. Scott (*pro hac vice*)
Amanda F. Lawrence (*pro hac vice*)
Patrick J. McGahan (*pro hac vice*)
Michael P. Srodoski
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Tel.: 860-537-5537

Fax: 860-537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Anthony F. Fata (*pro hac vice*)
Jennifer W. Sprengel (*pro hac vice*)
Christopher P.T. Tourek (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**

150 S. Wacker
Suite 3000
Chicago, IL 60606
Tel.: 312-782-4882
Fax: 312-782-4485
afata@caffertyclobes.com
jsprengel@caffertyclobes.com
ctourek@caffertyclobes.com
boconnell@caffertyclobes.com

Ellen Meriwether (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
205 N. Monroe St.
Media, PA 19063
Tel.: 215-864-2800
Fax: 215-864-2810
emeriwether@caffertyclobes.com

*Interim Co-Lead Counsel for the Cattle
Plaintiffs*

Stacey P. Slaughter (Bar No. 0296971)
K. Craig Wildfang (Bar No. 0117043)
Thomas J. Undlin (Bar No. 0183751)
Geoffrey H. Kozen (Bar No. 0398626)
Eric P. Barstad (Bar No. 0398979)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue
Suite 2800

Minneapolis, MN 55402
Tel: 612-349-8500
Fax: 612-339-4181
sslaughter@robinskaplan.com
kcwildfang@robinskaplan.com
tundlin@robinskaplan.com

*Liaison Counsel for the Cattle Plaintiffs*

Michael L. Schrag (*pro hac vice*)
Joshua Bloomfield (*pro hac vice*)
George Sampson (*pro hac vice*)
Kyla Jenny Gibboney
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel.: 510-350-9700
mls@classlawgroup.com
jjb@classlawgroup.com
gws@classlawgroup.com
kjg@classlawgroup.com

David E. Kovel (*pro hac vice*)
Thomas W. Elrod (*pro hac vice*)
Karen M. Lerner (*pro hac vice*)
Anthony E. Maneiro (*pro hac vice*)
**KIRBY McINERNEY LLP**

250 Park Avenue, Suite 820
New York, NY 10177
Tel.: 212-371-6600
dkovel@kmllp.com
telrod@kmllp.com
klerner@kmllp.com
amaneiro@kmllp.com

Richard M. Paul III (*pro hac vice*)
Sean Cooper (*pro hac vice forthcoming*)
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Tel.: 816-984-8100
Rick@PaulLLP.com

31

Sean@PaulLLP.com

Melissa Weiner (MN #0387900)
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Tel.: 612-389-0600
mweiner@pswlaw.com

Bruce L. Simon (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Tel.: 415-433-9000
bsimon@pswlaw.com

Daniel L. Warshaw (*pro hac vice*)
Bobby Pouya (*pro hac vice*)
Matthew A. Pearson (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Tel.: 818-788-8300
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mapearson@pswlaw.com

*Plaintiffs' Executive Committee*

*/s/ Shana E. Scarlett*
Shana E. Scarlett (*pro hac vice*)
Rio S. Pierce (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Breanna Van Engelen (*pro hac vice*)

32

**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

W. Joseph Bruckner (MN #0147758)
Brian D. Clark (MN #0390069)
Arielle S. Wagner (MN #0398332)
Stephanie A. Chen (MN #0400032)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South,
Suite 2200
Minneapolis, MN 55401
Tel:  612) 339-6900
Fax: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
aswagner@locklaw.com
sachen@locklaw.com

*Interim Co-Lead Class Counsel for Plaintiffs in the* Peterson *Action*

*/s/ Joshua J. Rissman*
Daniel E. Gustafson (MN #202241)
Daniel C. Hedlund (MN #258337)
Michelle J. Looby (MN #0388166)
Joshua J. Rissman (MN #0391500)
Brittany Resch (MN #397656)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com

33

jrissman@gustafsongluek.com
bresch@gustafsongluek.com

Dennis J. Stewart (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 B Street, 17thFloor
San Diego, CA 92101
Tel: (612) 333-8844
Fax: (612) 339-6622
dstewart@gustafsongluek.com

Adam J. Zapala (*pro hac vice*)
Elizabeth Tran Castillo (*pro hac vice*)
Reid W. Gaa (*pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
rgaa@cpmlegal.com

Alexander E. Barnett (*pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
40 Worth Street, 10th Floor
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753
abarnett@cpmlegal.com

Jason S. Hartley (*pro hac vice*)
**HARTLEY LLP**
101 W. Broadway, Suite 820
San Diego, CA  92101
Tel: (619) 400-5822
hartley@hartleyllp.com

Megan E. Jones (*pro hac vice forthcoming*)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908

34

mjones@hausfeld.com

*Interim Co-Lead Counsel for the Proposed Direct Purchaser Plaintiffs*

*/s/ Blaine Finley*
Jonathan W. Cuneo (*pro hac vice*)
Blaine Finley (pro hac vice)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3960
jonc@cuneolaw.com
bfinley@cuneolaw.com

Shawn M. Raiter (MN #240424)
**LARSON KING LLP**
30 East Seventh Street, Suite 2800
Street Paul, MN 55101
Tel: (651) 312-6518
sraiter@larsonking.com

Don Barrett (*pro hac vice*)
Katherine Barrett Riley (*pro hac vice*)
David McMullan (*pro hac vice*)
Sterling Starns (*pro hac vice*)
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095-0927
Tel: (662) 834-9168
Fax: (662) 834-2628
donbarrettpa@gmail.com
kbriley@BarrettLawGroup.com
dmcmullan@BarrettLawGroup.com
sstarns@barrettlawgroup.com

*Counsel for Commercial and Institutional Indirect Purchaser Plaintiff Erbert & Gerbert's, Inc.*