# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE CATTLE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | Case No. 0:19-cv-1222-JRT-HB |
| PETERSON, et al.,<br><br>               Plaintiffs,<br><br>    v.<br><br>JBS S.A., et al.,<br><br>              Defendants. | Case No. 0:19-cv-01129-JRT-HB |
| IN RE DPP BEEF LITIGATION<br><br>This document relates to:<br><br>ALL CASES | Case No. 0:20-cv-1319-JRT-HB |
| ERBERT & GERBERT'S, INC.,<br><br>             Plaintiff,<br><br>    v.<br><br>JBS USA FOOD COMPANY HOLDINGS, et al.,<br><br>              Defendants. | Case No. 0:20-cv-01414-JRT-HB |

## MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION TO DISMISS BY DEFENDANTS
## CARGILL, INCORPORATED AND CARGILL MEAT SOLUTIONS
## CORPORATION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 3

I.      PLAINTIFFS PLEAD DIRECT EVIDENCE THAT CARGILL
        PARTICIPATED IN THE CONSPIRACY .......................................................... 3

        A.      Jason Provides Direct Evidence that Cargill Agreed to Reduce
                and Restrain Slaughter Volumes in Violation of the Sherman Act ............. 4

        B.      Matt Provides Direct Evidence that Cargill Agreed to Limit Price
                Competition in the Procurement of Fed Cattle in Violation
                of the Sherman Act ...................................................................................... 6

II.     PLAINTIFFS' ALLEGATIONS OF PARALLEL CONDUCT AND PLUS
        FACTORS ARE SUFFICIENT TO STATE CLAIMS AGAINST CARGILL .... 9

        A.      Plaintiffs Provide Individualized Allegations Concerning
                Cargill's and its Co-Defendants' Parallel Conduct ................................... 10

                1.      The Complaints Plausibly Allege that Cargill Periodically
                        Restrained Slaughter Volumes in Parallel with Other Defendants ........ 10

                2.      The Complaints Plausibly Allege Cargill Cut Cash Cattle
                        Purchases During Periods of Slaughter Restraint in Parallel
                        with its Co-Defendants .......................................................................... 12

                3.      The Complaints Plausibly Allege that Cargill Took Other Acts in
                        Furtherance of the Conspiracy ............................................................... 15

        B.      The Complaints Allege Additional Plus Factors Beyond Those the Court
                Already Characterized as "Undoubtedly Strong" ....................................... 16

III.    THE COMPLAINT PLAUSIBLY ALLEGES THAT CARGILL
        VIOLATED THE COMMODITIES EXCHANGE ACT ...................................... 17

IV.     BOTH CARGILL ENTITIES ARE PROPERLY NAMED ................................. 19

CONCLUSION .............................................................................................................. 22

# TABLE OF AUTHORITIES

## Cases

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*,
　　900 F.3d 623 (9th Cir. 2018) ..................................................................20, 21, 22

*Bell Atl. Corp. v. Twombly*,
　　550 U.S. 544 (2007) ............................................................................................ 10

*Chandler v. Phoenix Servs.*,
　　Civ. A. No. 7:19-cv-00014-O, 2020 WL 1848047 (N.D. Tex. Apr. 13, 2020)......21

*City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*,
　　838 F.2d 268 (8th Cir. 1988). .........................................................................21, 22

*City of Philadelphia v. Bank of Am. Corp.*,
　　Civ. A. No. 19-CV-1608 (JMF), 2020 WL 6430307 (S.D.N.Y. Nov. 2, 2020)................ 8

*Copperweld Corp. v. Indep. Tube Corp.*,
　　467 U.S. 752 (1984) ...............................................................................20, 21, 22

*Davis v. Buchanan Cnty. Mo.*,
　　446 F. Supp. 3d 493 (W.D. Mo. 2020) .................................................................5

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
　　253 F. Supp. 2d 262 (D. Conn. 2003) ................................................................. 14

*In re Broiler Chicken Antitrust Litig.*,
　　290 F. Supp. 3d 772 (N.D. Ill. 2017).............................................................11, 12

*In re Cattle Antitrust Litig.*,
　　Civil Nos. 19-1222, 19-1129 (JRT/HB), 2020 WL 5884676 (D. Minn. Sept. 29,
　　2020) ...................................................................................................*passim*

*In re Foreign Exch. Benchmark Rates Antitrust Litig*,
　　Civ. No. 13-7789, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ........................ 19

*In re Graphics Processing Units Antitrust Litig.*,
　　527 F. Supp. 2d 1011 (N.D. Cal. 2007)................................................................ 17

*In re GSE Bonds Antitrust Litig.*,
　　396 F. Supp. 3d 354 (S.D.N.Y. 2019) ................................................................. 17

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ................................................................... 9

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010). .................................................................... 6

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   935 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................... 19

*In re Packaged Ice Antitrust Litig.*,
   723 F. Supp. 2d 987 (E.D. Mich. 2010) ............................................... 17

*In re Packaged Seafood Prods. Antitrust Litig.*,
   Case No.: 15-MD-2670 JLS (MDD), 2017 WL 35571 (S.D. Cal. Jan. 3, 2017) ... 17

*In re Pork Antitrust Litig.*,
   Civil No. 18-1776 (JRT/LIB), 2019 WL 3752497 (D. Minn. Aug. 8, 2019) .... 3, 16

*In re Pork Antitrust Litig.*,
   Civil Nos. 18-1776, 19-1578, and 19-2723 (JRT/LIB), 2020 WL 6149666 (D. Minn. Oct. 20, 2020) ...................................................................... 11, 13

*Interstate Circuit v. United States*,
   306 U.S. 208 (1939) ............................................................................. 11

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ............................................................... 14

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
   847 F.3d 1221 (10th Cir. 2017) ........................................................... 21

*Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*,
   9 F. Supp. 3d 1032 (D. Minn. 2014). ................................................... 22

*Rodriguez v. Leeman*,
   No. CIV. 01–72–P–C, 2001 WL 1328597 (D. Me. Oct. 29, 2001) ......... 5

*Romine v. Acxiom Corp.*,
   296 F.3d 701 (8th Cir. 2002) ................................................................. 5

*Starr v. Sony BMG Music Ent.*,
   592 F.3d 314 (2d Cir. 2010) ................................................................ 17

