# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE CATTLE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | Case No. 0:19-cv-1222-JRT-HB |
| PETERSON, et al.,<br>                 Plaintiffs,<br>      v.<br>JBS S.A., et al.,<br>               Defendants. | Case No. 0:19-cv-01129-JRT-HB |
| IN RE DPP BEEF LITIGATION<br><br>This document relates to:<br><br>ALL CASES | Case No. 0:20-cv-1319-JRT-HB |
| ERBERT & GERBERT'S, INC.,<br>              Plaintiff,<br>      v.<br>JBS USA FOOD COMPANY HOLDINGS, et al.,<br>             Defendants. | Case No. 0:20-cv-01414-JRT-HB |

# MEMORANDUM OF LAW
# IN OPPOSITION TO MOTION TO DISMISS BY DEFENDANT
# NATIONAL BEEF PACKING COMPANY, LLC

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................ii

INTRODUCTION ............................................................................................... 1

ARGUMENT...................................................................................................... 3

I.  PLAINTIFFS ALLEGE DIRECT EVIDENCE THAT NATIONAL BEEF
    PARTICIPATED IN THE CONSPIRACY ............................................... 3

    A.  Jason Provides Direct Evidence Tying National Beef to Defendants'
        Conspiracy................................................................................ 4

    B.  Matt Provides Direct Evidence Tying National Beef to Defendants'
        Conspiracy. ............................................................................... 9

II. PLAINTIFFS' ALLEGATIONS OF PARALLEL CONDUCT AND PLUS
    FACTORS STATE CLAIMS AGAINST NATIONAL BEEF. .......................... 12

    A.  Plaintiffs Plead Individualized Allegations in Support of Parallelism
        Against National Beef .................................................................. 13

        1.  The Complaints Adequately Allege that National Beef Closed and
            Idled Plants in Furtherance of the Conspiracy. ................................ 13

        2.  The Complaints Plausibly Allege that National Beef Periodically
            Restrained Slaughter Volumes and Cash Cattle Purchases in Parallel
            with the Other Defendants............................................................ 15

        3.  National Beef Engaged in Collusive Procurement Practices ........... 21

    B.  Plaintiffs' "Plus Factors" Are Undoubtedly Strong and National Beef's
        Arguments to the Contrary Are Unpersuasive ............................................ 22

    CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
    175 F. Supp. 3d 44 (S.D.N.Y. 2016)....................................................................... 25

*B & R Supermarket, Inc. v. Visa, Inc.*,
    No. C 16-01150 WHA, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016)........................ 8

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................ 3, 4, 13

*Berigan v. United States*,
    257 F.2d 852 (8th Cir. 1958) ................................................................................ 12

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
    203 F.3d 1028 (8th Cir. 2000) .............................................................................. 14

*In re Blood Reagents Antitrust Litig.*,
    266 F. Supp. 3d 750 (E.D. Pa. 2017) .................................................................... 23

*Brooks v. Ross*,
    578 F.3d 574 (7th Cir. 2009) ................................................................................. 7

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011)................................................................................... 5

*In re Cattle Antitrust Litig.*,
    Civil No. 19-1129 (JRT/HB), 2020 WL 5884676 (D. Minn. Sept. 29,
    2020) ................................................................................................... *passim*

*In re Commodity Exch., Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016).................................................................... 19

*Davis v. Buchanan Cty. Missouri*,
    446 F. Supp. 3d 493 (W.D. Mo. 2020) ................................................................... 7

*Domestic Airline Travel Antitrust Litig.*,
    221 F. Supp. 3d 46 (D.D.C. 2016) ........................................................................ 18

*In re Generic Pharm. Pricing Antitrust Litig.*,
    338 F. Supp. 3d 404 (E.D. Pa. 2018) ........................................................ 24

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) .................................................................. 12

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ..................................................................... 3

*In re Interior Molded Doors Antitrust Litig.*,
    2019 WL 4478734 (E.D. Va. Sept. 18, 2019) ........................................... 23

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    340 F. Supp. 3d 285 (S.D.N.Y. 2018) ........................................................ 7

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) .................................................................... 25

*Nypl v. JPMorgan Chase & Co.*,
    2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) ............................................ 19

*In re Pork Antitrust Litig.*,
    No. 18-cv-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ............... 22, 24

*Romine v. Acxiom Corp.*,
    296 F.3d 701 (8th Cir. 2002) .................................................................... 7

*In re Text Messaging Antitrust Litig.*,
    630 F.3d (7th Cir. 2010) ........................................................................ 24

*In re Titanium Dioxide Antitrust Litig.*,
    959 F. Supp. 2d 799 (D. Md. 2013) ......................................................... 24

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008) ..................................................................... 8

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ........................................................................... 18

*Wacker v. JP Morgan Chase & Co*,
    678 Fed. Appx. 27 (2d Cir. 2017) ........................................................... 18

## INTRODUCTION

Plaintiffs' amended complaints cure the deficiencies the Court identified in its September 28, 2020 Order.[1] *In re Cattle Antitrust Litig.*, Civil No. 19-1129 (JRT/HB), 2020 WL 5884676, at *5 (D. Minn. Sept. 29, 2020) ("*Cattle*"). As explained in Plaintiffs' Omnibus Opposition, Plaintiffs sufficiently detail the direct evidence Jason F. ("Jason" or "Witness 1") and Matt T. ("Matt" or "Witness 2") provided, and include Defendant-specific allegations of parallel conduct.

To begin with, Plaintiffs identify Jason (Witness 1); his employer, Swift; and how his work at Swift brought him into regular contact with James Hooker, Fabrication Manager at Swift's Cactus, Texas plant. The Complaints explain that Hooker specifically told Jason about an "agreement" among all Defendants, including National Beef, to cut their slaughter volumes in response to high prices. Plaintiffs further explain that Hooker was in frequent contact with friends and former colleagues at other Defendants' packing plants, including National Beef's packing plant in Liberal, Kansas, and provided Jason with detailed information about current and future operations at those plants. These allegations alone are sufficient to state a claim against National Beef.

---

[1] All capitalized terms and acronyms not otherwise defined herein have the meanings ascribed in Plaintiffs' Omnibus Opposition to Defendants' Joint Motion to Dismiss Plaintiffs Federal Claims filed contemporaneously herewith ("Omnibus Opposition" or "Omnibus Opp."), or the Cattle Complaint. References to "ECF No." are to the docket of *In re Cattle Antitrust Litigation.*, Civil No. 19-1222 (JRT/HB), unless stated otherwise. All "¶_," "¶¶_," and "Figure" references are to the Cattle Complaint unless stated otherwise. All references to "N.Br." are to National Beef Memorandum in Support of Its Motion to Dismiss (ECF No. 334). References to "DPP," "Peterson," and "E&G" are references to the DPP, Peterson, and E&G Complaints, respectively.

