# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

IN RE CATTLE ANTITRUST LITIGATION

This Document Relates to:                    Civil No.  19-1222 (JRT/HB)

*All Actions*.

---

KENNETH PETERSON et al.,

                              Plaintiffs,

v.                                            Civil No.  19-1129 (JRT/HB)

JBS USA FOOD COMPANY HOLDINGS et al.,

                              Defendants.

---

IN RE DPP BEEF LITIGATION

This Document Relates to:                    Civil No.  20-1319 (JRT/HB)

*All Actions*.

---

ERBERT & GERBERT'S, INC.,

                              Plaintiff,

v.                                            Civil No.  20-1414 (JRT/HB)

JBS USA FOOD COMPANY HOLDINGS et al.,

                              Defendants.

---

## MEMORANDUM OPINION AND ORDER

Thomas J. Undlin, Geoffrey H. Kozen, Stacey P. Slaughter & K. Craig Wildfang, **ROBINS KAPLAN LLP**, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402; Amanda F. Lawrence, Patrick McGahan & Michael P. Srodoski, **SCOTT & SCOTT ATTORNEYS AT LAW LLP**, 156 South Main Street, P.O. Box 192, Colchester, CT 06415; Christopher M. Burke, **SCOTT & SCOTT ATTORNEYS AT LAW LLP**, 600 West Broadway, Suite 3300, San Diego, CA 92101; Ellen Meriwether, **CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**, 205 North Monroe Street, Media, PA 19063; and Anthony F. Fata, **CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**, 150 South Wacker Drive, Suite 3000, Chicago, IL 60606, for Producer Plaintiffs.

Brian D. Clark and W. Joseph Bruckner, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401; and Shana Scarlett, **HAGENS BERMAN SOBOL SHAPIRO LLP**, 715 Hearst Avenue, Suite 202, Berkeley, CA 94710, for Consumer Indirect Purchaser Plaintiffs.

Adam J. Zapala and Elizabeth T. Castillo, **COTCHETT PITRE & MCCARTHY LLP**, 840 Malcolm Road, Suite 200, Burlingame, CA 94010; Daniel E. Gustafson, Daniel C. Hedlund & Joshua J. Rissman, **GUSTAFSON GLUEK PLLC**, 120 South Sixth Street, Suite 2600, Minneapolis, MN 55403; Megan Jones, **HAUSFELD LLP**, 600 Montgomery Street, Suite 3200, San Francisco, CA 94111; Timothy Kearns, **HAUSFELD LLP**, 888 Sixteenth Street Northwest, Suite 300, Washington, DC 20006; and Jason S. Hartley, **HARTLEY LLP**, 101 West Broadway, Suite 820, San Diego, CA 92101, for Direct Purchaser Plaintiffs.

Alec Blaine Finley, **CUNEO GILBERT & LADUCA LLP**, 4725 Wisconsin Avenue Northwest, Suite 200, Washington, DC 20016; S. Sterling Aldridge, **BARRETT LAW GROUP PA**, 404 Court Square North, P.O. Box 927, Lexington, MS 39095; and Shawn M. Raiter, **LARSON KING LLP**, 30 East Seventh Street, Suite 2800, Saint Paul, MN 55101, for Commercial-and-Institutional Indirect Purchaser Plaintiffs.

X. Kevin Zhao, **GREENE ESPEL PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, MN 55402; Nicole A. Saharsky and William Stallings, **MAYER BROWN LLP**, 1999 K Street Northwest, Washington, DC 20006, for Cargill Defendants.

Sami H. Rashid**, QUINN EMANUEL URQUHART & SULLIVAN LLP**, 51 Madison Avenue, New York, NY 10010; Patrick E. Brookhouser, Jr., **MCGRATH NORTH**, 1601 Dodge Street, Suite 3700, Omaha, NE 68102; and Donald G. Heeman, **SPENCER FANE LLP**, 100 South Fifth Street, Suite 2500, Minneapolis, MN 55402, for JBS Defendants.

Benjamin L. Ellison, **JONES DAY**, 90 South Seventh Street, Suite 4950, Minneapolis, MN 55402; and Michelle Fischer, **JONES DAY**, 901 Lakeside Avenue, Cleveland, OH 44114, for Defendant National Beef Packing Company, LLC.

Jon B. Jacobs, **PERKINS COIE LLP**, 700 Thirteenth Street Northwest, Suite 600, Washington, DC, 20005; and Ulrike Connelly, **PERKINS COIE LLP**, 1201 Third Avenue, Suite 4900, Seattle WA 98101, for Tyson Defendants.

Plaintiffs, comprising four putative classes across several actions, allege that Defendants, the nation's four largest beef packers, conspired to generate historically unprecedented profit margins in violation of the Sherman Act, the Packers and Stockyards Act, and myriad state laws; and that Defendants manipulated the Live Cattle Futures market in violation of the Commodity Exchange Act. Defendants ask the Court to dismiss Plaintiffs' claims.

Previously, the Court granted Defendants' first joint motions to dismiss because Plaintiffs had not pleaded plausible direct evidence of an unlawful agreement or enough defendant-specific allegations of parallel conduct. The Court also granted Plaintiffs leave to amend. Because Plaintiffs now plausibly plead that Defendants conspired to suppress the price of fed cattle and drive up the price of beef in order to realize sky-high margins, the Court will deny Defendants' Joint Motions to Dismiss except with respect to some of

Plaintiffs' state law claims.  Additionally, the Court will deny Defendants' Individual Motions to Dismiss and grant Plaintiffs' Motions to Approve Alternative Service on JBS S.A.

## BACKGROUND

## I.    FACTUAL BACKGROUND[1]

Plaintiffs consist of cattle producers, producer organizations, and those who transact in live cattle futures and options (collectively, "Producer Plaintiffs"); direct purchasers of beef ("Direct Purchaser Plaintiffs"); and consumer and commercial-and-institutional indirect purchasers of beef (collectively, "Indirect Purchaser Plaintiffs").[2] Defendants—Cargill, Inc. and a Cargill subsidiary ("Cargill"), JBS S.A. and JBS subsidiaries ("JBS"), Tyson Foods, Inc. and a Tyson subsidiary ("Tyson"), and National Beef Packing Company, LLC ("National Beef")—are packers that purchase fed cattle for slaughter and then sell high-quality beef products to processors, wholesalers, and retail outlets.  (ECF 19-1222, Sealed Third Am. Compl. ("TAC") ¶¶ 3, 42–67, Dec. 28, 2020, Docket No. 312.)[3]

---

[1] The Court will provide a general background of Plaintiffs' allegations here and more specific allegations when discussing Plaintiffs' separate claims below.

[2] The Court will occasionally refer to the consumer and commercial-and-institutional indirect purchasers separately.  When doing so, the consumer indirect purchaser plaintiffs will be referred to as "Peterson Plaintiffs" and the commercial-and-institutional indirect purchasers will be referred to as "Erbert & Gerbert's."

[3] As Plaintiffs' complaints are nearly identical, the Court will cite almost exclusively to Producer Plaintiffs' operative complaint.

Defendants purchase and slaughter between 82% and 87% of all fed cattle sold on an annual basis.  (*Id.* ¶ 4.)

Fed cattle prices increased steadily from 2009 to 2014 in response to strong beef demand and a shortage of fed cattle following several years of droughts.  (*Id.* ¶ 7.)  In November 2014, the price for fed cattle peaked at $170 per hundredweight ("cwt").  (*Id.*)  The industry expected the price of fed cattle to stabilize in 2015, continue at or around the $150/cwt mark for several years, and then experience a gradual decline.  (*Id.*)  However, beginning in 2015, the start of Plaintiffs' proposed class period, the price for fed cattle plummeted while the price for beef soared.  (*Id.* ¶¶ 1, 16–17.)  The "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef products, grew by historic proportions after hitting a low of $50 in the months leading up to 2015, (*id.* ¶¶ 5, 99), as depicted in the following figure:



(*Id.* ¶ 16, fig. 5.)

Defendants' profitability is driven by the meat margin.  (*Id.* ¶ 5.)  Plaintiffs allege that Defendants' unprecedented profits from 2015 onward resulted from coordinated conduct to jointly manage fed cattle slaughter volumes; jointly manage cash cattle purchases and enforce anticompetitive procurement practices; import foreign cattle after it became uneconomical to do so; and close and idle plants.  (*Id.* ¶¶ 8–9; ECF 20-1414, Sealed Am. Compl. ("DPP Am. Compl.") ¶¶ 9–10, Jan. 28, 2021, Docket No. 125.) Defendants' coordinated conduct allegedly led to a suppression of the price of fed cattle, which meant that producers were paid less than they would have been in a competitive market, (TAC ¶ 2), and an increase in the price of beef, which meant that purchasers paid more than they would have absent such conduct by Defendants, (DPP Am. Compl. ¶ 3.) Plaintiffs also allege that Defendants manipulated the Live Cattle Futures to further increase their profits.  (TAC ¶¶ 345, 396.)