*Unigestion Holding, S.A. v. UPM Tech., Inc.*,
   305 F. Supp. 3d 1134 (D. Or. 2018)......................................................................21

## **Statutes and Rules**

7 U.S.C. § 2(a)(1)(B) ...........................................................................................18

7 U.S.C. § 25(a)(1) ..............................................................................................18

7 U.S.C. § 25(a)(1)(D)(ii) ....................................................................................18

Fed. R. Civ. P. 8(a)(2) ...........................................................................................5

## INTRODUCTION

Plaintiffs' amended Complaints cure the deficiencies the Court identified in its September 28, 2020 Order.[1]  *In re Cattle Antitrust Litig.*, Civil No. 19-1129 (JRT/HB), 2020 WL 5884676, at *5 (D. Minn. Sept. 29, 2020) ("*Cattle*").  Plaintiffs' Omnibus Opposition sufficiently detail the direct evidence Jason F. ("Jason" or "Witness 1") and Matt T. ("Matt" or "Witness 2") provided, and include Defendant-specific allegations of parallel conduct, including parallel conduct by Cargill Meat Solutions Corp. ("CMS").

Plaintiffs identify Jason, his employer, Swift, and how his work at Swift brought him into regular contact with James Hooker, Fabrication Manager at Swift's Cactus, Texas plant.  Plaintiffs explain that Hooker specifically told Jason about an "agreement" among all Defendants, including CMS, to cut their slaughter volumes in response to high prices for fed cattle.  The Complaints explain that Hooker was in frequent contact with friends and former colleagues at other Defendants' packing plants, including CMS's packing plant in Friona, Texas, and provided Jason with detailed information about current and future operations at those plants.  Plaintiffs also detail Hooker's contacts across the spectrum of JBS's beef business.  These allegations alone are sufficient to state a claim against CMS.

---

[1]    All capitalized terms and acronyms not otherwise defined herein have the meaning ascribed in Plaintiffs' Omnibus Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Federal Claims filed contemporaneously herewith ("Omnibus Opposition" or "Omnibus Opp."), or the Cattle Complaint.  References to "ECF No" are to *In re Cattle Antitrust Litigation*, 19-cv-1222 (JRT/HB)' docket, unless stated otherwise.  All "¶_," "¶¶_," "Appendix," "Figure," and "Table" references are to the Cattle Complaint unless stated otherwise.  All references to "C.Br." are to Cargill Defendants' Memorandum in Support of Their Motion to Dismiss (ECF No. 331).  References to "DPP," "Peterson," and "E&G" are references to the DPP, Peterson, and E&G Complaints, respectively.

Cargill's argument that Jason's allegations need not be credited because he does not work for Cargill does nothing to rebut the sufficiency of those allegations since it is not the law.   Direct evidence, including in the form of admissions like those from Hooker, frequently comes from competitor firms and their employees.   Similarly, Cargill's arguments that the allegations are vague or should not be believed fail as well.  This Court has already rejected the assertion that a heightened pleading standard applies to Jason's allegations.  The facts he alleges, like any pleaded facts, are entitled to the presumption of truth at this stage of the proceedings.

The same applies to the newly-detailed allegations from Matt, who provides direct evidence of one collusive procurement practice described in the Complaints – the queuing convention.  As explained in the Omnibus Opposition, the queuing convention limited the Producers' ability to generate price competition for their cash cattle, and was enforced by all Defendants, including CMS, at Matt's feedlot.   The queuing convention, like Defendants' coordinated slaughter restraint, was another means by which Defendants accomplished their goal of artificially driving down the price of fed cattle and maximizing the meat margin. *See Cattle*, 2020 WL 5884676, at *5.

In addition to the direct evidence tying CMS to the conspiracy, Plaintiffs also include allegations specific to CMS to demonstrate that it acted in parallel with the other Defendants.  Using Defendant-specific data, the Complaints lay out how CMS:

- Set the stage for the conspiracy by closing its Plainview, Texas and Milwaukee, Wisconsin plants in the years directly preceding the Class Period, and thereby lowering its processing capacity substantially during the Class Period;

- Regularly changed its slaughter volumes in parallel with every other Defendant throughout the Class Period, in a manner it had not done prior to the Class Period;

- Reduced its cash cattle purchases in parallel with every other Defendant at key moments during the Class Period, including across 2015, the summer of 2016, and after the August 2019 fire at its Holcomb plant; and

- Maintained a slaughter volume below its 2007-14 average throughout the Class Period, in parallel with other Defendants, despite record meat margins and opportunities to grow its market share, and in contrast to Independent Packers.

Each of those allegations describes conduct CMS specifically undertook in parallel with other Defendants. Though Cargill quibbles about its degree of parallelism compared to other Defendants, the law does not demand the kind of precise level of uniformity that Cargill asks for. When coupled with Plaintiffs' "undoubtedly strong" plus factors, the allegations of parallel conduct are more than enough to state a claim against Cargill. *Cattle*, 2020 WL 5884676, at *6.[2] Cargill's motion to dismiss should be denied in its entirety.

## **ARGUMENT**

## I.   **PLAINTIFFS PLEAD DIRECT EVIDENCE THAT CARGILL PARTICIPATED IN THE CONSPIRACY**

The Complaints allege, with sufficient detail, direct evidence that Cargill unlawfully conspired with Tyson, JBS, and National Beef to suppress fed cattle prices. Plaintiffs allege that Cargill and its co-Defendants achieved this objective by reducing and restraining their collective slaughter volumes and limiting price competition in their procurement practices. The Complaints contain Jason's detailed recollections to plead that

---

[2]    Unless otherwise noted, internal citations are omitted and emphasis is added.

Cargill and its co-Defendants agreed to reduce and restrain their collective slaughter volumes whenever they perceived fed cattle prices as being "too high." ¶¶116-19; Sch.8.[3] Similarly, through the detailed recollections of Matt, the Complaints plead that Cargill and its co-Defendants agreed to limit price competition in their procurement practices at feedlots by, *inter alia*, adhering to and enforcing a "queuing convention" and a card-drawing protocol that was tantamount to a concerted refusal to deal. ¶¶159-69; Sch.13; *Cattle*, 2020 WL 5884676, at *3.