While National Beef claims that Jason's allegations need not be credited because he did not work for National Beef, that is simply not the law.  Direct evidence, including in the form of admissions like those from Hooker, frequently comes from competitor firms and their employees.

The same applies to the newly detailed allegations from Matt, who provides direct evidence of one collusive procurement practice described in the Complaints – the queuing convention.  As explained in the Omnibus Opposition, the queuing convention limited Producers' ability to generate price competition for their cash cattle, and was enforced by all Defendants, including National Beef, at Matt's feedlot.  The queuing convention, like Defendants' coordinated slaughter restraint, was another means by which Defendants accomplished their goal of artificially driving down the price of fed cattle and maximizing the meat margin.  *See Cattle*, 2020 WL 5884676, at *5.

Plaintiffs likewise include allegations specific to National Beef to demonstrate its role in the conspiracy.  For each allegation, Plaintiffs rely on data specific to National Beef, rather than utilizing the type of market-wide data the Court found inadequate in *Cattle*.  Among other conduct, the Complaints use individualized data to lay out how National Beef:

- set the stage for the conspiracy by closing its Brawley, California plant in June 2014, and thereby lowering its processing capacity by 2,000 head per day or more than half a million head a year;

- regularly changed its slaughter volumes in parallel with every other Defendant throughout the Class Period, in a manner it had not done prior to the Class Period;

- reduced its cash cattle purchases in parallel with every other Defendant at key moments during the Class Period, including across 2015, the summer of 2016, and

after the August 2019 fire at its Holcomb plant; and

- maintained a slaughter volume below its 2007-14 average throughout the Class period, in parallel with other Defendants, despite record meat margins and opportunities to grow its market share, and in contrast to Independent Packers.

Each of those allegations describes conduct National Beef specifically undertook in parallel with the other Defendants. Although National Beef quibbles about its degree of parallelism compared to the other Defendants, the law does not support dismissal based on such minor fluctuations in otherwise parallel conduct. And, when coupled with Plaintiffs' "undoubtedly strong" plus factors, the allegations are more than enough to state a claim against National Beef. *Cattle,* 2020 WL 5884676, at *14-15.[2] National Beef's motion to dismiss should be denied.

## ARGUMENT

## I. PLAINTIFFS ALLEGE DIRECT EVIDENCE THAT NATIONAL BEEF PARTICIPATED IN THE CONSPIRACY

As the Court previously held, Plaintiffs' direct evidence need only be "sufficiently detailed." *Cattle*, 2020 WL 5884676, at *5 (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 (3d Cir. 2010)). "Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate." *Cattle*, 2020 WL 5884676, at *4. Such allegations are sufficiently detailed where Plaintiffs offer "enough fact to raise a reasonable expectation that discovery will reveal" evidence of the illegal agreement. *Ins. Brokerage,* 618 F. 3d. at 324 (quoting *Twombly,* 550 U.S. at 556). *See also* Omnibus Op.

---

[2]     Unless otherwise noted, citations are omitted and emphasis is added in quoted materials.

at §II.A.

Through Jason, Plaintiffs offer direct evidence of Defendants' collusive agreement to restrain slaughter volume when fed cattle prices were too high.  Plaintiffs also offer direct evidence, through Matt F., of the existence and effect of a collusive procurement practice – the queuing convention – designed to limit price competition for cash cattle. This direct evidence connects all Defendants, including National Beef, to these practices, both of which are designed to achieve the same anticompetitive *goal* – namely, suppressing the prices Defendants, including National Beef, pay for fed cattle to maximize the meat margin.

In its prior opinion, the Court specifically rejected the application of a heightened pleading standard to the witness allegations.  It asked only that Plaintiffs explain better the jobs of the witnesses and "how their interactions in those jobs would lead to them acquiring the knowledge they allegedly possess."  *Cattle,* 2020 WL 5884676, at *13. Plaintiffs now include the additional detail the Court found lacking.  Furthermore, Jason and Matt's allegations tie National Beef to Defendants' conspiracy.

## A. Jason Provides Direct Evidence Tying National Beef to Defendants' Conspiracy

Jason offers direct evidence of an anticompetitive agreement among all Defendants, including National Beef, to periodically restrain purchase and slaughter volume when Operating Defendants viewed fed cattle prices as being or becoming "too

high." Omnibus Opp. at §II.A; ¶116[3]; Sch.8. Jason, a quality assurance officer at Swift's Cactus, Texas plant, learned about Defendants' collusion from his superior, James Hooker, whose position gave him reason to know about the anticompetitive agreement. ¶¶101, 104; Sch.8. Jason explained that he had multiple discussions with Hooker, who confirmed that all of Swift's nearby competitor plants, including National Beef's Liberal, Kansas plant, were parties to the agreement. *See* Omnibus Opp. at §II.A; ¶62. Hooker's statement of an agreement among all Defendants, and Jason's detailing of the same, is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011).

Faced with this direct evidence, National Beef wrongly insists that "Witness 1 fall[s] far short of implicating National Beef in any misconduct." N.Br. at 5. This argument rests on the assertion that Jason does not specifically mention "National Beef, its plan or any of its plants," but instead, refers to Swift's Cactus' "competitor plants." *See* N.Br at 5 (citing ¶118; Peterson, ¶104; DPP, ¶120). National Beef further argues that Jason somehow recanted his allegation that he asked Hooker about the plans of all Defendants' nearby plants, including National Beef's Liberal, Texas plant. N.Br. at 6.[4]

---

[3]    As in the Omnibus Opp., this brief principally cites to the Cattle Complaint. Equivalent cites to the DPP, Peterson, and E&G Complaints can be found in Exhibit B to the Declaration of Patrick McGahan in Support of Plaintiffs Memorandum of Law in Opposition to Defendants' Joint Rule 12(b)(6) Motion to Dismiss Federal Claims. *See* Omnibus Opp. at 6 n.6.

[4]    It is instructive to compare how National Beef describes the allegations in the Complaints with what the Complaints actually say. National Beef states: "Plaintiffs allege that Jason F's boss, James Hooker, once told him that Swift's "competitor plants" would be cutting their kills in an unspecified week sometime in 2015." N.Br. at 5. What

Each of these arguments lacks merit.