## II.    PROCEDURAL BACKGROUND

Plaintiffs allege that Defendants engaged in a price-fixing conspiracy in violation of § 1 of the Sherman Act.  (*E.g.*, TAC ¶¶ 446–53.)  Additionally, Producer Plaintiffs bring claims under the Packers and Stockyards Act ("PSA") and the Commodity Exchange Act ("CEA").  (*Id.* ¶¶ 454–83.)  Indirect Purchaser Plaintiffs bring claims for damages under

various state antitrust and consumer protection laws and for unjust enrichment.[4]  (ECF 19-1129, Sealed Third Am. Comp. ("Peterson TAC") ¶¶ 375–743, Jan 27, 2021, Docket No. 256; ECF 20-141, Sealed Am. Compl. ("E&G Am. Compl.") ¶¶ 347–414, Jan. 28, 2021, Docket No. 125.)

Previously, the Court granted Defendants' first joint motions to dismiss after concluding that Plaintiffs had failed to plausibly plead direct evidence of an antitrust conspiracy or parallel conduct by which to infer such a conspiracy.  *In re Cattle Antitrust Litig.*, No. 19-1222, 2020 WL 5884676, at *5–6 (D. Minn. Sept. 29, 2020).  With respect to the PSA, the Court concluded that Plaintiffs failed to plausibly allege that Defendants could have suppressed or reduced competition.  *Id.* at *7.  The Court then granted Plaintiffs leave to amend.  *Id.* at *8.

Plaintiffs timely amended the operative complaints, and now Defendants, individually and collectively, ask the Court to dismiss Plaintiffs' claims with prejudice. (*E.g.*, ECF 19-1222, Mots. Dismiss, Feb. 18, 2021, Docket Nos. 326, 330, 333, 338, and 342.)  Plaintiffs oppose the Motions and ask the Court to approve alternative service on JBS S.A. in Brazil.  (*E.g.*, ECF 19-1222, Mot. Approve Alternative Service, Mar. 30, 2021, Docket No. 356.)

---

[4] The District of Columbia is, of course, not a state.  However, for the sake of simplicity, the Court will refer to all non-federal claims as state law claims.

**DISCUSSION**

I.    **DEFENDANTS' JOINT MOTIONS TO DISMISS**

    A.    **Standard of Review**

In reviewing a motion to dismiss under Rule 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "'claim to relief that is plausible on its face.'" *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).   The Court construes the complaint in the light most favorable to the plaintiff, drawing all inferences in their favor. *See Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).   Although the Court accepts the complaint's factual allegations as true, and in the light most favorable to the plaintiff, it is "not bound to accept as true a legal conclusion couched as a factual allegation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), or mere "labels and conclusions or a formulaic recitation of the elements of a cause of action," *Iqbal*, 556 U.S. at 678 (quotation omitted).   Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*   At the motion to dismiss stage, the record for review before the Court is generally limited to the complaint and any documents attached as exhibits that are necessarily embraced by the complaint.  *Porous Media Corp. v. Pall Corp*., 186 F.3d 1077, 1079 (8th Cir. 1999).

-8-

### B.     Federal Claims

#### 1.     Sherman Act

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To establish a claim under § 1, "a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." *Insignia Sys., Inc. v. News Am. Mktg. In–Store, Inc.*, 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009). Because § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 775 (1984), "'the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express,'" *Twombly*, 550 U.S. at 553 (cleaned up).

"Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused." *Copperweld*, 467 U.S. at 768. Thus, where—as here— plaintiffs allege horizontal price fixing or agreements, the only thing that must be alleged at the motion to dismiss stage is that defendants acted in concert.

"'[T]o satisfy the concerted action requirement, the plaintiff must demonstrate that the defendants shared a unity of purpose or a common design and understanding, or a meeting of the minds.'"  *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (quoting *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1273 (8th Cir. 1983).  This showing can be accomplished through either direct or circumstantial evidence.  *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 554 (8th Cir. 1991).

### a.    Direct Evidence

Plaintiffs rely on two confidential witnesses to provide direct evidence of Defendants' alleged antitrust agreement.  The Court previously concluded that, even though a heightened pleading standard was not required, Plaintiffs failed to "adequately explain [the witnesses'] jobs and how their interactions in those jobs would lead to them acquiring the knowledge they allegedly possess," and that the complaints presented "mismatched" allegations of anticompetitive behavior.  *In re Cattle Antitrust Litig.*, 2020 WL 5884676, at *5.  The question now is whether the amended complaints overcome these pleading deficiencies.

Regarding Witness 1, Jason F., Plaintiffs disclose that he worked as a quality assurance officer at Swift's Cactus, Texas plant—an operating JBS subsidiary—for approximately ten years, up until early 2018.  (TAC ¶ 102.)  Witness 1 was primarily responsible for the kill floor, and hotboxes and coolers (where carcasses are stored before being broken down), and thus he was well-positioned to know about slaughter volumes.

(*Id.* ¶ 103.)  In 2015, Witness 1 had a conversation with James Hooker, head of fabrication at the plant, after Hooker had received a phone call from his immediate supervisor.  (*Id.* ¶¶ 104, 117.)  At that time, Hooker told Witness 1 that each Defendant expressly agreed to periodically reduce its purchase and slaughter volumes to reduce the prices they would pay for fed cattle, stating that the agreement was to cut back on kills when prices were getting too high.[5]  (*Id.* ¶¶ 101, 118.)   Hooker knew of Defendants' agreement from speaking regularly with higher ups at JBS, including some at JBS's head office in the United States who were in charge of beef production, and with former colleagues working at packing plants owned by the non-JBS Defendants.  (*Id.* ¶¶ 107–13, 115.)  Witness 1 also recalls Swift management telling staff that kill levels were being reduced in response to fed cattle prices, and he reports that his plant would reduce its slaughter around November and then regularly maintain lower kill volumes through April of the following year.  (*Id.* ¶¶ 121, 122.)

Regarding Witness 2, Matt T., Plaintiffs disclose that he was a former manager of a 35,000 head commercial feedlot, Carrizo Feeders, in Texline, Texas, from 2012 until July 1, 2015.  (*Id.* ¶ 143.)  In this capacity, Witness 2 was responsible for marketing (selling) the cattle fed there, negotiating with Defendants' field buyers on a weekly basis, and managing certain customers' risk positions by trading Live Cattle contracts on their behalf.

---

[5] For example, even though the Swift plant had a slaughtering capacity of 5,500–6,000 head per day, it might drop its kill level to around 4,800–5,200 head per day when implementing Defendants' agreement.  (TAC ¶ 121.)

(*Id.* ¶ 143 n.58.)  Witness 2 would market between 600–1,500 head of cattle most weeks, of which the majority were sold on the cash cattle market.  (*Id.*)  However, in 2015, Witness 2 reports that Defendants worked together to reduce their purchases of cash cattle, predominately offering only top-of-the-market bids instead, after Defendants realized that taking cattle out of the cash market would create an actual or perceived oversupply of slaughter-ready cattle and lower the base cash price.  (*Id.* ¶¶ 143–44.)  The reduced cash price, together with an interlinked depression of the Live Cattle Futures prices, lowered the price Defendants paid for all the cattle they purchased, with cash or otherwise.  (*Id.*)

The Court finds that above allegations adequately explain the confidential witnesses' jobs and how their job interactions would lead them to acquire knowledge of Defendants' alleged agreement to, respectively, reduce slaughter volumes and reduce cash cattle purchases.  The Court also finds that, while the allegations involve two different types of reductions, they are not mismatched.  Plaintiffs allege that reductions in slaughter volumes and cash cattle purchases were both used by Defendants for the same purpose: to drive down the price for fed cattle while simultaneously driving up the price of beef.  (*See, e.g.*, *id.* ¶¶ 9, 18–20; DPP Am. Compl. ¶¶ 6, 10.)

As such, the Court concludes that Plaintiffs have presented sufficiently detailed direct evidence at this stage to plausibly allege that Defendants have violated § 1 of the

Sherman Act.[6]  Accordingly, the Court will deny Defendants' Joint Motions to Dismiss in this regard.

### b.    Circumstantial Evidence

Although "[a]llegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010), the Court will also consider the sufficiency of Plaintiffs' circumstantial evidence, as concerted action may also be demonstrated by alleging parallel conduct that "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *In re Cattle Antitrust Litig.*, 2020 WL 5884676, at * 5 (quoting *Twombly*, 550 U.S at 557 n.4 (cleaned up)).