Taking the Court's directive, Plaintiffs amended their Complaints to specifically identify Jason and Matt, their employers, and to describe how they "would have known what they were alleged to know." *Cattle*, 2020 WL 5884676, at *5. Plaintiffs thus plead direct evidence connecting Cargill to the alleged conspiracy sufficient to satisfy Rule 8.

**A.  Jason Provides Direct Evidence that Cargill Agreed to Reduce and Restrain Slaughter Volumes in Violation of the Sherman Act**

The Complaints allege direct evidence of a conspiracy to restrain slaughter volumes and Cargill's involvement in it. The Complaints allege that Jason had multiple conversations with Hooker, head of fabrication at Swift's Cactus, Texas plant, in which Hooker explained that the Operating Defendants would each reduce purchase and slaughter volumes in order to reduce fed cattle prices when they were "too high." ¶¶116-19; Sch.8.

---

[3]     This brief principally cites to the Cattle Complaint. Equivalent cites to the DPP, Peterson, and E&G Complaints can be found in Exhibit B to the Declaration of Patrick McGahan in Support of Plaintiffs Memorandum of Law in Opposition to Defendants' Joint Rule 12(b)(6) Motion to Dismiss Federal Claims. *See* Omnibus Opp. at 6 n.6. References to allegations made in the DPP Complaint encompass the substantially similar allegations made in the E&G Complaint.

Jason describes at least one occasion in 2015 when Hooker explicitly admitted that they did so pursuant to an "agreement." ¶118; Sch.8. Jason describes Hooker, a long-time veteran of the packing industry, as having close relationships with friends and former colleagues at Tyson Fresh, CMS, and National Beef's nearby packing plants, with insight into each competitor's operations. ¶¶107-15; Sch.8. These allegations of direct evidence are sufficient in and of themselves to state a claim against Cargill.

Ignoring Plaintiffs' detailed pleadings, Cargill not only asks the Court to draw every inference in its favor, but also to find Jason's allegations inadequate on three grounds. *First*, Cargill insists the Court must disregard Jason's allegations because in reporting Hooker's admission, he describes the agreement as existing among "*all*" Defendants, rather than painstakingly repeating this defined term as including CMS *and* National Beef *and* Tyson Fresh *and* Packerland *and* Swift. C.Br. at 3. The law places no such semantic requirement on Plaintiffs. Jason cannot be discredited simply for failing to incant Cargill's preferred magic words. *See, e.g.*, *Romine v. Acxiom Corp.*, 296 F.3d 701, 710 (8th Cir. 2002) ("To dismiss plaintiffs' claim because they fail to state the magic words . . . is improper and inconsistent with the liberal pleading requirements of Fed. R. Civ. P. 8(a)(2).") (Bye, K., dissenting); *Davis v. Buchanan Cnty. Mo.*, 446 F. Supp. 3d 493, 499 (W.D. Mo. 2020) ("No 'magic words' are required to plead a claim."); *see also* Omnibus Opp. at §II.A.

*Second*, Cargill again attempts to impose a heightened pleading standard for direct evidence. *Compare* C.Br. at 3 ("no reason to believe") *with Rodriguez v. Leeman*, No. CIV. 01-72-P-C, 2001 WL 1328597, at *1, n.1 (D. Me. Oct. 29, 2001) ("For the

5

purposes of this motion to dismiss I have taken each of Rodriguez's factual allegations as true, and, therefore, even if he had no corroborating witnesses my disposition would be no different than if he had a legion of witnesses."). This Court has already rejected Defendants' invitation to impose the heightened pleading standard applied in securities fraud cases to Plaintiffs' witness allegations. *Cattle*, 2020 WL 5884676, at \*5.

**Third**, Cargill's argument that Jason's testimony cannot be credited because he did not work for Cargill must be rejected because it is not the law. Direct evidence, including in the form of admissions such as those about Hooker, frequently comes from competitor firms and their employees. *See* Omnibus Opp. at §II.A (discussion of cases accepting admissions of an employee of one co-conspirator as direct evidence against all conspirators). Indeed, Cargill cites no cases to demonstrate otherwise.

Plaintiffs' direct evidence is sufficiently detailed and is entitled to a presumption of truth. It is independently adequate to state a claim against Cargill.[4]

### B. Matt Provides Direct Evidence that Cargill Agreed to Limit Price Competition in the Procurement of Fed Cattle in Violation of the Sherman Act

The allegations from Matt directly tie Cargill to collusive procurement practices imposed on Matt at his feedlot. As discussed in the Omnibus Opposition, Plaintiffs allege a conspiracy among Defendants to suppress fed cattle prices **both** by jointly managing their demand below available supply **and** by engaging in collusive procurement practices

---

[4]    As the Court previously held, Plaintiffs' direct evidence need only be "sufficiently detailed." *Cattle*, 2020 WL 5884676, at \*5 (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 (3d Cir. 2010).

designed to suppress cash cattle price competition.  *See* Omnibus Opp. at §II.C.  Matt provides a direct and detailed eyewitness account of the operation of one collusive procurement practice, the queuing convention, at his feedlot from 2012 until mid-2015 (six months into the Class Period).  ¶¶159-64; Sch.13.  Matt provides evidence linking each Defendant, including Cargill, to the queuing convention – a practice that the Court correctly described as "a concerted refusal to deal."  *Cattle*, 2020 WL 5884676, at *5; *see* Omnibus Opp. at §II.C.

Matt was the manager of the 35,000-head Carrizo Feeders feedlot in Texline, Texas from 2012 to mid-2015.  ¶143; Sch.11; *see* DPP, ¶185.  As more fully described in the Omnibus Opposition, under the convention, Operating Defendants take "turns" opening the weekly cash cattle trade with the first bid.  That first bidder is said to be "on the cattle," and by virtue of this position, obtains valuable rights, including a right of first refusal.  Omnibus Opp. at §II.C.

Plaintiffs further detail how, at Matt's feedlot, the right to make the first bid for a specific lot of cattle was determined through a card draw imposed upon him by CMS's Mr. Vogel and his fellow field buyers from Swift, National Beef, and Tyson Fresh.  ¶170; Sch.13.  The Complaints explain that the field buyers from each of the Defendants, including Mr. Vogel, jointly demanded that Matt employ this procedure so they could avoid the inconvenience of coming to the feedlot at "increasingly early hours in an attempt to place the first bid."  ¶172; Sch.13.  Matt directly ties Mr. Vogel and CMS to this card-drawing scheme.  ¶170; Sch.13.