To begin with, the Complaints allege that Hooker "would often provide [Jason] with detailed information as to the current and future operations of Tyson Fresh, CMS, *and National Beef's* nearby packing plants."  *See* ¶115 (naming the "competitor plants," including National Beef); Sch.8.  It is clear, therefore, that the reference to "Swift Cactus's competitor plants" in paragraph 118 refers to "Tyson Fresh, CMS, and National Beef's nearby packing plants" immediately above in paragraph 115.  ¶115; Sch.8. Jason's allegations elsewhere also make clear that the agreement Hooker described involved the plants of each of Swift, Packerland, National Beef, Tyson Fresh, and CMS. *See, e.g.,* ¶¶116, 119 (referring to "all Packing Defendants"); Sch.8; DPP, ¶¶118, 122 (referring to "all . . . Operating Defendants").  As noted in the Omnibus Opposition, Defendants miss the mark in their attempt to point to small editing changes in Plaintiffs' amended complaints to claim that Jason somehow recanted his allegation that he asked Hooker about the plans of Tyson Fresh's, CMS's, and National Beef's nearby plants (including those at Amarillo, Friona, and Liberal, respectively), and that Hooker's answer, describing JBS's "agreement," encompassed each of the Defendants.  Omnibus Opp. at n.10.  The changes in the section were not prompted by any change in Jason's

---

the Complaints actually say is: Witness 1 reports having multiple discussions with Mr. Hooker during which Mr. Hooker explained that all Operating Defendants reduced their purchase and slaughter volumes in order to reduce fed cattle prices when Operating Defendants viewed fed cattle prices as being or becoming "too high" for their liking. During one such conversation, Mr. Hooker specifically admitted that the Operating Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.  ¶116.

recollection of his conversations with Hooker.  *Id.*

That Plaintiffs allege in the context of Jason's evidence and elsewhere that "all Packing Defendants" or all "Operating Defendants" agreed to reduce slaughter volumes, rather than painstakingly repeating this defined term as "National Beef, Tyson Fresh Meats, JBS Packerland, Swift Beef, and Cargill Meat Solutions" each time is not a basis to reject these allegations on a motion to dismiss.  *See Romine v. Acxiom Corp.*, 296 F.3d 701, 710 (8th Cir. 2002) ("To dismiss plaintiffs' claim because they fail to state the magic words . . . is improper and inconsistent with the liberal pleading requirements of Fed. R. Civ. P. 8(a)(2)."); *Davis v. Buchanan Cty. Missouri*, 446 F. Supp. 3d 493, 499 (W.D. Mo. 2020) ("No 'magic words' are required to plead a claim."); *accord Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009) ("In this paragraph, [plaintiff] adequately pleads personal involvement, because he specifies that he is directing this allegation at all of the defendants."); *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018) ("Because the Amended Complaint alleges each Defendant's participation separately, it is not impermissible group pleading to refer to their collective actions in furtherance of the conspiracy using a more general phrase such as 'the Prime Broker Defendants.'").  Plaintiffs were not required to list each Defendant in each paragraph of the Complaints.

National Beef also points to materials from outside the Complaints to offer an alternative explanation of Hooker's admission and his discussions with Jason.  Citing to Cattle Buyers Weekly Top 30 Beef Packers Report ("CBW Reports"), it asks the Court to take judicial notice of the proximity of two small Independent Packer's plants to Swift

7

Cactus's plant, in support of its contention that Jason and Hooker were referring to somebody other than National Beef when discussing Defendants' alleged agreement. Even if National Beef were permitted to do so (it's not),[5] the CBW Reports confirm that the comparatively tiny Caviness Beef Packers and Preferred Beef Group plants National Beef refers to would not have been viewed as competitors to Defendants' fed beef operations in 2015, as they are both cull cow and bull packers and thus participate in an entirely separate product market.[6]  Swift's Cactus, Texas plant was a fed cattle slaughter plant, as were the nearby plants of Tyson Fresh, CMS, and National Beef that Jason and Hooker discussed often.  ¶¶43, 49, 58, 62, 115; Sch.8.

National Beef also argues that Jason F. or Hooker needed to have worked for National Beef.  N.Br. at 5.  But no cases require that a witness can only implicate his or her own employer in a scheme or that a witness must have "direct knowledge" of a competitor's plans to implicate that party.[7]  *See, e.g.*, *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 220 (3d Cir. 2008) (holding that testimony describing

---

[5]    *B & R Supermarket, Inc. v. Visa, Inc.*, No. C 16-01150 WHA, 2016 WL 5725010, at *6 n.6 (N.D. Cal. Sept. 30, 2016) (refusing on motion to dismiss to take judicial notice of investor transcript that MasterCard claimed contradict an alleged admission made by it executive at an investor day, holding that the contents of the executive's statement was a factual dispute inappropriate "at the Rule 12 stage.").  *See also* Omnibus Opp. at n.10.

[6]    Declaration of Benjamin L. Ellison in Support of National Beef's Motion to Dismiss ("Ellison Decl.") Ex. A., Top 30 Beef Packers 2016 (noting under "cattle type" that in 2015 both Caviness Beef Packers and Preferred Beef Group's slaughter volume was comprised of 90% cull cow and bulls, and only 10% fed cattle.

[7]    Plaintiffs do allege Hooker provided Jason with "detailed information as to the current and future operations of . . . National Beef's nearby packing plants," and had friends and former colleagues at other Defendants, including National Beef, with whom he stayed in touch. ¶115; Sch.8.  This constitutes knowledge of competitors' plans.

statements of two Mack truck dealers that they "did not compete on price," and other testimony by Mack employees that dealers had a "gentlemen's agreement" or "unwritten understandings" not to compete in one another's territories was direct evidence of an agreement among dealers despite not describing direct communications among competing dealers or the "exact extent" of the alleged agreement); *see also* Omnibus Opp. at §II.A.

Finally, National Beef's argument that Jason's allegations are "vague and conclusory" because he does not provide details about the "current and future operations of Tyson Fresh, CMS and National Beef's nearby packing plants" is an improper attempt to weigh Jason's evidence.  N.Br. at 5 (quoting ¶115).  This Court has already held that a heightened pleading standard does not apply to Jason's allegations, and the specific details it found lacking – Jason's employer, his job, and how his interactions in his job would lead to him acquiring the knowledge he possesses – are now in the Complaints. *See* Omnibus Opp. at §II.A (addressing Defendants' request that the Court impose various improper standards).   Jason's factual allegations offer direct evidence that National Beef entered into an agreement with its competitors to periodically reduce fed cattle slaughter.