In addition to parallel conduct, Plaintiffs must also plead one or more "plus factors," or additional facts to demonstrate that a parallel price action amounts to an unlawful conspiracy as opposed to producers merely paralleling each other's prices. *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1032–33 (8th Cir. 2000) (en banc).  Plus factors might include "(1) a shared motive to conspire; (2) action against self-interest; (3) market concentration; and (4) a substantial amount of interfirm

---

[6] Defendants suggest that Plaintiffs' direct evidence is based on hearsay and speculation, so the Court should not credit it.  However, at the motion to dismiss stage, all allegations are taken as true and construed in Plaintiffs' favor.  To be sure, Plaintiffs will face a higher bar at summary judgment and their claims will likely need more evidentiary support and points of connection to survive a challenge then, but the litigation has not yet reached this point.

communication in conjunction with the parallel conduct."  *In re Pork Antitrust Litig.*, 495

F. Supp. 3d 753, 768 (D. Minn. 2020).

### i.     Plus Factors

The Court previously concluded that "the plus factors identified and discussed by

Plaintiffs are undoubtedly strong and are of the type often used to support an inference

of an agreement."  *In re Cattle Antitrust Litig.*, 2020 WL 5884676, at * 6.  The same factors

are alleged by Plaintiffs here, including that the market for fed-cattle processing is highly

concentrated, with Defendants making up more than 80 percent of it; demand for fed

cattle and beef is inelastic; Defendants can regularly communicate through trade

associations and other industry events; Defendants acted against self-interest, as when

importing cattle from abroad when domestic prices were low; and that there were

market-wide changes in pricing practices from cash sales to formula contracts.  (TAC

¶¶ 180–88, 290–313; DPP Am. Compl. ¶¶ 196–239); *see also In re Cattle Antitrust Litig.*,

2020 WL 5884676, at * 6.

Additionally, Plaintiffs now point to how Defendants are being investigated by the

U.S. Department of Justice ("DOJ") and the U.S. Department of Agriculture ("USDA") for

the same conduct alleged in the operative complaints.  (*E.g.*, TAC ¶¶ 314–15.)  While

some courts have declared that pending investigations carry no weight, *e.g.*, *In re

Graphics Processing Units Antitrust Litig. ("GPU")*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal.

2007), others have concluded that "the plausibility of [an] alleged conspiracy is bolstered,

at least to some extent, by [an] ongoing [DOJ] investigation into the same alleged misconduct," *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 363 (S.D.N.Y. 2019).[7] While a pending government investigation does not serve as a smoking gun or allow for an inference of a conspiracy by itself, the Court agrees that it certainly bolsters such an inference.

In sum, the Court concludes that the plus factors identified by Plaintiffs are even stronger than they were before.  The only remaining question is whether Plaintiffs have managed to plausibly allege parallel conduct.

### ii.        Parallel Conduct

The Court previously concluded that Plaintiffs' allegations of parallel conduct were sparse and conclusory.  *In re Cattle Antitrust Litig.*, 2020 WL 5884676, at *6.  More specifically, with respect to coordinated slaughter reductions, the Court found that Plaintiffs failed to provide a basis "to analyze which, how many, or when any of the individual Defendants may have affirmatively acted" and, with respect to coordinated cash cattle reductions, that Plaintiffs "rel[ied] almost exclusively on industry-wide data and ask[ed] the Court to infer that the individual Defendants all contributed to the decrease." *Id.*

---

[7] *Accord Starr v. Sony BMG Music Enter.*, 592 F.3d 314, 325 (2d Cir. 2010) (finding inference of conspiracy plausible in part because the DOJ had launched investigations); *In re Packaged Seafood Prod. Antitrust Litig.*, No. 15-2670, 2017 WL 35571, at *8 (S.D. Cal. Jan. 3, 2017) (recognizing *GPU*'s holding but concluding that "it is perfectly permissible to take as true the fact that a government investigation has been instituted").

Regarding coordinated slaughter reductions, Plaintiffs present a nuanced theory and a bevy of facts and figures to analyze whether each Defendant affirmatively acted to promote the alleged price-fixing conspiracy.[8]  Prior to 2015, fed cattle prices typically rose in the late winter/early spring, declined in the summer months, bottomed out in July for a few weeks, and then rose again in the fall.  (TAC ¶ 124.).  Seasonal slaughter reductions also typically occurred near the beginning of each year.  (*Id.*)  However, in January 2015 (the start of the class period), Plaintiffs allege that Defendants agreed to deviate from these cyclical patterns and began to moderate their slaughter volumes in lockstep.  (*Id.* ¶¶ 123–124.)  Doing so served to suppress the price for fed cattle, (*id.*), and drive up the price of beef, (*e.g.,* DPP Am. Compl. ¶¶ 255–57), which allowed Defendants to realize tremendous profits.  Plaintiffs provide a new figure to capture Defendants' tandem movements:

---

[8] To arrive at the numbers alleged below, Plaintiffs drew from a variety of materials, including Defendants' actual transaction data, Plaintiffs' records of transactions with Defendants, securities filings from three Defendants (Cargill is privately held), public statements from Tyson's CEO, industry data consisting almost entirely of Defendants' transactions, and contemporaneous reporting on Defendants' actions.  Defendants question the reliability of these materials and the accuracy of Plaintiffs' methodology when crunching the data.  However, at the motion to dismiss stage, "the Court need not now engage in a *Daubert-like* analysis of Plaintiffs' statistical pleadings.  Instead, the Court may, indeed must, accept as true Plaintiffs' factual assertions regarding pricing and other economic data."  *City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 528 (S.D.N.Y. 2020).



(TAC ¶ 127, fig. 2.)  Plaintiffs also break down the significance of what this figure depicts,

quarter by quarter and year by year.

In 2015, Tyson's, National Beef's, and JBS's year-over-year slaughter volume

decreased in the first quarter by -1.8%, -8.6%, and -11.2%, respectively (Cargill's quarterly

slaughter volume rose slightly but was still down on its 2014 fourth quarter volume).  (*Id.*

¶ 199.)  Across quarter two and into quarter three, Tyson, National Beef, and JBS further

reduced their slaughter volumes by approximately -5.4%, -6.2%, and -12.8%, respectively,

while Cargill continued to hold steady.  (*Id.* ¶ 202.)  Then, in the last quarter, each

Defendant slaughtered between 5.8% and 17.1% less cattle compared to their 2012–14

average.[9]  (*Id.* ¶ 213.)  Because of Defendants' reductions, less cattle were sold for slaughter in 2015 than in 2014.[10]  (*Id.* ¶ 220.)

All the while, the fed cattle price plummeted.  (*Id.* ¶ 212.)  As a result, producers' margins were reduced across the second, third, and fourth quarters of 2015, averaging, respectively, -$51, -$1, and - $359 per head.  (*Id.* ¶ 224.)  Conversely, Defendants posted average per head margins of between approximately $47 and $66 across the three quarters, well above their averages of between -$16 and $25 per head from 1997 to 2014.  (*Id.*)  Yet, even in this context, no Defendant sought to capture market share to drive its individual margins even higher.  (*See id.* ¶ 223.)

In 2016, Defendants again slaughtered less cattle in the first quarter than they did from 2012 to 2014: quarter-over-quarter change, Tyson -0.7%, Cargill -3.3%, National Beef -4.4%, and JBS -16.3%; year-over-year change, Tyson -4.5%, Cargill -9.3%, National Beef -14.9%, and JBS -21.7%.  (*Id.* ¶ 226 n.111 & n.112.)  Meanwhile, fed cattle prices remained low, around $130/cwt, which allowed Defendants to have one of their best

---

[9] Regarding pre-2015 behavior, Plaintiffs paint a very different picture.  In the fourth quarter of 2012, Cargill and JBS both increased their slaughter volumes (3.7% and 12%) while Tyson held steady (0.1% increase) and National Beef cut back (-4%).  (TAC ¶ 130.)  Then, in the third quarter of 2013, Tyson and National Beef increased their slaughter volumes, while JBS and Cargill reduced theirs.  (*Id.*)  Further, across the second and fourth quarters of 2014, JBS looked to capture market share from the others, increasing its slaughter volumes by 16.3%.  (*Id.*)

[10] Tyson's annual slaughter volumes were down 4%, National Beef's 6%, and JBS's 17% when compared to 2014.  (TAC ¶ 214.)  Cargill's remained flat; however, its slaughter volumes were still significantly below historic levels.  (*Id.*)

quarters in history, approximately $63 per head compared to the pre-class period average of $0 per head.[11]   (*Id.* ¶ 227.)

Across the second and third quarters of 2016, Defendants' kill volumes remained below 2012–2014 averages and created a supply glut, which allowed Defendants to unseasonably increase kill volumes in the fourth quarter—Tyson, Cargill, and National Beef's volumes rose 2.3%, 3.3%, and 10.9%, respectively—and experience their most profitable fourth quarter in modern history, about $153 per head, which was $100 more per head than previously realized.   (*Id.* ¶¶ 233–38.)   Producers, on the other hand, lost -$67 per head over the year.   (*Id.*)   Again, however, no Defendant acted to capture individual market share to capitalize on the record margins.   (*Id.* ¶ 238.)   In fact, even with the increased availability of fed cattle and Defendants' unseasonably large fourth quarter harvest, annual slaughter volumes in 2016 were -6% below 2014 levels (Tyson and JBS) or flat (National Beef).[12]   (*Id.* ¶ 237.)