Matt thus provides direct evidence that CMS and its co-Defendants conspired to

7

pre-select the bidding order and restrict his ability to solicit and accept competing bids. The result was the total elimination of price competition between CMS and its co-Defendants, with Matt unable to recall a single week in which one of the other three Operating Defendant field buyers raised the initial bid placed by the field buyer who won the card draw.  ¶171; Sch.13.

In the face of these strong allegations, Cargill first argues that the card-drawing scheme was not anti-competitive and suggests that a decline in fed cattle prices explains why CMS and its co-Defendants did not engage in any price competition for Matt's cattle. C.Br. at 11.  But again, Cargill is asking the Court to draw all reasonable inferences in its favor rather than in Plaintiffs'.  In fact, Cargill asks the Court to draw a patently **unreasonable** inference in its favor.  Inferring that a general "fall in fed cattle pricing" explains why CMS and its co-Defendants **never** raised each other's bids over a six-month time period is akin to inferring that, in a bear market, buyers will **never** compete with one another to narrow the bid-ask spread on a single transaction.  *Id.*

Moreover, Cargill's requested inference is contradicted by Plaintiffs' well pled allegation that Cargill, Swift/Packerland, Tyson, and National Beef would adhere to the price level established by the Defendant who opened the weekly cash cattle trade.  ¶149; Sch.12; *see, e.g.*, *City of Philadelphia v. Bank of Am. Corp.*, No. 19-CV-1608 (JMF), 2020 WL 6430307, at *8 (S.D.N.Y. Nov. 2, 2020) ("Taking all of Plaintiffs' allegations together and drawing all reasonable inferences in their favor, as the Court must, . . . the Court concludes that Plaintiffs meet that burden on their federal antitrust claims."); *see also* Omnibus Opp at §II.C  (addressing same argument).

8

Equally unavailing is Cargill's argument concerning Matt's supposed "refutation" of his allegation that CMS enforced adherence to the queuing convention.  C.Br. at 11. Matt alleges that each of the Operating Defendants' field buyers, including explicitly Steve Brown and Rick Vogel of CMS, "enforced strict adherence to this convention with threats of retaliation."  ¶166; Sch.13.  "Defendants' [including Mr. Brown's and Mr. Vogel's] threats of boycott were sufficient to ensure adherence to the convention."  ¶169; Sch.13. Like its competitors, CMS monitored Matt's adherence to the queuing convention, calling him weekly to confirm who bought his cattle that week on what terms.  ¶310 (alleging that Operating Defendants would pressure producers for details of sales); Sch.30.

Despite these allegations, Cargill claims that its participation in the queuing convention agreement was "refuted" by Matt's observation that CMS was not one of the Operating Defendants that still actively boycotted his feedlot when he took over management in 2012.  C.Br. at 11.  This is factually incorrect.  Matt repeatedly states that CMS required his adherence to the convention.  ¶¶166-71; Sch.13.  Those allegations cannot be ignored.[5]  Put simply, Plaintiffs' allegations from Jason and Matt sufficiently tie CMS to Defendants' conspiracy.

## II.     PLAINTIFFS' ALLEGATIONS OF PARALLEL CONDUCT AND PLUS FACTORS ARE SUFFICIENT TO STATE CLAIMS AGAINST CARGILL

Though Plaintiffs allege direct evidence of agreement that are independently

---

[5]     In any event, Cargill's contention regarding its buyer's actions prior to Matt's tenure at Carrizo Feeders fails to "distinguish between the existence of a conspiracy and its efficacy."  *In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d 651, 656 (7th Cir. 2002).

adequate to state a claim, Plaintiffs also demonstrate Defendants' agreement – including Cargill's – through circumstantial evidence by showing parallel conduct coupled with "plus factors." These allegations push the Complaints over the plausibility threshold, such that Defendants' similar behavior "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Cattle*, 2020 WL 5884676, at *5.

### A. Plaintiffs Provide Individualized Allegations Concerning Cargill's and its Co-Defendants' Parallel Conduct

The Complaints provide individualized data showing how Cargill and its co-Defendants jointly managed their respective slaughter volumes. Plaintiffs' Defendant-specific data show that each Defendant reduced and restrained its slaughter volumes in a manner consistent with an agreement to jointly manage their collective demand below the available supply. *See* Omnibus Opp. at §§II.B1-4, II.D.1.

### 1. The Complaints Plausibly Allege that Cargill Periodically Restrained Slaughter Volumes in Parallel with Other Defendants

As the Court requested, Plaintiffs plead Defendant-specific data to show that each Defendant's slaughter volumes moved in parallel during the Class Period, a marked pattern that had not existed before the conspiracy. *E.g.*, ¶¶127-46, Figure 2; Sch.9-10; DPP, ¶¶134, 137, Figure 7.[6]

Cargill's arguments to the contrary are not persuasive. Zooming in on the one

---

[6]    The details of Defendants' parallel slaughter restraint are described more fully in the Omnibus Opposition at §§II.B.1-3, II.D.1.

occasion where the peaks and troughs of Cargill's quarterly slaughter levels marginally deviated from those of its competitors, Cargill insists that Plaintiffs' data actually show that Cargill acted "very differently" than its competitors. C.Br. at 5. But Plaintiffs need not show that each Defendant's slaughter volume moved in absolute lockstep to demonstrate parallel conduct. As this Court recently noted, more than eighty years ago, the Supreme Court held that "simultaneous action is not a requirement to demonstrate parallel conduct." *In re Pork Antitrust Litig.*, Civil No. 18-1776 (JRT/LIB), 2020 WL 6149666, at *6, n.12 (D. Minn. Oct. 20, 2020) ("*Pork II*") (citing *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) (citing *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939)); *see also* Omnibus Opp. at §§II.B.1-3, II.D.1. Cargill's quarter-on-quarter changes are consistent with those of the other Operating Defendants and support Plaintiffs' contention that Defendants jointly managed demand below available supply.