## B. Matt Provides Direct Evidence Tying National Beef to Defendants' Conspiracy

Matt's allegations directly tie National Beef to collusive procurement practices imposed on Matt at his feedlot.  As discussed in the Omnibus Opposition, Plaintiffs allege a conspiracy among Defendants to suppress fed cattle prices ***both*** by jointly

managing their demand below available supply *and* by engaging in collusive procurement practices designed to suppress cash cattle price competition. *See* Omnibus Opp. at §II.C. Matt provides a direct and detailed eyewitness account of the operation of one collusive procurement practice, the queuing convention, at his feedlot from 2012 until mid-2015 (six months into the Class Period). ¶¶159-64; Sch.13. Matt provides evidence linking each Defendant, including National Beef, to the queuing convention – a practice that the Court correctly described as "a concerted refusal to deal." *Cattle*, 2020 WL 5884676, at *13-14. *See* Omnibus Opp. at §II.C.

Under the convention, Defendants take "turns" opening the weekly cash cattle trade with the first bid. *See* Omnibus Opp. at §II.C. That first bidder is said to be "on the cattle," and by virtue of this position, obtains valuable rights, including a right of first refusal. Matt explained how, as manager of the 35,000-head Carrizo Feeders feedlot in Texline, Texas, he negotiated with field buyers from each of the Operating Defendants on a weekly basis – including National Beef's Richard Duffy. ¶¶143 & n.58, 167; Sch.11 and 13. Matt further detailed that these field buyers, including Mr. Duffy, enforced "strict adherence to [the queuing] convention with threats of retaliation," and "that each of these field buyers individually spoke to him about the importance of his feedlot complying with the convention and that they would not 'come by' anymore should he break it." ¶166; Sch.13. Those threats of boycott were taken seriously: "Packing Defendants' [including Mr. Duffy's] threats of boycott were sufficient to ensure adherence to the convention." ¶169; Sch.13.

The Complaints further set forth how, at Matt's feedlot, the right to make the first

bid for a specific lot of cattle was determined through a card draw imposed upon him by Mr. Duffy and his fellow field buyers from Swift, CMS and Tyson Fresh.  ¶¶170-72; Sch.13.  The Complaints explain that the field buyers from each of the Defendants, including Mr. Duffy, jointly demanded that Matt employ this procedure so they could avoid the inconvenience of coming to the feedlot at "increasingly early hours in an attempt to place the first bid."  ¶172; Sch.13. Matt directly ties Mr. Duffy and National Beef to this card-drawing scheme.  ¶170; Sch.13.

Once again, in the face of such detailed and direct evidence, National Beef makes a number of spurious arguments in an attempt to distance itself from Matt's eyewitness account of its involvement in, and enforcement of, the queuing convention.

To begin with, Matt's statements are not "mismatched" from the main thrust of Plaintiffs' price-fixing conspiracy. N.Br. at 8. (quoting *Cattle,* 2020 WL 5884676, at *14).  Plaintiffs allege a conspiracy to suppress fed cattle prices and widen the meat margin ***through a variety of means***.  *See id.*, at *5 (describing the alleged conspiracy and the various means to accomplish the goal).  Defendants' queuing convention, which operated to suppress price competition in the cash cattle market, was one of those means.  Matt's account provides direct evidence of Defendants' use of this convention (and National Beef's participation in it) at his feedlot.  Omnibus Opp. at §II.C.

Next, National Beef suggests it did not abide by the convention because its field buyers continued to visit Matt's feedlot despite the breach of the convention by the former manager.  N.Br. at 8.  Yet, the Complaints allege that field buyers from each Defendant, including Mr. Duffy, told Matt they expected adherence to the convention or

11

they would boycott the feedlot.  ¶¶166, 168-69; Sch.13.  In any event, National Beef's contention regarding its buyer's action prior to Matt's tenure at Carrizo Feeders fails to "distinguish between the existence of a conspiracy and its efficacy."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002).

Finally, National Beef argues that "Plaintiffs do not explain how a random draw to start the bidding affected each packer's ability to compete when, as Plaintiffs admit, other packers could offer higher bids."  N.Br. at 8.  This argument ignores cases finding similar schemes to pre-select bidding order to be anticompetitive and to facilitate price-fixing. *See, e.g., Berigan v. United States*, 257 F.2d 852, 857 (8th Cir. 1958) (finding "flipping coins" to determine bidding order anticompetitive under PSA); *see also* Omnibus Opp. at §II.C (citing further authorities).  Indeed, the fact that Defendants' buyers were willing to arrive earlier and earlier just to obtain the right to start the bidding demonstrates that the rights granted to the first bidder under the queuing convention ***were*** valuable.  The value of being "on the cattle" is also reflected in Matt's statement that he cannot recall a single instance where another Packer outbid the Packer who made the opening bid at his feedlot. ¶171; Sch.13.

Plaintiffs' detailed direct evidence of the operation of the queuing convention at Matt's feedlot, a convention that National Beef participated in and enforced, ties National Beef to Defendants' conspiracy.

## II.   PLAINTIFFS' ALLEGATIONS OF PARALLEL CONDUCT AND PLUS FACTORS STATE CLAIMS AGAINST NATIONAL BEEF

National Beef's parallel conduct with the other Defendants, coupled with plus

factors, establishes that Defendants' similar behavior "would probably not [have] result[ed] from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Cattle,* 2020 WL 5884676, at \*12 (quoting *Twombly*, 550 U.S. at 557 n.4).

### A. Plaintiffs Plead Individualized Allegations in Support of Parallelism Against National Beef

The Complaints now address the Court's prior concerns regarding the actions of each individual Defendant. None of National Beef's arguments to the contrary are persuasive.