In 2017, Plaintiffs allege that Defendants' coordinated activity was much the same: reductions by Defendants in the first quarter—Cargill -4.6%, Tyson -6.1%, JBS -6.6%, National Beef -17.9%—followed by increases in the second quarter after the price had been driven down—JBS 5.3%, Tyson 7.5%, Cargill 7.7%, National Beef 12.4%.   (*Id.* ¶ 239

---

[11] In fact, over the class period, Defendants' average per head net margins for the first, second, third, and fourth quarters greatly exceeded pre-class period averages: respectively, $37 v. $0, $127 v. $21, $134 v. $25, and $116 v. -$16.   (TAC ¶ 126.)

[12] Cargill's 2016 slaughter volumes rose 10% against 2014, but they were still significantly below Cargill's 2007–2014 average.   (TAC ¶ 237.)

n.126 & n.127.)  Across the year, prices fell steadily to a low of $105/cwt by mid-September, which allowed Defendants to again post slaughter increases during the third quarter: Tyson 8.5%, JBS 9.0%, Cargill 16.0%, and National Beef 17.7%. (*Id.* ¶ 240.) Defendants' average per head margins for the first and fourth quarter in 2017, $42 and $88 per head, respectively, stood second only to the record quarterly profits generated in 2016.  (*Id.* ¶ 241.)  But Defendants continued to refuse to expand individual market share despite the obvious profit potential.  (*Id.*)

In 2018, the same again: the first quarter saw reductions—National Beef -4.7%, Tyson -8.6%, Cargill -10.5%, JBS - 14.4%—and prices were driven down to $110/cwt by the end of May, even though they should have allegedly risen because of the record beef demand and the tight supply of slaughter-ready cattle.  (*Id.* ¶¶ 242–43.)  Capitalizing on the low price, Defendants then increased slaughter volumes by 11.4%–13.6% and held this steady across the third quarter so as to not get in front of the available supply.  (*Id.* ¶ 244.)  When supply decreased in the fourth quarter, Defendant then reduced their slaughter volumes: Tyson -3.7%, Cargill -4.0%, National Beef -4.1%, and JBS -4.2%.  (*Id.*)

Over 2018, Defendants experienced record margins across the second, third and fourth quarters ($229, $198, and $175 per head, respectively).  (*Id.* ¶ 245.)  Conversely, producers suffered $30 and $41 per head losses in the second and third quarters before realizing a modest $27 per head profit in the fourth, though the latter was still well below the pre-class period average of $89 per head.  (*Id.*)

In 2019, after a severe winter had decreased slaughter weights, a substantial rally in cattle prices was expected because packers would have to secure a greater number of cattle to make up the weight.  (*Id.* ¶ 247.)  However, Defendants maintained comparably lighter slaughter volumes across the first three months of 2019 and kept collective demand in check.  (*Id.* ¶ 248.)  The glut of cattle resulting from Defendants' slaughter restraint drove the price down and, as before, most Defendants then began to increase slaughter volumes.  (*Id.* ¶ 250; *see also id.* figs. 28–32.)

Even then, however, no Defendant worked to capture market share.  (*Id.* ¶ 253.) Emblematically, after a fire closed a Tyson plant in August 2019 and left a 5,500–6,000 head per day hole for others to fill, the non-Tyson Defendants' slaughter volumes remained steady.  (*Id.* ¶¶ 256–57.)  Defendants also simultaneously stepped down fed cattle prices and raised beef prices after the fire, which allowed them to reap record high margins.  (*Id.* ¶ 261.)  By September, the profit margin between packer and producers exceeded $600, with packers making over $400 per head and producers losing $200 per head.  (*Id.*)

As a whole, the Court finds that the above allegations plausibly demonstrate that each Defendant, from 2015 on, unlawfully acted in concert with the others to moderate slaughter volumes to fix the price of fed cattle and beef.  The Court also finds that Plaintiffs' new defendant-specific dataset, (*id.* ¶¶ 135–36, 139–41; *see also id.* ¶ 137, tbl. 1; *id.* ¶ 138, tbl. 2), plausibly shows that Defendants also unlawfully worked in tandem to

reduce their cash cattle purchases to place further downward pressure on fed cattle prices.  By coordinating the amount and timing of their cash cattle purchases, their bidding, and the regions and feedlots where they would bid, Defendants ended up paying lower and remarkably similar prices for fed cattle, which would not have been the case, Plaintiffs allege, had any Defendant sought a greater market share to take advantage of the record beef demand.  (*Id.* ¶¶ 147–49, 151–53; *see, e.g.*, *id.* ¶¶ 175–78.)

In sum, the Court concludes that Plaintiffs plausibly plead parallel conduct among Defendants to coordinate slaughter volumes and cash cattle purchases in order to suppress the price of fed cattle and drive up the price for beef.  When these allegations are considered alongside Plaintiffs' undoubtedly strong plus factors, the Court further concludes that Plaintiffs have raised a reasonable expectation that discovery will reveal evidence of an illegal agreement between Defendants, which is all that is required at the motion to dismiss stage.  *Twombly*, 550 U.S. at 556–57.  The Court will therefore deny Defendants' Joint Motions to Dismiss in this regard.[13]

### 2.    Packers and Stockyards Act

"[A] practice which is likely to reduce competition and prices paid to farmers for cattle can be found an unfair practice under the [PSA]."  *IBP, Inc. v. Glickman*, 187 F.3d

---

[13] Regarding some of the Producer Plaintiffs, it is true that the organizational members do not have standing to pursue damages.  Accordingly, these Plaintiffs have agreed to drop the organizations' claims for damages and instead pursue injunctive and declaratory relief, which they are entitled to do under 15 U.S.C. § 26.

974, 977 (8th Cir. 1999) (quotation omitted).  In fact, "the lack of competition between buyers, with the attendant possible depression of producers' prices, was one of the evils at which the [PSA] was directed." *Farrow v. U.S. Dep't of Agric.*, 760 F.2d 211, 215 (8th Cir. 1985 (quotation omitted).  Based on the above allegations concerning Defendants' anticompetitive conduct to suppress the price paid to producers for fed cattle, Producer Plaintiffs state a plausible claim to relief with respect to the PSA.  Accordingly, the Court will deny Defendants' Joint Motions to Dismiss regarding Producer Plaintiffs' PSA claim.

### 3.    Commodity Exchange Act

To plausibly plead a CEA claim, the plaintiff must show "(1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *Anderson v. Dairy Farmers of Am., Inc.*, No. 08-4726, 2010 WL 1286181, at *5 (D. Minn. Mar. 29, 2010) (citation omitted).  "The specific intent to cause a market distortion, scienter, can be pled by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 530 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013).

Producer Plaintiffs sufficiently demonstrate that Defendants possessed the ability and opportunity to influence market prices, as they allegedly participated in the Live

Cattle Futures market and controlled nearly 100% of the facilities approved for the slaughter of cattle linked to Live Cattle Futures contracts.  (TAC ¶¶ 374–80.)  Likewise, Plaintiffs have also demonstrated that Defendants had a motive to manipulate the Live Cattle Futures market, as the prices paid for fed cattle under Defendants' forward contracts were inextricably intertwined with Live Cattle Futures prices.  (*Id.* ¶¶ 345, 382.)  Moreover, Defendants are alleged to have improperly taken extensive short positions rather than long ones to further increase their profits, even though packers are buyers of cattle and should protect against price increases, not bet on price decreases.  (*Id.* ¶¶ 393, 396.)  Finally, regarding whether an artificial price existed and whether Defendant caused the artificial price, because a suppression of the price of fed cattle leads to a reduction in the Live Cattle Futures price, (*id.* ¶¶ 390–92), Defendants' alleged antitrust agreement plausibly caused an artificial price.

In sum, the Court concludes that Producer Plaintiffs adequately plead their CEA claims.  Accordingly, the Court will dismiss Defendants' Joint Motions to Dismiss in this regard.

### 4.   Statute of Limitations

A statute of limitations is "typically an affirmative defense, which the defendant must plead and prove . . . and therefore the possible existence of a statute of limitations defense is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense," as when the complaint rules out tolling on its face.  *Jessie v.*

*Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008) (citations omitted).  However, when some or all of a defendant's arguments rely on disputed or insufficiently developed facts, a statute of limitations defense cannot be resolved on a motion to dismiss.  *Willis Elec. Co. v. Polygroup Macau Ltd.*, 437 F. Supp. 3d 693, 707 (D. Minn. 2020).

### a.    Sherman Act and Packers and Stockyards Act

The limitations period for any claims for damages under the Sherman Act and the PSA is four years.  15 U.S.C. § 15b; *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1460 (8th Cir. 1995).  The period begins to run when a defendant commits the injurious act.  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).

Defendants' alleged conspiracy is said to have begun on January 1, 2015.  Producer Plaintiffs filed their complaint on April 23, 2019[14] and Direct Purchaser Plaintiffs did so on June 6, 2020.[15]  As such, unless the limitations period for their claims for damages can be extended, all or some would be time-barred.  Plaintiffs argue that two extension doctrines apply: the continuing violation doctrine, which would allow them to recover most but not all the claimed damages, and the fraudulent concealment doctrine, which would allow them to recover all the claimed damages.

---

[14] The docket shows this complaint being filed in early May; however, the action was first filed in Illinois before being refiled here.