Furthermore, Cargill's incremental increase in its absolute slaughter levels in 2015 and over the conspiracy is irrelevant. Plaintiffs do not allege Defendants reduced their slaughter volume in absolute terms across the conspiracy, but rather engaged in periodic slaughter reductions or restraint, particularly focused on cash cattle, to create artificial gluts in slaughter weight cattle and ensure that their collective demand for fed cattle never outstripped the available supply. Omnibus Opp. at §§II.B.1-3, II.D.1. The data shows CMS, like other Defendants, constrained its annual slaughter volume well below pre-Class Period levels despite rising demand, and allowed its annual volume to rise at a much slower

pace than Independent Packers. ¶¶133-34 n.51, 214, 237, 246; Sch.10, 18-20, 29.[7]

Plaintiffs also offer facts showing that this conduct brought about a startling change in both CMS and its co-Defendants' margins during the Class Period. ¶¶126, 205, 223-24, 227, 238, 241, 245, 253, 255-56, 261, 264, 275-77, Figures 6, 40, 43; Sch.9, 18-22.

### 2. The Complaints Plausibly Allege Cargill Cut Cash Cattle Purchases During Periods of Slaughter Restraint in Parallel with its Co-Defendants

The Complaints allege that CMS and each of its co-Defendants made parallel reductions in each of their cash cattle purchases during periods of slaughter restraint. ¶¶20, 135-46, 204-13, 230, 249-50, 257-60; Sch.11, 17. By reducing their purchases of cash cattle, CMS and its co-Defendants sought to reduce the price of all cattle by leveraging the impact that cash cattle purchase prices had on the prices paid under the much larger formula and forward contracts pegged to that cash baseline. ¶¶6, 20, 90-94, 136, 139, 144; Sch.7, 11. This practice allowed CMS and its co-Defendants to "back-up" the volume of slaughter-ready cash cattle, thereby forcing Producers to overfeed their cattle and/or accept lower prices. *Id*. Plaintiffs provide individualized allegations regarding the degree to which each Defendant, including CMS, reduced its cash cattle purchases across 2015 and the summer of 2016. ¶¶137-45, 204-213, 230; Sch.11, 18-19; *see also* ¶¶249-50, 257-60; Sch.21 (detailing reductions in cash cattle purchases in 2019).

---

[7] Nor, in light of its much-more-significant year-on-year annual slaughter reduction in 2014, does Cargill's nominal 2015 "expansion" of its slaughter volume affect Defendants' efforts to manage their collective demand for cattle. *See Broiler Chicken*, 290 F. Supp. 3d at 792 (alleged conspiracy left "room for some participants to merely cancel production increases").

Defendants' purchase records (available only for the period from January 2019 through April 2020), support these allegations and demonstrate how successful Defendants' coordinated procurement tactics were.  ¶152; Sch.12.  These data show that Cargill paid remarkably similar cash cattle prices to its co-Defendants throughout that period, even though record beef demand and market disruptions caused by the Holcomb plant fire created opportunities for Defendants to increase market share and profits.  *See* ¶¶256-59, Figure 9; Sch.21.  And while the meat margin skyrocketed in 2019, Cargill made no move to take advantage of available profit by increasing cattle prices or decreasing beef prices in a bid to capture market share.  Rather, Cargill increased beef prices in parallel with other Defendants.  *See, e.g.*, DPP, ¶¶168, 172.

Cargill's attacks on Plaintiffs' allegations about its cuts in cash cattle purchases largely mimic those in Defendants' joint motion to dismiss.  First, Cargill essentially admits that it cut its cash cattle purchases in parallel with its co-Defendants, but insists its cuts were not *sufficiently* parallel to be afforded much weight as circumstantial evidence.  C.Br. at 8-9.  But, again, to make out a cognizable allegation of parallel conduct, Plaintiffs need not plead that each Defendant reduced its cash cattle purchases on precisely the same percentage basis, at precisely the same time.  *See Pork II*, 2020 WL 6149666, at *6, n.12. Plaintiffs allege that each Defendant reduced its cash cattle purchases during periods of slaughter restraint to drive down the price of all cattle by utilizing the link between cash cattle prices and the prices paid under formula and forward contracts.  Dataset A furnishes individualized data that supports these allegations.  ¶¶137-45; Sch.11.  That Cargill might have reduced its cash cattle purchases to differing degrees than National Beef, Tyson Fresh,

and Swift between 3Q2014 and 3Q2015 is of little consequence.  What matters is that each Operating Defendant reduced its cash cattle purchases in an attempt to jointly depress cattle prices, which Plaintiffs allege.

Second, Cargill contends that it might have had "many legitimate reasons" to prefer formula contracts.  C.Br. at 7-8.  Even if it were appropriate to proffer factual contentions on a Rule 12 motion, Cargill does not even attempt to specify what those "legitimate reasons" were, or why they suddenly became apparent to CMS in 2015 at the same time its co-Defendants were also shunning the cash cattle market.

In any event, Cargill's bigger issue is that it cannot address or explain away the incentives CMS shared with its co-Defendants to manipulate reported cash cattle prices to benefit the vast majority of cattle they procured on their formula contracts.  ¶¶94-95; Sch.6. Courts have long recognized that competitors whose prices or costs are pegged to a common benchmark have an incentive to conspire to manipulate that benchmark.  *See, e.g.*, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987-89 (9th Cir. 2000) (conspiracy to manipulate benchmark for bulk cheese auction prices); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.,* 253 F. Supp. 2d 262, 272-74 (D. Conn. 2003) (conspiracy to inflate price of butter, a component of minimum milk prices).

In these circumstances, Plaintiffs' factual allegations detailing how CMS and its co-Defendants reduced their cash cattle purchases, including in 2015 (¶¶136-139, 211-13, 221, 224-25; Sch.11, 17), the summer of 2016 (¶230; Sch.19), the first quarter of 2019 (¶¶249-50; Sch.21), and in the aftermath of the Holcomb Fire (¶¶256-59; Sch.21; DPP, ¶¶168-170), in order to "back-up" the volume of perishable, slaughter-ready cash cattle and

thereby depress prices for both cash cattle and formula/forward-contract cattle, plausibly states Defendants' agreement and Cargill's involvement in it.