### 1. The Complaints Adequately Allege that National Beef Closed and Idled Plants in Furtherance of the Conspiracy

The Complaints allege that National Beef took specific, individual steps in parallel with other Defendants to restrict its slaughter capacity, most notably closing its Brawley, California plant in June 2014.  ¶190; Sch.16.  National Beef closed the plant ***despite*** being offered a significant incentive package by local governments, utilities, and nearby feedlots invested in the plant's operation.  ¶¶190 & 193 n.82; Sch.16.  Doing so lowered National Beef's processing capacity by 2,000 head per day, or more than half a million head a year.  ¶190; Sch.16.  This plant closure coincided with plant closures or idling of plants by each of the other Defendants from 2013 to 2015.  *Id.*

National Beef's primary argument is that its closure is of "little relevance" because it occurred before the start of the conspiracy period. N.Br. at 9.  This argument is flawed. As set forth in the Omnibus Opposition, the fact that the conduct occurred before the Class Period does not mean this Court should disregard it, especially where the conduct

provides a context for the rest of Plaintiffs' claims.  Omnibus Opp. at §II.E (detailing why Defendants' reliance on *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1037 (8th Cir. 2000) is misplaced).  Furthermore, National Beef and its co-Defendants "commenced or accelerated their conspiracy to depress and stabilize the price of fed cattle purchased in the United States" in the months leading up to 2015. ¶¶99-100; Sch.1.  The closure of the Brawley plant, along with Defendants' closure of several other plants, provides additional examples of Defendants' pattern of refraining from expanding their respective slaughtering capacities or increasing their utilization of existing capacity.  ¶190; Sch.16.

Additionally, National Beef insists it did not reduce its slaughter capacity and instead touts production at the Brawley plant after an Independent Packer began operating it in 2015. N.Br. at 10.  This makes no sense. The fact that the plant was opened by an Independent Packer, during a period in which Defendants sought to restrict their slaughter capacity and volume below the available cattle supply, ***supports*** Plaintiffs' claim that National Beef was foregoing profitable production to further Defendants' conspiracy to reduce cattle prices.  *See also* ¶149 n.62 (alleging that Operating Defendants' procurement activities, rather than those of Independent Packers, set the market price for fed cattle); Sch.12; DPP, ¶177.

National Beef also invites the Court to draw an inappropriate, Defendant-favoring inference that its purchase of the Tama, Iowa plant in June 2019 increased the industry's total slaughter capacity, thus undermining the conspiracy claim. N.Br. at 10.  Not so. National Beef's acquisition of a pre-existing plant towards the end of the Class Period did

not add any slaughter capacity to the industry.  Indeed, the acquisition actually expanded Defendants' collective control over the rate at which fed cattle could be processed, and thus over fed cattle and beef prices.  Thus the acquisition, at a time when the available supply of cattle had increased, did not threaten the record margins Defendants were enjoying.  ¶¶133 n.51, 253-55, 261, 275-77; Sch.10 and 21.

> **2. The Complaints Plausibly Allege that National Beef Periodically Restrained Slaughter Volumes and Cash Cattle Purchases in Parallel with the Other Defendants**

Plaintiffs include Defendant-specific data to show that each Defendant's slaughter volumes moved in parallel after 2015 – a pattern that did not exist before Defendants' conspiracy.  *See, e.g.*, ¶¶127-32 & Figure 2; Sch.9 and 18.  That pattern is described in detail in Plaintiffs' Omnibus Opposition. Omnibus Opp. at §II.B.  National Beef's slaughter volumes and cash cattle purchases are consistent with these parallel trends:

- Q1 2015: National Beef's slaughter volume was down by 8.6% year over year from 2014 – parallel with the other Defendants, whose volume was either down or essentially flat (¶199; Sch.18);

- Q2 2015: National Beef's slaughter volume was down approximately 6.2% year over year from 2014 – parallel with the other Defendants (¶202; Sch.18);

- Year 2015:

  - National Beef's annual slaughter was down 6% compared to 2014 – and well below 2007-14 averages, parallel with other Defendants (¶214; Sch.18);

  - In common with the other Defendants, its cash cattle purchases were down significantly year-over-year and against its 2012-14 averages in the Q2 and Q3 (¶¶136-46 Tables 1-4; Sch.11; DPP, ¶134, Figure 7);

- Q1 2016: National Beef's slaughter volume was down in 2016 from Q4 2015 by 4.4% and lower than its average across 2012 to 2014 by 14.9% – parallel with

other Defendants (¶226 & n.112; Sch.19; DPP, ¶134);

- June and July 2016: All Defendants' cash cattle purchases were down between 16% and 83% against 2012-14 averages (¶230; Sch.19);

- 2016: In common with other Defendants, its quarterly volumes were down significantly year-over-year against 2012-14 averages (DPP, ¶134);

- Q1 2017: National Beef's slaughter volume was down quarter-over-quarter against Q4 2016 by 17.9% – parallel with other Defendants (¶239 n.126);

- Q2 2017: National Beef's slaughter volume was up in Q2 from Q1 2017 by 12.4% – in lockstep with increases by other Defendants (¶239 n.127);

- Q1 2018: National Beef's slaughter volume was down 4.7% against Q4 2017 – parallel with other Defendants (¶242; Sch.20);

- Q2 2018: National Beef and the other Defendants each raised their respective slaughter volume by 11.4-13.6% (¶244; Sch.20);

- Q3 2018: National Beef held its quarterly slaughter volume steady from Q2 at -0.7% – parallel with other Defendants (¶244; Sch.20);

- Q4 2018: National Beef reduced slaughter volume by 4.1% from Q3 – parallel with other Defendants (*Id.*); and

- Year 2019: National Beef and other Defendants' purchase price and slaughter volume (both total and cash cattle) moved in relative lockstep throughout the year. (Figure 9 and Figures 23-32; Sch.21).

National Beef disputes that the alleged facts show it engaged in parallel conduct.

To contest the pattern of parallel conduct, it argues that Plaintiffs' annual slaughter figures somehow contradict the conspiracy allegations because National Beef increased slaughter volume throughout the Class Period.  N.Br. at 11.  But as discussed more fully in the Omnibus Opposition, Plaintiffs do not allege – and never have alleged – that Defendants (including National Beef) reduced slaughter volume in an absolute manner throughout the Class Period.  Omnibus Opp. at §II.B.3.  Rather, Plaintiffs allege that

through agreements with respect to periodic purchase and slaughter restraint, often focused on cash cattle, Defendants caused gluts in cash cattle supply, driving fed cattle prices down, the meat margin up, and increasing wholesale beef prices.  ¶¶9-11, 123-35, 135-36.  The Complaints also allege that Defendants' yearly slaughter-volume increases from 2016 onward were much slower on a percentage basis than those of the Independent Packers.  ¶¶14, 132-34; Sch.10.  National Beef's annual slaughter volumes are consistent with these observed trends.  Figures 3 & 4.

National Beef also insists its decrease in slaughter volume from 2014 to 2015 is an "illusion" caused by the closure of its Brawley plant in 2014. N.Br. at 11.  But Plaintiffs allege that National Beef closed the Brawley plant in 2014, removing 2,000 head per day from its slaughtering capacity and reducing its total slaughter numbers.  ¶190; Sch.16; N.Br. at 12.  Closing the Brawley plant is not an "obvious alternative explanation" for National Beef's slaughter reduction (*see* N.Br. at 12), but instead it was part of the very groundwork for the coordinated slaughter reductions that the Complaints allege.  ¶189; Sch.16.