[15] Only Producer Plaintiffs may bring a PSA claim and only Producer Plaintiffs and Direct Purchaser Plaintiffs may recover damages under the Sherman Act.

A continuing violation restarts the statute of limitations period each time the defendant commits a new and independent act that inflicts new and accumulating injury on the plaintiff.  *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1063 (8th Cir. 2017) (en banc).  To adequately plead a continuing violation in the context of an alleged price-fixing conspiracy, Producer and Direct Purchaser Plaintiffs must demonstrate: (1) a price-fixing conspiracy; (2) that brings about a series of unlawfully priced sales during the class period; (3) and sales involving Plaintiffs during the class period.  *Id.* at 1068.

Plaintiffs have successfully pleaded the first and third elements by demonstrating that Defendants' alleged conspiracy had the effect of decreasing the price for fed cattle and increasing the price paid for beef, and that Plaintiffs either sold fed cattle to or purchased beef from Defendants during the class period.  Regarding the second element, Plaintiffs must adequately allege that the conspiracy continued into the non-time-barred class period—for Producer Plaintiffs, April 23, 2015, and for Direct Purchaser Plaintiffs, June 6, 2016. The Court finds that this element is easily met, for Plaintiffs' allegations involve activity occurring throughout 2015 and then continuing from 2016 up until 2020. (*See, e.g.*, TAC ¶¶ 198–262; DPP Am. Compl. ¶¶ 140–72.)

As such, the Court concludes that the Producer and Direct Purchaser Plaintiffs have adequately pleaded continuing violations and therefore at least some of their claims for damages are not time-barred.  Having concluded as much, the Court will defer deciding the issue of fraudulent concealment until a more robust record has been developed and

a need to determine damages, whether for the entire class period or a portion of it, has arisen.

### b.   Commodity Exchange Act

The limitations period for CEA claims is two years, 7 U.S.C. § 25(c), which begins to run from the discovery of the injury.  *Levy v. BASF Metals Ltd.*, 917 F.3d 106, 108 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 536 (2019); *see also Rotella v. Wood*, 528 U.S. 549, 555 (2000) (noting that federal courts generally apply a discovery accrual rule when a statute is silent on the issue).  "The proper standard for determining the commencement of the limitations period is when the plaintiff knew or in the exercise of reasonable diligence should have known of defendant's alleged misconduct."  *Anderson*, 2010 WL 1286181, at *5.

Producer Plaintiffs' operative complaint does not disclose whether they knew or should have known through the exercise of reasonable diligence of Defendants' alleged misconduct before April 23, 2017, especially given the confidential nature of Defendants' actual trading on the Live Cattle Futures market.  Additionally, the Court notes that material facts—specifically, the full measure of Defendants' trading activity—will not be known until after discovery, and that questions of actual or constructive knowledge are fact-intensive inquiries often left undecided even at summary judgment, *see id.* at *7.  As such, the Court finds that the question of whether Producer Plaintiffs' CEA claims are time-barred is best left for a later stage of the litigation.

C.      **State Law Claims**

Indirect Purchaser Plaintiffs bring claims for damages under the antitrust laws of 26 jurisdictions,[16] the consumer-protection laws of 25 jurisdictions,[17] and for unjust enrichment in 32 jurisdictions.[18] Defendants argue that these claims should be dismissed for lack of standing and various state-specific reasons.[19]

1.      **Standing**

Defendants argue that the Indirect Purchaser Plaintiffs lack standing to assert several state law claims because they lack a representative plaintiff from the respective jurisdictions. The Court will exercise its discretion to defer consideration of this issue until

---

[16] Arizona, California, the District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. (Peterson TAC ¶¶ 377–540; E&G Am. Compl. ¶¶ 355–78.)

[17] Arkansas, California, the District of Columbia, Florida, Hawaii, Illinois, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Vermont, and Wisconsin. (Peterson TAC ¶¶ 543–740; E&G Am. Compl. ¶¶ 381–96.)

[18] Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. (Peterson TAC ¶¶ 741–43; E&G Am. Compl. ¶¶ 397–414, at 150 n.70.)

[19] Defendants also aver that many claims are time-barred, as the continuing violation doctrine is not recognized in eleven jurisdictions. Yet, Defendants fail to offer any analysis of the relevant case law from these states. Plaintiffs, on the other hand, discuss state case law, but often their citations involve unrelated causes of action. As such, neither party's briefing allows the Court to make an educated *Erie* guess on a per state basis regarding whether Plaintiffs' claims would likely be tolled in these jurisdictions. The Court will therefore defer consideration of this question, which will also allow a fuller factual and legal record to be developed. Regarding the remaining jurisdictions, however, the Court has already found that Plaintiffs have adequately pleaded a continuing violation by Defendants to toll any applicable statute of limitation.

after class certification, "which is 'logically antecedent' to the question raised by Defendants[.]"  *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 776.  However, if "standing issues remain after class certification, Defendants are free to make a motion at that time."  *Id.*

### 2.   Antitrust Laws

#### a.   *AGC*

Defendants challenge Indirect Purchaser Plaintiffs' antitrust standing in several states pursuant to *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 535–45 (1983).  In the opinion, the Supreme Court states that a plaintiff's right to maintain an antitrust action turns on the nature of the alleged injury, and that being denied the benefits of price competition in the market in which trade was allegedly restrained is an appropriate injury.  *See id.* at 538–39; *see also South Dakota v. Kansas City S. Indus., Inc.,* 880 F.2d 40, 47 (8th Cir. 1989) ("[S]tanding has been generally limited to the actual participants in the relevant market: competitors and consumers.").

Here, Indirect Purchaser Plaintiffs claim that Defendants' horizontal price fixing restrained or eliminated beef price competition and deprived everyone down the supply chain in the relevant market of the benefit of price competition.  Thus, Indirect Purchaser Plaintiffs allege an appropriate injury.  *Accord In re Aftermarket Filters Antitrust Litig.*, No. 08-4883, 2009 WL 3754041, at *7–8 (N.D. Ill. Nov. 5, 2009).  Additionally, Indirect

Purchaser Plaintiffs allege that the cost they paid for beef is traceable through the product distribution chain, which is adequate both to show that the alleged injury was the direct result of Defendants' allegedly anticompetitive conduct, *accord In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 813–14 (N.D. Ill. 2017), and to satisfy the remaining three factors concerning the speculative nature of the harm, the risk of duplicative recovery, and the complexity in apportioning damages, *accord In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1155–56 (N.D. Cal. 2009).  The Court therefore concludes that Indirect Purchaser Plaintiffs have standing to assert their antitrust claims.[20]

### b.    *Illinois Brick*

In *Illinois Brick Co. v. Illinois*, the Supreme Court held that only direct purchasers may sue for damages in Sherman Act price-fixing cases. 431 U.S. 720, 737 (1977).  Most state courts generally interpret their states' antitrust laws in line with federal case law; however, in *California v. ARC Am. Corp.*, the Supreme Court held that state legislatures could pass laws, so-called "repealers," to provide for damages to indirect purchasers under state antitrust laws.  *See* 490 U.S. 93, 105–06 (1989).

Defendants claim that *Illinois Brick* has not been repealed under Missouri state law, which prevents Indirect Purchaser Plaintiffs from asserting claims pursuant to Missouri's

---

[20] As such, the Court declines to decipher the state of antitrust standing in each jurisdiction referenced by Defendants, as the same result would obtain even if state law dictated that *AGC* governs in a certain jurisdiction.

Merchandising Practices Act ("MMPA").   In interpreting state law, the Court is bound by the decisions of the state's highest court or, when there is no state supreme court case directly on point, in predicting how the state supreme court would rule.  *N. Oil & Gas, Inc. v. EOG Res., Inc.*, 970 F.3d 889, 892 (8th Cir. 2020).   Based on the reasoning within a Missouri Supreme Court decision, *Gibbons v. Nuckolls, Inc.*, the Court predicts that it would rule that indirect suits are allowed under the MMPA.  *See* 216 S.W.3d 667, 669–70 (Mo. 2007) (en banc) (declining to read the MMPA as limited to only direct purchaser suits); *see also In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 571 (E.D. La. 2013) (making the same prediction).  The Court will therefore deny Defendants' Joint Motions in this regard.

Defendants also assert that *Illinois Brick* bars Indirect Purchaser Plaintiffs from pursuing damages under either Montana's or South Carolina's consumer protection laws, as these claims are simply repackaged antitrust claims and these states have not repealed *Illinois Brick*.   However, the Court finds the reasoning in *In re Generic Pharms. Pricing Antitrust Litig.* to be persuasive: "Defendants' 'repackaging' argument is not enough to require dismissal of [plaintiffs'] consumer protection law claims . . .  so long as their allegations are enough to plead the relevant consumer protection violation."[21]   368 F.

---

[21] While the Eighth Circuit has spoken in favor of precluding attempts to get around *Illinois Brick* by alleging the equitable remedy of disgorgement, it has not addressed whether plaintiffs can pursue damages under state consumer protection laws.  *See In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1059 (8th Cir. 2018).