### 3. The Complaints Plausibly Allege that Cargill Took Other Acts in Furtherance of the Conspiracy

Plaintiffs also allege that CMS took other specific, individual steps to suppress fed cattle prices in parallel with all Defendants, among them strategically importing Canadian cattle to suppress demand for U.S. fed cattle and closing its Plainview, Texas and Milwaukee, Wisconsin plants to restrict slaughter capacity in 2013 and 2014 respectively. ¶¶186, 190; Sch.15, 16; DPP, ¶173. When considered in conjunction with the totality of Plaintiffs' allegations, these allegations provide further support for Defendants' conspiracy and Cargill's participation in it.

With respect to Cargill's Canadian imports, Plaintiffs allege that CMS's strategic importation of Canadian cattle evidences an intent to depress U.S. fed cattle cash prices because CMS would not choose to incur the additional costs of importing foreign cattle unless it was certain its major competitors would do same. ¶188; Sch.15. In response, Cargill tells the Court that its Canadian imports are not alleged to have been "uneconomical" or made in parallel with other Defendants. C.Br. at 12. This is untrue. Plaintiffs allege that CMS, Tyson Fresh, Swift and Packerland each strategically imported Canadian cattle, and that they were willing to incur the additional costs of importing that Canadian cattle because they were certain that, with their major competitors doing the same, it would lower their fed cattle supply procurement costs in the U.S. ¶¶186-88; Sch.15. Indeed, the very crux of the allegations center on Defendants, in parallel, importing

cattle into the U.S. even after it became unprofitable to do so.  ¶¶180-88; Sch.15.[8]

With respect to CMS's Plainview, Texas and Milwaukee, Wisconsin plant closures, Plaintiffs allege that each Defendant closed or idled plants in the run up to and in the early part of the Class Period.   These closures created the conditions that made Operating Defendants' concerted slaughter reduction and restraint successful.  ¶¶189-97; Sch.16; DPP, ¶¶173-78.  Cargill argues that its 2013 and 2014 plant closures "do not plausibly support an alleged conspiracy beginning in 2015." C.Br. at 12.  But Plaintiffs' allegations concerning Cargill's plant closures support their allegation that Cargill and its co-Defendants "commenced *or accelerated* their conspiracy to depress and stabilize the price of fed cattle purchased in the United States" in the months leading up to 2015.  ¶¶99-100; Sch.6; *see* DPP, ¶173 (alleging plant closures as part of "a longer-term strategy to restrict beef supplies").   They are thus, when considered along with all the allegations in the Complaints, further indicia of a conspiracy.  *See* Omnibus Opp. §II.E (addressing Defendants' arguments regarding their plant closures).

### B.   The Complaints Allege Additional Plus Factors Beyond Those the Court Already Characterized as "Undoubtedly Strong"

As explained more fully in the Omnibus Opposition, the Court has already concluded that "the plus factors identified and discussed by Plaintiff[s] are undoubtedly strong and are of the type often used to support an inference of an agreement." *Cattle*, 2020 WL 5884676, at *6.  In addition, the ongoing government investigations of Cargill

---

[8]     These uneconomic imports did not, however, offset the drastic cuts to domestic cattle purchases. *See* DPP, ¶227.

by the DOJ and the USDA are further plus factors strongly supporting an inference of conspiracy.[9]

Though Cargill relies on *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) to suggest that government investigations "carr[y] no weight in pleading an antitrust conspiracy claim," the weight of authority says otherwise. *See, e.g.*, *In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-MD-2670 JLS (MDD), 2017 WL 35571, at *7 (S.D. Cal. Jan. 3, 2017) (acknowledging *Graphics* but "agree[ing] with Plaintiffs that a pending investigation may bolster additional allegations"); *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 363 (S.D.N.Y. 2019) (allegations are "bolstered" by "ongoing Department of Justice investigation into the same alleged misconduct"); *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010) (inference of conspiracy plausible in part because DOJ launched investigations into possible price-fixing by defendants); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1008 (E.D. Mich. 2010) (pending investigations by a state attorney general and the DOJ Antitrust Division are plus factors suggesting a conspiracy). The plus factors weigh heavily against Cargill.

## III.   THE COMPLAINT PLAUSIBLY ALLEGES THAT CARGILL VIOLATED THE COMMODITIES EXCHANGE ACT

Plaintiffs allege that Cargill manipulated CME live cattle futures by suppressing

---

[9]   The DOJ is investigating Defendants ███████████████ for the very conduct that is the subject of these Complaints.  ¶¶315-16; Sch.31.  Moreover, the USDA is investigating Defendants, including CMS and Cargill Inc. for their parallel conduct following the fire at Tyson's Holcomb, Kansas plant, and for their pricing and practices throughout the pandemic.  ¶¶263, 265, 323-27; Sch.21, 31.

prices in the physical market for fed cattle, the commodity underlying CME live cattle futures. ¶¶390-92. Cargill also established a significant, manipulative "short" position in CME live cattle futures. ¶¶393-408. Although the specifics of their transactions are unknown, CMS and Cargill are alleged to have regularly transacted cattle futures. ¶378. Moreover, Cargill owned and operated four CME-approved live cattle slaughter plants from 2015-2020. ¶380, Figure 44. Cargill is alleged to be a part of the "Livestock Slaughterers" category that the U.S. Commodity Futures Trading Commission indicated held a significant short position in CME live cattle futures during the reporting period, November 2016-November 2019. ¶¶397-401.

The Cargill entities' motion focuses exclusively on allegations concerning their conduct in the futures market. They do not dispute that their conduct in the physical market – if manipulative – constitutes manipulation of the "commodity underlying" live cattle futures, and thereby gives rise to manipulation claims under the CEA. 7 U.S.C. § 25(a)(1)(D)(ii). Nor do they challenge that, as principals, they are liable for the manipulation by their agents, 7 U.S.C. § 2(a)(1)(B), and those whom they aided and abetted. 7 U.S.C. § 25(a)(1). *See* C.Br. at 13.