Regardless, National Beef gets the data wrong, demonstrating why Courts do not allow Defendants to engage in premature fact disputes on a motion to dismiss.  Contrary to National Beef's claim, N.Br. at 12, its operation of the Brawley plant from January to May of 2014 does not explain how National Beef's annual slaughter declined by 184,000 year-over-year in 2015 as reported in CBW's 2016 Top 30 Packers.  Brawley's slaughter volume had already been stripped out of CBW's prior report of National Beef's 2014

slaughter volume, which appeared in the 2015 Top 30 Packers report.[8]  Thus, the 184,000 year-over-year drop in National Beef's 2015 slaughter volume recorded by CBW reflected a year-over-year decline in the number of cattle processed at National Beef's Liberal and Dodge City, Kansas plants across 2015.

National Beef's other attacks on Plaintiffs' use of Defendants' 2007 to 2014 average slaughter volumes as a pre-conspiracy comparison are nothing more than premature methodological disputes.  N.Br. at 11.  Plaintiffs' economic analysis, like their other allegations, need only be plausible at this stage.   Omnibus Opp. at §II.B.5. Furthermore, averages are powerful and instructive, enabling clean and manageable comparisons of patterns in data sets.  Courts routinely sustain complaints that rely on economic analysis involving averages.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1043 (2016) (affirming the use of an average time study in FSLA case as evidence of the time employees spent donning and doffing protective gear); *Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 63–65 (D.D.C. 2016) (sustaining complaint that used averages in data analyses to support allegations of collusion); *Wacker v. JP Morgan Chase & Co*, 678 Fed. Appx. 27, 30 (2d Cir. 2017) (accepting analysis of

---

[8]      Using the standard industry assumption that plants should run 5.5 days per week (or 286 days per year), Brawley's annual slaughter volume equates to 572,000, nearly identical to the 575,000 head year-over-year drop in National Beef's 2014 annual slaughter volume reported by CBW.  Ellison Decl. Ex. A. (comparing 2015 Report's record of 2014 slaughter volume against 2014 Report's record of 2013 slaughter volume). In the years prior to this decline, National Beef's annual slaughter volume had been steady at about 3.7 million head a year, re-affirming that the significant year-over-year decline highlighted in National Beef's 2014 figures was driven by the removal of the Brawley plant's numbers.  *Id.*

average divergence of long-dated silver futures bid-ask spreads from a related benchmark); *Nypl v. JPMorgan Chase & Co.*, 2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) (accepting analysis of average divergence of consumer retail prices from published foreign exchange benchmark rates); *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 646 (S.D.N.Y. 2016) (accepting analysis of average bid dispersion and average price decline).[9]

National Beef next questions the validity of comparing Defendants' restrained slaughter increases during the Class Period with the conduct of Independent Packers, claiming its sale of the Brawley plant to an Independent Packer is the reason Independent Packers' slaughter volumes increased. N.Br. at 12-13. But National Beef misses the point. The rise of Independent Packers' slaughter volume shows that National Beef, along with its co-Defendants, all forwent profitable production despite record meat margins and increasing beef demand. Moreover, OneWorld Beef did not reopen the Brawley plant until November 28, 2016. ¶197; Ellison Decl., Ex. A. CBW 2016 Report. It thus cannot provide an "obvious alternative explanation" for why National Beef and its co-conspirators lagged behind Independent Packers' slaughter expansion in the first two crucial years of the Class Period.

National Beef then argues that data "shows no ***appreciable*** difference in its

---

[9]     Moreover, 2007 was an appropriate date to start Plaintiffs' pre-conspiracy comparison of Defendants' annual slaughter volumes as it captured each Defendant in their modern pre-conspiracy form, JBS S.A. having completed its acquisition of Swift in July of that year. Peterson, ¶275.

behavior before, during and after the alleged conspiracy period." N.Br. at 14. The Omnibus Opposition explains otherwise. Omnibus Opp. at §§II.B.1, 3, 4 & 5; *see also* ¶130 (detailing how Defendants' pre-Class Period quarter-to-quarter slaughter changes diverged significantly in a manner not witnessed during the Class Period). Nevertheless, using Defendant-specific yearly, quarterly, and (for 2019) monthly slaughter figures, the Complaints demonstrate that National Beef engaged in slaughter restraint in appreciable parallel with the other Defendants.

Finally, National Beef's attacks on Plaintiffs' allegations regarding its cuts in cash cattle purchases mimic those in Defendants' Joint Brief, and boil down to little more than disagreement with the data. *See* N.Br. at 15. Dataset A shows an extraordinary decline in cash cattle purchase volumes in Q2 and Q3 2015 as compared to the same periods in 2014.[10] National Beef's cash cattle purchases declined by 92% and 98%, respectively, in these quarters, ¶137; Sch.11, consistent with steep declines by each of the other Defendants over the same time periods. Unable to explain away these allegations, National Beef complains about the sample size.[11] It insists that the more-than-90% year-over-year decrease in its cash cattle purchasing between 2014 and 2015 was indicative only of "National Beef . . . buying more cattle under contract." N.Br. at 15. But Plaintiffs allege that National Beef and its co-Defendants each "pressur[ed] would-be cash sellers to commit their cattle on formula trades" as part of their attempts to reduce demand for

---

[10]    National Beef mistakenly characterizes these as "annual average decreases." N.Br. at 15. National Beef's annual change in cash cattle purchases is alleged separately at ¶145.

[11]    Dataset A is addressed in the Omnibus Opposition at §I.B.4 & 5.

cash cattle.  ¶135; *see also* ¶¶94, 140-44.   In parallel, National Beef and all other Defendants virtually withdrew from the cash cattle market in Q2 and Q3 of 2015 in order to back-up the volume of perishable, slaughter-ready cash cattle and precipitate a dramatic decline in prices. ¶¶139, 204-13; Sch.11 and 18.   Moreover, once they had succeeded in tanking the cash cattle price in 2016, National Beef, along with all other Defendants, moved in parallel back to the cash market, increasing its percentage of cash trades from 14.3% to 53.1%.  *See* ¶145 & Table 4; *see also* ¶230 (highlighting National Beef's participation in Defendants' reduced cash purchases across June and July 2016); Sch.19.