Supp. 3d 814, 840 (E.D. Pa. 2019).   Defendants do not assert any relevant pleading deficiencies with respect to Indirect Purchaser Plaintiffs' Montana or South Carolina consumer protection claims.[22]   Thus, the Court will deny Defendants' Joint Motions regarding these claims.

### c.    Intrastate Activity

A claim made pursuant to the Mississippi's antitrust law must involve, in part, transactions occurring wholly within the state.  *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1189 (Miss. 2020).  Indirect Purchaser Plaintiffs acknowledge that they have not adequately pleaded their Mississippi antitrust claims and thus ask for leave to amend.  Given that this pleading deficiency has not been addressed before, and that the actions will survive Defendants' motions to dismiss, the Court will grant Indirect Purchaser Plaintiffs leave to amend their Mississippi antitrust claims.

### 3.    Consumer Protection Laws

Defendants assert state-specific reasons for why several of Indirect Purchaser Plaintiffs' consumer protection claims are not actionable.  The Court covered much of this ground in *In re Pork Antitrust Litig.*  *See* 495 F. Supp. 3d at 785–90.  For the most part, the

---

[22] Defendants do ask the Court to reconsider its holding in a similar case that allegations pleading violations of state consumer protection laws based on anticompetitive conduct, not fraud, are not subject to Rule 9(b).  *See In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 779–90.  The Court remains unpersuaded by Defendants' argument and, as a result, will deny Defendants' Joint Motions to Dismiss with respect to Indirect Purchaser Plaintiffs' state consumer protection claims, including their Montana and South Carolina claims.

Court's reasoning and conclusions remain unchanged, and Defendants' Joint Motions to Dismiss will be granted in part and denied in part accordingly.[23]  The parties do offer some new arguments, however, which the Court will now address.[24]

### a.   Massachusetts

The Court previously determined that a claim brought pursuant to § 11 of the Massachusetts consumer protection statute required that the actions or transactions constituting the claim occur primarily and substantially within the state.  *Id.* at 788.  Now, however, Peterson Plaintiffs assert their claim under § 9, which contains no such wording.  *See* Mass. Gen. Laws Ann. ch. 93A, § 9.  Thus, Peterson Plaintiffs are no longer required to allege that the acts constituting their claim occurred primarily and substantially in Massachusetts.  *Geis v. Nestle Waters N. Am., Inc.*, 321 F. Supp. 3d 230, 241 (D. Mass. 2018).  As such, the Court will deny Defendants' Joint Motions to Dismiss in this regard.

---

[23] Defendants ask the Court to reconsider its earlier holding that certain state prohibitions against class actions are procedural, not substantive.  *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 776–78, 790.  The Court comes to the same conclusion here and, accordingly, will deny Defendants' Joint Motions to Dismiss in regard to Indirect Purchaser Plaintiffs' Montana, South Carolina, and Utah consumer protection claims.

[24] Indirect Purchaser Plaintiffs concede that their South Dakota consumer protection claims and Erbert & Gerbert's New York consumer protection claim fail for a lack of alleging, respectively, that Defendants made false promises or misrepresentations to them or materially misled them. Erbert & Gerbert's also states that it will withdraw its Missouri and Rhode Island consumer protection claims.  Accordingly, the Court will grant Defendants' Joint Motions to Dismiss with respect to these five claims.  Additionally, Defendants withdrew their arguments with respect to Indirect Purchaser Plaintiffs' New Mexico consumer protection claims and Peterson Plaintiffs' Hawaii consumer protection claim.  The Court will therefore deny Defendants' Joint Motions as to these claims.

**b.     Michigan**

The Court previously held that the Michigan Consumer Protection Act "is narrower than other state consumer-protection statutes because it specifically defines what constitutes unfair or unconscionable conduct." *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 785 (citing Mich. Comp. Laws Ann. § 445.903).  Here, Peterson Plaintiffs point out that § 445.911 specifies that actions for damages involving section 5(a)(1) of the Federal Trade Commission Act are also allowed under Michigan law.  This is true, if "a circuit court of appeals or the United State Supreme Court" has declared a "method, act, or practice in trade or commerce . . . to be an unfair or deception act or practice within the meaning of section 5(a)(1[.]"  Mich. Comp. Laws Ann. § 445.911(4)(c).  But Peterson Plaintiffs do not point the Court's attention to such a declaration by a court of appeals or the Supreme Court.  Accordingly, the Court will grant Defendants' Joint Motions in this regard.

**c.     Minnesota**

With respect to Minnesota's Consumer Fraud Act, plaintiffs must plead allegations involving misrepresentations by defendants that affected the market.  *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 786 (discussing *State v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124, 135 (Minn. 2019)).  This is not the case alleged here, and the Court will therefore grant Defendants' Joint Motions to Dismiss in regard to Peterson Plaintiffs' related claim.  Regarding Minnesota's Uniform Deceptive Trade Practices Act ("MUDTPA"), however, the Court will deny Defendants' Joint Motions in so far as Erbert & Gerbert's seek injunctive

relief, as a continuing conspiracy has been alleged and, thus, a plausible likelihood of future harm.[25]  *Cf. id.*

### d.    Nebraska

Defendants argue that Nebraska's Consumer Protection Act expressly prohibits Plaintiffs' claims because Defendants are regulated by the USDA.  *See* Neb. Rev. Stat. § 59–1617(1).  "[T]he relevant question is not whether the defendant is generally regulated, but whether the challenged practice is regulated."  *In re ConAgra Foods Inc.*, 908 F. Supp. 2d 1090, 1103 (C.D. Cal. 2012) (citation omitted) (collecting Nebraska cases). "[T]he exception to the Nebraska statute is broad[] . . . and applies to all conduct regulated by federal agencies."  *Id.* at 1104.

Here, the USDA mandates packers to report the price paid for fed cattle and the price charged for beef, 7 C.F.R. §§ 59.101–104, in order to encourage competition in the marketplace, 7 U.S.C. §§ 1635(3).  As such, the Court finds that Defendants' alleged anticompetitive conduct falls within the broad sweep of Nebraska's statutory exemption and, accordingly, will grant Defendants' Joint Motions to Dismiss in this regard.

### e.    New Hampshire

Previously, the Court found that New Hampshire's Consumer Protection Act requires the proscribed conduct to occur within the state after being persuaded by the

---

[25] The Court notes that the sole remedy under MUDTPA is injunctive relief.  *See Hudock v. LG Elecs. U.S.A., Inc.*, 16-1220, 2017 WL 1157098, at *7 (D. Minn. Mar. 27, 2017).

weight of authority concluding as much. *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 789. The additional case cited by Indirect Purchaser Plaintiffs does not persuade the Court to the contrary. Thus, the Court will grant Defendants' Joint Motions to Dismiss in this regard.

### f.    North Dakota

In so far as the Peterson Plaintiffs seek injunctive relief, not damages, the Court will deny Defendants' Joint Motions to Dismiss with respect to their Unlawful Trade Practices Law claim. *Id.* at 786. Regarding Erbert & Gerbert's claim made pursuant to Nebraska's Unlawful Sales or Advertising Practices statute, it is true that the statute was amended to include unconscionable acts or practices. *See* N.D. Cent. Code § 51-15-02. However, Erbert & Gerbert's points to no state court decisions (or even legislative history) that might provide an appropriate lens to interpret whether its claim falls within the statute's reach. As it "is not the role of a federal court to expand state law in ways not foreshadowed by state precedent," *Ashley Cnty.*, 552 F.3d at 673, the Court will grant Defendants' Joint Motions to Dismiss with respect to this claim.

### g.    Oregon

Oregon's Unlawful Trade Practices Act prohibits "any unconscionable tactic in connection with selling, renting or disposing of real estate, goods or services, or collecting or enforcing an obligation." Or. Rev. Stat. § 646.607. "Unconscionable" tactics may include knowingly taking advantage of a customer's physical infirmity, ignorance, illiteracy

or inability to understand the language of the agreement, or knowingly permitting a customer to enter into a transaction from which the customer will derive no material benefit. *See Id.* § 646.605(9). Based on these examples, courts have construed "unconscionable" to require allegations involving false and misleading representations made by defendants to plaintiffs. *See, e.g., In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1084 (S.D. Cal. 2017); *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1170–71 (N.D. Cal. 2015). The Court finds these decisions persuasive and will grant Defendants' Joint Motion to Dismiss with respect to this claim, as Peterson Plaintiffs fail to allege such conduct.

### h.   Utah

Utah's Consumer Sales Practice Act only prohibits deceptive and unconscionable acts, not unfair competition. *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 787. However, as Peterson Plaintiffs rightly point out, the Act is to be construed liberally. Utah Code Ann. § 13-11-2. As such, federal courts have found that an antitrust violation can be unconscionable. *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 15-6549, 2021 WL 2403727, at *33 (S.D.N.Y. June 11, 2021) (collecting cases); *see also In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 418 (D. Del. 2007). The Court agrees and will therefore deny Defendants' Joint Motions as to this claim.