With respect to the futures market, Cargill – one of the world's largest multinational agricultural entities – disclaims that there is any "evidence" that it engaged in CME live cattle futures trading, and that instead it simply comments on market conditions. C.Br. at 13. As noted, however, Plaintiffs allege that Cargill traded CME live cattle futures, ¶378, owned CME-approved live cattle slaughter plants, ¶380, and was part of the group that the CME describes anonymously as the "Livestock Slaughterers." ¶397. To the extent Cargill

18

is quibbling with the absence of specifics concerning its futures trading, such transactions are non-public, and the exchange is anonymous.  Under these circumstances, Plaintiffs "cannot be expected to have alleged with [] precision" the specifics of Cargill's futures trading activity.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 718 (S.D.N.Y. 2013), *rev'd on other grounds*, 823 F. 3d 759 (2d Cir. 2016). "Dismissal of the CEA claim is not warranted based on the lack of detail that Plaintiffs cannot be expected to know at the pleading stage."  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7784, 2016 WL 5108131, at *20  (S.D.N.Y. Sept. 20, 2016).

## IV.        BOTH CARGILL ENTITIES ARE PROPERLY NAMED

The Complaints allege that Cargill, Inc. and its subsidiary CMS "shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct that caused injury to, and derived direct benefit from, members of both Classes . . . ."  ¶60; Sch.5; DPP, ¶37.  Moreover, the Complaints allege that Cargill, Inc. "is not a mere investment mechanism" but rather created "subsidiaries, including CMS, to carry out business on Cargill, Inc.'s behalf."  Appendix 1, ¶27; Sch.5; *see* DPP, ¶71 ("Cargill, Inc. created CMS as its instrumentality to execute Cargill, Inc.'s directives.").

They further allege that "Cargill holds itself out as a single, unified enterprise with its subsidiaries," and when describing its employees, includes employees of both Cargill and CMS.  Appendix 1, ¶28; Sch.5; *see* DPP, ¶64.  The Complaints also provide examples of situations where the identities of the companies and their employees, operations and earnings are commingled in discussions of company business.  Appendix 1, ¶¶29-34;

19

Sch.5; DPP, ¶¶66, 68-69.  Further, the Complaints allege that Cargill, Inc. actively manages its beef business through CMS and identifies a multitude of former Cargill, Inc. executives with "responsibilities relating to cattle and/or beef."  Appendix 1, ¶35; Sch.5; *see* DPP, ¶¶68-69.

These allegations sufficiently establish that Cargill, Inc. and CMS operated as a "single enterprise" within the meaning of the Supreme Court's decision in *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984).  Antitrust law treats corporate affiliates as a "single enterprise" as a matter of law when they engage in "coordinated conduct."  *Copperweld*, 467 U.S. at 753; *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018) (finding subsidiary could be liable for conspiracy when it sold gas at prices fixed by its parent even though its managers did not know of parents' price-fixing activities).

Under this rule, courts have long held that affiliates cannot conspire with each other. As a corollary, courts have recognized that affiliates should be treated as a single enterprise when considering whether their coordinated actions constitute a violation of the Sherman Act.  *See, e.g.*, *Arandell Corp.*, 900 F.3d at 631 ("It would be inconsistent to insist both (1) that two affiliates are incapable of conspiring with each other for purposes of Section 1 of the Sherman Act because they 'always' share a 'unity of purpose,' and (2) that one affiliate may escape liability for its own conduct – conduct necessary to accomplish the illegal goals of the scheme – by disavowing the anticompetitive intent of the other, even where the two acted together.") (cleaned up).

Though the Eighth Circuit has not considered this question, *Arandell Corp.* is persuasive, and consistent with the decisions of other courts that have considered the issue. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1236 (10th Cir. 2017) (under *Copperweld*, the plaintiff did not need to prove that "'***specific*** Defendants' independently satisfied each necessary element of the claims," because "in a single-enterprise situation, it is the affiliated corporations' collective conduct – *i.e.*, the conduct of the ***enterprise*** they jointly compose – that matters; it is the ***enterprise*** which must be shown to satisfy the elements of a [Section 2] claim") (emphasis in original); *Unigestion Holding, S.A. v. UPM Tech., Inc.*, 305 F. Supp. 3d 1134, 1146 (D. Or. 2018) ("related entities' coordinated conduct must be treated as the unitary conduct of the single enterprise which together they form, and it is that aggregated conduct which must be scrutinized") (quoting *Lenox*, 847 F.3d at 1236); *Chandler v. Phoenix Servs.*, No. 7:19-CV-00014-O, 2020 WL 1848047, at *12 (N.D. Tex. Apr. 13, 2020) (adopting *Arandell Corp.* and *Lenox*, finding both "persuasive").

Cargill offers no authority for its suggestion that this Court should deviate from *Arandell Corp. Cf.* C.Br. at 15.  Moreover, as the Eighth Circuit has previously stated that "the logic of *Copperweld* reaches beyond its bare result," there is no reason to believe that it would decline to follow the Ninth and Tenth Circuit's conclusion in this regard.  *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.* ("*Mt. Pleasant*"), 838 F.2d 268, 274 (8th Cir. 1988).

Under *Arandell Corp.* and *Lenox*, each affiliate in the "enterprise" need not independently satisfy each element of the alleged violation.  Rather, it is sufficient that "the

conduct of the *enterprise* they jointly compose . . . be shown to satisfy the elements of a [claim]." *Arandell Corp.*, 900 F.3d at 631 (emphasis in original). Each entity is liable for the enterprise's breach if they "in fact participated in coordinated activity in furtherance of the alleged . . . conspiracy." *Id*. at 634; *Mt. Pleasant*, 838 F.2d at 276 (affiliates part of the same "enterprise" unless they "are, or have been, actual or potential competitors").

The Complaints allege facts showing that Cargill, Inc.: directed CMS's conduct regarding CMS's cattle procurement, slaughter and beef sales (Appendix 1, ¶¶27, 30-35; Sch.5; *see* DPP, ¶¶68, 71), benefited from the inflated meat margin generated by Defendants' conspiracy (¶¶275-77, Figures 6, 43; Appendix 1, ¶29; Sch.5, 22), issued public statements that covered up the operation of the conspiracy (¶¶442-43; Sch.34; DPP, ¶¶270-71, 275-77), ███████████████████████████████ (¶315; Sch.31).