### 3.  National Beef Engaged in Collusive Procurement Practices

National Beef participated in and enforced the queuing convention and card-drawing scheme at Matt's feedlot, along with the other Operating Defendants, and it curtailed cash cattle purchases in parallel with other Operating Defendants.  *See supra* at §§I.B, II.A.2.[12]   It also, like the other Operating Defendants and unlike Independent Packers, made all its cash cattle purchases during a short trading window, usually on a Friday, in more than a third of the trading weeks from 2015-19 and in nearly half of the trading weeks in 2018.  ¶151; Sch.11.

National Beef claims these allegations are based on industry-wide data. N.Br. at 15-16.  But Dataset A shows that ***National Beef***, along with Tyson Fresh, Swift

---

[12]    The Complaints do not allege that National Beef imported cattle, though Plaintiffs do allege that National Beef shipped cattle extra-regionally to suppress cash cattle prices. ¶180; Sch.15.

and CMS, *each* made *all* **or substantially all** of their respective cash cattle purchases within the same 30-60 minute window on Friday during at least a third, and up to a half, of all trading weeks during the Class Period.  Meanwhile, Independent Packers continued to purchase cash cattle throughout the week.  ¶151; *see also* ¶152 and Figure 9 (highlighting pricing similarities generated by Defendants' coordinated procurement practices).

National Beef also engaged in "backing up" cattle in parallel with the other Defendants. The Complaints describe how Operating Defendants boycotted purchases in Nebraska, then Kansas, then Colorado, in parallel with each Operating Defendant boycotting the same states during the same weeks.  ¶¶174-79; Sch.14.  National Beef contests Plaintiffs' allegations by ignoring all those that refer to conduct engaged in by all Operating Defendants. N.Br. at 16-17.  That argument represents yet another improper rejection of the facts plead in the Complaints.

### B. Plaintiffs' "Plus Factors" Are Undoubtedly Strong and National Beef's Arguments to the Contrary Are Unpersuasive

The Court has already concluded "that '[t]he plus factors identified and discussed by Plaintiff[s] are undoubtedly strong and of the type often used to support an inference of an agreement." *Cattle*, 2020 WL 5884676, at *14-15 (quoting *In re Pork Antitrust Litig.*, No. 18-cv-1776, 2019 WL 3752497, at *7 (D. Minn. Aug. 8, 2019) ("*Pork I*")).  Those plus factors include:

- "[t]he fed-cattle market is highly concentrated; indeed, the four Defendants make up 83% of the market";

- "[d]emand for fed cattle, as a commodity, is . . . inelastic";

- "[t]he Defendants belong to trade associations and regularly communicate through them, along with attending conferences together";

- "Defendants engaged in actions against self-interest, such as importing cattle from abroad when domestic prices were low"; and

- "[t]he market-wide change in pricing practices from cash sales to formula contracts." *Id.*

The Complaints now include allegations of even more plus factors that, with Plaintiffs' allegations of parallel conduct, support the inference that National Beef was a party to an anticompetitive agreement. Plaintiffs plead that Defendants, including National Beef, are protected by high barriers to entry, as new slaughter plants are extremely expensive to construct or convert, and permitting is a very time-intensive process. ¶¶304-07; Sch.29; *see In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 772 (E.D. Pa. 2017) ("High barriers to entry also make an industry more conducive collusion."); *see also In re Interior Molded Doors Antitrust Litig.*, 2019 WL 4478734, at *6 (E.D. Va. Sept. 18, 2019) (citing "high barriers to entry" as an aspect of an "industry structure that facilitates collusion"). Likewise, the perishable nature of fed cattle leaves Producers with few means of protecting themselves against Defendants' coordinated measures to depress cattle prices. ¶¶294-96; Sch.27. This asymmetric power structure also creates a strong incentive for Defendants, including National Beef, to collude. ¶¶225-53, 239-40, 294-96; Sch.19-21, 27.[13]

---

[13]   National Beef fails to marshal any legal citations whatsoever in support of its argument that structural, market-wide plus factors are insufficient or do not apply to it. N.Br. at 17. Rather, it is well-established that "[i]ndicators that a market is conducive to collusion," such as are alleged here, including "the homogeneous and highly

National Beef attempts to isolate and attack certain of the plus factors.  First, it argues Plaintiffs "have not identified any statements by **anyone** at National Beef that would indicate improper communication or signaling with competitors."  N.Br. at 17 (emphasis in original).  But Plaintiffs allege that National Beef and the other Defendants had **opportunities** to conspire and monitor adherence to the conspiracy.  Plaintiffs plead that Defendants facilitated their collusion by weekly trips by field buyers to feed lots, conduct in which National Beef, at a minimum through its employee, Mr. Duffy, unquestionably engaged.  ¶¶166, 309-13; Sch.13 and 30.  In addition, Plaintiffs allege that Defendants, including National Beef, are also active in numerous trade organizations whose meetings provide regular opportunities for managers and employees to meet and collude.  ¶¶297-303; Sch.28; *see also In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 449-50 (E.D. Pa. 2018) ("Participation in trade organizations and their meetings 'demonstrates how and when Defendants had opportunities to exchange information or make agreements.'"); *In re Text Messaging Antitrust Litig.*, 630 F.3d, 628 (7th Cir. 2010) (finding that allegations related to trade association meetings identify "a practice, not illegal in itself, that facilitates price fixing that would be difficult for the authorities to detect").  Therefore, public signaling statements by National Beef are not needed for this plus factor to apply.

---

standardized, or commodity-like nature, of the product; a concentrated market dominated by a few sellers; high barriers to new players' entry, such as high investment or fixed costs; and excess production capacity," are plus factors establishing a "motive to enter into a price fixing conspiracy."  *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 822 (D. Md. 2013); *see also Pork I*, 2019 WL 3752497, at *6-7.

Second, National Beef makes a few flawed arguments regarding government investigations. The allegations of ongoing investigations of National Beef are additional plus factors supporting the inference of conspiracy.   The DOJ has launched an investigation of Defendants, including National Beef, for the conduct that is the subject of the Complaints.   *See* ¶¶315-17; Sch.31.   Plus, the USDA is investigating Defendants, ***including National Beef***, for their parallel conduct following the fire at Tyson's Holcomb, Kansas plant, ¶¶323-24; Sch.31, and for their pricing and conduct throughout the pandemic.   ¶¶325-26; Sch.31.   National Beef has not been exonerated from any misconduct.

Without any citation to authority, National Beef argues that these government investigations do not constitute plus factors because there has not yet been an "enforcement action" against it specifically.  N.Br. at 20.  But "[t]he mere existence of such investigations is a circumstance that, 'when combined with parallel behavior, might permit a jury to infer the existence of an agreement.'"  *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016) (quoting *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)).