With respect to Utah's Unfair Practices Act, however, the Utah Supreme Court has signaled that it only protects commercial competitors, not consumers. *See Garrard v.*

*Gateway Fin. Servs., Inc.*, 207 P.3d 1227, 1230 (Utah 2009).  While Peterson Plaintiffs argue that the court's statement to this effect was mere dicta, it still is an accurate predictor of how Utah's highest court would likely rule on the issue.  Thus, the Court will grant Defendants' Joint Motions as to this claim.

### 4.    Unjust Enrichment Claims

The Court has covered much of the same ground before.  *See In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 790–99.  As in that case, Indirect Purchaser Plaintiffs lump their state claims together rather than individually pleading each element for every state. However, they have alleged that Defendants unlawfully overcharged them by conducting inequitable, traceable acts that enriched Defendants and that Defendants do not deserve to keep the benefits of this enrichment.  This is sufficient at the motion to dismiss stage.[26] *Id.* at 790–91.  Additionally, "when it is still unclear whether [plaintiffs'] other legal remedies will prevail, it is unnecessary to dismiss unjust-enrichment claims because they are pleaded in the alternative."  *Id.* at 799.

With respect to the parties' state-specific arguments, the Court and the parties are familiar with the Court's earlier holdings regarding many of the same ones made here.  *Id.* at 791–99.  The Court's reasoning and conclusions remain unchanged with respect to

---

[26] The Court notes that Defendants are free to bring a motion for summary judgment to ask the Court to consider whether any surviving claims fail to meet the elements required by certain jurisdictions then.

most of Plaintiffs' claims, and Defendants' Joint Motions to Dismiss will be granted in part and denied in part accordingly.[27]  There are, however, some new arguments to consider.[28]

###### a.    Arizona

The plaintiffs in *In re Pork Antitrust Litig.* failed to make out a cognizable claim under Arizona law because they did not allege the necessary indirect connection between themselves and defendants.  *Id.* at 792–93.  The requisite showing is not onerous, nor does the presence of an intermediary between a plaintiff and a defendant defeat a claim. *Id.*  In fact, all that is required to survive a motion to dismiss is an allegation that the plaintiff conferred a benefit on a defendant.  *Id.*; *see also Yee v. Nat'l Gypsum Co.*, No. 09-8189, 2010 WL 2572976, at *4 (D. Ariz. June 22, 2010).  Here, Indirect Purchaser Plaintiffs allege that they indirectly conferred a benefit on Defendants, which suffices at this stage. As such, the Court will deny Defendants' Joint Motions to Dismiss in this regard.

###### b.    New Hampshire

Under New Hampshire law, courts have allowed indirect purchasers to bring parasitic unjust enrichment claims based on defendants' violations of New Hampshire's consumer protection statute.  *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 792.  However,

---

[27] The Court notes that the parties presented a few additional cases to consider.  After careful review, they did not alter the Court's thinking.

[28] One argument, that *Illinois Brick* bars certain claims, has already been decided based on the Court's conclusions above: because *Illinois Brick* does not bar Plaintiffs' Missouri, Montana, or South Carolina consumer protection claims, neither does it bar Plaintiffs' Missouri, Montana, or South Carolina unjust enrichment claims.  Thus, the Court will deny Defendants' Joint Motions to Dismiss in this regard.

given that the Court will grant Defendants' Joint Motions to Dismiss with respect to Indirect Purchaser Plaintiffs' New Hampshire consumer protection claims, there is no host for their unjust enrichment claims. Accordingly, the Court will grant Defendants' Joint Motions to Dismiss in this regard.

### c.    North Dakota

Previously, the Court stated that "North Dakota does not require a direct conferral of a benefit in order to bring a claim for unjust enrichment . . . However, as with the Arizona claim, [plaintiffs] have failed to allege even the bare 'connection' required under North Dakota law." *Id.* at 796. Here, however, as mentioned above with respect to Indirect Purchaser Plaintiffs' Arizona claims, they have alleged the requisite bare connection. Thus, the Court will deny Defendants' Joint Motions to Dismiss in this regard.

### d.    Rhode Island

To recover for unjust enrichment under Rhode Island law, a plaintiff must allege that a benefit was conferred upon the defendant by the plaintiff, that the defendant appreciated such benefit, and that it is inequitable for the defendant to retain the benefit without paying its value. *Narragansett Elec. Co. v. Carbone*, 898 A.2d 87, 99 (R.I. 2006).

The parties do not cite to any decisions by the state's highest court requiring that the benefit be conferred directly to a defendant, nor has the Court found any cases

specifically addressing this issue. [29]  The Rhode Island Supreme Court has stated that the third prong of the analysis is the most important and dispositive.  *Emond Plumbing & Heating, Inc. v. BankNewport*, 105 A.3d 85, 90–91 (R.I. 2014).  It has also stated that "it is contrary to equity and good conscience for one to retain a benefit that has come to him at the expense of another."  *Merchants Mut. Ins. Co. v. Newport Hosp.*, 272 A.2d 329, 332 (R.I. 1971).  Based upon the reasoning contained in these decisions, and in the absence of contrary authority, the Court predicts that the state's highest court would construe "benefit" broadly and not require a direct connection.  The Court will therefore deny Defendants' Joint Motions to Dismiss in this regard.

### e.    Utah

Utah law distinguishes between a direct benefit and an incidental, not indirect, benefit.  *In re Packaged Seafood*, 242 F. Supp. 3d at 1092 (citing Utah cases).  "'Direct' is used to draw a distinction from 'incidental,' as in the realm of a by-product, specifically to explicate that services performed by the plaintiff for his own advantage cannot constitute grounds for unjust enrichment."  *In re Processed Egg Prod. Antitrust Litig.*, 851

---

[29] Each party does cite to a lower court decision.  The one presented by Defendants cites to New York law for the proposition that a benefit must be direct.  *Alessi v. Bowen Court Condominium*, No. 03-0235, 2010 WL 897246, at *4 (R.I. Super. Mar. 10, 2010).  The one presented by Indirect Purchaser Plaintiffs cites to another lower court decision that then cites to the Restatement of Restitution for the proposition that "benefit" denotes any form of advantage conferred to a defendant. *State v. Purdue Pharma L.P.*, No. PC-2018-4555, 2019 WL 3991963, at *17 (R.I. Super. Aug. 16, 2019) (citing *State v. Lead Ind. Assn., Inc.*, No. 99-5226, 2001 WL 345830, at *15 (R.I. Super. Apr. 2, 2001).  Given that neither holding is grounded in Rhode Island law, the Court finds that both are equally unpersuasive.

F. Supp. 2d 867, 934 (E.D. Pa. 2012) (cleaned up).  "Furthermore, Utah law recognizes that benefits under unjust enrichment are broadly defined."  *Id.*  As such, courts have found that when plaintiffs allege that defendants have profited directly from an alleged price-fixing conspiracy, then they have sufficiently alleged a direct benefit.  *In re Packaged Seafood*, 242 F. Supp. 3d at 1092–93; *see also Johnson v. Blendtec, Inc.*, 500 F. Supp. 3d 1271, 1292 (D. Utah 2020) (collecting cases) ("The lack of direct contact between indirect purchaser plaintiffs and a distributor does not doom an unjust enrichment claim." (cleaned up)).  The Court is persuaded by the weight of this authority and will therefore deny Defendants' Joint Motions to Dismiss in this regard.

## II.    DEFENDANTS' INDIVIDUAL MOTIONS TO DISMISS

National Beef and subsidiaries of the other Defendants each assert that Plaintiffs' allegations fail to demonstrate that it participated in any antitrust agreement.  For the reasons discussed above, the Court disagrees, finding that Plaintiffs have sufficiently demonstrated that National Beef and each subsidiary plausibly participated in the conspiracy and will therefore dismiss Defendants' Individual Motions to Dismiss in this regard.

The corporate parents of Cargill, Tyson, and JBS individually assert that Plaintiffs fail to allege that they participated in the conspiracy, simply lumping them in with their subsidiaries instead.  However, Producer Plaintiffs make specific allegations against the corporate parents with respect to their CEA claims.  Furthermore, with respect to the

Sherman Act and the PSA, Plaintiffs demonstrate that the corporate parents undertook specific acts in furtherance of the alleged anticompetitive conspiracy.  (*E.g.*, TAC ¶ 45, Sealed App. 1 ¶¶ 1–37, Dec. 28, 2020, Docket No. 312-1.)  This is sufficient to plausibly allege that the parents are liable too.[30]  *Cf. Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, 9 F. Supp. 3d 1032, 1045 (D. Minn. 2014).  As such, the Court will deny Defendants' Individual Motions to Dismiss in this regard.  However, given that discovery may disclose a different picture, the Court will allow Defendants to reassert this question at summary judgment.