Accordingly, the Complaints adequately plead that Cargill, Inc. and CMS are part of a "single enterprise" within the meaning of *Copperweld*, and that both "helped to carry out the inter-enterprise conspiracy with the other . . . companies." *Arandell Corp.*, 900 F.3d at 365. These same facts evidencing Cargill, Inc.'s contribution to the Cargill single enterprise's participation in the alleged conspiracy also meet the "direct and independent participation" standard for parental liability addressed in *Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, 9 F. Supp. 3d 1032, 1045 (D. Minn. 2014).

## CONCLUSION

The Court should deny Cargill's motion to dismiss in its entirety.

Dated: April 5, 2021

Respectfully Submitted.

/s/ Christopher M. Burke
Christopher M. Burke (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508
cburke@scott-scott.com

David R. Scott (*pro hac vice*)
Amanda F. Lawrence (*pro hac vice*)
Patrick J. McGahan (*pro hac vice*)
Michael P. Srodoski (Bar No. 0398250)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Tel.: 860-537-5537
Fax: 860-537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Anthony F. Fata (*pro hac vice*)
Jennifer W. Sprengel (*pro hac vice*)
Christopher P.T. Tourek (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER**
**& SPRENGEL LLP**
150 S. Wacker
Suite 3000
Chicago, IL 60606
Tel.: 312-782-4882
Fax: 312-782-4485
afata@caffertyclobes.com
jsprengel@caffertyclobes.com
ctourek@caffertyclobes.com

23

boconnell@caffertyclobes.com

Ellen Meriwether (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
205 N. Monroe St.
Media, PA 19063
Tel.: 215-864-2800
Fax: 215-864-2810
emeriwether@caffertyclobes.com

*Interim Co-Lead Counsel for the Cattle
Plaintiffs*

Stacey P. Slaughter (Bar No. 0296971)
K. Craig Wildfang (Bar No. 0117043)
Thomas J. Undlin (Bar No. 0183751)
Geoffrey H. Kozen (Bar No. 0398626)
Eric P. Barstad (Bar No. 0398979)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Tel: 612-349-8500
Fax: 612-339-4181
sslaughter@robinskaplan.com
kcwildfang@robinskaplan.com
tundlin@robinskaplan.com

*Liaison Counsel for the Cattle Plaintiffs*

Michael L. Schrag (*pro hac vice*)
Joshua Bloomfield (*pro hac vice*)
George Sampson (*pro hac vice*)
Kyla Jenny Gibboney
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel.: 510-350-9700
mls@classlawgroup.com
jjb@classlawgroup.com
gws@classlawgroup.com

24

kjg@classlawgroup.com


David E. Kovel (*pro hac vice*)
Thomas W. Elrod (*pro hac vice*)
Karen M. Lerner (*pro hac vice*)
Anthony E. Maneiro (*pro hac vice*)
**KIRBY MCINERNEY LLP**

250 Park Avenue, Suite 820
New York, NY 10177
Tel.: 212-371-6600
dkovel@kmllp.com
telrod@kmllp.com
klerner@kmllp.com
amaneiro@kmllp.com


Richard M. Paul III (*pro hac vice*)
Sean Cooper (*pro hac vice forthcoming*)
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Tel.: 816-984-8100
Rick@PaulLLP.com
Sean@PaulLLP.com


Melissa Weiner (MN #0387900)
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Tel.: 612-389-0600
mweiner@pswlaw.com


Bruce L. Simon (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Tel.: 415-433-9000
bsimon@pswlaw.com


Daniel L. Warshaw (*pro hac vice*)
Bobby Pouya (*pro hac vice*)

25

Matthew A. Pearson (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Tel.: 818-788-8300
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mapearson@pswlaw.com

*Plaintiffs' Executive Committee*

/s/ Shana E. Scarlett
Shana E. Scarlett (*pro hac vice*)
Rio S. Pierce (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Breanna Van Engelen (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

W. Joseph Bruckner (MN #0147758)
Brian D. Clark (MN #0390069)
Arielle S. Wagner (MN #0398332)
Stephanie A. Chen (MN #0400032)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South,
Suite 2200
Minneapolis, MN 55401
Tel:  612) 339-6900

26

Fax: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
aswagner@locklaw.com
sachen@locklaw.com

*Interim Co-Lead Class Counsel for
Plaintiffs in the* Peterson *Action*

/s/ Joshua J. Rissman
Daniel E. Gustafson (MN #202241)
Daniel C. Hedlund (MN #258337)
Michelle J. Looby (MN #0388166)
Joshua J. Rissman (MN #0391500)
Brittany Resch (MN #397656)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com

Dennis J. Stewart (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 B Street, 17thFloor
San Diego, CA 92101
Tel: (612) 333-8844
Fax: (612) 339-6622
dstewart@gustafsongluek.com

Adam J. Zapala (*pro hac vice*)
Elizabeth Tran Castillo (*pro hac vice*)
Reid W. Gaa (*pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000

Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
rgaa@cpmlegal.com

Alexander E. Barnett (*pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
40 Worth Street, 10th Floor
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753
abarnett@cpmlegal.com

Jason S. Hartley (*pro hac vice*)
**HARTLEY LLP**
101 W. Broadway, Suite 820
San Diego, CA  92101
Tel: (619) 400-5822
hartley@hartleyllp.com

Megan E. Jones (*pro hac vice forthcoming*)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
mjones@hausfeld.com

*Interim Co-Lead Counsel for the Proposed
Direct Purchaser Plaintiffs*

*/s/  Blaine Finley*
Jonathan W. Cuneo (*pro hac vice*)
Blaine Finley (pro hac vice)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3960
jonc@cuneolaw.com
bfinley@cuneolaw.com

Shawn M. Raiter (MN #240424)
**LARSON KING LLP**
30 East Seventh Street, Suite 2800

28

Street Paul, MN 55101
Tel: (651) 312-6518
sraiter@larsonking.com

Don Barrett (*pro hac vice*)
Katherine Barrett Riley (*pro hac vice*)
David McMullan (*pro hac vice*)
Sterling Starns (*pro hac vice*)
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095-0927
Tel: (662) 834-9168
Fax: (662) 834-2628
donbarrettpa@gmail.com
kbriley@BarrettLawGroup.com
dmcmullan@BarrettLawGroup.com
sstarns@barrettlawgroup.com

*Counsel for Commercial and Institutional Indirect Purchaser Plaintiff Erbert & Gerbert's, Inc.*