The Complaints set forth numerous plus factors as to National Beef that, combined with the parallel conduct allegations, demonstrate National Beef participated in the conspiracy, even without the direct evidence provided by Jason and Matt.

## CONCLUSION

For the reasons stated herein and in Plaintiffs' Omnibus Opposition, Plaintiffs respectfully request that the Court deny National Beef's motion to dismiss in its entirety.

25

Dated: April 5, 2021

Respectfully Submitted.

*/s/ Christopher M. Burke*

Christopher M. Burke (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508
cburke@scott-scott.com

David R. Scott (*pro hac vice*)
Amanda F. Lawrence (*pro hac vice*)
Patrick J. McGahan (*pro hac vice*)
Michael P. Srodoski
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Tel.: 860-537-5537
Fax: 860-537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Anthony F. Fata (*pro hac vice*)
Jennifer W. Sprengel (*pro hac vice*)
Christopher P.T. Tourek (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER**
**& SPRENGEL LLP**
150 S. Wacker
Suite 3000
Chicago, IL 60606
Tel.: 312-782-4882
Fax: 312-782-4485
afata@caffertyclobes.com

26

jsprengel@caffertyclobes.com
ctourek@caffertyclobes.com
boconnell@caffertyclobes.com

Ellen Meriwether (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
205 N. Monroe St.
Media, PA 19063
Tel.: 215-864-2800
Fax: 215-864-2810
emeriwether@caffertyclobes.com

*Interim Co-Lead Counsel for the Cattle
Plaintiffs*

Stacey P. Slaughter (Bar No. 0296971)
K. Craig Wildfang (Bar No. 0117043)
Thomas J. Undlin (Bar No. 0183751)
Geoffrey H. Kozen (Bar No. 0398626)
Eric P. Barstad (Bar No. 0398979)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Tel: 612-349-8500
Fax: 612-339-4181
sslaughter@robinskaplan.com
kcwildfang@robinskaplan.com
tundlin@robinskaplan.com

*Liaison Counsel for the Cattle Plaintiffs*

Michael L. Schrag (*pro hac vice*)
Joshua Bloomfield (*pro hac vice*)
George Sampson (*pro hac vice*)
Kyla Jenny Gibboney
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel.: 510-350-9700
mls@classlawgroup.com
jjb@classlawgroup.com

gws@classlawgroup.com
kjg@classlawgroup.com

David E. Kovel (*pro hac vice*)
Thomas W. Elrod (*pro hac vice*)
Karen M. Lerner (*pro hac vice*)
Anthony E. Maneiro (*pro hac vice*)
**KIRBY McINERNEY LLP** 250 Park Avenue,
Suite 820
New York, NY 10177
Tel.: 212-371-6600
dkovel@kmllp.com
telrod@kmllp.com
klerner@kmllp.com
amaneiro@kmllp.com

Richard M. Paul III (*pro hac vice*)
Sean Cooper (*pro hac vice forthcoming*)
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Tel.: 816-984-8100
Rick@PaulLLP.com
Sean@PaulLLP.com

Melissa Weiner (MN #0387900)
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Tel.: 612-389-0600
mweiner@pswlaw.com

Bruce L. Simon (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Tel.: 415-433-9000
bsimon@pswlaw.com

Daniel L. Warshaw (*pro hac vice*)
Bobby Pouya (*pro hac vice*)
Matthew A. Pearson (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**

28

15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Tel.: 818-788-8300
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mapearson@pswlaw.com

*Plaintiffs' Executive Committee*

*/s/ Shana E. Scarlett*

Shana E. Scarlett (*pro hac vice*)
Rio S. Pierce (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO
LLP**
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman (*pro hac vice)*
Breanna Van Engelen (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO
LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

W. Joseph Bruckner (MN #0147758)
Brian D. Clark (MN #0390069)
Arielle S. Wagner (MN #0398332)
Stephanie A. Chen (MN #0400032)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South,
Suite 2200
Minneapolis, MN 55401
Tel:  612) 339-6900
Fax: (612) 339-0981
wjbruckner@locklaw.com

29

bdclark@locklaw.com
aswagner@locklaw.com
sachen@locklaw.com

*Interim Co-Lead Class Counsel for*
*Plaintiffs in the* Peterson *Action*


*/s/ Joshua J. Rissman*
Daniel E. Gustafson (MN #202241)
Daniel C. Hedlund (MN #258337)
Michelle J. Looby (MN #0388166)
Joshua J. Rissman (MN #0391500)
Brittany Resch (MN #397656)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com


Dennis J. Stewart (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 B Street, 17thFloor
San Diego, CA 92101
Tel: (612) 333-8844
Fax: (612) 339-6622
dstewart@gustafsongluek.com


Adam J. Zapala (*pro hac vice*)
Elizabeth Tran Castillo (*pro hac vice*)
Reid W. Gaa (*pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com

ecastillo@cpmlegal.com
rgaa@cpmlegal.com

Alexander E. Barnett (*pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
40 Worth Street, 10th Floor
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753
abarnett@cpmlegal.com

Jason S. Hartley (*pro hac vice*)
**HARTLEY LLP**
101 W. Broadway, Suite 820
San Diego, CA  92101
Tel: (619) 400-5822
hartley@hartleyllp.com

Megan E. Jones (*pro hac vice forthcoming*)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
mjones@hausfeld.com

*Interim Co-Lead Counsel for the Proposed
Direct Purchaser Plaintiffs*

*/s/  Blaine Finley*
Jonathan W. Cuneo (*pro hac vice*)
Blaine Finley (pro hac vice)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3960
jonc@cuneolaw.com
bfinley@cuneolaw.com

Shawn M. Raiter (MN #240424)
**LARSON KING LLP**
30 East Seventh Street, Suite 2800
Street Paul, MN 55101
Tel: (651) 312-6518

sraiter@larsonking.com

Don Barrett (*pro hac vice*)
Katherine Barrett Riley (*pro hac vice*)
David McMullan (*pro hac vice*)
Sterling Starns (*pro hac vice*)
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095-0927
Tel: (662) 834-9168
Fax: (662) 834-2628
donbarrettpa@gmail.com
kbriley@BarrettLawGroup.com
dmcmullan@BarrettLawGroup.com
sstarns@barrettlawgroup.com

*Counsel for Commercial and Institutional Indirect Purchaser Plaintiff Erbert & Gerbert's, Inc.*