Finally, JBS makes two additional arguments.[31]  First, it asserts that the Court cannot exercise personal jurisdiction over JBS S.A.  However, given that the Court has concluded that the allegations concerning the conspiracy and the acts attributed to JBS S.A. in furtherance of the conspiracy are plausible, then conspiracy jurisdiction can be had.  *See Yellow Brick Rd., LLC v. Childs*, 36 F. Supp. 3d 855, 866 (D. Minn. 2014).  Second, JBS S.A. contends that it was not properly served by Plaintiffs.  The Court agrees, as letters rogatory were required at the time Plaintiffs attempted service, but they sent the

---

[30] The Court notes, without deciding, that Plaintiffs' single-enterprise theory could provide another plausible ground.  *See Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 631 (9th Cir. 2018) ("[I]n a single-enterprise situation, it is the affiliated corporations' collective conduct—i.e., the conduct of the enterprise they jointly compose—that matters; it is the enterprise which must be shown to satisfy the elements of a [Sherman Act] claim." (cleaned up)); *see also Copperweld*, 467 U.S. at 771 ("[I]n reality a parent and a wholly owned subsidiary always have a unity of purpose or a common design.").

[31] Regarding the misnaming of a JBS Defendant by Direct and Indirect Purchaser Plaintiffs, the Court will allow amendment back for Plaintiffs to rename JBS USA Food Company Holdings as JBS USA Food Company.  *See Roberts v. Michaels*, 219 F.3d 775, 777–78 (8th Cir. 2000).

summons and complaint via certified mail instead.  However, as discussed next, because

the Court will grant Plaintiffs' Motions to Approve Alternative Service, this point is moot.

Thus, the Court will deny JBS's Individual Motion to Dismiss in both regards.

## III.    PLAINTIFFS' MOTIONS TO APPROVE ALTERNATIVE SERVICE

Plaintiffs ask the Court to approve alternative service with respect to JBS S.A.,

namely by serving its attorneys here in the United States.  Federal Rule of Civil Procedure

4(f)(3) allows the Court to order any means of service, so long as it is not prohibited by

international agreement.  Brazil is now a party to the Hague Convention, which is the only

applicable international agreement.   Under Article 10 of the Convention, service of

process by mail is allowed unless a country objects.  Brazil has objected, so service by mail

is not an option.

However, courts have concluded that service of process sent to an international

defendant via email is not prohibited by Article 10.  *See, e.g.*, *Patrick's Rest., LLC v. Singh*,

No. 18-764, 2018 WL 5307839, at *3 (D. Minn. Oct. 26, 2018), *aff'd*, No. 18-764, 2019 WL

121250 (D. Minn. Jan. 7, 2019); *see also Nagravision SA v. Gotech Int'l Tech. Ltd.*, 882 F.3d

494, 498 (5th Cir. 2018) (holding that serving an international defendant by email does not

even constitute service effected pursuant to the Hague Convention).

Additionally, emailing the international defendant's counsel in the United States

avoids the dictates of the Hague Convention altogether, as it does not involve

transmitting documents abroad.  *See Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1509,

(2017); *see also In GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 267 (S.D.N.Y. 2012) (collecting cases). This method also avoids the possible issue of sending an email to an address not actively monitored abroad. *See, e.g.*, *Ehrenfeld v. Salim a Bin Mahfouz*, No. 04-9641, 2005 WL 696769, at *3 (S.D.N.Y. Mar. 23, 2005). Thus, the Court elects this method. Accordingly, it will grant Plaintiffs' Motions and order service on JBS S.A.'s counsel in the United States via email.[32]

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

<u>ECF 19-1222</u>

1. Defendants' Joint Motion to Dismiss [Docket No. 326] is **DENIED**;

2. Cargill Defendants' Motion to Dismiss [Docket No. 330] is **DENIED**;

3. Defendant National Beef's Motion to Dismiss [Docket No. 333] is **DENIED**;

4. JBS Defendants' Motion to Dismiss [Docket No. 338] is **DENIED**;

5. Tyson Defendants' Motion to Dismiss [Docket No. 342] is **DENIED**;

6. Plaintiffs' Motion to Approve Alternative Service [Docket No. 356] is **GRANTED**. Plaintiffs are authorized to serve JBS S.A. by serving counsel for JBS S.A., Patrick E. Brookhouser, Jr. and William F. Hargens of McGrath North, with the summons, complaint, and this Memorandum Opinion and Order via email.

---

[32] The Court notes that because it will order service on attorneys who have already appeared on behalf of JBS S.A., no due process concerns are implicated. *See, e.g., Washington State Inv. Bd. v. Odebrecht S.A.*, No. 17-8118, 2018 WL 6253877, at *5 (S.D.N.Y. Sept. 21, 2018).

ECF 19-1129

1. Defendants' Joint Motion to Dismiss [Docket No. 258] is **DENIED in part and GRANTED in part**, as follows:

   a. Plaintiffs' Michigan consumer protection claim is **DISMISSED with prejudice**;

   b. Plaintiffs' Nebraska consumer protection claim is **DISMISSED with prejudice**;

   c. Plaintiffs' New Hampshire consumer protection claim is **DISMISSED with prejudice**;

   d. Plaintiffs' Oregon consumer protection claim is **DISMISSED with prejudice**;

   e. Plaintiffs' South Dakota consumer protection claim is **DISMISSED with prejudice**;

   f. Plaintiffs' Utah Unfair Practices Act claim is **DISMISSED with prejudice**;

   g. Plaintiffs' Florida unjust enrichment claim is **DISMISSED with prejudice**;

   h. Plaintiffs' New Hampshire unjust enrichment claim is **DISMISSED with prejudice**;

   i. With respect to all other claims and issues, the Motion is **DENIED;**

2. Cargill Defendants' Motion to Dismiss [Docket No. 263] is **DENIED**;

3. Defendant National Beef's Motion to Dismiss [Docket No. 266] is **DENIED**;

4. JBS Defendants' Motion to Dismiss [Docket No. 271] is **DENIED**;

5. Tyson Defendants' Motion to Dismiss [Docket No. 275] is **DENIED**;

6. Plaintiffs' Motion to Approve Alternative Service [Docket No. 289] is **GRANTED**. Plaintiffs are authorized to serve JBS S.A. by serving counsel for JBS S.A., Sami H. Rashid of Quinn Emanuel Urquhart & Sullivan LLP, with the summons, complaint, and this Memorandum Opinion and Order via email.

ECF 20-1319

1.  Defendants' Joint Motion to Dismiss [Docket No. 166] is **DENIED**;

2.  Cargill Defendants' Motion to Dismiss [Docket No. 170] is **DENIED**;

3.  Defendant National Beef's Motion to Dismiss [Docket No. 173] is **DENIED**;

4.  JBS Defendants' Motion to Dismiss [Docket No. 178] is **DENIED**;

5.  Tyson Defendants' Motion to Dismiss [Docket No. 182] is **DENIED**;

6.  Plaintiffs' Motion to Approve Alternative Service [Docket No. 194] is **GRANTED**. Plaintiffs are authorized to serve JBS S.A. by serving counsel for JBS S.A., Sami H. Rashid of Quinn Emanuel Urquhart & Sullivan LLP, with the summons, complaint, and this Memorandum Opinion and Order via email.

ECF 20-1414

1.  Defendants' Joint Motion to Dismiss [Docket No. 127] is **DENIED in part and GRANTED in part**, as follows:

    a.  Plaintiff's Missouri consumer protection claim is **DISMISSED with prejudice**;

    b.  Plaintiff's Nebraska consumer protection claim is **DISMISSED with prejudice**;

    c.  Plaintiff's New Hampshire consumer protection claim is **DISMISSED with prejudice**;

    d.  Plaintiff's New York consumer protection claim is **DISMISSED with prejudice**;

    e.  Plaintiff's North Dakota consumer protection claim is **DISMISSED with prejudice**;

    f.  Plaintiff's Rhode Island consumer protection claim is **DISMISSED with prejudice**;

    g.    Plaintiff's South Dakota consumer protection claim is **DISMISSED with prejudice**;

    h.    Plaintiff's Florida unjust enrichment claim is **DISMISSED with prejudice**;

    i.    Plaintiffs' New Hampshire unjust enrichment claim is **DISMISSED with prejudice**;

    j.    With respect to all other claims and issues, the Motion is **DENIED;**

2. Cargill Defendants' Motion to Dismiss [Docket No. 132] is **DENIED**;

3. Defendant National Beef's Motion to Dismiss [Docket No. 135] is **DENIED**;

4. JBS Defendants' Motion to Dismiss [Docket No. 140] is **DENIED**;

5. Tyson Defendants' Motion to Dismiss [Docket No. 144] is **DENIED**;

6. Plaintiff's Motion to Approve Alternative Service [Docket No. 155] is **GRANTED**. Plaintiff is authorized to serve JBS S.A. by serving counsel for JBS S.A., Sami H. Rashid of Quinn Emanuel Urquhart & Sullivan LLP, with the summons, complaint, and this Memorandum Opinion and Order via email.

**IT IS FURTHER ORDERED** that the parties show cause on or before ten (10) calendar days from the date of this Order why the Court should not allow the Order to be accessible to the general public and specify any portion of the Order warranting redaction.

DATED: September 14, 2021
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
Chief Judge
United States District Court